# EXHIBIT B



# 102.01 Minimum Numerical Standards—Domestic Companies—Equity Listings

**102.01A A company must meet one of the following distribution criteria:**

| | |
|---|---|
| Number of holders of 100 shares or more or of a unit of trading if less than 100 shares | 400 (A) |
| **and** | |
| Number of publicly held shares | 1,100,000 shares (B) |

**Affiliated companies:**

| | |
|---|---|
| Number of holders of 100 shares or more or of a unit of trading if less than 100 shares | 400 (A) |
| **and** | |
| Number of publicly held shares | 1,100,000 shares (B) |

**Companies listing following emergence from bankruptcy:**

| | |
|---|---|
| Number of holders of 100 shares or more or of a unit of trading if less than 100 shares | 400 (A) |
| **and** | |
| Number of publicly held shares | 1,100,000 shares (B) |

**Companies listing in connection with a transfer or quotation or upon exchange of a common equity security for a listed Equity Investment Tracking Stock:**

| | |
|---|---|
| Number of holders of 100 shares or more or of a unit of trading if less than 100 shares | 400 (A) |
| **or** | |
| Total stockholders | 2,200 (A) |

| | |
|---|---|
| Together with average monthly trading volume | 100,000 shares (for most recent 6 months) |

**or**

| | |
|---|---|
| Total stockholders | 500 (A) |
| Together with average monthly trading volume | 1,000,000 shares (for most recent 12 months) |

**and**

| | |
|---|---|
| Number of publicly held shares | 1,100,000 shares (B) |

(A) The number of beneficial holders of stock held in the name of Exchange member organizations will be considered in addition to holders of record. The Exchange will make any necessary check of such holdings.

(B) If the unit of trading is less than 100 shares, the requirements relating to number of publicly-held shares shall be reduced proportionately. Shares held by directors, officers, or their immediate families and other concentrated holdings of 10 percent or more are excluded in calculating the number of publicly-held shares.

**102.01B** A Company must demonstrate an aggregate market value of publicly-held shares of $40,000,000 for companies that list either at the time of their initial public offerings ("IPO") (C) or as a result of spin-offs or under the Affiliated Company standard or, for companies that list at the time of their Initial Firm Commitment Underwritten Public Offering (C), and $100,000,000 for other companies (D)(E). A company must have a closing price or, if listing in connection with an IPO or Initial Firm Commitment Underwritten Public Offering, an IPO or Initial Firm Commitment Underwritten Public Offering price per share of at least $4 at the time of initial listing. A company listing a common equity security upon completion of an exchange of such security for a listed Equity Investment Tracking Stock must demonstrate an aggregate market value of publicly-held shares of $100,000,000 and a closing price per share of $4.00 and may demonstrate that it has met these requirements by reference to the trading price and publicly-held shares outstanding (D) of the Equity Investment Tracking Stock which is the subject of the exchange, basing those calculations on the exchange ratio between the two securities.

(C) For companies that list at the time of their IPOs or Initial Firm Commitment Underwritten Public Offering, the Exchange will rely on a written commitment from the underwriter to represent the anticipated value of the company's offering in order to determine a company's compliance with this listing standard. Similarly, for spin-offs, the Exchange will rely on a representation from the parent company's investment banker (or other financial advisor) in order to estimate the market value based upon the as disclosed distribution ratio. For purpose of this paragraph, an IPO is an offering by an issuer which, immediately prior to its original listing, does not have a class of common stock registered under the Securities Exchange Act of 1934. An IPO includes a carve-out, which is defined for purposes of this paragraph as the initial offering of an equity security to the public by a publicly traded company for an underlying interest in its existing business (which may be subsidiary, division, or business unit). For purposes of this paragraph, a company is listing in connection with its Initial Firm Commitment Underwritten Public Offering if (i) such company has a class of common stock registered under the Exchange Act, (ii) such common stock has never been listed on a national securities exchange in the period since the commencement of its current registration under the Exchange Act, and (iii) such company is listing in connection with a firm commitment underwritten public offering that is its first firm commitment underwritten public offering of its common stock since the registration of its common stock under the Exchange Act.

(D) Shares held by directors, officers, or their immediate families and other concentrated holding of 10 percent or more are excluded in calculating the number of publicly-held shares. If a company either has a significant concentration of stock, or changing market forces have adversely impacted the public market value of a company which otherwise would qualify for listing on the Exchange, such that its public market value is no more than 10 percent below $40,000,000 or $100,000,000, as applicable, the Exchange will generally consider $40,000,000 or $100,000,000, as applicable, in stockholders' equity as an alternate measure of size and therefore as an alternate basis on which to list the company.

(E) Generally, the Exchange expects to list companies in connection with a firm commitment underwritten IPO, upon transfer from another market, or pursuant to a spin-off. However, the Exchange recognizes that some companies that have not previously had their common equity securities registered under the Exchange Act, but which have sold common equity securities in a private placement, may wish to list their common equity securities on the Exchange at the time of effectiveness of a registration statement filed solely for the purpose of allowing existing shareholders to sell their shares. Consequently, the Exchange will, on a case by case basis, exercise discretion to list companies whose stock is not previously registered under the Exchange Act, where such a company is listing

without a related underwritten offering upon effectiveness of a registration statement registering only the resale of shares sold by the company in earlier private placements. In exercising this discretion, the Exchange will determine that such company has met the $100,000,000 aggregate market value of publicly-held shares requirement based on a combination of both (i) an independent third-party valuation (a "Valuation") of the company and (ii) the most recent trading price for the company's common stock in a trading system for unregistered securities operated by a national securities exchange or a registered broker-dealer (a "Private Placement Market"). The Exchange will attribute a market value of publicly-held shares to the company equal to the lesser of (i) the value calculable based on the Valuation and (ii) the value calculable based on the most recent trading price in a Private Placement Market. Alternatively, in the absence of any recent trading in a Private Placement Market, the Exchange will determine that such company has met its market-value of publicly-held shares requirement if the company provides a Valuation evidencing a market value of publicly-held shares of at least $250,000,000.

Any Valuation used for this purpose must be provided by an entity that has significant experience and demonstrable competence in the provision of such valuations.* The Valuation must be of a recent date as of the time of the approval of the company for listing and the evaluator must have considered, among other factors, the annual financial statements required to be included in the registration statement, along with financial statements for any completed fiscal quarters subsequent to the end of the last year of audited financials included in the registration statement. The Exchange will consider any market factors or factors particular to the listing applicant that would cause concern that the value of the company had diminished since the date of the Valuation and will continue to monitor the company and the appropriateness of relying on the Valuation up to the time of listing. In particular, the Exchange will examine the trading price trends for the stock in the Private Placement Market over a period of several months prior to listing and will only rely on a Private Placement Market price if it is consistent with a sustained history over that several month period evidencing a market value in excess of the Exchange's market value requirement. The Exchange may withdraw its approval of the listing at any time prior to the listing date if it believes that the Valuation no longer accurately reflects the company's likely market value.

\* A valuation agent will not be deemed to be independent if:

• At the time it provides such valuation, the valuation agent or any affiliated person or persons beneficially own in the aggregate as of the date of the valuation, more than 5% of the class of securities to be listed, including any right to receive any such securities

exercisable within 60 days.

• The valuation agent or any affiliated entity has provided any investment banking services to the listing applicant within the 12 months preceding the date of the valuation. For purposes of this provision, "investment banking services" includes, without limitation, acting as an underwriter in an offering for the issuer; acting as a financial adviser in a merger or acquisition; providing venture capital, equity lines of credit, PIPEs (private investment, public equity transactions), or similar investments; serving as placement agent for the issuer; or acting as a member of a selling group in a securities underwriting.

• The valuation agent or any affiliated entity has been engaged to provide investment banking services to the listing applicant in connection with the proposed listing or any related financings or other related transactions.

Calculations under the Distribution Criteria

When considering a listing application from a company organized under the laws of Canada, Mexico or the United States ("North America"), the Exchange will include all North American holders and North American trading volume in applying the minimum stockholder and trading volume requirements detailed above. When listing a company from outside North America, the Exchange may, in its discretion, include holders and trading volume in the company's home country or primary trading market outside the United States in applying the applicable listing standards, provided that such market is a regulated stock exchange. In exercising this discretion, the Exchange will consider all relevant factors including: (i) whether the information is derived from a reliable source, preferably either a government-regulated securities market or a transfer agent that is subject to governmental regulation; (ii) whether there exist efficient mechanisms for the transfer of securities between the company's non-U.S. trading market and the United States; and (iii) the number of shareholders and the extent of trading in the company's securities in the United States prior to the listing. For securities that trade in the format of American Depositary Receipts ("ADR's"), volume in the ordinary shares will be adjusted to be on an ADR-equivalent basis.

**Amended:** August 13, 2009 (NYSE-2009-80); January 21, 2010 (NYSE-2010-02); October 18, 2012 (NYSE-2012-52); February 2, 2018 (NYSE-2017-30); November 9, 2018 (NYSE-2018-55).

**102.01C** A company must meet one of the following financial standards.

    (I)    **Earnings Test**

(1)    Pre-tax earnings from continuing operations and after minority interest, amortization and equity in the earnings or losses of investees, adjusted for items specified in (3)(a) through (3)(j) below must total (x) at least $10,000,000 in the aggregate for the last three fiscal years together with a minimum of $2,000,000 in each of the two most recent fiscal years, and positive amounts in all three years or (y) at least $12,000,000 in the aggregate for the last three fiscal years together with a minimum of $5,000,000 in the most recent fiscal year and $2,000,000 in the next most recent fiscal year.

A company that (i) qualifies as an emerging growth company as defined in Section 2(a)(19) of the Securities Act and Section 3(a)(80) of the Exchange Act and (ii) avails itself of the provisions of the Securities Act and the Exchange Act permitting emerging growth companies to report only two years of audited financial statements, can qualify under the Earnings Test by meeting the following requirements: Pre-tax earnings from continuing operations and after minority interest, amortization and equity in the earnings or losses of investees, adjusted for items specified in (3)(a) through (3)(j) below must total at least $10,000,000 in the aggregate for the last two fiscal years together with a minimum of $2,000,000 in both years.

(2)    Financial statements compliant with applicable SEC rules covering a period of nine to twelve months shall satisfy the requirement for the most recent fiscal year in those cases where the Company has changed its fiscal year or where there has been a significant change in the Company's operations or capital structure. Financial statements compliant with applicable SEC rules covering a period of six months shall satisfy the requirement for the most recent fiscal year in those cases where the Company has changed its fiscal year or where there has been a significant change in the Company's operations or capital structure, provided that the Company must include financial data as derived from financial statements that have been subject to an SAS 100 review in a public disclosure (either an SEC filing or a press release) prior to the date of listing that confirms that the Company continues to satisfy the applicable standard based on at least nine completed months of the current fiscal year. When qualifying companies for listing based on interim financial information from the current fiscal year, the Exchange must conclude that the Company can reasonably be expected to qualify under the regular earnings standard upon completion of its then current fiscal year. If the Company does not qualify under the regular earnings standard at the end of such current fiscal year or qualify at such time for original listing under another listing standard, the Exchange will promptly initiate suspension and delisting procedures with respect to the Company; and

(3)    Adjustments (F)(G) that must be included in the calculation of the amounts required in paragraph (1) are as follows:

     (a)    Application of Use of Proceeds - If a company is in registration with the SEC and is in the process of an equity offering, adjustments should be made to reflect the net proceeds of that offering, and the specified intended application(s) of such proceeds to:

(i) Pay off existing debt or other financial instruments: The adjustment will include elimination of the actual historical interest expense on debt or other financial instruments classified as liabilities under generally accepted accounting principles being retired with offering proceeds of all relevant periods or by conversion into common stock at the time of an initial public offering occurring in conjunction with the company's listing. If the event giving rise to the adjustment occurred during a time-period such that *pro forma* amounts are not set forth in the SEC registration statement (typically, the *pro forma* effect of repayment of debt will be provided in the current registration statement only with respect to the last fiscal year plus any interim period in accordance with SEC rules), the company must prepare the relevant adjusted financial data to reflect the adjustment to its historical financial data, and its outside audit firm must provide a report of having applied agreed-upon procedures with respect to such adjustments. Such report must be prepared in accordance with the standards established by the American Institute of Certified Public Accountants.

(ii) Fund an acquisition:

   (1) The adjustments will include those applicable with respect to acquisition(s) to be funded with the proceeds. Adjustments will be made that are disclosed as such in accordance with Rule 3-05 "Financial Statements of Business Acquired or to be Acquired" and Article 11 of Regulation S-X. Adjustments will be made for all the relevant periods for those acquisitions for which historical financial information of the acquiree is required to be disclosed in the SEC registration statement; and

(2)    Adjustments applicable to any period for which *pro forma* numbers are not set forth in the registration statement shall be accompanied by the relevant adjusted financial data to combine the historical results of the acquiree (or relevant portion thereof) and acquiror, as disclosed in the company's SEC filing. Under SEC rules, the number of periods disclosed depends upon the significance level of the acquiree to the acquiror. The adjustments will include those necessary to reflect (a) the allocation of the purchase price, including adjusting assets and liabilities of the acquiree to fair value recognizing any intangibles (and associated amortization and depreciation), and (b) the effects of additional financing to complete the acquisition. The company must prepare the relevant adjusted financial data to reflect the adjustment to its historical financial data, and its outside audit firm must provide a report of having applied agreed-upon procedures with respect to such adjustments. Such report must be prepared in accordance with the standards established by the American Institute of Certified Public Accountants;

(b)    Acquisitions and Dispositions:

In instances other than acquisitions (and related dispositions of part of the acquiree) funded with the use of proceeds, adjustments will be made for those acquisitions and dispositions that are disclosed as such in a company's financial statements in accordance with Rule 3-05 "Financial Statements of Business Acquired or to be Acquired" and Article 11 of Regulation S-X. If the disclosure does not specify pre-tax earnings from continuing operations, minority interest, and equity in the earnings or losses of investees, then such data must be prepared by the company's outside audit firm for the Exchange's consideration. In this regard, the audit firm would have to issue an independent accountant's report on applying agreed-upon procedures in accordance with the standards established by the American Institute of Certified Public Accountants;

(c)    Exclusion of Merger or Acquisition Related Costs Recorded under Pooling of Interests;

(d)   Exclusion of nonrecurring Charges or Income Specifically Disclosed in the Applicant's SEC Filing for the Following –

    (i)     In connection with exiting an activity for the following-

       (1)    Costs of severance and termination benefits

       (2)    Costs and associated revenues and expenses associated with the elimination and reduction of product lines

       (3)    Costs to consolidate or re-locate plant and office facilities

    (ii)    Loss or gain on disposal of long-lived assets

    (iii)    Environmental clean-up costs

    (iv)    Litigation settlements;

    (v)    Loss or gain from extinguishment of debt prior to its maturity;

(e)   Exclusion of Impairment Charges on Long-lived Assets (goodwill, property, plant, and equipment, and other long-lived assets);

(f)   Exclusion of Gains or Losses Associated with Sales of a Subsidiary's or Investee's Stock;

(g)   Exclusion of In-Process Purchased Research and Development Charges;

(h) Regulation S-X Article 11 Adjustments

Adjustments will include those contained in a company's *pro forma* financial statements provided in a current filing with the SEC pursuant to SEC rules and regulations governing Article 11 "Pro forma information of Regulation S-X Part 210-Form and Content of and Requirements for Financial Statements;"

(i) Exclusion of the Cumulative Effect of Adoption of New Accounting Standards (APB Opinion No.20)

(j) Exclusion of the income statement effects for all periods of changes in fair value of financial instruments of the company classified as liabilities, provided such financial instrument is either being redeemed with the proceeds of an offering occurring in conjunction with the company's listing or converted into or exercised for common equity securities of the company at the time of such listing.

**OR**

**II) Global Market Capitalization Test\***

At least $200,000,000 in global market capitalization.\*\*

\* Acquisition companies (as such term is defined in Section 102.06) are not permitted to list under the Global Market Capitalization Test. Such companies will only be listed if they meet the requirements of Section 102.06.

\*\* In considering the listing under the Global Market Capitalization Test of current publicly-traded companies (including the listing a common equity security upon completion of an exchange of such security for a listed Equity Investment Tracking Stock), the Exchange will require such companies to meet the minimum $200,000,000 global market capitalization requirement and maintain a closing price of at least $4 per share in each case for a period of at least 90 consecutive trading days prior to receipt of clearance to make application to list on the Exchange and will also consider whether the company's business prospects and operating results indicate that the company's market capitalization value is likely to be sustained or increase over time.

In the case of companies listing in connection with an IPO or an Initial Firm Commitment Underwritten Public Offering, the company's underwriter (or, in the case of a spin-off, the parent company's investment banker or other financial advisor) must provide a written representation that demonstrates the company's ability to meet the $200,000,000 global market capitalization requirement based upon the completion of the offering (or distribution).

A company listing a common equity security upon completion of an exchange of such security for a listed Equity Investment Tracking Stock may demonstrate that it has met the Global Market Capitalization Test by reference to the trading price and shares outstanding of the Equity Investment Tracking Stock which is the subject of the exchange, basing those calculations on the exchange ratio between the two securities.

(F) Only adjustments arising from events specifically so indicated in the company's SEC filing(s) as to both categorization and amount can and must be made. Any such adjustment applies only in the year in which the event occurred except with regard to the use of proceeds or acquisitions and dispositions. Any company for which the Exchange relies on adjustments in granting clearance must include all relevant adjusted financial data in its listing application, and disclose the use of adjustments by including a statement in a press release (i) that additional information is available upon which the NYSE relied to list the company and is included in the listing application and (ii) that such information is available to the public upon request. This press release must be issued concurrently with any listing announcement issued by the company or, if a listing announcement is not issued, within 30 days from the date the company lists on the NYSE. The form of listing application and information regarding supporting documents required in connection with adjustments to historical financial data are available on the Exchange's website or from the Exchange upon request.

(G) Interested parties should apply the list of adjustments in accordance with any relevant accounting literature, such as that published by the Financial Accounting Standards Board ("FASB"), the Accounting Principles Board ("APB"), the Emerging Issues Task Force ("EITF"), the American Institute of Certified Public Accountants ("AICPA"), and the SEC. Any literature is intended to guide issuers and investors regarding the affected adjustment listed. If successor interpretations (or guidelines) are published with respect to any particular adjustment, the most recent relevant interpretations (or guidelines) should be consulted.

**********************

Aside from the minimum numerical standards listed above, other factors are taken into consideration. The company must be a going concern or be the successor to a going concern. Although the amount of assets and earnings and the aggregate market value are considerations, greater emphasis is placed on such questions as the degree of national interest in the company, the character of the market for its products, its relative stability and position in its industry, and whether or not it is engaged in a expanding industry with prospects for maintaining its position.

Income deposit securities to be traded as a unit will as a general matter be listed if each of the component parts of the unit meets the applicable requirements for listing.

The Exchange is also concerned with such matters as voting rights of shareholder, voting arrangements and pyramiding of control, and related party transactions.

When there is an indication of a lack of public interest in the securities of a company evidenced, for example, by low trading volume on another exchange, lack of dealer interest in the over-the-counter market, unusual geographic concentration of holders of shares, slow growth in the number of shareholders, low rate of transfers, etc., higher distribution standards may apply. In this connection, particular attention will be directed to the number of holders of from 100 to 1,000 shares and the total number of shares in this category.

> **Amended:** November 2, 2009 (NYSE-2009-109); January 21, 2010 (NYSE-2010-02); May 15, 2012 (NYSE-2012-12); August 15, 2013 (NYSE-2013-33); September 30, 2014 (NYSE-2014-52); November 9, 2018 (NYSE-2018-55).

### 102.01D Policy on restated financial statements due to change from an unacceptable to acceptable accounting principle or correction of errors.

If at any time following the Exchange's initial determination that a company meets the Exchange's original listing criteria, the company restates its financial statements due to a change from an unacceptable to an acceptable accounting principle or a correction of errors, and the restatement encompasses financial statements included in its SEC filings at the time of application for listing on the Exchange, the Exchange will reevaluate the company's listing status. In this regard, the Exchange will determine whether, at the time of the original clearance, the company would have qualified under the Exchange's original listing standards utilizing the restated financial data. If not, unless the company meets original listing standards at the time of the restatement, the company will be notified that it does not meet the original listing standards and, if its securities have been listed, such securities will be suspended from trading and the company will immediately be subject to the delisting procedures in Para. 804.

**102.01E Policy on reliance on the operating history of acquired companies.**

In the event that a company has less than three years of operating history and is acquiring (either completed or committed) an entity with the requisite operating history, the Exchange will consider the combined operating history of the aquiror and acquiree for the preceding period(s) in conducting its financial eligibility review. If it is necessary to combine historical financial statements if the acquiree and acquiror in order to enable the Exchange to conduct its analysis (e.g., overlapping fiscal year), then the combined data would need to be accompanied by an agreed upon procedures letter provided by the company's outside audit firm at the request of the company. The auditor's letter would state the procedures performed with respect to any necessary combination of historical data.

**102.01F Policy on Listing Reverse Merger Companies**

For purposes of this Section 102.01F, a "Reverse Merger" means any transaction whereby an operating company becomes an Exchange Act reporting company by combining directly or indirectly with a shell company which is an Exchange Act reporting company, whether through a reverse merger, exchange offer, or otherwise. However, a Reverse Merger does not include the acquisition of an operating company by a listed company which qualified for initial listing as an acquisition company under Section 102.06. In determining whether a company is a shell company, the Exchange will consider, among other factors: whether the Company is considered a "shell company" as defined in Rule 12b-2 under the Exchange Act; what percentage of the company's assets are active versus passive; whether the company generates revenues, and if so, whether the revenues are passively or actively generated; whether the company's expenses are reasonably related to the revenues being generated; how many employees work in the company's revenue-generating business operations; how long the company has been without material business operations; and whether the company has publicly announced a plan to begin operating activities or generate revenues, including through a near-term acquisition or transaction.

In order to qualify for initial listing, a company that is formed by a Reverse Merger (a "Reverse Merger Company") must comply with one of the initial listing standards set forth in Section 102.01C and the applicable requirements of Sections 102.01A and 102.01B. In addition to satisfying all of the Exchange's other initial listing requirements, a Reverse Merger Company shall be eligible to submit an application for initial listing only if the combined entity has, immediately preceding the filing of the initial listing application:

(1)   traded for at least one year in the U.S. over-the-counter market, on another national securities exchange, or on a regulated foreign exchange following the consummation of the Reverse Merger and (i) in the case of a domestic issuer, has filed with the Commission a Form 8-K containing all of the information required by Item 2.01(f) of Form 8-K, including all required audited financial statements, or (ii) in the case of a foreign private issuer, has filed all of the information described in (i) above on Form 20-F;

(2)   maintained a closing stock price of $4 or higher for a sustained period of time, but in no event for less than 30 of the most recent 60 trading days prior to the filing of the initial listing application, and

(3)   filed with the Commission all required reports since the consummation of the Reverse Merger, including the filing of at least one annual report containing all required audited financial statements for a full fiscal year commencing on a date after the date of filing with the Commission of the filing described in (1) above.

In addition, in order to qualify for listing, a Reverse Merger Company must have timely filed all required reports for the most recent 12-month period prior to the listing date, including at least one annual report containing all required audited financial statements.

In addition, a Reverse Merger Company will be required to maintain a closing stock price of $4 or higher for a sustained period of time, but in no event for less than 30 of the most recent 60 trading days prior to the date of the Reverse Merger Company's listing.

The Exchange may in its discretion impose more stringent requirements than those set forth above if the Exchange believes it is warranted in the case of a particular Reverse Merger Company based on, among other things, an inactive trading market in the Reverse Merger Company's securities, the existence of a low number of publicly held shares that are not subject to transfer restrictions, if the Reverse Merger Company has not had a Securities Act registration statement or other filing subjected to a comprehensive review by the Commission, or if the Reverse Merger Company has disclosed that it has material weaknesses in its internal controls which have been identified by management and/or the Reverse Merger Company's independent auditor and has not yet implemented an appropriate corrective action plan.

A Reverse Merger Company will not be subject to the requirements of this Section 102.01F if it is listing in connection with an Initial Firm Commitment Underwritten Public Offering (as defined in Section 102.01B) where the proceeds to the Reverse Merger Company will be

sufficient on a stand-alone basis to meet the aggregate market value of publicly-held shares requirement for Initial Firm Commitment Underwritten Public Offerings as set forth in Section 102.01B and the offering is occurring subsequent to or concurrently with the Reverse Merger. In addition, a Reverse Merger Company will not be subject to the requirement of this Section 102.01F that it must maintain a closing stock price of $4 or higher for at least 30 of the most recent 60 days prior to each of the filing of the initial listing application and the date of the Reverse Merger Company's listing, if it has satisfied the one-year trading requirement contained in paragraph (1) above and has filed at least four annual reports with the Commission which each contain all required audited financial statements for a full fiscal year commencing after filing the information described in paragraph (1) above. However, such companies will be required to (i) comply with the stock price requirement of Section 102.01B at the time of each of the filing of the initial listing application and the date of the Reverse Merger Company's listing and (ii) not be delinquent in their filing obligations with the Commission. In either of the cases described in this paragraph, the Reverse Merger Company will only need to meet the requirements of one of the financial initial listing standards in Section 102.01C, in addition to all other applicable non-financial listing standard requirements, including, without limitation, the requirements of Sections 102.01A, 102.01B and 303A.

**Adopted:** November 8, 2011 (NYSE-2011-38). **Amended;** September 24, 2013 (NYSE-2013-62).