GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
RAENA FERRER CALUBAQUIB, SBN 328794
1881 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

MATTHEW S. KAHN, SBN 261679
MICHAEL J. KAHN, SBN 303289
555 Mission St. Suite 3000
San Francisco, California 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER DENNEE, | Case No. 3:19-cv-05857-SI |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| SLACK TECHNOLOGIES, INC., STEWART BUTTERFIELD, ALLEN SHIM, BRANDON ZELL, ANDREW BRACCIA, EDITH COOPER, SARAH FRIAR, JOHN O'FARRELL, CHAMATH PALIHAPITIYA, GRAHAM SMITH, ACCEL GROWTH FUND IV ASSOCIATES L.L.C., ACCEL GROWTH FUND INVESTORS 2016 L.L.C., ACCEL LEADERS FUND ASSOCIATES L.L.C., ACCEL LEADERS FUND INVESTORS 2016 L.L.C., ACCEL X ASSOCIATES L.L.C., ACCEL INVESTORS 2009 L.L.C., ACCEL XI ASSOCIATES L.L.C., ACCEL INVESTORS 2013 L.L.C., ACCEL GROWTH FUND III ASSOCIATES L.L.C., AH EQUITY PARTNERS I L.L.C., A16Z SEED-III LLC, SOCIAL+ CAPITAL PARTNERSHIP GP II, L.P., SOCIAL+CAPITAL PARTNERSHIP GP II LTD., SOCIAL+CAPITAL PARTNERSHIP GP III LP, SOCIAL+ CAPITAL PARTNERSHIP GP III, LTD., SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP L.P., AND SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP LTD., | **<u>Hearing</u>** Date: March 6, 2020 Time: 10:00 a.m. Place: Courtroom 1, 17th Floor Judge: Hon. Susan Illston Action Filed: September 19, 2019 |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

Page

3

I.    INTRODUCTION ........................................................................................... 2

4

II.   FACTUAL BACKGROUND .......................................................................... 4

5

III.  PROCEDURAL BACKGROUND ................................................................. 7

6

IV.   ARGUMENT .................................................................................................. 7

7

A.   Plaintiff's Amended Complaint Is Fatally, Structurally Flawed................................... 7

8

1.   This Action Is Doomed Because Plaintiff Cannot Possibly Plead
     Standing. ............................................................................................... 7

9

10

2.   Defendants Are Not Statutory Sellers Under Section 12(a)(2). ..................... 12

11

3.   Plaintiff Cannot Establish Damages Under Section 11. ............................. 14

12

B.   Plaintiff Fails To Plead That Any Statement Was False Or Misleading.................... 15

13

1.   Outages And Slack's SLA. .......................................................................... 16

14

2.   Scaling. ........................................................................................................ 19

15

3.   Competition From Microsoft. ...................................................................... 20

16

4.   "Key Benefits" Of Slack. ............................................................................ 21

17

5.   Go-To-Market Strategy. .............................................................................. 21

18

C.   The Section 15 Claim Must Be Dismissed. .............................................................. 23

19

V.    CONCLUSION ............................................................................................. 24

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................................7

*In re Bare Escentuals, Inc. Sec. Litig.,*
   745 F. Supp. 2d 1052 (N.D. Cal. 2010) ..................................................12, 13, 14

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ....................................................................................................7

*Brody v. Transitional Hospitals Corp.,*
   280 F.3d 997 (9th Cir. 2002) ............................................................................15, 17

*In re Century Aluminum Co. Sec. Litig.,*
   2011 WL 830174 (N.D. Cal. Mar. 3, 2011), *aff'd,* 729 F.3d 1104 (9th Cir. 2013) ........................9

*In re Century Aluminum Co. Sec. Litig.,*
   729 F.3d 1104 (9th Cir. 2013) ............................................................................2, 7, 8, 9

*In re Century Aluminum Co. Sec. Litig.,*
   749 F. Supp. 2d 964 (N.D. Cal. 2010) ....................................................................8, 11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
   856 F.3d 605 (9th Cir. 2017) ....................................................................................24

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
   752 F.3d 173 (2d Cir. 2014) ....................................................................................21

*In re Crazy Eddie Sec. Litig.,*
   792 F. Supp. 197 (E.D.N.Y. 1992) ..........................................................................9

*In re CytRx Corp. Sec. Litig.,*
   2015 WL 5031232 (C.D. Cal. July 13, 2015) ....................................................11, 13

*In re Daou Sys., Inc.,*
   411 F.3d 1006 (9th Cir. 2005) ..................................................................................12

*In re DSP Grp., Inc. Sec. Litig.,*
   1997 WL 678151 (N.D. Cal. Mar. 5, 1997) ............................................................17

*In re Facebook, Inc. Sec. Litig.,*
   2019 WL 4674347 (N.D. Cal. Sept. 25, 2019) ......................................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
   352 F. Supp. 2d 429 (S.D.N.Y. 2005) ....................................................................24

Gibson, Dunn &
Crutcher LLP

*Fouad v. Isilon Sys., Inc.*,
   2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)............................................................24

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ................................................................18

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)........................................................................................7

*Golub v. Gigamon Inc.*,
   372 F. Supp. 3d 1033 (N.D. Cal. 2019) .........................................................................24

*Greenberg v. Sunrun Inc.*,
   233 F. Supp. 3d 764 (N.D. Cal. 2017) ....................................................................17, 23

*In re Gupta Corp. Sec. Litig.*,
   900 F. Supp. 1217 (N.D. Cal. 1994) ..............................................................................24

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995)........................................................................................................11

*In re Harmonic, Inc., Sec. Litig.*,
   2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ..........................................................12, 13

*Hedden v. Marinelli*,
   796 F. Supp. 432 (N.D. Cal. 1992) ................................................................................8

*Hertzberg v. Dignity Partners, Inc.*,
   191 F.3d 1076 (9th Cir. 1999).........................................................................................10

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) ..........................................................................21

*In re Infonet Servs. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1080 (C.D. Cal. 2003) .....................................................................13, 22

*In re Initial Pub. Offering Sec. Litig.*,
   227 F.R.D. 65 (S.D.N.Y. 2004), *vacated on other grounds by* 471 F.3d 24 (2d Cir.
   2006) ................................................................................................................................9

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................................14

*J & R Mktg., SEP v. Gen. Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008)..........................................................................................19

*Jui-Yang Hong v. Extreme Networks, Inc.*,
   2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ...........................................................21, 22

Gibson, Dunn &
Crutcher LLP

*Lilley v. Charren*,
   936 F. Supp. 708 (N.D. Cal. 1996) ..................................................................................9

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   2011 WL 4389689 (C.D. Cal. May 5, 2011) ..............................................................12, 13

*Maldonado v. Dominguez*,
   137 F.3d 1 (1st Cir. 1998) ..........................................................................................11

*Mallen v. Alphatec Holdings, Inc.*,
   2013 WL 1294640 (S.D. Cal. Mar. 28, 2013) ..............................................................19

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................................23

*In re Mellanox Techs. Ltd. Sec. Litig.*,
   2014 WL 12650991 (N.D. Cal. Mar. 31, 2014)..........................................................22

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)...................................................................................15, 21

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
   2019 WL 3219451 (S.D.N.Y. July 17, 2019) ..............................................................19

*O'Sullivan v. Trident Microsystems*,
   1994 WL 124453 (N.D. Cal. Jan. 31, 1994) ................................................................24

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996)........................................................................................16, 20

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014)......................................................................................21

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996)......................................................................................23

*Pinter v. Dahl*,
   486 U.S. 622 (1988)..............................................................................................12, 13

*Rabkin v. Lion Biotechnologies, Inc.*,
   2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ...............................................................10

*Rubke v. Capitol Bancorp Ltd*,
   551 F.3d 1156 (9th Cir. 2009)........................................................................15, 18, 20

*Sherman v. Network Commerce Inc.*,
   346 F. App'x 211 (9th Cir. 2009) ................................................................................22

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ......................................................................21

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ...............................................................24

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998)...............................................................................16, 19

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................................................11

*In re Valence Tech. Sec. Litig.*,
   1996 WL 37788 (N.D. Cal. Jan. 23, 1996) ..................................................................11

*In re Velti PLC Sec. Litig.*,
   2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)................................................................15

*In Re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)..............................................................16

*Welgus v. TriNet Grp., Inc.*,
   2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ..........................................................11, 13

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
   712 F. Supp. 2d 958 (N.D. Cal. 2010)  .......................................................................10

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)........................................................................................22

*Y-GAR Capital LLC v. Credit Suisse Grp. AG*,
   2020 WL 71163 (S.D.N.Y. Jan. 2, 2020)....................................................................19

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014)..................................................................................10, 11

*In re ZZZZ Best Sec. Litig.*,
   864 F. Supp. 960 (C.D. Cal. 1994)..............................................................................23

**Statutes**

15 U.S.C. § 77k(a) ..............................................................................................................15

15 U.S.C. § 77k(e) ..............................................................................................................14

15 U.S.C. § 77k(g) ..............................................................................................................14

15 U.S.C. § 77l(a)(2)......................................................................................................3, 10

**Regulations**

17 C.F.R. § 229.105 ............................................................................................................19

17 C.F.R. § 230.144 ..............................................................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Other Authorities

NYSE, "Ways to List," *available at* https://www.nyse.com/network/article/ways-to-list ..................................................................................................................................4

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 6, 2020, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the U.S. District Court for the Northern District of California, San Francisco Courthouse, Courtroom 1, 17th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Slack Technologies, Inc. ("Slack" or the "Company"); Stewart Butterfield, Allen Shim, Brandon Zell, Andrew Braccia, Edith Cooper, Sarah Friar, John O'Farrell, Chamath Palihapitiya, Graham Smith (the "Individual Defendants"); and Accel Growth Fund IV Associates L.L.C., Accel Growth Fund Investors 2016 L.L.C., Accel Leaders Fund Associates L.L.C., Accel Leaders Fund Investors 2016 L.L.C., Accel X Associates L.L.C., Accel Investors 2009 L.L.C., Accel XI Associates L.L.C., Accel Investors 2013 L.L.C., Accel Growth Fund III Associates L.L.C., AH Equity Partners I L.L.C., A16Z Seed-III LLC, Social+Capital Partnership GP II L.P., Social+Capital Partnership GP II Ltd., Social+Capital Partnership GP III L.P., Social+Capital Partnership GP III Ltd., Social+Capital Partnership Opportunities Fund GP L.P., and Social+Capital Partnership Opportunities Fund GP Ltd. (the "VC Defendants," and, together with Slack and the Individual Defendants, "Defendants"), through their undersigned counsel, will, and hereby do, move to dismiss the Amended Class Action Complaint for Violations of Federal Securities Laws (the "Amended Complaint" or "AC") (ECF No. 42) pursuant to Federal Rule of Civil Procedure 12(b)(6).  This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the Declaration of Michael J. Kahn ("Kahn Decl.") filed concurrently herewith, the accompanying Request for Judicial Notice, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing on the Motion.

Defendants seek dismissal of the Amended Complaint with prejudice for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiff's claim under Section 11 of the Securities Act of 1933 (the "Securities Act") should be dismissed for failure to plead that (1) he has standing to bring this action

by adequately pleading that the Slack shares he purchased are traceable to Slack's registration statement, (2) any challenged statement was false or misleading, or (3) he has suffered any damages.

2.      Whether Plaintiff's claim under Section 12(a)(2) of the Securities Act should be dismissed for failure to plead that (1) he has standing by alleging that he purchased in an initial public offering pursuant to Slack's prospectus, (2) any challenged statement was false or misleading, or (3) any Defendant is a statutory seller.

3.      Whether Plaintiff's claim under Section 15 of the Securities Act should be dismissed for failure to plead (1) a primary violation of the Securities Act, and (2) control over Slack.

## I.      INTRODUCTION

Plaintiff Fiyyaz Pirani's Amended Complaint makes no attempt to cure the fatal pleading defect identified in Defendants' prior motion to dismiss: that Pirani cannot plead standing because he is incapable of alleging that his shares are traceable to Slack's registration statement.  In that motion to dismiss, Slack (and the other Defendants) demonstrated that the unique "direct listing" process by which Slack became a public company makes it impossible for Pirani (or any other shareholder plaintiff) to establish standing under Section 11 because the majority of shares made available for purchase when Slack went public were *not registered under Slack's registration statement*, and thus are not traceable to it.  ECF No. 14 at 7–9.  The Ninth Circuit has held that when the market contains shares beyond those issued under a challenged registration statement, it is "often impossible" to meet the tracing requirement of Section 11.  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013).  It is therefore not enough for Pirani to plead the conclusory allegation that his shares are traceable to the registration statement; he must allege a factual basis to plausibly infer that he owns shares issued under that registration statement instead of from another source.  *Id.* at 1107–08. In other words, to proceed under Section 11, Pirani must allege facts showing that he bought *registered* shares, not unregistered shares.

Pirani cannot do that, as his Amended Complaint confirms.  Despite having the benefit of Slack's argument in front of him for the last two months, Pirani's Amended Complaint contains nothing more than the conclusory assertion that he "purchased or otherwise acquired Slack common stock pursuant and/or traceable to the Offering Materials."  AC ¶ 17.  He simply has no response to

1    Slack's standing argument, and clearly cannot cure this pleading deficiency through amendment.

2    Accordingly, Pirani's Section 11 claim should be dismissed *with prejudice*.

3         The same structural defect dooms his new Section 12(a)(2) claim.  A plaintiff has standing

4    under Section 12(a)(2) only if it purchased securities by "means of a prospectus."  15 U.S.C.

5    § 77l(a)(2).  Because (1) Slack's prospectus was issued only in connection with registered shares, and

6    (2) Pirani has not pleaded (and cannot plead) that he purchased registered shares as opposed to

7    unregistered ones, he cannot allege that he was sold registered shares "by means of a prospectus."

8    Pirani's failure to plead standing—along with several other structural flaws, not the least of which are

9    his inability to plead that he purchased shares directly from some Defendant (as required under

10   Section 12(a)(2)) and his failure to plead adequately that Slack's direct listing amounts to a public

11   offering (as required to recover damages under Section 11)—requires dismissal of this action.

12        While the Court should grant Defendants' motion to dismiss due to these pleading failures

13   alone, Plaintiff's claims also fail on the substance of his allegations.  Just as in the initial complaint,

14   Plaintiff does not plead that anything in Slack's registration statement or prospectus is false or

15   misleading.  Indeed, the Complaint itself demonstrates that Slack prominently and purposefully

16   *disclosed* the supposedly "concealed" or "omitted" facts.  Plaintiff alleges Slack failed to disclose

17   that: (a) it experienced service outages; (b) it had paid—and could in the future pay—credits to

18   customers upon the occurrence of such outages; (c) it faced a risk of being unable to scale its

19   platform as its user base increased; and (d) it faced competition from Microsoft.  But Slack was

20   entirely upfront about these facts.  Because Slack was completely transparent about the issues alleged

21   by Plaintiff, his Sections 11 and 12(a)(2) claims fail.

22        In short: Pirani lacks standing and cannot establish it; he fails to plead that he purchased

23   shares directly from Defendants; he has no damages under Section 11; and he has failed to plead a

24   single false or misleading statement.  Because Pirani's Amended Complaint proves that he cannot

25   cure his deficient standing allegations or the other structural defects, further amendment would be

26   futile.  The Court should therefore dismiss this case with prejudice.

27

28

## II.    FACTUAL BACKGROUND[1]

*Slack's direct listing.*   On June 20, 2019, Slack became a public company when its shares of Class A common stock were listed on the New York Stock Exchange ("NYSE").  AC ¶¶ 1, 4.  However, Slack did not become a public company through a traditional initial public offering ("IPO").  *Id.* ¶ 66; Kahn Decl. Ex. A at 46; *see* Request for Judicial Notice.  Instead, it became a public company by means of a "direct listing" on the NYSE, *see id.*, which is a process that "allows companies to list their shares directly and begin trading publicly on the NYSE, without issuing new shares via a traditional initial public offering."  *See* NYSE, "Ways to List," *available at* https://www.nyse.com/network/article/ways-to-list.  A direct listing "is an option for private companies that do not have an immediate need to raise capital, but wish to provide liquidity for their existing shareholders while creating a publicly traded company."  *Id.*

Slack's direct listing differed from a traditional IPO in several legally significant ways.  First, Slack neither sold any of its own shares nor offered them to the public at any price.  Instead, it registered for the resale of up to 118,429,640 shares of Class A common stock by existing registered stockholders.  Kahn Decl. Ex. A at ECF p. 4; *see also* AC ¶ 4.

Second, because Slack did not sell any of its own shares, Slack did not receive any proceeds from the sale of (1) registered shares sold by stockholders pursuant to the Registration Statement[2] or (2) unregistered shares sold by stockholders following the direct listing (which shares were *not* sold pursuant to the Registration Statement).  *Id.* ¶ 69; Kahn Decl. Ex. A at 58.  Stockholders holding unregistered shares were often already able to sell those shares even without the Registration Statement.  *See* Kahn Decl. Ex. A at 164 (describing sales of shares exempt from the registration requirements of the Securities Act pursuant to SEC Rule 144).

Third, there was no guarantee that *any* Slack shares would be available for purchase when Slack went public because existing stockholders holding registered or unregistered shares, *not* Slack, decided whether or not to sell their shares.  *See* AC ¶ 69; Kahn Decl. Ex. A at 46 ("There is not a

---

[1]  By summarizing Plaintiff's allegations here, Defendants do not concede the allegations are true.

[2]  The "Registration Statement" refers to the final amendment to Slack's registration statement filed with the SEC on May 31, 2019, which was declared effective on June 7, 2019.  AC ¶ 74.

Gibson, Dunn &
Crutcher LLP

fixed or determined number of shares of Class A common stock available for sale" and "there can be no assurance that any Registered Stockholders or other existing stockholders will sell any of their shares"), 58, 171.

Fourth, Slack's stockholders did not enter into contractual lock-up agreements as is customary in IPOs, so "any of [Slack's] stockholders . . . [could] sell any or all of their shares . . . immediately upon listing." Kahn Decl. Ex. A at 46. Thus, "[f]ollowing the listing of [Slack's] Class A common stock on the NYSE, shares of [Slack's] Class A common stock [could] be sold either by the Registered Stockholders pursuant to [Slack's] prospectus *or by [Slack's] other existing stockholders* in accordance with Rule 144 of the Securities Act." *Id.* at 164 (emphasis added). Accordingly, not only were the 118,429,640 *registered* shares available for resale following the direct listing, but so were "approximately 164,932,646 shares" *exempt from registration* under SEC Rule 144. *Id.* A given stockholder could have held registered shares, unregistered shares, or both, and that stockholder alone would decide whether to sell shares and which type of shares to sell. *Id.* at 46, 58, 152, 171.

***Slack provided detailed disclosures about its business.*** On June 20, 2019, the same day as Slack's direct listing, Slack filed a prospectus (the "Prospectus) that, as relevant to this litigation, contained the same disclosures as the Registration Statement. *Id.* ¶ 75; Kahn Decl. Ex. E. The Registration Statement and Prospectus contained hundreds of pages of disclosures about Slack and its business, including 41 pages of detailed "Risk Factors." Kahn Decl. Ex. A at 13-54. Of particular relevance to this litigation, the Registration Statement and Prospectus specifically disclosed risk factors about increasing competition from companies such as Microsoft (*id.* at 16-17), service outages and other interruptions to Slack's services (*id.* at 19-20, 29), and potential liabilities for such interruptions under its service level agreements ("SLA") with customers (*id.* at 19-20, 32).

To provide just a few examples, Slack informed prospective purchasers that "[Slack's] primary competitor is currently Microsoft Corporation" and that "competitive pressures in [Slack's] market or [Slack's] failure to compete effectively may result in price reductions, fewer customers, reduced revenue, gross profit, and gross margins, increased net losses, and loss of market share." *Id.* at 16-17. Slack further disclosed that (1) "[w]e have in the past and may in the future experience

disruptions, data loss, outages, and other performance problems" (*id.* at 19); (2) "[i]f Slack is unavailable or if organizations are unable to access Slack within a reasonable amount of time, or at all, our business would be harmed" because "any outage on Slack would impair the ability of organizations on Slack and their users to perform their work" (*id.*); (3) Slack has certain customers with "service level agreements, under which we guarantee specified minimum availability of Slack" (*id.* at 32); (4) "[i]f we fail to meet these contractual commitments, we could be obligated to provide credits for future service" and/or pay "financial penalties and liabilities under our service level agreements" (*id.* at 19-20, 32), which Slack further explained on its website could entail customers "receiv[ing] credits for significant outages even if [their] workspace felt no impact" (Kahn Decl. Ex. B at 2); and (5) if credits must be provided, Slack's "revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements" (Kahn Decl. Ex. A at 32).

**Slack experiences outages after its direct listing.**  As Slack had cautioned prospective purchasers might occur, Slack suffered certain service outages after it went public.  This means that Slack's platform was unavailable to certain of its users for a period of time.  Specifically, on June 28, 2019, there was a service outage "affecting users across the United States and Europe." AC ¶ 99.  A month later, on July 29, 2019, Slack suffered another outage that disrupted services for many users. *Id.* ¶ 106.

Plaintiff alleges these outages impacted Slack's revenue.  On September 4, 2019, Slack reported on its second quarter 2019 financial results.  *Id.* ¶ 108.  Despite a revenue impact of $8.2 million stemming from "credits related to service level disruption in the quarter," Slack reported revenue of $145 million, which *exceeded* the $139-$141 million revenue guidance Slack had previously told the market to expect.  *Compare id. with* Kahn Decl. Ex. C at 4.  Plaintiff thus (implausibly) alleges that Slack hid damaging facts from prospective purchasers when it actually beat its guidance.

After Slack reported on its Q2 2019 financial results, Slack's share price declined.  AC ¶ 122. Plaintiff and other Slack stockholders allegedly were injured by this stock price decline.  *Id.*

### III.     PROCEDURAL BACKGROUND

On September 19, 2019, the first complaint was filed in this action.  ECF No. 1.  On November 8, 2019, Defendants filed a motion to dismiss for failure to state a claim, arguing, among other things, that plaintiff (1) did not and could not plead that his shares are traceable to the Registration Statement because, *inter alia*, there were far more *unregistered* Slack shares than registered shares made available to the market as part of the direct listing (ECF No. 14 at 7-9); and (2) did not and could not plead damages because Section 11 damages require a public offering, but Slack did not offer any shares as part of its direct listing (*id.* at 15-16).  Two months after the motion to dismiss was filed and with the benefit of having Defendants' arguments in front of him, Plaintiff filed the Amended Complaint.

### IV.     ARGUMENT

Plaintiff's Amended Complaint must be dismissed because it fails to plead any plausible claim against Defendants.  To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Moreover, when evaluating whether a complaint states a claim, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted).

**A.     Plaintiff's Amended Complaint Is Fatally, Structurally Flawed.**

**1.     This Action Is Doomed Because Plaintiff Cannot Possibly Plead Standing.**

**a.     Plaintiff Totally Fails To Plead Standing Under Section 11.**

Plaintiff's Section 11 claim fails at step one because he does not—*and cannot*—plead that he purchased Slack shares that are traceable to the Registration Statement.  Section 11 *only* "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement."  *Century Aluminum*, 729 F.3d at 1106.  Thus, a plaintiff only has standing to bring a Section 11 claim if it pleads that its shares can be traced back to the allegedly misleading

registration statement.  *Id.*  Although this requirement does not pose an obstacle in the usual case "[w]hen all of a company's shares have been issued in a single offering under the same registration statement," *id.*, it is "*often impossible*" to meet the tracing requirement when the market contains more shares than those issued under the registration statement, *id.* at 1107 (emphasis added).  In those "often impossible" circumstances—the circumstances in which Pirani finds himself here—the Ninth Circuit requires a plaintiff to plead "a greater level of factual specificity . . . before [the] court can reasonably infer that shares purchased in the aftermarket are traceable" to the registration statement in question, *id.*, including "facts tending to exclude the possibility" that its shares are anything other than traceable shares, *id.* at 1108.  This is a very high bar, and Plaintiff cannot clear it.

Plaintiff will never be able to establish statutory standing because both registered and unregistered Slack shares were available for sale when Slack went public.  Indeed, there were *far more* unregistered shares available than registered ones.  While there were "118,429,640 registered shares," there also were "164,932,646 unregistered shares" (AC ¶ 4) available for sale "*immediately after [Slack's] registration*" that were *not required to be registered* under SEC Rule 144.  Kahn Decl. Ex. A at 164 (emphasis added); *see* 17 C.F.R. § 230.144; *Hedden v. Marinelli*, 796 F. Supp. 432, 434 (N.D. Cal. 1992) ("SEC Rule 144 [] provides a safe harbor under certain conditions, exempting sellers from the registration requirements imposed by the 1933 Act.").  These 164,932,646 registration-exempt shares could be sold regardless of whether Slack filed the Registration Statement; Slack's direct listing merely provided holders of these shares a way to access the public markets. *Supra* at 4-5.  Thus, as of the date Slack went public, *only 41.8%* of Slack's publicly available shares were issued under the Registration Statement.  Moreover, there was never any guarantee that *any* of the shares sold to the public (including to Plaintiff) would be registered shares because, in a direct listing like Slack's, existing stockholders have unfettered discretion about whether or not to sell their shares.  *See* Kahn Decl. Ex. A at 46 ("there can be no assurance that any Registered Stockholders or other existing stockholders will sell any of their shares").  Plaintiff therefore cannot establish (and has not even attempted to plead) that the shares he purchased were registered under the Registration Statement rather than being exempt from registration, especially because sales were "made through brokerage transactions on the NYSE," *see id.* at 152, which has the effect of anonymizing the source

1    of shares.  *See Century Aluminum*, 729 F.3d at 1107 (brokerage transactions make tracing nearly

2    impossible because brokers "neither know nor care whether they are getting newly registered or old

3    shares," and they "do not identify specific shares with particular accounts") (internal quotation marks

4    and citation omitted).

5            Under these circumstances, Plaintiff's Section 11 claim must be dismissed.  Plaintiff merely

6    alleges the unsupported and unsupportable conclusion that he "purchased or otherwise acquired Slack

7    common stock pursuant and/or traceable to the Offering Materials."  AC ¶ 17.  As this Court has

8    held, Plaintiff's allegation is patently insufficient because it is merely "a formulaic recitation of the

9    [tracing] element[]" of a Section 11 claim.  *In re Century Aluminum Co. Sec. Litig.*, 2011 WL

10   830174, at *7 (N.D. Cal. Mar. 3, 2011) (Illston, J.), *aff'd*, 729 F.3d 1104 (9th Cir. 2013).  Plaintiff

11   completely fails to plead the "greater level of factual specificity" that the Ninth Circuit requires when

12   there are more shares in the market than just shares issued pursuant to the relevant registration

13   statement.  *See Century Aluminum*, 729 F.3d at 1107 (affirming dismissal of complaint).  The Ninth

14   Circuit imposes this mandatory pleading burden because "experience and common sense tell us that

15   when a company has offered shares under more than one registration statement, aftermarket

16   purchasers usually will *not* be able to trace their shares back to a particular offering."  *Id.* at 1107-08.

17   Plaintiff faces the same problem here because of the presence of both registered and unregistered

18   shares.  *See Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996) (granting motion to dismiss

19   because plaintiffs were "unable to establish that they purchased shares pursuant to the public

20   offering" when the market contained "80,000 unregistered shares of common stock"); *In re Initial*

21   *Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 119 n.402 (S.D.N.Y. 2004), *vacated on other grounds by*

22   471 F.3d 24 (2d Cir. 2006) (noting "impossibility of tracing shares once they have mingled with

23   unregistered shares"); *In re Crazy Eddie Sec. Litig.*, 792 F. Supp. 197, 202 (E.D.N.Y. 1992) (granting

24   motion for summary judgment for failure to trace shares to "allegedly defective offerings and not

25   to . . . registration-exempt sales made . . . pursuant to Rule 144.").  Because Plaintiff does not and

26   cannot plead that he purchased registered shares as opposed to the far *greater* number of unregistered

27   shares available for sale at the time of Slack's direct listing, Plaintiff's Section 11 claim must be

28   dismissed for lack of standing.

### b.      Plaintiff Also Fails To Plead Standing Under Section 12(a)(2).

Plaintiff fails to plead standing under Section 12(a)(2) for the same reason.  "To establish standing under § 12(a)(2), a plaintiff must allege that he purchased shares from '[a]ny person' who 'offer[ed] or s[old] a security . . . by means of a prospectus.'"  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 899 (4th Cir. 2014) (quoting 15 U.S.C. § 77l(a)(2)).  As this Court has recognized, Section 12(a)(2) standing is even *harder* to plead than Section 11 standing because "[u]nlike Section 11, which permits an action by a plaintiff who has purchased a security that is merely 'traceable to' the challenged misstatement or omission, Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market."  *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010) (Illston, J.) (dismissing claim for lack of standing); *see also Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999) ("the express privity requirement of Section 12" imposes stricter standing requirements than Section 11).  Accordingly, as this Court recently held, a plaintiff necessarily fails to plead Section 12(a)(2) standing when it fails to plead Section 11 standing. *See Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *21 (N.D. Cal. Feb. 15, 2018) (Illston, J.) (dismissing Section 12(a)(2) claim for lack of standing for same reasons claim failed under Section 11).

Because Slack's prospectus was expressly issued only in connection with registered shares, *see* Kahn Decl. Ex. E at 1 ("[t]his prospectus relates to the registration of the resale of up to 118,429,640 shares of [Slack's] Class A common stock"), the only sales that could have been made "by means of a prospectus" are sales of registered shares.  *See* 15 U.S.C. § 77l(a)(2).  Again, Plaintiff does not and cannot plead that his Slack shares are registered rather than unregistered because both were available for sale as part of Slack's direct listing; he does not know which kind of shares he bought.  *Supra* at 8-9.  Indeed, Plaintiff alleges no facts from which this Court can infer that it is even *possible*—let alone plausible, as required—that he acquired registered shares pursuant to Slack's prospectus.  The Fourth Circuit's opinion in *Yates* demonstrates why this pleading failure requires dismissal.  There, plaintiffs argued they sufficiently alleged they "purchased directly in the [offering]" because (1) they purchased shares the day after the offering and (2) their trades were

settled the same day that the shares issued in the offering were available for delivery.  *See* 744 F.3d at 900.  Relying on the Ninth Circuit's Section 11 tracing analysis in *Century Aluminum*, the court held that plaintiff's allegations were insufficient to plead Section 12(a)(2) standing because they "are merely consistent with the *possibility* that [plaintiff] purchased his securities in the [offering]."  *Id.* at 900-01 (emphasis added).  Here, Plaintiff alleges far less—he does not allege *any* details regarding his purchases.  More importantly, he is incapable of alleging more.  Pirani knew that Slack would make this argument in its motion to dismiss because he had it in front of him when he drafted his Amended Complaint.  Because his amended pleading still offers no basis for how he can ever establish standing, it follows that he cannot do so, and that dismissal with prejudice is appropriate.

Additionally, even if Plaintiff hypothetically could establish standing (which he cannot), the Amended Complaint still must be dismissed because his standing allegations are wholly conclusory.  Plaintiff merely alleges he "purchased or otherwise acquired Slack common stock pursuant and/or traceable to the Offering Materials."  AC ¶ 17.  Courts in this Circuit—including this Court— repeatedly hold that this language is insufficient to plead Section 12(a)(2) standing.  *See In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 977 (N.D. Cal. 2010) (Illston, J.) (plaintiffs' "conclusory allegations" that they "purchase[d] 'pursuant and/or traceable to' the January 2009 offering . . . are insufficient to establish standing under Section 12(a)(2)"); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016) (same); *Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *18 (N.D. Cal. Jan. 17, 2017) (same); *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *14 (C.D. Cal. July 13, 2015) (same, and noting that "[s]uch wishy-washy allegations are insufficient to demonstrate that Plaintiffs have Section 12 standing").  Plaintiff's conclusory standing allegation requires dismissal of his claim.[3]

---

[3]  Plaintiff's claim also must be dismissed with prejudice because Section 12(a)(2) does not even apply to direct listings.  In *Gustafson v. Alloyd Co.*, the Supreme Court held that "§ 12(2) liability [is] limited to public offerings."  513 U.S. 561, 578 (1995); *see id.* at 573 ("Congress [] intended § 12(2) to govern only initial public offerings").  Courts have construed *Gustafson* as "conclusively decid[ing] that section 12(2) applies exclusively to 'initial public offerings.'"  *Maldonado v. Dominguez*, 137 F.3d 1, 8 (1st Cir. 1998) (quoting *Gustafson*, 513 U.S. at 577-78); *see also In re Valence Tech. Sec. Litig.*, 1996 WL 37788, at *4 (N.D. Cal. Jan. 23, 1996) ("section 12(2) applies only to initial public offerings").  As Plaintiff admits, Slack went public through a direct listing, **not** an IPO.  *See* AC ¶ 66.  Because there was no public offering here, *see infra* at 14, the Section 12(a)(2) claim must be dismissed.

Gibson, Dunn &
Crutcher LLP

### 2. Defendants Are Not Statutory Sellers Under Section 12(a)(2).

The unique features of Slack's direct listing also prevent Plaintiff from pleading that Defendants are statutory sellers under Section 12(a)(2). In *Pinter v. Dahl*, the Supreme Court held that Section 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." 486 U.S. 622, 644 n.21 (1988).[4] Pirani does not allege that any of the Defendants sold directly to him, and he offers no basis to infer that he purchased shares from Defendants as opposed to any other seller. In fact, given that sales in Slack's direct listing were made through brokerage transactions, it is essentially *impossible* for Plaintiff to plead that Defendants sold to him because of the anonymizing effect of brokerage transactions. *See supra* at 8-9. Plaintiff's failure to identify *anybody* (let alone a Defendant) who sold to him requires dismissal of his claim.

Pirani also fails to allege that Defendants actively solicited his purchases of Slack shares. A statutory seller under Section 12(a)(2) is a party that "passes title of the security to the purchaser, *or* solicits the sale of the security." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1073 (N.D. Cal. 2010). However, to plead solicitation, "a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their *own financial gain*." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005) (emphasis added). A plaintiff must "plead active participation in the solicitation of the immediate sale," which requires "a direct relationship between the purchaser and the defendant." *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *9 (C.D. Cal. May 5, 2011). Plaintiff must make "very specific allegations of solicitation, including direct communications with Plaintiff[]," *id.* at *10, because the Supreme Court has held that "mere participation" in solicitation activities cannot establish liability. *See Pinter*, 486 U.S. at 650-51 & n.27.

Pirani utterly fails to meet these stringent standards. He alleges that Defendants engaged in solicitation by "participating in the preparation of the false and misleading Offering Materials." AC

---

[4] Although *Pinter* was interpreting Section 12(1), its holding applies to Section 12(a)(2). *In re Harmonic, Inc., Sec. Litig.*, 2006 WL 3591148, at *9 n. 5 (N.D. Cal. Dec. 11, 2006).

Gibson, Dunn &
Crutcher LLP

¶ 141.  However, "an individual's 'simple involvement' in the preparation of a registration statement is insufficient . . . to establish liability under § 12(a)(2)."  *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003) (citation omitted); *see also Harmonic*, 2006 WL 3591148, at *13 ("participating in the drafting of the prospectus" does not amount to solicitation); *Countrywide*, 2011 WL 4389689, at *9 (collecting cases for proposition that "mere preparation of prospectus supplements insufficient to plead solicitation").  Indeed, Plaintiff's broad participation allegations would sweep in the very types of parties that the Supreme Court held *cannot* be held liable as solicitors.  *See Pinter*, 486 U.S. at 651 & n.27 ("accountants and lawyers" that help prepare prospectus are not solicitors).  Nor does Plaintiff state a claim based on the Individual Defendants' alleged signing of the prospectus (AC ¶¶ 19-27) because "they cannot be liable under § 12(a)(2) merely because . . . they signed the Prospectus and Registration Statements."  *Infonet*, 310 F. Supp. 2d at 1101; *see also Harmonic*, 2006 WL 3591148, at *10 (same, and collecting cases); *Welgus*, 2017 WL 167708, at *19 (same).

Pirani's remaining allegations fare no better.  First, Plaintiff's allegations that Messrs. Butterfield and Shim participated in "the investor day presentation" (*id.* ¶¶ 19-20) are insufficient to plead solicitation.  *See CytRx*, 2015 WL 5031232, at *15 ("participation of some directors in a road show [] is insufficient" to plead solicitation); *Bare Escentuals*, 745 F. Supp. 2d at 1072 (rejecting "allegations that the individual defendants actively met with potential investors to present highly favorable information about the company and its sales model").  These allegations also fail because Plaintiff does not allege that Messrs. Butterfield and Shim personally solicited *him* at this presentation.  Plaintiff's allegations are just like those rejected in *Infonet*, where the court held that allegations that defendants "made oral misrepresentations during various roadshow presentations" were irrelevant because plaintiffs did not allege that defendants "personally or directly solicited any of the named Plaintiffs."  310 F. Supp. 2d at 1102.  Second, Plaintiff's allegations that the Individual Defendants were "financially motivated to take the Company public" (AC ¶¶ 19-27) are irrelevant because "motivation alone is not sufficient to make them sellers, absent allegations in the complaint of actual solicitation of stock purchases."  *Harmonic*, 2006 WL 3591148, at *14; *see also Bare Escentuals*, 745 F. Supp. 2d at 1072 (rejecting allegation that "defendants were motivated to solicit

purchasers").  Finally, Plaintiff's allegations that certain Individual Defendants earned money in the direct listing likewise do not establish active solicitation.  *See id.* (rejecting allegation that defendants "reaped millions of dollars from the company's offerings").  Plaintiff's deficient solicitation allegations require dismissal of his claim.

### 3. Plaintiff Cannot Establish Damages Under Section 11.

Plaintiff's inability to recover damages under Section 11 is yet another structural problem with this action.  A necessary predicate for establishing damages under Section 11 is the existence of a price at which a security is "offered to the public."  *See* 15 U.S.C. § 77k(e); *id.* § 77k(g) ("In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public.").  Typically, "[w]hen a company goes public, the initial offering price (the price paid by the first customer) is established by the company and underwriters."  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 300 (S.D.N.Y. 2003).  But Slack's direct listing is not the typical scenario.  There was no public offering.  Existing stockholders merely had the opportunity to sell their shares in their complete discretion.  *Supra* at 4-5.  More fundamentally, there was a complete "lack of an initial public offering price."  Kahn Decl. Ex. A at 172; *see id.*, cover page (noting that the "proposed maximum offering price per share" was "not applicable").  None of the Defendants had any role in establishing the pricing of Slack's securities in connection with the direct listing.  Instead, the NYSE established a reference price for Slack's shares one day prior to the commencement of trading, *id.* at 58, and a designated market maker set the opening trading price "without coordination with" Slack.  *Id.* at 47; *see generally id.* at 171-72 (explaining the direct listing process).  Because Slack's direct listing did not involve a public offering or a public offering price, Plaintiff cannot recover any damages under Section 11.[5]  This structural flaw—identified in Defendants' prior motion to dismiss (ECF No. 14 at 16)—also warrants dismissal with prejudice because the Amended Complaint proves that Plaintiff cannot plead his way around it.

Frankly, the Court could stop reading here.  This case is fatally flawed and cannot proceed.  But as set forth below there are yet more reasons it must be dismissed; most fundamentally that no

---

[5]  Plaintiff alleges that the "offering price" is the price at which Slack shares started to trade, but fails to allege any basis in fact or law for this self-serving allegation.  AC ¶¶ 10, 75.

1    Defendant made an actionable misstatement.

2    **B.     Plaintiff Fails To Plead That Any Statement Was False Or Misleading.**

3           Even if Plaintiff's Sections 11 and 12(a)(2) claims were to proceed past the threshold standing

4    and other inquiries discussed above—which they plainly should not—the claims should still be

5    dismissed for failure to allege that any challenged statement was false or misleading.  To state a

6    claim, Plaintiff must plead that Slack's Registration Statement either "contained an untrue statement

7    of a material fact or omitted to state a material fact . . . necessary to make the statements therein not

8    misleading."  15 U.S.C. § 77k(a); *see Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir.

9    2009) (registration statement must have "contained an omission or misrepresentation" that was

10   material such that "it would have misled a reasonable investor about the nature of his or her

11   investment") (internal quotation marks and citation omitted).  A statement is only "misleading where

12   it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one

13   that actually exists.'"  *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *25 (N.D. Cal. Oct. 1, 2015)

14   (quoting *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  Plaintiff fails to

15   plead falsity under these standards.[6]

16          Plaintiff takes a kitchen-sink approach in his attempt to plead falsity, attacking a hodgepodge

17   of Slack's disclosures in the hope that something sticks.  However, none of his allegations show that

18   the challenged disclosures were false or misleading.  First, Plaintiff alleges that several disclosures

19   misleadingly discuss risks to Slack's business—*e.g.,* outages or competition—as merely hypothetical

20   future risks, but Plaintiff ignores that Slack disclosed that these risks had already materialized.

21   Second, Plaintiff's theory of falsity is based on the conclusory assertion that Slack was suffering

22   severe outages and paying out significant amounts of money to customers as a result, but Plaintiff

23   alleges no facts in support of this conclusion.  Finally, the reasons that Plaintiff often provides for

24

25   _____

26

27   [6]  Because Sections 11 and 12(a)(2) are "Securities Act siblings" with "roughly parallel elements," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010), this falsity analysis applies both to Sections 11(as to the Registration Statement) and 12(a)(2) (as to the Prospectus).  *See*

28   *Velti*, 2015 WL 5736589, at *31 (finding Section 12(a)(2) falsity allegations inadequate based on Section 11 analysis).

1    why statements are misleading are nonsensical because they bear no rational connection to the

2    statements themselves.  These pleading deficiencies require dismissal of his claims.

3         **1.    Outages And Slack's SLA.**

4         Slack's robust disclosures about outages on its platform are not adequately alleged to be

5    misleading.  As Plaintiff concedes, the Registration Statement specifically cautioned:  "*If there are*

6    *interruptions or performance problems associated with technology or infrastructure used to*

7    *provide Slack, organizations on Slack may experience service outages* . . . ."  AC ¶ 95; Kahn Decl.

8    Ex. A at 19-20.  Plaintiff alleges that this risk disclosure was misleading because Slack presented the

9    risk of outages as "merely hypothetical" when Slack was "already suffering vulnerabilities that

10   caused severe service disruption."  AC ¶ 96.  These allegations are contradicted by Plaintiff's own

11   pleading.  Plaintiff *admits* that Slack disclosed that it had experienced outages "*in the past*" and that

12   "we *have experienced* intermittent connectivity issues and product issues *in the past*, including those

13   that *have prevented* many organizations on Slack and their users from accessing Slack for a period of

14   time."  *Id.* ¶ 95 (emphasis added).  Slack further disclosed that these outages negatively impacted

15   Slack as "any outage on Slack . . . would negatively impact our brand, reputation, and customer

16   satisfaction."  *Id.*  Plaintiff simply cannot state a claim when a review of the documents he challenges

17   shows that the very information that he claims was omitted was in fact disclosed.  *See Steckman v.*

18   *Hart Brewing, Inc*., 143 F.3d 1293, 1296 (9th Cir. 1998) (affirming 12(b)(6) dismissal where "the

19   risks were completely disclosed"); *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)

20   (affirming 12(b)(6) dismissal where "[t]he prospectuses warn investors of exactly the risk the

21   plaintiffs claim was not disclosed"); *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *12-13

22   (N.D. Cal. Oct. 31, 2014) (dismissing complaint where company made "comprehensive and specific

23   disclosures").

24        Similarly, Slack's disclosures that it could incur liabilities under its SLA in connection with

25   outages are not misleading.  Slack told prospective purchasers that there is a risk that Slack might

26   face liability under its SLA:  "*We provide service level commitments under certain of our paid*

27   *customer contracts.  If we fail to meet these contractual commitments, we could be obligated to*

28   *provide credits* . . . ."  AC ¶ 95.  While Plaintiff again contends that Slack presented this risk as

Gibson, Dunn &
Crutcher LLP

1    merely hypothetical, *id.* (emphasizing "could" and "may be"), Plaintiff admits that Slack disclosed

2    that "we *have granted* credits" to customers pursuant to the SLA.  *Id.*  Plaintiff alleges this was

3    misleading because Slack "was paying out significant amounts of service credits," but Plaintiff offers

4    no support for this conclusory allegation.  *Id.* ¶ 96.

5         There also is nothing misleading about allegedly omitting the specific terms of Slack's SLA

6    (*id.*) because none of Slack's disclosures purport to discuss those details.  Nor did Slack have a duty

7    to disclose these details merely because the Registration Statement disclosed the existence of the

8    SLA.  The Ninth Circuit has explicitly held that the securities laws do not impose a duty to make

9    disclosures "complete."  *Brody*, 280 F.3d at 1006.  The securities laws only prohibit "misleading"

10   statements, but "[o]ften, a statement will not mislead even if it is incomplete or does not include all

11   relevant facts."  *Id.*; *see also Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 772-73 (N.D. Cal. 2017)

12   (applying *Brody*'s holding to Section 11 claim).  For example, if a company makes a disclosure about

13   it sales growth, the company does not need to disclose "a detailed breakdown of the company's

14   region by region or month by month sales."  *Brody*, 280 F.3d at 1006 n.8.  Plaintiff's "tell me more"

15   theory regarding the details of Slack's SLA is no different.  There is nothing misleading about

16   omitting the details of how the SLA's credit policy worked merely because the Registration

17   Statement discussed the SLA.  *See, e.g.*, *In re DSP Grp., Inc. Sec. Litig.*, 1997 WL 678151, at *5

18   (N.D. Cal. Mar. 5, 1997) ("Defendants had no duty to disclose the detailed terms of every new

19   license agreement they announced.").[7]

20        Despite Slack's robust risk disclosures, Plaintiff nonetheless claims that Slack painted a

21   misleading picture because Slack's past outages were "severe," purportedly showed that Slack had a

22   "reliability problem" and an "inability to sufficiently scale," and led to "significant" payouts to

23   customers with SLAs that "significantly impacted" Slack's finances.  AC ¶ 96.  These allegations are

24   _____

25   [7] In any event, Slack *did* disclose the terms of the SLA on its publicly available website.  At the time
     of the direct listing, Slack's website contained a page entitled "Service Level Agreements (SLA)"
26   that summarized the terms of Slack's SLA and disclosed the very information that Plaintiff falsely
     claims Slack concealed.  Kahn Decl. Ex. B at 2.  Specifically, this webpage stated "[i]f we fall short
27   of our 99.99% uptime guarantee, we'll refund customers on the Plus plan and above 100 times the
     amount your workspace paid during the period Slack was down," which the page made clear means
28   that customers "receive credits for significant outages *even if your workspace felt no impact*."  *Id.*
     (emphasis added).

unsupported and must be rejected.  Plaintiff's *only* non-conclusory allegation that the reliability of Slack's platform was more "significant" than depicted in the Registration Statement is that Slack "failed to meet its 99.99% uptime guarantee 7 out of 12 months" in 2018.  *Id.*  This allegation fails to demonstrate falsity for numerous reasons.  First, how Slack's platform performed in *2018* says nothing about how Slack's platform was performing in *mid-2019* at the time of the disclosures.  *See In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869 at *19 (N.D. Cal. Feb. 12, 2015) (alleged fact that was three months old was too stale to establish falsity of later statement).  Second, Plaintiff does not allege *the effect* this downtime had on Slack.  For example, Plaintiff does not allege how far Slack deviated from its uptime guarantee, how frequent or severe any outages were, or if Slack even had to pay *any* credits under it SLAs in connection with this downtime.  Absent such allegations, there is no basis to infer that Slack was repeatedly suffering outages that materially affected its platform.[8]

Moreover, several of Plaintiff's allegations affirmatively *refute* Plaintiff's theory of falsity. Plaintiff's speculation that Slack "was paying significant amounts of service credits" that "significantly impacted" Slack's "financial and operational results" when the Registration Statement was issued is based on Slack's *subsequent* disclosure in September 2019 that it paid $8.2 million in credits related to outages that occurred after the issuance of the Registration Statement.  AC ¶¶ 74, 96, 99, 106, 108.  However, Plaintiff admits that "[s]ervice-level disruption of this magnitude is *unusual*" and that Slack did "not expect a revenue impact of this magnitude again."  *Id.* ¶ 109 (emphasis added); Kahn Decl. Ex. D at 6.  Similarly, Plaintiff repeatedly alleges that Slack's user base continued to grow both before and after the issuance of the Registration Statement, which establishes that his conclusion that Slack's allegedly unreliable platform prevented the Company from growing is baseless.  *E.g.*, AC ¶¶ 79 (paid customers increased from January 31 to April 30,

---

[8]  To the extent Plaintiff is alleging that Slack's June 28 and July 29, 2019 outages—which occurred *after* the Registration Statement was deemed effective (AC ¶¶ 74, 99, 106)—establish the falsity of the Registration Statement, that theory fails because Plaintiff "must demonstrate that the omitted information existed *at the time* the registration statement became effective."  *Rubke*, 551 F.3d at 1164; *see id.* (company could not have known about activities that happened "later that month, and therefore could not include a disclaimer to that effect at the time the registration statement was published").

Gibson, Dunn & Crutcher LLP

1   2019), 90 (daily active users increased from January to October 2019), 111 (alleging "growing user

2   load").

3          Finally, for all of the above reasons, Plaintiff's allegation that the Registration Statement

4   violated Items 303 and 105 of Regulation S-K fails.  AC ¶¶ 97-98.  Under Item 303, a company must

5   disclose "trends" affecting the company where the trend "is *both* [1] presently known to management

6   and [2] reasonably likely to have material effects on the registrant's financial condition or results of

7   operation."  *Steckman*, 143 F.3d at 1296 (citation omitted).  Item 105 requires disclosure of "the most

8   significant factors that make the offering speculative or risky."  17 C.F.R. § 229.105.[9]  Because there

9   can be no Item 303 or 105 violation unless Plaintiff pleads a material omission, the Items 303 and

10  105 allegations fail for all of the reasons laid out above.  *See, e.g.*, *Y-GAR Capital LLC v. Credit*

11  *Suisse Grp. AG*, 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020).  Additionally, Plaintiff's Item 303

12  theory must be rejected because Plaintiff makes *no* allegations that Defendants *knew* of the alleged

13  trend of serious outages.  *See J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 391-92 (6th Cir.

14  2008) (affirming dismissal for failing to plead knowledge); *Mallen v. Alphatec Holdings, Inc.*, 2013

15  WL 1294640, at *12-13 (S.D. Cal. Mar. 28, 2013) (dismissing complaint for failure to plead

16  knowledge).  To the contrary, Plaintiff alleges that outages of the magnitude experienced in June and

17  July 2019 were "unusual" and they were caused in part by "limits that we *didn't realize* were built

18  into the system."  AC  ¶¶ 109, 111 (emphasis added).  Plaintiff's attack on Slack's disclosures

19  regarding outages and its SLA fails.

20         **2.      Scaling.**

21         Plaintiff's challenge to the statement that Slack "built [its] technology infrastructure using a

22  distributed and scalable architecture" likewise fails.  AC ¶ 92.  Plaintiff alleges this disclosure was

23  misleading because "Slack was facing difficulty in scaling globally and attaining enterprise

24  customers . . . as evidenced by the Slack App's widespread downtime."  *Id.* ¶ 94.  As just discussed,

25  the Amended Complaint lacks any factual support for these conclusory allegations of outages and

26

27  _____

28  [9]  Because the requirements of Item 105 previously were located in Item 503, case law interpreting
    Item 503 applies to Item 105.  *See Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at
    *7 n.5 (S.D.N.Y. July 17, 2019).

their purported impact on Slack's business.  Additionally, Slack expressly warned prospective purchasers that "as we continue to expand the number of users and organizations on Slack . . . we *may not be able to scale* our technology to accommodate the increased capacity requirements, which *may result in interruptions* or delays in service."  Kahn Decl. Ex. A at 29 (emphasis added).  Plaintiff also alleges that Slack's disclosures were misleading because Mr. Butterfield explained on the September 2019 earnings call that the June and July outages were caused in part by "scaling."  AC ¶ 111.  However, Plaintiff ignores that on the same call he said "[w]e have been *successful in scaling* . . . between 99.9% and 99.99% in every quarter, and in most quarters, 99.99%" with just "occasional hiccups" that "affect everyone in the industry."  Kahn Decl. Ex. D at 14 (emphasis added).  Plaintiff's claim is thus refuted by the very information he incorporated by reference in his complaint.

### 3.    Competition From Microsoft.

While Plaintiff admits that Slack disclosed the risk to its business posed by competition from Microsoft, AC ¶¶ 83-84, Plaintiff nonetheless alleges Slack's competition disclosures were misleading because "the Company was already experiencing serious competition from Microsoft," *id.* ¶ 85.  However, Slack did not imply that competition with Microsoft was somehow not "serious" as Plaintiff bizarrely alleges.  In a disclosure that Plaintiff conspicuously omits, Slack stated that its "primary competitor *is currently* Microsoft."  Kahn Decl. Ex. A at 16 (emphasis added).  Additionally, Slack disclosed that many of its larger competitors, which would include its "primary competitor" Microsoft, "*have* . . . substantial competitive advantages" and "*have* . . . [taken actions] in a manner that discourages users from purchasing Slack."  *Id.* at 17 (emphasis added).  Because Slack fully disclosed the effect of competition on its business, Plaintiff cannot state a claim.  *See Olkey*, 98 F.3d at 5.

Plaintiff also attempts to plead falsity by pointing to a news report and a Microsoft announcement—both "after the Offering"—that Microsoft's user base was growing faster than Slack's.  AC ¶¶ 86-88.  However, supposed evidence that did not exist until *after* Slack filed its Registration Statement cannot be used to establish the falsity of Slack's disclosures.  *Rubke*, 551 F.3d at 1164 (Plaintiff "must demonstrate that the omitted information existed *at the time* the registration statement became effective.").

### 4.     "Key Benefits" Of Slack.

Plaintiff fails to plead that the "Summary of Key Benefits" of using Slack is misleading because none of the allegedly omitted information has anything to do with the Slack features discussed.  AC ¶ 91.  Plaintiff alleges that the discussion of Slack's benefits—such as that Slack "increases accessibility of communication" and has "powerful search and discovery tools"—is misleading because it failed to disclose competition from Microsoft, outages on the platform, and Slack's "difficulty in scaling."  *Id.* ¶¶ 91, 94.  This allegation fails to plead falsity because statements about Slack's features have nothing to do with the allegedly omitted information.  *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) (plaintiff failed to plead falsity where "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves"); *In re Facebook, Inc. Sec. Litig.*, 2019 WL 4674347, at *23 (N.D. Cal. Sept. 25, 2019) (alleged unauthorized use of user data did not render statement about preventing data attacks such as "phishing" false because there was an insufficient nexus between the two issues).  Additionally, the fact that the Registration Statement contained disclosures about all of these topics in other parts of the document, *supra* at 16-20, bars Plaintiff from claiming the "Summary of Key Benefits" was misleading by omission.  *See Morgan Stanley*, 592 F.3d at 365-66 ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety.").

### 5.     Go-To-Market Strategy.

Finally, Plaintiff's challenges to disclosures regarding Slack's "go-to-market" strategy fail.  AC ¶¶ 77-81.  *First*, these disclosures are not actionable because they consist of optimistic "puffery" that is immaterial as a matter of law.  *See Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (puffing defense available under Section 11).  For example, Slack's disclosures regarding "offering an exceptional product" (AC ¶ 79), the "strength of our market leadership" (*id.* ¶ 80), and "customer love" (*id.*) are all non-actionable puffery.  *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001) ("'strong' demand" and "growth strategy 'was unfolding as planned'" not actionable); *In re Impac Mortg. Holdings, Inc. Sec.*

Gibson, Dunn &
Crutcher LLP

*Litig.*, 554 F. Supp. 2d 1083, 1097 (C.D. Cal. 2008) ("'strong,' 'better than expected,' 'robust,' 'well-positioned,' 'solid,' and 'improved,' when used to describe *demand*, results, and *growth strategy*, were not actionable") (emphasis added); *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *8-9 (N.D. Cal. Mar. 31, 2014) (statement that "leading this market" not actionable).

*Second*, these disclosures are forward-looking statements that are not actionable under the "bespeaks caution" doctrine.  This doctrine allows "a court to rule as a matter of law . . . that defendants' forward-looking statements contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994) (internal quotation marks and citation omitted) (adopting doctrine in Section 11 action).  Plaintiff challenges Slack's statements about what it "will" do, it "intend[s] to" do, and its "plan" (AC ¶ 81), but Slack expressly warned potential investors that these statements are forward-looking.  Kahn Decl. Ex. A at 55.  Because Slack disclosed in detail the risks posed to its business (*id.* at 13-54), Slack's forward-looking statements about its strategy and plans are not actionable.  *See, e.g.*, *Sherman v. Network Commerce Inc.*, 346 F. App'x 211, 213 (9th Cir. 2009) (affirming dismissal under bespeaks caution doctrine); *Infonet*, 310 F. Supp. 2d at 1092 (dismissing claim under doctrine).

*Third*, the allegedly omitted information is unrelated to Slack's discussion of its strategy.  Plaintiff alleges that Slack's go-to-market strategy disclosures were misleading because Slack omitted to disclose the SLA credit policy, Slack's "reliability was compromised," and revenue and user growth was slowing.  AC ¶ 82.  Because the challenged disclosures do not purport to address these topics, they are not rendered misleading by omission of this information.  *See, e.g.*, *Hong*, 2017 WL 1508991, at *15.

*Finally*, these disclosures are not misleading because the very information Plaintiff alleges was omitted was actually disclosed.  Plaintiff alleges that Slack failed to disclose that its "revenue growth was trending downward while marketing expenses were increasing."  AC ¶ 82.  But Plaintiff *admits* that Slack disclosed that revenue growth went down from 110% to 82% year-over-year between 2017-19, *id.* ¶ 79, and the Registration Statement disclosed increases in marketing expenses, Kahn Decl. Ex A at 10 ("sales and marketing" expenses grew each year 2017-19).  Plaintiff also

1   alleges that Slack did not disclose that user growth was slowing, AC ¶ 82, but the Registration

2   Statement again disclosed that in its discussion of "Key Business Metrics," Kahn Decl. Ex. A at 69-

3   71.

4          In sum, Plaintiff's claims fail because he does not allege any false or misleading statement.

5   **C.     The Section 15 Claim Must Be Dismissed.**

6          Because Plaintiff fails to state a claim under Sections 11 and 12(a)(2), Plaintiff necessarily

7   fails to plead a Section 15 claim.  To plead a Section 15 claim, a plaintiff must "allege (1) an

8   underlying violation of Section 11 or 12, and (2) control."  *Greenberg*, 233 F. Supp. 3d at 772.

9   Because Plaintiff fails to plead an underlying violation of Sections 11 or 12(a)(2), his derivative

10  Section 15 claim must be dismissed.

11         Plaintiff also fails to plead that the VC Defendants controlled Slack.  Pleading control requires

12  alleging that a defendant "exercised 'a significant degree of day-to-day operational control [over the

13  primary violator], amounting to the power to dictate another party's conduct or operations.'"  *In re*

14  *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) (quoting *In re ZZZZ*

15  *Best Sec. Litig.*, 864 F. Supp. 960, 970 (C.D. Cal. 1994)).  It is a "necessary element of 'controlling

16  person' liability" that a defendant "exercise control over the 'management and policies'" of the

17  primary violator or "direct its day-to-day affairs."  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96

18  F.3d 1151, 1163 (9th Cir. 1996).  It is *not* sufficient to allege power over "discrete transactions," such

19  as the direct listing.  *See id.* at 1162.

20         Plaintiff fails to plead control under these standards.  Plaintiff's allegations that the VC

21  Defendants controlled Slack because they (1) held a minority stake in Slack, (2) designated a

22  minority of directors to Slack's board of directors, and (3) "had the ability to influence the policies

23  and management of the Company" are insufficient as a matter of law.  AC ¶¶ 34, 152.[10]  *First*, the

24  VC Defendants' minority stockholdings—23.8% for the Accel entities, 13.2% for the Andreessen

25  Horowitz entities, and 10.1% for the Social+Capital entities (*id.* ¶¶ 30-32)—do not establish control

---

[10]  Plaintiff also points to Slack's director and officers' insurance policy and indemnification of directors as evidence of control, but such agreements are commonplace and do not give the VC Defendants control over Slack.  AC ¶ 34.

Gibson, Dunn &
Crutcher LLP

because "holding a minority share of a company does not establish control person liability." *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1053 (N.D. Cal. 2019).  In fact, courts have dismissed control person claims against defendants with equivalent and even *greater* stockholdings than the VC Defendants.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig*., 352 F. Supp. 2d 429, 458-59 (S.D.N.Y. 2005) (30% of shares); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (20% of shares); *Gigamon*, 372 F. Supp. 3d at 1053 (15.3% of shares).  *Second*, the alleged fact that each of Accel, Andreessen Horowitz, and Social+Capital designated a single director to Slack's board—which, even when considered together, still comprises a minority of Slack's seven-member board (AC ¶¶ 19, 22-27)—does not establish control.  *See, e.g.*, *In re Gupta Corp. Sec. Litig.,* 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) (defendant's "position as a minority shareholder . . . with an agent on the board does not establish control person liability"); *O'Sullivan v. Trident Microsystems*, 1994 WL 124453, at *18 (N.D. Cal. Jan. 31, 1994) (same); *Flag*, 352 F. Supp. 2d at 458-59 (ability to appoint *three* of nine directors insufficient).  *Finally*, Plaintiff's allegation that the VC Defendants had the "ability to influence" Slack is conclusory, and in any event falls short of alleging, as required, that they "*exercised* actual power or control" over Slack.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (emphasis added).

Plaintiff also impermissibly attempts to plead control by lumping the VC Defendants together and alleging they collectively held more than 47% of Slack's shares and three of seven board seats. AC ¶ 34.  This tactic fails because there are no allegations that the VC Defendants acted jointly as a group.  *See Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *13 (W.D. Wash. Dec. 29, 2008) ("Without additional allegations that the venture capital firms acted together to control [the company], these allegations of control by virtue of collective ownership are conclusory and unconvincing.").

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.  The Amended Complaint proves that Plaintiff is unable to plead

anything more than conclusions with respect to statutory standing.  There is no reason to prolong this case any further.  This action should be dismissed with prejudice.

DATED:  January 21, 2020

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Michael D. Celio
MICHAEL D. CELIO, SBN 197998
RAENA FERRER CALUBAQUIB, SBN 328794
1881 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

MATTHEW S. KAHN, SBN 261679
MICHAEL J. KAHN, SBN 303289
555 Mission St. Suite 3000
San Francisco, California 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

*Attorneys for Defendants Slack Technologies, Inc., Stewart Butterfield, Allen Shim, Brandon Zell, Andrew Braccia, Edith Cooper, Sarah Friar, John O'Farrell, Chamath Palihapitiya, Graham Smith, Accel Growth Fund IV Associates L.L.C., Accel Growth Fund Investors 2016 L.L.C., Accel Leaders Fund Associates L.L.C., Accel Leaders Fund Investors 2016 L.L.C., Accel X Associates L.L.C., Accel Investors 2009 L.L.C., Accel XI Associates L.L.C., Accel Investors 2013 L.L.C., Accel Growth Fund III Associates L.L.C., AH Equity Partners I L.L.C., A16Z Seed-III LLC, Social+Capital Partnership GP II L.P., Social+Capital Partnership GP II Ltd., Social+Capital Partnership GP III L.P., Social+Capital Partnership GP III Ltd., Social+Capital Partnership Opportunities Fund GP L.P., and Social+Capital Partnership Opportunities Fund GP Ltd.*