# EXHIBIT A

**As filed with the Securities and Exchange Commission on May 31, 2019.**

Registration No. 333-231041

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**AMENDMENT NO. 3 TO**
**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# Slack Technologies, Inc.

(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 7372 | 26-4400325 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**500 Howard Street**
**San Francisco, California 94105**
**(855) 980-5920**

(Address, Including Zip Code, and Telephone Number, Including
Area Code, of Registrant's Principal Executive Offices)

**Stewart Butterfield**
**Chief Executive Officer**
**Slack Technologies, Inc.**
**500 Howard Street**
**San Francisco, California 94105**
**(855) 980-5920**

(Name, address, including zip code, and telephone number, including
area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Richard A. Kline** | **David Schellhase** |
| **David W. Van Horne** | **Gabe Stern** |
| **Sarah B. Axtell** | **Amanda Westendorf** |
| **Goodwin Procter LLP** | **Slack Technologies, Inc.** |
| **Three Embarcadero Center** | **500 Howard Street** |
| **San Francisco, California 94111** | **San Francisco, California 94105** |
| **(650) 752-3100** | **(855) 980-5920** |

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after this registration statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box:  ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                       Accelerated filer ☐
Non-accelerated filer ☒                                                           Smaller reporting company ☐
                                                                                        Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price [1] | Amount of Registration Fee [2] |
|---|---|---|---|---|
| Class A Common Stock, $0.0001 par value per share | 118,429,640 | Not applicable | $198,961,796 | $24,115 |

(1)   Estimated solely for purposes of calculating the registration fee pursuant to Rule 457(a) of the Securities Act. Given that there is no proposed maximum offering price per share of Class A common stock, the registrant calculates the proposed maximum aggregate offering price, by analogy to Rule 457(f)(2), based on the book value of the Class A common stock the registrant registers, which was calculated from its unaudited pro forma balance sheet as of January 31, 2019. Given that the registrant's shares of Class A common stock are not traded on an exchange or over-the-counter, the registrant did not use the market prices of its Class A common stock in accordance with Rule 457(c).

(2)   The registrant previously paid $23,814 of the registration fee with the prior filings of this registration statement.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

The information in this prospectus is not complete and may be changed. The securities may not be sold until the Registration Statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

Subject to Completion, dated May 31, 2019

# SLACK TECHNOLOGIES, INC.



## Shares of Class A Common Stock

This prospectus relates to the registration of the resale of up to 118,429,640 shares of our Class A common stock by our stockholders identified in this prospectus, or the Registered Stockholders. Unlike an initial public offering, the resale by the Registered Stockholders is not being underwritten by any investment bank. The Registered Stockholders may, or may not, elect to sell their shares of Class A common stock covered by this prospectus, as and to the extent they may determine. Such sales, if any, will be made through brokerage transactions on the New York Stock Exchange, or the NYSE. See the section titled "Plan of Distribution." If the Registered Stockholders choose to sell their shares of Class A common stock, we will not receive any proceeds from the sale of shares of Class A common stock by the Registered Stockholders.

We have two classes of common stock, Class A common stock and Class B common stock. The rights of holders of Class A common stock and Class B common stock are identical, except voting and conversion rights. Each share of Class A common stock is entitled to one vote. Each share of Class B common stock is entitled to 10 votes and is convertible at any time into one share of Class A common stock. As of April 30, 2019, the holders of our outstanding Class B common stock held approximately 99.9% of the voting power of our outstanding capital stock, with our directors and executive officers and their affiliates holding approximately 65.6%.

Prior to any sales of shares of Class A common stock, Registered Stockholders who hold Class B common stock must convert their shares of Class B common stock into shares of Class A common stock.

No public market for our Class A common stock currently exists. However, our shares of Class B common stock (on an as converted basis) have a history of trading in private transactions. Based on information available to us, the low and high sales price per share of Class B common stock (on an as converted basis) for such private transactions during the year ended January 31, 2019 was $8.37 and $23.41, respectively, and during the period from February 1, 2019 through May 30, 2019 was $21.00 and $31.50, respectively. The volume weighted average price per share for the period from February 1, 2019 through May 30, 2019 was $26.38. For more information, see the section titled "Sale Price History of our Capital Stock." Our recent trading prices in private transactions may have little or no relation to the opening public price of our shares of Class A common stock on the NYSE or the subsequent trading price of our shares of Class A common stock on the NYSE. Further, the listing of our Class A common stock on the NYSE without underwriters is a novel method for commencing public trading in shares of our Class A common stock, and consequently, the trading volume and price of shares of our Class A common stock may be more volatile than if shares of our Class A common stock were initially listed in connection with an underwritten initial public offering.

Based on information provided by the NYSE, the opening public price of our Class A common stock on the NYSE will be determined by buy and sell orders collected by the NYSE from broker-dealers. Based on such orders, the designated market maker will determine an opening price for our Class A common stock in consultation with a financial advisor pursuant to applicable NYSE rules. For more information, see the section titled "Plan of Distribution."

We have been approved to list our Class A common stock on the NYSE under the symbol "WORK." We expect our Class A common stock to begin trading on the NYSE on or about June 20, 2019.

We are an "emerging growth company" as defined under the federal securities laws and, as such, we have elected to comply with reduced reporting requirements for this prospectus and may elect to do so in future filings.

*See the section titled " Risk Factors " beginning on page 13  to read about factors you should consider before buying shares of our Class A common stock.*

The Securities and Exchange Commission and state securities regulators have not approved or disapproved these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

**, 2019**



# Our vision is a world where organizational agility is easy to achieve, regardless of an organization's size.



**10,000,000+**
Worldwide
Daily Active Users

| | | |
|---|---|---|
| **150+** | **600K+** | **90+** |
| COUNTRIES | ORGANIZATIONS | MINUTES OF ACTIVE USAGE PER WORKDAY |
| **50%+** | **500K+** | **1B+** |
| OF DAUS OUTSIDE US | REGISTERED DEVELOPERS | MESSAGES SENT PER WEEK |

Our mission is to make people's working lives simpler, more pleasant and more productive.



**TABLE OF CONTENTS**

About This Prospectus                                                                         i
Prospectus Summary                                                                           1
Risk Factors                                                                                13
Special Note Regarding Forward-Looking Statements                                           55
Market and Industry Data                                                                    57
Use of Proceeds                                                                             58
RSU Sales                                                                                   58
Dividend Policy                                                                             59
Capitalization                                                                              60
Selected Consolidated Financial Data and Other Data                                         62
Management's Discussion and Analysis of Financial Condition and Results of Operations       65
Business                                                                                    96
Management                                                                                 128
Executive Compensation                                                                     136
Certain Relationships and Related Party Transactions                                       145
Principal and Registered Stockholders                                                      152
Description of Capital Stock                                                                157
Shares Eligible for Future Sale                                                             164
Sale Price History of our Capital Stock                                                     166
Certain Material U.S. Federal Income Tax Consequences                                       167
Plan of Distribution                                                                        171
Legal Matters                                                                               173
Experts                                                                                     173
Additional Information                                                                      173
Index to Consolidated Financial Statements                                                 F-1

———————

You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission, or the SEC. Neither we nor any of the Registered Stockholders have authorized anyone to provide any information or make any representations other than those contained in this prospectus or in any free writing prospectus we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. The Registered Stockholders are offering to sell, and seeking offers to buy, shares of their Class A common stock only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, financial condition, results of operations, and prospects may have changed since such date.

For investors outside of the United States: Neither we nor any of the Registered Stockholders have done anything that would permit the use of or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. You are required to inform yourselves about, and to observe any restrictions relating to, the offering of Class A common stock by the Registered Stockholders and the distribution of this prospectus outside of the United States.

**ABOUT THIS PROSPECTUS**

This prospectus is a part of a registration statement on Form S-1 that we filed with the SEC using a "shelf" registration or continuous offering process. Under this shelf process, the Registered Stockholders may, from time to time, sell the Class A common stock covered by this prospectus in the manner described in the section titled "Plan of Distribution." Additionally, we may provide a prospectus supplement to add information to, or update or change information contained in, this prospectus, including the section titled "Plan of Distribution." You may obtain this information without charge by following the instructions under the section titled "Additional Information" appearing elsewhere in this prospectus. You should read this prospectus and any prospectus supplement before deciding to invest in our Class A common stock.

i

**PROSPECTUS SUMMARY**

*This summary highlights selected information that is presented in greater detail elsewhere in this prospectus. This summary does not contain all of the information you should consider before investing in our Class A common stock. You should read this entire prospectus carefully, including the sections titled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Unless the context otherwise requires, the terms "Slack," "the company," "we," "us" and "our" in this prospectus refer to Slack Technologies, Inc. and its consolidated subsidiaries. Our fiscal year ends January 31.*

**SLACK TECHNOLOGIES, INC.**

**Introduction – What is Slack?**

Slack is where work happens.

Around the world, over 600,000 organizations in over 150 countries have turned to Slack as the place to communicate, collaborate, and get work done. Over 10 million people inside those organizations – accountants, customer support reps, engineers, lawyers, journalists, dentists, chefs, detectives, executives, scientists, farmers, hoteliers, salespeople, and many others – collectively spend more than 50 million hours in active use of Slack in a typical week, on either a free or paid subscription plan. They do so because Slack is a new layer of the business technology stack that brings together people, applications, and data – a single place where people can effectively work together, access hundreds of thousands of critical applications and services, and find important information to do their best work.

**History**

We created Slack initially as an internal tool to help our own team stay on the same page, to be able to easily access conversations, decisions, data, and content that had been shared, and to tap into a variety of software applications from one place. We were frustrated with email. It created fragmented silos of inaccessible information, hidden in individual inboxes. When new members joined the team, they were cut off from the rich history of communication that occurred before they arrived. Transparency was difficult to achieve and routine communication had to be supplemented with status reports and stand-up meetings in order to keep the team coordinated.

In addition, despite the fact that email was the universal default routing mechanism for enterprise software, it was also an ineffective medium for sharing and managing the information and activity generated by that software. The notifications and simple workflows, such as approval processes, generated by customer support ticketing tools, human resources management systems, and expense trackers, disappeared into individual inboxes. Email is static and offers no direct integration with any of these tools. In short, email was a tiny window into the vast landscape of business information and software available to us collectively, and we needed to see the whole picture.

We needed a new way to work that would help us make the most of both our people and our significant investment in software. What was available was incomplete, inadequate, and unfit for our work at hand. What we needed did not exist. So we built it.

Since our public launch in 2014, it has become apparent that organizations worldwide have similar needs, and are now finding the solution with Slack. Our growth is largely due to word-of-mouth recommendations. Slack usage inside organizations of all kinds is typically initially driven bottoms-up, by end users. Despite this, we (and the rest of the world) still have a hard time explaining Slack. It's been called an operating system for teams, a hub for collaboration, a connective tissue across the organization, and much else. Fundamentally, it is a new layer of the business technology stack in a category that is still being defined.

**Slack's Role**

The most helpful explanation of Slack is often that it replaces the use of email inside the organization. Like email (or the Internet or electricity), Slack has very general and broad applicability. It is not aimed at any one specific purpose, but nearly anything that people do together at work.

1

Unlike email, however, most of this activity happens in team-based channels, rather than in individual inboxes. Channels offer a persistent record of the conversations, data, documents, and application workflows relevant to a project or a topic. Membership of a channel can change over time as people join or leave a project or organization, and users benefit from the accumulated historical information in a way an employee never could when starting with an empty email inbox. Depending on the size of the organization, this might provide tens, hundreds or even thousands of times more access to information than is available to individuals working in environments where email is the primary means of communication.

Also unlike email, Slack was designed from the ground up to integrate with external software systems. Slack provides an easy way for users to share and aggregate information from other software, take action on notifications, and advance workflows in a multitude of third-party applications, over 1,500 of which are listed in the Slack App Directory. Further, Slack's platform capabilities extend beyond integrations with third-party applications and allow for easy integrations with an organization's internally-developed software. During the three months ended January 31, 2019, our more than 10 million daily active users included more than 500,000 registered developers. Developers have collectively created more than 450,000 third-party applications or custom integrations that were used in a typical week during the three months ended January 31, 2019. Additionally, we are currently developing low-code solutions to create integrations and workflows entirely in Slack, suitable for all users and based on a simple, non-technical user interface .

Ultimately, Slack is more than email replacement. It is a new layer of technology that brings together people, applications, and data. Just as an operating system coordinates the flow of information and resources of a computer in a centralized fashion, using Slack inside an organization creates a hub into which critical business information flows, is acted upon and transformed, and is then quickly routed to its desired destination. Slack streamlines our users' workflows, increases the beneficial return on the time they spend communicating, and creates a powerful point of leverage for increased productivity.

**Business Context**

We believe Slack is positioned extremely well to benefit from the explosive proliferation of software into every aspect of business and the increased pace of disruption driven by technological change.

According to Netskope, a typical enterprise uses more than 1,000 cloud services. Many of the largest IT departments maintain thousands of enterprise applications. All of this software either automates the repetitive and often error-prone work that humans used to do or augments human effort with entirely new capabilities.

With the simpler and more routine tasks automated away, the work that remains is more sophisticated and complex. Those tasks, which most rely on human judgment, intelligence, and creativity, are both more difficult to perform and more difficult to coordinate. Organizational alignment becomes harder to achieve. Further, the increased use of highly specialized software in different functional areas leads to a fragmentation of attention and, because it is often difficult to share objects or records with non-users, impedes the flow of important information across the organization.

These challenges compound the disruptive threats companies face in increasingly dynamic environments. Technological change and increased globalization continually create new opportunities and threats, but they also accelerate second-order change in customer needs, competitors' behavior, and overall macroeconomic conditions. This environment demands an ever-greater ability to adapt and respond . In an increasingly dynamic world, the fundamental business advantage is organizational agility – the ability for individuals, teams, and organizations to maintain alignment while continually transforming to meet evolving challenges.

2

**How Slack Helps**

Slack is designed to allow people and teams to realize their full potential at work and, in doing so, to help organizations overcome the challenges created by their increased reliance on a proliferation of specialized software and radically reduce the communication and coordination effort required to achieve a given amount of organizational agility.

*Our vision is a world where organizational agility is easy to achieve, regardless of an organization's size*

As a result of the alignment teams and organizations are able to maintain while continuously adapting to respond in increasingly dynamic environments, less effort and energy is wasted and the human beings on those teams are able to fully utilize their intelligence and creativity in pursuit of the organization's shared objectives.

*Slack makes existing software more useful and accessible*

As a flexible platform for routing information of all kinds , Slack integrates horizontally with thousands of other applications, from those provided by companies like Google, Salesforce, ServiceNow, Atlassian, and Dropbox to the proprietary line-of-business applications developed by organizations for their own internal use. This functionality enables users to securely interact with all of these applications in one familiar user interface . We enable organizations that use Slack to get more out of their software investment.

*Slack drives increased organizational agility*

As a new layer of business technology that brings together an organization's people, applications, and data, Slack improves organizational alignment. In a December 2018 survey that we conducted with more than a thousand U.S.-based users who had been using Slack for at least one month, which we refer to as our 2018 Survey, 87% reported that Slack improved communication and collaboration inside their organization.

**Summary of Key Benefits**

Working in Slack provides several key benefits to users, teams, and organizations and to our platform ecosystem:

- **People love using Slack and that leads to high levels of engagement.** Slack is enterprise software created with an eye for user experience usually associated with consumer products. We believe that the more simple, enjoyable, and intuitive the product is, the more people will want to use it. As a result, teams benefit from the aggregated attention that happens when all members of a team are engaged in a single collaboration tool.

- **Slack increases an organization's "return on communication."** Moving to channel-based communication increases accessibility of communication, which in turn increases transparency and breaks down silos. The organization benefits from increased coordination and alignment from a given amount of communication, with no additional effort in the form of status reports, update meetings, and so on.

- **Slack increases the value of existing software investment** . Integration with Slack increases both the accessibility of information inside applications and the response times for many basic actions. Because Slack users can do virtually everything on Slack on mobile that they can do on desktop, they do not need to have dozens of work applications on their mobile devices to be able to make lightweight use of those applications on the go.

- **An organization's archive of data increases in value over time.** As teams continue to use Slack, they build a valuable resource of widely accessible information. Important messages are surrounded by useful context and users can see how fellow team members created and worked with the information and arrived at a decision. New employees can have instant access to the information they need to be effective whenever they join a new team or company. Finally, the content on Slack is available through powerful search and discovery tools, powered by machine learning, which improve through usage.

- **Slack helps organizations improve culture and employees' feelings of empowerment.** When every member of a team learns from, and contributes towards, common goals, people feel they have greater influence over

3

the ultimate outcomes of their work. By keeping all team members in the information flow, we believe that Slack increases this sense that members of a team can have an impact and make a difference and that creates greater team cohesion and increases motivation.

- **Slack helps achieve organizational agility** . Slack's channels immerse workers directly into the dynamic and evolving communication, decision making, and data flow that defines modern work. Because workers have both more access to data updated in real time and more context for that data, they are better able to quickly react and adjust work streams in response to new business priorities or changing conditions while staying in alignment with one another.

- **Developers are better able to reach and deliver value to their customers** . Slack has aggregated hundreds of thousands of organizations on one platform and made it easier for developers to distribute their software to any Slack-using organization. By making information from their applications available and allowing users to perform key actions through a whole new interface, developers can make their customers happier and more engaged.

We believe that whoever makes it easiest for teams to function with agility and cohesion in an ever more complex world will be the most important software company in the world. We aim to be that company.

## Our Business Model

From the outset, our go-to-market strategy has centered around offering an exceptional product and level of service to organizations on Slack. We offer a self-service approach, for b oth free and paid subscriptions to Slack, which capitalizes on strong word-of-mouth adoption and customer love for our brand. Since 2016, we have augmented our approach with a direct sales force and customer success professionals who are focused on driving successful adoption and expansion within organizations, whether on a free or paid subscription plan.

We define daily active users as users who either created or consumed content in a given 24-hour period on either a free or paid subscription plan. We define an organization on Slack as a separate entity, such as a company, educational or government institution, or distinct business unit of a company, that is on a subscription plan, whether free or paid. Once an organization has three or more users on a paid subscription plan, we count them as a Paid Customer.

Our user base has grown rapidly since our launch in 2014. During the three months ended January 31, 2019, our daily active users exceeded 10 million. As of January 31, 2019, Slack had more than 600,000 organizations with three or more users, comprised of:

- More than 500,000 organizations on our Free subscription plan; and

- More than 88,000 Paid Customers, including more than 65 companies in the Fortune 100.

As of April 30, 2019, Slack had more than 95,000 Paid Customers. Many of these Paid Customers have thousands of active users and our largest Paid Customers have tens of thousands of employees using Slack on a daily basis.

Our users, whether on a free or paid subscription plan, are highly engaged, and their collective active use of Slack for the week ended January 31, 2019 exceeded 50 million hours. During the week ended January 31, 2019, more than 1 billion messages were sent in Slack. During this same time, on a typical workday, users at Paid Customers averaged nine hours connected to Slack through at least one device and spent more than 90 minutes actively using Slack.

Our direct sales and customer success efforts are focused on larger organizations who have a greater number of users and teams and have the potential to increase spend over time. We measure the number of Paid Customers > $100,000 of annual recurring revenue, or ARR, as a gauge of adoption within and expansion into large enterprises. As of January 31, 2019, we had 575 Paid Customers >$100,000 of ARR, which accounted for approximately 40% of our revenue in fiscal year 2019 . As of April 30, 2019, we had 645 Paid Customers >$100,000 of ARR, which accounted for approximately 43% of our revenue in the three months ended April 30, 2019 .

We generate revenue primarily from the sale of subscriptions for Slack. Paid customers typically pay on a monthly or annual basis, based on the number of users that they have on Slack.

4

Our reven ue was $105.2 million, $220.5 million, and $400.6 million in fiscal years 2017, 2018, and 2019, respectively, representing annual growth of 110% and 82%, respectively. Our revenue was $80.9 million and $134.8 million for the three months ended April 30, 2018 and 2019, respectively, representing year-over-year growth of 67%. Our growth is global with international revenue representing 34%, 34%, and 36% of total revenue in fiscal years 2017, 2018, and 2019, respectively, and 36% and 37% in the three months ended April 30, 2018 and 2019, respectively. We continue to invest in growing our business to capitalize on our market opportunity. As a result, we incurred net losses of $146.9 million, $140.1 million, and $138.9 million in fiscal years 2017, 2018, and 2019, respectively. We incurred net losses of $24.9 million and $31.9 million in the three months ended April 30, 2018 and 2019, respectively . Our net losses have been decreasing as a percentage of revenue over time as revenue growth has outpaced the growth in operating expenses.

Expansion within organizations on Slack is a significant contributor to our growth. We measure the rate of expansion within our Paid Customer base, both sales-driven and through organic growth, by Net Dollar Retention Rate. Our Net Dollar Retention Rate was 138% as of April 30, 2019. We believe that our Net Dollar Retention Rate is a reflection of the rapid pace of adoption that often occurs as usage spreads within and across teams. We believe that all of these factors will contribute to a high lifetime value of an organization on Slack. For a definition of how we calculate Net Dollar Retention Rate and additional information about our key business metrics, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business Metrics."

### What Sets Us Apart

#### Singular focus

Our development, design, partnerships, customer engagement, and investments are targeted at realizing the enormity and simplicity of Slack's singular mission: to make people's working lives simpler, more pleasant, and more productive. We have no legacy products or competing priorities.

#### Scale and market leadership

The strength of our market leadership is demonstrated by the scale and growth of our users, the high level of engagement within our user base, our growth within organizations, the breadth of applications that integrate with Slack, and the size of our developer ecosystem.

#### Strong increasing returns dynamics

As Slack usage increases inside an organization, more value is created for each additional user who might join, as well as for all existing users. We believe shared channels between organizations will increase the value of the overall Slack network for each new organization that joins as well as for all existing network members. Slack also generates more value for developers as more users and more organizations join Slack, and users and organizations are more attracted to Slack as more apps are integrated into or built on our platform.

#### Customer love leading to stickiness and organic expansion

People love using Slack and many become advocates for wider use inside of their organizations. They also tend to recommend Slack when they switch jobs or join organizations that are not yet using Slack. This customer love is a source of growth that is exceptional in enterprise software.

#### Differentiated go-to-market strategy

Organic growth is generated as users realize the benefits of Slack. This growth enables us to attract new and prospective organizations through a highly effective self-service customer engagement model for free and paid subscription plans. We complement our self-service strategy with a focused direct sales effort and our customer success teams work to broaden adoption of Slack into wider-scale deployments.

5

*Customer-centricity as the fundamental tenet of our company*

We build our software and user interface around the real needs of human beings. We focus maniacally on customer support for free and paid subscription plans and treat it as a critical and strategic imperative for our company. We believe people should leave every interaction with a Slack representative feeling that they have been heard, respected, and helped by a human being who truly understands Slack .

## Market Opportunity

We believe everyone whose working life is mediated by email is a potential Slack user. Indeed, because of the universal need for organizational agility and the impact to current and potential organizations on Slack of getting more out of their investment in software, we further believe that the shift to Slack, or services like Slack, is inevitable. We estimate the market opportunity for Slack and other providers of workplace business technology software platforms for communication and collaboration to be $28 billion. As our market and the number of competitors in it is rapidly evolving, our estimates for the size of this market may not be reflective of the actual size of the market.

## Growth Strategy

We intend to continue to grow by the following means:

*Expand our user base through continuous enhancements to Slack*

We will continue a relentless focus on product design and new user experience to reach more users and organizations .

*Grow the number of organizations on Slack and increase our paid customers*

We believe our market remains underpenetrated and we will continue to expand our marketing and sales efforts to reach more users and organizations and to increase the number of paid customers.

*Increase usage within organizations on Slack*

We plan to continue to grow use and users within organizations on Slack by increasing our investments in our direct sales force, customer success, and customer experience teams, along with new user education initiatives .

*Enable Slack usage across existing and new business networks*

Slack's guest accounts and shared channels features facilitate secure collaboration between companies and we believe adoption of these features will grow significantly in the coming years. We expect the associated network effects will increase the value of Slack both for existing and new organizations on Slack and will be an important factor in our future growth.

*Further invest in enterprise capabilities*

We intend to increase investments in marketing, expand our field sales team, and continue to build product functionality in order to drive greater adoption of Slack by large organizations.

*Invest in international expansion*

We plan to open offices and hire sales and customer experience people in additional countries and expand our presence in countries where we already operate.

*Grow our application platform and developer ecosystem*

We will continue investing to expand the number of developers building applications that integrate with Slack and to make Slack work with an increasing number of third-party and internally developed custom applications .

*Leverage artificial intelligence, machine learning and advanced search*

We believe that there is a significant opportunity to further streamline people's working lives by automating workflows , and we intend to continue to invest in our research and development efforts in artificial intelligence, machine learning, and search capabilities.

### Risk Factors Summary

Our business is subject to numerous risks and uncertainties, including those highlighted in the section titled "Risk Factors." These risks include, but are not limited to, the following:

- We have a limited operating history, which makes it difficult to forecast our revenue and evaluate our business and future prospects.

- We have a history of net losses, we anticipate increasing operating expenses in the future, and we may not be able to achieve and, if achieved, maintain profitability.

- We have experienced rapid growth in recent periods and our recent growth rates may not be indicative of our future growth.

- If we fail to manage our growth effectively, we may be unable to execute our business plan or maintain high levels of service and customer satisfaction.

- We may experience quarterly fluctuations in our results of operations due to a number of factors that make our future results difficult to predict and could cause our results of operations to fall below analyst or investor expectations.

- Real or perceived errors, failures, vulnerabilities, or bugs in Slack could harm our business, results of operations, and financial condition.

- The market and software categories in which we participate are competitive, new, and rapidly changing, and if we do not compete effectively with established companies as well as new market entrants our business, results of operations, and financial condition could be harmed.

- If we are unable to attract new users and organizations, convert users of and organizations on our free version into paid customers, grow or maintain our Net Dollar Retention Rate, expand usage within organizations on Slack, and sell premium subscription plans or develop new features, integrations, capabilities, and enhancements that achieve market acceptance, our revenue growth and profitability will be harmed.

- Our ability to introduce new f eatures, integrations, capabilities, and enhancements is dependent on adequate research and development resources. If we do not adequately fund our research and development efforts, or if our research and development investments do not translate into material enhancements to Slack, we may not be able to compete effectively and our business, results of operations, and financial condition may be harmed.

- If there are interruptions or performance problems associated with the technology or infrastructure used to provide Slack, organizations on Slack may experience service outages, other organizations may be reluctant to adopt Slack, and our reputation could be harmed.

- A security incident may allow unauthorized access to our systems, networks, or data or the data of organizations on Slack, harm our reputation, create additional liability, and harm our financial results.

- Any actual or perceived failure by us to comply with privacy, data protection, information security, consumer privacy, data residency, or telecommunications laws, regulations, government access requests, and obligations in one or multiple jurisdictions could result in proceedings, actions, or penalties against us and could harm our business and reputation. These laws are uncertain, evolving, and interpreted and applied in different ways in different countries and, as a result, our legal obligations in different countries, and our efforts to comply with those legal obligations, may be inadequate or in conflict.

- Our listing differs significantly from an underwritten initial public offering.

- The public price of our Class A common stock may be volatile, and could, upon listing on the NYSE, decline significantly and rapidly.

- The dual class structure of our common stock has the effect of concentrating voting control with those stockholders who held our capital stock prior to the listing of our Class A common stock on the NYSE, including our directors, executive officers and their respective affiliates, who held in the aggregate 65.6% of the voting power of our capital stock as of April 30, 2019. Further, the voting agreements between our Chief Executive Officer, Stewart Butterfield, and certain stockholders have the effect of concentrating voting power with our Chief Executive Officer. This ownership will limit or preclude your ability to influence corporate matters, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval.

- None of our stockholders are party to any contractual lock-up agreement or other contractual restrictions on transfer. Following our listing, sales of substantial amounts of our Class A common stock in the public markets or the perception that sales might occur, could cause the market price of our Class A common stock to decline.

## Channels for Disclosure of Information

Investors, the media, and others should note that, following the effectiveness of the registration statement of which this prospectus forms a part, we intend to announce material information to the public through filings with the SEC, the investor relations page on our website, blog posts on our website, press releases, public conference calls, webcasts, our twitter feed (@SlackHQ), our Facebook page, and our LinkedIn page.

The information disclosed by the foregoing channels could be deemed to be material information. As such, we encourage investors, the media, and others to follow the channels listed above and to review the information disclosed through such channels.

Any updates to the list of disclosure channels through which we will announce information will be posted on the investor relations page on our website.

## Corporate Information

We were incorporated in 2009 as Tiny Spec, Inc., a Delaware corporation. Later in 2009, we changed our name to Tiny Speck, Inc. and, in 2014, we changed our name to Slack Technologies, Inc. Our principal executive offices are located at 500 Howard Street, San Francisco, California 94105, and our telephone number is (855) 980-5920. Our website address is www.slack.com. Information contained on or that can be accessed through our website does not constitute part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

"Slack" is our registered trademark in the United States, Australia, Brazil, Canada, Colombia, the European Union, Japan, Mexico, New Zealand, Russia, and South Korea. Other trademarks and trade names referred to in this prospectus are the property of their respective owners.

## Emerging Growth Company

The Jumpstart Our Business Startups Act, or the JOBS Act, was enacted in April 2012 with the intention of encouraging capital formation in the United States and reducing the regulatory burden on newly-public companies that qualify as "emerging growth companies." We are an "emerging growth company" within the meaning of the JOBS Act. As an "emerging growth company," we intend to take advantage of certain exemptions from various public reporting requirements, including the requirement that our internal control over financial reporting be audited by our independent registered public accounting firm pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, certain requirements related to the disclosure of executive compensation in this prospectus and in our periodic reports and proxy statements, and the requirement that we hold a non-binding advisory vote on executive compensation

8

and any golden parachute payments. We may take advantage of these exemptions until we are no longer an "emerging growth company."

In addition, under the JOBS Act, "emerging growth companies" can delay adopting new or revised accounting standards until such time as those standards apply to private companies. We intend to avail ourselves of this exemption from new or revised accounting standards. Accordingly, we will not be subject to the same new or revised accounting standards as other public companies that are not "emerging growth companies."

We will remain an "emerging growth company" until the earliest to occur of: (i) the last day of the fiscal year in which we have more than $1.07 billion in annual revenue; (ii) the date we qualify as a "large accelerated filer," with at least $700 million of equity securities held by non-affiliates; (iii) the date on which we have issued, in any three-year period, more than $1.0 billion in non-convertible debt securities; and (iv) the last day of the fiscal year ending after the fifth anniversary of the listing of our Class A common stock on the NYSE.

For certain risks related to our status as an "emerging growth company," see the section titled "Risk Factors—Risks Related to Our Business—We are an 'emerging growth company,' and the reduced disclosure requirements applicable to 'emerging growth companies' may make our Class A common stock less attractive to investors."

9

**SUMMARY CONSOLIDATED FINANCIAL DATA AND OTHER DATA**

The following tables summarize our consolidated financial data and other data. The summary consolidated statements of operations data for the years ended January 31, 2017, 2018, and 2019 has been derived from our audited consolidated financial statements included elsewhere in this prospectus. The summary consolidated statements of operations data for the three months ended April 30, 2018 and 2019 and consolidated balance sheet data as of April 30, 2019 have been derived from our unaudited interim consolidated financial statements included elsewhere in this prospectus. We have prepared the unaudited interim consolidated financial statements on the same basis as the audited financial statements. We have included, in our opinion, all adjustments, consisting only of normal recurring adjustments that we consider necessary for a fair presentation of the financial information set forth in those unaudited interim consolidated financial statements. Our historical results are not necessarily indicative of the results that may be expected in the future and the results for the three months ended April 30, 2019 are not necessarily indicative of the results to be expected for the full year or any other period. You should read the following summary consolidated financial data and other data below in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

| | Year Ended January 31, | | | Three Months Ended April 30, | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | (In thousands, except per share data) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 105,153 | $ 220,544 | $ 400,552 | $ 80,919 | $ 134,821 |
| Cost of revenue [1] | 15,517 | 26,364 | 51,301 | 10,101 | 18,574 |
| Gross profit | 89,636 | 194,180 | 349,251 | 70,818 | 116,247 |
| Operating expenses: | | | | | |
| Research and development [1] | 96,678 | 141,350 | 157,538 | 35,410 | 51,103 |
| Sales and marketing [1] | 104,006 | 140,188 | 233,191 | 42,168 | 66,838 |
| General and administrative [1] | 37,455 | 56,493 | 112,730 | 19,568 | 36,744 |
| Total operating expenses | 238,139 | 338,031 | 503,459 | 97,146 | 154,685 |
| Loss from operations | (148,503) | (143,851) | (154,208) | (26,328) | (38,438) |
| Other income (expense), net | 1,749 | 4,581 | 16,146 | 1,802 | 7,077 |
| Loss before income taxes | (146,754) | (139,270) | (138,062) | (24,526) | (31,361) |
| Provision for income taxes | 155 | 793 | 840 | 350 | 520 |
| Net loss | (146,909) | (140,063) | (138,902) | (24,876) | (31,881) |
| Net income (loss) attributable to noncontrolling interest [2] | (45) | 22 | 1,781 | 6 | 1,451 |
| Net loss attributable to Slack | (146,864) | (140,085) | (140,683) | (24,882) | (33,332) |
| Less: Deemed dividends to preferred stockholders | — | 40,883 | — | — | — |
| Net loss attributable to Slack common stockholders | $ (146,864) | $ (180,968) | $ (140,683) | $ (24,882) | $ (33,332) |
| Basic and diluted net loss per share: | | | | | |
| Net loss per share attributable to Slack common stockholders, basic and diluted [3] | $ (1.28) | $ (1.47) | $ (1.16) | $ (0.21) | $ (0.26) |
| Weighted-average shares used in computing net loss per share attributable to Slack common stockholders, basic and diluted [3] | 114,887 | 122,865 | 121,732 | 118,926 | 125,890 |
| Pro forma net loss per share attributable to Slack common stockholders, basic and diluted (unaudited) [3] | | | $ (0.27) | | $ (0.06) |
| Weighted-average shares used in computing pro forma net loss per share attributable to Slack common stockholders, basic and diluted (unaudited) [3] | | | 517,493 | | 525,337 |

_____

(1)  Includes stock-based compensation as follows:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
|---|---|---|---|---|---|
| | (In thousands) | | | | |
| Cost of revenue | $ 630 | $ 491 | $ 732 | $ 603 | $ 46 |
| Research and development | 34,546 | 35,260 | 9,948 | 3,395 | 1,635 |
| Sales and marketing | 9,744 | 8,044 | 2,677 | 1,204 | 382 |
| General and administrative | 5,171 | 4,288 | 9,775 | 916 | 1,576 |
| Total stock-based compensation | $ 50,091 | $ 48,083 | $ 23,132 | $ 6,118 | $ 3,639 |

Stock-based compensation for fiscal years 2017, 2018, and 2019 included compensation expense of $26.5 million, $0, and $14.8 million, respectively, related to secondary sales of common stock by certain of our current and former employees and $8.0 million, $39.4 million, and $0, respectively, related to cash payments attributable to tender offers and repurchases for our outstanding common stock. Stock-based compensation for the three months ended April 30, 2018 and 2019 included compensation expense of $4.4 million and $0, respectively, related to secondary sales of common stock by certain of our current and former employees.

(2)  Our consolidated financial statements include our majority-owned subsidiary, Slack Fund L.L.C., or Slack Fund. The ownership interest of minority investors in Slack Fund is recorded as a noncontrolling interest.

(3)  See note 10 to our consolidated financial statements included elsewhere in this prospectus for an explanation of the method used to calculate basic and diluted net loss per share attributable to Slack common stockholders and pro forma basic and diluted net loss per share attributable to Slack common stockholders and the weighted-average number of shares used in the computation of the per share amounts.

| | As of April 30, 2019 | |
| | Actual | Pro Forma [1] |
|---|---|---|
| | (In thousands) | |
| **Consolidated Balance Sheet Data:** | | |
| Cash, cash equivalents, and marketable securities | $ 792,658 | $ 792,658 |
| Working capital | 599,938 | 599,938 |
| Total assets | 1,167,030 | 1,167,030 |
| Total deferred revenue | 256,689 | 256,689 |
| Convertible preferred stock | 1,392,101 | — |
| Total stockholders' equity | 816,779 | 816,779 |

_____

(1)  The pro forma column in the consolidated balance sheet data table above reflects (a) the automatic conversion of all outstanding shares of our convertible preferred stock into 373,371,712 shares of Class B common stock as if such conversion had occurred on April 30, 2019, (b) the vesting and settlement of 26,075,320 restricted stock units, or RSUs, for which the service-based condition was fully satisfied as of April 30, 2019 and for which we expect the performance vesting condition to be satisfied upon the listing and public trading of our Class A common stock on the NYSE, and (c) stock-based compensation of $201.6 million associated with outstanding RSUs as of April 30, 2019 for which we expect the performance vesting condition to be satisfied upon the listing and public trading of our Class A common stock on the NYSE. Payroll taxes and other withholding obligations have not been included in the pro forma column. For additional information, see Note 1 to our consolidated financial statements included elsewhere in this prospectus and in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Significant Impacts of Stock-Based Compensation."

**Key Business Metrics**

We review the following key business metrics to measure our performance, identify trends, formulate financial projections, and make strategic decisions. We are not aware of any uniform standards for calculating these key metrics, which may hinder comparability with other companies who may calculate similarly-titled metrics in a different way.

| | As of January 31, | | | As of April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
|---|---|---|---|---|---|
| Paid Customers | 37,000 | 59,000 | 88,000 | 67,000 | 95,000 |
| Paid Customers >$100,000 | 135 | 298 | 575 | 351 | 645 |
| Net Dollar Retention Rate | 171% | 152% | 143% | 149% | 138% |

11

For additional information about our key business metrics, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business Metrics."

## Non-GAAP Financial Measures

In addition to our results determined in accordance with U.S. generally accepted accounting principles, or GAAP, we believe the below non-GAAP measures are useful in evaluating our operating performance . We use the below non-GAAP financial information, collectively, to evaluate our ongoing operations and for internal planning and forecasting purposes.

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
|---|---|---|---|---|---|
| | (In thousands) | | | | |
| Calculated Billings | $ 143,390 | $ 289,013 | $ 516,972 | $ 102,080 | $ 149,637 |
| Free Cash Flow | $ (114,038) | $ (57,661) | $ (97,239) | $ (14,969) | $ (34,203) |
| Tender offer payments and repurchases deemed compensation [1] | 8,033 | 39,374 | — | — | — |
| Adjusted Free Cash Flow | $ (106,005) | $ (18,287) | $ (97,239) | $ (14,969) | $ (34,203) |

(1)  In fiscal years 2017 and 2018, we made cash payments of $8.0 million and $39.4 million, respectively, attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. Adjusted Free Cash Flow has been shown here as adjusted for these cash payments. We have adjusted our Free Cash Flow for these payments because we do not expect them to occur when we are a public company so we believe that this provides greater comparability across periods.

For additional information and reconciliations of the non-GAAP financial measures to the most directly comparable financial measures stated in accordance with GAAP, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures."

12

## RISK FACTORS

*Investing in our Class A common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, before making a decision to invest in our Class A common stock. If any of the risks actually occur, our business, results of operations, financial condition, and prospects could be harmed. In that event, the trading price of our Class A common stock could decline, and you could lose part or all of your investment.*

### Risks Related to Our Business

#### *We have a limited operating history, which makes it difficult to forecast our revenue and evaluate our business and future prospects.*

We launched Slack publicly in 2014 and much of our growth has occurred in recent periods. As a result of our limited operating history, our ability to forecast our future results of operations and plan for and model future growth is limited and subject to a number of uncertainties. We have encountered and expect to continue to encounter risks and uncertainties frequently experienced by growing companies in rapidly evolving industries, such as the risks and uncertainties described herein. Additionally, the sales cycle for the evaluation and implementation of our paid versions, Standard and Plus, which typically ranges from a single day to multiple months, and of Enterprise Grid, which typically extends for multiple months, may also cause us to experience a delay between increasing operating expenses and the generation of corresponding revenue, if any. Accordingly, we may be unable to prepare accurate internal financial forecasts or replace anticipated revenue that we do not receive as a result of delays arising from these factors, and our results of operations in future reporting periods may be below the expectations of investors. If we do not address these risks successfully, our results of operations could differ materially from our estimates and forecasts or the expectations of investors, causing our business to suffer and our Class A common stock price to decline.

#### *We have a history of net losses, we anticipate increasing operating expenses in the future, and we may not be able to achieve and, if achieved, maintain profitability.*

We have incurred significant net losses in each year since our inception, including net losses of $146.9 million , $140.1 million , and $138.9 million in fiscal years 2017, 2018, and 2019, respectively. We expect to continue to incur net losses for the foreseeable future and we may not achieve or maintain profitability in the future. Because the market for Slack, and the features, integrations, and capabilities we offer on Slack, is rapidly evolving and has not yet reached widespread adoption, it is difficult for us to predict our future results of operations or the limits of our market opportunity. We expect our operating expenses to significantly increase over the next several years as we hire additional personnel, particularly in sales and marketing, expand our partnerships, operations, and infrastructure, both domestically and internationally, continue to enhance Slack and develop and expand its features, integrations and capabilities, and expand and improve our application programming interfaces, or APIs. We also intend to continue to build and enhance Slack through both internal research and development as well as selectively pursuing acquisitions that can uniquely contribute to Slack's capabilities. In addition, as we grow and become a public company, we will incur additional significant legal, accounting, and other expenses that we did not incur as a private company. If our revenue does not increase to offset the expected increases in our operating expenses, we will not be profitable in future periods. In future periods, our revenue growth could slow or our revenue could decline for a number of reasons, including any failure to increase the number of organizations on Slack, increase our number of paid customers, or grow or maintain our Net Dollar Retention Rate, a decrease in the growth of our overall market, our failure, for any reason, to continue to capitalize on growth opportunities, slowing demand for Slack, additional regulatory burdens, or increasing competition. As a result, our past financial performance may not be indicative of our future performance. Any failure by us to achieve or sustain profitability on a consistent basis could cause the value of our Class A common stock to decline.

#### *We have experienced rapid growth in recent periods and our recent growth rates may not be indicative of our future growth.*

We have experienced rapid growth in recent periods. Our revenue was $105.2 million , $220.5 million , and $400.6 million for the years ended January 31, 2017, 2018, and 2019, respectively, representing annual growth of 110% and 82% , respectively. In future periods, we may not be able to sustain revenue growth consistent with recent history, or at all. Further, as we operate in a new and rapidly changing category of software, widespread acceptance and use of

13

Slack is critical to our future growth and success. We believe our revenue growth depends on a number of factors, including, but not limited to, our ability to:

- attract new users and organizations;

- provide excellent customer experience;

- grow or maintain our Net Dollar Retention Rate, expand usage within organizations on Slack, and sell premium versions of Slack;

- convert users of and organizations on our free version into paid customers;

- introduce and grow adoption of Slack in new markets outside of the United States;

- expand usage of Slack between organizations through shared channels;

- achieve widespread acceptance and use of Slack;

- adequately expand our sales force;

- expand the features and capabilities of Slack, including through the creation and use of additional integrations;

- maintain the security and reliability of Slack;

- comply with existing and new applicable laws and regulations;

- price Slack effectively so that we are able to attract and retain paid customers without compromising our profitability;

- successfully compete against established companies and new market entrants, as well as existing software tools; and

- increase awareness of our brand on a global basis.

If we are unable to accomplish any of these tasks, our revenue growth will be harmed. We also expect our operating expenses to increase in future periods, and if our revenue growth does not increase to offset these anticipated increases in our operating expenses, our business, results of operations, and financial condition will be harmed, and we may not be able to achieve or maintain profitability. We have also encountered in the past, and expect to encounter in the future, risks and uncertainties frequently experienced by growing companies in rapidly evolving industries. If our assumptions regarding these risks and uncertainties, which we use to plan and operate our business, are incorrect or change, or if we do not address these risks successfully, our growth rates may slow and our business would suffer. Further, our rapid growth may make it difficult to evaluate our future prospects.

***If we fail to manage our growth effectively, we may be unable to execute our business plan or maintain high levels of service and customer satisfaction.***

We have experienced, and expect to continue to experience, rapid growth, which has placed, and may continue to place, significant demands on our management and our operational and financial resources. For example, our headcount has grown from 716 employees as of January 31, 2017 to 1,664 employees as of April 30, 2019. We have established international offices, including offices in Australia, Canada, Ireland, India, Japan, and the United Kingdom, and we plan to continue to expand our international operations into other countries in the future. We have also experienced significant growth in the number of users, organizations on Slack and integrations, and in the amount of data that Slack supports. Additionally, our organizational structure is becoming more complex as we scale our operational, financial and management controls as well as our reporting systems and procedures.

To manage growth in our operations and personnel, we will need to continue to grow and improve our operational, financial, and management controls and our reporting systems and procedures. We will require significant capital expenditures and the allocation of valuable management resources to grow and change in these areas without

14

undermining our culture, which has been central to our growth so far. Our expansion has placed, and our expected future growth will continue to place, a significant strain on our management, customer experience, research and development, sales and marketing, administrative, financial, and other resources. If we fail to manage our anticipated growth and change in a manner that preserves the key aspects of our corporate culture, the quality of Slack may suffer, which could negatively affect our brand and reputation and harm our ability to attract users, employees, and organizations, and to grow or maintain our Net Dollar Retention Rate.

In addition, as we expand our business, it is important that we continue to maintain a high level of customer service and satisfaction. As our paid customer base continues to grow, we will need to expand our account management, customer service and other personnel, our partners, our features, and our security offerings to provide personalized account management and customer service as well as personalized features, integrations and capabilities. If we are not able to continue to provide high levels of customer service, our reputation, as well as our business, results of operations, and financial condition, could be harmed.

***We may experience quarterly fluctuations in our results of operations due to a number of factors that make our future results difficult to predict and could cause our results of operations to fall below analyst or investor expectations.***

Our quarterly results of operations may fluctuate from quarter to quarter as a result of a number of factors, many of which are outside of our control and may be difficult to predict, including, but not limited to:

- the level of demand for Slack;

- our ability to grow or maintain our Net Dollar Retention Rate, expand usage within organizations on Slack, and sell premium versions of Slack;

- our ability to convert users of and organizations on our free version into paid customers;

- the timing and success of new features, integrations, capabilities, and enhancements by us to Slack or by our competitors to their products or any other change in the competitive landscape of our market;

- our ability to achieve widespread acceptance and use of Slack;

- errors in our forecasting of the demand for Slack, which could lead to lower revenue, increased costs or both;

- the amount and timing of operating expenses and capital expenditures, as well as entry into operating leases, that we may incur to maintain and expand our business and operations and to remain competitive;

- the timing of expenses and recognition of revenue;

- security breaches, technical difficulties, or interruptions to Slack resulting in service level agreement credits;

- adverse litigation judgments, other dispute-related settlement payments, or other litigation-related costs;

- regulatory fines;

- changes in, and continuing uncertainty in relation to, the legislative or regulatory environment;

- legal and regulatory compliance costs in new and existing markets;

- the number of new employees added;

- the timing of the grant or vesting of equity awards to employees, directors, or consultants;

- pricing pressure as a result of competition or otherwise;

- seasonal buying patterns for IT spending;

- fluctuations in foreign currency exchange rates;

15

- costs and timing of expenses related to the acquisition of businesses, talent, technologies, or intellectual property, including potentially significant amortization costs and possible write-downs; and

- general economic conditions in either domestic or international markets, including geopolitical uncertainty and instability.

Any one or more of the factors above may result in significant fluctuations in our quarterly results of operations. You should not rely on our past results as an indicator of our future performance.

The variability and unpredictability of our quarterly results of operations or other operating metrics could result in our failure to meet our expectations or those of analysts that cover us or investors with respect to revenue or other key metrics for a particular period. If we fail to meet or exceed such expectations for these or any other reasons, the market price of our Class A common stock could fall, and we could face costly lawsuits, including securities class action suits.

***Real or perceived errors, failures, vulnerabilities, or bugs in Slack could harm our business, results of operations, and financial condition.***

The software technology underlying and integrating with Slack is inherently complex and may contain material defects or errors, particularly when new features, integrations, or capabilities are released. Errors, failures, vulnerabilities, or bugs have in the past, and may in the future, occur in Slack, especially when updates are deployed or new features, integrations, or capabilities are rolled out. Slack is often used in connection with large-scale computing environments with different operating systems, system management software, integrations, equipment, and networking configurations, which may cause errors or failures, or affect other aspects of the computing environment in which Slack is used. In addition, use of Slack in complicated, large-scale computing environments may expose errors, failures, vulnerabilities, or bugs in Slack or integrations. Any such errors, failures, vulnerabilities, or bugs may not be found until after new features, integrations, or capabilities have been released to organizations on Slack. Furthermore, we will need to ensure that Slack can scale to meet the evolving needs of users and organizations on Slack, particularly as we continue to focus on larger organizations with Enterprise Grid. Real or perceived errors, failures, vulnerabilities, or bugs in Slack could result in negative publicity, loss or leaking of personal data and data of organizations on Slack, loss of or delay in market acceptance of Slack, loss of competitive position, regulatory fines or claims by organizations on Slack for losses sustained by them, all of which could harm our business, results of operations, and financial condition.

***The market and software categories in which we participate are competitive, new, and rapidly changing, and if we do not compete effectively with established companies as well as new market entrants our business, results of operations, and financial condition could be harmed.***

Slack is a new category of business technology in a rapidly evolving market for software, programs, and tools used by knowledge workers that is intensely competitive, fragmented, and subject to rapidly changing technology, shifting user and customer needs, new market entrants, and frequent introductions of new products and services. We also compete in various segments of the communication, collaboration, and integration software categories. Moreover, we expect competition to increase in the future from established competitors and new market entrants, including established technology companies who have not previously entered the market. Our primary competitor is currently Microsoft Corporation. Our other competitors fall into the following categories: productivity tool and email providers, such as Alphabet Inc. (including Google Inc.); unified communications providers, such as Cisco Systems Inc.; and consumer application companies who have entered the business software market, such as Facebook Inc. We also compete with smaller companies that offer niche or point products that attempt to address certain problems that Slack addresses. We further compete against existing software, programs, and tools, such as email. With the introduction of new technologies, the evolution of Slack, and new market entrants, we expect competition to intensify in the future. Established companies may not only develop their own communication and collaboration solutions, platforms for software integration, and secure repositories of information and data, but also acquire or establish product integration, distribution, or other cooperative relationships with our current competitors. For example, while we currently partner with Atlassian Corporation PLC, Google Inc., Okta, Inc., Oracle Corporation, ServiceNow, Inc., salesforce.com, inc., SAP SE, Workday, Inc., and Zoom Video Communications, Inc. , among others, they may develop and introduce products that directly or indirectly compete with Slack. New competitors or alliances among competitors may emerge and rapidly acquire significant market share due to factors such as greater brand name recognition, a larger existing user and/or

16

customer base, superior product offerings, a larger or more effective sales organization, and significantly greater financial, technical, marketing, and other resources and experience. We also compete with niche companies that offer specific point solutions in the communication, collaboration and data use markets, normally focused on specific industries, geographies, or specific use cases, which attempt to address certain of the problems that Slack addresses. In addition, with the recent increase in large merger and acquisition transactions in the technology industry, particularly transactions involving cloud-based technologies, there is a greater likelihood that we will compete with other large technology companies in the future. We expect this trend to continue as companies attempt to strengthen or maintain their market positions in an evolving industry. Companies resulting from these possible consolidations may create more compelling product offerings and be able to offer more attractive pricing options, making it more difficult for us to compete effectively.

Many of our existing competitors have, and some of our potential competitors could have, substantial competitive advantages such as greater brand name recognition and longer operating histories, larger sales and marketing budgets and resources, broader distribution, and established relationships with independent software vendors, partners, and customers, greater customer experience resources, greater resources to make acquisitions, lower labor, and development costs, larger and more mature intellectual property portfolios, and substantially greater financial, technical and other resources. Such competitors with greater financial and operating resources may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards, or customer requirements.

In addition, some of our larger competitors have substantially broader product offerings and leverage their relationships based on other products or incorporate functionality into existing products to gain business in a manner that discourages users from purchasing Slack, including through selling at zero or negative margins, product bundling, or closed technology platforms. Potential customers may also prefer to purchase from their existing suppliers rather than a new supplier regardless of product performance or features. These larger competitors often have broader product lines and market focus and will therefore not be as susceptible to downturns in a particular market. Our competitors may also seek to repurpose their existing offerings to provide software, programs, and tools used by knowledge workers with subscription models. Further, some current and potential customers, particularly large organizations, have elected, and may in the future elect, to develop or acquire their own software, programs, and tools used by knowledge workers that would reduce or eliminate the demand for Slack.

Conditions in our market could also change rapidly and significantly as a result of technological advancements, partnering by our competitors or continuing market consolidation, and it is uncertain how our market will evolve. New start-up companies that innovate and large competitors that are making significant investments in research and development may invent similar or superior products and technologies that compete with Slack. These competitive pressures in our market or our failure to compete effectively may result in price reductions, fewer customers, reduced revenue, gross profit, and gross margins, increased net losses, and loss of market share. Any failure to meet and address these factors could harm our business, results of operations, and financial condition.

***If we are unable to attract new users and organizations, convert users of and organizations on our free version into paid customers, grow or maintain our Net Dollar Retention Rate, expand usage within organizations on Slack, and sell premium subscription plans or develop new features, integrations, capabilities, and enhancements that achieve market acceptance, our revenue growth and profitability will be harmed.***

To increase our revenue and achieve and maintain profitability, we must add new users and organizations, convert users of and organizations on our free version into paid customers, grow or maintain our Net Dollar Retention Rate, expand usage within organizations on Slack, and sell premium subscription plans. We encourage organizations on our free version to upgrade to paid versions of Slack and paid customers of Standard to upgrade to our premium subscription plans, Plus or Enterprise Grid, through in-product prompts and notifications, by recommending additional features and by providing customer support that explains the additional capabilities of our paid and premium plans. Additionally, we seek to expand within organizations on Slack by adding new users, having organizations on our Free or Standard subscription plan upgrade to our premium plans, or expanding the use of Slack into other departments within an organization already on Slack. We often see enterprise decision-makers deciding to adopt Slack after noticing substantial organic adoption by individuals and teams within the organization. While we have experienced significant growth in the number of users on Slack, we do not know whether we will continue to achieve similar user growth rates in the future. Numerous factors, however, may impede our ability to add new users and organizations, convert users of and

17

organizations on our free version into paid customers, grow and maintain our Net Dollar Retention Rate, expand usage within organizations on Slack, and sell premium subscription plans, including our inability to convert organizations using our free version into paid customers, failure to attract and effectively train new sales and marketing personnel, especially as we increase our sales efforts, failure to retain and motivate our current sales and marketing personnel, failure to develop or expand relationships with partners, failure to successfully deploy new features, integrations, and capabilities for organizations on Slack and provide quality customer experience, or failure to ensure the effectiveness of our marketing programs. Additionally, increasing our sales to large organizations requires increasingly sophisticated and costly sales efforts targeted at senior management and other personnel. If our efforts to sell to large organizations and organizations of all sizes are not successful or do not generate additional revenue, our business would suffer. See also "—Failure to effectively develop and expand our direct sales capabilities could harm our ability to increase the number of organizations on Slack and achieve broader market acceptance of Slack."

Our ability to attract new users and organizations and increase revenue from existing paid customers depends in large part on our ability to continually enhance and improve Slack and the features, integrations, and capabilities we offer, and to introduce compelling new features, integrations, and capabilities that reflect the changing nature of our market in order to maintain and improve the quality and value of Slack, which depends on our ability to continue investing in research and development and in our ongoing efforts to improve and enhance Slack. The success of any enhancement to Slack depends on several factors, including timely completion and delivery, competitive pricing, adequate quality testing, integration with existing technologies, and overall market acceptance. Any new features, integrations, and capabilities that we develop may not be introduced in a timely or cost-effective manner, may contain errors, failures, vulnerabilities, or bugs, or may not achieve the market acceptance necessary to generate significant revenue. We must also convince developers to adopt and build on Slack. We believe that these developer-built integrations facilitate greater usage and customization of Slack and the features, integrations, and capabilities enhance user experience. If these developers stop developing on or supporting Slack, we will lose the benefits that have contributed to the growth in the number of organizations and users on Slack, and our business, results of operations, and financial condition could be harmed. If we are unable to successfully develop new features, integrations, and capabilities to enhance Slack to meet requirements of organizations on Slack, especially as we continue to grow and enhance Enterprise Grid, or otherwise gain widespread market acceptance, our business, results of operations, and financial condition would be harmed.

Moreover, our business is subscription based, and organizations are not obligated to and may not renew their subscriptions after their existing subscriptions expire. Many of our subscriptions are sold for a one-year term, though some organizations choose a month-to-month subscription plan or multi-year subscription plan. While many of our subscriptions provide for automatic renewal, organizations have no obligation to renew a subscription after the expiration of the term, and we cannot ensure that organizations will renew subscriptions with a similar contract period, with the same or greater number of users, or for the same subscription plan or upgrade to Plus or Enterprise Grid. With our fair billing practices, we may also not earn as much revenue as anticipated if the actual numbers of users in a paid customer decreases during the subscription period. Organizations may or may not renew their subscriptions as a result of a number of factors, including their satisfaction or dissatisfaction with Slack or services, our pricing or pricing structure, the pricing or capabilities of the products and services offered by our competitors, the effects of economic conditions, or reductions in our paid customers' spending levels. In the past, few of our paid customers have elected to downgrade or not to renew agreements with us, but it is difficult to accurately predict long-term Net Dollar Retention Rates. If organizations do not renew their subscriptions, renew on less favorable terms or fail to add more users, or if we fail to upgrade organizations on our Free or Standard subscription plan to our premium subscription plans, Plus and Enterprise Grid, or expand within organizations on Slack, our revenue may decline or grow less quickly than anticipated, which would harm our business, results of operations, and financial condition.

Additionally, organizations can and do subscribe to multiple subscription plans simultaneously for a variety of reasons. For example, many of our customers are large enterprises with distributed procurement processes where different buyers, departments or affiliates make their own purchasing decisions based on distinct product features or separate budgets. Companies who are existing Slack customers may also acquire another organization that is already on a Slack subscription plan or complete a reorganization or spin-off transaction that results in an organization subscribing to multiple subscription plans. If organizations that subscribe to multiple subscription plans decide not to consolidate all of their subscription plans into an Enterprise Grid subscription for the entire organization or decide to downgrade to lower priced or free subscription plans, our revenue may decline or grow less quickly than anticipated,

18

which would harm our business, results of operations, and financial condition. Having organizations on multiple subscription plans also makes it more difficult to accurately predict long-term Net Dollar Retention Rates.

***Our ability to introduce new f eatures, integrations, capabilities, and enhancements is dependent on adequate research and development resources. If we do not adequately fund our research and development efforts, or if our research and development investments do not translate into material enhancements to Slack, we may not be able to compete effectively and our business, results of operations, and financial condition may be harmed.***

To remain competitive, we must continue to develop new features, integrations, capabilities, and enhancements to Slack. This is particularly true as we further expand and diversify our capabilities to address additional applications and markets. For example, in September 2017, we introduced a new beta feature, shared channels, which facilitates secure collaboration between companies . Maintaining adequate research and development resources, such as the appropriate personnel and development technology, to meet the demands of the market is essential. If we are unable to develop features, integrations, and capabilities internally due to certain constraints, such as employee turnover, lack of management ability, or a lack of other research and development resources, our business may be harmed.

Moreover, research and development projects can be technically challenging and expensive. The nature of these research and development cycles may cause us to experience delays between the time we incur expenses associated with research and development and the time we are able to offer compelling features, integrations, capabilities, and enhancements and generate revenue, if any, from such investment. Additionally, anticipated demand for a feature, integration, capability, or enhancement we are developing could decrease after the development cycle has commenced, and we would nonetheless be unable to avoid substantial costs associated with the development of any such feature, integration, capability, or enhancement. If we expend a significant amount of resources on research and development and our efforts do not lead to the successful introduction or improvement of features, integrations, and capabilities that are competitive, it would harm our business, results of operations, and financial condition.

Further, many of our competitors expend a considerably greater amount of funds on their respective research and development programs, and those that do not may be acquired by larger companies that would allocate greater resources to our competitors' research and development programs. Our failure to maintain adequate research and development resources or to compete effectively with the research and development programs of our competitors would give an advantage to such competitors and may harm our business, results of operations, and financial condition.

***If there are interruptions or performance problems associated with the technology or infrastructure used to provide Slack, organizations on Slack may experience service outages, other organizations may be reluctant to adopt Slack, and our reputation could be harmed.***

Our continued growth depends, in part, on the ability of existing and potential organizations on Slack to access Slack 24 hours a day, seven days a week, without interruption or degradation of performance. We have in the past and may in the future experience disruptions, data loss, outages, and other performance problems with our infrastructure due to a variety of factors, including infrastructure changes, introductions of new functionality, human or software errors, capacity constraints, denial-of-service attacks, ransomware attacks, or other security-related incidents. In some instances, we may not be able to identify the cause or causes of these performance problems immediately or in short order. We may not be able to maintain the level of service uptime and performance required by organizations on Slack, especially during peak usage times and as our user traffic and number of integrations increase. For example, we have experienced intermittent connectivity issues and product issues in the past, including those that have prevented many organizations on Slack and their users from accessing Slack for a period of time. If Slack is unavailable or if organizations are unable to access Slack within a reasonable amount of time, or at all, our business would be harmed. Since organizations on Slack rely on Slack to communicate, collaborate, and access and complete their work, which in many cases includes entire organizations that complete substantially all of their work functions on Slack, any outage on Slack would impair the ability of organizations on Slack and their users to perform their work, which would negatively impact our brand, reputation, and customer satisfaction, and could give rise to legal liability under our service level agreements with paid customers.

Moreover, we depend on services from various third parties to maintain our infrastructure, including Amazon Web Services, or AWS. If a service provider fails to provide sufficient capacity to support Slack or otherwise experiences service outages, such failure could interrupt access to Slack by users and organizations, which could adversely affect

19

their perception of Slack's reliability and our revenue and harm the businesses of organizations on Slack. Any disruptions in these services, including as a result of actions outside of our control, would significantly impact the continued performance of Slack. In the future, these services may not be available to us on commercially reasonable terms, or at all. Any loss of the right to use any of these services could result in decreased functionality of Slack until equivalent technology is either developed by us or, if available from another provider, is identified, obtained, and integrated into our infrastructure. If we do not accurately predict our infrastructure capacity requirements, organizations on Slack could experience service shortfalls. We may also be unable to effectively address capacity constraints, upgrade our systems as needed, and continually develop our technology and network architecture to accommodate actual and anticipated changes in technology.

Any of the above circumstances or events may harm our reputation, cause organizations on Slack to terminate their agreements with us, impair our ability to obtain subscription renewals from organizations on Slack, impair our ability to grow the base of users and organizations on Slack, subject us to financial penalties and liabilities under our service level agreements with our paid customers, and otherwise harm our business, results of operations, and financial condition.

***A security incident may allow unauthorized access to our systems, networks, or data or the data of organizations on Slack, harm our reputation, create additional liability, and harm our financial results.***

Increasingly, companies are subject to a wide variety of attacks on their systems on an ongoing basis. In addition to threats from traditional computer "hackers," malicious code (such as malware, viruses, worms, and ransomware), employee theft or misuse, password spraying, phishing, credential stuffing, and denial-of-service attacks, we also face threats from sophisticated organized crime, nation-state, and nation-state supported actors who engage in attacks (including advanced persistent threat intrusions) that add to the risks to Slack, our internal systems and our partners' systems, as well as the systems of organizations on Slack and the information that they store and process. Third parties may attempt to fraudulently induce employees, users, or organizations into disclosing sensitive information such as user names, passwords, or other information or otherwise compromise the security of our internal electronic systems, networks, and/or physical facilities in order to gain access to our data or the data of organizations on Slack, which could result in significant legal and financial exposure, a loss of confidence in the security of Slack, interruptions or malfunctions in our operations, and, ultimately, harm to our future business prospects and revenue. Users or organizations on Slack may also disclose or lose control of their API keys, secrets, or passwords, or use the same or similar secrets or passwords on third parties' systems, which could lead to unauthorized access to their accounts and data within Slack (arising from, for example, an independent third-party data security incident that compromises those API keys, secrets, or passwords). Further, if a channel is shared between paid customers or workspaces, the above risks, vulnerabilities, and threats may be "inherited" or transferred from one paid customer or workspace to another. Despite significant efforts to create security barriers to such threats, it is virtually impossible for us to entirely mitigate these risks, especially where they are attributable to the behavior of independent third parties beyond our control. The security measures we have implemented or integrated into Slack and our internal systems and networks (including measures to audit third-party and custom applications), which are designed to detect unauthorized activity and prevent or minimize security breaches, may not function as expected or may not be sufficient to protect Slack and our internal systems and networks against certain attacks. For instance, for a period of approximately four days in March 2015, a security incident occurred in which unauthorized third parties had access to information maintained by us that included user names, email addresses, encrypted passwords, and information that users may have optionally added to their profiles, such as phone numbers. We are not aware of any material impact on any organizations that resulted from the incident. In addition, techniques used to sabotage or to obtain unauthorized access to systems and networks in which data is stored or through which data is transmitted change frequently and generally are not recognized until launched against a target. As a result, it may not be possible for us to anticipate these techniques or implement adequate preventative measures to prevent an electronic intrusion into our systems and networks and we may be required to expend significant capital and financial resources to protect against such threats or to alleviate problems caused by breaches in systems, network, or data security. Our board of directors has primary responsibility for overseeing cybersecurity risk management. For more information, see "Management—Role of Board of Directors in Risk Oversight."

The storage, transmittal, and use of data by organizations on Slack concerning, among others, their employees, contractors, customers, and partners is essential to their use of Slack, which stores, transmits, and processes their sensitive and proprietary information, including business strategies, financial and operational data, personal or

20

identifying information, and other related data. Security breaches impacting Slack or integrations on Slack could result in a risk of loss, unavailability, or unauthorized disclosure of this information, which, in turn, could lead to litigation, governmental audits, and investigations and possible liability (including regulatory fines), damage our relationships with existing users and organizations on Slack, and have a negative impact on our ability to attract new users and organizations and to grow or maintain our Net Dollar Retention Rate. Furthermore, any such breach, including a breach of the systems or networks of our partners or organizations on Slack, could compromise our systems or networks, creating system disruptions or slowdowns and exploiting security vulnerabilities of our networks or the networks of our partners and organizations on Slack, and the information stored on our network or the networks of our partners and organizations on Slack could be accessed, publicly disclosed, altered, lost, or stolen, which could subject us to liability and cause us financial harm. In addition, a breach of the security measures of one of our partners could result in the destruction, modification, or exfiltration of confidential corporate information, or other data that may provide additional avenues of attack. These breaches, or any perceived breach, of our systems or networks or the systems of our partners or organizations on Slack, whether or not any such breach is due to a vulnerability in Slack, may also undermine confidence in Slack or our industry and result in damage to our reputation, negative publicity, loss of users, organizations on Slack, partners, and sales, increased costs to remedy any problem, and costly litigation or regulatory fines.

We maintain errors, omissions, and cyber liability insurance policies covering certain security and privacy damages. However, we cannot be certain that our coverage will be available or adequate for all liabilities that might actually be incurred or that insurance will continue to be available to us on economically reasonable terms, or at all. Further, if a high-profile security breach occurs with respect to another software company with communication, collaboration, data collection, and integrations, our users and potential users could lose trust in the security of such solutions providers generally, which could adversely impact our ability to attract organizations to Slack or grow or maintain our Net Dollar Retention Rate.

***Any actual or perceived failure by us to comply with privacy, data protection, information security, consumer privacy, data residency, or telecommunications laws, regulations, government access requests, and obligations in one or multiple jurisdictions could result in proceedings, actions, or penalties against us and could harm our business and reputation. These laws are uncertain, evolving, and interpreted and applied in different ways in different countries and, as a result, our legal obligations in different countries, and our efforts to comply with those legal obligations, may be inadequate or in conflict.***

The use and storage of data, files, and information by organizations on Slack concerning, among others, their employees, contractors, customers, and partners is essential to their use of Slack. We have implemented various features, integrations, and capabilities as well as contractual obligations intended to enable and encourage organizations on Slack to comply with applicable privacy and security requirements in their collection, use, and transmittal of data using Slack, but these features do not ensure their compliance and may not be effective against all potential privacy concerns. In addition, we are subject to certain contractual obligations regarding the collection, use, storage, transfer, disclosure, and/or processing of personal data.

Around the world, there are numerous lawsuits and regulatory proceedings in process against various technology companies that process personal data. If those lawsuits or regulatory proceedings are successful, it could increase the likelihood that we may be exposed to liability for our own policies and practices concerning the processing of personal data and could hurt our business. Privacy, security, or data protection concerns, whether or not valid, may inhibit market adoption of Slack. For instance, Slack currently only utilizes AWS data centers located in the United States but certain organizations, or categories of organizations, may limit their adoption or use of Slack unless we also utilize local AWS data centers, such as data centers in Europe, Asia, and Latin America. Additionally, concerns about privacy, security, or data protection may result in the adoption of new legislation that restricts the implementation of technologies like ours or requires us to make modifications to Slack, which could significantly limit the adoption and deployment of our technologies or result in significant expense to us. Many jurisdictions have enacted or are considering enacting privacy and/or data security legislation, including laws and regulations applying to the collection, use, storage, transfer, disclosure, and/or processing of personal data. Such laws may include data residency or data localization requirements, which generally require that certain types of data collected within a certain country be stored and processed within that country and/or data export restrictions, or international transfer laws which prohibit or impose conditions upon the transfer of such data from one country to another. In addition, some jurisdictions have recently enacted or are currently considering enacting laws requiring online service providers to be able to decrypt encrypted content stored as part of

21

their service, which may limit deployment and adoption of Slack. The costs of compliance with, and other burdens imposed by, such laws and regulations that are applicable to the operations of organizations on Slack may limit the use and adoption of Slack and reduce overall demand for Slack. Moreover, the existence and need to comply with such privacy and data security laws could impact our ability to offer Slack in certain markets without taking additional compliance steps (including the use of local data centers) or in general. Further, these privacy and data security related laws and regulations are evolving and may result in increasing regulatory and public scrutiny and escalating levels of enforcement and sanctions and impose regulatory challenges on our business. For instance, evolving and changing definitions of what constitutes "Personal Information" and "Personal Data" within the European Union, the United States, and elsewhere, especially relating to classification of IP addresses, machine, or device identification numbers, location data, and other information, may limit or inhibit our ability to operate or expand our business.

Although we continually work to comply with federal, state, and foreign laws and regulations, industry standards, contractual obligations, and other legal obligations that apply to us, such laws, regulations, standards, and obligations are evolving and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another, other requirements or legal obligations, our practices, or the features of Slack. In particular, as a U.S. company we may be obliged to disclose data pursuant to governmental requests under U.S. law. This requirement may make our platform less attractive to users and organizations. Further, compliance with such U.S. governmental requests may be inconsistent with local laws in other countries to which we and organizations on Slack are subject.

Any failure or perceived failure by us to comply with federal, state, or foreign laws or regulations, industry standards, Internet accessibility standards, contractual obligations, or other legal obligations, or any actual or suspected security incident, whether or not resulting in unauthorized access to, or acquisition, release, or transfer of personal or other data, may result in governmental enforcement actions and prosecutions, private litigation, fines, and penalties, or adverse publicity and could cause organizations on Slack to lose trust in us, which could have an adverse effect on our reputation and business. For example, fines of up to the greater of €20.0 million and 4% of our global turnover can be imposed for breaches of the E.U.'s General Data Protection Regulation. Any inability to adequately address privacy and security concerns, even if unfounded, or comply with applicable laws, regulations, policies, industry standards, contractual obligations, or other legal obligations could result in additional cost and liability to us, damage our reputation, inhibit sales, and adversely affect our business.

We also expect that there will continue to be new proposed laws, regulations, Internet accessibility standards, and industry standards concerning privacy, data protection, and information security in the United States, the European Union, and other jurisdictions, and we cannot yet determine the impact such future laws, regulations, and standards may have on our business. For example, in June 2018 the State of California enacted the California Consumer Privacy Act, which takes effect on January 1, 2020 and will broadly define personal information, give California residents expanded privacy rights and protections and provide for civil penalties for violations and a private right of action for data breaches. In addition to government activity, privacy advocacy groups, and technology and other industries are considering various new, additional, or different self-regulatory standards that may place additional burdens on us. Future laws, regulations, standards, and other obligations, and changes in the interpretation of existing laws, regulations, standards, and other obligations could impair the ability of us or organizations on Slack to collect, use, or disclose information relating to consumers, which could decrease demand for Slack, increase our operating expenses, and impair our ability to maintain and grow the base of users and organizations on Slack and our revenue. Similarly, such laws could require changes to our technology, operations, and practices. New laws, amendments to, or re-interpretations of existing laws and regulations, industry standards, contractual obligations, and other obligations may require us to incur additional costs and restrict our business operations. Such laws and regulations may require companies to implement privacy and security policies, permit users to access, correct, and delete personal data stored or maintained by such companies, inform individuals of security breaches that affect their personal information, and, in some cases, obtain individuals' consent to use personal data for certain purposes. If we, or the third parties on which we rely, fail to comply with federal, state, and foreign data privacy laws and regulations, our ability to successfully operate our business and pursue our business goals could be harmed.

Failure by us to comply with applicable laws and regulations, or to protect such data, could result in enforcement actions against us, including fines and public censure, claims for damages by organizations on Slack and other affected

22

persons, damage to our reputation, and loss of goodwill (both in relation to existing and prospective organization on Slack), any of which could harm our business, results of operations, and financial condition.

Since many of the features of Slack involve the processing of personal data or other data of organizations on Slack and their employees, contractors, customers, partners, and others, any inability to adequately address privacy concerns, even if such concerns are unfounded, or to comply with applicable privacy or data security laws, regulations, and policies, could result in liability to us, damage to our reputation, inhibition of sales and to our business. Addressing these concerns could increase the length of our sales cycles. For example, cultural norms around privacy and employee expectations vary country to country and can drive a need to localize or customize certain features of Slack in order to address such varied privacy concerns, which can add cost and time to our development and sales cycles. In some markets, such as Germany, organizations as well as their employees through works councils, must both determine whether Slack is adopted, and organization and employee expectations around privacy do not always align. As a result, concerns by employees with respect to the protection of their privacy rights could affect adoption of Slack.

We publicly post our privacy policies and practices concerning our processing, use and disclosure of the personal data provided to us by users, organizations, and website visitors. Our publication of our privacy policies and other statements we publish that provide promises and assurances about privacy and security can subject us to potential state and federal action, as well as enforcement action in other countries (particularly the European Union) if they are found to omit necessary information, be deceptive, or misrepresentative of our practices. If Slack is perceived to cause, or is otherwise unfavorably associated with, violations of privacy or data security requirements, it may subject us or organizations on Slack to public criticism and potential legal liability. Existing and potential privacy laws and regulations concerning privacy and data security and increasing sensitivity of consumers to unauthorized processing of personal data may create negative public reactions to technologies and products such as ours. This, in turn, may reduce the value of Slack and slow or eliminate the growth of our business.

***We may face particular privacy, data security, and data protection risks in Europe particularly due to the new European General Data Protection Regulation.***

In relation to transfers of Personal Data out of the European Economic Area, or the EEA, and Switzerland to the United States, we are currently registered for both the E.U.-U.S. and the Swiss-U.S. Privacy Shield programs. There are concerns about the future of Privacy Shield as a data transfer mechanism as it continues to be subject to legal challenges, which, if successful, would require us to ensure that we had alternative data transfer mechanisms. In the interim, if we are investigated by a European data protection authority or the U.S. Federal Trade Commission, or the FTC, and found to have failed to comply with the Privacy Shield programs, we may face fines and other penalties. Any such investigation or charges by European and/or Swiss data protection authorities and/or the FTC could have a negative effect on our existing business and on our ability to attract new users and organizations and to grow or maintain our Net Dollar Retention Rate.

We also use model contractual clauses (or standard contractual clauses) to transfer, and to enable organizations on Slack to transfer, personal data out of Europe. The validity of model clauses is also the subject of litigation. If the E.U.-U.S. Privacy Shield program or the European Commission decisions underpinning the model contractual clauses are invalidated, we will be required to identify and implement other methods to enable compliant data transfers from the EEA and Switzerland to the United States. Such methods may be more costly or not available to us.

Depending on the evolving legal framework, we may find it necessary to establish systems to maintain Personal Data originating from the European Union in the EEA, which may involve substantial expense and may cause us to need to divert resources from other aspects of our business, all of which may adversely affect our business.

In addition, data protection regulation is an area of increased focus and changing requirements. The European Union adopted the General Data Protection Regulation 2016/679, or GDPR, that took effect on May 25, 2018, largely replacing the current data protection laws of each E.U. member state. The GDPR applies to any organization with an establishment in the European Union for data processing purposes as well as to those outside the European Union if they process Personal Data of individuals in the European Union in connection with offering them goods or services or monitoring their behavior. The GDPR enhances data protection obligations for processors and controllers of Personal Data, including, for example, expanded disclosures about how Personal Data is to be used, limitations on retention of information, mandatory data breach notification requirements, and additional obligations on service providers (such

23

as any third parties to whom we may transfer Personal Data). Non-compliance with the GDPR can trigger fines of up to the greater of €20 million and 4% of our global revenue. Given the breadth and depth of changes in data protection obligations, compliance has caused us to expend significant resources, and such expenditures are likely to continue into the future as we continue our compliance efforts and respond to new interpretations and enforcement actions. In addition, separate E.U. laws and regulations (and member states' implementations thereof) govern the protection of consumers and of electronic communications and these are also evolving. A draft of the new ePrivacy Regulation extends the strict opt-in marketing rules with limited exceptions to business-to-business communications, alters rules on third-party cookies, web beacons, and similar technology and significantly increases penalties. This law, as well as related changes to the European Union's telecommunications regime, could subject us to additional privacy obligations of the sort that have historically been imposed primarily on telecommunication service providers. We cannot yet determine the impact that such future laws, regulations, and standards may have on our business. Such laws and regulations are often subject to differing interpretations and may be inconsistent among jurisdictions. Further, the obligations imposed by E.U. data protection and related laws may conflict with the obligations imposed by other legal regimes, such as U.S. laws concerning government access to data. We may incur substantial expense in complying with the new obligations to be imposed by the GDPR, and we may be required to make significant changes in our business operations and product development, all of which may adversely affect our revenues and our business overall.

***If we are unable to ensure that Slack interoperates with a variety of software applications that are developed by others, including our partners, Slack may become less competitive and our results of operations may be harmed.***

Slack must integrate with a variety of network, hardware, and software platforms, and we need to continuously modify and enhance Slack to adapt to changes in hardware, software, networking, browser, and database technologies. In particular, we have developed Slack to be able to easily integrate with third-party applications, including the applications of software providers that compete with us as well as our partners, through the interaction of APIs. In general, we rely on the providers of such software systems to allow us access to their APIs to enable these user integrations. We are typically subject to standard terms and conditions for application developers of such providers, which govern the distribution, operation, and fees of such software systems, and which are subject to change by such providers from time to time. Our business may be harmed if any provider of such software systems:

- discontinues or limits our access to its software or APIs;

- modifies its terms of service or other policies, including fees charged to, or other restrictions on us or other application developers;

- changes how information is accessed by us, our users, or organizations on Slack;

- establishes more favorable relationships with one or more of our competitors; or

- develops or otherwise favors its own competitive offerings over ours.

We believe a significant component of our value proposition to users and organizations is the ability to improve and interface with these third-party applications through APIs on and directly in Slack. Third-party services and products are constantly evolving, and we may not be able to modify Slack to assure its compatibility with that of other third parties following development changes. In addition, some of our competitors may be able to disrupt the operations or compatibility of Slack with their products or services, or exert strong business influence on our ability to, and terms on which we, operate Slack. For example, we currently directly compete with several large technology companies whose applications interface with Slack, including Google and Microsoft. As our respective products evolve, we expect this level of competition to increase. Should any of our competitors modify their products or standards in a manner that degrades the functionality of Slack or gives preferential treatment to competitive products or services, whether to enhance their competitive position or for any other reason, the interoperability of Slack with these products could decrease and our business, results of operations, and financial condition could be harmed. If we are not permitted or able to integrate with these and other third-party applications in the future, demand for Slack would be harmed and our business, results of operations, and financial condition would be harmed.

We also depend on our ecosystem of developers to create applications that will integrate with Slack. Our reliance on this ecosystem of developers creates certain business risks relating to the quality and security of the applications

24

built using our APIs, service interruptions of Slack from these applications, lack of service support for these applications, possession of intellectual property rights associated with these applications, and privacy concerns around the transfer of data to these applications. We may not have the ability to control or prevent these risks. As a result, issues relating to these applications could adversely affect our business, brand, and reputation.

Further, we have created mobile applications and mobile versions of Slack to respond to the increasing number of people who access the Internet through mobile devices and access cloud-based software applications through mobile devices, including smartphones and handheld tablets or laptop computers. If these mobile applications do not perform well, our business may suffer. We are also dependent on third-party application stores that may prevent us from timely updating Slack; building new features, integrations, and capabilities; or charging for access. We distribute the mobile Slack application via smartphone and tablet application stores managed by Apple and Google, among others. Certain of these companies are now, and others may in the future become, competitors of ours, and could stop allowing or supporting access to Slack through their products, could allow access for us only at an unsustainable cost, or could make changes to the terms of access in order to make Slack less desirable or harder to access, for competitive reasons. In addition, Slack interoperates with servers, mobile devices, and software applications predominantly through the use of protocols, many of which are created and maintained by third parties. We, therefore, depend on the interoperability of Slack with such third-party services, mobile devices, and mobile operating systems, as well as cloud-enabled hardware, software, networking, browsers, database technologies, and protocols that we do not control. Any changes in such technologies that degrade the functionality of Slack or give preferential treatment to competitive services could adversely affect adoption and usage of Slack. Also, we may not be successful in developing or maintaining relationships with key participants in the mobile industry or in ensuring that Slack operates effectively with a range of operating systems, networks, devices, browsers, protocols, and standards. If we are unable to effectively anticipate and manage these risks, or if it is difficult for users and organizations on Slack to access and use Slack, our business, results of operations, and financial condition may be harmed.

***Because we recognize subscription revenue over the subscription term, downturns or upturns in new sales and renewals are not immediately reflected in full in our results of operations.***

We recognize revenue from subscriptions to Slack on a straight-line basis over the term of the contract subscription period beginning on the date access to Slack is granted, provided all other revenue recognition criteria have been met. Our subscription arrangements generally have monthly or annual contractual terms. As a result, much of the revenue we report each quarter is the recognition of deferred revenue from recurring subscriptions and related support services contracts entered into during previous quarters. Consequently, a decline in new or renewed recurring subscription contracts in any one quarter will not be fully reflected in revenue in that quarter, but will negatively affect our revenue in future quarters. Accordingly, the effect of significant downturns in new or renewed sales of our recurring subscriptions are not reflected in full in our results of operations until future periods. By contrast, a significant majority of our costs are expensed as incurred, which occurs as soon as a user starts using Slack. As a result, an increase in paid customers could result in our recognition of more costs than revenue in the earlier portion of the subscription term, and we may not attain profitability in any given period.

***Our financial results may fluctuate due to increasing variability in our sales cycles as a substantial portion of our sales efforts are targeted at large organizations.***

We plan our expenses based on certain assumptions about the length and variability of our sales cycle. These assumptions are based upon historical trends for sales cycles and conversion rates associated with organizations on Slack, which may not be indicative of future trends or results. As we continue to expand our efforts on sales to larger organizations, we expect our average sales cycles to lengthen and become less predictable, which may harm or cause unpredictable fluctuations in our financial results. Factors that may influence the length and variability of our sales cycle include, among other things:

- the need to raise awareness about the uses and benefits of Slack, particularly our paid versions;

- the need to allay privacy and security concerns or develop required enhancements;

- the discretionary nature of purchasing and budget cycles and decisions;

25

- the competitive nature of evaluation and purchasing processes;

- announcements or planned introductions of new features, integrations, and capabilities by us or our competitors; and

- often lengthy purchasing approval processes.

Our increasing focus on sales to larger organizations may further increase the variability of our financial results. To achieve acceptance of Slack by additional large organizations, we may need to engage with senior management and other personnel and not just gain acceptance of Slack from employees, who are often the initial adopters of Slack. As a result, sales efforts targeted at large organizations involve greater costs, longer sales cycles, greater competition, and less predictability in completing some of our sales. In the large organization market, an organization's decision to use Slack, expand the use of Slack, and/or upgrade to a paid version of Slack can sometimes be an enterprise-wide decision, in which case, we typically provide designated account and customer success teams, greater levels of user and customer education to familiarize potential users and organizations with the use and benefits of Slack, as well as the design and implementation of special enterprise-specific integrations. In addition, larger organizations may demand more customization, integration, support services, and features. As a result of these factors, these sales opportunities may require us to devote greater sales support, research and development, customer experience, and professional services resources to these organizations, resulting in increased costs, lengthened sales cycle, and diversion of our own sales and professional services resources to a smaller number of larger organizations. Further, we have limited experience in selling and marketing to larger organizations, and we may not be able to successfully execute our sales and marketing strategy targeted at such large organizations. Moreover, these larger transactions may require us to delay revenue recognition on some of these transactions until the technical or implementation requirements have been met. If we are unable to close one or more expected significant transactions with large organizations in a particular period, or if an expected transaction is delayed until a subsequent period, our results of operations for that period, and for any future periods in which revenue from such transaction would otherwise have been recognized, may be harmed.

***If we fail to adapt to rapid technological change, our ability to remain competitive could be impaired.***

The industry in which we compete is characterized by rapid technological change, frequent introductions of new products and features, and evolving industry standards and regulatory requirements. Our ability to attract new users and organizations and increase revenue from organizations on Slack will depend in significant part on our ability to anticipate industry standards and trends and continue to enhance Slack and introduce new features, integrations, and capabilities on a timely basis to keep pace with technological developments. If we are unable to provide enhancements and new features and integrations for Slack, develop new features, integrations, and capabilities that achieve market acceptance, or innovate quickly enough to keep pace with rapid technological developments, our business could be harmed. We must also keep pace with changing legal and regulatory regimes that affect Slack and our business practices. We may not be successful in developing modifications, enhancements, and improvements; in bringing them to market quickly or cost-effectively in response to market demands; or at modifying Slack to remain compliant with applicable legal and regulatory requirements.

***If we fail to offer high-quality customer experience, our business and reputation will suffer.***

While we have designed Slack to be easy to adopt and use, once organizations and their users begin using Slack, those organizations rely on our support services to resolve any related issues. High-quality user and customer education and customer experience has been key to our brand and is important for the successful marketing and sale of Slack, for the conversion of organizations on our free version into paid customers, and for growth or maintenance of our Net Dollar Retention Rate. The importance of high-quality customer experience will increase as we expand our business and pursue new organizations. For instance, if we do not help organizations on Slack quickly resolve issues and provide effective ongoing customer experience at the individual user and organization levels, our ability to sell our paid versions to organizations on our free version would suffer and our reputation with existing or potential users and organizations may be harmed. Further, our sales are highly dependent on our business reputation and on positive recommendations from existing users and organizations on Slack. Any failure to maintain high-quality customer experience, or a market perception that we do not maintain high-quality customer experience, could harm our reputation, our ability to sell Slack to existing and prospective organizations, and our business, results of operations, and financial condition.

26

In addition, as we continue to grow our operations and reach a larger and increasingly global customer and user base, we need to be able to provide efficient customer support that meets the needs of organizations on Slack globally at scale. The number of organizations on Slack has grown significantly and that will put additional pressure on our support organization. In order to meet these needs, we have relied in the past, and will continue to rely on, third-party contractors and self-service product support to resolve common or frequently asked questions, which supplement our customer experience teams. If we are unable to provide efficient product support globally at scale, including through the use of third-party contractors and self-service support, our ability to grow our operations may be harmed and we may need to hire additional support personnel, which could harm our results of operations.

***Failure to effectively develop and expand our direct sales capabilities could harm our ability to increase the number of organizations on Slack and achieve broader market acceptance of Slack.***

Our ability to increase the number of organizations on Slack, grow usage within larger organizations on Slack, and achieve broader market acceptance of Slack among large organizations will depend to a significant extent on our ability to expand our sales operations, particularly our direct sales efforts targeted at C-suite executives and business unit leaders . We plan to continue expanding our direct sales force, both domestically and internationally, in order to reach these large organizations. This expansion will require us to invest significant financial and other resources to train and grow our direct sales force, in order to complement our self-service go-to-market approach . Our business will be harmed if our efforts do not generate a corresponding increase in revenue. We may not achieve anticipated revenue growth from expanding our direct sales force if we are unable to hire and develop talented direct sales personnel, if our new direct sales personnel are unable to achieve desired productivity levels in a reasonable period of time or if we are unable to retain our existing direct sales personnel. We believe that there is significant competition for sales personnel with the skills and technical knowledge that we require. Our ability to achieve revenue growth will depend, in large part, on our success in recruiting, training, and retaining sufficient numbers of sales personnel to support our growth.

***Certain estimates of market opportunity included in this prospectus may prove to be inaccurate.***

This prospectus includes our internal estimates of the addressable market for Slack. Market opportunity estimates, whether obtained from third-party sources or developed internally, are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size of our target market, market demand and adoption, capacity to address this demand, and pricing may prove to be inaccurate. The addressable market we estimate may not materialize for many years, if ever, and even if the markets in which we compete meet the size estimates in this prospectus, our business could fail to grow at similar rates, if at all.

***Adverse general economic and market conditions and reductions in IT spending may reduce demand for Slack, which could harm our revenue, results of operations, and cash flows.***

Our revenue, results of operations, and cash flows depend on the overall demand for and use of Slack. Concerns about the systemic impact of a recession (in the United States or globally), energy costs, geopolitical issues, or the availability and cost of credit could lead to increased market volatility, decreased consumer confidence, and diminished growth expectations in the U.S. economy and abroad, which in turn could result in reductions in IT spending by existing and prospective organizations. Prolonged economic slowdowns may result in organizations on Slack requesting us to renegotiate existing contracts on less advantageous terms to us than those currently in place or defaulting on payments due on existing contracts or not renewing at the end of the contract term.

Organizations on Slack may merge with other entities who use alternative software that addresses one or more of the problems that Slack solves and, during weak economic times, there is an increased risk that one or more of our paid customers will file for bankruptcy protection, either of which may harm our revenue, profitability, and results of operations. We also face risk from international paid customers that file for bankruptcy protection in foreign jurisdictions, particularly given that the application of foreign bankruptcy laws may be more difficult to predict. In addition, we may determine that the cost of pursuing any claim may outweigh the recovery potential of such claim. As a result, broadening or protracted extension of an economic downturn could harm our business, revenue, results of operations, cash flows, and financial condition.

27

***If we fail to maintain our brand cost-effectively, our ability to expand the number of organizations on Slack will be impaired, our reputation may be harmed, and our business, results of operations, and financial condition may suffer.***

We believe that developing and maintaining awareness of our brand is critical to achieving widespread acceptance of Slack and is an important element in attracting new organizations to Slack. Furthermore, we believe that the importance of brand recognition will increase as competition in our market increases. Successful promotion of our brand will depend largely on the effectiveness of our marketing efforts and on our ability to ensure that Slack remains high-quality, reliable, and useful at competitive prices.

Brand promotion activities may not yield increased revenue, and even if they do, any increased revenue may not offset the expenses we incur in building our brand. If we fail to successfully promote and maintain our brand, or incur substantial expenses in an unsuccessful attempt to promote and maintain our brand, we may fail to attract new organizations to Slack or to grow or maintain our Net Dollar Retention Rate to the extent necessary to realize a sufficient return on our brand-building efforts, and our business, results of operations, and financial condition could suffer. In January 2019, we launched our new brand campaign. Such rebranding may not be as successful as our current brand and may not achieve its intended results. Furthermore, in connection with the development and implementation of our rebranding campaign, we have spent additional time and costs, including those associated with advertising and marketing efforts. If we are unable to effectively implement our rebranding campaign, our business, results of operations, and financial condition could suffer.

In addition, independent industry analysts often provide reviews of Slack, as well as the products offered by our competitors, and perception of the relative value of Slack in the marketplace may be significantly influenced by these reviews. If these reviews are negative, or less positive as compared to those of our competitors' products, our brand may be harmed.

***One of our marketing strategies is to offer a free version of Slack, and we may not be able to realize the benefits of this strategy.***

We offer a free version of Slack to promote initial usage, brand and product awareness, and organic adoption. Historically, not all users of and organizations on our free version convert to one of our paid versions. Our marketing strategy depends in part on users of and/or organizations on the free version of Slack convincing others within their organizations to use Slack and to drive the conversion to purchasing subscriptions to Standard, Plus, or Enterprise Grid. To the extent that some of these users and organizations do not become, or lead others to become, paid customers, we will not realize the intended benefits of this marketing strategy, which incurs costs as we must pay to host our free version, and our ability to grow our business may be harmed and our results of operations and financial condition could suffer.

***We derive, and expect to continue to derive, substantially all of our revenue from a single product.***

We derive, and expect to continue to derive, substantially all of our revenue from a single product – Slack. As such, the continued growth in market demand for and market acceptance of Slack is critical to our continued success. Demand for Slack is affected by a number of factors, many of which are beyond our control, such as continued market acceptance, the timing of development, and release of competing new products; the development and acceptance of new features, integrations, and capabilities; price or product changes by us or our competitors; technological changes and developments within the markets we serve; growth, contraction, and rapid evolution of our market; and general economic conditions and trends. If we are unable to continue to meet demands of organizations on Slack or trends in preferences or to achieve more widespread market acceptance of Slack, our business, results of operations, and financial condition could be harmed. Changes in preferences of users or organizations on Slack for software may have a disproportionately greater impact on us than if we offered multiple products. In addition, some current and potential organizations, particularly large organizations, may develop or acquire their own tools or software or continue to rely on traditional tools and software, such as email, which would reduce or eliminate the demand for Slack. If demand for Slack declines for any of these or other reasons, our business could be adversely affected.

28

***Our corporate culture has contributed to our success, and if we cannot maintain this culture as we grow, we could lose the innovative approach, creativity, and teamwork fostered by our culture and our business could be harmed.***

We believe that an important contributor to our success has been our corporate culture, which we believe creates an environment that drives and perpetuates our strategy to create a better, more productive way to work. As we continue to grow, including geographically, and develop the infrastructure of a public company, we may find it difficult to maintain our corporate culture. Any failure to preserve our culture could harm our future success, including our ability to retain and recruit personnel, innovate and operate effectively, and execute on our business strategy.

***Interruptions or delays in the services provided by third-party data centers or Internet service providers could impair Slack and our business could suffer.***

We currently serve organizations on Slack from third-party data centers operated by AWS. Any damage to or failure of our systems generally would prevent us from operating our business. We rely on the Internet and, accordingly, depend upon the continuous, reliable, and secure operation of Internet servers, related hardware and software, and network infrastructure. We host Slack using AWS data centers, a provider of cloud infrastructure services. Our operations depend on protecting the virtual cloud infrastructure hosted in AWS by maintaining its configuration, architecture, and interconnection specifications, as well as the information stored in these virtual data centers and which third-party Internet service providers transmit. Furthermore, we have no physical access or control over the services provided by AWS. Although we have disaster recovery plans that utilize multiple AWS locations, the data centers that we use are vulnerable to damage or interruption from human error, intentional bad acts, earthquakes, floods, fires, severe storms, war, terrorist attacks, power losses, hardware failures, systems failures, telecommunications failures, and similar events, many of which are beyond our control, any of which could disrupt our service, destroy user content, or prevent us from being able to continuously back up or record changes in our users' content. In the event of significant physical damage to one of these data centers, it may take a significant period of time to achieve full resumption of our services, and our disaster recovery planning may not account for all eventualities. Further, a prolonged AWS service disruption affecting Slack for any of the foregoing reasons could damage our reputation with current and potential organizations, expose us to liability, cause us to lose organizations on Slack, or otherwise harm our business. We may also incur significant costs for using alternative equipment or taking other actions in preparation for, or in reaction to, events that damage the AWS services we use. Damage or interruptions to these data centers could harm our business. Moreover, negative publicity arising from these types of disruptions could damage our reputation and may adversely impact use of Slack. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events that cause interruptions in our service. Further, the contractual commitments that we provide to organizations on Slack with regard to data privacy are limited by the commitments that AWS has provided us.

AWS enables us to order and reserve server capacity in varying amounts and sizes distributed across multiple regions. AWS provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party. In some cases, AWS may terminate the agreement for cause upon 30 days' notice. Termination of the AWS agreement may harm our ability to access data centers we need to host Slack or to do so on terms as favorable as those we have with AWS.

Slack is accessed by a large number of organizations and users, and as we continue to expand the number of users and organizations on Slack and integrations available to organizations on Slack, we may not be able to scale our technology to accommodate the increased capacity requirements, which may result in interruptions or delays in service. In addition, the failure of AWS data centers or third-party Internet service providers to meet our capacity requirements could result in interruptions or delays in access to Slack or impede our ability to scale our operations. In the event that our AWS service agreements are terminated, or there is a lapse of service, interruption of Internet service provider connectivity or damage to such facilities, we could experience interruptions in access to Slack as well as delays and additional expense in arranging new facilities and services.

***Our growth depends, in part, on the success of our strategic relationships with third parties.***

To grow our business and build out our application ecosystem, we anticipate that we will continue to depend on relationships with third parties. Identifying partners, and negotiating and documenting relationships with them, requires significant time and resources. Further, our competitors may be effective in providing incentives to third parties to favor their products or services over Slack. If we are unsuccessful in establishing or maintaining our relationships with third

parties, if any existing or future partners fail to successfully implement or support Slack integrations, or if they partner with our competitors and devote greater resources to implement and support the products and solutions of competitors, our ability to compete in the marketplace, or to grow our revenue, could be impaired, and our results of operations may suffer. Even if we are successful, we cannot assure you that these relationships will result in increased usage of Slack or increased revenue.

***We rely on software and services from other parties. Defects in, or the loss of access to, software or services from third parties could increase our costs and adversely affect the quality of Slack.***

We rely on technologies from third parties to operate critical functions of our business, including cloud infrastructure services provided by AWS and customer relationship management services. Our business would be disrupted if any of the third-party software or services we utilize, or functional equivalents thereof, were unavailable due to extended outages or interruptions or because they are no longer available on commercially reasonable terms or prices. In each case, we would be required to either seek licenses to software or services from other parties and redesign Slack or certain aspects of Slack to function with such software or services or develop these components ourselves, which would result in increased costs and could result in delays in launches and releases of new features, integrations, capabilities or enhancements until equivalent technology can be identified, licensed, or developed, and integrated into Slack. Furthermore, we might be forced to limit the features available in Slack. These delays and feature limitations, if they occur, could harm our business, results of operations, and financial condition.

***If we fail to adequately protect our proprietary rights, our competitive position could be impaired and we may lose valuable assets, generate reduced revenue, and incur costly litigation to protect our rights.***

Our success is dependent, in part, upon protecting our proprietary information and technology. We rely on a combination of patents, copyrights, trademarks, service marks, trade secret laws, and contractual restrictions to establish and protect our proprietary rights. However, the steps we take to protect our intellectual property may be inadequate. We will not be able to protect our intellectual property if we are unable to enforce our rights or if we do not detect unauthorized use of our intellectual property. Despite our precautions, it may be possible for unauthorized third parties to copy Slack, or certain aspects of Slack, and use information that we regard as proprietary to create products that compete with Slack. Some license provisions protecting against unauthorized use, copying, transfer, and disclosure of Slack, or certain aspects of Slack, may be unenforceable under the laws of certain jurisdictions and foreign countries. Further, the laws of some countries do not protect proprietary rights to the same extent as the laws of the United States, and mechanisms for enforcement of intellectual property rights in some foreign countries may be inadequate. To the extent we expand our international activities, our exposure to unauthorized copying and use of Slack, or certain aspects of Slack, and proprietary information may increase. Further, competitors, foreign governments, foreign government-backed actors, criminals, or other third parties may gain unauthorized access to our proprietary information and technology. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing upon or misappropriating our technology and intellectual property.

We rely in part on trade secrets, proprietary know-how, and other confidential information to maintain our competitive position. Although we enter into confidentiality and invention assignment agreements with our employees and consultants and enter into confidentiality agreements with the parties with whom we have strategic relationships and business alliances, no assurance can be given that these agreements will be effective in controlling access to and distribution of Slack, or certain aspects of Slack, and proprietary information. Further, these agreements do not prevent our competitors from independently developing technologies that are substantially equivalent or superior to Slack.

To protect our intellectual property rights, we may be required to spend significant resources to monitor and protect these rights, and we may or may not be able to detect infringement by third parties. Litigation may be necessary in the future to enforce our intellectual property rights and to protect our trade secrets. Such litigation could be costly, time consuming, and distracting to management and could result in the impairment or loss of portions of our intellectual property. Furthermore, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims, and countersuits attacking the validity and enforceability of our intellectual property rights. Our inability to protect our proprietary technology against unauthorized copying or use, as well as any costly litigation or diversion of our management's attention and resources, could delay further sales or the implementation of Slack, impair the functionality of Slack, delay introductions of new features, integrations, and capabilities, result in our substituting inferior or more

costly technologies into Slack, or injure our reputation. In addition, we may be required to license additional technology from third parties to develop and market new features, integrations, and capabilities, and we cannot assure you that we could license that technology on commercially reasonable terms or at all, and our inability to license this technology could harm our ability to compete.

***Our results of operations may be harmed if we are subject to a protracted infringement claim, a claim that results in a significant damage award, or a claim that results in an injunction.***

There is considerable patent and other intellectual property development and enforcement activity in our industry. We expect that software product developers will increasingly be subject to infringement claims as the number of products and competitors grows and the functionality of products in different industry segments overlaps. Our future success depends in part on not infringing upon or misappropriating the intellectual property rights of others. Other companies have claimed in the past, and may claim in the future, that we infringe upon their intellectual property rights. A claim may also be made relating to technology that we acquire or license from third parties. If we were subject to a claim of infringement, regardless of the merit of the claim or our defenses, the claim could:

- require costly litigation to resolve and the payment of substantial damages;

- require and divert significant management time;

- cause us to enter into unfavorable royalty or license agreements;

- require us to discontinue some or all of the features, integrations, and capabilities available in Slack;

- require us to indemnify organizations on Slack or third-party service providers; and/or

- require us to expend additional development resources to redesign Slack or certain aspects of Slack.

Any one or more of the above could harm our business, results of operations, and financial condition.

***We use open source software, which could negatively affect our ability to offer Slack and subject us to litigation or other actions.***

We use substantial amounts of open source software in Slack and may use more open source software in the future. From time to time, there have been claims challenging both the ownership of open source software against companies that incorporate open source software into their products and whether such incorporation is permissible under various open source licenses. The terms of many open source licenses have not been interpreted by U.S. courts, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to commercialize Slack. As a result, we could be subject to lawsuits by parties claiming ownership of what we believe to be open source software, or breach of open source licenses. Litigation could be costly for us to defend, have a negative effect on our results of operations and financial condition, or require us to devote additional research and development resources to change Slack, or certain aspects of Slack. In addition, if we were to combine our proprietary source code or software with open source software in a certain manner, we could, under certain of the open source licenses, be required to release the source code of our proprietary software to the public. This would allow our competitors to create similar products with less development effort and time. If we inappropriately use open source software, or if the license terms for open source software that we use change, we may be required to re-engineer our Slack, or certain aspects of Slack, incur additional costs, discontinue the sale of Slack or the availability of certain features, integrations, or capabilities of Slack, or take other remedial actions.

In addition to risks related to license requirements, usage of open source software can lead to greater risks than use of third-party commercial software, as open source licensors generally do not provide warranties or assurance of title or controls on origin of the software. In addition, many of the risks associated with usage of open source software, such as the lack of warranties or assurances of title, cannot be eliminated, and could, if not properly addressed, negatively affect our business. We have established processes to help alleviate these risks, but we cannot be sure that all of our use of open source software is in a manner that is consistent with our current policies and procedures, or will not subject us to liability.

31

***Indemnity provisions in various agreements potentially expose us to substantial liability for intellectual property infringement and other losses.***

Our agreements with organizations on Slack and other third parties may include indemnification or other provisions under which we agree to indemnify or otherwise be liable to them for losses suffered or incurred as a result of claims of intellectual property infringement, damages caused by us to property or persons, or other liabilities relating to or arising from the use of Slack or other acts or omissions. The term of these contractual provisions often survives termination or expiration of the applicable agreement. As we continue to grow, the possibility of these and other intellectual property rights claims against us may increase. For any intellectual property rights indemnification claim against us or organizations on Slack, we may incur significant legal expenses and may have to pay damages, license fees and/or stop using technology found to be in violation of the third party's rights. Large indemnity payments could harm our business, results of operations, and financial condition. We may also have to seek a license for the technology. Such license may not be available on reasonable terms, if at all, and may significantly increase our operating expenses or may require us to restrict our business activities and limit our ability to deliver Slack and/or certain features, integrations, and capabilities of Slack. As a result, we may also be required to develop alternative non-infringing technology, which could require significant effort and expense and/or cause us to alter Slack, which could negatively affect our business.

From time to time, organizations on Slack may require us to indemnify or otherwise be liable to them for breach of confidentiality, violation of applicable law, or failure to implement adequate security measures with respect to their data stored, transmitted, or accessed using Slack. Although we normally contractually limit our liability with respect to such obligations, the existence of such a dispute may have adverse effects on our relationship with organizations on Slack and reputation or such limitations may not be honored in every jurisdiction and we may still incur substantial liability related to them.

Any assertions by a third party, whether or not successful, with respect to such indemnification obligations could subject us to costly and time-consuming litigation, expensive remediation and licenses, divert management attention and financial resources, harm our relationship with that organization on Slack and other current and prospective organizations, reduce demand for Slack, and harm our brand, business, results of operations, and financial condition.

***We provide service level commitments under certain of our paid customer contracts. If we fail to meet these contractual commitments, we could be obligated to provide credits for future service, or face contract termination with refunds of prepaid amounts related to unused subscriptions, which could harm our business, results of operations, and financial condition.***

Certain of our paid customer agreements contain service level agreements, under which we guarantee specified minimum availability of Slack. From time to time, we have granted credits to paid customers pursuant to the terms of these agreements. We do not currently have any material liabilities accrued on our balance sheet for these commitments. Any failure of or disruption to our infrastructure could make Slack unavailable to organizations on Slack. If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Slack, we may be contractually obligated to provide affected paid customers with service credits for future subscriptions, or paid customers could elect to terminate and receive refunds for prepaid amounts related to unused subscriptions. Our revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages could adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales.

***We may be subject to liability claims if we breach our contracts and our insurance may be inadequate to cover our losses.***

We are subject to numerous obligations in our contracts with organizations on Slack and our partners. Despite the procedures, systems and internal controls we have implemented to comply with our contracts, we may breach these commitments, whether through a weakness in these procedures, systems, and internal controls, negligence, or the willful act of an employee or contractor. Our insurance policies, including our errors and omissions insurance, may be inadequate to compensate us for the potentially significant losses that may result from claims arising from breaches of our contracts, disruptions in our services, failures or disruptions to our infrastructure, catastrophic events, and disasters or otherwise.

In addition, such insurance may not be available to us in the future on economically reasonable terms, or at all. Further, our insurance may not cover all claims made against us and defending a suit, regardless of its merit, could be costly and divert management's attention.

***We may be subject to litigation for a variety of claims, which could harm our reputation and adversely affect our business, results of operations, and financial condition.***

In the ordinary course of business, we may be involved in and subject to litigation for a variety of claims or disputes and receive regulatory inquiries. These claims, lawsuits, and proceedings could include labor and employment, wage and hour, commercial, antitrust, alleged securities law violations or other investor claims, and other matters. The number and significance of these potential claims and disputes may increase as our business expands. Further, our general liability insurance may not cover all potential claims made against us or be sufficient to indemnify us for all liability that may be imposed. Any claim against us, regardless of its merit, could be costly, divert management's attention and operational resources, and harm our reputation. As litigation is inherently unpredictable, we cannot assure you that any potential claims or disputes will not have a material adverse effect on our business, results of operations, and financial condition.

***We may be subject to federal and state health privacy laws and regulations. If we are unable to comply or have not fully complied with such laws and regulations, we could face government enforcement actions, civil penalties, criminal sanctions, or damages, which could harm our reputation and adversely affect our business.***

We may function as a HIPAA business associate for certain of our paid customers and, as such, are subject to applicable privacy and data security requirements. If we fail to comply with any of these requirements, we could be subject to significant liability, which could harm our reputation and adversely affect our business as well as our ability to attract new and retain existing paid customers.

The Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, and their respective implementing regulations, or collectively, HIPAA, establish a set of federal privacy and security standards for the protection of individually identifiable health information that apply to health plans, healthcare clearinghouses, and healthcare providers that submit certain covered transactions, or "covered entities." A subset of these standards also apply to '' business associates ,'' which are persons or entities that perform certain services for, or on behalf of, a covered entity that involve creating, receiving, maintaining, or transmitting protected health information.

Certain of our paid customers are HIPAA covered entities and service providers, and in that context we may function as a business associate under HIPAA. Among other things, this status means that for certain activities we must comply with applicable administrative, technical, and physical safeguards as required by HIPAA, including stringent data security obligations. F ailure to comply with HIPAA can result in significant civil monetary penalties and, in certain circumstances, criminal penalties with fines and/or imprisonment.

The HIPAA covered entities and service providers to whom we serve as a business associate require us to enter into HIPAA-compliant business associate agreements with them. If we are unable to comply with our obligations as a HIPAA business associate, we could face contractual liability under the applicable business associate agreement .

In addition, many state laws govern the privacy and security of health information in certain circumstances, many of which differ from HIPAA. There may also be costs associated with responding to government investigations regarding alleged violations of these and other laws and regulations, even if there are ultimately no findings of violations or no penalties imposed. These costs can consume company resources and impact our business and, if public, harm our reputation.

If we are unable to meet the requirements of HIPAA, our business associate agreements or state health privacy laws, we could face contractual liability or civil and criminal liability under HIPAA, all of which can have an adverse impact on our business and generate negative publicity, which, in turn, can have an adverse impact on our ability to attract new paid customers and to grow or maintain our Net Dollar Retention Rate.

***We are subject to anti-corruption, anti-bribery, and similar laws, and non-compliance with such laws can subject us to criminal penalties or significant fines and harm our business and reputation.***

We are subject to anti-corruption and anti-bribery and similar laws, such as the U.S. Foreign Corrupt Practices Act of 1977, as amended, or the FCPA, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, U.S. Travel Act, the USA PATRIOT Act, the U.K. Bribery Act 2010, and other anti-corruption, anti-bribery and anti-money laundering laws in countries in which we conduct activities. Anti-corruption and anti-bribery laws have been enforced aggressively in recent years and are interpreted broadly and prohibit companies and their employees and agents from promising, authorizing, making, or offering improper payments or other benefits to government officials and others in the private sector. As we increase our international sales and business, our risks under these laws may increase. Noncompliance with these laws could subject us to investigations, sanctions, settlements, prosecution, other enforcement actions, disgorgement of profits, significant fines, damages, other civil and criminal penalties or injunctions, adverse media coverage, and other consequences. Any investigations, actions or sanctions could harm our business, results of operations, and financial condition.

In addition, in the future we may use third parties to sell access to Slack and conduct business on our behalf abroad. We or such future third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities, and we can be held liable for the corrupt or other illegal activities of such future third-party intermediaries, and our employees, representatives, contractors, partners, and agents, even if we do not explicitly authorize such activities. We have implemented an anti-corruption compliance program but cannot assure you that all our employees and agents, as well as those companies to which we outsource certain of our business operations, will not take actions in violation of our policies and applicable law, for which we may be ultimately held responsible. Any violation of the FCPA, other applicable anti-corruption laws, or anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, loss of export privileges, severe criminal or civil sanctions and, in the case of the FCPA, suspension or debarment from U.S. government contracts, any of which could have a materially adverse effect on our reputation, business, results of operations, and prospects.

***We are subject to governmental export controls and economic sanctions laws that could impair our ability to compete in international markets and subject us to liability if we are not in full compliance with applicable laws.***

Some of our business activities may be subject to various restrictions under U.S. and E.U. export controls and trade and economic sanctions laws, including, among others, the U.S. Commerce Department's Export Administration Regulations and economic and trade sanctions regulations maintained by the U.S. Treasury Department's Office of Foreign Assets Control. U.S. and E.U. export control laws and U.S. and E.U. economic sanctions laws may prohibit or restrict the sale or supply of certain products, including encryption items and technology, and services to certain governments, persons, and entities and countries and territories, including those that are the target of comprehensive sanctions. In addition, various countries regulate the import of certain encryption technology, including through import permitting and licensing requirements, and have enacted laws that could limit our ability to distribute Slack or could limit the ability of organizations on Slack to implement Slack in those countries. Although we take precautions to prevent Slack from being provided in violation of such laws and regulations, we cannot guarantee that such precautions will be fully effective and Slack may have been in the past, and could in the future be, provided inadvertently in violation of such laws, despite the precautions we take. If we fail to comply with these laws and regulations, we and certain of our employees could be subject to civil or criminal penalties, government investigation, loss of export privileges, and reputational harm. Further, obtaining the necessary authorizations, including any required licenses, for a particular transaction may be time-consuming, is not guaranteed, and may result in the delay or loss of sales opportunities. Although we take precautions to prevent transactions with sanction targets, we cannot guarantee that such precautions will be fully effective and we could inadvertently provide Slack to persons prohibited by U.S. and E.U. sanctions, which could result in negative consequences to us, including government investigations, penalties, and harm to our reputation.

In addition, changes in Slack, or future changes in export and import regulations may prevent our users with international operations from using Slack globally or, in some cases, prevent the export or import of Slack to certain countries, governments, or persons altogether. Any change in export or import regulations, economic sanctions or related legislation, or change in the countries, governments, persons, or technologies targeted by such regulations, could result in decreased use of Slack by, or in our decreased ability to export or sell subscriptions to Slack to, existing or

34

potential users with international operations. Any decreased use of Slack or limitation on our ability to export or sell Slack would likely adversely affect our business, results of operations and financial condition.

***We are subject to a variety of U.S. and international laws that could subject us to claims, increase our operating expenses, or otherwise harm our business due to changes in the laws, changes in the interpretations of the laws, greater enforcement of the laws, or investigations into compliance with the laws.***

We are subject to compliance with various laws, including those covering copyright, consumer protection, child protection, and similar matters. There have been instances where improper or illegal content has been stored on Slack without our knowledge. As a service provider, with some exceptions, we do not regularly monitor Slack to evaluate the legality of content stored on it. While to date we have not been subject to material legal or administrative actions as a result of the content stored on Slack or the activities conducted or organized using Slack, the laws in this area are currently in a state of flux and vary widely between jurisdictions. Accordingly, it may be possible that in the future we and our competitors may be subject to legal actions, along with the organizations on Slack and users who upload improper or illegal content, or engage in improper or illegal activities using Slack. In addition, regardless of any legal liability we may face, our reputation could be harmed should there be an incident generating negative publicity about the content stored on Slack, or the activities conducted or organized using Slack. Such publicity could harm our reputation and brand as well as our business, results of operations, and financial condition.

We may also be subject to consumer privacy or consumer protection laws that may impact our sales, marketing, and compliance efforts, including laws related to subscriptions, billing, and auto-renewal. These laws, as well as any changes in these laws, could adversely affect our free version of Slack and make it more difficult for us to grow or maintain our Net Dollar Retention Rate, upgrade organizations on Slack, and attract new organizations to Slack. Additionally, we have in the past, are currently, and may from time to time in the future become the subject of inquiries and other actions by regulatory authorities as a result of our business practices, including our subscription, billing, and auto-renewal policies. Consumer privacy and consumer protection laws may be interpreted or applied by regulatory authorities in a manner that could require us to make changes to Slack, our contracts, or our operations, or incur fines, penalties, or settlement expenses, which may result in harm to our business, results of operations, financial condition, and brand.

Further, in certain countries, we may be classified as a telecommunications service provider, or our classification may be uncertain. Such classification as a telecommunications service provider could restrict our ability to operate in such markets without appropriate local authorization, or at all.

We are also subject to other U.S. and international laws. Although we take precautions to prevent violations of these laws, our exposure for violating these laws increases as we continue to expand our international presence and any failure to comply with such laws could harm our reputation and our business.

***Action by governments to restrict access to Slack in their countries or to require us to disclose or provide access to information in our possession could harm our business, results of operations, and financial condition.***

Slack depends on the ability of our users to access the Internet and Slack could be blocked or restricted in some countries for various reasons. Further, it is possible that governments of one or more foreign countries may seek to limit access to or certain features of Slack in their countries, or impose other restrictions that may affect the availability of Slack, or certain features of Slack, in their countries for an extended period of time or indefinitely. For example, Russia and China are among a number of countries that have recently blocked certain online services, including AWS, which hosts Slack, making it very difficult for such services to access those markets. In addition, governments in certain countries may seek to restrict or prohibit access to Slack if they consider us to be in violation of their laws and may require us to disclose or provide access to information in our possession. If we fail to anticipate developments in the law, or fail for any reason to comply with relevant law, Slack could be further blocked or restricted and we could be exposed to significant liability that could harm our business. In the event that access to Slack is restricted, in whole or in part, in one or more countries or our competitors are able to successfully penetrate geographic markets that we cannot access, our ability to grow or maintain our Net Dollar Retention Rate may be adversely affected, we may not be able to maintain or grow our revenue as anticipated and our business, results of operations, and financial condition could be adversely affected.

35

***Because our success depends, in part, on our ability to expand sales of Slack to organizations located outside of the United States, our business will be susceptible to risks associated with international operations.***

We currently maintain offices and have sales personnel outside the United States in Australia, Canada, Ireland, India, Japan, and the United Kingdom, and we intend to expand our international operations. In fiscal years 2017, 2018, and 2019, our non-U.S. revenue was 34%, 34%, and 36% of our total revenue, respectively. We expect to continue to expand our international operations, which may include opening offices in new jurisdictions and providing Slack in additional languages. Any additional international expansion efforts that we are undertaking and may undertake may not be successful. In addition, conducting international operations subjects us to new risks, some of which we have not generally faced in the United States or in other countries where we currently operate. These risks include, among other things:

- unexpected costs and errors in the localization of Slack, including translation into foreign languages and adaptation for local culture, practices, and regulatory requirements;

- lack of familiarity and burdens of complying with foreign laws, legal standards, privacy standards, regulatory requirements, tariffs, and other barriers, and the risk of penalties to our users and individual members of management or employees if our practices are deemed to be out of compliance;

- practical difficulties of enforcing intellectual property rights in countries with varying laws and standards and reduced or varied protection for intellectual property rights in some countries;

- an evolving legal framework and additional legal or regulatory requirements for data privacy, which may necessitate the establishment of systems to maintain data in local markets, requiring us to invest in additional data centers and network infrastructure, and the implementation of additional employee data privacy documentation (including locally-compliant data privacy notice and policies), all of which may involve substantial expense and may cause us to need to divert resources from other aspects of our business, all of which may adversely affect our business;

- as a U.S. company, we are subject to U.S. laws concerning governmental access to data and the risk, or perception of risk, of such access may make Slack less attractive to organizations outside the U.S., and compliance with such U.S. laws may conflict with legal obligations that we, or our organizations on Slack, may be subject to in other countries;

- unexpected changes in regulatory requirements, taxes, trade laws, tariffs, export quotas, custom duties, or other trade restrictions;

- difficulties in managing systems integrators and technology partners;

- differing technology standards;

- longer accounts receivable payment cycles and difficulties in collecting accounts receivable;

- increased financial accounting and reporting burdens and complexities;

- difficulties in managing and staffing international operations including the proper classification of independent contractors and other contingent workers, differing employer/employee relationships, and local employment laws;

- increased costs involved with recruiting and retaining an expanded employee population outside the United States through cash and equity-based incentive programs and unexpected legal costs and regulatory restrictions in issuing our shares to employees outside the United States;

- global political and regulatory changes that may lead to restrictions on immigration and travel for our employees outside the United States;

- fluctuations in exchange rates that may decrease the value of our foreign-based revenue;

36

- potentially adverse tax consequences, including the complexities of foreign value added tax (or other tax) systems, and restrictions on the repatriation of earnings; and

- permanent establishment risks and complexities in connection with international payroll, tax, and social security requirements for international employees.

Additionally, operating in international markets also requires significant management attention and financial resources. We cannot be certain that the investment and additional resources required in establishing operations in other countries will produce desired levels of revenue or profitability.

Further, we have not engaged in currency hedging activities to limit risk of exchange rate fluctuations. Changes in exchange rates affect our costs and earnings, and may also affect the book value of our assets located outside the United States and the amount of our stockholders' equity.

Compliance with laws and regulations applicable to our global operations also substantially increases our cost of doing business in foreign jurisdictions. We have limited experience in marketing, selling, and supporting Slack outside of the United States. Our limited experience in operating our business internationally increases the risk that any potential future expansion efforts that we may undertake will not be successful. If we invest substantial time and resources to expand our international operations and are unable to do so successfully and in a timely manner, our business, results of operations, and financial condition will suffer. We may be unable to keep current with changes in government requirements as they change from time to time. Failure to comply with these regulations could harm our business. In many countries, it is common for others to engage in business practices that are prohibited by our internal policies and procedures or other regulations applicable to us. Although we have implemented policies and procedures designed to ensure compliance with these laws and policies, there can be no assurance that all of our employees, contractors, partners, and agents will comply with these laws and policies. Violations of laws or key control policies by our employees, contractors, partners, or agents could result in delays in revenue recognition, financial reporting misstatements, enforcement actions, reputational harm, disgorgement of profits, fines, civil and criminal penalties, damages, injunctions, other collateral consequences, or the prohibition of the importation or exportation of Slack and could harm our business, results of operations, and financial condition.

### *We may face exposure to foreign currency exchange rate fluctuations.*

Today, our contracts with paid customers outside of the United States are sometimes denominated in local currencies. In addition, the majority of our foreign costs are denominated in local currencies. Over time, an increasing portion of our contracts with paid customers outside of the United States may be denominated in local currencies. Therefore, fluctuations in the value of the U.S. dollar and foreign currencies may affect our results of operations when translated into U.S. dollars. We do not currently engage in currency hedging activities to limit the risk of exchange rate fluctuations. However, in the future, we may use derivative instruments, such as foreign currency forward and option contracts, to hedge certain exposures to fluctuations in foreign currency exchange rates. The use of such hedging activities may not offset any or more than a portion of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place. Moreover, the use of hedging instruments may introduce additional risks if we are unable to structure effective hedges with such instruments.

### *Exposure to political developments in the United Kingdom, including the outcome of the U.K. referendum on membership in the European Union, could harm us.*

On June 23, 2016, a referendum was held on the United Kingdom's membership in the European Union, the outcome of which was a vote in favor of leaving the European Union. The United Kingdom's vote to leave the European Union has created an uncertain political and economic environment in the United Kingdom and across other European Union member states. The result of the referendum means that the long-term nature of the United Kingdom's relationship with the European Union is unclear and that there is considerable uncertainty as to whether and when any such relationship will be agreed and implemented. The political and economic instability created by the United Kingdom's vote to leave the European Union has caused and may continue to cause significant volatility in global financial markets and the value of the British Pound or other currencies, including the Euro. Depending on the terms reached regarding any exit from the European Union, or if no such terms are reached, it is possible that there may be adverse practical or operational implications on our business. For example, the UK Data Protection Act that substantially implements the

37

GDPR became effective in May 2018. It remains unclear, however, how United Kingdom data protection laws or regulations will develop in the medium to longer term and how data transfers to and from the United Kingdom will be regulated and how those regulations may differ from those in the European Union. Further, the United Kingdom's exit from the European Union may create increased compliance costs and an uncertain regulatory landscape for offering equity-based incentives to our employees in the United Kingdom. If we are unable to maintain equity-based incentive programs for our employees in the United Kingdom due to the departure of the United Kingdom from the European Union, our business in the United Kingdom may suffer and we may face legal claims from employees in the United Kingdom to whom we previously offered equity-based incentive programs.

***Our activities in the United States subject us to various laws relating to foreign investment and the export of certain technologies, and our failure to comply with these laws or adequately monitor the compliance of our suppliers and others we do business with could subject us to fines, penalties, and even injunctions, the imposition of which on us could have a material adverse effect on the success of our business.***

Because we are a U.S. business with substantial operations in the United States, we may be subject to U.S. laws that regulate foreign investments in U.S. businesses and access by foreign persons to technology developed and produced in the United States. These laws include Section 721 of the Defense Production Act of 1950, as amended by the Foreign Investment Risk Review Modernization Act of 2018, and the regulations at 31 C.F.R. Parts 800 and 801, as amended, administered by the Committee on Foreign Investment in the United States; and the Export Control Reform Act of 2018, which is being implemented in part through Commerce Department rulemakings to impose new export control restrictions on "emerging and foundational technologies" yet to be fully identified. Application of these laws, including as they are implemented through regulations being developed, may negatively impact our business in various ways, including by restricting our access to capital and markets; limiting the collaborations we may pursue; regulating the export of our service and technology from the United States and abroad; increasing our costs and the time necessary to obtain required authorizations and to ensure compliance; and threatening monetary fines and other penalties if we do not.

***Our revolving credit facility provides our lenders with a first-priority lien against substantially all of our assets, and contains financial covenants and other restrictions on our actions that may limit our operational flexibility or otherwise adversely affect our results of operations.***

We are party to a revolving credit and guaranty agreement, which contains a number of covenants that restrict our and our subsidiaries' ability to, among other things, incur additional indebtedness, create or incur liens, merge or consolidate with other compa nies, sell substantially all of our assets, liquidate or dissolve, make distributions to its equity holders or its subsidiaries' equity interests, pay dividend s, make redemptions and repurchases of stock, or engage in transactions with affiliates. We are also required to maintain certain financial covenants, including a minimum liquidity balance and a minimum revenue amount. The terms of our revolving credit facility may restrict our current and future operations and could adversely affect our ability to finance our future operations or capital needs or to execute business strategies in the means or manner desired. In addition, complying with these covenants may make it more difficult for us to successfully execute our business strategy, invest in our growth strategy, and compete against companies who are not subject to such restrictions.

A failure by us to comply with the covenants or payment requirements specified in the revolving credit and guaranty agreement could result in an event of default under the agreement, which would give the lenders the right to terminate their commitments to provide additional loans under our revolving credit facility and to declare any and all borrowings outstanding, together with accrued and unpaid interest and fees, to be immediately due and payable. In addition, the lenders would have the right to proceed against the collateral in which we granted a security interest to them, which consists of substantially all our assets. If the debt under our revolving credit facility were to be accelerated, we may not have sufficient cash or be able to borrow sufficient funds to refinance the debt or sell sufficient assets to repay the debt, which could immediately materially and adversely affect our cash flows, business, results of operations, and financial condition. Further, the terms of any new or additional financing may be on terms that are more restrictive or on terms that are less desirable to us.

***We may be required to defer recognition of some of our revenue, which may harm our financial results in any given period.***

We may be required to defer recognition of revenue for a significant period of time after entering into an agreement due to a variety of factors, including, among other things, whether:

- the paid customer fails to deploy Slack to as many users as contemplated in the agreement given that, in many of our transactions, revenue is reduced in the form of fair billing credits we provide to paid customers when a user becomes inactive;

- contract modification is granted to reduce commitment or to lower fees because of frequent service interruptions or because Slack did not meet the paid customer's needs or expectations;

- service outages result in failure to meet our monthly uptime guarantee because revenue is reduced when we compensate paid customers in the form of credits promised under our service level agreements;

- the transaction includes an option to renew at significantly higher discounts than what was provided under existing agreement and other comparable transactions;

- the transaction is contingent on future functionality that is not delivered within the paid customer's expected timeline; or

- the transaction involves acceptance criteria or other contingencies that may delay revenue recognition.

Because of these factors and other specific revenue recognition requirements under GAAP, we must have very precise terms in our contracts to recognize revenue when we initially provide access to Slack or perform services. Although we strive to enter into agreements that meet the criteria under GAAP for current revenue recognition on delivered elements, our agreements are often subject to negotiation and revision based on the demands of our paid customers. The final terms of our agreements sometimes result in deferred revenue recognition well after the time of delivery, which may adversely affect our financial results in any given period.

Furthermore, the presentation of our financial results requires us to make estimates and assumptions that may affect the timing of revenue recognition as well as how revenue is allocated between revenue categories. In some instances, we could reasonably use different estimates and assumptions, and changes in estimates are likely to occur from period to period as new updated information becomes available or when there is a change in prevailing conditions. Accordingly, actual results could differ significantly from our estimates.

***We have limited experience with respect to determining the optimal prices for Slack.***

We have limited experience with respect to determining the optimal prices for Slack and, as a result, we have in the past, and expect in the future, that we will need to change our pricing model from time to time. In the past, we have sometimes adjusted our prices either for individual paid customers in connection with long-term agreements or unique situations. Moreover, demand for Slack is also sensitive to price. Many factors, including our marketing, user acquisition and technology costs, and our current and future competitors' pricing and marketing strategies, can significantly affect our pricing strategies. Further, certain of our competitors offer, or may in the future offer, lower-priced or free products or services that compete with Slack or may bundle functionality compatible with Slack and offer a broader range of products and services. Similarly, certain competitors may use marketing strategies that enable them to acquire users more rapidly or at a lower cost than us, or both, and we may be unable to attract new users and organizations or grow or maintain our Net Dollar Retention Rate based on our historical pricing. As we expand internationally, we also must determine the appropriate price to enable us to compete effectively internationally. In addition, if our mix of features, integrations, and capabilities on Slack changes or we develop additional versions for specific use cases or additional premium versions, then we may need to, or choose to, revise our pricing. There can be no assurance that we will not be forced to engage in price-cutting initiatives or to increase our marketing and other expenses to attract users and organizations to Slack and to grow or maintain our Net Dollar Retention Rate in response to competitive or other pressures, either of which could materially and adversely affect our business, results of operations, and financial condition.

39

*Future acquisitions, strategic investments, partnerships, or alliances could be difficult to identify and integrate, divert the attention of key management personnel, disrupt our business, dilute stockholder value, and harm our results of operations and financial condition.*

We have in the past acquired, and we may in the future seek to acquire or invest in, businesses, products, or technologies that we believe could complement Slack or expand its breadth, enhance our technical capabilities, or otherwise offer growth opportunities. The pursuit of potential acquisitions may divert the attention of management and cause us to incur various expenses in identifying, investigating, and pursuing suitable acquisitions, whether or not they are consummated. Any acquisition, investment or business relationship may result in unforeseen operating difficulties and expenditures. In addition, we have limited experience in acquiring other businesses. If we acquire additional businesses, we may not be able to integrate successfully the acquired personnel, operations, and technologies, or effectively manage the combined business following the acquisition. Specifically, we may not successfully evaluate or utilize the acquired technology or personnel, or accurately forecast the financial impact of an acquisition transaction, including accounting charges. Moreover, the anticipated benefits of any acquisition, investment, or business relationship may not be realized or we may be exposed to unknown risks or liabilities.

We may not be able to find and identify desirable acquisition targets or we may not be successful in entering into an agreement with any one target. Acquisitions could also result in dilutive issuances of equity securities or the incurrence of debt, which could harm our results of operations. In addition, if an acquired business fails to meet our expectations, our business, results of operations, and financial condition may suffer.

We also make strategic investments in early stage companies developing products or technologies that we believe could complement Slack or expand its breadth, enhance our technical capabilities, or otherwise offer growth opportunities through our subsidiary, Slack Fund. These investments are generally in early stage private companies for restricted stock. Such investments are generally illiquid and may never generate value. Further, the companies in which we invest may not succeed, and our investments would lose their value.

*We depend on our executive officers and other key employees, and the loss of one or more of these employees or an inability to attract and retain other highly skilled employees could harm our business.*

Our success depends largely upon the continued services of our executive officers and other key employees. We rely on our leadership team in the areas of research and development, operations, security, marketing, sales, customer experience, general, and administrative functions, and on individual contributors in our research and development and operations. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. We do not have employment agreements with our executive officers or other key personnel that require them to continue to work for us for any specified period and, therefore, they could terminate their employment with us at any time. The loss of one or more of our executive officers, especially our Chief Executive Officer, or key employees could harm our business. Changes in our executive management team may also cause disruptions in, and harm to, our business.

In addition, to execute our growth plan, we must attract and retain highly qualified personnel. Competition for these personnel in the San Francisco Bay Area, where our headquarters is located, and in other locations where we maintain offices, is intense, especially for engineers experienced in designing and developing software and Software-as-a-Service applications and experienced sales professionals. We have, from time to time experienced, and we expect to continue to experience, difficulty in hiring and retaining employees with appropriate qualifications. In addition, certain domestic immigration laws restrict or limit our ability to recruit internationally. Any changes to U.S. immigration policies that restrain the flow of technical and professional talent may inhibit our ability to recruit and retain highly qualified employees. Many of the companies with which we compete for experienced personnel have greater resources than we have. If we hire employees from competitors or other companies, their former employers may attempt to assert that these employees or we have breached their legal obligations, resulting in a diversion of our time and resources. In addition, job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. If the perceived value of our equity awards declines, it may harm our ability to recruit and retain highly skilled employees. If we fail to attract new personnel or fail to retain and motivate our current personnel, our business and future growth prospects could be harmed. Meanwhile, additions of executive-level management and large numbers of employees could significantly and adversely impact our culture.

Volatility or lack of appreciation in the stock price of our Class A common stock may also affect our ability to attract and retain our key employees. Many of our senior personnel and other key employees have become, or will soon become, vested in a substantial amount of stock or stock options. Employees may be more likely to leave us if the shares they own or the shares underlying their vested options or restricted stock units, or RSUs, have significantly appreciated in value relative to the original purchase price of the shares or the exercise price of the options, or conversely, if the exercise price of the options that they hold are significantly above the market price of our Class A common stock. If we do not maintain and continue to develop our corporate culture as we grow and evolve, it could harm our ability to foster the innovation, craftsmanship, teamwork, curiosity, and diversity, we believe that we need to support our growth.

### *Our management team has limited experience managing a public company.*

Most members of our management team have limited experience managing a publicly-traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to being a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could harm our business, results of operations, and financial condition.

### *Catastrophic events may disrupt our business.*

Natural disasters or other catastrophic events may cause damage or disruption to our operations, international commerce, and the global economy, and thus could harm our business. We have our headquarters and a large employee presence in San Francisco, California and the west coast of the United States contains active earthquake zones. In the event of a major earthquake, hurricane, or catastrophic event such as fire, power loss, telecommunications failure, cyber-attack, war, or terrorist attack, we may be unable to continue our operations and may endure system interruptions, reputational harm, delays in our application development, lengthy interruptions in Slack, breaches of data security, and loss of critical data, all of which could harm our business, results of operations, and financial condition. Acts of terrorism could also cause disruptions to the Internet or the economy as a whole. In addition, the insurance we maintain would likely not be adequate to cover our losses resulting from disasters or other business interruptions.

### *Our failure to raise additional capital or generate cash flows necessary to expand our operations and invest in new technologies in the future could reduce our ability to compete successfully and harm our results of operations.*

Historically, we have funded our operations and capital expenditures primarily through equity issuances and cash generated from our operations. Although we currently anticipate that our existing cash and cash equivalents, cash flow from operations, and amounts available under our revolving credit facility will be sufficient to meet our cash needs for the foreseeable future, we may require additional financing, and we may not be able to obtain debt or equity financing on favorable terms, if at all. If we raise equity financing to fund operations or on an opportunistic basis, our stockholders may experience significant dilution of their ownership interests. Our revolving credit facility restricts our ability to incur additional indebtedness, requires us to maintain specified minimum liquidity and revenue amounts, and restricts our ability to pay dividends. The terms of any additional debt financing may be similar or more restrictive. If we need additional capital and cannot raise it on acceptable terms, or at all, we may not be able to, among other things:

- develop new features, integrations, capabilities, and enhancements;

- continue to expand our product development, sales, and marketing organizations;

- hire, train, and retain employees;

- respond to competitive pressures or unanticipated working capital requirements; or

- pursue acquisition opportunities.

41

***Changes in laws and regulations related to the Internet or changes in the Internet infrastructure itself may diminish the demand for Slack, and could harm our business.***

The future success of our business depends upon the continued use of the Internet as a primary medium for commerce, communication, and business applications. Federal, state, or foreign government bodies or agencies have in the past adopted, and may in the future adopt, laws or regulations affecting the use of the Internet as a commercial medium. The adoption of any laws or regulations that could reduce the growth, popularity, or use of the Internet, including laws or practices limiting Internet neutrality, could decrease the demand for, or the usage of, Slack and services, increase our cost of doing business and harm our results of operations. Changes in these laws or regulations could require us to modify Slack, or certain aspects of Slack, in order to comply with these changes. In addition, government agencies or private organizations have imposed and may impose additional taxes, fees, or other charges for accessing the Internet or commerce conducted via the Internet. These laws or charges could limit the growth of Internet-related commerce or communications generally, or result in reductions in the demand for Internet-based products such as ours. In addition, the use of the Internet as a business tool could be harmed due to delays in the development or adoption of new standards and protocols to handle increased demands of Internet activity, security, reliability, cost, ease-of-use, accessibility, and quality of service. Further, Slack depends on the quality of our users' access to the Internet. Certain features of Slack require significant bandwidth and fidelity to work effectively. Internet access is frequently provided by companies that have significant market power that could take actions that degrade, disrupt or increase the cost of user access to Slack, which would negatively impact our business. The performance of the Internet and its acceptance as a business tool has been harmed by "viruses," "worms" and similar malicious programs and the Internet has experienced a variety of outages and other delays as a result of damage to portions of its infrastructure. If the use of the Internet is adversely affected by these issues, demand for Slack could decline.

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we will file with the SEC is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms and that information required to be disclosed in reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is accumulated and communicated to our principal executive and financial officers. We are also continuing to improve our internal control over financial reporting. For example, as we have prepared to become a public company, we have worked to improve the controls around our key accounting processes and our quarterly close process, we have implemented a number of new systems to supplement our core enterprise resource planning, or ERP, system as part of our control environment, and we have hired additional accounting and finance personnel to help us implement these processes and controls. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight. If any of these new or improved controls and systems do not perform as expected, we may experience material weaknesses in our controls. In addition to our results determined in accordance with GAAP, we believe certain non-GAAP measures and key metrics may be useful in evaluating our operating performance. We present certain non-GAAP financial measures and key metrics in this prospectus and intend to continue to present certain non-GAAP financial measures and key metrics in future filings with the SEC and other public statements. Any failure to accurately report and present our non-GAAP financial measures and key metrics could cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our Class A common stock.

Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. Further, weaknesses in our disclosure controls and internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our results of operations or cause us to fail to meet our reporting obligations and may result in a restatement of our consolidated financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic

42

reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our Class A common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE. We are not currently required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore not required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose. As a public company, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting commencing with our second annual report on Form 10-K.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until after we are no longer an "emerging growth company" as defined in the JOBS Act. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could harm our business, results of operations, and financial condition and could cause a decline in the price of our Class A common stock.

*We are an "emerging growth company," and the reduced disclosure requirements applicable to "emerging growth companies" may make our Class A common stock less attractive to investors.*

We are an "emerging growth company," as defined in the JOBS Act, and we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies," including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We may take advantage of these exemptions until we are no longer an "emerging growth company," which could be as long as five full fiscal years following the listing of our Class A common stock on the NYSE. We cannot predict if investors will find our Class A common stock less attractive because we will rely on these exemptions. If some investors find our Class A common stock less attractive as a result, there may be a less active trading market for our Class A common stock and the price of our Class A common stock may be more volatile.

*We recently implemented a new enterprise resource planning system, and if this new system proves ineffective or if we experience issues with the transition, we may be unable to timely or accurately prepare financial reports, make payments to our suppliers and employees, or invoice and collect from our users.*

In fiscal year 2019, we implemented a new ERP system, including our systems for tracking revenue recognition. Our ERP system is critical to our ability to accurately maintain books and records and to prepare our consolidated financial statements. The transition to our new ERP system may be disruptive to our business if the ERP system does not work as planned or if we experience issues relating to the implementation. Such disruptions could impact our ability to timely or accurately make payments to our suppliers and employees, and could also inhibit our ability to invoice, and collect from our users. Data integrity problems or other issues may be discovered which, if not corrected, could impact our business or financial results. In addition, we may experience periodic or prolonged disruption of our financial functions arising out of this conversion, general use of such system, other periodic upgrades or updates, or other external factors that are outside of our control. If we encounter unforeseen problems with our ERP system or other related systems and infrastructure, our business, results of operations, and financial condition could be adversely affected.

*Changes in existing financial accounting standards or practices may harm our results of operations.*

Changes in existing accounting rules or practices, new accounting pronouncements rules, or varying interpretations of current accounting pronouncements practice could harm our results of operations or the manner in which we conduct our business. Further, such changes could potentially affect our reporting of transactions completed before such changes are effective.

GAAP is subject to interpretation by the Financial Accounting Standards Board, or FASB, the SEC and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or

43

interpretations could have a significant effect on our reported financial results, and could affect the reporting of transactions completed before the announcement of a change. In particular, in February 2016, the FASB issued Accounting Standards Codification, or ASC, 842, which supersedes the lease accounting guidance in ASC 840, Leases. The core principle of ASC 842 requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. This classification will determine whether lease expense is recognized based on an effective interest method or on a straight-line basis over the term of the lease. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. As an "emerging growth company," we are allowed under the JOBS Act to delay adoption of new or revised accounting pronouncements applicable to public companies until such pronouncements are made applicable to private companies. We have elected to take advantage of this extended transition period under the JOBS Act with respect to ASC 842, which will result in ASC 842 becoming effective for us beginning on February 1, 2020 unless we choose to adopt it earlier. Any difficulties in implementing these pronouncements could cause us to fail to meet our financial reporting obligations, which could result in regulatory discipline and harm investors' confidence in us.

We are evaluating the impact of the adoption of ASC 842 and currently believe the most significant impact upon adoption will be the recognition of material right-of-use assets and lease liabilities on our consolidated balance sheets associated with operating leases. We do not believe this standard will have a material impact on our consolidated statements of operations.

***If our estimates or judgments relating to our critical accounting policies prove to be incorrect, our results of operations could be adversely affected.***

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in our consolidated financial statements and related notes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, as provided in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations." The results of these estimates form the basis for making judgments about the carrying values of assets, liabilities and equity, and the amount of revenue and expenses that are not readily apparent from other sources. Significant assumptions and estimates used in preparing our consolidated financial statements include those related to revenue recognition, stock-based compensation including the estimation of fair value of common stock, valuation of strategic investments, period of benefit for deferred costs, and uncertain tax positions. Our results of operations may be adversely affected if our assumptions change or if actual circumstances differ from those in our assumptions, which could cause our results of operations to fall below the expectations of securities analysts and investors, resulting in a decline in the trading price of our Class A common stock.

***Changes in tax laws or regulations in the various tax jurisdictions we are subject to that are applied adversely to us or our paid customers could increase the costs of Slack and harm our business.***

New income, sales, use or other tax laws, statutes, rules, regulations, or ordinances could be enacted at any time. Those enactments could harm our domestic and international business operations, and our business, results of operations, and financial condition. Further, existing tax laws, statutes, rules, regulations, or ordinances could be interpreted, changed, modified, or applied adversely to us. These events could require us or our paid customers to pay additional tax amounts on a prospective or retroactive basis, as well as require us or our paid customers to pay fines and/or penalties and interest for past amounts deemed to be due. If we raise our prices to offset the costs of these changes, existing and potential future paid customers may elect not to purchase Slack in the future. Additionally, new, changed, modified, or newly interpreted or applied tax laws could increase our paid customers' and our compliance, operating, and other costs, as well as the costs of Slack. Further, these events could decrease the capital we have available to operate our business. Any or all of these events could harm our business, results of operations, and financial condition.

On December 22, 2017, the legislation commonly referred to as the Tax Cuts and Jobs Act, or the Tax Act, was enacted, which contains significant changes to U.S. tax law, including, but not limited to, a reduction in the corporate tax rate and a transition to a modified territorial system of taxation. The primary impact of the new legislation on our provision for income taxes was a reduction of the future tax benefits of our deferred tax assets as a result of the reduction in the corporate tax rate. However, since we have recorded a full valuation allowance against our deferred tax assets,

44

we do not currently anticipate that these changes will have a material impact on our consolidated financial statements. The impact of the Tax Act will likely be subject to ongoing technical guidance and accounting interpretation, which we will continue to monitor and assess. As we expand the scale of our international business activities, any changes in the U.S. or foreign taxation of such activities may increase our worldwide effective tax rate and harm our business, results of operations, and financial condition.

Additionally, the application of U.S. federal, state, local, and international tax laws to services provided electronically is unclear and continuously evolving. Existing tax laws, statutes, rules, regulations, or ordinances could be interpreted or applied adversely to us, possibly with retroactive effect, which could require us or our paid customers to pay additional tax amounts, as well as require us or our paid customers to pay fines or penalties, as well as interest for past amounts. If we are unsuccessful in collecting such taxes due from our paid customers, we could be held liable for such costs, thereby adversely affecting our results of operations and harming our business.

As a multinational organization, we may be subject to taxation in several jurisdictions around the world with increasingly complex tax laws, the application of which can be uncertain. The amount of taxes we pay in these jurisdictions could increase substantially as a result of changes in the applicable tax principles, including increased tax rates, new tax laws, or revised interpretations of existing tax laws and precedents, which could harm our liquidity and results of operations. In addition, the authorities in these jurisdictions could review our tax returns and impose additional tax, interest, and penalties, and the authorities could claim that various withholding requirements apply to us or our subsidiaries or assert that benefits of tax treaties are not available to us or our subsidiaries, any of which could harm us and our results of operations.

***Our results of operations may be harmed if we are required to collect sales or other related taxes for subscriptions to Slack in jurisdictions where we have not historically done so.***

States and some local taxing jurisdictions have differing rules and regulations governing sales and use taxes, and these rules and regulations are subject to varying interpretations that may change over time. The application of federal, state, local, and international tax laws to services provided electronically is evolving. In particular, the applicability of sales taxes to Slack in various jurisdictions is unclear. We collect and remit U.S. sales and value-added tax, or VAT, in a number of jurisdictions. It is possible, however, that we could face sales tax or VAT audits and that our liability for these taxes could exceed our estimates as state tax authorities could still assert that we are obligated to collect additional tax amounts from our paid customers and remit those taxes to those authorities. We could also be subject to audits in states and international jurisdictions for which we have not accrued tax liabilities. A successful assertion that we should be collecting additional sales or other taxes on our services in jurisdictions where we have not historically done so and do not accrue for sales taxes could result in substantial tax liabilities for past sales, discourage organizations from subscribing to Slack, or otherwise harm our business, results of operations, and financial condition.

Further, one or more state or foreign authorities could seek to impose additional sales, use or other tax collection and record-keeping obligations on us or may determine that such taxes should have, but have not been, paid by us. Liability for past taxes may also include substantial interest and penalty charges. Any successful action by state, foreign, or other authorities to compel us to collect and remit sales tax, use tax or other taxes, either retroactively, prospectively or both, could harm our business, results of operations, and financial condition.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

Under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50 percentage point change (by value) in its equity ownership over a three-year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change taxable income or tax liability may be limited. We have experienced ownership changes in the past and, although we do not expect to experience an ownership change in connection with our listing on the NYSE, any such ownership change could result in increased future tax liability. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards and other pre-change tax attributes to offset U.S. federal taxable income or tax liability may be subject to limitations, which could potentially result in increased future tax liability to us. In addition, under the Tax Act, the amount of post 2017 net operating loss carryforward that we are permitted to use in any taxable year is limited to 80% of our taxable income

45

in such year, where taxable income is determined without regard to the net operating loss deduction itself. The Tax Act also generally eliminates the ability to carry back net operating losses to prior taxable years. For these reasons, we may not be able to realize a tax benefit from the use of our net operating losses even if we attain profitability.

**Risks Related to Ownership of Our Class A Common Stock**

*Our listing differs significantly from an underwritten initial public offering.*

This is not an underwritten initial public offering of our Class A common stock. This listing of our Class A common stock on the NYSE differs from an underwritten initial public offering in several significant ways, which include, but are not limited to, the following:

- There are no underwriters. Consequently, prior to the opening of trading on the NYSE, there will be no book building process and no price at which underwriters initially sold shares to the public to help inform efficient and sufficient price discovery with respect to the opening trades on the NYSE. Therefore, buy and sell orders submitted prior to and at the opening of trading of our Class A common stock on the NYSE will not have the benefit of being informed by a published price range or a price at which the underwriters initially sold shares to the public, as would be the case in an underwritten initial public offering. Moreover, there will be no underwriters assuming risk in connection with the initial resale of shares of our Class A common stock. Additionally, because there are no underwriters, there is no underwriters' option to purchase additional shares to help stabilize, maintain, or affect the public price of our Class A common stock on the NYSE immediately after the listing. In an underwritten initial public offering, the underwriters may engage in "covered" short sales in an amount of shares representing the underwriters' option to purchase additional shares. To close a covered short position, the underwriters purchase shares in the open market or exercise the underwriters' option to purchase additional shares. In determining the source of shares to close the covered short position, the underwriters typically consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the underwriters' option to purchase additional shares. Purchases in the open market to cover short positions, as well as other purchases underwriters may undertake for their own accounts, may have the effect of preventing a decline in the market price of shares. Given that there will be no underwriters' option to purchase additional shares and no underwriters engaging in stabilizing transactions, there could be greater volatility in the public price of our Class A common stock during the period immediately following the listing. See also "—The public price of our Class A common stock may be volatile, and could, upon listing on the NYSE, decline significantly and rapidly."

- There is not a fixed or determined number of shares of Class A common stock available for sale in connection with the registration and the listing, except we expect approximately 11,500,000 shares of our Class A common stock to be sold on our first trading day in order to fund the tax withholding and remittance obligations arising in connection with the RSUs that will vest and settle upon that day. See the section titled "RSU Sales." Therefore, there can be no assurance that any Registered Stockholders or other existing stockholders will sell any of their shares of Class A common stock and there may initially be a lack of supply of, or demand for, shares of Class A common stock on the NYSE. Alternatively, we may have a large number of Registered Stockholders or other existing stockholders, including holders of RSUs that vest and settle on the first day of trading, who choose to sell their shares of Class A common stock in the near term, resulting in potential oversupply of our Class A common stock, which could adversely impact the public price of our Class A common stock once listed on the NYSE.

- None of our Registered Stockholders or other existing stockholders have entered into contractual lock-up agreements or other contractual restrictions on transfer. In an underwritten initial public offering, it is customary for an issuer's officers, directors, and most or all of its other stockholders to enter into a 180-day contractual lock-up arrangement with the underwriters to help promote orderly trading immediately after such initial public offering. Consequently, any of our stockholders, including our directors and officers who own our common stock and other significant stockholders, may sell any or all of their shares of Class A common stock at any time upon conversion of any shares of Class B common stock into Class A common stock at the time of sale (subject to any restrictions under applicable law), including immediately upon listing. If such sales were to occur in a significant volume in a short period of time following the listing, it may result in an oversupply

46

of our Class A common stock in the market, which could adversely impact the public price of our Class A common stock. See also "——None of our stockholders are party to any contractual lock-up agreement or other contractual restrictions on transfer. Following our listing, sales of substantial amounts of our Class A common stock in the public markets or the perception that sales might occur, could cause the market price of our Class A common stock to decline."

- We will not conduct a traditional "roadshow" with underwriters prior to the opening of trading of our Class A common stock on the NYSE. Instead, we hosted an investor day and are engaging in certain other investor education meetings. In advance of the investor day, we announced the date for such day over financial news outlets in a manner consistent with typical corporate outreach to investors. We prepared an electronic presentation for this investor day, which had content similar to a traditional roadshow presentation, and made a version of the presentation publicly available, without restrictions, on our website. There can be no guarantee that the investor day and other investor education meetings will have the same impact on investor education as a traditional "roadshow" conducted in connection with an underwritten initial public offering. As a result, there may not be efficient or sufficient price discovery with respect to our Class A common stock or sufficient demand among potential investors immediately after our listing, which could result in a more volatile public price of our Class A common stock.

- Such differences from an underwritten initial public offering could result in a volatile market price for our Class A common stock and uncertain trading volume, which may adversely affect your ability to sell any Class A common stock that you may purchase.

- We have agreed to indemnify the Registered Stockholders for certain claims arising in connection with sales under this prospectus. Large indemnity payments could adversely affect our business, results of operations, and financial condition.

***The public price of our Class A common stock may be volatile, and could, upon listing on the NYSE, decline significantly and rapidly.***

The listing of our Class A common stock and the registration of the Registered Stockholders' shares of Class A common stock is a novel process that is not an underwritten initial public offering. We have engaged Goldman Sachs & Co. LLC, or Goldman Sachs; Morgan Stanley & Co. LLC, or Morgan Stanley; and Allen & Company LLC, or Allen & Company, as our financial advisors. We have also engaged Credit Suisse Securities (USA) LLC, Barclays Capital Inc., Citigroup Global Markets Inc., RBC Capital Markets, LLC, KeyBanc Capital Markets Inc., Canaccord Genuity LLC, and William Blair & Company, L.L.C. as our associate financial advisors. There will be no book building process and no price at which underwriters initially sold shares to the public to help inform efficient and sufficient price discovery with respect to the opening trades on the NYSE. As there has not been a recent sustained history of trading in our common stock in a private placement market prior to listing, NYSE listing rules require that a designated market maker, or DMM, consult with our financial advisors in order to effect a fair and orderly opening of our Class A common stock without coordination with us, consistent with the federal securities laws in connection with our direct listing. Accordingly, Morgan Stanley and our other financial advisors will be available to consult with the DMM who will be setting the opening public price of our Class A common stock on the NYSE. Our financial advisors are expected to provide input to the DMM regarding their understanding of the ownership of our outstanding common stock and pre-listing selling and buying intere st in our Class A common stock that they become aware of from potential investors and holders of our Class A common stock, including after consultation with certain institutional investors (which may include certain of the Registered Holders, other than the RSU holders) , in each case, without coordination with us. The DMM, in consultation with Morgan Stanley and our other financial advisors, is also expected to consider the information in the section titled "Sale Price History of our Capital Sto ck." Based on information provided to the NYSE, the opening public price of our Class A common stock on the NYSE will be determined by buy and sell orders collected by the NYSE from broker-dealers, and the NYSE is where buy orders can be matched with sell orders at a single price. Based on such orders, the DMM will determine an opening price for our Class A common stock pursuant to NYSE rules. However, because our financial advisors will not have engaged in a book building process, they will not be able to provide input to the DMM that is based on or informed by that process. For more information, see the section titled "Plan of Distribution."

Moreover, prior to the opening trade, there will not be a price at which underwriters initially sold shares of Class A common stock to the public as there would be in an underwritten initial public offering. The absence of a predetermined initial public offering price could impact the range of buy and sell orders collected by the NYSE from various broker-dealers. Consequently, upon listing on the NYSE, the public price of our Class A common stock may be more volatile than in an underwritten initial public offering and could decline significantly and rapidly.

Moreover, because of our novel listing process and the broad consumer awareness and brand recognition of Slack, individual investors, retail or otherwise, may have greater influence in setting the opening public price and subsequent public prices of our Class A common stock on the NYSE and may participate more in our initial trading than is typical for an underwritten initial public offering. These factors could result in a public price of our Class A common stock that is higher than other investors (such as institutional investors) are willing to pay, which could cause volatility in the trading price of our Class A common stock and an unsustainable trading price if the price of our Class A common stock significantly rises upon listing and institutional investors believe our Class A common stock is worth less than retail investors, in which case the price of our Class A common stock may decline over time. Further, if the public price of our Class A common stock is above the level that investors determine is reasonable for our Class A common stock, some investors may attempt to short our Class A common stock after trading begins, which would create additional downward pressure on the public price of our Class A common stock. To the extent that there is a lack of consumer awareness among retail investors, such lack of consumer awareness could reduce the value of our Class A common stock and cause volatility in the trading price of our Class A common stock.

The public price of our Class A common stock following the listing also could be subject to wide fluctuations in response to the risk factors described in this prospectus and others beyond our control, including:

- the number of shares of our Class A common stock publicly owned and available for trading;

- overall performance of the equity markets and/or publicly-listed technology companies;

- actual or anticipated fluctuations in our revenue or other operating metrics;

- our actual or anticipated operating performance and the operating performance of our competitors;

- changes in the financial projections we provide to the public or our failure to meet these projections;

- failure of securities analysts to initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company, or our failure to meet the estimates or the expectations of investors;

- any major change in our board of directors, management, or key personnel;

- the economy as a whole and market conditions in our industry;

- rumors and market speculation involving us or other companies in our industry;

- announcements by us or our competitors of significant innovations, new products, services, features, integrations or capabilities, acquisitions, strategic investments, partnerships, joint ventures, or capital commitments;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business, including those related to data privacy and cyber security in the U.S. or globally;

- lawsuits threatened or filed against us;

- other events or factors, including those resulting from war, incidents of terrorism, or responses to these events; and

- sales or expected sales of our Class A common stock by us, and our officers, directors, and principal stockholders.

In addition, stock markets, and the market for technology companies in particular, have experienced price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. Stock prices of many companies, including technology companies, have fluctuated in a manner often unrelated to the operating performance of those companies. These fluctuations may be even more pronounced in the trading market for our Class A common stock shortly following the listing of our Class A common stock on the NYSE as a result of the supply and demand forces described above. In the past, stockholders have instituted securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business, and harm our business, results of operations, and financial condition.

***The public price of our Class A common stock, upon listing on the NYSE, may have little or no relationship to the historical sales prices of our capital stock in private transactions.***

Prior to the listing of our Class A common stock on the NYSE, there has been no public market for our capital stock. The historical sales prices of our capital stock is primarily from sales of shares of our Class B common stock (on an as converted basis), which entitle holders to 10 votes per share (as opposed to one vote per share of our Class A common stock). In the section titled "Sale Price History of our Capital Stock," we have provided the historical sales prices of our capital stock in private transactions. However, given the differences in voting rights between Class A and Class B common stock and the limited history of sales, among other factors, this information may have little or no relation to broader market demand for our Class A common stock and thus the initial public price of our Class A common stock on the NYSE once trading begins. As a result, you should not place undue reliance on these historical sales prices as they may differ materially from the opening public prices and subsequent public prices of our Class A common stock on the NYSE. For more information about how the initial listing price on the NYSE will be determined, see the section titled "Plan of Distribution."

***An active, liquid and orderly market for our Class A common stock may not develop or be sustained. You may be unable to sell your shares of Class A common stock at or above the price you bought them for.***

We currently expect our Class A common stock to be listed and traded on the NYSE. Prior to listing on the NYSE, there has been no public market for our common stock. Moreover, consistent with Regulation M and other federal securities laws applicable to our listing, we have not consulted with Registered Stockholders or other existing stockholders regarding their desire or plans to sell shares in the public market following the listing or discussed with potential investors their intentions to buy our Class A common stock in the open market. While our Class A common stock may be sold after our listing on the NYSE by the Registered Stockholders pursuant to this prospectus or by our other existing stockholders in accordance with Rule 144 of the Securities Act of 1933, as amended, or the Securities Act, unlike an underwritten initial public offering, there can be no assurance that any Registered Stockholders or other existing stockholders will sell any of their shares of Class A common stock and there may initially be a lack of supply of, or demand for, Class A common stock on the NYSE. Conversely, there can be no assurance that the Registered Stockholders and other existing stockholders will not sell all of their shares of Class A common stock, resulting in an oversupply of our Class A common stock on the NYSE. In the case of a lack of supply of our Class A common stock, the trading price of our Class A common stock may rise to an unsustainable level. Further, institutional investors may be discouraged from purchasing our Class A common stock if they are unable to purchase a block of our Class A common stock in the open market due to a potential unwillingness of our existing stockholders to sell a sufficient amount of Class A common stock at the price offered by such institutional investors and the greater influence individual investors have in setting the trading price. If institutional investors are unable to purchase our Class A common stock, the market for our Class A common stock may be more volatile without the influence of long-term institutional investors holding significant amounts of our Class A common stock. In the case of a lack of demand for our Class A common stock, the trading price of our Class A common stock could decline significantly and rapidly after our listing. Therefore, an active, liquid, and orderly trading market for our Class A common stock may not initially develop or be sustained, which could significantly depress the public price of our Class A common stock and/or result in significant volatility, which could affect your ability to sell your shares of Class A common stock.

***The dual class structure of our common stock has the effect of concentrating voting control with those stockholders who held our capital stock prior to the listing of our Class A common stock on the NYSE, including our directors, executive officers and their respective affiliates, who held in the aggregate 65.6% of the voting power of our capital***

*stock as of April 30, 2019. Further, the voting agreements between our Chief Executive Officer, Stewart Butterfield, and certain stockholders have the effect of concentrating voting power with our Chief Executive Officer. This ownership will limit or preclude your ability to influence corporate matters, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval.*

Our Class B common stock has ten votes per share, and our Class A common stock, which is the stock we are listing on the NYSE and is being registered pursuant to the registration statement of which this prospectus forms a part, has one vote per share. As of April 30, 2019, our directors, executive officers and their affiliates held in the aggregate 65.6% of the voting power of our capital stock, including the shares subsequently covered by voting agreements in favor of Stewart Butterfield . Because of the ten-to-one voting ratio between our Class B and Class A common stock, the holders of our Class B common stock collectively could continue to control a significant percentage of the combined voting power of our common stock and therefore be able to control all matters submitted to our stockholders for approval until the tenth anniversary of the date of this prospectus, when all outstanding shares of Class A common stock and Class B common stock will convert automatically into shares of a single class of common stock. This concentrated control may limit or preclude your ability to influence corporate matters for the foreseeable future, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval. In addition, this may prevent or discourage unsolicited acquisition proposals or offers for our capital stock that you may believe are in your best interest as one of our stockholders. Further, as a result of voting agreements between Stewart Butterfield, our co-founder, Chairman of the board of directors, and Chief Executive Officer, and each of our three other co-founders, and the shares he holds, Mr. Butterfield will be able to exercise voting rights with respect to an aggregate of 89,768,926 shares of Class B common stock, which represents approximately 17.8% of the voting power of our outstanding capital stock as of April 30, 2019. As a director and officer, Mr. Butterfield owes a fiduciary duty to our stockholders to act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, Mr. Butterfield is entitled to vote his shares, and shares over which he has voting control as a result of voting agreements, in his own interests, which may not always be in the interests of our stockholders generally.

Future transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning purposes. The conversion of Class B common stock to Class A common stock will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term. As a result, it is possible that one or more of the persons or entities holding our Class B common stock could gain significant voting control as other holders of Class B common stock sell or otherwise convert their shares into Class A common stock.

In addition, while we do not expect to issue any additional shares of Class B common stock following the listing of our Class A common stock on the NYSE, any future issuances of Class B common stock would be dilutive to holders of Class A common stock.

***We cannot predict the effect our dual class structure may have on the market price of our Class A common stock.***

We cannot predict whether our dual class structure will result in a lower or more volatile market price of our Class A common stock, in adverse publicity, or other adverse consequences. For example, certain index providers have announced restrictions on including companies with multiple-class share structures in certain of their indices. In July 2017, FTSE Russell announced that it plans to require new constituents of its indices to have greater than 5% of the company's voting rights in the hands of public stockholders, and S&P Dow Jones announced that it will no longer admit companies with multiple-class share structures to certain of its indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400, and S&P SmallCap 600, which together make up the S&P Composite 1500. Also in 2017, MSCI, a leading stock index provider, opened public consultations on their treatment of no-vote and multi-class structures and temporarily barred new multi-class listings from certain of its indices; however, in October 2018, MSCI announced its decision to include equity securities "with unequal voting structures" in its indices and to launch a new index that specifically includes voting rights in its eligibility criteria. Under such announced policies, the dual class structure of our common stock would make us ineligible for inclusion in certain indices and, as a result, mutual funds, exchange-traded funds, and other investment vehicles that attempt to passively track those indices would not invest in our Class A common stock. These policies are relatively new and it is unclear what effect, if any, they will

50

have on the valuations of publicly-traded companies excluded from such indices, but it is possible that they may depress valuations, as compared to similar companies that are included. Because of the dual class structure of our common stock, we will likely be excluded from certain indices and we cannot assure you that other stock indices will not take similar actions. Given the sustained flow of investment funds into passive strategies that seek to track certain indices, exclusion from certain stock indices would likely preclude investment by many of these funds and could make our Class A common stock less attractive to other investors. As a result, the market price of our Class A common stock could be adversely affected.

***None of our stockholders are party to any contractual lock-up agreement or other contractual restrictions on transfer. Following our listing, sales of substantial amounts of our Class A common stock in the public markets or the perception that sales might occur, could cause the market price of our Class A common stock to decline.***

In addition to the supply and demand and volatility factors discussed above, sales of a substantial number of shares of our Class A common stock into the public market, particularly sales by our directors, executive officers and principal stockholders, or the perception that these sales might occur in large quantities, could cause the market price of our Class A common stock to decline.

As of April 30, 2019, giving effect to the conversion of all outstanding shares of our convertible preferred stock to shares of Class B common stock upon the effectiveness of the registration statement of which this prospectus forms a part, we have 504,144,027 shares of common stock outstanding, of which 896,057 are Class A common stock and 503,247,970 are Class B common stock, all of which are "restricted securities" (as defined in Rule 144 under the Securities Act). Approximately 281,935,953 of these shares may be converted to Class A common stock and then immediately sold either by the Registered Stockholders pursuant to this prospectus or by our other existing stockholders under Rule 144 since such shares held by such other stockholders will have been beneficially owned by non-affiliates for at least one year. Moreover, once we have been a reporting company subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act for 90 days and assuming the availability of certain public information about us, (i) non-affiliates who have beneficially owned our common stock for at least six months may rely on Rule 144 to sell their shares of common stock, and (ii) our directors, executive officers, and other affiliates who have beneficially owned our common stock for at least six months, including certain of the shares of Class A common stock covered by this prospectus to the extent not sold hereunder, will be entitled to sell their shares of our common stock subject to volume limitations under Rule 144 under the Securities Act and various vesting agreements.

Further, as of April 30, 2019, we had 19,318,139 options outstanding that, if fully exercised, would result in the issuance of shares of Class B common stock, as well as 77,376,197 shares of Class B common stock subject to RSU awards. All of the shares of Class B common stock issuable upon the exercise of stock options, subject to RSU awards and reserved for future issuance under our equity incentive plans, will be registered for public resale under the Securities Act. Accordingly, these shares will be able to be freely sold in the public market upon issuance, subject to applicable vesting requirements and compliance by affiliates with Rule 144. The listing and public trading of our Class A common stock on the NYSE will satisfy the performance vesting condition on our RSUs and result in the vesting and settlement of approximately 28,250,000 RSUs held by our current and former employees and other service providers as of June 20, 2019. We expect approximately 11,500,000 shares of our Class A common stock to be sold on our first trading day in order to fund the tax withholding and remittance obligations arising in connection with the RSUs that will vest and settle upon that day and the remaining approximately 16,750,000 shares upon the vesting and settlement of RSUs may also be sold as early as the first day of trading, though there is no assurance that such shares will be sold on the first day of trading. See the section titled "RSU Sales." If the market price of our Class A common stock on the NYSE is volatile or if there is an oversupply of shares of Class A common stock and holders of RSUs are unable to sell their shares, holders of RSUs would still be responsible for funding the tax withholding and remittance obligations arising in connection with the vesting and settlement of their RSUs and could have to fund such amounts with cash. A potential oversupply of shares due to sales by holders of RSUs could also adversely impact the public price of our Class A common stock.

None of our stockholders are subject to any contractual lock-up or other contractual restriction on the transfer or sale of their shares.

51

Following the effectiveness of the registration statement of which this prospectus forms a part, the holders of up to 372,136,712 shares of our Class B common stock will have rights, subject to some conditions, to require us to file registration statements for the public resale of the Class A common stock issuable upon conversion of such shares or to include such shares in registration statements that we may file for us or other stockholders. Any registration statement we file to register additional shares, whether as a result of registration rights or otherwise, could cause the market price of our Class A common stock to decline or be volatile.

We also may issue our capital stock or securities convertible into our capital stock from time to time in connection with a financing, acquisition, investments, or otherwise. Any such issuance could result in substantial dilution to our existing stockholders and cause the public price of our Class A common stock to decline.

***The requirements of being a public company may strain our resources, divert management's attention, and affect our ability to attract and retain executive management and qualified board members.***

As a public company, we will be subject to the reporting requirements of the Exchange Act, the listing standards of the NYSE, and other applicable securities rules and regulations. We expect that the requirements of these rules and regulations will continue to increase our legal, accounting, and financial compliance costs, make some activities more difficult, time-consuming, and costly, and place significant strain on our personnel, systems, and resources. For example, the Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and results of operations. As a result of the complexity involved in complying with the rules and regulations applicable to public companies, our management's attention may be diverted from other business concerns, which could harm our business, results of operations, and financial condition. Although we have already hired additional employees to assist us in complying with these requirements, we may need to hire more employees in the future or engage outside consultants, which will increase our operating expenses.

In addition, changing laws, regulations, and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs, and making some activities more time-consuming. These laws, regulations, and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We intend to invest substantial resources to comply with evolving laws, regulations, and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from business operations to compliance activities. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us and our business may be harmed.

We also expect that being a public company and these new rules and regulations will make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These factors could also make it more difficult for us to attract and retain qualified members of our board of directors, particularly to serve on our audit and risk committee and compensation committee, and qualified executive officers.

As a result of disclosure of information in this prospectus and in filings required of a public company, our business and financial condition will become more visible, which may result in an increased risk of threatened or actual litigation, including by competitors and other third parties. If such claims are successful, our business, results of operations, and financial condition could be harmed, and even if the claims do not result in litigation or are resolved in our favor, these claims, and the time and resources necessary to resolve them, could divert the resources of our management and harm our business, results of operations, and financial condition.

***If securities or industry analysts do not publish research, or publish inaccurate or unfavorable research, about our business, the price of our Class A common stock and trading volume could decline.***

The trading market for our Class A common stock will depend in part on the research and reports that securities or industry analysts publish about us and/or our business. Securities and industry analysts do not currently, and may never, publish research on our company. If few securities analysts commence coverage of us, or if industry analysts

52

cease coverage of us, the trading price for our Class A common stock would be negatively affected. If one or more of the analysts who cover us downgrade our Class A common stock or publish inaccurate or unfavorable research about our business, our Class A common stock price would likely decline. If one or more of these analysts cease coverage of us or fail to publish reports on us on a regular basis, demand for our Class A common stock could decrease, which might cause our Class A common stock price and trading volume to decline.

***We do not intend to pay dividends for the foreseeable future.***

We have never declared or paid any cash dividends on our common stock and do not intend to pay any cash dividends in the foreseeable future. We anticipate that we will retain all of our future earnings for use in the operation of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of our board of directors. In addition, our revolving credit facility contains restrictions on our ability to pay dividends. Accordingly, investors must rely on sales of their Class A common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investments.

***Provisions in our charter documents and under Delaware law could make an acquisition of our company more difficult, limit attempts by our stockholders to replace or remove our current board of directors, and limit the market price of our Class A common stock.***

Provisions in our amended and restated certificate of incorporation and amended and restated bylaws may have the effect of delaying or preventing a change of control or changes in our management. Our amended and restated certificate of incorporation and amended and restated bylaws, which will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part, include provisions that:

- provide that our board of directors will be classified into three classes of directors with staggered three-year terms;

- permit our board of directors to establish the number of directors and fill any vacancies and newly-created directorships;

- require super-majority voting to amend some provisions in our amended and restated certificate of incorporation and amended and restated bylaws;

- authorize the issuance of "blank check" preferred stock that our board of directors could use to implement a stockholder rights plan;

- provide that only the Chairperson of our board of directors, our Chief Executive Officer, or a majority of our board of directors will be authorized to call a special meeting of stockholders;

- provide for a dual class common stock structure in which holders of our Class B common stock have the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the outstanding shares of our Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws; and

- advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

Moreover, Section 203 of the Delaware General Corporation Law may discourage, delay, or prevent a change in control of our company. Section 203 imposes certain restrictions on mergers, business combinations, and other transactions between us and holders of 15% or more of our common stock. See the section titled "Description of Capital Stock" for additional information.

***Our amended and restated bylaws will designate a state or federal court located within the State of Delaware as the exclusive forum for certain litigation that may be initiated by our stockholders, which could limit stockholders' ability to obtain a favorable judicial forum for disputes with us.***

Our amended and restated bylaws will provide that, to the fullest extent permitted by law, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware) will be the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a breach of fiduciary duty;

- any action asserting a claim against us arising pursuant to the Delaware General Corporation Law, our amended and restated certificate of incorporation, or our amended and restated bylaws; or

- or any action asserting a claim against us that is governed by the internal affairs doctrine.

Nothing in our amended and restated bylaws will preclude stockholders that assert claims under the Securities Act from bringing such claims in state or federal court, subject to applicable law.

These choice of forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, or other employees, which may discourage lawsuits with respect to such claims. Alternatively, if a court were to find either choice of forum provision contained in our amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, results of operations, and financial condition.

54

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements within the meaning of the federal securities laws, which are statements that involve substantial risks and uncertainties. Forward-looking statements generally relate to future events or our future financial or operating performance. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "shall," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential," or "continue" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans, or intentions. Forward-looking statements contained in this prospectus include, but are not limited to, statements about:

- our future financial performance, including our revenue, cost of revenue, and operating expenses;

- our ability to maintain the security and availability of Slack;

- our ability to increase the number of organizations on Slack and paid customers;

- our ability to grow or maintain our Net Dollar Retention Rate;

- our ability to achieve widespread adoption;

- our ability to effectively manage our growth and future expenses;

- our ability to maintain our network of partners;

- our ability to enhance Slack to respond to new technologies and requirements of organizations on Slack;

- our estimated market opportunity;

- the future benefits to be derived from new third-party applications and integrations;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to comply with modified or new laws and regulations applying to our business;

- the attraction and retention of qualified employees and key personnel;

- our anticipated investments in sales and marketing and research and development;

- the sufficiency of our cash, cash equivalents, and investments to meet our liquidity needs;

- our ability to successfully defend litigation brought against us; and

- the increased expenses associated with being a public company.

We caution you that the foregoing list may not contain all of the forward-looking statements made in this prospectus.

You should not rely upon forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this prospectus primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations, and prospects. The outcome of the events described in these forward-looking statements is subject to risks, uncertainties, and other factors described in the section titled "Risk Factors" and elsewhere in this prospectus. Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. The results, events, and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

55

The forward-looking statements made in this prospectus relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this prospectus to reflect events or circumstances after the date of this prospectus or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, or investments we may make.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and you are cautioned not to unduly rely upon these statements.

56

## MARKET AND INDUSTRY DATA

This prospectus contains statistical data and estimates that are based on independent industry publications or other publicly available information, as well as other information based on our internal sources. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to these estimates. The industry in which we operate is subject to a high degree of uncertainty and risk due to a variety of factors, including those described in the section titled "Risk Factors."

Certain information in this prospectus is taken from an independent industry publication (Netskope, Inc., *Cloud Report* , February 2018) and publicly-available reports.

57

**USE OF PROCEEDS**

Registered Stockholders may, or may not, elect to sell shares of our Class A common stock covered by this prospectus. To the extent any Registered Stockholder chooses to sell shares of our Class A common stock covered by this prospectus, we will not receive any proceeds from any such sales of our Class A common stock. See the section titled "Principal and Registered Stockholders."

**RSU SALES**

We grant RSUs to our employees and directors with both service-based and performance vesting conditions. The service-based vesting period for these awards is typically four years with a cliff vesting period of one year and continued vesting quarterly thereafter. The performance vesting condition is satisfied on the earlier of (i) a change in control of the company, (ii) the initial public offering of our securities, or (iii) the listing and public trading of our Class A common stock on the NYSE .

The listing and public trading of our Class A common stock on the NYSE will satisfy the performance vesting condition and result in the vesting and settlement of approximately 28,250,000  RSUs held by our current and former employees and other service providers as of June 20, 2019. To fund the personal tax withholding and remittance obligations arising in connection with the RSUs that will vest and settle on that day, we expect that current and former employees will use a broker or brokers to sell a portion of such shares into the market on the first trading day. The proceeds of such sales will be remitted either to us or directly to the relevant taxing authorities, in either case, to be applied towards such tax obligations. Approximately  11,500,000  shares of our Class A common stock are expected to be sold throughout the first trading day in order to fund such tax amounts. The number of shares expected to be sold has been calculated using a percentage that is based on the estimated withholding tax rates for those current and former employees and other service providers holding RSUs that will vest and settle on the first trading day. In addition, the estimated number of shares expected to be sold is further based on the estimated weighted-average price for the shares of Class A common stock on the first day of trading on the NYSE, and because that price will not be known until trading closes, the price per share for purposes of this estimate has been based solely on our latest common stock price as determined by our most recently completed independent common stock valuation report, dated as of May 15, 2019, which was $22.14 per share of Class A common stock. One day prior to the commencement of trading on the NYSE, we will recalculate the estimated number of shares expected to be sold based on the NYSE's published reference price.

In order to meet our obligation to remit withholding taxes on behalf of certain of our employees and former employees on a timely basis, we may use our own cash reserves to satisfy such tax remittance obligations prior to receiving the proceeds from such market sales. We do not currently know the amount of cash that would be used to satisfy these tax withholding obligations because it would be dependent on a number of factors, including the share price at the time of settlement. After the first trading day, additional RSUs typically will vest and settle on the first of each month and RSU holders will sell a portion of such shares into the market to fund the personal tax withholding and remittance obligations arising in connection with the RSUs that will vest and settle on such date. As of April 30, 2019, we expect that approximately 2,038,000, 1,365,000, and 1,318,000 RSUs will vest on July 1, 2019, August 1, 2019, and September 1, 2019, respectively.

If the market price of our Class A common stock on the NYSE is volatile or if there is an oversupply of shares of Class A common stock and holders of RSUs are unable to sell their shares, holders of RSUs would still be responsible for funding the tax withholding and remittance obligations arising in connection with the vesting and settlement of their RSUs and could have to fund such amounts with cash.

58

**DIVIDEND POLICY**

We have never declared or paid any cash dividends on our capital stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. Any future determination to declare cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and other factors that our board of directors may deem relevant. In addition, the terms of our revolving credit facility place certain limitations on the amount of cash dividends we can pay, even if no amounts are currently outstanding.

## CAPITALIZATION

The following table sets forth cash, cash equivalents, and marketable securities, as well as our capitalization, as of April 30, 2019 as follows:

- on an actual basis; and

- on a pro forma basis, giving effect to (i) the automatic conversion of all outstanding shares of our convertible preferred stock into an aggregate of 373,371,712 shares of our Class B common stock, as if such conversion had occurred on April 30, 2019, (ii) the vesting and settlement of 26,075,320 RSUs for which the service-based condition was fully satisfied as of April 30, 2019 and for which we expect the performance vesting condition to be satisfied upon the listing and public trading of our Class A common stock on the NYSE , and (iii) stock-based compensation of $201.6 million associated with outstanding RSUs as of April 30, 2019 for which we expect the performance vesting condition to be satisfied upon the listing and public trading of our Class A common stock on the NYSE.

You should read this table together with our consolidated financial statements and related notes, and the sections titled "Selected Consolidated Financial Data and Other Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" that are included elsewhere in this prospectus.

| | As of April 30, 2019 | |
| --- | --- | --- |
| | Actual | Pro Forma [1] |
| | (In thousands, except share and per share data) | |
| Cash, cash equivalents, and marketable securities | $ 792,658 | $ 792,658 |
| Stockholders' equity: | | |
| Convertible preferred stock, $0.0001 par value; 390,588,630 shares authorized, 373,371,712 shares issued and outstanding, actual; no shares authorized, issued and outstanding, pro forma | $ 1,392,101 | $ — |
| Class A common stock, $0.0001 par value; 660,000,000 shares authorized, 896,057 shares issued and outstanding, actual; 660,000,000 shares authorized, 896,057 shares issued and outstanding, pro forma | — | — |
| Class B common stock, $0.0001 par value; 650,000,000 shares authorized, 129,876,258 shares issued and outstanding, actual; 650,000,000 shares authorized, 529,323,290 shares issued and outstanding, pro forma | 13 | 53 |
| Additional paid-in capital | 112,267 | 1,705,969 |
| Accumulated other comprehensive loss | (78) | (78) |
| Accumulated deficit | (698,895) | (900,536) |
| Total Slack Technologies, Inc. stockholders' equity | 805,408 | 805,408 |
| Noncontrolling interest | 11,371 | 11,371 |
| Total stockholders' equity | 816,779 | 816,779 |
| Total capitalization | $ 816,779 | $ 816,779 |

_____

(1) Payroll taxes and other withholding obligations have not been included in the pro forma column. For additional information, see Note 1 to our consolidated financial statements included elsewhere in this prospectus and the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Significant Impacts of Stock-Based Compensation."

The pro forma column in the table above is based on 896,057 shares of Class A and 529,323,290 shares of Class B common stock outstanding as of April 30, 2019, and excludes:

- 19,318,139 shares of our Class B common stock issuable upon the exercise of options to purchase shares of our Class B common stock that were outstanding as of April 30, 2019, with a weighted-average exercise price of $2.75 per share;

60

- 51,300,877 RSUs for shares of our Class B common stock that are releasable upon satisfaction of service and performance conditions outstanding as of April 30, 2019, for which the service-based condition was not yet satisfied as of April 30, 2019;

- 1,200,000 shares of our Class B common stock reserved for issuance to fund and support our social impact initiatives;

- 7,990,835 shares of our Class B common stock reserved for future issuance pursuant to our 2009 Stock Plan, or our 2009 Plan; and

- 69,200,000 shares of our Class A common stock reserved for future issuance under our stock-based compensation plans to be adopted in connection with the effectiveness of the registration statement of which this prospectus forms a part, consisting of:

  - 60,200,000 shares of our Class A common stock reserved for future issuance under our 2019 Stock Option and Incentive Plan, or our 2019 Plan; and

  - 9,000,000 shares of our Class A common stock reserved for future issuance under our 2019 Employee Stock Purchase Plan, or ESPP.

Our 2019 Plan and ESPP each provide for annual automatic increases in the number of shares reserved thereunder and our 2019 Plan also provides for increases to the number of shares of Class A common stock that may be granted thereunder based on shares underlying any awards under our 2009 Plan that expire, are forfeited, or are otherwise terminated, as more fully described in the section titled "Executive Compensation—Employee Benefits and Stock Plans."

Except as otherwise indicated, all information in this prospectus assumes:

- the filing and effectiveness of our amended and restated certificate of incorporation in Delaware and the adoption of our amended and restated bylaws, each of which will occur shortly following the effectiveness of the registration statement of which this prospectus forms a part; and

- the automatic conversion of all outstanding shares of our convertible preferred stock into an aggregate of 373,371,712 shares of our Class B common stock, the conversion of which will occur upon the effectiveness of the registration statement of which this prospectus forms a part.

61

### SELECTED CONSOLIDATED FINANCIAL DATA AND OTHER DATA

The following selected consolidated statements of operations data for the years ended January 31, 2017, 2018, and 2019 and consolidated balance sheet data as of January 31, 2018 and 2019 have been derived from our audited consolidated financial statements included elsewhere in this prospectus. The following selected consolidated statements of operations data for the three months ended April 30, 2018 and 2019 and consolidated balance sheet data as of April 30, 2019 have been derived from our unaudited interim consolidated financial statements included elsewhere in this prospectus. We have prepared the unaudited interim consolidated financial statements on the same basis as the audited financial statements. We have included, in our opinion, all adjustments, consisting only of normal recurring adjustments that we consider necessary for a fair presentation of the financial information set forth in those unaudited interim consolidated financial statements. Our historical results are not necessarily indicative of the results that may be expected in the future and the results for the three months ended April 30, 2019 are not necessarily indicative of the results to be expected for the full year or any other period. You should read the following selected consolidated financial data and other data below in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | (In thousands, except per share data) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 105,153 | $ 220,544 | $ 400,552 | $ 80,919 | $ 134,821 |
| Cost of revenue [1] | 15,517 | 26,364 | 51,301 | 10,101 | 18,574 |
| Gross profit | 89,636 | 194,180 | 349,251 | 70,818 | 116,247 |
| Operating expenses: | | | | | |
| Research and development [1] | 96,678 | 141,350 | 157,538 | 35,410 | 51,103 |
| Sales and marketing [1] | 104,006 | 140,188 | 233,191 | 42,168 | 66,838 |
| General and administrative [1] | 37,455 | 56,493 | 112,730 | 19,568 | 36,744 |
| Total operating expenses | 238,139 | 338,031 | 503,459 | 97,146 | 154,685 |
| Loss from operations | (148,503) | (143,851) | (154,208) | (26,328) | (38,438) |
| Other income (expense), net | 1,749 | 4,581 | 16,146 | 1,802 | 7,077 |
| Loss before income taxes | (146,754) | (139,270) | (138,062) | (24,526) | (31,361) |
| Provision for income taxes | 155 | 793 | 840 | 350 | 520 |
| Net loss | (146,909) | (140,063) | (138,902) | (24,876) | (31,881) |
| Net income (loss) attributable to noncontrolling interest [2] | (45) | 22 | 1,781 | 6 | 1,451 |
| Net loss attributable to Slack | (146,864) | (140,085) | (140,683) | (24,882) | (33,332) |
| Less: Deemed dividends to preferred stockholders | — | 40,883 | — | — | — |
| Net loss attributable to Slack common stockholders | $ (146,864) | $ (180,968) | $ (140,683) | $ (24,882) | $ (33,332) |
| Basic and diluted net loss per share: | | | | | |
| Net loss per share attributable to Slack common stockholders, basic and diluted [3] | $ (1.28) | $ (1.47) | $ (1.16) | $ (0.21) | $ (0.26) |
| Weighted-average shares used in computing net loss per share attributable to Slack common stockholders, basic and diluted [3] | 114,887 | 122,865 | 121,732 | 118,926 | 125,890 |
| Pro forma net loss per share attributable to Slack common stockholders, basic and diluted (unaudited) [3] | | | $ (0.27) | | $ (0.06) |
| Weighted-average shares used in computing pro forma net loss per share attributable to Slack common stockholders, basic and diluted (unaudited) [3] | | | 517,493 | | 525,337 |

62

_____

(1) Includes stock-based compensation as follows:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
|---|---|---|---|---|---|
| | (In thousands) | | | | |
| Cost of revenue | $ 630 | $ 491 | $ 732 | $ 603 | $ 46 |
| Research and development | 34,546 | 35,260 | 9,948 | 3,395 | 1,635 |
| Sales and marketing | 9,744 | 8,044 | 2,677 | 1,204 | 382 |
| General and administrative | 5,171 | 4,288 | 9,775 | 916 | 1,576 |
| Total stock-based compensation | $ 50,091 | $ 48,083 | $ 23,132 | $ 6,118 | $ 3,639 |

Stock-based compensation for fiscal years 2017, 2018, and 2019 included compensation expense of $26.5 million, $0, and $14.8 million, respectively, related to secondary sales of common stock by certain of our current and former employees and $8.0 million, $39.4 million, and $0, respectively, related to cash payments attributable to tender offers and repurchases for our outstanding common stock. Stock-based compensation for the three months ended April 30, 2018 and 2019 included compensation expense of $4.4 million and $0, respectively, related to secondary sales of common stock by certain of our current and former employees.

(2) Our consolidated financial statements include our majority-owned subsidiary, Slack Fund . The ownership interest of minority investors in Slack Fund is recorded as a noncontrolling interest.

(3) See note 10 to our consolidated financial statements included elsewhere in this prospectus for an explanation of the method used to calculate basic and diluted net loss per share attributable to Slack common stockholders and pro forma basic and diluted net loss per share attributable to Slack common stockholders and the weighted-average number of shares used in the computation of the per share amounts.

| | As of January 31, | | As of April 30, 2019 | Pro Forma April 30, 2019 [(1)] |
| | 2018 | 2019 | | |
|---|---|---|---|---|
| | (In thousands) | | | |
| **Consolidated Balance Sheet Data:** | | | | |
| Cash, cash equivalents, and marketable securities | $ 548,761 | $ 841,071 | $ 792,658 | $ 792,658 |
| Working capital | 440,258 | 650,324 | 599,938 | 599,938 |
| Total assets | 697,780 | 1,198,956 | 1,167,030 | 1,167,030 |
| Total deferred revenue | 125,453 | 241,873 | 256,689 | 256,689 |
| Convertible preferred stock | 965,221 | 1,392,101 | 1,392,101 | — |
| Total stockholders' equity | 519,288 | 841,606 | 816,779 | 816,779 |

_____

(1) The pro forma column in the consolidated balance sheet data table above reflects (a) the automatic conversion of all outstanding shares of our convertible preferred stock into 373,371,712 shares of Class B common stock as if such conversion had occurred on April 30, 2019, (b) the vesting and settlement of 26,075,320 RSUs for which the service-based condition was fully satisfied as of April 30, 2019 and for which we expect the performance vesting condition to be satisfied upon the listing and public trading of our Class A common stock on the NYSE, and (c) stock-based compensation of $201.6 million associated with outstanding RSUs as of April 30, 2019 for which we expect the performance vesting condition to be satisfied upon the listing and public trading of our Class A common stock on the NYSE. Payroll taxes and other withholding obligations have not been included in the pro forma column. For additional information, see Note 1 to our consolidated financial statements included elsewhere in this prospectus and in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Significant Impacts of Stock-Based Compensation."

**Key Business Metrics**

We review the following key business metrics to measure our performance, identify trends, formulate financial projections, and make strategic decisions. We are not aware of any uniform standards for calculating these key metrics, which may hinder comparability with other companies who may calculate similarly-titled metrics in a different way.

| | As of January 31, | | | As of April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| Paid Customers | 37,000 | 59,000 | 88,000 | 67,000 | 95,000 |
| Paid Customers >$100,000 | 135 | 298 | 575 | 351 | 645 |
| Net Dollar Retention Rate | 171% | 152% | 143% | 149% | 138% |

For additional information about our key business metrics, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business Metrics."

**Non-GAAP Financial Measures**

In addition to our results determined in accordance with GAAP we believe the below non-GAAP measures are useful in evaluating our operating performance. We use the below non-GAAP financial information, collectively, to evaluate our ongoing operations and for internal planning and forecasting purposes.

| | Year Ended January 31, | | | | | Three Months Ended April 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2018 | | 2019 | | 2018 | | 2019 |
| | (In thousands) | | | | | | | | |
| Calculated Billings | $ | 143,390 | $ | 289,013 | $ | 516,972 | $ | 102,080 | $ | 149,637 |
| | | | | | | | | | |
| Free Cash Flow | $ | (114,038) | $ | (57,661) | $ | (97,239) | $ | (14,969) | $ | (34,203) |
| Tender offer payments and repurchases deemed compensation [1] | | 8,033 | | 39,374 | | — | | — | | — |
| Adjusted Free Cash Flow | $ | (106,005) | $ | (18,287) | $ | (97,239) | $ | (14,969) | $ | (34,203) |

_____

(1)    In fiscal years 2017 and 2018, we made cash payments of $8.0 million and $39.4 million, respectively, attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. Adjusted Free Cash Flow has been shown here as adjusted for these cash payments. We have adjusted our Free Cash Flow for these payments because we do not expect them to occur when we are a public company so we believe that this provides greater comparability across periods.

For additional information and reconciliations of the non-GAAP financial measures to the most directly comparable financial measures stated in accordance with GAAP, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures."

64

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations together with the "Selected Consolidated Financial Data and Other Data" and the consolidated financial statements and related notes included elsewhere in this prospectus. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under the section titled "Risk Factors" or in other parts of this prospectus. Our fiscal year ends January 31.*

**Overview**

Slack is a new layer of the business technology stack that brings together people, applications, and data – a single place where people can effectively work together, access hundreds of thousands of critical applications and services, and find important information to do their best work. Slack has very general and broad applicability. It is not aimed at any one specific purpose, but at nearly anything that people do together at work. Slack is used to review job candidates, coordinate election coverage, diagnose network problems, negotiate budgets, plan marketing campaigns, approve menus, and organize disaster response teams, along with countless other tasks.

Slack provides an easy way for users to share and aggregate information from other software, take action on notifications, and advance workflows in a multitude of third-party applications, over 1,500 of which are listed in the Slack App Directory. Further, Slack's platform capabilities extend beyond integrations with third-party applications and allow for easy integrations with an organization's internally-developed software.

During the three months ended January 31, 2019, our daily active users, which we define as users who either created or consumed content in a given 24-hour period on either a free or paid subscription plan, exceeded 10 million. As of January 31, 2019, Slack had more than 600,000 organizations with three or more users, comprised of more than 88,000 Paid Customers and more than 500,000 organizations on our Free subscription plan. As of April 30, 2019, Slack had more than 95,000 Paid Customers. We define an organization as a separate entity, such as a company, educational or government institution, or distinct business unit of a company, that is on a subscription plan, whether free or paid. Once an organization has three or more users on a paid subscription plan, we count them as a Paid Customer.

We serve organizations of all sizes across industries, ranging from software companies, such as Autodesk and Oracle, to consumer retail companies, such as LVMH and Everlane, to financial services companies, such as Liberty Mutual, and government entities, such as NASA Jet Propulsion Laboratory. Slack is currently used in over 150 countries and available in eight languages (English (U.S.), English (U.K.), French, German, Japanese, Portuguese (Brazil), Spanish (Latin America), and Spanish (Spain)). In the years ended January 31, 2017, 2018 and 2019, 34%, 34%, and 36%, respectively, of our revenue was generated by Paid Customers outside of the United States. In the three months ended April 30, 2018 and 2019, 36% and 37%, respectively, of our revenue was generated by Paid Customers outside of the United States. In the periods presented, no one Paid Customer accounted for more than 3% of our revenue.

We have experienced rapid growth in recent periods. Our revenue was $105.2 million , $220.5 million , and $400.6 million for the years ended January 31, 2017, 2018, and 2019, respectively, representing annual growth of 110% and 82% , respectively. Our revenue was $80.9 million and $134.8 million for the three months ended April 30, 2018 and 2019, respectively, representing year-over-year growth of 67% .

We generated net losses for the years ended January 31, 2017, 2018, and 2019 of $146.9 million , $140.1 million , and $138.9 million , respectively, which included $50.1 million , $48.1 million , and $23.1 million , respectively, of stock-based compensation. We generated net losses for the three months ended April 30, 2018 and 2019 of $24.9 million and $33.3 million , respectively, which included $6.1 million and $3.6 million , respectively, of stock-based compensation. Our net losses have been decreasing as a percentage of revenue over time as revenue growth has outpaced the growth in operating expenses. We plan to continue to invest in adding organizations to Slack in order to increase our revenues, decrease our operating losses, and eventually reach profitability. However, there can be no guarantee as to when we will eventually reach profitability, if at all.

Since our public launch in 2014, we have focused on designing Slack and developing partnerships in ways that have allowed organizations on Slack to realize the value of this new way of working.



**Our Subscriptions**

We generate revenue primarily from the sale of subscriptions for Slack. Paid customers typically pay on a monthly or annual basis, based on the number of users that they have on Slack. We offer four subscription plans to serve the varying needs of organizations on Slack: Free, Standard, Plus, and Enterprise Grid.

Our Free, Standard, and Plus subscription plans consist of a single workspace, or a basic Slack environment configured for each team. These plans are typically adopted by teams within small- and medium-sized businesses. Our Free subscription plan is designed for new organizations and users to quickly realize value. Our Standard and Plus subscription plans introduce additional capabilities, including enhanced access to content, unlimited integrations, shared channels, guest accounts, and administrative controls. We believe these features offer organizations and users significant value, especially as Slack expands within an organization.

We designed Enterprise Grid for larger organizations that often have tens of thousands of users and require enhanced functionality, flexibility, administrative control, and security at scale. Enterprise Grid allows paid customers to create, manage, and search across an unlimited set of connected workspaces and channels. Enterprise Grid makes it easy for workers and administrators to tap into their organization's collective knowledge at scale; access centralized controls to provision and manage Slack; and integrate with third-party e-Discovery and data loss prevention tools to help meet security and compliance requirements.

We have a fair billing policy under which certain paid customers are charged a fee per user, and their billing is reconciled on a monthly or quarterly basis based on usage. As part of this policy, these paid customers are entitled to a credit if they have not used the entirety of the contracted number of users for which they have paid during the contractual term of the arrangement. Other paid customers have a type of subscription agreement where they are charged a fee based on the number of purchased user subscriptions, but billing is fixed and independent of usage.

66

**Our Go-to-Market Model**

We combine a web-based, self-service go-to-market approach to attract users with direct sales efforts that focus on growing paid users within larger organizations that generally already have Slack users and acquiring new large organizations as paid customers. We believe that these go-to-market approaches reinforce one another; self-service users become leads for our salespeople and paid users within larger enterprises create organic awareness of Slack inside and outside of their organizations. We complement these activities with an obsessive focus on customer experience and customer success to support the growth of the number of users on free and paid subscriptions.

*Self-service adoption and marketing*

Many organizations adopt Slack initially as part of our self-service go-to-market approach. We deploy a range of marketing strategies and tactics to drive initial awareness and adoption. Slack is easily accessible from our website and users can immediately begin using Slack through our Free subscription plan. This model facilitates rapid and efficient user adoption, particularly by empowering users to access Slack without the friction of payment or a formal sales interaction. We believe free usage helps prospective paid customers realize the value of Slack and users spread the word organically throughout their networks and organizations. Many of our users begin their journey with Slack on our Free subscription plan.

Our customer experience team is core to enhancing user adoption, free-to-paid conversion, and Net Dollar Retention Rate. This team educates users and organizations on Slack about Slack's broad use cases and benefits, and helps facilitate broader organic adoption. As organizations engage more deeply with Slack, they often upgrade to paid plans via our website.

*Direct sales and marketing*

To acquire new paid customers and increase adoption within larger organizations, we utilize a direct sales organization that complements our self-service approach. Our direct sales force leverages Slack champions and proofs of concept developed through self-service adoption. We combine this bottoms-up demand with direct sales efforts targeted at C-suite executives and business unit leaders. These efforts include a globally distributed field sales force, solutions engineering, demand generation campaigns, webinars, analyst relations, C-suite events, cooperative marketing efforts with our partners, and hosted user conferences, highlighted by Frontiers, our annual user conference.

**Factors Affecting our Performance**

We believe that the growth of Slack and our future success and performance are dependent upon many factors, including those below. While these factors present significant opportunities for us, these factors also represent the challenges that we must successfully address in order to grow the adoption and use of Slack and improve our results of operations.

*Self-service acquisition of new organizations*

We primarily attract new and prospective organizations organically, through a self-service customer engagement model. Prospective organizations can evaluate and subscribe to Slack directly on our website, through either our Free subscription plan or one of our self-service paid plans. As organizations realize the benefits of Slack, they often expand their usage and spread the word organically throughout their networks about the benefits they have experienced. This organic growth in the number of organizations on Slack in turn leads to increased benefits for organizations already on Slack. We intend to continue investing to maintain organic growth in the number of organizations on Slack by strengthening our efficient self-service customer engagement model and investing in marketing to help new organizations discover the benefits of Slack. This self-service model requires us to incur sales and marketing expenses often prior to generating corresponding revenue.

*Conversion of organizations on our free version to paid customers*

Many organizations often start using our Free subscription plan. We have observed that organizations on Free subscription plans often upgrade to paid subscriptions as they engage more deeply with Slack, both through using Slack for collaboration and communication and integrating more third-party and internally-developed applications via our

67

platform. Often, we believe that organizations on our Free subscription plan convert to a paid subscription plan because of the ability to search and access beyond 10,000 messages, which is the limit under our Free subscription plan, and single-sign-on, which is offered under our Plus plan. In fiscal year 2018, approximately 10% of our revenue was derived from organizations on our Free subscription plan prior to fiscal year 2018 that converted to Paid Customers in fiscal year 2018. I n fiscal year 2019, approximately 8% of our revenue was derived from organizations on our Free subscription plan prior to fiscal year 2019 that converted to Paid Customers in fiscal year 2019.

We intend to continue to invest in product development, customer experience, customer support, and sales and marketing in order to help all organizations on Slack transform the way they work, which we believe will continue to propel the conversion of organizations on our Free subscription plan to a paid subscription plan.

### Success of our direct sales force

We believe that there is a substantial opportunity for us to continue to increase the size of our enterprise paid customer base across a broad range of industries given the fundamental need to help people collaborate, communicate, and seamlessly integrate workflows across applications. Our direct sales force is focused on growing usage within larger paid customers and acquiring new paid customers. We intend to continue to expand our enterprise direct sales force to address this opportunity.

### Expansion of users within existing paid customers

We believe that the long-term value of Slack to an organization increases as an organization expands its adoption, increases application integrations, and grows inter- and intra-organization communications. Our direct sales and customer success teams help organizations on Slack realize and achieve the potential value from broader adoption of Slack. We are investing substantially in customer experience, customer success, education, and other capabilities to drive an increase in users within organizations on Slack. We measure the rate of expansion within our Paid Customer base by calculating our Net Dollar Retention Rate. We believe that our Net Dollar Retention Rate demonstrates our large addressable market and high rate of net expansion within Paid Customers. As of April 30, 2019, our Net Dollar Retention Rate was 138%.

The chart below illustrates the annual recurring revenue, or ARR, of each cohort over the periods presented, with each cohort representing Paid Customers who made their first purchase from us in a given fiscal year. For example, the fiscal year 2015 cohort represents all Paid Customers that purchased their first subscription from us during the fiscal year 2015. For a description of how our ARR is calculated, see the section titled "—Key Business Metrics—Paid Customers >$100,000" below.



**Annual Recurring Revenue (ARR)**
by Annual Cohort through January 31, 2019

■ FY 2019
■ FY 2018
■ FY 2017
■ FY 2016
■ FY 2015

68

*Continued investment in product development*

We intend to continually invest to innovate and augment Slack's core capabilities, to further our market leadership and to make Slack an even easier and more effective place where users get work done. For example, we recently launched shared channels, which create a new way for secure inter-organization communication and collaboration beyond what single- and multi-channel guest accounts provide. We also intend to continue investing to expand the number of developers building applications that integrate with Slack and to make Slack work with an increasing number of third-party and internally developed custom applications. We intend to continue to build and enhance Slack through both internal research and development as well as selectively pursuing acquisitions that can uniquely contribute to Slack's capabilities. We also intend to unlock growth in under-penetrated regions by translating and localizing Slack, as well as adding product functionality to address new markets. We expect these investments to benefit our business over the long term and to see research and development expenses increase in dollar amount over time as we grow.

*Continued investment for growth*

Although we have invested significantly in our business to date, we believe that our high-growth market opportunity is still in the early stages of development. We intend to continue to make investments to support the growth and expansion of our business, to increase revenue, and to further scale our operations. We believe there is a significant opportunity to continue our growth and, therefore, we intend to increase investments in marketing and expand our field sales team in order to drive greater adoption of Slack. We plan to open offices, hire sales and customer experience employees in additional countries, and expand our presence in countries where we already operate. Contrary to statements that were made in a public interview by one of our directors that we could expand globally at marginally zero cost, we expect to incur additional expenses as we expand internationally to support this growth. Further, we expect to incur additional general and administrative expenses in connection with our transition to being a public company. As cost of revenue and operating expenses may fluctuate over time, we may experience short-term, negative impacts to our results of operations and cash flows, but we expect our investments will contribute to the long-term growth and success of our company.

### Key Business Metrics

We review the following key business metrics to measure our performance, identify trends, formulate financial projections, and make strategic decisions. We are not aware of any uniform standards for calculating these key metrics, which may hinder comparability with other companies who may calculate similarly-titled metrics in a different way.

We define an organization as a separate entity, such as a company, educational or government institution, or distinct business unit of a company, that is on a subscription plan, whether free or paid. Once an organization has three or more users on a paid subscription plan, we count them as a Paid Customer, and when disclosing the number of Paid Customers, we round down to the nearest thousand.

| | As of January 31, | | | As of April 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2017** | **2018** | **2019** | **2018** | **2019** |
| Paid Customers | 37,000 | 59,000 | 88,000 | 67,000 | 95,000 |
| Paid Customers >$100,000 | 135 | 298 | 575 | 351 | 645 |
| Net Dollar Retention Rate | 171% | 152% | 143% | 149% | 138% |

69

*Paid Customers*

We believe that the growth in our Paid Customer base reflects our value proposition and positions us for future growth as our Paid Customers often expand their adoption over time and Paid Customers increase awareness of Slack, which leads to organic adoption by new organizations. Our Paid Customers base has expanded through increasing awareness of Slack, further developing our go-to-market strategy and continuing to build features tuned to different industry needs. Our Paid Customer base includes organizations of all sizes across a wide range of industries.



70

*Paid Customers >$100,000*

We focus on growing the number of Paid Customers >$100,000 as a measure of our ability to scale with organizations on Slack and attract larger organizations to Slack. We believe that our ability to increase the number of Paid Customers >$100,000 is a key indicator for important components of the growth of our business, including our success in expanding the number of users within a Paid Customer, providing the functionality required by large organizations and developing our direct sales force. In fiscal years 2017, 2018, and 2019, approximately 22%, 32%, and 40%, respectively, of our revenue was generated from our Paid Customers >$100,000. In the three months ended April 30, 2018 and 2019, approximately 36% and 43%, respectively, of our revenue was generated from our Paid Customers >$100,000.

We define Paid Customers >$100,000 as those organizations on a paid subscription plan that had more than $100,000 in ARR as of a period end. ARR is based on monthly recurring revenue, or MRR, for the most recent month at period end, multiplied by twelve. For Paid Customers that have a type of subscription agreement where billing is reconciled on a monthly or quarterly basis based on usage, MRR is calculated by multiplying the monthly subscription price, inclusive of discounts, by the number of active subscriptions as of the month end. For Paid Customers that have a type of subscription agreement where billing is fixed and independent of usage, MRR is calculated by multiplying the monthly subscription price, inclusive of discounts, by the number of purchased subscriptions.



*Net Dollar Retention Rate*

We disclose Net Dollar Retention Rate as a supplemental measure of our organic revenue growth. We believe Net Dollar Retention Rate is an important metric that provides insight into the long-term value of our subscription agreements and our ability to retain, and grow revenue from, our Paid Customers.

We calculate Net Dollar Retention Rate as of a period end by starting with the MRR from all Paid Customers as of twelve months prior to such period end, or Prior Period MRR. We then calculate the MRR from these same Paid Customers as of the current period end, or Current Period MRR. Current Period MRR includes expansion within Paid Customers and is net of contraction or attrition over the trailing twelve months, but excludes revenue from new Paid Customers in the current period, including those organizations that were only on Free subscription plans in the prior period and converted to paid subscription plans during the current period. We then divide the total Current Period MRR by the total Prior Period MRR to arrive at our Net Dollar Retention Rate. Our Net Dollar Retention Rate has declined

71

from 171% as of January 31, 2017 to 152% as of January 31, 2018 to 143% as of January 31, 2019 to 138% as of April 30, 2019 as our base of revenue has grown the past few years and our penetration within existing, long-term Paid Customers has increased. Our Net Dollar Retention Rate will fluctuate in future periods due to a number of factors, including the growing level of our revenue base, the level of penetration within our Paid Customer base, expansion of products and features, and our ability to retain our Paid Customers.

**Non-GAAP Financial Measures**

In addition to our results determined in accordance with GAAP, we believe the below non-GAAP measures are useful in evaluating our operating performance . We use the below non-GAAP financial information, collectively, to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that non-GAAP financial information, when taken collectively, may be helpful to investors because it provides consistency and comparability with past financial performance, and assists in comparisons with other companies, some of which use similar non-GAAP financial information to supplement their GAAP results. The non-GAAP financial information is presented for supplemental informational purposes only, and should not be considered a substitute for financial information presented in accordance with GAAP, and may be different from similarly-titled non-GAAP measures used by other companies. A reconciliation is provided below for each non-GAAP financial measure to the most directly comparable financial measure stated in accordance with GAAP. Investors are encouraged to review the related GAAP financial measures and the reconciliation of these non-GAAP financial measures to their most directly comparable GAAP financial measures.

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| --- | --- | --- | --- | --- | --- |
| | (In thousands) | | | | |
| Calculated Billings | $ 143,390 | $ 289,013 | $ 516,972 | $ 102,080 | $ 149,637 |
| | | | | | |
| Free Cash Flow | $ (114,038) | $ (57,661) | $ (97,239) | $ (14,969) | $ (34,203) |
| Tender offer payments and repurchases deemed compensation [1] | 8,033 | 39,374 | — | — | — |
| Adjusted Free Cash Flow | $ (106,005) | $ (18,287) | $ (97,239) | $ (14,969) | $ (34,203) |

(1)  In fiscal years 2017 and 2018, we made cash payments of $8.0 million and $39.4 million, respectively, attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. Adjusted Free Cash Flow has been shown here as adjusted for these cash payments. We have adjusted our Free Cash Flow for these payments because we do not expect them to occur when we are a public company so we believe that this provides greater comparability across periods.

*Calculated Billings*

Calculated Billings consists of our revenue plus the change in our deferred revenue in a given period. The Calculated Billings metric is intended to reflect sales to new paid customers plus renewals and additional sales to existing paid customers. Our management uses Calculated Billings to measure and monitor our sales growth because we generally bill our paid customers at the time of sale, but may recognize a portion of the related revenue ratably over time. For subscriptions, we typically invoice our paid customers at the beginning of the term, in annual or monthly installments and, from time to time, in multi-year installments. Only amounts invoiced to a paid customer in a given period are included in Calculated Billings. While we believe that Calculated Billings provides valuable insight into the cash that will be generated from sales of our subscriptions, this metric may vary from period-to-period for a number of reasons, and therefore has a number of limitations as a quarter-over-quarter or year-over-year comparative measure. These reasons include, but are not limited to, the following: (i) a variety of contractual terms could result in some periods having a higher proportion of annual subscriptions than other periods, (ii) as we focus on sales to large organizations, the lengthening of our sales cycle, and the variability in the timing of the execution of these larger transactions, (iii) fluctuations in payment terms affecting the billings recognized in a particular period, and (iv) seasonality in our billings, with a greater proportion of our billings occurring in our fourth quarter, following typical enterprise software

72

buying patterns. Because of these and other limitations, you should consider Calculated Billings along with revenue and our other GAAP financial results.

The following table presents a reconciliation of revenue, the most directly comparable financial measure calculated in accordance with GAAP, to Calculated Billings, for each of the periods presented:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | (In thousands) | | | | |
| Revenue | $ 105,153 | $ 220,544 | $ 400,552 | $ 80,919 | $ 134,821 |
| Add: Total deferred revenue, end of period | 56,984 | 125,453 | 241,873 | 146,614 | 256,689 |
| Less: Total deferred revenue, beginning of period | (18,747) | (56,984) | (125,453) | (125,453) | (241,873) |
| Calculated Billings | $ 143,390 | $ 289,013 | $ 516,972 | $ 102,080 | $ 149,637 |

*Free Cash Flow and Adjusted Free Cash Flow*

Free Cash Flow is a non-GAAP financial measure that we calculate as net cash provided by (used in) operating activities less purchases of property and equipment. Adjusted Free Cash Flow is a non-GAAP financial measure that we calculate as Free Cash Flow plus cash payments attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. We believe that Free Cash Flow and Adjusted Free Cash Flow are useful indicators of liquidity that provide information to management and investors about the amount of cash generated from our core operations that, after the purchases of property and equipment, can be used for strategic initiatives, including investing in our business, making strategic acquisitions, and strengthening our balance sheet. We have adjusted our Free Cash Flow by the amount of cash payments attributable to tender offers and repurchases, which was accounted for as compensation because we do not expect such payments to occur when we are public company so we believe that this provides greater comparability across periods. Free Cash Flow and Adjusted Free Cash Flow have limitations as analytical tools, and they should not be considered in isolation or as substitutes for analysis of other GAAP financial measures, such as net cash provided by operating activities. Some of the limitations of Free Cash Flow and Adjusted Free Cash Flow are that these metrics do not reflect our future contractual commitments and may be calculated differently by other companies in our industry, limiting their usefulness as comparative measures. We expect our Free Cash Flow and Adjusted Free Cash Flow to fluctuate in future periods as we invest in our business to support our plans for growth. These activities, along with certain increased operating expenses as described below, may result in a decrease in Free Cash Flow and Adjusted Free Cash Flow, each as a percentage of revenue in future periods. We do not expect to use Adjusted Free Cash Flow as a metric for periods after we become a public reporting company.

73

The following table summarizes our cash flows for the periods presented and provides a reconciliation of net cash from operating activities, the most directly comparable financial measure calculated in accordance with GAAP, to Free Cash Flow and Adjusted Free Cash Flow, for each of the periods presented:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2018** | **2019** |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $ (89,806) | $ (35,617) | $ (41,059) | $ 3,433 | $ (14,126) |
| Purchases of property and equipment | (24,232) | (22,044) | (56,180) | (18,402) | (20,077) |
| Free Cash Flow | (114,038) | (57,661) | (97,239) | (14,969) | (34,203) |
| Tender offer payments and repurchases deemed compensation [1] | 8,033 | 39,374 | — | — | — |
| Adjusted Free Cash Flow | $ (106,005) | $ (18,287) | $ (97,239) | $ (14,969) | $ (34,203) |
| Net cash provided by (used in) investing activities | $ (41,771) | $ (240,436) | $ (333,421) | $ (38,608) | $ 105,460 |
| Net cash provided by financing activities | $ 214,096 | $ 297,035 | $ 437,677 | $ 758 | $ 2,385 |

_____

(1) In fiscal years 2017 and 2018, we made cash payments of $8.0 million and $39.4 million, respectively, attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. Adjusted Free Cash Flow has been shown here as adjusted for these cash payments. We have adjusted our Free Cash Flow for these payments because we do not expect them to occur when we are public company so we believe that this provides greater comparability across periods.

## Key Components of Results of Operations

### Revenue

We generate substantially all of our revenue through sales of subscriptions of Slack to organizations. We recognize subscription revenue on a straight-line basis over the term of the contract subscription period beginning on the date access to Slack is granted, provided all other revenue recognition criteria have been met. Our subscriptions are generally non-cancellable and typically do not contain general rights of return. We maintain a fair billing policy, under which certain organizations on a paid subscription plan are entitled to credit if they have not used the entirety of the contracted number of users for which they have paid during the contractual term of the arrangement. These credits, accounted for as a part of deferred revenue, may be carried over to offset future billings and are not refundable for cash. On occasion, we also provide professional services to organizations on Slack. Professional services revenue has not been material to date.

### Overhead Allocation and Employee Compensation Costs

We allocate shared costs, such as facilities (including rent, utilities, and depreciation on equipment shared by all departments) and information technology (IT) costs to all departments based on headcount. As such, allocated shared costs are reflected in cost of revenue and each operating expense category. Employee compensation costs, or personnel costs, include salaries, bonuses, benefits, and stock-based compensation for cost of revenue and each operating expense category and also includes sales commissions for sales and marketing.

### Cost of Revenue

Cost of revenue consists primarily of expenses related to hosting Slack and providing ongoing customer support for paid customers. These expenses include employee compensation (including stock-based compensation) and other employee-related expenses for customer experience, professional services, and technical operations staff, payments to outside service providers, third-party hosting costs, payment processing fees, and amortization expense associated with internally-developed and purchased technology . We expect our cost of revenue to continue to increase in absolute dollar amounts as we grow our business and revenue.

74

*Operating Expenses*

*Research and Development*. Research and development expenses consist primarily of personnel costs and allocated overhead. Our research and development efforts focus on maintaining and enhancing existing functionality of, and adding new functionality to, Slack. We plan to increase the dollar amount of our investment in research and development for the foreseeable future as we focus on developing new features and enhancements. We expect, however, that our research and development expenses will decrease as a percentage of our revenue over time as our revenue grows, although the percentage may fluctuate from period to period depending on fluctuations in the timing and extent of our research and development expenses.

*Sales and Marketing*. Sales and marketing expenses consist primarily of personnel costs, expenses associated with our marketing and business development programs, including Frontiers, our annual user conference. Sales and marketing expenses also include allocated third-party hosting costs as well as customer experience and technical operations employee overhead costs for users of our free version of Slack. Sales commissions that are directly related to acquiring sales contracts, as well as associated payroll taxes, are deferred upon execution of a non-cancellable contract with an organization, and subsequently amortized to sales and marketing expense over the estimated period of benefit, typically four years. We plan to increase the dollar amount of our investment in sales and marketing for the foreseeable future, primarily for increased headcount for our direct sales organization and investment in brand and product marketing efforts. Contrary to statements that were made in a public interview by one of our directors that we do not need to spend money to make money, we expect to continue to incur sales and marketing expenses to the extent that we continue to see a high-growth market opportunity to support the growth of our business. If the growth in our business lessens over time, we plan to decrease the rate of growth in our sales and marketing expenses. We expect, however, that our sales and marketing expenses will decrease as a percentage of our revenue over time as our revenue grows, although the percentage may fluctuate from period to period depending on fluctuations in the timing and extent of our sales and marketing expenses.

*General and Administrative* . General and administrative expenses consist primarily of personnel costs for our finance and accounting, legal, human resources, and other administrative teams as well as for certain executives and professional fees, including audit, legal, and recruiting services. We expect to increase the size of our general and administrative function to support the growth of our business. We also expect to recognize certain non-recurring costs as part of our transition to a publicly-traded company, consisting of professional fees and other expenses. These fees are being expensed in the period incurred. We expect to incur $1.4 million in audit fees and $2.5 million in legal fees and expenses. In the quarter of the listing of our Class A common stock on the NYSE, we expect to incur approximately $22.1 million in fees paid to our financial advisors and associate financial advisors. Following the listing of our Class A common stock on the NYSE, we expect to continue to incur additional expenses as a result of operating as a public company, including costs to comply with the rules and regulations applicable to companies listed on a U.S. securities exchange and costs related to compliance and reporting obligations pursuant to the rules and regulations of the SEC. In addition, as a public company, we expect to incur increased expenses in the areas of insurance, investor relations, and professional services. As a result, we expect the dollar amount of our general and administrative expenses to increase for the foreseeable future. We expect, however, that our general and administrative expenses will decrease as a percentage of our revenues over time, although the percentage may fluctuate from period to period depending on fluctuations in our revenue and the timing and extent of our general and administrative expenses.

*Other Income (Expense), Net*

Other income (expense), net consists primarily of interest income earned on our cash, cash equivalents, and marketable securities, gains or losses on foreign currency exchange, and the change in fair value of our strategic investments.

*Provision for Income Taxes*

Provision for income taxes consists primarily of U.S. federal, state income taxes, and income taxes in certain foreign jurisdictions in which we conduct business. Since inception, we have incurred operating losses and, accordingly, have not recorded a provision for income taxes for any of the periods presented other than provisions for foreign income tax. As of January 31, 2019, we had net operating loss carryforwards for both federal and state income tax purposes of $221.4 million and $154.5 million , respectively. We also had federal research and development tax credit carryforwards

75

of approximately $17.2 million and state research and development tax credit carryforwards of approximately $14.4 million .

Since the realization of deferred tax assets is dependent upon future earnings, if any, the timing and amount of which are uncertain, we have recorded a valuation allowance of $112.7 million as of January 31, 2019, against our net deferred tax asset balance of $112.7 million . If not utilized, a portion of the federal and state net operating loss and tax credit carryforwards will begin to expire in 2029. Utilization of these net operating losses and credit carryforwards may be subject to an annual limitation that is applicable if we experience an "ownership change" through a change in significant stockholder allocation or equity structure.

On December 22, 2017, the legislation commonly referred to as the Tax Cuts and Jobs Act, or the Tax Act, was enacted, which contains significant changes to U.S. tax law. Among other provisions, the Tax Act reduces the U.S. corporate income tax rate to 21% and repeals the alternative minimum tax, effective as of 2018. As a result, we have re-measured our U.S. deferred tax assets and liabilities as of December 31, 2017 to reflect the lower rate expected to apply when these temporary differences reverse.

76

## Results of Operations

The following tables set forth our results of operations for the periods presented in dollars and as a percentage of our revenue:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | (In thousands) | | | | |
| Revenue | $ 105,153 | $ 220,544 | $ 400,552 | $ 80,919 | $ 134,821 |
| Cost of revenue [1] | 15,517 | 26,364 | 51,301 | 10,101 | 18,574 |
| Gross profit | 89,636 | 194,180 | 349,251 | 70,818 | 116,247 |
| Operating expenses: | | | | | |
| Research and development [1] | 96,678 | 141,350 | 157,538 | 35,410 | 51,103 |
| Sales and marketing [1] | 104,006 | 140,188 | 233,191 | 42,168 | 66,838 |
| General and administrative [1] | 37,455 | 56,493 | 112,730 | 19,568 | 36,744 |
| Total operating expenses | 238,139 | 338,031 | 503,459 | 97,146 | 154,685 |
| Loss from operations | (148,503) | (143,851) | (154,208) | (26,328) | (38,438) |
| Other income (expense), net | 1,749 | 4,581 | 16,146 | 1,802 | 7,077 |
| Loss before income taxes | (146,754) | (139,270) | (138,062) | (24,526) | (31,361) |
| Provision for income taxes | 155 | 793 | 840 | 350 | 520 |
| Net loss | (146,909) | (140,063) | (138,902) | (24,876) | (31,881) |
| Net income (loss) attributable to noncontrolling interest [2] | (45) | 22 | 1,781 | 6 | 1,451 |
| Net loss attributable to Slack | (146,864) | (140,085) | (140,683) | (24,882) | (33,332) |
| Less: Deemed dividends to preferred stockholders | — | 40,883 | — | — | — |
| Net loss attributable to Slack common stockholders | $ (146,864) | $ (180,968) | $ (140,683) | $ (24,882) | $ (33,332) |

(1) Includes stock-based compensation as follows:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | (In thousands) | | | | |
| Cost of revenue | $ 630 | $ 491 | $ 732 | $ 603 | $ 46 |
| Research and development | 34,546 | 35,260 | 9,948 | 3,395 | 1,635 |
| Sales and marketing | 9,744 | 8,044 | 2,677 | 1,204 | 382 |
| General and administrative | 5,171 | 4,288 | 9,775 | 916 | 1,576 |
| Total stock-based compensation | $ 50,091 | $ 48,083 | $ 23,132 | $ 6,118 | $ 3,639 |

(2) Our consolidated financial statements include our majority-owned subsidiary, Slack Fund. The ownership interest of minority investors in Slack Fund is recorded as a noncontrolling interest.

77

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
|---|---|---|---|---|---|
| | | | (as a % of revenue) | | |
| Revenue | 100 % | 100 % | 100 % | 100 % | 100 % |
| Cost of revenue | 15 | 12 | 13 | 12 | 14 |
| Gross profit | 85 | 88 | 87 | 88 | 86 |
| Operating expenses: | | | | | |
|    Research and development | 92 | 64 | 39 | 44 | 38 |
|    Sales and marketing | 99 | 63 | 58 | 52 | 50 |
|    General and administrative | 35 | 26 | 28 | 24 | 27 |
| Total operating expenses | 226 | 153 | 125 | 120 | 115 |
| Loss from operations | (141) | (65) | (38) | (32) | (29) |
| Other income (expense), net | 1 | 2 | 4 | 2 | 6 |
| Loss before income taxes | (140) | (63) | (34) | (30) | (23) |
| Provision for income taxes | — | 1 | 1 | 1 | 1 |
| Net loss | (140) | (64) | (35) | (31) | (24) |
| Net income (loss) attributable to noncontrolling interest | — | — | — | — | 1 |
| Net loss attributable to Slack | (140) | (64) | (35) | (31) | (25) |
| Less: Deemed dividends to preferred stockholders | — | 18 | — | — | — |
| Net loss attributable to Slack common stockholders | (140)% | (82)% | (35)% | (31)% | (25)% |

**Comparison of the Three Months Ended April 30, 2018 and 2019**

*Revenue and Cost of Revenue*

| | Three Months Ended April 30, | | | |
| | 2018 | 2019 | $ Change | % Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Revenue | $ 80,919 | $ 134,821 | $ 53,902 | 67% |
| Cost of revenue | 10,101 | 18,574 | 8,473 | 84 |
| Gross profit | $ 70,818 | $ 116,247 | $ 45,429 | 64 |

Revenue increased $53.9 million , or 67% , for the three months ended April 30, 2019 compared to the three months ended April 30, 2018. The increase in revenue was primarily due to expansion within our existing Paid Customers, as reflected by our Net Dollar Retention Rate of 138% as of April 30, 2019, and the addition of new Paid Customers, as our number of Paid Customers grew from 67,000 as of April 30, 2018 to 95,000 as of April 30, 2019.

Cost of revenue increased $8.5 million , or 84% , for the three months ended April 30, 2019 compared to the three months ended April 30, 2018. The increase was primarily due to a $4.2 million increase in third-party hosting costs as the number of organizations on and usage of Slack in general increased, a $2.3 million increase in personnel and related costs, a $0.6 million increase in amortization of acquired intangible assets, a $0.6 million increase in facility- and IT-related overhead costs due to additional headcount to support the growth in organizations on Slack, and a $0.4 million increase in credit card payment processing fees as the volume of sales transactions increased.

78

*Operating Expenses*

| | Three Months Ended April 30, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | $ Change | % Change |
| | (In thousands) | | | |
| Operating expenses: | | | | |
| Research and development | $ 35,410 | $ 51,103 | $ 15,693 | 44% |
| Sales and marketing | 42,168 | 66,838 | 24,670 | 59 |
| General and administrative | 19,568 | 36,744 | 17,176 | 88 |
| Total operating expenses | $ 97,146 | $ 154,685 | $ 57,539 | 59 |

*Research and Development*

Research and development expenses increased $15.7 million , or 44% , for the three months ended April 30, 2019 compared to the three months ended April 30, 2018. The increase was primarily due to an $11.4 million increase in personnel costs, primarily attributable to a 39% increase in research and development headcount, a $2.4 million increase in facility- and IT-related overhead costs to support our headcount growth, and the continued development and scalability of Slack, and a $1.0 million increase in contracted workers to supply additional workforce.

*Sales and Marketing*

Sales and marketing expenses increased $24.7 million , or 59% , for the three months ended April 30, 2019 compared to the three months ended April 30, 2018. The increase was primarily due to the substantial expansion of our sales force and marketing programs. Personnel costs, which include customer experience and infrastructure employee costs for users of our free version, increased $11.3 million as we increased our sales and marketing headcount by 88% due to the need to support our growth. Marketing expenses increased $4.3 million due to our annual user conference, Frontiers, moving from the third quarter in fiscal year 2019 to the first quarter in fiscal year 2020, partially offset by less spending on advertising. Further, third-party hosting costs for users on a Free subscription plan of Slack increased $4.1 million primarily due to continuing growth in our user base, facility- and IT-related overhead costs increased $3.1 million to support our headcount growth, and travel and event related costs increased $2.1 million due to increased selling activities.

*General and Administrative*

General and administrative expenses increased $17.2 million , or 88% , for the three months ended April 30, 2019 compared to the three months ended April 30, 2018. The increase was primarily due to a $7.7 million increase in personnel costs primarily attributable to a 61% increase in our administrative, finance and accounting, legal, IT, and human resources headcount, a $4.3 million increase in third-party professional service expenses to support our growth, a $3.4 million increase in facility- and IT-related overhead costs due to increased headcount, and a $1.4 million increase in travel and event related expense mainly related to corporate events.

**Other Income (Expense), Net**

Other income (expense), net was $7.1 million for the three months ended April 30, 2019, an increase of $5.3 million from the three months ended April 30, 2018. The increase in other income (expense), net was primarily due to an increase in net gain from our strategic investments of $3.0 million and an increase in interest income of $2.6 million on marketable securities, partially offset by increased net foreign exchange losses of $0.4 million.

**Provision for Income Taxes**

The provision for income taxes was $0.5 million for the three months ended April 30, 2019, an increase of $0.2 million from the three months ended April 30, 2018, primarily related to a provision for income taxes in foreign jurisdictions.

**Comparison of the Years Ended January 31, 2018 and 2019**

*Revenue and Cost of Revenue*

| | Year Ended January 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | $ Change | % Change |
| | (In thousands) | | | |
| Revenue | $ 220,544 | $ 400,552 | $ 180,008 | 82% |
| Cost of revenue | 26,364 | 51,301 | 24,937 | 95 |
| Gross profit | $ 194,180 | $ 349,251 | $ 155,071 | 80 |

Revenue increased $180.0 million , or 82% , for the year ended January 31, 2019 compared to the year ended January 31, 2018. The increase in revenue was primarily due to expansion within our existing Paid Customers, as reflected by our Net Dollar Retention Rate of 143% as of January 31, 2019, and the addition of new Paid Customers, as our number of Paid Customers increased by 49% in the year ended January 31, 2019 compared to the prior year.

Cost of revenue increased $24.9 million , or 95% , for the year ended January 31, 2019 compared to the year ended January 31, 2018. The increase was primarily due to an $11.2 million increase in third-party hosting costs as the number of organizations on and usage of Slack in general increased, an $8.3 million increase in personnel and related costs, a $2.7 million increase in facility- and IT-related overhead costs due to additional headcount to support the growth in organizations on Slack, and a $2.4 million increase in credit card payment processing fees as the volume of sales transactions increased.

*Operating Expenses*

| | Year Ended January 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | $ Change | % Change |
| | (In thousands) | | | |
| Operating expenses: | | | | |
| Research and development | $ 141,350 | $ 157,538 | $ 16,188 | 11% |
| Sales and marketing | 140,188 | 233,191 | 93,003 | 66 |
| General and administrative | 56,493 | 112,730 | 56,237 | 100 |
| Total operating expenses | $ 338,031 | $ 503,459 | $ 165,428 | 49 |

*Research and Development*

Research and development expenses increased $16.2 million , or 11% , for the year ended January 31, 2019 compared to the year ended January 31, 2018. The increase was primarily due to a $6.9 million increase in personnel costs, primarily attributable to a 36% increase in research and development headcount, a $6.4 million increase in facility- and IT-related overhead costs to support our headcount growth, and the continued development and scalability of Slack, and a $2.5 million increase in contracted workers to supply additional workforce.

*Sales and Marketing*

Sales and marketing expenses increased $93.0 million , or 66% , for the year ended January 31, 2019 compared to the year ended January 31, 2018. The increase was primarily due to the substantial expansion of our sales force and marketing programs, including a $34.9 million increase in marketing expenses associated with higher advertising, brand marketing, and promotional activities. Personnel costs, which include customer experience and infrastructure employee costs for users of our free version, also increased $30.2 million as we increased our sales and marketing headcount by 77% due to the need to support our growth. In addition, facility- and IT-related overhead costs increased $10.3 million to support our headcount growth. Further, third-party hosting costs for users on a Free subscription plan of Slack increased $9.5 million primarily due to continuing growth in our user base.

80

*General and Administrative*

General and administrative expenses increased $56.2 million , or 100% , for the year ended January 31, 2019 compared to the year ended January 31, 2018. The increase was primarily due to a $27.1 million increase in personnel costs primarily attributable to a 74% increase in our administrative, finance and accounting, legal, and human resources headcount, a $15.6 million increase in third-party professional service expenses to support our growth, and a $7.6 million increase in facility- and IT-related overhead costs due to additional headcount. In addition, we recorded a $2.3 million loss on disposals of property and equipment associated with office equipment and furniture and fixtures located at our previous headquarters facility.

*Other Income (Expense), Net*

Other income (expense), net was $16.1 million for the year ended January 31, 2019, an increase of $11.6 million from the year ended January 31, 2018. The increase in other income (expense), net was primarily due to an increase in interest income of $9.6 million on marketable securities and an increase in fair market value of our strategic investments of $3.7 million, partially offset by increased net foreign exchange losses of $1.4 million.

*Provision for Income Taxes*

The provision for income taxes was consistent at $0.8 million for the year ended January 31, 2019 and January 31, 2018.

**Comparison of the Years Ended January 31, 2017 and 2018**

*Revenue and Cost of Revenue*

|  | Year Ended January 31, | | $ Change | % Change |
|  | 2017 | 2018 |  |  |
|  | (In thousands) | | | |
| Revenue | $ 105,153 | $ 220,544 | $ 115,391 | 110% |
| Cost of revenue | 15,517 | 26,364 | 10,847 | 70 |
| Gross profit | $ 89,636 | $ 194,180 | $ 104,544 | 117 |

Revenue increased $115.4 million , or 110% , for the year ended January 31, 2018 compared to the year ended January 31, 2017. The increase in revenue was primarily due to expansion within our existing Paid Customers, as reflected by our Net Dollar Retention Rate of 152% as of January 31, 2018, and the addition of new Paid Customers, as our number of Paid Customers increased by 59% in the year ended January 31, 2018 compared to the prior year.

Cost of revenue increased $10.8 million , or 70% , for the year ended January 31, 2018 compared to the year ended January 31, 2017. The increase was primarily due to a $5.0 million increase in third-party hosting costs as the number of organizations on and usage of Slack in general increased, a $2.5 million increase in personnel and related costs, a $1.6 million increase in credit card payment processing fees as the volume of sales transactions increased due to the growth of our business, and a $1.4 million increase in facility- and IT-related overhead costs due to additional headcount to support the growth in organizations on Slack.

*Operating Expenses*

|  | Year Ended January 31, | | $ Change | % Change |
|  | 2017 | 2018 |  |  |
|  | (In thousands) | | | |
| Operating expenses: | | | | |
| Research and development | $ 96,678 | $ 141,350 | $ 44,672 | 46% |
| Sales and marketing | 104,006 | 140,188 | 36,182 | 35 |
| General and administrative | 37,455 | 56,493 | 19,038 | 51 |
| Total operating expenses | $ 238,139 | $ 338,031 | $ 99,892 | 42 |

81

*Research and Development*

Research and development expenses increased $44.7 million , or 46% , for the year ended January 31, 2018 compared to the year ended January 31, 2017. The increase was primarily due to a $31.0 million increase in personnel costs, primarily attributable to a 22% increase in research and development headcount, a $10.6 million increase in facility- and IT-related overhead costs to support our headcount growth, and the continued development and scalability of Slack.

*Sales and Marketing*

Sales and marketing expenses increased $36.2 million , or 35% , for the year ended January 31, 2018 compared to the year ended January 31, 2017. The increase was primarily due to the substantial expansion of our sales force and marketing programs. Personnel costs, which include customer experience and infrastructure employee costs for users of our free version, increased $17.0 million as we increased our sales and marketing headcount by 86% due to the need to support our growth. In addition, third-party hosting costs for users on a Free subscription plan of Slack increased $9.9 million primarily due to continuing growth in our user base. Further, facility- and IT-related overhead costs increased $8.1 million to support our headcount growth.

*General and Administrative*

General and administrative expenses increased $19.0 million , or 51% , for the year ended January 31, 2018 compared to the year ended January 31, 2017. The increase was primarily due to a $10.0 million increase in personnel costs primarily attributable to a 38% increase in our administrative, finance and accounting, legal, and human resources headcount, a $4.7 million increase in facility- and IT-related overhead costs due to additional headcount, and a $2.5 million increase in third-party professional service expenses to support our growth.

**Other Income (Expense), Net**

Other income (expense), net was $4.6 million for the year ended January 31, 2018, an increase of $2.8 million from the year ended January 31, 2017. The increase in other income (expense), net was primarily due to an increase in interest income of $1.8 million on investments, increased net foreign exchange gains of $0.6 million, and an increase in other non-operating income of $0.4 million.

**Provision for Income Taxes**

The provision for income taxes was $0.8 million for the year ended January 31, 2018, an increase of $0.6 million from the year ended January 31, 2017, primarily related to a provision for income taxes in foreign tax jurisdictions.

82

**Quarterly Results of Operations**

The following tables set forth our unaudited quarterly statements of operations data for each of the nine quarters ended April 30, 2019, as well as the percentage of revenue that each line item represents for each quarter. The information for each of these quarters has been prepared on the same basis as the audited annual financial statements included elsewhere in this prospectus and, in the opinion of management, includes all adjustments, which includes only normal recurring adjustments, necessary for the fair statement of the results of operations for these periods. This data should be read in conjunction with our audited consolidated financial statements and related notes included elsewhere in this prospectus. These quarterly results of operations are not necessarily indicative of our future results of operations that may be expected for the remainder of fiscal year 2020 or for any future period.

| | Three Months Ended | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
| | (In thousands) | | | | | | | | |
| Revenue | $ 42,719 | $ 51,320 | $ 58,046 | $ 68,459 | $ 80,919 | $ 92,018 | $ 105,648 | $ 121,967 | $ 134,821 |
| Cost of revenue [1] | 5,418 | 6,098 | 6,788 | 8,060 | 10,101 | 11,361 | 13,540 | 16,299 | 18,574 |
| Gross profit | 37,301 | 45,222 | 51,258 | 60,399 | 70,818 | 80,657 | 92,108 | 105,668 | 116,247 |
| Operating expenses: | | | | | | | | | |
| Research and development [1] | 24,381 | 26,800 | 28,489 | 61,680 | 35,410 | 35,182 | 40,990 | 45,956 | 51,103 |
| Sales and marketing [1] | 26,761 | 29,307 | 35,274 | 48,846 | 42,168 | 53,553 | 67,687 | 69,783 | 66,838 |
| General and administrative [1] | 12,337 | 12,482 | 14,404 | 17,270 | 19,568 | 25,608 | 34,185 | 33,369 | 36,744 |
| Total operating expenses | 63,479 | 68,589 | 78,167 | 127,796 | 97,146 | 114,343 | 142,862 | 149,108 | 154,685 |
| Loss from operations | (26,178) | (23,367) | (26,909) | (67,397) | (26,328) | (33,686) | (50,754) | (43,440) | (38,438) |
| Other income (expense), net | 547 | 890 | 843 | 2,301 | 1,802 | 2,085 | 3,376 | 8,883 | 7,077 |
| Loss before income taxes | (25,631) | (22,477) | (26,066) | (65,096) | (24,526) | (31,601) | (47,378) | (34,557) | (31,361) |
| Provision for (benefit from) income taxes | 194 | (114) | 161 | 552 | 350 | 85 | 318 | 87 | 520 |
| Net loss | (25,825) | (22,363) | (26,227) | (65,648) | (24,876) | (31,686) | (47,696) | (34,644) | (31,881) |
| Net income (loss) attributable to noncontrolling interest [2] | (1) | 47 | 31 | (55) | 6 | 174 | (24) | 1,625 | 1,451 |
| Net loss attributable to Slack | (25,824) | (22,410) | (26,258) | (65,593) | (24,882) | (31,860) | (47,672) | (36,269) | (33,332) |
| Less: Deemed dividends to preferred stockholders | — | — | — | 40,883 | — | — | — | — | — |
| Net loss attributable to Slack common stockholders | $ (25,824) | $ (22,410) | $ (26,258) | $ (106,476) | $ (24,882) | $ (31,860) | $ (47,672) | $ (36,269) | $ (33,332) |

_____

(1)  Includes stock-based compensation as follows:

| | Three Months Ended | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
| | (In thousands) | | | | | | | | |
| Cost of revenue | $ 71 | $ 59 | $ 56 | $ 305 | $ 603 | $ 58 | $ 40 | $ 31 | $ 46 |
| Research and development | 1,126 | 1,494 | 1,108 | 31,532 | 3,395 | 944 | 3,532 | 2,077 | 1,635 |
| Sales and marketing | 479 | 416 | 312 | 6,837 | 1,204 | 248 | 227 | 998 | 382 |
| General and administrative | 814 | 659 | 486 | 2,329 | 916 | 388 | 6,716 | 1,755 | 1,576 |
| Total stock-based compensation | $ 2,490 | $ 2,628 | $ 1,962 | $ 41,003 | $ 6,118 | $ 1,638 | $ 10,515 | $ 4,861 | $ 3,639 |

83

In the fourth quarter of fiscal year 2018, we recorded compensation expense of $39.1 million attributable to a tender offer that increased all operating expense line items and cost of revenue for the quarter. In the first, second and fourth quarters of fiscal year 2019, we recorded an additional compensation expense of $4.4 million, $7.9 million, and $2.5 million, respectively, related to secondary sales of Class B common stock by certain of our current and former employees.

(2)    Our consolidated financial statements include our majority-owned subsidiary, Slack Fund. The ownership interest of minority investors in Slack Fund is recorded as a noncontrolling interest.

| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
| | (as a % of revenue) | | | | | | | | |
| Revenue | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| Cost of revenue | 13 | 12 | 12 | 12 | 12 | 12 | 13 | 13 | 14 |
| Gross profit | 87 | 88 | 88 | 88 | 88 | 88 | 87 | 87 | 86 |
| Operating expenses: | | | | | | | | | |
| Research and development | 57 | 52 | 49 | 90 | 44 | 39 | 39 | 38 | 38 |
| Sales and marketing | 62 | 57 | 60 | 71 | 52 | 58 | 64 | 57 | 50 |
| General and administrative | 29 | 25 | 25 | 25 | 24 | 28 | 32 | 28 | 27 |
| Total operating expenses | 148 | 134 | 134 | 186 | 120 | 125 | 135 | 123 | 115 |
| Loss from operations | (61) | (46) | (46) | (98) | (32) | (37) | (48) | (36) | (29) |
| Other income (expense), net | 1 | 2 | 1 | 3 | 2 | 3 | 3 | 8 | 6 |
| Loss before income taxes | (60) | (44) | (45) | (95) | (30) | (34) | (45) | (28) | (23) |
| Provision for/(benefit from) income taxes | — | — | — | 1 | 1 | — | — | — | 1 |
| Net loss | (60) | (44) | (45) | (96) | (31) | (34) | (45) | (28) | (24) |
| Net income (loss) attributable to noncontrolling interest | — | — | — | — | — | 1 | — | 2 | 1 |
| Net loss attributable to Slack | (60) | (44) | (45) | (96) | (31) | (35) | (45) | (30) | (25) |
| Less: Deemed dividends to preferred stockholders | — | — | — | 60 | — | — | — | — | — |
| Net loss attributable to Slack common stockholders | (60)% | (44)% | (45)% | (156)% | (31)% | (35)% | (45)% | (30)% | (25)% |

## Quarterly Trends

### *Revenue and Cost of Revenue*

Our revenue increased sequentially for all periods presented primarily due to higher sales of subscriptions to both our existing and new Paid Customers.

Total cost of revenue increased sequentially for all periods presented, consistent with our revenue growth, in order to support our overall growth.

### *Operating Expenses*

Total operating expenses increased sequentially for all periods presented, excluding stock-based compensation of $39.1 million attributable to tender offers and repurchases for our outstanding common stock in the fourth quarter of fiscal year 2018, primarily due to increases in employee headcount and the expansion of our business. In the fourth quarter of fiscal year 2018, we recorded a one-time compensation charge for a total amount of $39.1 million due to a tender offer in which we repurchased shares of our Class B common stock and convertible preferred stock from certain of our stockholders. The expense associated with the tender offer increased cost of revenue by $0.3 million, research

and development expense by $30.4 million, sales and marketing expense by $6.5 million, and general and administrative expense by $1.9 million, in the fourth quarter of fiscal year 2018. In the third quarter of fiscal year 2019, we incurred additional sales and marketing expenses primarily due to increased advertising efforts as well as incurring expenses in connection with holding our annual user conference, Frontiers.

### Key Business Metrics

| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
| Paid Customers (period end) | 42,000 | 47,000 | 52,000 | 59,000 | 67,000 | 73,000 | 81,000 | 88,000 | 95,000 |
| Paid Customers >$100,000 (period end) | 164 | 209 | 254 | 298 | 351 | 412 | 491 | 575 | 645 |
| Net Dollar Retention Rate | 156% | 153% | 151% | 152% | 149% | 146% | 144% | 143% | 138% |

### Quarterly Key Metrics Trends

Our Paid Customers, including Paid Customers >$100,000, increased sequentially for all nine quarters presented primarily due to organic growth of new organizations on Slack as a result of strong performance within our self-service acquisition model, as well as increased expansion of users within our existing Paid Customer base.

Our Net Dollar Retention Rate has declined across most of the nine quarters presented as our base of revenue has grown and our penetration within existing, long-term Paid Customers has increased. We expect our Net Dollar Retention Rate will fluctuate in future periods due to a number of factors, including the growing level of our revenue base, the level of penetration within our Paid Customer base, expansion of products and features, and our ability to retain our Paid Customers.

### Non-GAAP Financial Measures

| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
| | (In thousands) | | | | | | | | |
| Calculated Billings | $ 59,696 | $ 66,602 | $ 74,484 | $ 88,231 | $ 102,080 | $ 114,767 | $ 126,457 | $ 173,668 | $ 149,637 |
| Free Cash Flow | $ (10,977) | $ 5,237 | $ (1,388) | $ (50,533) | $ (14,969) | $ (7,722) | $ (43,467) | $ (31,081) | $ (34,203) |
| Tender offer payments and repurchases deemed compensation [1] | 51 | 251 | — | 39,072 | — | — | — | — | — |
| Adjusted Free Cash Flow | $ (10,926) | $ 5,488 | $ (1,388) | $ (11,461) | $ (14,969) | $ (7,722) | $ (43,467) | $ (31,081) | $ (34,203) |

_____

(1)  In fiscal year 2018, we made cash payments of $39.4 million, attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. Adjusted Free Cash Flow has been shown here as adjusted for these cash payments. We have adjusted our Free Cash Flow for these payments because we do not expect them to occur when we are a public company so we believe that this provides greater comparability across periods.

*Calculated Billings*

We define Calculated Billings as revenue plus the change in total deferred revenue during the period.

| | Three Months Ended | | | | | | | | |
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
|---|---|---|---|---|---|---|---|---|---|
| | (In thousands) | | | | | | | | |
| Revenue | $ 42,719 | $ 51,320 | $ 58,046 | $ 68,459 | $ 80,919 | $ 92,018 | $ 105,648 | $ 121,967 | $ 134,821 |
| Add: Deferred revenue, end of period | 73,961 | 89,243 | 105,681 | 125,453 | 146,614 | 169,363 | 190,172 | 241,873 | 256,689 |
| Less: Deferred revenue, beginning of period | (56,984) | (73,961) | (89,243) | (105,681) | (125,453) | (146,614) | (169,363) | (190,172) | (241,873) |
| Calculated Billings | $ 59,696 | $ 66,602 | $ 74,484 | $ 88,231 | $ 102,080 | $ 114,767 | $ 126,457 | $ 173,668 | $ 149,637 |

Our Calculated Billings increased sequentially for all nine quarters presented, with the exception of the first quarter of fiscal year 2020, primarily due to higher sales of subscriptions to both our existing and new Paid Customers. The significant increase in the fourth quarter of fiscal year 2019 and subsequent decrease in the first quarter of fiscal year 2020 was due to the impact of seasonality on our business, following typical enterprise software buying patterns, and a particularly strong fourth quarter of fiscal year 2019 in billings.

*Free Cash Flow and Adjusted Free Cash Flow*

We define Free Cash Flow as net cash provided by (used in) operating activities less cash used for purchases of property and equipment and Adjusted Free Cash Flow as Free Cash Flow plus tender offer payments and repurchases deemed compensation.

| | Three Months Ended | | | | | | | | |
| | April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 | April 30, 2019 |
|---|---|---|---|---|---|---|---|---|---|
| | (In thousands) | | | | | | | | |
| Net cash provided by (used in) operating activities | $ (2,848) | $ 7,048 | $ 2,499 | $ (42,316) | $ 3,433 | $ 1,488 | $ (28,375) | $ (17,605) | $ (14,126) |
| Purchases of property and equipment | (8,129) | (1,811) | (3,887) | (8,217) | (18,402) | (9,210) | (15,092) | (13,476) | (20,077) |
| Free Cash Flow | (10,977) | 5,237 | (1,388) | (50,533) | (14,969) | (7,722) | (43,467) | (31,081) | (34,203) |
| Tender offer payments and repurchases deemed compensation [1] | 51 | 251 | — | 39,072 | — | — | — | — | — |
| Adjusted Free Cash Flow | $ (10,926) | $ 5,488 | $ (1,388) | $ (11,461) | $ (14,969) | $ (7,722) | $ (43,467) | $ (31,081) | $ (34,203) |
| Net cash provided by (used in) investing activities | $ 5,950 | $ (11,629) | $ (89,192) | $ (145,565) | $ (38,608) | $ (7,141) | $ (289,939) | $ 2,267 | $ 105,460 |
| Net cash provided by financing activities | $ 681 | $ 1,013 | $ 249,428 | $ 45,913 | $ 758 | $ 7,173 | $ 427,623 | $ 2,123 | $ 2,385 |

(1) In fiscal year 2018, we made cash payments of $39.4 million, attributable to tender offers and repurchases for our outstanding common stock, which was accounted for as compensation. Adjusted Free Cash Flow has been shown here as adjusted for these cash payments. We have adjusted our Free Cash Flow for these payments because we do not expect them to occur when we are a public company so we believe that this provides greater comparability across periods.

## Liquidity and Capital Resources

As of April 30, 2019, our principal sources of liquidity were cash, cash equivalents, and restricted cash of $295.0 million and marketable securities of $536.2 million . Cash and cash equivalents are comprised of bank deposits, money market funds and commercial paper. Restricted cash consists of cash deposited with financial institutions as collateral for our obligations under the facility leases in San Francisco, California and Denver, Colorado. As of April 30, 2019,

restricted cash was $38.5 million . Marketable securities are comprised of commercial paper, U.S. agency securities, U.S. government securities, international government securities, and corporate bonds. Substantially all cash and cash equivalents are held in the United States. Since our inception, we have financed our operations primarily through proceeds from the issuance of our convertible preferred stock and common stock and cash generated from the sale of our subscriptions.

We have generated significant losses from operations and negative cash flows from operating activities in the past as reflected in our accumulated deficit of $698.9 million as of April 30, 2019. We expect to continue to incur operating losses for the foreseeable future due to the investments that we intend to make in our business and, as a result, we may require additional capital resources to grow our business.

On May 30, 2019, we entered into a $215.0 million revolving credit and guaranty agreement with a syndicate of financial institutions. The revolving credit facility has an accordion option, which, if exercised, would allow us to increase the aggregate commitments by up to the greater of $200.0 million and 100% of the consolidated adjusted EBITDA of us and our subsidiaries, plus an unlimited amount subject to satisfaction of certain leverage ratio based compliance tests after giving effect to the exercise, in each case subject to obtaining additional lender commitments and satisfying certain conditions. Pursuant to the terms of the revolving credit facility, we may issue letters of credit under the revolving credit facility, which reduce the total amount available for borrowing under such facility. The revolving credit facility terminates on May 30, 2024.

Interest on borrowings under the revolving credit facility accrues at a variable rate tied to the prime rate or the LIBOR rate, plus the applicable margin, at our election. The margin is 0.25% in the case of prime rate loans and 1.25% in the case of LIBOR loans. Interest is payable quarterly in arrears. Pursuant to the terms of the revolving credit facility, we are required to pay an annual commitment fee that accrues at a rate of 0.10% per annum on the unused portion of the borrowing commitments under the revolving credit facility. In addition, we are required to pay a fee in connection with letters of credit issued and outstanding under the revolving credit facility that accrues at a rate of 1.25% per annum on the amount to be drawn under such letters of credit outstanding. There is an additional fronting fee of 0.125% per annum multiplied by the aggregate face amount of issued and outstanding letters of credit.

The revolving credit facility contains customary conditions to borrowing, events of default, and covenants, including covenants that restrict our and our subsidiaries' ability to, among other things, incur additional indebtedness, create or incur liens, merge or consolidate with other companies, sell substantially all of our assets, liquidate or dissolve, make distributions to our equity holders or our subsidiaries' equity interests, pay dividends, make redemptions and repurchases of stock, or engage in transactions with affiliates. In addition, the revolving credit facility contains financial covenants, including a minimum liquidity balance and a minimum revenue amount . We were in compliance with all covenants under the revolving credit facility as of May 30, 2019.

As of May 30, 2019, we had no amounts or letters of credit issued and outstanding under the revolving credit facility. Our total available borrowing capacity under the revolving credit facility was $215.0 million as of May 30, 2019.

We believe that current cash, cash equivalents, marketable securities, and available borrowing capacity under the revolving credit facility will be sufficient to fund our operations for at least the next 12 months. Our future capital requirements, however, will depend on many factors, including our subscription growth rate, our Net Dollar Retention Rate, the timing and extent of spending to support our research and development efforts, the expansion of sales and marketing activities, the introduction of new and enhanced products and features, particularly for large organizations and for networks between organizations and the continuing market adoption of Slack. We may in the future enter into arrangements to acquire or invest in complementary businesses, services, and technologies, including intellectual property rights. In the event that additional financing is required from outside sources, we may seek to raise additional funds at any time through equity, equity-linked arrangements, and debt. If we are unable to raise additional capital when desired and at reasonable rates, our business, results of operations, and financial condition would be adversely affected. See the section titled "Risk Factors—Risks Related to Our Business—Our failure to raise additional capital or generate cash flows necessary to expand our operations and invest in new technologies in the future could reduce our ability to compete successfully and harm our results of operations."

87

*Cash Flows*

The following table summarizes our cash flows for the periods indicated:

| | Year Ended January 31, | | | Three Months Ended April 30, | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $ (89,806) | $ (35,617) | $ (41,059) | $ 3,433 | $ (14,126) |
| Net cash provided by (used in) investing activities | (41,771) | (240,436) | (333,421) | (38,608) | 105,460 |
| Net cash provided by financing activities | 214,096 | 297,035 | 437,677 | 758 | 2,385 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | $ 82,519 | $ 20,982 | $ 63,197 | $ (34,417) | $ 93,719 |

*Cash Provided by (Used in) Operating Activities*

Our largest source of operating cash is cash collections from organizations on a paid subscription plan. Our primary uses of cash from operating activities are for employee-related expenditures, sales and marketing expenses, and third-party hosting costs. Historically, we have generated negative cash flows from operating activities and have supplemented working capital requirements through net proceeds from the private sale of equity securities.

During the three months ended April 30, 2019, operating activities used $14.1 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $31.9 million , impacted by $6.9 million non-cash charges and $10.8 million of cash provided from changes in our operating assets and liabilities. The non-cash charges primarily consisted of $5.9 million of depreciation and amortization, $3.6 million in stock-based compensation, and $1.5 million of amortization of deferred contract acquisition costs, partially offset by a $3.0 million gain as a result of the change in fair value of our strategic investments and $1.1 million of net amortization of bond discount on debt securities available for sale. The cash provided from changes in our operating assets and liabilities was primarily due to a $15.6 million decrease in accounts receivable, reflecting an increase in collections and seasonal decrease in billings, a $14.8 million increase in deferred revenue due to additional billings with new and existing Paid Customers, and a $3.2 million increase in accrued expenses and other liabilities as a result of our increased spending and headcount associated with the growth of our business. These amounts were partially offset by a $15.3 million decrease in accrued compensation and benefits mainly due to the payment of our corporate bonus to employees and a $6.5 million increase in prepaid expenses and other assets, including a $3.3 million increase in deferred commissions, a $2.7 million increase in prepaid hosting services, and a $1.0 million decrease in accounts payable due to the timing of payments.

During the three months ended April 30, 2018, operating activities generated $3.4 million in cash. The primary factors affecting our operating cash flows during this period were $18.6 million of cash provided from changes in our operating assets and liabilities and $9.7 million non-cash charges, partially offset by our net loss of $24.9 million . The cash provided from changes in our operating assets and liabilities was primarily due to a $21.2 million increase in deferred revenue due to increased billings, a $5.4 million increase in accounts payable, accrued expenses, and other liabilities as a result of our increased spending and headcount associated with the growth of our business. The non-cash charges primarily consisted of $6.1 million in stock-based compensation, $2.8 million of depreciation and amortization, $0.5 million of amortization of deferred contract acquisition costs, and a $0.3 million loss on disposal of property and equipment. These amounts were partially offset by a $7.5 million decrease in accrued compensation and benefits mainly due to the payment of our corporate bonus to employees for fiscal year 2017.

During the year ended January 31, 2019, operating activities used $41.1 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $138.9 million , impacted by $39.2 million non-cash charges and $58.6 million of cash provided from changes in our operating assets and liabilities. The non-cash charges primarily consisted of $23.1 million in stock-based compensation, $16.8 million of depreciation and amortization, $3.2 million of amortization of deferred contract acquisition costs, and a $2.3 million loss on disposal of property and equipment, partially offset by a $3.7 million gain as a result of the change in fair value of our strategic

88

investments and $3.1 million of net amortization of bond discount on debt securities available for sale. The cash provided from changes in our operating assets and liabilities was primarily due to a $116.4 million increase in deferred revenue due to increased billings, and a $45.6 million increase in accounts payable, accrued expenses including compensation and benefits, and other liabilities as a result of our increased spending and headcount associated with the growth of our business. These amounts were partially offset by a $53.1 million increase in prepaid expenses and other assets mainly due to a $22.8 million increase in prepaid hosting services and a $12.7 million increase in deferred commissions, and a $50.3 million increase in accounts receivable, reflecting increased billings.

During the year ended January 31, 2018, operating activities used $35.6 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $140.1 million, impacted by non-cash charges of $25.3 million, primarily consisting of $14.3 million of depreciation and amortization, $8.7 million in stock-based compensation, and $1.4 million of net amortization of bond premium on debt securities available for sale, and $79.1 million of cash provided from changes in our operating assets and liabilities. The cash provided from changes in our operating assets and liabilities was primarily due to a $68.5 million increase in deferred revenue due to increased billings, a $26.2 million increase in accounts payable, accrued expenses including compensation and benefits, and other liabilities as a result of our increased spending and headcount associated with the growth of our business, and a $6.4 million decrease in prepaid expenses and other assets. These amounts were partially offset by an increase in accounts receivable of $22.0 million reflecting increased billings.

During the year ended January 31, 2017, operating activities used $89.8 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $146.9 million, impacted by non-cash charges of $51.3 million, primarily consisting of $42.1 million in stock-based compensation, $6.8 million of depreciation and amortization, and $2.2 million of net amortization of bond premium on debt securities available for sale, and $5.8 million of cash provided from changes in our operating assets and liabilities. The cash provided by changes in our operating assets and liabilities was primarily the result of a $38.2 million increase in deferred revenue due to increased billings, a $12.6 million increase in accrued expenses including compensation and benefits, and other liabilities due to increased expenditures and headcount associated with the growth of our business. These increases were partially offset by a $31.6 million increase in prepaid expenses and other assets of which $20.0 million was for our hosting service contract, a $12.0 million increase in accounts receivable reflecting increased billings, and a $1.4 million decrease in accounts payable.

### *Cash Provided by (Used in) Investing Activities*

Net cash provided by investing activities during the three months ended April 30, 2019 was $105.5 million , which was primarily driven by maturities of marketable securities of $150.7 million , partially offset by cash used to purchase marketable securities of $24.9 million and property and equipment of $20.1 million .

Net cash used in investing activities during three months ended April 30, 2018 was $38.6 million , which was primarily used to purchase marketable securities of $230.0 million and property and equipment of $18.4 million , partially offset by maturities of marketable securities of $209.3 million .

Net cash used in investing activities during the year ended January 31, 2019 was $333.4 million , which was primarily used to purchase marketable securities of $967.1 million , property and equipment of $56.2 million , business and intangible assets of $47.7 million, and strategic investments of $2.3 million , partially offset by sales and maturities of marketable securities of $738.9 million.

Net cash used in investing activities during the year ended January 31, 2018 was $240.4 million, which was primarily used to purchase marketable securities of $510.8 million, property and equipment of $22.0 million and strategic investments of $2.9 million, partially offset by sales and maturities of marketable securities of $295.2 million.

Net cash used in investing activities during the year ended January 31, 2017 was $41.8 million, which was primarily used to purchase marketable securities of $346.4 million, property and equipment of $24.2 million, and strategic investments of $4.5 million, partially offset by sales and maturities of marketable securities of $333.9 million.

89

*Cash Provided by Financing Activities*

Net cash provided by financing activities for the three months ended April 30, 2019 was $2.4 million , reflecting the exercise of stock options to purchase common stock.

Net cash provided by financing activities for the three months ended April 30, 2018 was $0.8 million , reflecting the exercise of stock options to purchase common stock.

Net cash provided by financing activities for the year ended January 31, 2019 was $437.7 million , reflecting proceeds from issuance of convertible preferred stock of $426.9 million , proceeds from issuance of common stock to a third party of $6.1 million , and the exercise of stock options to purchase common stock of $4.8 million .

Net cash provided by financing activities for the year ended January 31, 2018 was $297.0 million, reflecting proceeds from issuance of convertible preferred stock of $412.4 million and the exercise of stock options to purchase common stock of $2.9 million, partially offset by repurchases of convertible preferred stock of $77.7 million and common stock of $40.5 million.

Net cash provided by financing activities for the year ended January 31, 2017 was $214.1 million, reflecting proceeds from the issuance of convertible preferred stock of $207.9 million, the exercise of stock options to purchase common stock of $4.7 million, and capital contributions made by noncontrolling interest members of Slack Fund of $5.8 million, partially offset by repurchases of common stock of $4.3 million.

### Contractual Obligations and Commitments

Our principal contractual commitments primarily consist of obligations under leases for office space and datacenter operations.

The following table summarizes our consolidated principal contractual cash obligations, as of January 31, 2019, and is supplemented by the discussion following the table:

| | Total | | Less than 1 year | | 1-3 years | | 3-5 years | | More than 5 years |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands ) | | | | |
| Operating lease obligations [1] | $ | 238,187 | $ | 27,359 | $ | 50,952 | $ | 48,327 | $ 111,549 |
| Hosting commitments [2] | | 212,500 | | 50,000 | | 100,000 | | 62,500 | — |
| Other commitments [3] | | 47,944 | | 17,801 | | 15,989 | | 3,576 | 10,578 |
| Total | $ | 498,631 | $ | 95,160 | $ | 166,941 | $ | 114,403 | $ 122,127 |

_____

(1) Consists of future non-cancelable minimum rental payments under operating leases for our offices.

(2) In April 2018, we executed an amendment to our existing agreement with Amazon Web Services. The amended agreement was effective as of May 1, 2018 and continues through July 31, 2023. We have minimum annual commitments of $50.0 million each year of the agreement term for a total minimum commitment of $250.0 million.

(3) Consists of future minimum payments under non-cancelable purchase commitments primarily related to IT operations, sales and marketing activities, and acquisition related obligations.

In addition to the contractual obligations set forth above, as of January 31, 2019, we had $20.5 million in standby letters of credit outstanding related to our office facilities in San Francisco, California and Denver, Colorado.

In March 2019, we entered into a non-cancelable operating lease agreement for an office facility in San Francisco, California. The lease term is from March 2019 to June 2030, with future minimum lease payments of $171.0 million . In conjunction with the agreement and to secure the lease, we entered into an $18.0 million irrevocable standby letter of credit.

90

**Off-Balance Sheet Arrangements**

As of April 30, 2019, we did not have any relationships with unconsolidated entities or financial partnerships, such as structured finance or special purpose entities that were established for the purpose of facilitating off-balance sheet arrangements or other purposes.

**Significant Impacts of Stock-Based Compensation**

*Restricted Stock Units (RSUs)*

We have granted RSUs to our employees and directors under our 2009 Plan. RSUs outstanding as of April 30, 2019 have both service-based and performance vesting conditions. The service-based vesting period for these awards is typically four years with a cliff vesting period of one year and continued vesting quarterly thereafter. Upon satisfaction of the performance vesting condition, RSUs for which the service-based condition has also been satisfied will vest immediately, and any remaining unvested RSUs will vest quarterly over the remaining service period. The performance vesting condition is satisfied on the earlier of (i) a change in control of the company, (ii) the initial public offering of our securities, or (iii) the listing and public trading of our Class A common stock on the NYSE .

As of April 30, 2019, all compensation expense related to RSUs remained unrecognized because the performance vesting condition was not satisfied. At the time the performance vesting condition becomes probable, which is not until such condition is satisfied, we will recognize the cumulative stock-based compensation expense for the outstanding RSUs using the accelerated attribution method. As of April 30, 2019, 77.4 million RSUs were outstanding, of which 26.1 million had met their service-based condition. If the performance vesting condition had occurred on April 30, 2019, we would have recorded $201.6 million of stock-based compensation, and we would recognize unamortized stock-based compensation of $340.0 million over a weighted-average remaining requisite service period of 3.1 years . The recognition of stock-based compensation would affect our cost of revenue and our research and development, sales and marketing, and general and administrative operating expense line items. We expect to recognize this stock-based compensation during the three months ended July 31, 2019 when our Class A common stock is expected to begin trading on the NYSE.

**Indemnification Agreements**

In the ordinary course of business, we enter into contractual arrangements under which we agree to provide indemnification of varying scope and terms to organizations on Slack, business partners, and other parties with respect to certain matters, including losses arising out of intellectual property infringement claims made by third parties, violation of applicable laws, and negligence or acts of willful misconduct, among others, with respect to Slack. In these circumstances, payment is typically conditional on the other party making a claim pursuant to the procedures specified in the particular contract.

In addition, we have entered into indemnification agreements with our directors, executive officers, and certain board observers that require us, among other things, to indemnify them against certain liabilities that may arise by reason of their status or service as directors or as board observers until the effectiveness of the registration statement of which this prospectus forms a part.

**Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to certain market risks in the ordinary course of our business. These risks primarily include:

*Interest Rate Risk*

We had cash and cash equivalents of $256.5 million and marketable securities of $536.2 million as of April 30, 2019, which consisted of bank deposits, money market accounts, commercial paper, U.S. agency securities, U.S. government securities, international government securities, and corporate bonds. The cash and cash equivalents are held primarily for working capital purposes. Such interest-earning instruments carry a degree of interest rate risk. To date, fluctuations in interest income have not been significant. The primary objective of our investment activities is to preserve principal while maximizing income without significantly increasing risk. We do not enter into investments for trading or speculative purposes and have not used any derivative financial instruments to manage our interest rate

risk exposure. Due to the short-term nature of our investments, we have not been exposed to, nor do we anticipate being exposed to, material risks due to changes in interest rates. A hypothetical 10% change in interest rates during any of the periods presented would not have had a material impact on our consolidated financial statements.

### Currency Exchange Risk

The functional currency of our foreign subsidiaries is generally the U.S. dollar. Monetary assets and liabilities are remeasured using foreign currency exchange rates at the end of the period, and non-monetary assets are remeasured based on historical exchange rates. Gains and losses due to foreign currency are the result of either the remeasurement of subsidiary balances or transactions denominated in currencies other than the foreign subsidiaries' functional currency and are included in other income (expense), net in our statements of operations.

We have foreign currency exchange risks related to our revenue and operating expenses denominated in currencies other than the U.S. dollar, principally the Euro. The volatility of exchange rates depends on many factors that we cannot forecast with reliable accuracy. We have experienced and will continue to experience fluctuations in foreign exchange gains (losses) related to changes in foreign currency exchange rates. In the event our foreign currency denominated assets, liabilities, sales, or expenses increase, our results of operations may be more greatly affected by fluctuations in the exchange rates of the currencies in which we do business.

We do not currently engage in any hedging activity to reduce our potential exposure to currency fluctuations, although we may choose to do so in the future. A hypothetical 10% change in foreign currency exchange rates during any of the periods presented would not have had a material impact on our consolidated financial statements.

### Inflation Risk

We do not believe that inflation has had a material effect on our business, results of operations, or financial condition.

## Critical Accounting Policies and Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs, and expenses, and related disclosures. On an ongoing basis, we evaluate our estimates and assumptions. Our actual results may differ from these estimates under different assumptions or conditions.

We believe that of our significant accounting policies, which are described in Note 1 to our consolidated financial statements, the following accounting policies involve a greater degree of judgment and complexity. Accordingly, these are the policies we believe are the most critical to aid in fully understanding and evaluating our consolidated financial condition and results of operations.

Under the JOBS Act, an "emerging growth company" can take advantage of an extended transition period for complying with new or revised accounting standards. This provision allows an "emerging growth company" to delay the adoption of new or revised accounting standards that have different transition dates for public and private companies until those standards would otherwise apply to private companies. We meet the definition of an "emerging growth company" and have elected to use this extended transition period. As a result of this election, our timeline to comply with these standards will in many cases be delayed as compared to other public companies that are not eligible to take advantage of this election or have not made this election. Therefore, our financial statements may not be comparable to those of companies that comply with the public company effective dates for these standards.

### Revenue Recognition

We elected to adopt Accounting Standards Codification, or ASC Topic 606, Revenue from Contracts with Customers, or ASC 606, effective as of February 1, 2017, utilizing the full retrospective method of adoption. Accordingly, the consolidated financial statements for the years ended January 31, 2017, 2018, and 2019 and three months ended April 30, 2018 and 2019 are presented under ASC 606. We recognize revenue from contracts with organizations on a paid subscription plan using the five-step method described in Note 1 in our consolidated financial statements. We

92

derive revenue from monthly, annual, and multi-year subscription fees earned from organizations on a paid subscription plan accessing Slack.

In our contracts, we typically have one performance obligation of providing access to Slack . On occasion, we also provide professional services to organizations on Slack, which are separate performance obligations. Professional services revenue has not been material to date. Contracts that contain multiple performance obligations require an allocation of the transaction price to each performance obligation based on their relative standalone selling price. We determine standalone selling price, or SSP, for all of our performance obligations using observable inputs, such as standalone sales and historical contract pricing. SSP also reflects the amount we would charge for that performance obligation if it were sold separately in a standalone sale, and the price we would sell to similar organizations on Slack in similar circumstances.

In general, we satisfy our performance obligations over time as we provide the promised services to organizations on a paid subscription plan. We maintain a fair billing policy, under which certain organizations on a paid subscription plan are entitled to credit if they have not used the entirety of the contracted number of users for which they have paid during the contractual term of the arrangement. These credits, accounted for as a part of deferred revenue, may be carried over to offset future billings and are not refundable for cash. A majority of our contracts give a right to bill for additional usage, and this is deemed variable consideration. The variable consideration is allocated to the distinct day the services are completed, as services provided to the additional users are specific to the period that the usage occurs. To the extent that we believe it is probable that a significant reversal would not occur, an estimate is made for the revenue associated with incremental usage during a period. The incremental revenue recognized associated with these estimates has not been material through fiscal year 2019 and the three months ended April 30, 2019.

### *Business Combinations and Valuation of Goodwill and Other Acquired Intangible Assets*

Upon acquiring a business, we estimate the fair value of assets acquired and liabilities assumed. Goodwill as of the acquisition date is measured as the excess of consideration transferred over the net of the acquisition date fair values of the assets acquired and the liabilities assumed.

The estimation of fair value requires significant judgment and the use of assumptions by management. Key assumptions made in making these estimates include, but are not limited to, estimating future cash flows, selecting discount rates, and selecting valuation methodologies. While we believe the assumptions and estimates we have made in the past have been appropriate, they are inherently uncertain and subject to refinement. During the measurement period, which may be up to one year from the acquisition date, we record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. On the conclusion of the measurement period or final determination of the values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded in our consolidated statements of operations.

### *Stock-Based Compensation*

We measure compensation expense for all stock-based payment awards, including stock options, RSUs, and RSAs, granted to employees, directors, and other service providers, based on the estimated fair value of the awards on the date of grant. The fair value of each stock option granted is estimated using the Black-Scholes option pricing model. Stock-based compensation is recognized on a straight-line basis, net of forfeitures, over the requisite service period.

We grant RSUs to our employees and directors with both service-based and performance vesting conditions. The service-based vesting period for these awards is typically four years with a cliff vesting period of one year and continued vesting quarterly thereafter. The performance vesting condition is satisfied on the earlier of (i) a change in control of the company, (ii) the initial public offering of our securities, or (iii) the listing and public trading of our Class A common stock on the NYSE . As of April 30, 2019, achievement of the performance condition was not probable and therefore, all compensation expense related to RSUs remained unrecognized. A change in control event, the initial public offering of our securities, and effective registration statement for the listing and public trading of our Class A common stock on the NYSE are not deemed probable until consummated. If the listing and public trading of our Class A common stock on the NYSE had occurred on April 30, 2019, we would have recognized $201.6 million of stock-based compensation for all RSUs that had fully satisfied the service-based vesting condition on that date, and would have $340.0 million of unrecognized compensation cost that represents the grants that have not met the service condition as

93

of April 30, 2019. We expect to recognize this stock-based compensation during the three months ended July 31, 2019 when our Class A common stock is expected to begin trading on the NYSE.

### Common Stock Valuations

The fair value of the common stock underlying our stock-based payment awards is determined by our board of directors, with input from management and reviews of third-party valuations which are performed at least quarterly to determine the fair value of RSUs and RSAs and perform the fair value calculations with the Black-Scholes option-pricing model. We believe that our board of directors has the relevant experience and expertise to determine the fair value of our common stock. If stock-based payment awards were granted a short period of time prior to the date of a valuation report, we retrospectively assessed the fair value used for financial reporting purposes after considering the fair value reflected in the subsequent valuation report and other facts and circumstances on the date of grant as discussed below. Prior to the listing of our Class A common stock on the NYSE, given the absence of a public trading market for our common stock, the valuations of common stock were determined in accordance with the guidance provided by the American Institute of Certified Public Accountants Practice Aid, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation* , and our board of directors exercised reasonable judgment and considered numerous and subjective factors to determine the best estimate of fair value of our common stock, including the following factors:

- the results of contemporaneous valuations performed at periodic intervals by an independent valuation firm;

- the prices, rights, preferences, and privileges of our convertible preferred stock relative to those of our common stock;

- the prices of our convertible preferred stock and common stock sold to investors in arms-length transactions or offered to investors through a tender offer;

- our actual operating and financial performance and estimated trends and prospects for our future performance;

- our stage of development;

- the likelihood of achieving a liquidity event, such as an initial public offering, direct listing, or sale of our company, given prevailing market conditions;

- the lack of marketability involving securities in a private company;

- the market performance of comparable publicly traded companies; and

- U.S. and global capital market conditions.

In valuing our common stock, our board of directors determined the equity value of our business generally using a weighting of the income and market approach valuation methods. The income approach estimates value based on the expectation of future cash flows that a company will generate. These future cash flows are discounted to their present values using a discount rate based on our weighted-average cost of capital and are adjusted to reflect the risks inherent in our cash flows. The market approach estimates value based on a comparison of the subject company to comparable public companies in a similar line of business. From the comparable companies, a representative market value multiple is determined and then applied to the subject company's financial forecasts to estimate the value of the subject company.

For valuations prior to January 31, 2018, the equity valuation was based on both the income and the market approach valuation methods. The Option Pricing Method, or OPM, was selected as the principal equity allocation method. When we had completed or were expecting to complete a preferred equity financing, the terms and pricing of the financing round were included in the analysis used to estimate our value and the value of our common stock. These methods were consistent with prior valuations.

For valuations as of and subsequent to January 31, 2018, where the company did not have a recent or expected arm's length preferred equity financing, we have used a hybrid method utilizing a combination of the OPM and the probability-weighted expected return method, or PWERM, in estimating the value of our common stock. Using the PWERM, the value of our common stock is estimated based upon a probability-weighted analysis of varying values

94

for our common stock assuming possible future events for our company, including a scenario of an IPO or a direct listing of our Class A common stock on an exchange and a scenario assuming continued operation as a private entity. When the company had a recent or expected arm's length preferred equity financing, the results from the PWERM analysis were not inconsistent with the overall weighted value considering the terms and pricing of the preferred round of financing.

Application of these approaches involves the use of estimates, judgment, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and future cash flows, discount rates, market multiples, the selection of comparable companies, and the probability of possible future events. Changes in any or all of these estimates and assumptions or the relationships between those assumptions impact our valuations as of each valuation date and may have a material impact on the valuation of our common stock.

Our board of directors' assessments of the fair value of our common stock for grant dates between the dates of an available third-party valuation report were based in part on the current available financial and operational information and the common stock value provided in the most recent available third-party valuation report as compared to the timing of each grant. For financial reporting purposes, we generally used a straight-line interpolation between the two dates of the valuation included in third-party valuation reports. This determination included an evaluation of whether the subsequent valuation report indicated that any significant change in valuation had occurred between the previous valuation and the grant date.

For valuations after the completion of the listing of our Class A common stock on the NYSE, our board of directors will determine the fair value of each share of underlying Class A common stock based on the closing price of our Class A common stock as reported on the date of grant.

### Recent Accounting Pronouncements

See the section titled "Summary of Business and Significant Accounting Policies" in Note 1 of the notes to our consolidated financial statements included elsewhere in this prospectus for more information.

95

## BUSINESS

### Introduction – What is Slack?

Slack is where work happens.

Around the world, over 600,000 organizations in over 150 countries have turned to Slack as the place to communicate, collaborate, and get work done. Over 10 million people inside those organizations – accountants, customer support reps, engineers, lawyers, journalists, dentists, chefs, detectives, executives, scientists, farmers, hoteliers, salespeople, and many others – collectively spend more than 50 million hours in active use of Slack in a typical week, on either a free or paid subscription plan. They do so because Slack is a new layer of the business technology stack that brings together people, applications, and data – a single place where people can effectively work together, access hundreds of thousands of critical applications and services, and find important information to do their best work.

### History

We created Slack initially as an internal tool to help our own team stay on the same page, to be able to easily access conversations, decisions, data, and content that had been shared, and to tap into a variety of software applications from one place. We were frustrated with email. It created fragmented silos of inaccessible information, hidden in individual inboxes. When new members joined the team, they were cut off from the rich history of communication that occurred before they arrived. Transparency was difficult to achieve and routine communication had to be supplemented with status reports and stand-up meetings in order to keep the team coordinated.

In addition, despite the fact that email was the universal default routing mechanism for enterprise software, it was also an ineffective medium for sharing and managing the information and activity generated by that software. The notifications and simple workflows, such as approval processes, generated by customer support ticketing tools, human resources management systems, and expense trackers, disappeared into individual inboxes. Email is static and offers no direct integration with any of these tools. In short, email was a tiny window into the vast landscape of business information and software available to us collectively, and we needed to see the whole picture.

We needed a new way to work that would help us make the most of both our people and our significant investment in software. What was available was incomplete, inadequate, and unfit for our work at hand. What we needed did not exist. So we built it.

Since our public launch in 2014, it has become apparent that organizations worldwide have similar needs, and are now finding the solution with Slack. Our growth is largely due to word-of-mouth recommendations. Slack usage inside organizations of all kinds is typically initially driven bottoms-up, by end users. Despite this, we (and the rest of the world) still have a hard time explaining Slack. It's been called an operating system for teams, a hub for collaboration, a connective tissue across the organization, and much else. Fundamentally, it is a new layer of the business technology stack in a category that is still being defined.

### Slack's Role

The most helpful explanation of Slack is often that it replaces the use of email inside the organization. Like email (or the Internet or electricity), Slack has very general and broad applicability. It is not aimed at any one specific purpose, but nearly anything that people do together at work. Slack is used to review job candidates, coordinate election coverage, diagnose network problems, negotiate budgets, plan marketing campaigns, approve menus, and organize disaster response teams, along with countless other tasks.

Unlike email, however, most of this activity happens in team-based channels, rather than in individual inboxes. Channels offer a persistent record of the conversations, data, documents, and application workflows relevant to a project or a topic. Membership of a channel can change over time as people join or leave a project or organization, and users benefit from the accumulated historical information in a way an employee never could when starting with an empty email inbox. Depending on the size of the organization, this might provide tens, hundreds or even thousands of times more access to information than is available to individuals working in environments where email is the primary means of communication.

96

Also unlike email, Slack was designed from the ground up to integrate with external software systems. Slack provides an easy way for users to share and aggregate information from other software, take action on notifications, and advance workflows in a multitude of third-party applications, over 1,500 of which are listed in the Slack App Directory. Further, Slack's platform capabilities extend beyond integrations with third-party applications and allow for easy integrations with an organization's internally-developed software. During the three months ended January 31, 2019, our more than 10 million daily active users included more than 500,000 registered developers. Developers have collectively created more than 450,000 third-party applications or custom integrations that were used in a typical week during the three months ended January 31, 2019. Additionally, we are currently developing low-code solutions to create integrations and workflows entirely in Slack, suitable for all users and based on a simple, non-technical user interface .

Ultimately, Slack is more than email replacement. It is a new layer of technology that brings together people, applications, and data. Just as an operating system coordinates the flow of information and resources of a computer in a centralized fashion, using Slack inside an organization creates a hub into which critical business information flows, is acted upon and transformed, and is then quickly routed to its desired destination. Slack streamlines our users' workflows, increases the beneficial return on the time they spend communicating, and creates a powerful point of leverage for increased productivity.

### Business Context

We believe Slack is positioned extremely well to benefit from several powerful secular trends that are transforming businesses and shaping the future of work. The first is the explosive proliferation of software into every aspect of business and the second is the increased pace of disruption driven by technological change.

According to Netskope, a typical enterprise uses more than 1,000 cloud services. Many of the largest IT departments maintain thousands of enterprise applications. All of this software either automates the repetitive and often error-prone work that humans used to do or augments human effort with entirely new capabilities. This software has enormous benefits in terms of accuracy of information, speed of delivery, and knowledge worker productivity, but it also introduces new challenges.

With the simpler and more routine tasks automated away, the work that remains is more sophisticated and complex. Those tasks, which most rely on human judgment, intelligence, and creativity, are both more difficult to perform and more difficult to coordinate. Organizational alignment becomes harder to achieve. Further, the increased use of highly specialized software in different functional areas leads to a fragmentation of attention and, because it is often difficult to share objects or records with non-users, impedes the flow of important information across the organization.

These challenges compound the disruptive threats companies face in increasingly dynamic environments. Technological change and increased globalization continually create new opportunities and threats, but they also accelerate second-order change in customer needs, competitors' behavior, and overall macroeconomic conditions. This environment demands an ever-greater ability to adapt and respond : 52% of the companies in the S&P 500 at the end of 2000 were no longer in the S&P at the end of 2018. In an increasingly dynamic world, the fundamental business advantage is organizational agility – the ability for individuals, teams, and organizations to maintain alignment while continually transforming to meet evolving challenges.

### How Slack Helps

Slack is designed to allow people and teams to realize their full potential at work and, in doing so, to help organizations overcome the challenges created by their increased reliance on a proliferation of specialized software and radically reduce the communication and coordination effort required to achieve a given amount of organizational agility.

*Our vision is a world where organizational agility is easy to achieve, regardless of an organization's size*

As a result of the alignment teams and organizations are able to maintain while continuously adapting to respond in increasingly dynamic environments, less effort and energy is wasted and the human beings on those teams are able to fully utilize their intelligence and creativity in pursuit of the organization's shared objectives.

97

*Slack makes existing software more useful and accessible*

As a flexible platform for routing information of all kinds – messages, data, documents, even user interfaces and application state – Slack integrates horizontally with thousands of other applications, from those provided by companies like Google, Salesforce, ServiceNow, Atlassian, and Dropbox to the proprietary line-of-business applications developed by organizations for their own internal use. This functionality enables users to securely interact with all of these applications in one familiar user interface , with actions and workflows recorded both in Slack and in the integrated applications. For example, a manager can quickly look up an account in Salesforce, approve a time-off request in Workday, and view a Word document stored in Box, all without leaving Slack.

Whatever tools organizations on Slack already use, and whatever they might use in the future, our goal is to make their experience of those tools better *because* they use Slack. Through an open API and an expansive approach to partnerships, we enable organizations on Slack to get more out of their software investment. Because software is a way of getting more out of what is often an organization's largest expense, payroll, this can have a double-levered impact on topline productivity.

*Slack drives increased organizational agility*

As a new layer of business technology that brings together an organization's people, applications, and data, Slack improves organizational alignment. In a December 2018 survey that we conducted with more than a thousand U.S.-based users who had been using Slack for at least one month, which we refer to as our 2018 Survey, 87% reported that Slack improved communication and collaboration inside their organization. Of those users who believed that Slack impacted the transparency of projects, initiatives, or team activities across their organization, 97% reported either "more" or "much more" transparency with Slack. By the same measure, 89% reported "more" or "much more" productivity.

Organizational agility is a difficult thing to measure, but anyone who has worked at a large organization knows that the cost of communication and coordination is high and it grows dramatically with the number of people involved. We believe an organization's perception of the value of Slack and specifically their perception of its impact on key factors in their organization's performance are useful indicators of the improvements organizations are able to achieve through their use of Slack.

## Summary of Key Benefits

Working in Slack provides several key benefits to users, teams, and organizations and to our platform ecosystem:

- **People love using Slack and that leads to high levels of engagement.** Slack is enterprise software created with an eye for user experience usually associated with consumer products. We believe that the more simple, enjoyable, and intuitive the product is, the more people will want to use it. As a result, teams benefit from the aggregated attention that happens when all members of a team are engaged in a single collaboration tool.

- **Slack increases an organization's "return on communication."** Moving to channel-based communication increases accessibility of communication, which in turn increases transparency and breaks down silos. The organization benefits from increased coordination and alignment from a given amount of communication, with no additional effort in the form of status reports, update meetings, and so on.

- **Slack increases the value of existing software investment** . Integration with Slack increases both the accessibility of information inside applications and the response times for many basic actions. Because Slack users can do virtually everything on Slack on mobile that they can do on desktop, they do not need to have dozens of work applications on their mobile devices to be able to make lightweight use of those applications on the go.

- **An organization's archive of data increases in value over time.** As teams continue to use Slack, they build a valuable resource of widely accessible information. Important messages are surrounded by useful context and users can see how fellow team members created and worked with the information and arrived at a decision. New employees can have instant access to the information they need to be effective whenever they join a new

98

team or company. Finally, the content on Slack is available through powerful search and discovery tools, powered by machine learning, which improve through usage.

- **Slack helps organizations improve culture and employees' feelings of empowerment.** When every member of a team learns from, and contributes towards, common goals, people feel they have greater influence over the ultimate outcomes of their work. By keeping all team members in the information flow, we believe that Slack increases this sense that members of a team can have an impact and make a difference and that creates greater team cohesion and increases motivation.

- **Slack helps achieve organizational agility** . Slack's channels immerse workers directly into the dynamic and evolving communication, decision making, and data flow that defines modern work. Because workers have both more access to data updated in real time and more context for that data, they are better able to quickly react and adjust work streams in response to new business priorities or changing conditions while staying in alignment with one another.

- **Developers are better able to reach and deliver value to their customers** . Slack has aggregated hundreds of thousands of organizations on one platform and made it easier for developers to distribute their software to any Slack-using organization. By making information from their applications available and allowing users to perform key actions through a whole new interface, developers can make their customers happier and more engaged.

Organizations and employees demand better and more productive ways to work, and organizations must be able to fully employ the knowledge, skill, and creativity of the people they invest in. We believe that whoever makes it easiest for teams to function with agility and cohesion in an ever more complex world will be the most important software company in the world. We aim to be that company.

### Our Business Model

From the outset, our go-to-market strategy has centered around offering an exceptional product and level of service to organizations on Slack. We offer a self-service approach, for b oth free and paid subscriptions to Slack, which capitalizes on strong word-of-mouth adoption and customer love for our brand. Since 2016, we have augmented our approach with a direct sales force and customer success professionals who are focused on driving successful adoption and expansion within organizations, whether on a free or paid subscription plan. We believe deep user engagement and an obsessive focus on customer experience are catalysts for expanding paid adoption within organizations.

We define daily active users as users who either created or consumed content in a given 24-hour period on either a free or paid subscription plan. We define an organization on Slack as a separate entity, such as a company, educational or government institution, or distinct business unit of a company, that is on a subscription plan, whether free or paid. Once an organization has three or more users on a paid subscription plan, we count them as a Paid Customer.

Our user base has grown rapidly since our launch in 2014. During the three months ended January 31, 2019, our daily active users exceeded 10 million. As of January 31, 2019, Slack had more than 600,000 organizations with three or more users, comprised of:

- More than 500,000 organizations on our Free subscription plan; and

- More than 88,000 Paid Customers, including more than 65 companies in the Fortune 100.

As of April 30, 2019, Slack had more than 95,000 Paid Customers. Many of these Paid Customers have thousands of active users and our largest Paid Customers have tens of thousands of employees using Slack on a daily basis.

Our users, whether on a free or paid subscription plan, are highly engaged, and their collective active use of Slack for the week ended January 31, 2019 exceeded 50 million hours. During the week ended January 31, 2019, more than 1 billion messages were sent in Slack. During this same time, on a typical workday, users at Paid Customers averaged nine hours connected to Slack through at least one device and spent more than 90 minutes actively using Slack. We believe that this broad, active user base and deep user engagement propel increased adoption within organizations and inspire many organizations to become Paid Customers.

99

Our direct sales and customer success efforts are focused on larger organizations who have a greater number of users and teams and have the potential to increase spend over time. We measure the number of Paid Customers > $100,000 of ARR as a gauge of adoption within and expansion into large enterprises. As of January 31, 2019, we had 575 Paid Customers >$100,000 of ARR, which accounted for approximately 40% of our revenue in fiscal year 2019 . As of April 30, 2019, we had 645 Paid Customers >$100,000 of ARR, which accounted for approximately 43% of our revenue in the three months ended April 30, 2019 .

We generate revenue primarily from the sale of subscriptions for Slack. Paid customers typically pay on a monthly or annual basis, based on the number of users that they have on Slack.

Our reven ue was $105.2 million, $220.5 million, and $400.6 million in fiscal years 2017, 2018, and 2019, respectively, representing annual growth of 110% and 82%, respectively. Our revenue was $80.9 million and $134.8 million for the three months ended April 30, 2018 and 2019, respectively, representing year-over-year growth of 67%. Our growth is global with international revenue representing 34%, 34%, and 36% of total revenue in fiscal years 2017, 2018, and 2019, respectively, and 36% and 37% in the three months ended April 30, 2018 and 2019, respectively. We continue to invest in growing our business to capitalize on our market opportunity. As a result, we incurred net losses of $146.9 million, $140.1 million, and $138.9 million in fiscal years 2017, 2018, and 2019, respectively. We incurred net losses of $24.9 million and $31.9 million in the three months ended April 30, 2018 and 2019, respectively . Our net losses have been decreasing as a percentage of revenue over time as revenue growth has outpaced the growth in operating expenses.

Expansion within organizations on Slack is a significant contributor to our growth. We measure the rate of expansion within our Paid Customer base, whether it is sales-driven growth inside our larger Paid Customers or product-driven organic growth inside of self-serve Paid Customers, by Net Dollar Retention Rate. Our Net Dollar Retention Rate was 138% as of April 30, 2019. We believe that our Net Dollar Retention Rate is a reflection of the rapid pace of adoption that often occurs as usage spreads within and across teams. We believe that all of these factors will contribute to a high lifetime value of an organization on Slack.

### What Sets Us Apart

We believe Slack is uniquely well positioned to maintain its advantages as the market for our new category grows.

*Singular focus*

Our development, design, partnerships, customer engagement, and investments are targeted at realizing the enormity and simplicity of Slack's singular mission: to make people's working lives simpler, more pleasant, and more productive. We have no legacy products or competing priorities. We believe our platform has broad enough utility and a large enough market that we can remain focused indefinitely.

*Scale and market leadership*

The strength of our market leadership is demonstrated by the scale and growth of our users, the high level of engagement within our user base, our growth within organizations, the breadth of applications that integrate with Slack, and the size of our developer ecosystem. We believe we know more about how organizations use platforms like Slack than anyone else in the world and will put this knowledge to work faster.

*Strong increasing returns dynamics*

As Slack usage increases inside an organization, more value is created for each additional user who might join, as well as for all existing users. As organizations continue to use Slack over time, the value of their archive increases and they realize more utility in their usage. We believe shared channels between organizations will increase the value of the overall Slack network for each new organization that joins as well as for all existing network members. Slack also generates more value for developers as more users and more organizations join Slack, and users and organizations are more attracted to Slack as more apps are integrated into or built on our platform.

*Customer love leading to stickiness and organic expansion*

People love using Slack and many become advocates for wider use inside of their organizations. They also tend to recommend Slack when they switch jobs or join organizations that are not yet using Slack. There are thousands of public tweets and other public endorsements or recommendations of Slack, a source of growth that is exceptional in enterprise software.

*Differentiated go-to-market strategy*

Organic growth is generated as users realize the benefits of Slack. This growth enables us to attract new and prospective organizations through a highly effective self-service customer engagement model for free and paid subscription plans. We complement our self-service strategy with a focused direct sales effort targeted at organizations with existing organic adoption of Slack. Once prospective organizations are identified, our direct sales and customer success teams work to broaden adoption of Slack into wider-scale deployments.

*Customer-centricity as the fundamental tenet of our company*

We build our software and user interface around the real needs of human beings. We aim for radical convenience and do our best to anticipate the needs of our users. Empathy and respect for users is built into our company values and this mindset extends to our broader sales and customer engagement model. We focus maniacally on customer support for free and paid subscription plans and treat it as a critical and strategic imperative for our company. We believe people should leave every interaction with a Slack representative feeling that they have been heard, respected, and helped by a human being who truly understands Slack and the experience of depending on it for work. This quality of service has a real impact on user behavior: based on our internal data, users who interact with our customer experience team are eight times more likely to become paid users than those who do not.

## Market Opportunity

We believe everyone whose working life is mediated by email is a potential Slack user. Indeed, because of the universal need for organizational agility and the impact to current and potential organizations on Slack of getting more out of their investment in software, we further believe that the shift to Slack, or services like Slack, is inevitable.

We estimate the market opportunity for Slack and other providers of workplace business technology software platforms for communication and collaboration to be $28 billion. We calculate this market opportunity by estimating the total number of companies in our addressable market globally across large enterprises (companies that have more than 5,000 employees), medium-sized organizations (companies that have 250 – 5,000 employees), and emerging and small businesses, or ESB (companies that have 10 – 250 employees), and applying ARR to each respective organization based on its size and location. The ARR applied to the estimated number of organizations is calculated by using our internal data on current spend by size of the organization. For large enterprises, we have applied the median ARR of our top 100 global Paid Customers. For medium-sized organizations and ESBs, we have applied a median ARR based on current Paid Customer spend by size. For both medium-sized organizations and ESBs in emerging markets, we have reduced ARR to reflect pricing plans in emerging market regions such as Brazil and India. As our market and the number of competitors in it is rapidly evolving, our estimates for the size of this market may not be reflective of the actual size of the market.

## Growth Strategy

Slack has shown significant growth relative to other enterprise software companies, indicating strong product-market fit and a large market opportunity. We intend to continue to grow by the following, and other, means:

*Expand our user base through continuous enhancements to Slack*

We believe our user base is loyal and engaged because users enjoy working in Slack and value the productivity it enables. We will continue a relentless focus on product design and new user experience to reach more users and organizations who can benefit from Slack. To maintain high levels of user satisfaction, we intend to continue to enhance Slack's speed, reliability, quality, and capabilities. For example, we intend to increase our investment in the interoperability between Slack and leading providers of email, calendar, task management, file system, and unified

communication services. We are currently also building tools to integrate with traditional email in order to broaden use of Slack and facilitate communication with non-Slack users.

*Grow the number of organizations on Slack and increase our paid customers*

We believe our market remains underpenetrated and we will continue to expand our marketing and sales efforts to reach more users and organizations and to increase the number of paid customers.

*Increase usage within organizations on Slack*

Expansion within organizations on Slack has been an important growth driver. We plan to continue our efforts to grow use and users within organizations on Slack by increasing our investments in our direct sales force, customer success, and customer experience teams, along with new user education initiatives to help teams get the most out of Slack.

*Enable Slack usage across existing and new business networks*

Slack has been used primarily for internal communications. Slack's guest account feature, which allows organizations to bring customers, vendors, consultants, contractors, and other service providers into their Slack instance, is used by more than 65% of paid customers. Our shared channels feature, which facilitates secure collaboration between companies, is in beta release and over 15% of our paid customers have used this feature to connect with other paid customers. We believe adoption of this feature will grow significantly in the coming years, both in terms of network participants and network density. Because the associated network effect increases the value of Slack both for organizations on Slack and organizations new to Slack, we expect shared channels to create more utility for existing users and be an important factor in future growth.

*Further invest in enterprise capabilities*

We believe there is significant opportunity to accelerate our growth within the world's largest organizations. We launched Enterprise Grid in 2017 to provide scalability and greater administrative controls to address the needs of larger and more complex enterprises. We intend to increase investments in marketing and expand our field sales team in order to drive greater adoption of Enterprise Grid by large organizations. Additionally, we plan to continue to build product functionality that meets the unique needs of the world's largest, most complex organizations. Examples of such needs include enterprise key management and features and support for regulated industries, including organizations that are HIPAA or FINRA regulated.

*Invest in international expansion*

We are currently used in more than 150 countries and available in eight languages (English (U.S.), English (U.K.), French, German, Japanese, Portuguese (Brazil), Spanish (Latin America), and Spanish (Spain)). More than 36% of our revenue in the fiscal year ended January 31, 2019 and more than 37% in the three months ended April 30, 2019 came from outside the United States. We have sales and customer experience offices in the United States, Canada, Japan, Australia, Ireland, and the United Kingdom. We plan to open offices and hire sales and customer experience people in additional countries and expand our presence in countries where we already operate. We also intend to unlock growth in under-penetrated regions by translating and localizing our product, as well as adding product functionality to address new markets.

*Grow our application platform and developer ecosystem*

As of the week ended January 31, 2019, more than 1,500 apps were available through our App Directory, and in a typical week during the three months ended January 31, 2019, more than 450,000 third-party applications or custom integrations were used by organizations on Slack. We will continue investing to expand the number of developers building applications that integrate with Slack and to make Slack work with an increasing number of third-party and internally developed custom applications , making Slack even more powerful for our user s. Additionally, we are currently developing low-code and no-code solutions to build integrations and bring workflows entirely in Slack, based on a simple, non-technical user interface. These solutions will be designed to enable users without development skills and experience to build basic workflows and applications inside of Slack.

*Leverage artificial intelligence, machine learning and advanced search*

We believe that there is a significant opportunity to improve the quality of communication and collaboration and further streamline people's working lives by automating workflows . This automation can help people prioritize the most important information and work. We have already seen early benefits from using machine learning and advanced search technologies to proactively recommend relevant topics, experts, and documents in discussions. We intend to continue to invest in our research and development efforts in artificial intelligence, machine learning, and search capabilities.

<div align="center">

**Our Service**

</div>

Slack is a new layer of the business technology stack that brings together people, applications, and data – a single place where people can effectively work together, access hundreds of thousands of critical applications and services, and find important information to do their best work.



*Slack's Key Functionality*

- **Messaging and Channels:** Slack users communicate with one another by posting messages to a channel or sending direct messages to a person or a group of people. Slack's core organizing principle is the channel, which brings the right people together to collaborate, share information, and get work done. Channels offer flexibility and can be organized by project, topic, team, or whatever makes sense for a specific task or situation. Public channels are accessible to all users within a Slack workspace. For more exclusive workstreams and conversations, users create invite-only channels.

  Within channels, users post messages, documents, and images and interact with other software. Users can search for information about a topic or project, find a relevant channel, join it, and easily scroll through the entire channel's history, finding messages and contextual content. Slack enables users to optimize the way they use the service, allowing users to choose when to receive notifications and customize alerts by person, keyword, channel, or application.

<div align="center">103</div>

During the week ended January 31, 2019, more than 1 billion messages were sent in Slack.

- **Integrations:** Through integrations with both third-party and internally-built software applications, users of Slack are able to easily access and interact in their channels with information from other applications. We believe this makes Slack users more productive at work and increases the value of other software programs. For example, a user may look up customer account information in Salesforce or get updates on deployment status through GitHub within Slack. More advanced use cases include the ability to design custom workflows, which can automatically perform a series of tasks and actions in Slack in otherwise unconnected software applications. For example, creating a customer service ticket routing application that brings together information from a Zendesk ticket, customer data from Salesforce, and suggested solutions from an internally-built knowledge base – all without leaving Slack. Additionally, we are currently developing low-code solutions to create integrations and workflows entirely in Slack, suitable for all users and based on a simple, non-technical user interface .

There are two main types of application integrations:

*Custom-built integrations* . Purpose-built tools developed by organizations on Slack for their own internal use, or built on their behalf by systems integrators. These applications address unique needs of specific users and organizations on Slack. Examples are:

- An integration built by Shopify that enables Shopify employees to run more than 100 custom commands within Slack, including receiving phone, email, and chat support service updates, which helps the team manage requests and assign the right support team member to appropriate channels, and querying information about the most active shops, traffic volume, and sales; and

- An integration built by Monzo that alerts the team to a spike or incident in the infrastructure backend and creates a new channel where individuals can troubleshoot the issue in a moment's notice.

*Third-party integrations* . Applications available for download from the App Directory or through the vendor. Examples include:

- An integration with Atlassian's Trello that enables a user to create new Trello cards, attach conversations, change due dates, and take other actions on a Trello card in Slack;

- An integration with SurveyMonkey that enables users to start and answer surveys in Slack; and

- An integration with Zoom that enables a user to start a video call directly from Slack.

- **Shared Channels:** Slack enables communication and collaboration among organizations via shared channels and guest accounts. Shared channels securely connect the Slack workspaces of different organizations, enabling the same level of communication and collaboration between enterprises that Slack brings to teams within an organization. Shared channels can be public or invite-only and contain all of the powerful tools and integrations of Slack along with an added layer of administrative capabilities to regulate and monitor the flow of information between organizations. Guest accounts allow workspace owners to invite people from outside their organizations to join one or more channels.

As of January 31, 2019, more than 15% of our Paid Customers have adopted shared channels since we launched our beta program in September 2017. These Paid Customers have connected an average of more than four shared channels.

- **Search:** Everything in Slack, including messages, posts from applications, and text content of files is searchable, so that permissioned users can tap into company knowledge and find information when they need it. Over time, use of Slack creates an archive of information generated by an organization that is universally available, persistent and contextual, making Slack's search function increasingly useful. Our search capability offers a range of filters and modifiers to allow users easy and efficient access to specific knowledge from potentially vast repositories of information. We also leverage machine learning to deliver personalized search

104

results based on user behavior and context, such as the people a user may communicate with most often, the files that may be most relevant to the user and the channels in which the user tends to participate.



105

**Our Subscription Plans**

We offer four subscription plans to serve the varying needs of our users: Free, Standard, Plus, and Enterprise Grid.

Our Free, Standard, and Plus subscription plans consist of a single workspace, which we define as a Slack environment configured for a team. These plans are most often adopted by small and medium sized teams. From time to time, we provide additional features and functionality, such as enterprise key management, to meet specialized requirements of organizations on Slack.

Our Enterprise Grid plan is uniquely designed for larger organizations, which typically are more complex and require enhanced functionality, flexibility, administrative control, and security at scale. Enterprise Grid allows paid customers to:

- create and manage an unlimited set of connected workspaces and channels;

- search across multiple workspaces, making it easy for workers and administrators to tap into their organization's collective knowledge at scale;

- access centralized controls to ensure a company's data remains secure, giving administrators a single point of visibility to provision and manage Slack; and

- integrate with third-party e-Discovery and data loss prevention tools to help meet security and compliance requirements.

| FREE | STANDARD | PLUS | ENTERPRISE GRID |
|---|---|---|---|
| Top Features | Top Features | Top Features | Top Features |
| | Includes Free features and | Includes Standard features and | Includes Plus features and |
| Access the team's most recent 10,000 messages | Access all of the team's content | 99.99% guaranteed uptime SLA | Access unlimited workspaces with channels to connect across workspaces |
| Access up to 10 third-party or custom integrations | Access unlimited integrations | User provisioning and deprovisioning | Organization-wide search, direct-messaging, and announcement focused channels |
| 1-to-1 audio and video calls | Group audio and video calls with screen sharing | SAML based single sign-on | Security, compliance, billing, and platform integration management |
| Standard customer support | Guest accounts | Data exports | Integrations with Data Loss Prevention, e-Discovery, Enterprise Mobility Management, and offline backup providers |
| | Priority customer support | 24/7 customer support with response within 4 hours | Dedicated account and customer success teams |

Slack is accessible through the web, a desktop application, and native iOS and Android applications.

**The Slack Platform**

Our technology platform was purpose built to enable independent software developers and organizations to integrate existing software with Slack or build entirely new applications that provide new features for Slack users. We believe that the power of Slack is amplified through integration with third-party and internal software, providing easy, intuitive access to a broad range of applications. Our platform consists of a set of open, documented APIs, developer tools, and an App Directory that lists apps that have met our guidelines. Organizations on Slack use our platform to create internal applications and integrations, ranging from simple notifications to complex internal workflows. Third-party developers build integrations and applications that make it easier for their existing customers to engage with their products as well as find new customers.

There were more than 450,000 third-party applications or custom integrations used in a typical week during the three months ended January 31, 2019. More than 90% of Paid Customers used a third-party application or custom integration in the week ended January 31, 2019.

Our App Directory lists applications and integrations that address virtually all aspects of knowledge work. These applications and integrati ons connect Slack users with software from some of the world's largest technology companies to some of the smallest startups.

As of January 31, 2019, more than 1,500 apps were listed in our App Directory. A sample of some of the integrations listed in the App Directory is as follows:

| ANALYTICS | COMMUNICATION | CUSTOMER SUPPORT | DESIGN | DEVELOPER TOOLS | FILE MANAGEMENT |
|---|---|---|---|---|---|
| Google Analytics Insights | BlueJeans | Desk.com | Adobe Creative Cloud | Bitbucket Cloud | Box |
| Looker | Cisco WebEx | Freshdesk | Canva | Github | Dropbox |
| Qualtrics | RingCentral | Gainsight | Dropbox Paper | Jira Cloud | Google Drive |
| Sisense | Skype | Intercom | Lucidchart | New Relic | Microsoft OneDrive |
| SurveyMonkey | Zoom | Zendesk | | PagerDuty | Quip |

| FINANCE | HUMAN RESOURCES | OFFICE PRODUCTIVITY | SALES & MARKETING | SECURITY & COMPLIANCE | SOCIAL & FUN |
|---|---|---|---|---|---|
| Concur | ADP Virtual Assistant | Asana | HubSpot | Cisco Cloudlock | Donut |
| Coupa Messenger | Greenhouse | Google Calendar | MailChimp | HackerOne | Foursquare |
| Stripe | UltiPro | Smartsheet | Marketo | McAfee Skyhigh | Giphy |
| Zoho | Zenefits | Trello | Salesforce | Okta | Polly |
| | | | | Symantec CloudSOC | Twitter |

We foster our platform ecosystem through our dedicated Slack API site, open source forums, software development kits, global developer events, partnerships, and technical support for developers building for their own companies or aiming to list their apps in our App Directory.

**Organizations on Slack**

Organizations on Slack are of all sizes, from individual entrepreneurs, freelancers, and emerging small businesses to large, multi-national corporations. They work across a wide range of industries, including professional services, technology, media, education, healthcare, government, industrials, consumer and retail, and financial services. Organizations are adopting Slack globally and using Slack across more than 150 countries, and more than half of our daily active users are outside the United States. Slack is used by all types of departments, roles, and functions within organizations, including sales, marketing, product, design, engineering, finance, legal, and human resources. According to our 2018 Survey, more than half of our users are in non-technical roles.

As of January 31, 2019, we had more than 600,000 organizations with three or more users, comprised of more than 88,000 Paid Customers, including more than 65 of the companies in the Fortune 100, and more than 500,000 organizations on our Free subscription plan. As of April 30, 2019, we had more than 95,000 Paid Customers. The number of organizations on Slack is highly diversified, and during the year ended January 31, 2019, and the three months ended April 30, 2019, no Paid Customer accounted for more than 3% of our revenue.

107

**Case Studies**

The examples of organizations on Slack below illustrate how organizations of all sizes across a wide range of industries benefit from Slack.

108

# Customer Stories

The story of how Slack works is best told by the people who use it. In more than 150 countries, organizations of all kinds depend on Slack as the place to communicate, collaborate, and get work done. Accountants, customer support reps, engineers, lawyers, journalists, dentists, chefs, detectives, executives, scientists, farmers, hoteliers, salespeople — for over 10 million people across the world, every day, Slack is where work happens. These are just a few of their stories.



110

Tasked with a mandate to make Autodesk more transparent, Guy Martin quickly found 85 separate groups using Slack throughout the organization that had been established organically. Merging those instances and migrating other groups from HipChat had a profound and immediate effect. With everyone on Slack, information flowed more freely and work was getting done faster.

Autodesk has a massive product line of more than 140 software applications. These products represent the best-of-breed solutions for dozens of industries — design software like AutoCAD and Revit are nearly synonymous with architecture, and Maya is paramount in animated filmmaking. But in the course of Autodesk's 40-year tenure, siloes had calcified across the company's 8,500 employees and work wasn't shared across product lines. Until Slack came along.

Just ask Guy Martin, the director of Autodesk's open-source initiative Open@ADSK. Tasked with a mandate to make Autodesk more transparent, Martin quickly found 85 separate groups using Slack throughout the organization that had been established organically. Merging those instances and migrating other groups from HipChat had a profound and immediate effect. With everyone on Slack, information flowed more freely and work was getting done faster.

Dozens of teams had newfound visibility into projects and the reasons behind company decisions related to those projects. This understanding led them to develop new metrics: "We're measuring things like how many contributions are coming into particular pieces of code from outside the immediate product development team," says Martin. By collaborating with the cloud platform team, product teams are helping to build high-frequency data management, a way to manage engineering data that changes at a rapid pace. In another channel, cross-functional teams can engage in real-time discussion about the immediate and long-term design of an unreleased product.

Autodesk has a "default to open" policy in Slack, which means that every channel in Slack is public, except those granted a special exception (for example, HR or Finance channels). "Transparency and collaboration are crucial for us because that is what we are trying to provide in the products we build for our customers," Martin says. "If we can't model that internally, it's going to be really difficult to build software that way."

Slack has helped build a culture of transparency within Autodesk. When questions are answered in companywide channels such as #ADSK-slack-help or #ADSK-announcements, they're added to an FAQ, which is pinned to the channel for easy reference. Now, when people ask questions in Slack, it's easy for teammates to point them in the right direction. "When you've built a self-sustaining community, it's a great sign of success," says Martin. Further, employees are offered answers more quickly, which promotes answer-seeking within the company.

111



112

To ensure speed and quality, Color has automated as much of the genetic sequencing and analysis process as possible. The company needed something robust and adaptable—something that could bridge communication between its team and its robots. Color's solution of choice? Slack.

Color partners with organizations that manage the health of large populations to adopt data-driven care and patient engagement models. Color's technology and services enable patients and health organizations to access important health information at scale as well as incorporate it into a modern-care delivery model — linking data to risk, risk to decisions, and decisions to outcomes. Color's partners are some of the world's top health systems as well as more than 100 leading global employers and national health initiatives, including the million-person All of Us program of the National Institutes of Health.

For years, accessing potentially lifesaving information through clinical-grade genetic testing was prohibitively expensive and required multiple in-person visits to a physician's office. Five years ago, Color's team set out to reduce those barriers by taking a first-principles approach to building a clinical-grade lab and reimagining the way these services are delivered to large populations. Color increased efficiencies through innovative software and robotics and removed the burdensome and time-consuming aspects of conventional testing. Color's service can be ordered online, requires just a saliva sample provided from home, and offers genetic counseling sessions over the phone for a fraction of the cost.

To ensure speed and quality, Color has automated as much of the genetic sequencing and analysis process as possible. The company needed something robust and adaptable, something that

could bridge communication between its team and its robots. Color's solution of choice? Slack.

Today, Color relies on Slack to organize communication, improve research workflows, and deliver faster results to its customers. Where communication really shines is how Color's geneticists and researchers use Slack bots to interface with the Hamilton robots in their lab, using the #Ham-Bot channel. The channel acts as a progress dashboard for the robots' DNA sequencing process. With Slack notifications and updates, lab technicians can easily keep track of when a DNA sample run begins, when it needs attention, and when it's done processing — without monitoring the robots at all times.

This ensures that important updates — for instance, a notification that a certain robot is ready for more DNA samples — are automatically delivered to the right person at the right time. Slack helps the team run multiple robotics tests simultaneously and stagger their delivery timing, which frees up time for tasks that only humans can do, without sacrificing quality.

As a result, Color saw a 20% increase in daily throughput after integrating Slack with its lab processes. "After adopting Slack," says Justin Lock, "we've objectively measured a substantial increase in the frequency of iterations through particular sets of processes in the lab, just because there is way less downtime."



"Sporting event highlights that used to take hours from creation to approval and distribution are now able to be shared in near real time through our digital media channels, thanks to Slack."

Paul Cheesbrough
CTO, FOX CORPORATION

| CUSTOMER SINCE | PEAK DAILY ACTIVE USERS | APPS INSTALLED | AVG MESSAGES SENT DAILY* | AVG FILES UPLOADED DAILY* |
|---|---|---|---|---|
| Aug. 2016 | 9,700+ | 820+ | 205,000+* | 4,000+* |

* Over the course of 30 working days during the fourth quarter of fiscal 2019

114

Slack is utilized in a wide range of cases, such as sharing information, reacting to live stats, creating digital assets on the fly, and generating revenue from content sold to almost 200 of Fox's distribution partners.

Covering live sports is hard. Livestreaming hundreds of sporting events across the globe? That's nearly impossible. But that's precisely what Fox Corporation ("Fox") and its Fox Sports division have done for years. And as the world adapted to a digital landscape, Fox — and its 22,000 employees — needed to transform its process to match. So it started to move to Slack in 2016.

Adoption was swift. Slack was originally brought in by the IT team, which purchased Slack Plus for 250 users. After seeing early success across the organization through organic adoption, the CTO made the decision to migrate Fox's 30 workspaces to Enterprise Grid and provision access for up to 2,000 users. Fox now has more than 12,000 users collaborating on Slack, and that number continues to grow. Slack is utilized in a wide range of cases, such as sharing information, reacting to live stats, creating digital assets on the fly, and generating revenue from content sold to almost 200 of Fox's distribution partners. It is also used across multiple departments. For example, the marketing team uses Slack to monitor the performance of content across social media channels for Fox's various business entities; the internal communications team uses it to share companywide information with employees; and the Global Inclusion team uses it to organize employee resource groups. On an average workday, employees across all functions, including design, video production, sales, marketing, IT, and engineering use Slack to share more than 200,000 messages and upload more than 4,000 files. These numbers add up to meaningful work getting completed efficiently in Slack.

Fox also used Slack to orchestrate one of the largest sporting events on earth: 2018's FIFA World Cup in Russia. To livestream each match, Fox used Slack to coordinate employees across the entire organization, overcoming disparate divisions and time zones in order to support continuous coverage. Videos filmed in Red Square could be previewed directly in-channel, where feedback was offered in a thread, and then those videos were compiled by a team of producers in California. Fox developed an easy-to-use custom integration that imported social media posts from select accounts directly into Slack channels — a great tweet from an athlete might be quickly discussed before being broadcast on television. These intelligent workflows resulted in impressive content production and engagement. Fox created and posted more than 3,000 tweets in real time, while garnering more than 558 million video views — which tallied up to more than 2.6 billion minutes viewed. The network more than doubled its internal engagement goals in terms of number of viewers, likes on Facebook, retweets on Twitter and more. With Slack, Fox coordinated a phenomenal event — one experienced across the entire world.



116

Monzo credits its rapid growth to a culture of transparency, which has been cemented by how it uses Slack. At Monzo, all 750-plus employees use Slack every workday to get work done, in teams ranging from Customer Operations and Marketing to Security and TechOps.

Forget about going to the bank: Monzo brings the bank to you — or more specifically, your phone. Monzo's motto is "making money work for everyone" — and its laser focus on customers has led to rapid growth. Since 2015, the digital bank has amassed more than 1.5 million customers, half of which are under age 30, all without a single brick-and-mortar location.

Monzo credits its rapid growth to a culture of transparency, which has been cemented by how it uses Slack. At Monzo, all 750+ employees use Slack every workday to get work done, in teams ranging from Customer Operations and Marketing to Security and TechOps. Monzo even uses it to collaborate with partners and third parties, causing the number of weekly active users to exceed 850 on its workspace. Monzo doesn't use email internally at all; it has made Slack its primary tool for communication.

By default, channels in Slack are public within Monzo, which helps spread ideas and cross-functional expertise. Monzo says public channels have even helped employees gain the knowledge they need to move to entirely different roles within new departments. This knowledge-sharing permeates even the highest levels. The company's COO hosts impromptu fireside chats in a channel called **#COO-brain**. There, he shares early ideas with the entire company so all employees can offer their thoughts and brainstorm together. It's a win-win: The company gets early and immediate feedback, and the employees get a sense of ownership in important initiatives.

Monzo also uses Slack's automation tools to accelerate everything from incident management to recruiting and employee onboarding. For example, if the company has a spike or incident take place in the infrastructure backend, IncidentBot, a custom-built application, immediately sends an alert. An employee can then type "/incident," which automatically creates a new channel where engineers can troubleshoot on a moment's notice. Due to the success of early automation use cases, Monzo is implementing new ways to fold automation into workflows, including through engagement surveys, periodic reminders, and more.

117



"Slack uptake was driven by Oracle's engineering community and the need for a modern tool chain upon which we could speed development and improve the level of service provided to our customers."

Campbell Webb
SENIOR VICE PRESIDENT, ORACLE

| CUSTOMER SINCE | PEAK DAILY ACTIVE USERS | APPS INSTALLED | AVG MESSAGES SENT DAILY* | AVG FILES UPLOADED DAILY* |
|---|---|---|---|---|
| Jan. 2017 | 70,000+ | 1,100+ | 1,650,000+* | 18,000+* |

* Over the course of 30 working days during the fourth quarter of fiscal 2019

118

Oracle initially launched Slack to 30,000 users, focusing on its engineering organization. Just a year later, the company rolled out Slack to over 100,000 users across all its lines of business.

Companies around the world rely on Oracle, and Oracle relies on Slack. Oracle is a multinational business that specializes in technologies ranging from database software to enterprise software, both on-premise and in the cloud. It first adopted Slack in 2017, after acquiring multiple companies that expressed how important Slack was to their day-to-day business operations. Based on this feedback, Oracle decided to investigate Slack and quickly realized it was much more than just a communication tool. Slack allowed the company to integrate its existing applications and operational processes into a single solution. Oracle initially launched Slack to 30,000 users, focusing on its engineering organization. Just a year later, the company rolled out Slack to all its lines of business.

Slack is a bridge that gives all employees, whether new or long-standing, access to the larger organization. For instance, in the Sales workspace, account teams share information and collaborate quickly on new opportunities, while the Cloud Engineering teams use their workspace to address critical customer issues and drive down implementation lead times. Throughout Oracle, Slack is an effective tool that improves communication across organizations.

Importantly, Oracle is not enforcing a one-size-fits-all approach on its 50,000-plus daily active users. Instead it maximizes the malleability of Slack — some departments have strict channel creation or message guidelines, while others do not. As a result, Oracle has been able to unify tens of thousands of employees with Slack.

119



"How do you communicate within an organization that has 4,000-plus people across six continents? How do you keep track of people? It's about communication. It's about knowing where to look. That's what I love about Slack. Channels are created and used based on the needs and interests of an organization, and all of the information in those channels is anchored and searchable."

Fred McAmis

VP, LEARNING AND DEVELOPMENT

| CUSTOMER SINCE | PEAK DAILY ACTIVE USERS | APPS INSTALLED | AVG MESSAGES SENT DAILY* | AVG FILES UPLOADED DAILY* |
|---|---|---|---|---|
| Nov. 2017 | 4,700+ | 250+ | 140,000+* | 1,700+* |

* Over the course of 30 working days during the fourth quarter of fiscal 2019

120

Splunk's rewarding feature set has propelled the company into high-growth mode, with all 4,000-plus employees using Slack—from Sales to HR to Engineering to Communications. Onboarding and retaining so many employees means that communication is a huge undertaking for Splunk's Learning and Development department, and Slack makes that goal simple to achieve.

Splunk was founded to pursue a disruptive new vision: make machine data accessible, usable, and valuable to everyone.

By monitoring and analyzing everything from customer clickstreams and transactions to network activity and call records, Splunk turns machine data into valuable insights. Splunk's rewarding feature set has propelled the company into high-growth mode, with all 4,000-plus employees using Slack — from Sales to HR to Engineering to Communications. Onboarding and retaining so many employees means that communication is a huge undertaking for Splunk's Learning and Development department, and Slack makes that goal simple to achieve.

"Slack, for us, was the promise of really starting to change the communication culture," says Fred McAmis, Splunk's VP of Learning and Development. To foster engagement, his department creates a channel for every training course it offers, whether it's for employee onboarding or leadership development. It's a place where attendees can ask questions and have discussions. When the course is offered again, a new group is added to the channel and able to explore the wealth of knowledge and topics already discussed by former attendees. Even after the course ends, attendees can return to the channel to review information, continue to learn from the discussions of subsequent courses, and pose new questions. "Learning takes reinforcement, and we're using Slack to reinforce the training. Slack provides a way for people to stay in touch, remind themselves of what they learned, and to keep learning," says McAmis. "It's something that email just literally can't do."

Beyond Learning and Development, Slack has been fundamental in supporting Splunk's growth and increasingly complex needs. It helps enable the company to cultivate and share institutional knowledge at scale. For instance, prior to Slack, the Strategy and Operations team created a tool to consolidate and share answers tucked in emails, but it wasn't effective enough. "That's not how people wanted to interact with their information," says Mike Dupuis, the head of presales strategy and operations at Splunk. "They wanted to ask the question and have answers at their fingertips, which is what Slack allows them to do." Now conversations happen in channels, where questions, answers, and the decision-making behind those answers are available to all.

Slack also supports the work of the global sales engineering department at Splunk and enables them to stay coordinated on product demos worldwide. "When we had 60 sales engineers, everybody knew where everybody was," says Dupuis. "Now we have hundreds of sales engineers worldwide doing demos at any time of the day." The department is able to stay coordinated on demos, even at scale, thanks to a dedicated channel, #se. The channel serves as a dynamic knowledge base where engineers search for answers and craft best practices for Splunk. Critically, it also allows them to communicate when a demo is occurring, so everyone knows not to touch the demo servers. And on the off chance anything goes wrong, a sales engineering team member can respond and provide support immediately.

Splunk also relies on bots within Slack to alleviate some of the challenges it faces as a result of its rapid growth. For the sales engineering team, Splunk's most important bot is Capture. Capture is a connector between Slack and the company's own data analytics service, which allows sales engineers to peer into Splunk's CRM system quickly. Managers simply type "/splunkcapture" and Slack creates a readout of the sales dashboard. Capture provides managers with an immediate view into all available opportunities and potential red flags without wasting time switching to a new tab or needing to log in somewhere else. Relevant information flows immediately — just by typing two words in Slack.

121

**Our Sales and Marketing Approach**

We combine a web-based, self-service go-to-market approach with direct sales efforts that focus on growing users within larger organizations and acquiring new large paid customers. We believe that these go-to-market approaches reinforce one another; self-service users become leads for our direct sales force and users within larger enterprises create organic awareness of Slack inside and outside their organizations. We complement these sales and marketing activities with an obsessive focus on customer experience and customer success.

*Self-Service Adoption and Marketing*

Many organizations adopt Slack initially as part of our self-service go-to-market approach. We deploy a range of marketing strategies and tactics to drive initial awareness and adoption. These include brand advertising, public relations, digital marketing campaigns, product localization, in-product customer education, and a website designed to teach new users about Slack.

Organizations often start by using our free version. Organizations on Slack are diverse, and range from businesses to non-governmental organizations, universities, sports clubs, and open source communities. We believe free usage helps create champions of Slack, and as these prospective paid customers realize the value of Slack, they spread the word organically throughout their networks and organizations.

As organizations engage more deeply with Slack, both through using Slack for collaboration and communication and integrating more third-party and internally-developed software via our platform, they often upgrade to paid plans via our website. We support this upgrade path through targeted marketing campaigns and in-product prompts highlighting the added benefits and features of our paid plans.

*Direct sales and marketing*

To increase adoption within larger paid customers and acquire new paid customers, we utilize a direct sales organization that complements our self-service approach. Our direct sales force leverages the Slack champions and proofs of concept developed through self-service adoption. We combine this bottoms-up demand with direct sales efforts targeted at C-suite executives and business unit leaders.

These efforts include a globally distributed direct sales force, solutions engineering, demand generation campaigns, webinars, analyst relations, C-suite events, and cooperative marketing efforts with our partners. We also host an annual user conference, Frontiers, where we bring together organizations and partners around the world to share best practices on achieving organizational alignment, unveil the latest Slack features, educate users, and embrace our growing application developer and platform ecosystem.

*Customer experience and customer success*

We believe that highly responsive and effective support and education are an extension of our brand and are core to building and maintaining user love and trust.

Our customer experience team provides support to users of both free and paid versions of Slack and is core to enhancing user adoption, free-to-paid conversion, and subscription renewal. Additionally, our customer experience team receives and quantifies feedback from organizations on Slack at scale. This maniacal focus on responsiveness and personal touch helps us optimize customer satisfaction and identify high-value opportunities for both user-facing and internal product improvements.

Our customer experience core philosophies are:

- Organizations on Slack are busier than we are;

- We exist to be of service to organizations on Slack;

- The barriers to reach and receive support should be as low as possible; and

- Support is an opportunity not just to fix problems, but to educate users and organizations on Slack.

122

Our educational offerings include a range of free, web-based classes and tutorials on how to use, administer, optimize, and customize Slack, as well as how to integrate other applications, build custom workflows, and build entirely new applications on Slack. We also offer in-person training through our developer relations program and at events for organizations on Slack.

Our customer success team supports larger organizations through every step of their journey with Slack. This starts with supporting onboarding, workspace best practices, change management, and education, and continues with renewals and expansion to other functional teams, departments, or business units. In addition, we offer professional services tailored to the needs of organizations on Slack.

### Our Partnerships

Slack has a robust and diverse partner ecosystem that includes leading enterprise software companies, security providers, systems integrators, and new, emerging companies. Our partner ecosystem extends and enhances Slack through integrations and operates as an important component of our go-to-market strategy. Partners serve as a source of enterprise sales leads and help to accelerate our sales cycles through co-selling and services delivery. Our partners benefit from growth in customer engagement with their products and services and new opportunities to grow their users and customers.

We have deep partnerships with some of the largest and fastest growing enterprise software providers, including Atlassian, Google, Okta, Oracle, Salesforce, SAP, ServiceNow, Workday, and Zoom. Through these partnerships we expand the number of organizations on Slack and provide differentiated user experiences between Slack and the other critical applications used by large, complex organizations. Some examples of the activities we undertake with other software providers include:

- Atlassian: Joint migration of organizations from Atlassian's Hipchat and Stride products to Slack; creation of differentiated user experiences between Slack and the suite of Atlassian products, including Jira, Bitbucket, Confluence, Trello, and Statuspage;

- Okta: Cross-platform identity mapping and synchronization; co-selling and joint initiatives to bring our integrated, solutions to the market; and

- Workday: Joint product roadmap to deliver Slack-centric experiences for Workday's employee directory, feedback, expenses, paid time off, and recruiting functionalities.

### Slack Fund

Investing is also a component of our partnerships strategy. The Slack Fund is an investment fund that we started, in partnership with entities affiliated with certain of our stockholders, Accel, Andreessen Horowitz, Index Ventures, Kleiner Perkins, Social Capital, and Spark Capital. We created the fund to support companies building applications on the Slack platform and other applications that are focused on the next generation of enterprise software. As of January 31, 2019, Slack Fund has invested $10.1 million in 46 companies, with $5.2 million funded by Slack and the balance funded by the venture capital funds who partner with Slack Fund. We plan to continue to invest in start-up companies that we believe enhance the value of Slack and that are focused on the future of work.

### Our Employees, Culture, Values, and Slack for Good

As of April 30, 2019, we had 1,664 full-time employees. We supplement our workforce with contractors and consultants.

At Slack, our goal is to make people's working lives simpler, more pleasant, and more productive. Slack's culture is rooted in a sense of belonging, encouraging personal and professional growth, and the ability to empathize and relate to one another.

Part of our culture is what we refer to as Slack for Good. Slack for Good's principal focus is to increase the representation of people from backgrounds that have been historically under-represented in the technology industry. We have pledged 1% of employee time, 1% of our equity, and 1% of our product to activities associated with Slack

123

for Good. We encourage our employees to volunteer their time to support causes of their choice and provide them with paid time off to do so. We have reserved 1.2 million shares of our Class B common stock for potential future sale to fund and support our social impact initiatives. We also donate money and discount access to our service for non-profit organizations.

## Research and Development

We build our software with the user in mind – we invest substantial time, energy, and resources to ensure we have a deep understanding of the needs of organizations on Slack and we continually innovate on our product. Unlike traditional enterprise software, we aim to release new features to users and organizations on Slack as rapidly as possible through internal testing releases and external beta cycles to ensure that we are constantly receiving feedback. We leverage the power of our expansive user base and our focused customer service philosophy to collect feedback on product features to enhance our development process.

Since Slack's launch, we have invested more than $506 million to build our service. Research and development expenses were $96.7 million, $141.4 million, and $157.5 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $35.4 million and $51.1 million for the three months ended April 30, 2018 and 2019, respectively. As of April 30, 2019, we had 574 employees across our engineering, product, research, and design teams.

## Technology Infrastructure and Operations

We have built our technology infrastructure using a distributed and scalable architecture on a global scale.

We designed our technology platform with multiple layers of redundancy to guard against data loss and deliver high availability and low latency. Incremental backups are performed hourly and full backups are performed daily. In addition, redundant copies of content are stored in at least two geographically separate regions and are replicated within each region. Data is transmitted in encrypted form and encrypted when stored in our system. We use Amazon Web Services as our processing and delivery infrastructure.

We have built a network operations infrastructure that combines automated, 24x7 telemetry with human monitoring to help ensure that any issues that arise with our service are addressed as quickly as possible. We publish our uptime metrics, system status, and event reports on our public website so that users and organizations know how our systems are performing at any given time.

## Security, Privacy, and Data Protection

Trust is important for our relationship with users and organizations on Slack, and we take significant measures to protect their privacy and data.

### *Security*

We devote considerable resources to our security program, which is dedicated to ensuring that organizations on Slack have the highest confidence in our custodianship of their data. Our security program is aligned to the ISO 27000 standards and is regularly audited and assessed by third parties as well as organizations on Slack.

Our security program consists of the following:

- **Organizational security** including personnel security, security and privacy training, a team of dedicated security professionals, policies and standards, separation of duties, and regular audits, compliance activities, and third-party assessments;

- **Secure by design principles** by which we assess the security risk of each software development project according to our secure development lifecycle and create a set of requirements that must be met before the resulting change may be released to production; and

- **Public bug bounty program** to facilitate responsible disclosure of potential security vulnerabilities identified by external researchers and reward them for their verified findings.

124

The focus of our security program is to prevent unauthorized access to the data of organizations on Slack. To this end, our team of security practitioners, working in partnership with peers across our company, work to identify and mitigate risks, implement best practices, and continue to evaluate ways to improve. These steps include data encryption in transit and at rest, network security, classifying and inventorying data, limiting and authorizing access controls, and multi-factor authentication for access to systems with data. We also employ regular system monitoring, logging, and alerting to retain and analyze the security state of our corporate and production infrastructure.

In addition, our security program has achieved several internationally-recognized certifications and industry standard audited attestations of our security controls, and maintains a number of compliance programs.

The International Organization for Standardization, or ISO, has developed a series of standards for information security and related areas, and we have received the following ISO certifications:

- ISO/IEC 27001 (Information Security Management);

- ISO/IEC 27017 (Security Controls for the Provisions and Use of Cloud Services); and

- ISO/IEC 27018 (Protection of Personally Identifiable Information).

Service Organization Controls, or SOC, are standards established by the American Institute of Certified Public Accountants for reporting on internal control environments implemented within an organization. We have completed SOC 2 and SOC 3 examinations.

We are a member of the Cloud Security Alliance, or CSA. The CSA Security, Trust & Assurance Registry, or STAR, is a publicly-accessible registry that offers a security assurance program for cloud services, helping organizations assess the security posture of cloud providers they currently use or are considering using. We meet the requirements of the STAR Level 1 Self-Assessment.

The Health Insurance Portability and Accountability Act, or HIPAA, is a U.S. government regulation that includes data privacy, security and breach notification requirements for safeguarding protected health information. Since 2017, we have offered limited support for HIPAA-regulated organizations that purchase Enterprise Grid.

The Federal Risk and Authorization Management Program, or FedRAMP, is a U.S. government program that provides a standardized approach to security assessment, authorization and continuous monitoring for cloud products and services and allows federal agencies to accelerate cloud adoption initiatives. We have achieved a FedRAMP Authority to Operate at the Low/Tailored impact level issued by the General Services Administration for our Standard, Plus and Enterprise Grid subscription plans.

The G-Cloud framework is an agreement between the government of the United Kingdom and suppliers who provide cloud-based services to U.K. public sector organizations. All approved cloud-based services and providers are listed on a publicly accessible portal known as the Digital Marketplace. Our Standard and Plus subscription plans are listed in the Digital Marketplace.

We take appropriate steps to help ensure that our security measures are maintained by the third-party vendors we use, including by conducting security reviews and audits.

### *Privacy and data protection*

The privacy of users and protection of data is important to Slack's continued growth and success. Privacy is a shared responsibility among all our employees, but we also have a dedicated privacy and data governance team that builds and executes on our privacy program, including the management of data protection impact assessments. Our privacy and legal teams work together to conduct product and feature reviews, data inventory and mapping, and support for data protection and privacy-related requests.

We are committed to complying with, and helping organizations on Slack comply with, data protection laws globally. We monitor guidance from industry and regulatory bodies, meet with regulators and update our product features and contractual commitments accordingly.

Slack is offered to organizations outside the United States and Canada by Slack Technologies Limited, an Irish company based in Dublin, Ireland, which is subject to the European Union's General Data Protection Regulation and the regulatory oversight of the Irish Data Protection Commission. We also maintain a self-certification under the E.U.-U.S. and Swiss-U.S. Privacy Shield and offer European Union Model Clauses, also known as Standard Contractual Clauses.

We maintain a privacy policy that describes how Slack collects, uses and discloses information, and what choices organizations and users have.

<div align="center">**Competition**</div>

The market for services like Slack is emerging, rapidly evolving, and fragmented, and we believe that Slack represents a new category of business technology. As a result, we principally compete against incumbent collaboration and communication tools and products from established vendors, such as Microsoft, productivity tool and email providers, such as Google, unified communications providers, such as Cisco, and consumer application companies that have entered the business software market, such as Facebook. We also compete with smaller companies that offer niche or point products that attempt to address certain problems that Slack addresses. These smaller companies include companies that specialize in voice or video communication, instant messaging, email filtering and email inbox organization, business workflows, team-based collaboration, intranet creation, and maintenance and other functionality. Some of these companies offer free or discounted services. We believe that we compete favorably with these smaller companies because they do not offer the unique mix of features and functionality combined with our proven ability to scale to handle large amounts of users, usage, and data. In addition, our market is subject to changing technology, shifting customer needs, new market entrants, and frequent introductions of new products and services.

We believe that the principal competitive factors in our markets include the following:

- ease of adoption, use, and deployment;

- product functionality;

- platform capabilities;

- breadth and depth of platform integrations;

- scalability;

- security and privacy;

- ability to support intercompany collaboration;

- brand awareness and reputation;

- customer support; and

- total cost of ownership.

We believe that our product experience and product strategy, technological innovation, and company culture enable us to compete favorably on each of these factors.

We expect competition to increase as established and emerging companies continue to enter the markets we serve or attempt to address the problems Slack addresses, as customer requirements evolve and as new products, technologies, and regulations are introduced. Further, some of our competitors have longer operating histories, the ability to bundle a broader range of products and services, larger marketing budgets, access to larger existing user bases, and greater financial, technical, and other resources than we do. We believe, however, that we are uniquely positioned to more rapidly innovate and respond to new technologies and customer requirements than our competitors.

<div align="center">126</div>

**Intellectual Property**

We believe that our intellectual property rights are valuable and important to our business. We rely on a combination of patents, trademarks, copyrights, trade secrets, license agreements, confidentiality procedures, non-disclosure agreements, employee disclosure, and invention assignment agreements, and other legal and contractual rights to establish and protect our proprietary rights.

As of January 31, 2019, we had one issued patent in the United States, which expires in 2036, and more than 80 pending patent applications that cover various aspects of Slack in the United States and abroad. These patents and patent applications are intended to protect our proprietary inventions relevant to our business.

We have trademark rights in our name and other brand indicia and have trademark registrations for select marks in the United States and other jurisdictions around the world. We also have registered domain names for websites that we use in our business, such as www.slack.com, and similar variations.

We intend to pursue additional intellectual property protection to the extent we believe it would be beneficial and cost effective. Despite our efforts to protect our intellectual property rights, they may not be respected in the future or may be invalidated, circumvented, or challenged. In addition, the laws of various foreign countries where our products are distributed may not protect our intellectual property rights to the same extent as laws in the United States.

**Facilities**

Our corporate headquarters is located in San Francisco, California, and covers 228,998 square feet pursuant to an operating lease that expires in 2028. We also lease and purchase service memberships to additional facilities in San Francisco, California; Denver, Colorado; New York, New York; Chicago, Illinois; Dublin, Ireland; London, United Kingdom; Toronto, Canada; Vancouver, Canada; Melbourne, Australia; Sydney, Australia; Tokyo, Japan; and Pune, India.

We lease or purchase service memberships to all of our facilities and do not own any real property. We believe that our facilities are generally suitable to meet our current needs. We intend to expand our facilities as we add employees and enter new geographic markets, and we believe that suitable additional or alternative space will be available as needed to accommodate any such growth.

**Legal Proceedings**

We are not party to any material pending legal proceedings. From time to time, we may be subject to legal proceedings and claims arising in the ordinary course of business.

127

## MANAGEMENT

### Executive Officers and Directors

The following table provides information regarding our executive officers and directors as of April 30, 2019:

| Name | Age | Position |
|------|-----|----------|
| *Executive Officers:* | | |
| Stewart Butterfield | 46 | Co-Founder, Chief Executive Officer, and Chairman of the Board of Directors |
| Allen Shim | 38 | Chief Financial Officer |
| Robert Frati | 50 | Senior Vice President of Sales and Customer Success |
| Cal Henderson | 38 | Co-Founder, Chief Technology Officer |
| David Schellhase | 55 | General Counsel, Secretary |
| Tamar Yehoshua | 54 | Chief Product Officer |
| | | |
| *Non-Employee Directors:* | | |
| Andrew Braccia [2] | 43 | Director |
| Edith Cooper [2][3] | 57 | Director |
| Sarah Friar [1] | 46 | Director |
| John O'Farrell [1] | 60 | Director |
| Chamath Palihapitiya | 42 | Director |
| Graham Smith [1][3] | 59 | Director |

_____

(1)  Member of the audit and risk committee.
(2)  Member of the compensation committee.
(3)  Member of the nominating and corporate governance committee.

Each executive officer serves at the discretion of our board of directors and holds office until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. There are no family relationships among any of our directors or executive officers.

#### Executive Officers

*Stewart Butterfield* . Mr. Butterfield co-founded Slack and has served as our Chief Executive Officer and as Chairman of our board of directors since February 2009. From April 2005 to July 2008, Mr. Butterfield served as General Manager of the photo-sharing website Flickr at Yahoo! Inc., following Yahoo!'s acquisition of Ludicorp Research and Development Ltd. (which developed Flickr), where he served as Chief Executive Officer from May 2002 to April 2005. Mr. Butterfield holds a Master of Philosophy from the University of Cambridge and a Bachelor of Arts in Philosophy from the University of Victoria.

We believe that Mr. Butterfield is qualified to serve as a member of our board of directors because of his experience and perspective as our Chief Executive Officer and a co-founder.

*Allen Shim* . Mr. Shim has served as our Chief Financial Officer since January 2018. Mr. Shim joined Slack in March 2014 and served as Senior Vice President of Finance and Operations from March 2014 to January 2018. From September 2008 to March 2014, Mr. Shim served as Vice President of Finance and Treasurer at YuMe, Inc., a data analysis company for television advertising that was acquired by RhythmOne in 2017. From March 2005 to September 2008, Mr. Shim worked in business operations at Yahoo! Inc. Mr. Shim is a Chartered Financial Analyst (CFA) charterholder and holds a Bachelor of Science in Economics from the Wharton School of the University of Pennsylvania.

128

*Robert Frati* . Mr. Frati has served as our Senior Vice President of Sales and Customer Success since February 2018. Mr. Frati joined Slack in May 2016 and served as Vice President of Sales and Customer Success from May 2016 to February 2018. From January 2006 to May 2016, Mr. Frati served in various roles at salesforce.com inc., a customer relationship management software company, most recently as Senior Vice President, Commercial Sales, Asia Pacific from August 2014 to April 2016. Mr. Frati holds a Bachelor of Arts in Political Economy from the University of California, Berkeley.

*Cal Henderson.* Mr. Henderson co-founded Slack. He has served as our Chief Technology Officer since December 2012 and served as Vice President of Engineering from April 2009 to December 2012. From June 2005 to April 2009, Mr. Henderson served as Director of Engineering at Yahoo! Inc. From December 2003 to June 2005, Mr. Henderson served as Director of Web Development at Ludicorp Research and Development Ltd. Mr. Henderson holds a Bachelor of Science in Software Engineering from the University of Central England.

*David Schellhase.* Mr. Schellhase has served as our General Counsel and Secretary since December 2016. From February 2015 to April 2016, Mr. Schellhase served as Chief Operating Officer at Honest Work Corporation, a software company that was acquired by Twitter, Inc. From June 2011 to January 2015, Mr. Schellhase served as General Counsel and then Strategic Advisor at Groupon, Inc., an e-commerce marketplace company. From July 2002 to May 2011, Mr. Schellhase served as General Counsel at salesforce.com, inc. Mr. Schellhase holds a Juris Doctor from Cornell Law School and a Bachelor of Arts in European History from Columbia University.

*Tamar Yehoshua* . Ms. Yehoshua has served as our Chief Product Officer since January 2019. From August 2010 to January 2019, Ms. Yehoshua served in various roles at Alphabet, Inc., an Internet-related services and products company, first as Director, Product Management, until September 2013, and then as Vice President, Product Management, in leadership roles on search, identity, and privacy. Since March 2019, Ms. Yehoshua has served as a member of the board of directors of ServiceNow, Inc., a publicly traded cloud computing company. Since October 2017, Ms. Yehoshua has served as a member of the board of directors of Yext Inc., a publicly traded online brand management company. From December 2015 to May 2017, Ms. Yehoshua served as a member of the board of directors of RetailMeNot, Inc., a publicly-traded company operating an online marketplace that aggregates discounts and offer codes. Ms. Yehoshua holds a Master of Science in Computer Science from the Hebrew University of Jerusalem and a Bachelor of Arts in Mathematics from the University of Pennsylvania.

### *Non-Employee Directors*

*Andrew Braccia* . Mr. Braccia has served as a member of our board of directors since March 2010. Since April 2007, Mr. Braccia has served as a Partner at Accel, a venture capital firm. From 1998 to 2007, Mr. Braccia was Vice President of Yahoo! Search at Yahoo! Inc. Mr. Braccia serves as a member of the board of directors of several private technology companies. Mr. Braccia holds a Bachelor of Science in Business Administration from the University of Arizona.

We believe that Mr. Braccia is qualified to serve as a member of our board of directors because of his significant knowledge of and history with our company, his experience as a seasoned investor and as a current and former director of many companies, and his knowledge of the industry in which we operate.

*Edith Cooper* . Ms. Cooper has served as a member of our board of directors since January 2018. From May 1996 to December 2017, Ms. Cooper served in various roles at Goldman Sachs Group, Inc., an investment bank, including Managing Director, Securities Division; Managing Director, Global Head of Human Capital Management; and, most recently, Senior Director. Ms. Cooper serves as a member of the board of directors of Etsy, Inc., a publicly-traded e-commerce company. Ms. Cooper holds a Masters of Business Administration from Northwestern University Kellogg School of Management and a Bachelor of Arts in American History from Harvard University.

We believe that Ms. Cooper is qualified to serve as a member of our board of directors because of her experience as a financial industry executive and her extensive knowledge of that industry and the industry in which we operate.

*Sarah Friar* . Ms. Friar has served as a member of our board of directors since March 2017. Since December 2018, Ms. Friar has served as Chief Executive Officer at Nextdoor, a social network for neighborhoods. From July 2012 to November 2018, Ms. Friar served as Chief Financial Officer at Square, Inc., a financial services and mobile payment

129

company. From April 2011 to July 2012, Ms. Friar served as Senior Vice President, Finance and Strategy at salesforce.com, inc. Ms. Friar also serves as a member of the board of directors of Walmart Inc., a publicly-traded retail and wholesale operations company. From September 2012 to May 2015, Ms. Friar served as a member of the board of directors of Model N, Inc., a publicly-traded company providing revenue management cloud solutions for life sciences and technology companies. From June 2014 to April 2018, Ms. Friar served as a member of the board of directors of New Relic, Inc., a publicly-traded provider of real-time insights for software-driven businesses. Ms. Friar holds a Masters of Business Administration from Stanford University and a Masters of Engineering in Metallurgy, Economics, and Management from the University of Oxford.

We believe that Ms. Friar is qualified to serve as a member of our board of directors because of her experience as a public company executive, her extensive finance background, her service as a current and former director of public companies, and her knowledge of the industry in which we operate.

*John O'Farrell* . Mr. O'Farrell has served as a member of our board of directors since April 2011. Since June 2010, Mr. O'Farrell has served as a General Partner at Andreessen Horowitz, a venture capital firm. Prior to joining Andreessen Horowitz, Mr. O'Farrell served in various management positions with Silver Spring Networks, Inc., Opsware, Inc., a publicly-traded software company, At Home Corporation, US WEST Inc., and Telecom Eireann, an Irish telecommunications company. Mr. O'Farrell has served as a member of the board of directors of PagerDuty, Inc., a publicly-traded software-as-a-service company that provides a digital operations management platform for businesses, since 2013. Mr. O'Farrell also serves as a member of the board of directors of a number of privately held companies, the U.S. Fund for UNICEF (d/b/a UNICEF USA), and MapLight, a nonprofit research organization . Mr. O'Farrell holds a Masters of Business Administration from Stanford University and a Bachelor of Engineering in Electrical Engineering from University College Dublin.

We believe that Mr. O'Farrell is qualified to serve as a member of our board of directors because of his significant knowledge of and history with our company, his business and venture capital expertise, his extensive experience as an executive and board member of technology companies, and his knowledge of the industry in which we operate.

*Chamath Palihapitiya* . Mr. Palihapitiya has served as a member of our board of directors since August 2017. Mr. Palihapitiya co-founded Social Capital, a venture capital firm, and has served as its Chief Executive Officer since July 2011. From July 2007 to June 2011, Mr. Palihapitiya worked at Facebook, Inc., a social media and social networking company, where he held various roles, including Vice President, Platform and Monetization and Vice President, User Growth, Mobile & International. Mr. Palihapitiya serves as a member of the board of directors of Social Capital Hedosophia Holdings Corp., a publicly-traded blank check company. Mr. Palihapitiya also serves as a member of the board of directors of several private technology companies. Mr. Palihapitiya holds a Bachelor of Applied Sciences in Electrical Engineering from the University of Waterloo.

We believe that Mr. Palihapitiya is qualified to serve as a member of our board of directors because of his experience as a company executive, his experience as a seasoned investor, and his knowledge of the industry in which we operate.

*Graham Smith* . Mr. Smith has served as a member of our board of directors since December 2018. Mr. Smith serves as a member of the board of directors of Splunk Inc., BlackLine, Inc., and Xero Limited, all of which are publicly-traded software companies. From March 2015 to February 2019, Mr. Smith served as a member of the board of directors of MINDBODY, Inc., a publicly-traded technology platform serving the fitness, beauty and wellness services industries, which was acquired by Vista Equity Partners in February 2019. From December 2015 to June 2018, Mr. Smith served as a member of the board of directors of Citrix Systems, Inc., a publicly-traded software company providing server, application, and desktop virtualization, and networking. From December 2007 to June 2015, Mr. Smith worked at salesforce.com, inc. serving first as Chief Financial Officer and then as Executive Vice President, Finance. From January 2003 to December 2007, Mr. Smith served as Chief Financial Officer at Advent Software, Inc., a portfolio accounting software company. Mr. Smith qualified as a member of the Institute of Chartered Accountants in England and Wales and holds a Bachelor of Science in Economics and Politics from the University of Bristol.

We believe that Mr. Smith is qualified to serve as a member of our board of directors because of his experience as a current and former director of many public companies, his extensive finance background, including service as a chief financial officer of several large, publicly-traded technology companies, and his knowledge of the industry in which we operate.

130

## Code of Conduct

Our board of directors has adopted a code of conduct that will apply to all of our employees, officers, and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. Upon the effectiveness of the registration statement of which this prospectus forms a part, the full text of our code of conduct will be posted on our website. We intend to disclose any amendments to our code of conduct, or waivers of its requirements, on our website or in filings under the Exchange Act.

## Board of Directors

Our business and affairs are managed under the direction of our board of directors. The number of directors will be fixed by our board of directors, subject to the terms of our amended and restated certificate of incorporation and amended and restated bylaws that will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part. Our board of directors consists of seven directors, six of whom will qualify as "independent" under NYSE listing standards.

In accordance with our amended and restated certificate of incorporation and our amended and restated bylaws, our board of directors will be divided into three classes with staggered three-year terms. Only one class of directors will be elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms. Our directors will be divided among the three classes as follows:

- the Class I directors will be Stewart Butterfield and John O'Farrell, and their terms will expire at the annual meeting of stockholders to be held in 2020;

- the Class II directors will be Andrew Braccia, Sarah Friar, and Chamath Palihapitiya, and their terms will expire at the annual meeting of stockholders to be held in 2021; and

- the Class III directors will be Edith Cooper and Graham Smith, and their terms will expire at the annual meeting of stockholders to be held in 2022.

Each director's term will continue until the election and qualification of his or her successor, or his or her earlier death, resignation, or removal. Any increase or decrease in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors.

This classification of our board of directors may have the effect of delaying or preventing changes in control of our company.

## Director Independence

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Messrs. Braccia, O'Farrell, Palihapitiya, and Smith and Mmes. Cooper and Friar do not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the applicable rules and regulations of the SEC and the listing standards of the NYSE. In making these determinations, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our capital stock by each non-employee director, and the transactions involving them described in the section titled "Certain Relationships and Related Party Transactions."

## Lead Independent Director

Our board of directors has adopted, effective prior to the effectiveness of the registration statement of which this prospectus forms a part, corporate governance guidelines that provide that one of our independent directors will serve as our lead independent director for so long as we have a non-independent chairperson. Our board of directors has appointed Mr. O'Farrell to serve as our lead independent director. As lead independent director, Mr. O'Farrell will preside over periodic meetings of our independent directors, serve as a liaison between the Chairperson of our board

131

of directors and the independent directors and perform such additional duties as our board of directors may otherwise determine and delegate.

**Committees of the Board of Directors**

Our board of directors has established an audit and risk committee, a compensation committee, and a nominating and corporate governance committee. The composition and responsibilities of each of the committees of our board of directors are described below. Members will serve on these committees until their resignation or until as otherwise determined by our board of directors.

*Audit and Risk Committee*

Our audit and risk committee consists of Ms. Friar, Mr. O'Farrell, and Mr. Smith, with Mr. Smith serving as Chairperson. The composition of our audit and risk committee meets the requirements for independence under current NYSE listing standards and SEC rules and regulations. Each member of our audit and risk committee meets the financial literacy requirements of the NYSE listing standards. In addition, our board of directors has determined that each of Mr. Smith and Ms. Friar is an audit committee financial expert within the meaning of Item 407(d) of Regulation S-K under the Securities Act. Our audit and risk committee will, among other things:

- select and hire a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

- supervise and evaluate the independent registered public accounting firm;

- evaluate the independence of the independent registered public accounting firm;

- discuss the scope and results of the audit with the independent registered public accounting firm, and review, with management and the independent registered public accounting firm, our interim and year-end results of operations;

- approve audited financial information and the audit and risk committee report;

- oversee procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- review major financial risk exposures and information security risk;

- review related party transactions;

- obtain and review a report by the independent registered public accounting firm at least annually, that describes our internal control procedures, any material issues with such procedures and any steps taken to deal with such issues;

- review disclosure controls and procedures; and

- approve (or, as permitted, pre-approve) all audit and all permissible non-audit services and fees, to be performed by the independent registered public accounting firm.

Our audit and risk committee operates under a written charter that satisfies the applicable rules of the SEC and the listing standards of the NYSE.

*Compensation Committee*

Our compensation committee consists of Ms. Cooper and Mr. Braccia, with Ms. Cooper serving as Chairperson. The composition of our compensation committee meets the requirements for independence under NYSE listing standards and SEC rules and regulations. Each member of the compensation committee is also a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act. The purpose of our compensation committee

132

is to discharge the responsibilities of our board of directors relating to compensation of our executive officers. Our compensation committee, among other things:

- reviews, approves and determines, or makes recommendations to our board of directors regarding, the compensation of our executive officers;

- administers our stock and equity incentive plans;

- reviews and approves, or make recommendations to our board of directors regarding, incentive compensation and equity plans; and

- establishes and reviews general policies relating to compensation and benefits of our employees.

Our compensation committee operates under a written charter that satisfies the applicable rules of the SEC and the listing standards of the NYSE.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Ms. Cooper and Mr. Smith, with Ms. Cooper serving as Chairperson. The composition of our nominating and corporate governance committee meets the requirements for independence under NYSE listing standards and SEC rules and regulations. Our nominating and corporate governance committee will, among other things:

- identify, evaluate and select, or make recommendations to our board of directors regarding, nominees for election to our board of directors and its committees;

- evaluate the performance of our board of directors and of individual directors;

- consider and make recommendations to our board of directors regarding the composition of our board of directors and its committees;

- review developments in corporate governance practices;

- evaluate the adequacy of our corporate governance practices and reporting; and

- develop and make recommendations to our board of directors regarding corporate governance guidelines and matters.

The nominating and corporate governance committee operates under a written charter that satisfies the applicable listing requirements and rules of the NYSE.

## Role of Board of Directors in Risk Oversight

Our board of directors has responsibility for the oversight of our risk management and, either as a whole or through the audit and risk committee, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from the audit and risk committee and members of senior management to enable our board of directors to understand our risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, cybersecurity, strategic, and reputational risk.

## Compensation Committee Interlocks and Insider Participation

None of the members of our compensation committee is or has been an officer or employee of our company. None of our executive officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our board of directors or compensation committee. See the section titled "Certain Relationships and Related Party Transactions" for information about related party transaction involving members of our compensation committee or their affiliates.

**Non-Employee Director Compensation**

Other than as set forth in the table and described more fully below, we did not pay any compensation or make any equity awards or non-equity awards to any of our non-employee directors during fiscal year 2019. Directors may be reimbursed for travel and other expenses directly related to their activities as directors. Directors who also serve as employees receive no additional compensation for their service as directors. During fiscal year 2019, Mr. Butterfield, our Chief Executive Officer, was a member of our board of directors, as well as an employee, and received no additional compensation for his services as a director. See the section titled "Executive Compensation" for more information about Mr. Butterfield's compensation for fiscal year 2019. The following table presents the total compensation for each person who served as a non-employee director during fiscal year 2019.

| Name | Stock Awards ($) [1] | Total ($) |
|---|---|---|
| Andrew Braccia, Edith Cooper, John O'Farrell, Chamath Palihapitiya [2] | — | — |
| Sarah Friar [3] | 3,024,827 | 3,024,827 |
| Graham Smith [4] | 1,751,400 | 1,751,400 |

(1) The amounts reported represent the aggregate grant date fair value of the restricted shares or restricted stock units awarded to the non-employee directors during fiscal year 2019, calculated in accordance with FASB ASC Topic 718. Such grant date fair value does not take into account any estimated forfeitures. The assumptions used in calculating the grant date fair value of the awards reported in this column are set forth in the notes to our consolidated financial statements included elsewhere in this prospectus. The amounts reported in this column reflect the accounting cost for these awards and does not correspond to the actual economic value that may be received by the director upon the sale of any of the underlying shares of Class B common stock.

(2) Messrs. Braccia, O'Farrell, and Palihapitiya and Ms. Cooper did not receive any compensation for fiscal year 2019.

(3) In October 2018, we granted a restricted stock award for 406,017 shares of our Class B common stock outside of our 2009 Plan to Ms. Friar through the David Riley and Sarah Friar Revocable Trust dated August 11, 2006. The restricted shares vest in 16 equal quarterly installments commencing on June 8, 2017, subject to Ms. Friar's continuous service on each such date. Upon Ms. Friar's service to us through a change in control, 100% of the restricted shares shall immediately vest.

(4) Mr. Smith was elected to our board of directors in December 2018 and was granted a restricted stock unit award for 210,000 shares of our Class B common stock under our 2009 Plan. The restricted stock units vest upon the satisfaction of both a time condition and performance vesting. The time condition is satisfied over a four year period, with 25% vesting in December 2019, and the remaining 75% time-vesting in 12 equal quarterly installments thereafter, subject to Mr. Smith's continuous service on each such date. The performance vesting will be achieved upon the first to occur of (i) a change in control of the company, (ii) the initial public offering of our securities, or (iii) the listing and public trading of our Class A common stock on the NYSE. Upon Mr. Smith's service to us through a change in control, 100% of the restricted stock units shall immediately satisfy the time condition.

As of January 31, 2019, Ms. Cooper held 273,428 restricted stock units, Ms. Friar held 228,385 shares of restricted stock that are subject to a risk of forfeiture through the David Riley and Sarah Friar Revocable Trust dated August 11, 2006, and Mr. Smith held 210,000 restricted stock units. None of the other non-employee directors held equity awards as of January 31, 2019.

Prior to the effectiveness of the registration statement of which this prospectus forms a part, we did not have a formal policy to compensate our non-employee directors. We have adopted a formal policy, which will become effective immediately prior to the effectiveness of the registration statement of which this prospectus forms a part, pursuant to which our non-employee directors are eligible to receive the following cash retainers and equity awards.

| **Annual Retainer for Board Membership** | | |
|---|---|---|
| Annual service on the board of directors | $ | 35,000 |
| Annual service on the board of directors as lead independent director | $ | 20,000 |
| **Additional Annual Retainer for Committee Membership** | | |
| Annual service as member of the audit and risk committee (other than chair) | $ | 10,000 |
| Annual service as chair of the audit and risk committee | $ | 20,000 |
| Annual service as member of the compensation committee (other than chair) | $ | 7,500 |
| Annual service as chair of the compensation committee | $ | 15,000 |
| Annual service as member of the nominating and corporate governance committee (other than chair) | $ | 4,000 |
| Annual service as chair of the nominating and corporate governance committee | $ | 8,000 |

134

Our policy provides that each non-employee director elected to our board of directors after the effectiveness of this registration statement of which this prospectus forms a part, upon initial election to our board of directors, will be granted RSUs having a fair market value of $300,000, or the Initial Grant. In addition, on the date of each of our annual meetings of stockholders following the completion of the effectiveness of the registration statement of which this prospectus forms a part, each non-employee director who will continue as a non-employee director following such meeting will be granted an annual award of RSUs having a fair market value of $180,000, or the Annual Grant. The Initial Grant will vest in three equal annual installments on each anniversary date on which the non-employee director was appointed to our board for directors, subject to continued service as a director through each applicable vesting date. The Annual Grant will vest in full on the earlier of (i) the first anniversary of the grant date or (ii) our next annual meeting of stockholders, subject to continued service as a director through the applicable vesting date. In addition, all such awards are subject to full accelerated vesting upon the sale event of our company (as defined in the policy).

Employee directors will receive no additional compensation for their service as a director.

We will reimburse all reasonable out-of-pocket expenses incurred by directors for their attendance at meetings of our board of directors or any committee thereof.

## EXECUTIVE COMPENSATION

### Overview

The following discussion contains forward-looking statements that are based on our current plans, considerations, expectations, and determinations regarding future compensation programs. The actual amount and form of compensation and the compensation policies and practices that we adopt in the future may differ materially from currently planned programs as summarized in this discussion.

As an "emerging growth company," we have opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies," as such term is defined in the rules promulgated under the Securities Act. This section provides an overview of the compensation awarded to, earned by, or paid to each individual who served as our principal executive officer during fiscal year 2019, and our next two most highly compensated executive officers in respect of their service to our company for fiscal year 2019. We refer to these individuals as our named executive officers. Our named executive officers for fiscal year 2019 are:

• Stewart Butterfield, our Chief Executive Officer;

• Robert Frati, our Senior Vice President of Sales and Customer Success; and

• Allen Shim, our Chief Financial Officer.

Our executive compensation program is based on a pay for performance philosophy. Compensation for our executive officers is comprised primarily of the following main components: base salary, bonus (or commissions), and equity incentives in the form of restricted stock or RSU awards. Our executive officers, like all full-time employees, are eligible to participate in our health and welfare benefit plans. As we transition from a private company to a publicly traded company, we intend to evaluate our compensation philosophy and compensation plans and arrangements as circumstances require.

### 2019 Summary Compensation Table

The following table provides information regarding the total compensation, for services rendered in all capacities, that was earned by our named executive officers during fiscal year 2019.

| Name and principal position | Year | Salary ($) | Stock Awards ($) [1] | Non-Equity Incentive Plan Compensation ($) [2] | All Other Compensation ($) [3] | Total ($) |
|---|---|---|---|---|---|---|
| Stewart Butterfield *Chief Executive Officer* [4] | 2019 | 356,952 [5] | 9,798,113 | 136,715 | 55,466 | 10,347,246 |
| Robert Frati *SVP of Sales and Customer Success* | 2019 | 450,000 | 758,840 | 331,087 | 4,000 | 1,543,927 |
| Allen Shim *Chief Financial Officer* | 2019 | 320,000 | 3,357,900 | 122,880 | 4,094 | 3,804,874 |

_____

(1) The amounts reported represent the aggregate grant date fair value of the restricted stock or restricted stock units awarded to the named executive officers during fiscal year 2019, calculated in accordance with FASB ASC Topic 718. Such grant date fair value does not take into account any estimated forfeitures. The assumptions used in calculating the grant date fair value of the awards reported in this column are set forth in the notes to our consolidated financial statements included elsewhere in this prospectus. The amounts reported in this column reflect the accounting cost for these awards and does not correspond to the actual economic value that may be received by the officer upon the sale of any of the underlying shares of Class B common stock.

(2) The amounts represent annual cash bonuses earned by Mr. Butterfield and Mr. Shim based on the achievement of company and individual performance objectives. For Mr. Frati, the amount reflects quarterly commissions earned by Mr. Frati under our sales incentive plan, or Sales Incentive Plan.

(3) The amounts reported represent 401(k) company matching contributions for Mr. Frati and Mr. Shim. For Mr. Butterfield, the amount reported represents $29,438 in travel and housing costs, $24,953 as a tax gross-up for the aforementioned costs, and $1,075 in 401(k) company matching contributions.

(4) From February 1, 2018 through June 30, 2018 as well as the month of September 2018, Mr. Butterfield was compensated in Canadian dollars for an aggregate amount of CAD$154,006, which has been converted into U.S. dollars based on the exchange rate at the applicable points in time that such compensation was paid (such exchange rate obtained from Xignite) to $119,637.

(5) Mr. Butterfield's base salary was increased to $430,000 on July 1, 2018.

136

**Narrative to Summary Compensation Table**

*Base Salaries*

We use base salaries to recognize the experience, skills, knowledge, and responsibilities required of all our employees, including our named executive officers. Base salaries are reviewed annually, typically in connection with our annual performance review process, and adjusted from time to time to realign salaries with market levels after taking into account individual responsibilities, performance, and experience. For fiscal year 2019, the annual base salary for Mr. Butterfield was $234,949 (which is equal to CAD$320,000 converted into U.S. dollars using an exchange rate of CAD$1.362 for each U.S. dollar) until June 30, 2018, and $430,000 on and after July 1, 2018, and for Messrs. Frati and Shim $450,000 and $320,000, respectively.

*Annual Bonuses and Commissions*

From time to time, our board of directors may approve annual bonuses for our named executive officers based on individual performance, company performance, or as otherwise determined to be appropriate. In fiscal year 2019, Messrs. Butterfield and Shim were both eligible for an annual cash bonus equal to 40% of their base salary based upon company and individual performance. In fiscal year 2019, Mr. Frati participated in the Sales Incentive Plan, which provided quarterly commission payments based upon our attainment of certain revenue targets, paid shortly after attainment of the relevant target.

*Equity Compensation*

Although we do not have a formal policy with respect to the grant of equity incentive awards to our executive officers, we believe that equity grants provide our executives with a strong link to our long-term performance, create an ownership culture, and help to align the interests of our executives and our stockholders. In addition, we believe that equity grants with a time-based vesting feature promote executive retention because this feature incentivizes our executive officers to remain in our employment during the vesting period. Accordingly, our board of directors periodically reviews the equity incentive compensation of our named executive officers and from time to time may grant equity incentive awards to them. During fiscal year 2019, we granted restricted stock to Mr. Butterfield and restricted stock units to Messrs. Frati and Shim, as described in more detail in the "Outstanding Equity Awards at Fiscal Year-End 2019" table below.

In February 2019, our board of directors approved equity awards to our employees, including the named executive officers. Mr. Butterfield received a restricted stock award for 295,000 shares of our Class B common stock, which vests in 16 equal quarterly installments commencing February 1, 2019 subject to his continued service to us through each vesting date. Mr. Frati and Mr. Shim received an award for 250,000 and 220,000 restricted stock units, respectively, and a stock option to purchase 114,000 and 78,000 shares of our Class B common stock, respectively. The restricted stock units vest upon the satisfaction of both a time-based condition and a performance-based condition. The performance-based condition will be satisfied on the first to occur of (i) a change in control, (ii) the initial public offering of our securities, or (iii) the listing and public trading of our Class A common stock on the NYSE. The time-based condition is satisfied over a four-year period in 16 equal quarterly installments commencing February 1, 2019, subject to the applicable named executive officer's continued service to us through each such vesting date. The stock options vest in 24 equal quarterly installments following February 1, 2019 subject to the named executive officer's continued service to us through each such vesting date.

**Executive Employment Arrangements**

*Executive Employment Arrangements*

Below are descriptions of our current offer letters with our named executive officers.

*Stewart Butterfield*

Prior to and during fiscal year 2019, we had not entered into an offer letter or employment agreement with Mr. Butterfield. On March 7, 2019, we entered into an offer letter with Mr. Butterfield to continue to serve as our Chief Executive Officer. The offer letter provides for Mr. Butterfield's at-will employment and an annual base salary of

137

$430,000, target bonus set at 40% of his adjusted base salary for fiscal year 2019 and 60% of his adjusted base salary for fiscal year 2020, and his eligibility to participate in our benefit plans generally. Mr. Butterfield is subject to our standard confidential information, invention assignment and arbitration agreement.

### Robert Frati

On March 23, 2016, we entered into an offer letter with Mr. Frati, who currently serves as our Senior Vice President of Sales and Customer Success. The offer letter provides for Mr. Frati's at-will employment and an annual base salary of $420,000, target bonus of $280,000, and an initial RSU grant, as well as his eligibility to participate in our benefit plans generally. Pursuant to his offer letter, we also provided Mr. Frati with a one-time signing bonus in the amount of $250,000, and we agreed to provide Mr. Frati with reimbursement of his moving expenses, up to a maximum aggregate amount of $75,000. Mr. Frati is subject to our standard confidential information, invention assignment and arbitration agreement.

### Allen Shim

On March 9, 2014, we entered into an offer letter with Mr. Shim, who currently serves as our Chief Financial Officer. The offer letter provided for Mr. Shim's at-will employment and an initial annual base salary of $200,000 and an initial stock option grant, as well as his eligibility to participate in our benefit plans generally. Mr. Shim is subject to our standard confidential information, invention assignment and arbitration agreement.

### Executive Severance Plan

In connection with the effectiveness of the registration statement of which this prospectus forms as part, we adopted an executive severance plan, in which our named executive officers, and certain other executives, will participate. Our executive severance plan, or the Executive Severance Plan, will provide that upon a (i) termination by us for any reason other than for "cause," as defined in the Executive Severance Plan, death or disability or (ii) a resignation for "good reason," as defined in the Executive Severance Plan, in each case outside of the change in control period (i.e., the period beginning on and ending 12 months after, a "change in control," as defined in the Executive Severance Plan), an eligible participant will be entitled to receive, subject to the execution and delivery of an effective release of claims in favor of the Company, (i) a lump sum cash payment equal to 12 months of base salary for our Chief Executive Officer and 6 months of base salary for the other participants, and (ii) a monthly cash payment equal to our contribution towards health insurance for up to 12 months for our Chief Executive Officer and up to 6 months for the other participants.

The Executive Severance Plan will also provide that upon a (i) termination by us other than for cause, death or disability or (ii) a resignation for good reason, in each case within the change in control period, an eligible participant will be entitled to receive, in lieu of the payments and benefits above and subject to the execution and delivery of an effective release of claims in favor of the Company, (i) a lump sum cash payment equal to 12 months of base salary for all participants, (ii) a monthly cash payment equal to our contribution towards health insurance for up to 12 months for all participants, (iii) accelerated vesting of certain outstanding and unvested equity award held by such participant; provided, that any unvested and outstanding equity awards subject to performance conditions will be deemed satisfied at the higher of target levels specified in the applicable award agreements or actual achievement, and (iv) a lump sum cash amount equal to the participant's pro-rated annual target bonus.

The payments and benefits provided under the Executive Severance Plan in connection with a change in control may not be eligible for a federal income tax deduction by us pursuant to Section 280G of the Code. These payments and benefits may also subject an eligible participant, including the named executive officers, to an excise tax under Section 4999 of the Code. If the payments or benefits payable in connection with a change in control would be subject to the excise tax imposed under Section 4999 of the Code, then those payments or benefits will be reduced if such reduction would result in a higher net after-tax benefit to the recipient.

138

**Outstanding Equity Awards at Fiscal Year-End 2019**

The following table sets forth information regarding outstanding equity awards held by our named executive officers as of January 31, 2019:

| | | | Option Awards | | | | Stock Awards [1] | |
|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Vesting Commencement Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) [2] |
| Stewart Butterfield | 06/08/2016 [3] | 10/1/2017 | — | — | — | — | 3,050,680 | 32,215,181 |
| | 10/28/2018 [4] | 7/1/2019 | — | — | — | — | 1,315,183 | 13,888,332 |
| Robert Frati | 06/08/2016 [5] | 5/1/2017 | — | — | — | — | 682,080 | 7,202,765 |
| | 06/20/2018 [6] | 5/1/2018 | — | — | — | — | 40,000 | 865,920 |
| | 06/20/2018 [6] | 8/1/2018 | — | — | — | — | 82,000 | 422,400 |
| Allen Shim | 05/21/2014 [7] | — | 588,605 | — | 0.14 | 5/21/2024 | — | — |
| | 02/17/2016 [8] | 3/1/2016 | — | — | — | — | 31,243 | 329,926 |
| | 04/06/2016 [6] | 7/1/2016 | — | — | — | — | 122,026 | 1,288,595 |
| | 05/10/2017 [6] | 6/1/2017 | — | — | — | — | 150,000 | 1,584,000 |
| | 02/21/2018 [6] | 5/1/2018 | — | — | — | — | 682,500 | 7,207,200 |

(1) As further described in the footnotes below, the RSUs granted pursuant to our 2009 Plan will vest upon the satisfaction of both a time-based condition and a performance-based condition before the award's expiration date. The performance-based condition will be satisfied on the first to occur of (i) a change in control, (ii) the initial public offering of our securities, or (iii) the listing and public trading of our Class A common stock on the NYSE. The expiration date is seven years from the Grant Date. Any RSUs that have satisfied the time-based condition at the time of the named executive officer's termination of service remain eligible for vesting upon the achievement of the performance-based condition prior to the expiration date of the award.

(2) The amounts represent the number of shares underlying the RSUs or restricted stock multiplied by the value of a share of our Class B common stock on January 31, 2019, which was $10.56 per share.

(3) The time-based condition of the award vests as follows: 4.286% of the RSUs subject to the award satisfy the time-based condition each quarter commencing on the vesting commencement date, subject to Mr. Butterfield continuing to provide service to us on such date. Upon the effectiveness of the registration statement of which this prospectus forms a part, the time-based condition shall be automatically adjusted as follows: 7.5% of the RSUs subject to the award shall satisfy the time-based condition on the applicable quarterly vesting date, subject to Mr. Butterfield continuing to provide service to us on such dates. If Mr. Butterfield is subject to a termination without "cause" or resignation for "good reason" (as each term is defined in his stock purchase agreement dated March 17, 2009) within 12 months after a change in control (as defined in the award agreement), 100% of the RSUs shall immediately satisfy the time-based condition as of such termination date.

(4) This award represents an award for restricted stock under our 2009 Plan. With respect to such award, 1/6th of the shares shall vest and no longer be subject to our right of repurchase on the vesting commencement date, subject to Mr. Butterfield continuing to provide service to us through such date. Following such date, 1/24th of the shares shall vest and no longer be subject to our right of repurchase on each quarter thereafter, subject to Mr. Butterfield continuing to provide service to us through each such date. In addition, if Mr. Butterfield is subject to a termination without "cause" or resignation for "good reason" (as each term is defined in his stock purchase agreement dated March 17, 2009) within 12 months after a change in control (as defined in the award agreement), 100% of the shares shall vest and no longer be subject to our right of repurchase immediately upon such termination date.

(5) The time-based condition of the award vests as follows: 25% of the RSUs subject to the award vest on the first anniversary of the vesting commencement date and the remaining 75% of the RSUs vest in 12 equal quarterly installments thereafter, subject to Mr. Frati continuing to provide service to us through each such vesting date.

(6) The time-based condition of the award vests as follows: the RSUs subject to the award vest in 16 equal quarterly installments commencing on the vesting commencement date, subject to the named executive officer continuing to provide service to us through each such vesting date.

(7) Mr. Shim's stock option was granted pursuant to our 2009 Plan and all of the shares are fully vested.

(8) This award represents an award for restricted stock under our 2009 Plan. With respect to such award, 1/48 th of the shares vest and are no longer subject to our right of repurchase commencing on the vesting date, subject to Mr. Shim continuing to provide service to us through each such vesting date. The shares were transferred by Mr. Shim to the Shim-Park Family Revocable Trust on November 28, 2016.

**Employee Benefits and Stock Plans**

*2019 Stock Option and Incentive Plan*

Our 2019 Plan was adopted by our board of directors in April 2019 and approved by our stockholders in May 2019, and shall become effective immediately prior to the effectiveness of the registration statement of which this prospectus forms a part. The 2019 Plan will replace the 2009 Plan, as our board of directors has determined not to make additional

awards under the 2009 Plan following the effectiveness of the registration statement of which this prospectus forms a part. However, the 2009 Plan will continue to govern outstanding equity awards granted thereunder. The 2019 Plan will allow the compensation committee to make equity-based incentive awards to our officers, employees, directors, and other key persons, including consultants.

*Authorized Shares.* We have initially reserved 60,200,000 shares of our Class A common stock for the issuance of awards under the 2019 Plan. The 2019 Plan provides that the number of shares reserved and available for issuance under the 2019 Plan will automatically increase each February 1, beginning on February 1, 2020, by 5% of the outstanding number of shares of our Class A and Class B common stock on the immediately preceding January 31 or such lesser number of shares as determined by our compensation committee. This number is subject to adjustment in the event of a stock split, stock dividend, or other change in our capitalization. The shares we issue under the 2019 Plan will be authorized but unissued shares or shares that we reacquire. The shares of Class A and Class B common stock underlying any awards that are forfeited, canceled, held back upon exercise, or settlement of an award to satisfy the exercise price or tax withholding, reacquired by us prior to vesting, satisfied without the issuance of stock, expire, or are otherwise terminated, other than by exercise, under the 2019 Plan and the 2009 Plan will be added back to the shares of Class A common stock available for issuance under the 2019 Plan (provided that any such shares of Class B common stock will first be converted into shares of Class A common stock). The maximum number of shares of Class A common stock that may be issued as incentive stock options in any one calendar year period may not exceed 60,200,000 shares cumulatively increased on February 1, 2020 and on each February 1 thereafter by the lesser of 5% of the number of outstanding shares of Class A and Class B common stock as of the immediately preceding January 31, or 12,040,000 shares. The value of all awards issued under the 2019 Plan and all other cash compensation paid by us to any non-employee director in any calendar year cannot exceed $1,000,000.

*Administration.* The 2019 Plan will be administered by our compensation committee. Our compensation committee will have full power to select, from among the individuals eligible for awards, the individuals to whom awards will be granted, to make any combination of awards to participants, and to determine the specific terms and conditions of each award, subject to the provisions of the 2019 Plan.

*Eligibility.* Persons eligible to participate in the 2019 Plan will be those employees, non-employee directors, and consultants, as selected from time to time by our compensation committee in its discretion.

*Options.* The 2019 Plan permits the granting of both options to purchase Class A common stock intended to qualify as incentive stock options under Section 422 of the Code and options that do not so qualify. The option exercise price of each option will be determined by our compensation committee but may not be less than 100% of the fair market value of our Class A common stock on the date of grant unless the option is granted (i) pursuant to a transaction described in, and in a manner consistent with, Section 424(a) of the Code or (ii) to individuals who are not subject to U.S. income tax. The term of each option will be fixed by our compensation committee and may not exceed 10 years from the date of grant. Our compensation committee will determine at what time or times each option may be exercised.

*Stock Appreciation Rights.* Our compensation committee will be able to award stock appreciation rights subject to such conditions and restrictions as it may determine. Stock appreciation rights entitle the recipient to shares of Class A common stock, or cash, equal to the value of the appreciation in our stock price over the exercise price. The exercise price may not be less than 100% of the fair market value of our Class A common stock on the date of grant. The term of each stock appreciation right will be fixed by our compensation committee and may not exceed 10 years from the date of grant. Our compensation committee will determine at what time or times each stock appreciation right may be exercised.

*Restricted Stock and Restricted Stock Units.* Our compensation committee will be able to award restricted shares of Class A common stock and restricted stock units to participants subject to such conditions and restrictions as it may determine. These conditions and restrictions may include the achievement of certain performance goals and/or continued employment with us through a specified vesting period.

*Unrestricted Stock Awards.* Our compensation committee will also be able to grant shares of Class A common stock that are free from any restrictions under the 2019 Plan. Unrestricted stock may be granted to participants in recognition of past services or for other valid consideration and may be issued in lieu of cash compensation due to such participant.

140

*Dividend Equivalent Rights.* Our compensation committee will be able to grant dividend equivalent rights to participants that entitle the recipient to receive credits for dividends that would be paid if the recipient had held a specified number of shares of common stock.

*Cash-Based Awards.* Our compensation committee will be able to grant cash bonuses under the 2019 Plan to participants, subject to the achievement of certain performance goals.

*Sale Event.* The 2019 Plan provides that upon the effectiveness of a "sale event," as defined in the 2019 Plan, an acquirer or successor entity may assume, continue, or substitute for the outstanding awards under the 2019 Plan. To the extent that awards granted under the 2019 Plan are not assumed, continued, or substituted by the successor entity, all unvested awards granted under the 2019 Plan shall terminate. In such case, except as may be otherwise provided in the relevant award agreement, all options and stock appreciation rights with time-based vesting, conditions, or restrictions that are not exercisable immediately prior to the sale event will become fully exercisable as of the sale event, all other awards with time-based vesting, conditions, or restrictions will become fully vested and nonforfeitable as of the sale event, and all awards with conditions and restrictions relating to the attainment of performance goals may become vested and nonforfeitable in connection with the sale event in the plan administrator's discretion or to the extent specified in the relevant award agreement. In the event of such termination, individuals holding options and stock appreciation rights will be permitted to exercise such options and stock appreciation rights (to the extent exercisable) prior to the sale event. In addition, in connection with the termination of the 2019 Plan upon a sale event, we may make or provide for a cash payment to participants holding vested and exercisable options and stock appreciation rights equal to the difference between the per share cash consideration payable to stockholders in the sale event and the exercise price of the options or stock appreciation rights.

*Amendment.* Our board of directors will be able to amend or discontinue the 2019 Plan and our compensation committee will be able to amend or cancel outstanding awards for purposes of satisfying changes in law or any other lawful purpose, but no such action may adversely affect rights under an award without the holder's consent. The compensation committee is specifically authorized to exercise its discretion to reduce the exercise price of outstanding stock options or stock appreciation rights or effect the repricing of such awards through cancellation and re-grants. Certain amendments to the 2019 Plan will require the approval of our stockholders.

No awards may be granted under the 2019 Plan after the date that is 10 years from the date of stockholder approval of the 2019 Plan. No awards under the 2019 Plan have been made prior to the date hereof.

### 2009 Stock Plan, as amended

Our board of directors adopted, and our stockholders approved, our 2009 Plan in June 2009. Our 2009 Plan was most recently amended in May 2019. Our 2009 Plan allows for the grant of incentive stock options to our employees and any of our parent and subsidiary corporations' employees, and for the grant of nonqualified stock options and restricted stock unit awards and the direct award or sale of shares to employees, officers, directors, and consultants of ours and our parent and subsidiary corporations.

*Authorized Shares.* No shares will be available for future issuance under the 2009 Plan following the effectiveness of the registration statement of which this prospectus forms a part. However, our 2009 Plan will continue to govern outstanding awards granted thereunder. As of January 31, 2019, options to purchase 18,405,776 shares of our Class B common stock remained outstanding under our 2009 Plan at a weighted-average exercise price of approximately $0.9428 per share and 63,113,635 restricted stock units also remained outstanding.

*Administration.* Our board of directors currently administers our 2009 Plan. Subject to the provisions of our 2009 Plan, the administrator has full authority and discretion to take any actions it deems necessary or advisable for the administration of our 2009 Plan. Our board is specifically authorized to exercise its discretion to reduce the exercise price of outstanding stock options or stock appreciation rights or effect the repricing of such awards through cancellation and re-grants without stockholder approval.

*Options.* Stock options may be granted under our 2009 Plan. The exercise price per share of all options must equal at least 100% of the fair market value per share of our Class B common stock on the date of grant. The term of an incentive stock option may not exceed 10 years. An incentive stock option granted to a participant who owns more

141

than 10% of the total combined voting power of all classes of our outstanding stock, or any parent or subsidiary corporations', on the date of grant may not be exercisable after the expiration of five years from the date of grant and must have an exercise price of at least 110% of the fair market value per share of our Class B common stock on the date of grant. The administrator will determine the methods of payment of the exercise price of an option, which may include cash or cash equivalents, surrender of stock or certain other forms of payment acceptable to the administrator and permitted by the Delaware General Corporation Law.

*Stock Awards.* Our 2009 Plan also allows for the grant or purchase of shares of Class B common stock subject to such conditions and restrictions as our board may determine. These conditions and restrictions may include the achievement of certain performance goals and/or continued employment with us through a specified vesting period.

*RSUs.* RSUs may be granted under our 2009 Plan. An RSU is an award that covers a number of shares of our Class B common stock that may be settled upon vesting in cash or shares of our Class B common stock. The administrator determines the terms and conditions of RSUs, including the number of units granted and the vesting criteria (which may include achievement of pre-established performance goals or continued service to us).

*Transferability or Assignability of Awards.* Our awards are subject to transfer restrictions as the administrator may determine. In addition, options are transferable only by a beneficiary designation, a will, or the laws of descent and distribution. Nonstatutory options may also be transferable by gift or domestic relations order to an immediate family member. In addition, incentive stock options may be exercised during the lifetime of the optionee only by the optionee or by the optionee's guardian or legal representative.

*Certain Adjustments.* In the event of certain changes in our capitalization, the number of shares available for future grants, the number of shares covered by each outstanding equity grant and the exercise price under each outstanding option will be proportionately adjusted.

*Mergers and Consolidations.* The 2009 Plan provides that in the event that we are a party to a merger or consolidation, all shares acquired under our 2009 Plan and all outstanding awards shall be subject to the agreement of merger or consolidation, or, in the event such transaction does not entail an agreement to which we are a party, as determined by the administrator of the 2009 Plan, in either case, all outstanding awards need not be treated in an identical manner. Such agreement, without the optionees', grantees', or purchasers' consent, may provide for one or more of the following with respect to each award that is outstanding as of the effective date of such merger or consolidation: (i) the continuation of the option, RSU, or award by the Company (if the Company is the surviving corporation), (ii) the assumption or substitution of the option by the surviving corporation or its parent in a manner that complies with Section 424(a) of the Code, (iii) the cancellation of options and a payment to the optionees equal to the excess of (A) the fair market value of the shares subject to such options as of the effective date of such merger or consolidation over (B) their exercise price, (iv) the cancellation of such options without payment of any consideration, (v) the assumption of RSUs, or substitution of a new RSU, by the surviving corporation or its parent with an equitable or proportionate adjustment to the amount and kind of shares subject thereto, (vi) the cancellation of RSUs and a payment to the grantee with respect to each share subject to the portion of the RSUs that are vested as of the effective date of such merger or consolidation (including those RSUs that become vested as a result of such transaction) equal to the fair market value of such shares, (vii) suspension of the right to exercise options for a limited period of time prior to the closing of a merger or consolidation transaction, or (viii) termination of the right to exercise options unvested as of the closing of a merger or consolidation transaction.

Our board of directors has determined that no further awards shall be made pursuant to the 2009 Plan after the effectiveness of the registration statement of which this prospectus forms a part. Following the effectiveness of the registration statement of which this prospectus forms a part, we expect to make future awards under the 2019 Plan.

### 2019 Employee Stock Purchase Plan

Our ESPP was adopted by our board of directors in April 2019 and approved by our stockholders in May 2019 and shall become effective immediately prior to the effectiveness of the registration statement of which this prospectus forms a part. The ESPP will initially reserve and authorize the issuance of up to a total of 9,000,000 shares of Class A common stock to participating employees. The ESPP will provide that the number of shares reserved and available for issuance will automatically increase each February 1, beginning on February 1, 2020, by the lesser of 6,000,000 shares

142

of our Class A common stock, 1% of the outstanding number of shares of our Class A and Class B common stock on the immediately preceding January 31, or such lesser number of shares as determined by our compensation committee. This number will be subject to adjustment in the event of a stock split, stock dividend, or other change in our capitalization.

All employees who work for entities designated as participating in the ESPP will be eligible to participate in the ESPP. Any employee who owns 5% or more of the total combined voting power or value of all classes of stock will not be eligible to purchase shares under the ESPP.

We will make one or more offerings, consisting of one or more purchase periods, each year to our employees to purchase shares under the ESPP. The first offering will begin on the date that our Class A common stock is first publicly traded on the NYSE and, unless otherwise determined by the administrator of the ESPP, will end on October 9, 2019. Each eligible employee as of the date that our Class A common stock is first publicly traded on the NYSE will be deemed to be a participant in the ESPP at that time and must authorize payroll deductions or other contributions by submitting an enrollment form by the deadline specified by the plan administrator. Unless otherwise determined by the plan administrator, subsequent offerings will usually begin every six months and will continue for six-month periods, referred to as offering periods. If an offering period contains more than one purchase period, and if the fair market value of our Class A common stock on the exercise date is less than the fair market value on the first trading day of the offering period, participants will be withdrawn from the current offering period following their purchase of our Class A common stock on the purchase date and will be automatically re-enrolled in a new offering period. Each eligible employee may elect to participate in any subsequent offering by submitting an enrollment form by the deadline specified by the plan administrator.

Each employee who is a participant in the ESPP may purchase shares by authorizing contributions of up to 15% of his or her compensation during an offering period. Unless the participating employee has previously withdrawn from the offering, his or her accumulated contributions will be used to purchase shares on the last business day of the purchase period at a price equal to 85% of the fair market value of the shares on the first business day of the offering period or the business day prior to the last business day of the purchase period, whichever is lower, provided that no more than 1,250 shares of Class A common stock (or a lesser number as established by the plan administrator in advance of the purchase period) may be purchased by any one employee during each purchase period. Under applicable tax rules, an employee may purchase no more than $25,000 worth of shares of Class A common stock, valued at the start of the offering period, under the ESPP for each calendar year in which a purchase right is outstanding.

The accumulated contributions of any employee who is not a participant on the last day of a purchase period will be refunded. An employee's rights under the ESPP terminate upon voluntary withdrawal from the plan or when the employee ceases employment with us for any reason.

The ESPP may be terminated or amended by our board of directors at any time but shall automatically terminate on the 10 year anniversary of the effective date of the registration statement of which this prospectus forms a part. An amendment that increases the number of shares of Class A common stock that are authorized under the ESPP and certain other amendments will require the approval of our stockholders. The plan administrator may adopt subplans under the ESPP for employees of our non U.S. subsidiaries who may participate in the ESPP and may permit such employees to participate in the ESPP on different terms, to the extent permitted by applicable law.

### *Senior Executive Cash Incentive Bonus Plan*

In April 2019, our board of directors adopted the Senior Executive Cash Incentive Bonus Plan, or the Bonus Plan. The Bonus Plan provides for cash bonus payments based upon the attainment of performance targets established by our compensation committee. The payment targets will be related to financial and operational measures or objectives with respect to our company, or corporate performance goals, as well as individual performance objectives.

Our compensation committee may select corporate performance goals from among but not limited to the following: achievement of cash flow (including, but not limited to, operating cash flow and Free Cash Flow); earnings before interest, taxes, depreciation, and amortization; net income (loss) (either before or after interest, taxes, depreciation, and/or amortization); changes in the market price of our common stock; economic value-added; acquisitions or strategic transactions, including licenses, collaborations, joint ventures, or promotion arrangements; operating income (loss);

return on capital, assets, equity, or investment; total stockholder returns; productivity; expense efficiency; margins; operating efficiency; working capital; earnings (loss) per share of our common stock; sales or market shares; revenue; corporate revenue; operating income and/or net annual recurring revenue, any of which may be (A) measured in absolute terms or compared to any incremental increase, (B) measured in terms of growth, (C) compared to another company or companies or to results of a peer group, (D) measured against the market as a whole and/or as compared to applicable market indices, and/or (E) measured on a pre-tax or post-tax basis (if applicable).

Each executive officer who is selected to participate in the Bonus Plan will have a target bonus opportunity set for each performance period. The bonus formulas will be adopted in each performance period by the compensation committee and communicated to each executive. The corporate performance goals will be measured at the end of each performance period after our financial reports have been published or such other appropriate time as the compensation committee determines. If the corporate performance goals and individual performance objectives are met, payments will be made as soon as practicable following the end of each performance period. Subject to the rights contained in any agreement between the executive officer and us, an executive officer must be employed by us on the bonus payment date to be eligible to receive a bonus payment. The Bonus Plan also permits the compensation committee to approve additional bonuses to executive officers in its sole discretion and provides the compensation committee with discretion to adjust the size of the award as it deems appropriate to account for unforeseen factors beyond management's control that affected corporate performance.

### 401(k) Plan

We maintain a tax-qualified retirement plan that provides eligible U.S. employees with an opportunity to save for retirement on a tax-advantaged basis. Plan participants are able to defer eligible compensation subject to applicable annual Code limits. We provide a matching contribution of 50% of employee contributions up to $4,000, which is 100% vested after one year of service. The 401(k) plan is intended to be qualified under Section 401(a) of the Code with the 401(k) plan's related trust intended to be tax exempt under Section 501(a) of the Code. As a tax-qualified retirement plan, contributions to the 401(k) plan and earnings on those contributions are not taxable to the employees until distributed from the 401(k) plan.

### Rule 10b5-1 Sales Plans

Our directors and executive officers may adopt written plans that are intended to comply with Rule 10b5-1 under the Exchange Act, known as Rule 10b5-1 plans, in which they may contract with a broker to buy or sell shares of our Class A common stock on a periodic basis. Under a Rule 10b5-1 plan, a broker executes trades pursuant to parameters established by the director or executive officer when entering into the plan, without further direction from such director or executive officer. The director or executive officer may amend a Rule 10b5-1 plan in some circumstances and may terminate a plan at any time. Our directors and executive officers also may buy or sell additional shares outside of a Rule 10b5-1 plan when they are not in possession of material nonpublic information, subject to compliance with the terms of our insider trading policy.

144

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the compensation arrangements, including employment, termination of employment, and change in control arrangements, and indemnification arrangements, discussed, when required, in the sections titled "Management" and "Executive Compensation" and the registration rights described in the section titled "Description of Capital Stock—Registration Rights," the following is a description of each transaction since February 1, 2016 and each currently proposed transaction in which:

- we have been or are to be a participant;

- the amount involved exceeded or exceeds $120,000; and

- any of our directors, executive officers or holders of more than 5% of our capital stock, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

### Equity Financings

#### *Series F and Series F-1 Convertible Preferred Stock Financing*

On March 31, 2016, we sold an aggregate of 19,866,694 shares of our Series F convertible preferred stock at a purchase price of $7.802 per share, for an aggregate purchase price of $155.0 million and an aggregate of 6,793,130 shares of our Series F-1 convertible preferred stock at a purchase price of $7.802 per share, for an aggregate purchase price of $53.0 million, pursuant to our Series F and Series F-1 convertible preferred stock financing. The following table summarizes purchases of our Series F and Series F-1 convertible preferred stock by holders of more than 5% of our capital stock and their affiliated entities. None of our executive officers purchased shares of Series F or Series F-1 convertible preferred stock.

| Stockholder | Shares of Series F Convertible Preferred Stock | Shares of Series F-1 Convertible Preferred Stock | Total Purchase Price | |
|---|---|---|---|---|
| Entities affiliated with Accel [1] | — | 6,793,130 | $ | 53,000,000 |
| Entities affiliated with Social Capital [2] | 2,550,628 | — | | 19,900,000 |

_____

(1) Consists of Accel Growth Fund III L.P., Accel Growth Fund III Strategic Partners L.P., Accel Growth Fund Investors 2014 L.L.C., Accel Investors 2013 L.L.C., Accel XI L.P., and Accel XI Strategic Partners L.P. Andrew Braccia, a member of our board of directors, is a partner at Accel.

(2) Consists of The Social+Capital Partnership Opportunities Fund, L.P. Chamath Palihapitiya, a member of our board of directors, is the Chief Executive Officer of Social Capital.

145

*Series G and Series G-1 Convertible Preferred Stock Financing*

From October 2017 through December 2017, we sold an aggregate of 24,717,887 shares of our Series G convertible preferred stock at a purchase price of $9.305 per share, for an aggregate purchase price of $230.0 million and an aggregate of 2,149,382 shares of our Series G-1 convertible preferred stock at a purchase price of $9.305 per share, for an aggregate purchase price of $20.0 million, pursuant to our Series G and Series G-1 convertible preferred stock financing. The following table summarizes purchases of our Series G and Series G-1 convertible preferred stock by holders of more than 5% of our capital stock and their affiliated entities. None of our executive officers purchased shares of Series G or Series G-1 convertible preferred stock.

| Stockholder | Shares of Series G Convertible Preferred Stock | Shares of Series G-1 Convertible Preferred Stock | Total Purchase Price |
|---|---|---|---|
| Entities affiliated with Accel [1] | 7,173,562 | — | $ 66,749,994 |
| Entities affiliated with Social Capital [2] | 322,407 | — | 2,999,997 |
| SoftBank Vision Fund (AIV M1) L.P. | 14,454,593 | — | 134,499,988 |

_____

(1) Consists of Accel Growth Fund Investors 2016 L.L.C., Accel Growth Fund IV L.P., Accel Growth Fund IV Strategic Partners L.P., Accel Leaders Fund Investors 2016 L.L.C., and Accel Leaders Fund L.P. Andrew Braccia, a member of our board of directors, is a partner at Accel.

(2) Consists of The Social+Capital Partnership III, L.P., for itself and as nominee for The Social+Capital Partnership Principals Fund III, L.P. Chamath Palihapitiya, a member of our board of directors, is the Chief Executive Officer of Social Capital.

*Series G-2 Convertible Preferred Stock Financing*

On November 22, 2017, we sold an aggregate of 17,241,379 shares of our Series G-2 convertible preferred stock at a purchase price of $8.70 per share, for an aggregate purchase price of $150.0 million, pursuant to our Series G-2 convertible preferred stock financing. The following table summarizes purchases of our Series G-2 convertible preferred stock by holders of more than 5% of our capital stock and their affiliated entities. None of our executive officers purchased shares of Series G-2 convertible preferred stock.

| Stockholder | Shares of Series G-2 Convertible Preferred Stock | Total Purchase Price |
|---|---|---|
| SoftBank Vision Fund (AIV M1) L.P. | 17,241,379 | $ 149,999,997 |

*Series G-3 Convertible Preferred Stock Financing*

On December 29, 2017, we sold an aggregate of 1,464,680 shares of our Series G-3 convertible preferred stock at a purchase price of $8.70 per share, for an aggregate purchase price of $12.7 million, pursuant to our Series G-3 convertible preferred stock financing. The following table summarizes purchases of our Series G-3 convertible preferred stock by holders of more than 5% of our capital stock and their affiliated entities. None of our executive officers purchased shares of Series G-3 convertible preferred stock.

| Stockholder | Shares of Series G-3 Convertible Preferred Stock | Total Purchase Price |
|---|---|---|
| SoftBank Vision Fund (AIV M1) L.P. | 1,464,680 | $ 12,742,716 |

*Series H and Series H-1 Convertible Preferred Stock Financing*

From August 2018 through September 2018, we sold an aggregate of 33,469,795 shares of our Series H convertible preferred stock at a purchase price of $11.9053 per share, for an aggregate purchase price of $398.5 million and an aggregate of 2,418,922 shares of our Series H-1 convertible preferred stock at a purchase price of $11.9053 per share,

146

for an aggregate purchase price of $28.8 million, pursuant to our Series H and Series H-1 convertible preferred stock financing. The following table summarizes purchases of our Series H and Series H-1 convertible preferred stock by holders of more than 5% of our capital stock and their affiliated entities. None of our executive officers purchased shares of Series H and Series H-1 convertible preferred stock.

| Stockholder | Shares of Series H Convertible Preferred Stock | Shares of Series H-1 Convertible Preferred Stock | Total Purchase Price | |
|---|---|---|---|---|
| Entities affiliated with Accel [1] | 2,519,886 | 1,679,924 | $ | 49,999,998 |
| SoftBank Vision Fund (AIV M1) L.P. | 2,245,638 | — | | 26,734,994 |

_____
(1) Consists of Accel Growth Fund Investors 2016 L.L.C., Accel Growth Fund IV L.P., Accel Growth Fund IV Strategic Partners L.P., Accel Investors 2013 L.L.C., Accel Leaders Fund Investors 2016 L.L.C., Accel Leaders Fund L.P., Accel XI L.P., and Accel XI Strategic Partners L.P. Andrew Braccia, a member of our board of directors, is a partner at Accel.

## Stock Repurchases

### November 2017

In November 2017, we repurchased an aggregate of 17,921,146 shares of our outstanding Class B common stock, Series A preferred stock, Series D preferred stock, Series D-1 preferred stock, and Series E preferred stock from our stockholders, at a purchase price of $8.37 per share, for an aggregate purchase price of $150.0 million, which we refer to as the November 2017 Repurchase. The following table summarizes our repurchases of capital stock from our directors and executive officers in the November 2017 Repurchase.

| Stockholder | Title | Shares of Stock | Aggregate Purchase Price | |
|---|---|---|---|---|
| Stewart Butterfield [1] | CEO, Director, Co-Founder | 125,000 | $ | 1,046,250 |
| Allen Shim [2] | CFO | 48,000 | | 401,760 |
| Cal Henderson [3] | Chief Technology Officer, Co-Founder | 1,077,497 | | 9,018,650 |

_____
(1) Includes shares repurchased from Omnibus Land & Cattle Co. Ltd., an entity affiliated with Mr. Butterfield.
(2) Shares were repurchased from The Shim-Park Family Revocable Trust.
(3) Shares were repurchased from Cal Henderson and Rebecca Reeve Henderson, as Trustees of The Henderson Family Trust.

147

**Third Party Tender Offers**

*September 2016*

In August 2016, we entered into a participation agreement with Social Capital , a holder of more than 5% of our capital stock, and GGV Capital, pursuant to which we agreed to waive certain transfer restrictions in connection with a tender offer that such parties proposed to commence. In September 2016, these holders conducted a tender offer for shares of our outstanding common stock, Series A preferred stock, Series C preferred stock, and Series D-1 preferred stock from our stockholders and purchased an aggregate of 3,268,450 shares of our outstanding common stock and Series A preferred stock from our stockholders, at a purchase price of $7.41 per share, for an aggregate purchase price of $24.2 million, which we refer to as the September 2016 Third Party Tender. Social Capital purchased an aggregate of 2,178,967 shares of our outstanding common stock and Series A preferred stock for an aggregate purchase price of $16.1 million. The following table summarizes purchases of common stock from our executive officers in the September 2016 Third Party Tender.

| Stockholder | Title | Shares of Common Stock | | Aggregate Purchase Price |
|---|---|---|---|---|
| Allen Shim | CFO | 93,699 | $ | 694,310 |
| Omnibus Land & Cattle Co. Ltd. [1] | | 120,000 | | 889,200 |

_____

(1)   Omnibus Land & Cattle Co. Ltd. is an entity affiliated with Mr. Butterfield, our Chief Executive Officer, a director, and a co-founder.

**Stock Transfers**

*November 2016*

On November 18, 2016, entities affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock, purchased an aggregate of 674,291 shares of our outstanding common stock from Cal Henderson, one of our executive officers, at a purchase price of $7.41 per share, for an aggregate purchase price of $5.0 million.

*April 2018*

On April 30, 2018, SoftBank Vision Fund (AIV M1) L.P., a holder of more than 5% of our capital stock, purchased an aggregate of 1,205,454 shares of our outstanding Class B common stock from holders of our Class B common stock, at a purchase price of $8.37 per share, for an aggregate purchase price of $10.1 million, which we refer to as the April 2018 Stock Transfer. The following table summarizes purchases of Class B common stock from our directors and executive officers in the April 2018 Stock Transfer.

| Stockholder | Title | Shares of Stock | | Aggregate Purchase Price |
|---|---|---|---|---|
| Stewart Butterfield | CEO, Director, Co-Founder | 150,000 | $ | 1,255,500 |

**Investors' Rights Agreement**

We are party to an amended and restated investors' rights agreement which provides, among other things, that certain holders of our capital stock, including entities affiliated with Accel, Andreessen Horowitz, Social Capital, and SoftBank, which each hold more than 5% of our outstanding capital stock, have the right to demand that we file a registration statement or request that their shares of our capital stock be included on a registration statement that we are otherwise filing. See the section titled "Description of Capital Stock—Registration Rights" for more information regarding these registration rights.

### Right of First Refusal

Pursuant to our equity compensation plans and certain agreements with our stockholders, including a right of first refusal and co-sale agreement with certain holders of our capital stock, including entities affiliated with Accel, Andreessen Horowitz, Social Capital, and SoftBank, which each hold more than 5% of our outstanding capital stock, and Mr. Butterfield, our Chief Executive Officer and a co-founder and director, we or our assignees have a right to purchase shares of our capital stock which certain stockholders propose to sell to other parties. This right will terminate upon the effectiveness of the registration statement of which this prospectus forms a part. Since July 31, 2014, we have waived our right of first refusal in connection with the sale of certain shares of our capital stock, including sales by certain of our executive officers. See the section titled "Principal and Registered Stockholders" for additional information regarding beneficial ownership of our capital stock.

### Voting Agreement

We are party to a voting agreement under which certain holders of our capital stock, including entities affiliated with Accel, Andreessen Horowitz, Social Capital, and SoftBank, which each hold more than 5% of our outstanding capital stock, and Mr. Butterfield, our Chief Executive Officer and a co-founder and director, have agreed as to the manner in which they will vote their shares of our capital stock on certain matters, including with respect to the election of directors. Upon the effectiveness of the registration statement of which this prospectus forms a part, the voting agreement will terminate and none of our stockholders will have any special rights regarding the election or designation of members of our board of directors.

### Slack Fund L.L.C.

We are the manager of Slack Fund L.L.C., a Delaware limited liability company, or Slack Fund. We established and designed Slack Fund to fund companies that we believe are building the future of work through next-generation enterprise software, are solving problems for working teams by building on Slack and have potential for substantial contribution to Slack. Entities affiliated with Accel, Andreessen Horowitz, and Social Capital, each holders of more than 5% of our capital stock, are members of Slack Fund. The following table summarizes the contractual contribution of holders of more than 5% of our capital stock and their affiliated entities in Slack Fund. In addition, Mr. Butterfield, our Chief Executive Officer and a co-founder and director, serves on the investment committee of Slack Fund.

| Stockholder | Subscription Amount | | Amount Funded as of January 31, 2019 | |
|---|---|---|---|---|
| Entities affiliated with Accel [1] | $ | 2,000,000 | $ | 1,360,000 |
| Entities affiliated with Andreessen Horowitz [2] | $ | 2,000,000 | $ | 1,360,000 |
| Entities affiliated with Social Capital [3] | $ | 2,000,000 | $ | 1,360,000 |

[1] Consists of Accel X L.P., Accel X Strategic Partners L.P., Accel XI L.P., Accel XI Strategic Partners L.P., Accel Growth Fund III L.P., Accel Growth Fund III Strategic Partners L.P., Accel Growth Fund Investors 2014 L.L.C., Accel Investors 2009 L.L.C., and Accel Investors 2013 L.L.C. Andrew Braccia, a member of our board of directors, is a partner at Accel.

[2] Consists of AH Parallel Fund IV, L.P. for itself and as nominee for AH Parallel Fund IV-A, L.P., AH Parallel Fund IV-B, L.P., and AH Parallel Fund IV-Q, L.P. John O'Farrell, a member of our board of directors, is a general partner at Andreessen Horowitz.

[3] Consists of The Social+Capital Partnership III, L.P., for itself and as nominee for The Social+Capital Partnership Principals Fund III, L.P. Chamath Palihapitiya, a member of our board of directors, is the Chief Executive Officer of Social Capital.

### Transactions with Square, Inc.

In September 2014, we entered into a Subscription Agreement with Square, Inc. for the use of Slack, which was renewed in 2016, 2017 and 2018. The 2017 renewal agreement for the use of Slack from September 2017 to September 2018 had a total contract value of $150,592. We recognized revenue of $144,760 from Square, Inc. in fiscal year 2018. The 2018 renewal agreement for the use of Slack from September 2018 to September 2019 has a total contract value of $230,400. We recognized revenue of $214,589 from Square, Inc. in fiscal year 2019. Sarah Friar joined our board of directors in March 2017 and previously served as the Chief Financial Officer of Square, Inc. from July 2012 to October 2018.

149

**Transactions with Pacific Content**

On February 10, 2015, we entered into a Consulting Agreement with Pacific Content Company Incorporated, as last amended on August 1, 2016, for the creation of branded podcast episodes for us. We paid Pacific Content Company Incorporated $820,762, $567,500, and $0 in fiscal years 2017, 2018, and 2019, respectively. The former domestic partner of Stewart Butterfield , our Chief Executive Officer, is the Co-Founder and a director of Pacific Content Company Incorporated.

**Transactions with RSquared**

On January 1, 2015, we entered into a Client Agreement with Rsquared Communication, Inc. and on November 1, 2017, we entered into a Supplier Services Agreement with Rsquared Communication, Inc., both for the provision of Rsquared Communication, Inc.'s communication and media relations services to us. We paid Rsquared Communication, Inc. $519,342, $413,932, and $78,000 in fiscal years 2017, 2018, and 2019, respectively. The wife of Cal Henderson, our Chief Technology Officer, is the Founder and Principal of Rsquared Communication, Inc.

**Other Transactions**

We have granted stock options, RSUs, and RSAs to our executive officers and certain of our directors. See the sections titled "Executive Compensation" and "Management—Non-Employee Director Compensation" for a description of these options, RSUs, and RSAs.

Jonathan O'Farrell, the son of John O'Farrell, one of our directors, is a non-executive employee and has served as an Associate Software Engineer with us since August 2017. Jonathan O'Farrell does not live in the same household as John O'Farrell.

Other than as described above under this section titled "Certain Relationships and Related Person Transactions," since February 1, 2016, we have not entered into any transactions, nor are there any currently proposed transactions, between us and a related party where the amount involved exceeds, or would exceed, $120,000, and in which any related person had or will have a direct or indirect material interest. We believe the terms of the transactions described above were comparable to terms we could have obtained in arm's-length dealings with unrelated third parties.

**Limitation of Liability and Indemnification of Officers and Directors**

We expect to adopt an amended and restated certificate of incorporation, which will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part, and which will contain provisions that limit the liability of our directors for monetary damages to the fullest extent permitted by Delaware law. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for the following:

- any breach of their duty of loyalty to our company or our stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- any transaction from which they derived an improper personal benefit.

Any amendment to, or repeal of, these provisions will not eliminate or reduce the effect of these provisions in respect of any act, omission or claim that occurred or arose prior to that amendment or repeal. If the Delaware General Corporation Law is amended to provide for further limitations on the personal liability of directors of corporations, then the personal liability of our directors will be further limited to the greatest extent permitted by the Delaware General Corporation Law.

In addition, shortly following the effectiveness of the registration statement of which this prospectus forms a part, we will adopt amended and restated bylaws, which will provide that we will indemnify, to the fullest extent permitted by law, any person who is or was a party or is threatened to be made a party to any action, suit, or proceeding by reason

150

of the fact that he or she is or was one of our directors or officers or is or was serving at our request as a director or officer of another corporation, partnership, joint venture, trust, or other enterprise. Our amended and restated bylaws are expected to provide that we may indemnify to the fullest extent permitted by law any person who is or was a party or is threatened to be made a party to any action, suit, or proceeding by reason of the fact that he or she is or was one of our employees or agents or is or was serving at our request as an employee or agent of another corporation, partnership, joint venture, trust, or other enterprise. Our amended and restated bylaws will also provide that we must advance expenses incurred by or on behalf of a director or officer in advance of the final disposition of any action or proceeding, subject to very limited exceptions.

Further, we have entered into indemnification agreements with each of our directors and executive officers that may be broader than the specific indemnification provisions contained in the Delaware General Corporation Law. These indemnification agreements require us, among other things, to indemnify our directors and executive officers against liabilities that may arise by reason of their status or service. These indemnification agreements also require us to advance all expenses incurred by the directors and executive officers in investigating or defending any such action, suit, or proceeding. We believe that these agreements are necessary to attract and retain qualified individuals to serve as directors and executive officers.

The limitation of liability and indemnification provisions that are expected to be included, or are included, in our amended and restated certificate of incorporation, amended and restated bylaws, and in indemnification agreements that we enter into with our directors and executive officers may discourage stockholders from bringing a lawsuit against our directors and executive officers for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against our directors and executive officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be harmed to the extent that we pay the costs of settlement and damage awards against directors and executive officers as required by these indemnification provisions. At present, we are not aware of any pending litigation or proceeding involving any person who is or was one of our directors, officers, employees, or other agents or is or was serving at our request as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification.

We have obtained insurance policies under which, subject to the limitations of the policies, coverage is provided to our directors and executive officers against loss arising from claims made by reason of breach of fiduciary duty or other wrongful acts as a director or executive officer, including claims relating to public securities matters, and to us with respect to payments that may be made by us to these directors and executive officers pursuant to our indemnification obligations or otherwise as a matter of law.

Certain of our non-employee directors may, through their relationships with their employers, be insured and/or indemnified against certain liabilities incurred in their capacity as members of our board of directors.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers, or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

### Policies and Procedures for Related Party Transactions

Our audit and risk committee charter provides that the audit and risk committee has the primary responsibility for reviewing and approving or disapproving "related party transactions," which are transactions between us and related persons in which the aggregate amount involved exceeds or may be expected to exceed $120,000 and in which a related person has or will have a direct or indirect material interest. For purposes of this policy, a related person is defined as a director, executive officer, nominee for director, or greater than 5% beneficial owner of our common stock, in each case since the beginning of the most recently completed year, and their immediate family members.

All of the transactions described above were approved by either the audit and risk committee or the disinterested members of our board of directors after making a determination that the transaction was executed on terms no less favorable than those that could have been obtained from an unrelated third party.

## PRINCIPAL AND REGISTERED STOCKHOLDERS

The following table sets forth:

• certain information with respect to the beneficial ownership of our common stock as of April 30, 2019, for: (i) each of our executive officers; (ii) each of our directors; (iii) all of our directors and executive officers as a group; and (iv) each person known by us to be the beneficial owner of more than five percent of any class of our voting securities; and

• the number of shares of common stock held by and registered for resale by means of this prospectus for the Registered Stockholders.

The Registered Stockholders include (i) our affiliates and certain other stockholders with "restricted securities" (as defined in Rule 144 under the Securities Act) who, because of their status as affiliates pursuant to Rule 144 or because they acquired their shares of common stock from an affiliate or from us within the prior 12 months, would be unable to sell their securities pursuant to Rule 144 until we have been subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act for a period of at least 90 days, and (ii) our non-executive officer service providers who acquired shares from us within the prior 12 months under Rule 701 and hold "restricted securities" (as defined in Rule 144 under the Securities Act). The Registered Stockholders may, or may not, elect to sell their shares of Class A common stock covered by this prospectus, as and to the extent they may determine. Such sales, if any, will be made through brokerage transactions on the NYSE at prevailing market prices. As such, we will have no input if and when any Registered Stockholder may, or may not, elect to sell their shares of common stock or the prices at which any such sales may occur. Prior to any sales of shares of Class A common stock, Registered Stockholders who hold Class B common stock must convert their shares of Class B common stock into shares of Class A common stock. See the section titled "Plan of Distribution."

The listing and public trading of our Class A common stock on the NYSE will satisfy the performance vesting condition and result in the vesting and settlement of approximately 28,250,000 RSUs held by our current and former employees and other service providers as of June 20, 2019. To fund the tax withholding and remittance obligations arising in connection with the RSUs that will vest and settle on that day, we expect that current and former employees will use a broker or brokers to sell a portion of such shares into the market on the first trading day. The proceeds of such sales will be remitted either to us or directly to the relevant taxing authorities, in either case, to be applied towards such tax obligations. Approximately 11,500,000 shares of our Class A common stock are expected to be sold throughout the first trading day in order to fund such tax amounts. The number of shares expected to be sold has been calculated using a percentage that is based on the estimated withholding tax rates for those employees with RSUs that will vest and settle on the first day of trading. Information concerning the Registered Stockholders may change from time to time and any changed information will be set forth in supplements to this prospectus, if and when necessary. Because the Registered Stockholders who hold Class B common stock may convert their shares of Class B common stock into Class A common stock at any time and the Registered Stockholders may sell all, some, or none of the shares of Class A common stock covered by this prospectus, we cannot determine the number of such shares of Class A common stock that will be sold by the Registered Stockholders, or the amount or percentage of shares of common stock that will be held by the Registered Stockholders, either as Class A common stock or Class B common stock, upon consummation of any particular sale. In addition, the Registered Stockholders listed in the table below may have sold, transferred, or otherwise disposed of, or may sell, transfer, or otherwise dispose of, at any time and from time to time, shares of common stock in transactions exempt from the registration requirements of the Securities Act, after the date on which they provided the information set forth in the table below. The Registered Stockholders have not, nor have they within the past three years had, any position, office, or other material relationship with us, other than as disclosed in this prospectus. See the sections titled "Management" and "Certain Relationships and Related Party Transactions" for further information regarding the Registered Stockholders.

After the listing of our Class A common stock on the NYSE, certain of the Registered Stockholders are entitled to registration rights with respect to their shares of Class B common stock, as described in the section titled "Description of Capital Stock—Registration Rights" at any time beginning 180 days after the listing of our Class A common stock on the NYSE.

152

We currently intend to use our reasonable efforts to keep the Registration Statement effective for a period of 90 days after the effectiveness of the Registration Statement. As a result, we have registered shares of Class A common stock and Class B common stock currently held by Registered Stockholders, as well as shares of Class B common stock of our affiliates that can vest and settle while the registration statement of which this prospectus forms a part is effective.

We are not party to any arrangement with any Registered Stockholder or any broker-dealer with respect to sales of the shares of Class A common stock by the Registered Stockholders. However, we have engaged financial advisors and associate financial advisors with respect to certain other matters relating to our listing. See the section titled "Plan of Distribution."

We have determined beneficial ownership in accordance with the rules of the SEC, and thus it represents sole or shared voting or investment power with respect to our securities. Unless otherwise indicated below, to our knowledge, the persons and entities named in the table have sole voting and sole investment power with respect to all shares that they beneficially owned, subject to community property laws where applicable. We have deemed shares of our common stock subject to options that are currently exercisable or exercisable within 60 days of April 30, 2019 to be outstanding and to be beneficially owned by the person holding the option for the purpose of computing the percentage ownership of that person. We have deemed shares of our common stock subject to RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019 to be outstanding and to be beneficially owned by the person holding the RSUs for the purpose of computing the percentage ownership of that person. However, we did not deem these shares subject to stock options or RSUs outstanding for the purpose of computing the percentage ownership of any other person. This table also gives effect to the entry into voting agreements between our Chief Executive Officer, Stewart Butterfield, and certain other stockholders as if the voting agreements were effective as of April 30, 2019.

We have based percentage ownership of our common stock on 896,057 shares of our Class A common stock and 503,247,970 shares of our Class B common stock outstanding as of April 30, 2019, which includes 373,371,712 shares of Class B common stock resulting from the automatic conversion of all outstanding shares of our convertible preferred stock upon the effectiveness of the registration statement of which this prospectus forms a part, as if this conversion had occurred as of April 30, 2019.

153

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o Slack Technologies, Inc., 500 Howard St., San Francisco, California 94105.

| | Shares Beneficially Owned | | | | | | | |
| | Class A | | Class B | | | | | |
| | Shares Outstanding | % | Shares Outstanding | Shares that may be Acquired within 60 Days | Total | % | Percent of Total Voting Power | Shares of Class A Common Stock being Registered (1) |
|---|---|---|---|---|---|---|---|---|
| **5% Stockholders:** | | | | | | | | |
| Entities affiliated with Accel (2) | — | — | 119,928,410 | — | 119,928,410 | 23.8% | 23.8% | 29,982,103 |
| Entities affiliated with Andreessen Horowitz (3) | — | — | 66,523,324 | — | 66,523,324 | 13.2% | 13.2% | 16,630,831 |
| Entities affiliated with Social Capital (4) | — | — | 50,853,362 | — | 50,853,362 | 10.1% | 10.1% | 12,713,341 |
| Entities affiliated with SoftBank (5) | — | — | 36,611,744 | — | 36,611,744 | 7.3% | 7.3% | 2,245,638 |
| **Executive Officers and Directors:** | | | | | | | | |
| Stewart Butterfield (6) | — | — | 41,619,937 | 915,204 | 42,535,141 | 8.4% | 8.4% | 11,048,386 |
| Shares subject to voting proxy (7) | — | — | 46,975,038 | 258,747 | 47,233,785 | 9.4% | 9.4% | — |
| Total (6)(7) | — | — | 88,594,975 | 1,173,951 | 89,768,926 | 17.8% | 17.8% | — |
| Allen Shim (8) | — | — | 1,989,105 | 754,780 | 2,743,885 | * | * | 1,322,706 |
| Robert Frati (9) | — | — | — | 564,935 | 564,935 | * | * | 635,565 |
| Cal Henderson (10) | — | — | 16,604,503 | 197,560 | 16,802,063 | 3.3% | 3.3% | 4,378,441 |
| David Schellhase (11) | — | — | — | 508,670 | 508,670 | * | * | 573,312 |
| Tamar Yehoshua (12) | — | — | 356,984 | — | 356,984 | * | * | — |
| Andrew Braccia (13) | — | — | 119,928,410 | — | 119,928,410 | 23.8% | 23.8% | — |
| Edith Cooper (14) | — | — | — | 85,446 | 85,446 | * | * | 102,535 |
| Sarah Friar (15) | — | — | 406,017 | — | 406,017 | * | * | 50,752 |
| John O'Farrell (16) | — | — | — | — | — | — | — | — |
| Chamath Palihapitiya (17) | — | — | 50,853,362 | — | 50,853,362 | 10.1% | 10.1% | — |
| Graham Smith (18) | — | — | 210,000 | — | 210,000 | * | * | — |
| All executive officers and directors as a group (12 persons) (19) | — | — | 262,338,853 | 3,087,782 | 265,426,635 | 52.4% | 52.4% | 18,111,697 |
| **Other Registered Stockholders:** | | | | | | | | |
| Non-Executive Officer and Non-Director Service Providers Holding Common Stock (20) | — | — | 10,162,002 | 10,950,145 | 21,112,147 | 4.1% | 4.1% | 5,490,471 |
| All Other Registered Stockholders (21) | 896,057 | 100% | 68,346,543 | — | 69,242,600 | 13.6% | 13.6% | 33,255,559 |

---

\*    Represents less than one percent (1%).

(1)    Registered shares also include, in the case of our executive officers, chief accounting officer and directors, (i) shares of Class B common stock subject to outstanding options that are exercisable as of September 30, 2019 and (ii) shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied as of September 30, 2019.

(2)    Consists of (i) 14,822,116 shares of Class B common stock held of record by Accel Growth Fund III L.P., (ii) 699,769 shares of Class B common stock held of record by Accel Growth Fund III Strategic Partners L.P., (iii) 981,989 shares of Class B common stock held of record by Accel Growth Fund Investors 2014 L.L.C., (iv) 233,298 shares of Class B common stock held of record by Accel Growth Fund Investors 2016 L.L.C., (v) 4,877,680 shares of Class B common stock held of record by Accel Growth Fund IV L.P., (vi) 27,749 shares of Class B common stock held of record by Accel Growth Fund IV Strategic Partners L.P., (vii) 2,753,490 shares of Class B common stock held of record by Accel Investors 2009 L.L.C., (viii) 1,550,384 shares of Class B common stock held of record by Accel Investors 2013 L.L.C., (ix) 207,696 shares of Class B

154

common stock held of record by Accel Leaders Fund Investors 2016 L.L.C., (x) 4,347,025 shares of Class B common stock held of record by Accel Leaders Fund L.P., (xi) 68,584,320 shares of Class B common stock held of record by Accel X L.P., (xii) 5,147,490 shares of Class B common stock held of record by Accel X Strategic Partners L.P., (xiii) 14,598,564 shares of Class B common stock held of record by Accel XI L.P., and (xiv) 1,096,840 shares of Class B common stock held of record by Accel XI Strategic Partners L.P. Accel Growth Fund III Associates L.L.C. is the general partner of each of Accel Growth Fund III L.P. and Accel Growth Fund III Strategic Partners L.P. (the "Accel Growth Fund III Entities"). The managing members of Accel Growth Fund III Associates L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong. Accel Growth Fund III Associates L.L.C. has sole voting and dispositive power with regard to the shares held by the Accel Growth Fund III Entities, and its managing members share such powers. The managing members of Accel Growth Fund Investors 2014 L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong, all of whom share voting and dispositive power with regard to the shares held by Accel Growth Fund Investors 2014 L.L.C. The managing member of Accel Growth Fund Investors 2016 L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong, all of whom share voting and dispositive power with regard to the shares held by Accel Growth Fund Investors 2016 L.L.C. Accel Growth Fund IV Associates L.L.C. is the general partner of each Accel Growth Fund IV L.P. and Accel Growth Fund IV Strategic Partners L.P. (the "Accel Growth Fund IV Entities"). The managing members of Accel Growth Fund IV Associates L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong. Accel Growth Fund IV Associates L.L.C. has sole voting and dispositive power with regard to the shares held by the Accel Growth Fund IV Entities, and its managing members share such powers. The managing member of Accel Investors 2009 L.L.C. are Andrew Braccia, Kevin Efrusy, Sameer Gandhi, Ping Li, Tracy Sedlock, and Richard Wong, all of whom share voting and dispositive power with regard to the shares held by Accel Investors 2009 L.L.C. The managing members of Accel Investors 2013 L.L.C. are Andrew G. Braccia, Sameer K. Gandhi, Ping Li, Tracy L. Sedlock, and Richard P. Wong, all of whom share voting and dispositive power with regard to the shares held by Accel Investors 2013 L.L.C. The managing members of Accel Leaders Funder Investors 2016 L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong, all of whom share voting and dispositive power with regard to the shares held by Accel Leaders Funder Investors 2016 L.L.C. Accel Leaders Fund Associates L.L.C. is the general partner of Accel Leaders Fund L.P. The managing members of Accel Leaders Fund Associates L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong. Accel Leaders Fund Associates L.L.C. has sole voting and dispositive power with regard to the shares held by the Accel Leaders Fund L.P. Accel X Associates L.L.C. is the general partner of each of Accel X L.P. and Accel X Strategic Partners L.P. (together, the "Accel X Entities"). The managing members of Accel X Associates L.L.C. are Andrew Braccia, Kevin Efrusy, Sameer Gandhi, Ping Li, Tracy Sedlock, and Richard P. Wong. Accel X Associates L.L.C. has sole voting and dispositive power with regard to the shares held by the Accel X Entities. Accel XI Associates L.L.C. is the general partner each of Accel XI L.P. and Accel XI Strategic Partners L.P. (together, the "Accel XI Entities"). The managing members of Accel XI Associates L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, and Richard Wong. Accel XI Associates L.L.C. has sole voting and dispositive power with regard to the shares held by the Accel XI Entities. The address for each of these entities is 500 University Avenue, Palo Alto, CA 94301.

(3)    Consists of (i) 42,990 shares of Class B common stock held of record by a16z Seed-III, LLC ("a16z Seed"), (ii) 18,092,974 shares of Class B common stock held of record by AH Parallel Fund IV, L.P. for itself and as nominee for AH Parallel Fund IV-A, L.P., AH Parallel Fund IV-B, L.P., and AH Parallel Fund IV-Q, L.P. (collectively, the "AH Parallel Fund IV Entities"), and (iii) 48,387,360 shares of Class B common stock held of record by Andreessen Horowitz Fund I, L.P., as nominee for Andreessen Horowitz Fund I, L.P., Andreessen Horowitz Fund I-A, L.P., and Andreessen Horowitz Fund I-B, L.P. (collectively, the "AH Fund I Entities"). The shares held directly by a16z Seed are indirectly held by Andreessen Horowitz Fund III, L.P., Andreessen Horowitz Fund III-A, L.P., Andreessen Horowitz Fund III-B, L.P., and Andreessen Horowitz Fund III-Q, L.P. (collectively, the "AH Fund III Entities"), and the members of a16z Seed. AH Equity Partners III, L.L.C. ("AH EP III"), the general partner of the AH Fund III Entities, has sole voting and dispositive power with regard to the shares held by a16z Seed. The managing members of AH EP III are Marc Andreessen and Ben Horowitz. AH Equity Partners IV (Parallel), L.L.C. ("AH EP IV Parallel"), the general partner of the AH Parallel Fund IV Entities, has sole voting and dispositive power with regard to the shares held by the AH Parallel Fund IV Entities. The managing members of AH EP IV Parallel are Marc Andreessen and Ben Horowitz. AH Equity Partners I, L.L.C. ("AH EP I"), the general partner of the AH Fund I Entities, has sole voting and dispositive power with regard to the shares held by the AH Fund I Entities. The managing members of AH EP I are Marc Andreessen and Ben Horowitz. The address for each of these individuals and entities is 2865 Sand Hill Road, Suite 101, Menlo Park, CA 94025.

(4)    Consists of (i) 43,290,060 shares of Class B common stock held of record by The Social+Capital Partnership II, L.P., for itself and as nominee for certain other individuals and entities, (ii) 2,501,374 shares of Class B common stock held of record by The Social+Capital Partnership III, L.P., for itself and as nominee for The Social+Capital Partnership Principals Fund III, L.P., and (iii) 5,061,928 shares of Class B common stock of record by The Social+Capital Partnership Opportunities Fund, L.P. The Social+Capital Partnership GP II, Ltd. is the general partner of The Social+Capital Partnership GP II, L.P., which is the general partner of The Social+Capital Partnership II, L.P. The sole member of The Social+Capital Partnership GP II, Ltd. is Social Capital Holdings Inc. The Social+Capital Partnership GP II, Ltd. has sole voting and dispositive power with regard to the shares held by The Social+Capital Partnership II, L.P. The Social+Capital Partnership GP III, Ltd. is the general partner of The Social+Capital Partnership GP III, L.P., which is the general partner of The Social+Capital Partnership III, L.P. The sole member of The Social+Capital Partnership GP III, Ltd. is Social Capital Holdings Inc. The Social+Capital Partnership GP III, Ltd. has sole voting and dispositive power with regard to the shares held by The Social+Capital Partnership III, L.P. The Social+Capital Partnership Opportunities Fund GP, Ltd. is the general partner of The Social+Capital Partnership Opportunities Fund GP, L.P., which is the general partner of The Social+Capital Partnership Opportunities Fund, L.P. The sole member of The Social+Capital Partnership Opportunities Fund GP, Ltd. is Social Capital Holdings Inc. The Social+Capital Partnership Opportunities Fund GP, Ltd. has sole voting and dispositive power with regard to the shares held by The Social+Capital Partnership Opportunities Fund, L.P. Chamath Palihapitiya is the Chief Executive Officer of Social Capital Holdings Inc. and holds voting and dispositive power over shares controlled by The Social+Capital Partnership GP II, Ltd., The Social+Capital Partnership GP III, Ltd., and The Social+Capital Partnership Opportunities Fund GP, Ltd. The address for each of these entities is c/o The Social+Capital Partnership, L.L.C. 120 Hawthorne Avenue, Palo Alto, CA 94301.

(5)    Consists of 36,611,744 shares of Class B common stock held of record by SoftBank Vision Fund (AIV M1) L.P. SoftBank Vision Fund (AIV M1) L.P. is managed by SB Investment Advisers (UK) Limited. Ruwan Weerasekera is a Director of SB Investment Advisers (UK) Limited. SB Investment Advisers (UK) Limited has sole voting and dispositive power over the shares held by the SoftBank Vision Fund (AIV M1) L.P. The address of SoftBank Vision Fund (AIV M1) L.P. is c/o SB Investment Advisers (UK) Limited, 69 Grosvenor Street, London, W1K 3JP and c/o SB Investment Advisers (US), Inc., 1 Circle Star Way, 4F, San Carlos, CA 94070.

155

(6)  Consists of (i) 41,619,937 shares of Class B common stock, of which 1,610,183 are subject to repurchase by the company and (ii) 915,204 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019.

(7)  Consists of shares of Class B common stock currently held or that may be acquired within 60 days of April 30, 2019 by other stockholders over which, except under limited circumstances, Mr. Butterfield holds an irrevocable proxy, pursuant to voting agreements between Mr. Butterfield and each of such stockholders, including Mr. Henderson, an executive officer, as indicated in the footnotes below. The voting agreements will terminate upon (i) the liquidation or dissolution of Slack, (ii) an assignment by Slack for the benefit of creditors or appointment of a receiver, (iii) the written consent of Mr. Butterfield, (iv) the death of Mr. Butterfield, (v) the time at which Mr. Butterfield is no longer an officer, employee or director of Slack, (vi) the time at which all shares of Class B common stock automatically convert to Class A common stock according to the terms of our amended and restated certificate of incorporation, or (vii) the transfer of shares covered by the voting agreement, but only with respect to such shares that are transferred. We do not believe that the parties to these voting agreements constitute a "group" under Section 13 of the Exchange Act, as Mr. Butterfield exercises voting control over these shares.

(8)  Consists of (i) 240,000 shares of Class B common stock, (ii) 1,749,105 shares of Class B common stock held of record by the Shim-Park Family Revocable Trust, of which 24,033 are subject to repurchase by the company, (iii) 351,855 shares of Class B common stock subject to outstanding options that are exercisable within 60 days of April 30, 2019, and (iv) 402,925 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019.

(9)  Consists of (i) 560,185 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019 and (ii) 4,750 shares of Class B common stock subject to outstanding options that are exercisable within 60 days of April 30, 2019.

(10)  Consists of (i) 16,604,503 shares of Class B common stock held of record by Cal Henderson and Rebecca Reeve Henderson, Trustees of The Henderson Family Trust, (ii) 194,130 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019, and (iii) 3,250 shares of Class B common stock subject to outstanding options that are exercisable within 60 days of April 30, 2019. All shares of Class B common stock beneficially owned by Mr. Henderson are subject to a voting agreement in favor of Mr. Butterfield, however Mr. Henderson retains dispositive power over such shares.

(11)  Consists of (i) 505,170 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019 and (ii) 3,500 shares of Class B common stock subject to outstanding options that are exercisable within 60 days of April 30, 2019.

(12)  Consists of (i) 356,984 shares of Class B common stock, all of which are subject to repurchase by the company and (ii) 0 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019.

(13)  Consists of shares held by the entities affiliated with Accel identified in footnote 1.

(14)  Consists of 85,446 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019.

(15)  Consists of (i) 228,385 shares of Class B common stock held of record by Sarah J. Friar, as Trustee of the David Riley and Sarah Friar Revocable Trust Dated August 11, 2006, of which 203,009 are subject to repurchase by the company and (ii) 177,632 shares of Class B common stock held of record by Sarah Friar 2019 Grantor Retained Annuity Trust Dated February 1, 2019, of which none are subject to repurchase by the company.

(16)  Excludes shares listed in footnote 2 above owned by entities affiliated with Andreessen Horowitz. Mr. O'Farrell, one of our directors, is a non-managing member of these entities and does not have voting or dispositive power over such shares.

(17)  Consists of shares held by the entities affiliated with Social Capital identified in footnote 3.

(18)  Consists of 210,000 shares of Class B common stock, all of which are subject to repurchase by the company.

(19)  Consists of (i) 262,338,853 shares of Class B common stock beneficially owned by our current directors and executive officers, of which 2,404,209 are subject to repurchase by the company, (ii) 363,355 shares of Class B common stock subject to outstanding options that are exercisable within 60 days of April 30, 2019, and (iii) 2,724,427 shares of Class B common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019; including shares of Class B common stock currently held or that may be acquired within 60 days of April 30, 2019 by other stockholders over which, except under limited circumstances, Mr. Butterfield holds an irrevocable proxy, pursuant to voting agreements between Mr. Butterfield and each of such stockholders.

(20)  Consists of (i) 10,162,002 shares of Class B common stock beneficially owned by such other Registered Stockholders, of which 103,088 are subject to repurchase by the company, (ii) 4,682,688 shares of common stock subject to outstanding options that are exercisable within 60 days of April 30, 2019, and (iii) 6,267,457 shares of common stock subject to outstanding RSUs for which the service condition has been satisfied or would be satisfied within 60 days of April 30, 2019.

(21)  Consists of (i) 896,057 shares of Class A common stock and (ii) 68,346,543 shares of Class B common stock.

## DESCRIPTION OF CAPITAL STOCK

### General

The following description summarizes the most important terms of our capital stock, as they are expected to be in effect shortly following the effectiveness of the registration statement of which this prospectus forms a part. We expect to adopt an amended and restated certificate of incorporation and amended and restated bylaws in connection with this registration, and this description summarizes the provisions that are expected to be included in such documents. Because it is only a summary, it does not contain all the information that may be important to you. For a complete description of the matters set forth in this section titled "Description of Capital Stock," you should refer to our amended and restated certificate of incorporation, amended and restated bylaws, and our amended and restated investor rights' agreement, which are or will be included as exhibits to the registration statement of which this prospectus forms a part, and to the applicable provisions of Delaware law. Shortly following the effectiveness of the registration statement of which this prospectus forms a part, our authorized capital stock will consist of:

- 5,000,000,000 shares of Class A common stock, $0.0001 par value per share,

- 700,000,000 shares of Class B common stock, $0.0001 par value per share, and

- 100,000,000 shares of undesignated preferred stock, $0.0001 par value per share.

Assuming the conversion of all outstanding shares of our convertible preferred stock into shares of our Class B common stock, which will occur upon the effectiveness of the registration statement of which this prospectus forms a part, as of April 30, 2019, there were 896,057 outstanding shares of Class A common stock and 503,247,970 shares of our Class B common stock outstanding, held by 494 stockholders of record, and no shares of our convertible preferred stock outstanding. Our board of directors is authorized, without stockholder approval except as required by the listing standards of the NYSE, to issue additional shares of our capital stock.

### Class A Common Stock and Class B Common Stock

We have two classes of authorized common stock, Class A common stock and Class B common stock. All outstanding shares of our convertible preferred stock will be converted into shares of our Class B common stock. In addition, any options to purchase shares of our capital stock outstanding prior to the effectiveness of the registration statement of which this prospectus forms a part are eligible to be settled in or exercisable for shares of our Class B common stock.

#### *Dividend Rights*

Subject to preferences that may apply to any shares of preferred stock outstanding at the time, the holders of our Class A common stock and Class B common stock are entitled to receive dividends out of funds legally available if our board of directors, in its discretion, determines to issue dividends and then only at the times and in the amounts that our board of directors may determine. See the section titled "Dividend Policy."

*Voting Rights*

Holders of our Class A common stock are entitled to one vote per share, and holders of our Class B common stock are entitled to 10 votes per share, on all matters submitted to a vote of stockholders. The holders of our Class A common stock and Class B common stock will generally vote together as a single class on all matters submitted to a vote of our stockholders, unless otherwise required by Delaware law or our amended and restated certificate of incorporation. Delaware law could require either holders of our Class A common stock or Class B common stock to vote separately as a single class in the following circumstances:

- if we were to seek to amend our amended and restated certificate of incorporation to increase or decrease the par value of a class of our capital stock, then that class would be required to vote separately to approve the proposed amendment; and

- if we were to seek to amend our amended and restated certificate of incorporation in a manner that alters or changes the powers, preferences, or special rights of a class of our capital stock in a manner that affected its holders adversely, then that class would be required to vote separately to approve the proposed amendment.

Our amended and restated certificate of incorporation and amended and restated bylaws will establish a classified board of directors that is divided into three classes with staggered three-year terms. Only the directors in one class will be subject to election by a plurality of the votes cast at each annual meeting of our stockholders, with the directors in the other classes continuing for the remainder of their respective three-year terms. Our amended and restated certificate of incorporation will not provide for cumulative voting for the election of directors.

*Conversion*

Each outstanding share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock. In addition, each share of Class B common stock will convert automatically into one share of Class A common stock upon (i) any transfer, whether or not for value, which occurs after the effectiveness of the registration statement of which this prospectus forms a part , except for certain permitted transfers, described in the paragraph that immediately follows this paragraph and further described in our amended and restated certificate of incorporation, or (ii), in the case of a stockholder who is a natural person, the death or incapacity of such stockholder. Once converted into Class A common stock, the Class B common stock will not be reissued.

The following transfers of Class B common stock will not trigger an automatic conversion of such stock to Class A common stock: (i) a transfer by a holder of Class B common stock to any of the persons or entities listed in clauses (A) through (G) below (each, a "Permitted Transferee") and from any such Permitted Transferee back to such holder of Class B common stock and/or any other Permitted Transferee established by or for such holder of Class B common stock: (A) to any family member of such holder of Class B common stock, including a spouse, domestic partner, parent, grandparent, lineal descendant (which includes a descendant adopted as a minor), sibling or lineal descendant of a sibling; (B) to a trust for the benefit of the holder of Class B common stock or over which such holder of Class B common stock or its family members retain sole dispositive power and voting control, provided the holder of Class B common stock does not receive consideration in exchange for the transfer (other than as a settlor or beneficiary of such trust); (C) to the beneficiaries or trustee of a trust; so long as the original grantor of the trust (the "Grantor") and/or family members of such Grantor have sole dispositive power and exclusive voting control with respect to the shares of Class B common stock; (D) to a trust under the terms of which such holder of Class B common stock has retained a "qualified interest" within the meaning of §2702(b)(1) of the Internal Revenue Code and/or a reversionary interest so long as the holder of Class B common stock and/or family members of such holder of Class B common stock retain sole dispositive power and exclusive voting control with respect to the shares of Class B common stock held by such trust; (E) to an Individual Retirement Account, as defined in Section 408(a) of the Internal Revenue Code (or successor provision), or a pension, profit sharing, stock bonus or other type of plan or trust of which such holder of Class B common stock is a participant or beneficiary and which satisfies the requirements for qualification under Section 401 of the Internal Revenue Code (or successor provision), so long as such holder of Class B common stock retains sole dispositive power and exclusive voting control with respect to the shares of Class B common stock held in such account, plan or trust; (F) to a corporation, partnership or limited liability company in which such holder of Class B common stock and/or family members of such holder of Class B common stock directly, or indirectly, retain sole dispositive power and exclusive voting control with respect to the shares of Class B common stock held by such corporation,

158

partnership or limited liability company; or (G) to an affiliate of a holder of Class B common stock, provided that the person or entity holding sole dispositive power and exclusive voting control with respect to the shares of Class B common stock being transferred retains, directly or indirectly, sole dispositive power and exclusive voting control with respect to the shares following such transfer.

Each outstanding share of Class B common stock will convert automatically into one share of Class A common stock upon the date specified by affirmative vote of the holders of at least 66-2/3% of the outstanding shares of Class B common stock, voting as a single class.

All outstanding shares of Class A common stock and Class B common stock will convert automatically into shares of a single class of common stock on the earlier of the date that is ten years from the date of this prospectus or the date the holders of at least two-thirds of our Class B common stock elect to convert the Class B common stock to Class A common stock. The purpose of this provision is to ensure that following such conversion, each share of common stock will have one vote per share and the rights of the holders of all outstanding common stock will be identical. Once converted into a single class of common stock, the Class A common stock and Class B common stock may not be reissued. See the section titled "Risk Factors— Risks Related to Ownership of Our Class A Common Stock — The dual class structure of our common stock has the effect of concentrating voting control with those stockholders who held our capital stock prior to the listing of our Class A common stock on the NYSE, including our directors, executive officers and their respective affiliates, who will hold in the aggregate 65.6% of the voting power of our capital stock upon the effectiveness of the registration statement of which this prospectus forms a part. This ownership will limit or preclude your ability to influence corporate matters, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval." f or a description of the risks related to the dual class structure of our common stock.

### No Preemptive or Similar Rights

Our Class A common stock and Class B common stock are not entitled to preemptive rights and are not subject to conversion (except as noted above), redemption, or sinking fund provisions.

### Right to Receive Liquidation Distributions

If we become subject to a liquidation, dissolution, or winding-up, the assets legally available for distribution to our stockholders would be distributable ratably among the holders of our Class A common stock and Class B common stock and any participating preferred stock outstanding at that time, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights of and the payment of liquidation preferences, if any, on any outstanding shares of preferred stock.

### Fully Paid and Non-Assessable

All of the outstanding shares of our Class A common stock and Class B common stock are fully paid and non-assessable.

### Preferred Stock

Shortly following the effectiveness of the registration statement of which this prospectus forms a part, our board of directors will be authorized, subject to limitations prescribed by Delaware law, to issue preferred stock in one or more series, to establish from time to time the number of shares to be included in each series and to fix the designation, powers, preferences, and rights of the shares of each series and any of its qualifications, limitations, or restrictions, in each case without further vote or action by our stockholders. Our board of directors can also increase or decrease the number of shares of any series of preferred stock, but not below the number of shares of that series then outstanding, without any further vote or action by our stockholders. Our board of directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of our Class A common stock and Class B common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring, or preventing a change in control of our company and might adversely affect the market price of

our Class A common stock and the voting and other rights of the holders of our Class A common stock and Class B common stock. We have no current plan to issue any shares of preferred stock.

## Options

As of April 30, 2019, we had outstanding options to purchase an aggregate of 19,318,139 shares of our Class B common stock, with a weighted-average exercise price of $2.74645 per share, pursuant to our 2009 Plan.

## Restricted Stock Units

As of April 30, 2019, we had outstanding RSUs representing 77,376,197 shares of our Class B common stock, issued pursuant to our 2009 Plan.

## Registration Rights

After the listing of our Class A common stock on the NYSE, certain holders of our Class B common stock will be entitled to rights with respect to the registration of their shares under the Securities Act. These registration rights are contained in our amended and restated investors' rights agreement, or the IRA, dated as of May 9, 2019. We, along with certain holders of our convertible preferred stock are parties to the IRA. The registration rights set forth in the IRA will expire five years following the listing of our Class A common stock on the NYSE, or, with respect to any particular stockholder, when such stockholder is able to sell all of its shares pursuant to Rule 144(b)(1)(i) of the Securities Act or holds 1% or less of our common stock and is able to sell all of its Registrable Securities, as defined in the IRA, without registration pursuant to Rule 144 of the Securities Act during any three-month period. We will pay the registration expenses (other than underwriting discounts and selling commissions) of the holders of the shares registered pursuant to the registrations described below, including the reasonable fees of one counsel for the selling holders. In an underwritten offering, the underwriters have the right, subject to specified conditions, to limit the number of shares such holders may include.

### *Demand Registration Rights*

After the listing of our Class A common stock on the NYSE, the holders of up to approximately 372,136,712 shares of our Class B common stock will be entitled to certain demand registration rights. At any time beginning six months after the listing of our Class A common stock on the NYSE, the holders of at least 25% of these shares then outstanding can request that we register the offer and sale of their shares. We are obligated to effect only two such registrations. If we determine that it would be seriously detrimental to us and our stockholders to effect such a demand registration, we have the right to defer such registration, not more than once in any 12-month period, for a period of up to 90 days. Additionally, we will not be required to effect a demand registration during the period beginning 60 days prior to our good faith estimate of the date of the filing of and ending on a date 180 days following the effectiveness of a registration statement relating to our Class A common stock.

### *Piggyback Registration Rights*

After the listing of our Class A common stock on the NYSE, if we propose to register the offer and sale of our common stock under the Securities Act, in connection with the public offering of such common stock, the holders of up to approximately 372,136,712 shares of our Class B common stock will be entitled to certain "piggyback" registration rights allowing the holders to include their shares in such registration, subject to certain marketing and other limitations. As a result, whenever we propose to file a registration statement under the Securities Act, other than with respect to (1) a registration related solely to a company stock plan, (2) a registration relating to a corporate reorganization or transaction under Rule 145 of the Securities Act, (3) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the public offering of our common stock, or (4) a registration in which the only common stock being registered is common stock issuable upon the conversion of debt securities that are also being registered, the holders of these shares are entitled to notice of the registration and have the right, subject to certain limitations, to include their shares in the registration.

160

*S-3 Registration Rights*

After the listing of our Class A common stock on the NYSE, the holders of up to approximately 372,136,712 shares of our Class B common stock will be entitled to certain Form S-3 registration rights. The holders of at least 25% of these shares then outstanding may make a written request that we register the offer and sale of their shares on a registration statement on Form S-3 if we are eligible to file a registration statement on Form S-3 so long as the request covers at least that number of shares with an anticipated offering price, net of underwriting discounts and commissions, of at least $5.0 million. These stockholders may make an unlimited number of requests for registration on Form S-3; however, we will not be required to effect a registration on Form S-3 if we have effected two such registrations within the 12-month period preceding the date of the request. Additionally, if we determine that it would be seriously detrimental to us and our stockholders to effect such a registration, we have the right to defer such registration, not more than once in any 12-month period, for a period of up to 90 days.

**Anti-Takeover Provisions**

The provisions of Delaware law, our amended and restated certificate of incorporation and our amended and restated bylaws, which are summarized below, may have the effect of delaying, deferring, or discouraging another person from acquiring control of our company. They are also designed, in part, to encourage persons seeking to acquire control of us to negotiate first with our board of directors. We believe that the benefits of increased protection of our potential ability to negotiate with an unfriendly or unsolicited acquirer outweigh the disadvantages of discouraging a proposal to acquire us because negotiation of these proposals could result in an improvement of their terms.

*Delaware Law*

We are governed by the provisions of Section 203 of the Delaware General Corporation Law. In general, Section 203 prohibits a public Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner. A "business combination" includes mergers, asset sales or other transactions resulting in a financial benefit to the stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns, or within three years did own, 15% or more of the corporation's outstanding voting stock. These provisions may have the effect of delaying, deferring, or preventing a change in our control.

*Amended and Restated Certificate of Incorporation and Amended and Restated Bylaw Provisions*

Our amended and restated certificate of incorporation and our amended and restated bylaws will include a number of provisions that could deter hostile takeovers or delay or prevent changes in control of our board of directors or management team, including the following:

- *Dual Class Stock.* As described above in the subsection titled "—Class A Common Stock and Class B Common Stock—Voting Rights," our amended and restated certificate of incorporation will continue to provide for a dual class common stock structure, which will provide our founders, current investors, executives, and employees with significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company of its assets.

- *Board of Directors Vacancies.* Our amended and restated certificate of incorporation and amended and restated bylaws will authorize only our board of directors to fill vacant directorships, including newly created seats. In addition, the number of directors constituting our board of directors will be permitted to be set only by a resolution adopted by a majority vote of our entire board of directors. These provisions would prevent a stockholder from increasing the size of our board of directors and then gaining control of our board of directors by filling the resulting vacancies with its own nominees. This will make it more difficult to change the composition of our board of directors and promote continuity of management.

- *Classified Board.* Our amended and restated certificate of incorporation and amended and restated bylaws will provide that our board of directors is classified into three classes of directors. A third party may be discouraged from making a tender offer or otherwise attempting to obtain control of us as it is more difficult

161

and time consuming for stockholders to replace a majority of the directors on a classified board of directors. See the section titled "Management—Board of Directors."

- *Stockholder Action; Special Meeting of Stockholders.* Our amended and restated certificate of incorporation will provide that our stockholders may not take action by written consent, but may only take action at annual or special meetings of our stockholders. As a result, a holder controlling a majority of our capital stock would not be able to amend our amended and restated bylaws or remove directors without holding a meeting of our stockholders called in accordance with our amended and restated bylaws. Our amended and restated bylaws will further provide that special meetings of our stockholders may be called only by a majority of our board of directors, the Chairperson of our board of directors, or our Chief Executive Officer, thus prohibiting a stockholder from calling a special meeting. These provisions might delay the ability of our stockholders to force consideration of a proposal or for stockholders controlling a majority of our capital stock to take any action, including the removal of directors.

- *Advance Notice Requirements for Stockholder Proposals and Director Nominations.* Our amended and restated bylaws will provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders or to nominate candidates for election as directors at our annual meeting of stockholders. Our amended and restated bylaws will also specify certain requirements regarding the form and content of a stockholder's notice. These provisions might preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders if the proper procedures are not followed. We expect that these provisions may also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

- *No Cumulative Voting.* The Delaware General Corporation Law provides that stockholders are not entitled to cumulate votes in the election of directors unless a corporation's certificate of incorporation provides otherwise. Our amended and restated certificate of incorporation will not provide for cumulative voting.

- *Directors Removed Only for Cause.* Our amended and restated certificate of incorporation will provide that stockholders may remove directors only for cause.

- *Amendment of Charter Provisions.* Any amendment of the above provisions in our amended and restated certificate of incorporation would require approval by holders of at least two-thirds of our then outstanding common stock.

- *Issuance of Undesignated Preferred Stock.* Our board of directors has the authority, without further action by the stockholders, to issue up to 100,000,000 shares of undesignated preferred stock with rights and preferences, including voting rights, designated from time to time by our board of directors. The existence of authorized but unissued shares of preferred stock would enable our board of directors to render more difficult or to discourage an attempt to obtain control of us by means of a merger, tender offer, proxy contest, or other means.

- *Exclusive Forum.* Our amended and restated bylaws will provide that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a breach of a fiduciary duty, (3) any action asserting a claim against us arising pursuant to the Delaware General Corporation Law, our amended and restated certificate of incorporation or our amended and restated bylaws, or (4) any action asserting a claim against us that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware), in all cases subject to the court having jurisdiction over indispensable parties named as defendants. Nothing in our amended and restated bylaws will preclude stockholders that assert claims under the Securities Act from bringing such claims in state or federal court, subject to applicable law. Any person or entity purchasing or otherwise acquiring any interest in our securities shall be deemed to have notice of and consented to this provision. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

**Transfer Agent and Registrar**

Upon the effectiveness of the registration statement of which this prospectus forms a part, the transfer agent and registrar for our Class A common stock and Class B common stock will be Computershare Trust Company, N.A. The transfer agent's address is 250 Royal Street, Canton, MA 02021.

**Listing**

We have been approved to list our Class A common stock on the NYSE under the symbol "WORK."

163

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to the listing of our Class A common stock on the NYSE, there has been no public market for our common stock, and we cannot predict the effect, if any, that market sales of shares of our common stock or the availability of shares of our common stock for sale will have on the market price of our common stock prevailing from time to time. Sales of substantial amounts of our Class A common stock in the public market following our listing on the NYSE, or the perception that such sales could occur, could adversely affect the public price of our Class A common stock and may make it more difficult for you to sell your Class A common stock at a time and price that you deem appropriate. We will have no input if and when any Registered Stockholder may, or may not, elect to sell its shares of Class A common stock or the prices at which any such sales may occur. Future sales of our Class A common stock in the public market, or the availability of such shares for sale in the public market, could adversely affect market prices prevailing from time to time.

Upon the effectiveness of the registration statement of which this prospectus forms a part, based on the number of shares of our capital stock outstanding as of April 30, 2019, we will have a total of 896,057 shares of our Class A common stock and 503,247,970 shares of our Class B common stock outstanding, assuming the automatic conversion of all outstanding shares of our convertible preferred stock into 373,371,712 shares of our Class B common stock immediately prior to the effectiveness of the registration statement of which this prospectus forms a part.

Shares of our Class A common stock and Class B common stock will be deemed "restricted securities" (as defined in Rule 144 under the Securities Act). Restricted securities may be sold in the public market only if they are registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which rules are summarized below. Following the listing of our Class A common stock on the NYSE, shares of our Class A common stock may be sold either by the Registered Stockholders pursuant to this prospectus or by our other existing stockholders in accordance with Rule 144 of the Securities Act.

As further described below, until we have been a reporting company for at least 90 days, only non-affiliates who have beneficially owned their shares of common stock for a period of at least one year will be able to sell their shares of Class A common stock under Rule 144, which is expected to include approximately 164,932,646 shares of common stock immediately after our registration.

### Rule 144

In general, under Rule 144 as currently in effect, once we have been subject to the public company reporting requirements of Section 13 or Section 15(d) of the Exchange Act for at least 90 days, a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least six months, including the holding period of any prior owner other than our affiliates, is entitled to sell those shares without complying with the manner of sale, volume limitation or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the shares proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then that person would be entitled to sell those shares without complying with any of the requirements of Rule 144.

In general, under Rule 144 as currently in effect, our affiliates or persons selling shares on behalf of our affiliates are entitled to sell, within any three-month period, a number of shares that does not exceed the greater of:

- 1% of the number of shares of our Class A common stock then outstanding; or

- the average weekly trading volume of our Class A common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to that sale.

Sales under Rule 144 by our affiliates or persons selling shares on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us.

164

**Rule 701**

Rule 701 generally allows a stockholder who purchased shares of our common stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of our company during the immediately preceding 90 days to sell these shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation or notice provisions of Rule 144. Rule 701 also permits affiliates of our company to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. All holders of Rule 701 shares, however, are required by that rule to wait until 90 days after the date of this prospectus before selling those shares pursuant to Rule 701.

**Registration Rights**

Pursuant to our amended and restated investors' rights agreement, the holders of up to 372,136,712 shares of our Class B common stock (including shares issuable upon the conversion of our outstanding convertible preferred stock immediately prior to the effectiveness of the registration statement of which this prospectus forms a part), or their transferees, will be entitled to certain rights with respect to the registration of the offer and sale of those shares under the Securities Act. See the section titled "Description of Capital Stock—Registration Rights" for a description of these registration rights. If the offer and sale of these shares is registered, the shares will be freely tradable without restriction under the Securities Act, and a large number of shares may be sold into the public market.

**Registration Statement on Form S-8**

We intend to file a registration statement on Form S-8 under the Securities Act to register all of the shares of our Class A common stock and Class B common stock issuable or reserved for issuance under our 2009 Plan, our 2019 Plan, and our 2019 ESPP. Shares covered by such registration statement will be eligible for sale in the public market, subject to the Rule 144 limitations and vesting restrictions. As of April 30, 2019, RSUs and options to purchase a total of 96,694,336 shares of our Class B common stock pursuant to our 2009 Plan were outstanding and no options or other equity awards were outstanding or exercisable under our 2019 Plan.

**SALE PRICE HISTORY OF OUR CAPITAL STOCK**

We have been approved to list our Class A common stock on the NYSE. Prior to the initial listing, no public market existed for our Class A common stock. However, our Class B common stock (on an as converted basis) has a history of trading in private transactions. The table below shows the high and low sales prices for our Class B common stock (on an as converted basis) in private transactions by our stockholders, for the indicated periods, as well as the volume weighted average price per share, based on information available to us. As of May 30, 2019, there have been no sales of our Class A common stock. While the DMM, in consultation with our financial advisors, is expected to consider this information in connection with setting the opening public price of our Class A common stock, this information may, however, have little or no relation to broader market demand for our Class A common stock and thus the opening public price and subsequent public price of our Class A common stock on the NYSE. As a result, you should not place undue reliance on these historical private sales prices as they may differ materially from the opening public price and subsequent public price of our Class A common stock on the NYSE. See the section titled "Risk Factors—Risks Related to Ownership of Our Class A Common Stock—The public price of our Class A common stock, upon listing on the NYSE, may have little or no relationship to the historical sales prices of our capital stock in private transactions."

| | Per Share Sale Price | | | Number of Shares Sold in the Period | Volume Weighted Average Price (VWAP) | | Number of Shares Outstanding (Period End) |
|---|---|---|---|---|---|---|---|
| | High | | Low | | | | |
| **Annual** | | | | | | | |
| Year ended January 31, 2019 | $ | 23.41 | $ 8.37 | 9,382,888 | $ | 12.97 | 500,945,001 |
| **Quarterly** | | | | | | | |
| Year ended January 31, 2019 | | | | | | | |
| First Quarter | $ | 8.37 | $ 8.37 | 1,205,454 | $ | 8.37 | 458,259,049 |
| Second Quarter | $ | 15.50 | $ 14.00 | 312,104 | $ | 14.95 | 460,744,948 |
| Third Quarter | $ | 13.79 | $ 10.71 | 6,048,141 | $ | 11.18 | 499,263,366 |
| Fourth Quarter | $ | 23.41 | $ 17.25 | 1,817,189 | $ | 21.64 | 500,945,001 |
| Year ended January 31, 2020 | | | | | | | |
| First Quarter | $ | 27.25 | $ 21.00 | 4,384,104 | $ | 25.67 | 504,144,027 |
| Second Quarter (through May 30) | $ | 31.50 | $ 25.75 | 7,113,529 | $ | 26.82 | 504,512,134 |
| **Monthly** | | | | | | | |
| Year Ended January 31, 2019 | | | | | | | |
| July | $ | — | $ — | — | $ | — | 460,744,948 |
| August | $ | 10.71 | $ 10.71 | 4,185,501 | $ | 10.71 | 494,056,811 |
| September | $ | 11.91 | $ 11.91 | 1,548,640 | $ | 11.91 | 497,210,557 |
| October | $ | 13.79 | $ 13.79 | 314,000 | $ | 13.79 | 499,263,366 |
| November | $ | 22.00 | $ 22.00 | 75,000 | $ | 22.00 | 499,315,136 |
| December | $ | 22.00 | $ 17.25 | 154,500 | $ | 20.01 | 499,806,957 |
| January | $ | 23.41 | $ 21.00 | 1,587,689 | $ | 21.78 | 500,945,001 |
| Year Ended January 31, 2020 | | | | | | | |
| February | $ | 22.00 | $ 22.00 | 210,000 | $ | 22.00 | 501,542,049 |
| March | $ | 26.00 | $ 21.00 | 2,374,376 | $ | 25.80 | 502,136,716 |
| April | $ | 27.25 | $ 25.00 | 1,799,728 | $ | 25.91 | 504,144,027 |
| May (through May 30) | $ | 31.50 | $ 25.75 | 7,113,529 | $ | 26.82 | 504,512,134 |

166

**CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following is a discussion of the material U.S. federal income and estate tax consequences relating to ownership and disposition of our common stock by a non-U.S. holder. For purposes of this discussion, the term "non-U.S. holder" means a beneficial owner of our common stock that is not, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or of any political subdivision of the United States;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a U.S. court is able to exercise primary supervision over the administration of the trust and one or more "United States persons" (as defined in the Code) have authority to control all substantial decisions of the trust or if the trust has a valid election in effect to be treated as a United States person under applicable U.S. Treasury Regulations.

A modified definition of "non-U.S. holder" applies for U.S. federal estate tax purposes (as discussed below).

This discussion is based on current provisions of the Code, U.S. Treasury Regulations promulgated thereunder, current administrative rulings, and judicial decisions, all as in effect as of the date of this prospectus and all of which are subject to change or to differing interpretation, possibly with retroactive effect. Any change could alter the tax consequences to non-U.S. holders described in this prospectus. In addition, the Internal Revenue Service, or the IRS, could challenge one or more of the tax consequences described in this prospectus.

We assume in this discussion that each non-U.S. holder holds shares of our common stock as a capital asset (generally, property held for investment) within the meaning of Section 1221 of the Code. This discussion does not address all aspects of U.S. federal income and estate taxation that may be relevant to a particular non-U.S. holder in light of that non-U.S. holder's individual circumstances nor does it address any aspects of state, local, or non-U.S. taxes, alternative minimum tax, or U.S. federal taxes other than income and estate taxes. This discussion also does not consider any specific facts or circumstances that may apply to a non-U.S. holder and does not address the special tax rules applicable to particular non-U.S. holders, such as:

- banks;

- insurance companies;

- tax-exempt organizations;

- other financial institutions;

- brokers or dealers in securities;

- pension plans;

- tax-qualified retirement plans;

- governmental organizations;

- controlled foreign corporations;

- passive foreign investment companies;

- owners that hold our common stock as part of a straddle, hedge, conversion transaction, synthetic security, or other integrated investment;

- certain U.S. expatriates;

167

- persons who have elected to mark securities to market;

- persons subject to the unearned income Medicare contribution tax;

- persons that elect to apply Section 1400Z-2 of the Code to gains recognized with respect to shares of our common stock; or

- persons that acquire our common stock as compensation for services.

In addition, this discussion does not address the tax treatment of partnerships (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) or other entities that are "pass-throughs" for U.S. federal income tax purposes or persons who hold their common stock through partnerships or other entities that are "pass-throughs" for U.S. federal income tax purposes. In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a person treated as a partner in such partnership for U.S. federal income tax purposes generally will depend on the status of the partner, the activities of the partner and the partnership, and certain determinations made at the partner level. A person treated as a partner in a partnership or who holds their stock through another transparent entity should consult his, her, or its own tax advisor regarding the tax consequences of the ownership and disposition of our common stock through a partnership or other "pass-through" entity, as applicable.

Prospective investors should consult their own tax advisors regarding the U.S. federal, state, local, and non-U.S. income and other tax considerations of acquiring, holding, and disposing of our common stock.

### Distributions on our Common Stock

We have never declared or paid any cash dividend on our capital stock, and do not expect to pay any dividends in the foreseeable future. See the section titled "Dividend Policy." However, in the event that we do pay distributions of cash or property on our common stock, those distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. If a distribution exceeds our current and accumulated earnings and profits, the excess will be treated as a tax-free return of the non-U.S. holder's investment, up to such holder's tax basis in our common stock. Any remaining excess will be treated as capital gain, subject to the tax treatment described below under the heading "Gain on Sale, Exchange, or Other Taxable Disposition of Common Stock."

Subject to the discussion of effectively connected income below and the discussions below under the headings "Information Reporting and Backup Withholding" and "Foreign Account Tax Compliance Act", dividends paid to a non-U.S. holder generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty between the United States and such holder's country of residence. If we or another withholding agent apply over-withholding or if a non-U.S. holder does not timely provide us with the required certification, the non-U.S. holder may be entitled to a refund or credit of any excess tax withheld by timely filing an appropriate claim with the IRS.

A non-U.S. holder of our common stock who claims the benefit of an applicable income tax treaty between the United States and such holder's country of residence generally will be required to provide a properly executed IRS Form W-8BEN or W-8BEN-E (or applicable successor form) and satisfy applicable certification and other requirements. A non-U.S. holder that is eligible for a reduced rate of U.S. withholding tax under an income tax treaty may obtain a refund or credit of any excess amounts withheld by timely filing an appropriate claim with the IRS. Non-U.S. holders are urged to consult their own tax advisors regarding their entitlement to benefits under a relevant income tax treaty.

Dividends that are treated as effectively connected with a trade or business conducted by a non-U.S. holder within the United States, and, if an applicable income tax treaty so provides, that are attributable to a permanent establishment or a fixed base maintained by the non-U.S. holder within the United States, are generally exempt from the 30% withholding tax if the non-U.S. holder satisfies applicable certification and disclosure requirements. To obtain this exemption, a non-U.S. holder must generally provide a properly executed original and unexpired IRS Form W-8ECI properly certifying such exemption. However, such U.S. effectively connected income is taxed at the same graduated U.S. federal income tax rates applicable to U.S. persons (as defined in the Code). Any U.S. effectively connected income received by a non-U.S. holder that is a corporation may also, under certain circumstances, be subject to an additional

168

"branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty between the United States and such holder's country of residence.

Any documentation provided to an applicable withholding agent may need to be updated in certain circumstances. The certification requirements described above also may require a non-U.S. holder to provide its U.S. taxpayer identification number.

### Gain on Sale, Exchange, or Other Taxable Disposition of Common Stock

Subject to the discussions below under the headings "Information Reporting and Backup Withholding" and "Foreign Account Tax Compliance Act," a non-U.S. holder generally will not be subject to U.S. federal income tax or withholding tax on gain recognized on a sale, exchange, or other taxable disposition of our common stock unless:

- the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States, and, if an applicable income tax treaty so provides, the gain is attributable to a permanent establishment or fixed base maintained by the non-U.S. holder in the United States; in these cases, the non-U.S. holder will be taxed on a net income basis at the regular graduated rates and in the manner applicable to United States persons, and, if the non-U.S. holder is a foreign corporation, an additional branch profits tax at a rate of 30%, or a lower rate as may be specified by an applicable income tax treaty, may also apply;

- the non-U.S. holder is an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, in which case the non-U.S. holder will be subject to U.S. federal income tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the amount by which the non-U.S. holder's capital gains allocable to U.S. sources exceed certain capital losses allocable to U.S. sources; or

- we are or were a "U.S. real property holding corporation" during the shorter of the five-year period ending on the date of the disposition or the period that the non-U.S. holder held our common stock, unless our common stock is regularly traded on an established securities market and the non-U.S. holder held no more than five percent of our outstanding common stock, directly or indirectly, actually or constructively, during the shorter of the five-year period ending on the date of the disposition or the period that the non-U.S. holder held our common stock. In such case, such non-U.S. holder generally will be taxed on its net gain derived from the disposition at the graduated U.S. federal income tax rates applicable to United States persons. Generally, a corporation is a "U.S. real property holding corporation" if the fair market value of its "U.S. real property interests" equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business. Although there can be no assurance in this regard, we believe that we have not been and are not currently, and we do not anticipate becoming, a "U.S. real property holding corporation" for U.S. federal income tax purposes.

### Information Reporting and Backup Withholding

We (or the applicable paying agent) must report annually to the IRS and to each non-U.S. holder the gross amount of the distributions on our common stock paid to such holder and the tax withheld, if any, with respect to such distributions. Non-U.S. holders may have to comply with specific certification procedures to establish that the holder is not a United States person in order to avoid backup withholding at the applicable rate with respect to dividends on our common stock. Generally, a holder will comply with such procedures if it provides a properly executed IRS Form W-8BEN or W-8BEN-E or otherwise establishes an exemption.

Information reporting and backup withholding generally will apply to the proceeds of a disposition of our common stock by a non-U.S. holder effected by or through the U.S. office of any broker, U.S. or foreign, unless the holder certifies its status as a non-U.S. holder and satisfies certain other requirements, or otherwise establishes an exemption. Generally, information reporting and backup withholding will not apply to a payment of disposition proceeds to a non-U.S. holder where the transaction is effected outside the United States through a foreign broker. However, dispositions effected through a non-U.S. office of a broker with substantial U.S. ownership or operations generally will be treated in a manner similar to dispositions effected through a U.S. office of a broker. Non-U.S. holders should consult their own tax advisors regarding the application of the information reporting and backup withholding rules to them.

169

Copies of information returns may be made available to the tax authorities of the country in which the non-U.S. holder resides or is incorporated under the provisions of a specific treaty or agreement. Any documentation provided to an applicable withholding agent may need to be updated in certain circumstances.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to a non-U.S. holder may be refunded or credited against the non-U.S. holder's U.S. federal income tax liability, if any, provided that an appropriate claim is timely filed with the IRS.

### Foreign Account Tax Compliance Act

Legislation commonly referred to as the Foreign Account Tax Compliance Act and associated guidance, or collectively, FATCA, generally imposes a 30% withholding tax on any "withholdable payment" (as defined below) to a "foreign financial institution" (as defined in the Code), unless such institution enters into an agreement with the U.S. government to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which would include certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with United States owners) or another applicable exception applies or such institution is compliant with applicable foreign law enacted in connection with an applicable intergovernmental agreement between the United States and a foreign jurisdiction. FATCA also generally imposes a 30% withholding tax on any "withholdable payment" (as defined below) to a foreign entity that is not a financial institution, unless such entity provides the withholding agent with a certification identifying the substantial U.S. owners of the entity (which generally includes any United States person who directly or indirectly owns more than 10% of the entity), if any, or another applicable exception applies or such entity is compliant with applicable foreign law enacted in connection with an applicable intergovernmental agreement between the United States and a foreign jurisdiction. Under certain circumstances, a non-U.S. holder might be eligible for refunds or credits of such taxes.

Under final regulations and other current guidance, "withholdable payments" currently include dividends on our common stock. While withholding under FATCA would have applied also to the gross proceeds of a disposition of our common stock on or after January 1, 2019, recently proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued. The FATCA withholding tax will apply regardless of whether a payment would otherwise be exempt from or not subject to U.S. nonresident withholding tax (e.g., as capital gain).

### Federal Estate Tax

Common stock owned or treated as owned by an individual who is a non-U.S. holder (as specially defined for U.S. federal estate tax purposes) at the time of death will be included in the individual's gross estate for U.S. federal estate tax purposes and, therefore, may be subject to U.S. federal estate tax, unless an applicable estate tax or other treaty provides otherwise.

**The preceding discussion of material U.S. federal tax considerations is for general information only. It is not tax advice. Prospective investors should consult their own tax advisors regarding the particular U.S. federal, state, local, and non-U.S. tax consequences of purchasing, holding, and disposing of our common stock, including the consequences of any proposed changes in applicable laws.**

170

## PLAN OF DISTRIBUTION

The Registered Stockholders may sell their shares of Class A common stock covered hereby pursuant to brokerage transactions on the NYSE, or other public exchanges or registered alternative trading venues, at prevailing market prices at any time after the shares of Class A common stock are listed for trading. We are not party to any arrangement with any Registered Stockholder or any broker-dealer with respect to sales of shares of Class A common stock by the Registered Stockholders, except we have engaged financial advisors and associate financial advisors with respect to certain other matters relating to our listing, as further described below. As such, we will have no input if and when any Registered Stockholder may, or may not, elect to sell their shares of Class A common stock or the prices at which any such sales may occur, and there can be no assurance that any Registered Stockholders will sell any or all of the shares of Class A common stock covered by this prospectus.

We will not receive any proceeds from the sale of shares of Class A common stock by the Registered Stockholders. We expect to recognize certain non-recurring costs as part of our transition to a publicly-traded company, consisting of professional fees and other expenses. As part of our direct listing, these fees will be expensed in the period incurred and not deducted from net proceeds to the issuer as they would be in an initial public offering.

We have engaged Goldman Sachs, Morgan Stanley, and Allen & Company as our financial advisors to advise and assist us with respect to certain matters relating to our listing, including defining our objectives with respect to the filing of the registration statement of which this prospectus forms a part and the listing of our Class A common stock on the NYSE, the preparation of the registration statement of which this prospectus forms a part, and the preparation of investor communications and presentations in connection with investor education, and to be available to consult with the DMM who will be setting the opening public price of our Class A common stock on the NYSE. However, the financial advisors have not been engaged to participate in investor meetings or to otherwise facilitate or coordinate price discovery activities or sales of our Class A common stock in consultation with us, except as described herein with respect to consultation with the DMM on the opening public price in accordance with NYSE rules. We have also engaged Credit Suisse Securities (USA) LLC, Barclays Capital Inc., Citigroup Global Markets Inc., RBC Capital Markets, LLC, KeyBanc Capital Markets Inc., Canaccord Genuity LLC, and William Blair & Company, L.L.C. as our associate financial advisors to advise and assist us with respect to certain matters relating to our listing, including the preparation of the registration statement of which this prospectus forms a part and the preparation of investor communications and presentations in connection with investor education. However, the associate financial advisors have not been engaged to participate in investor meetings or to otherwise facilitate or coordinate price discovery activities or sales of our Class A common stock in consultation with us.

The DMM, acting pursuant to its obligations under the rules of the NYSE, is responsible for facilitating an orderly market for our Class A common stock. Based on information provided to the NYSE, the opening public price of our Class A common stock on the NYSE will be determined by buy and sell orders collected by the NYSE from various broker-dealers and will be set based on the DMM's determination of where buy orders can be matched with sell orders at a single price. On the NYSE, buy orders priced equal to or higher than the opening public price and sell orders priced lower than or equal to the opening public price will participate in that opening trade. In accordance with NYSE rules because there has not been a recent sustained history of trading in our common stock in a private placement market prior to listing, the DMM will consult with Morgan Stanley and our other financial advisors, in order for the DMM to effect a fair and orderly opening of our Class A common stock on the NYSE, without coordination with us, consistent with the federal securities laws in connection with our direct listing. Pursuant to such NYSE rules, and based upon information known to it at that time, Morgan Stanley and our other financial advisors are expected to provide input to the DMM regarding their understanding of the ownership of our outstanding common stock and pre-listing selling and buying interest in our Class A common stock that they become aware of from potential investors and holders of our Class A common stock, including after consultation with certain institutional investors (which may include certain of the Registered Holders, other than the RSU holders), in each case, without coordination with us. Morgan Stanley and certain of our other financial advisors, in their capacity as financial advisors to the Company, and who are available to consult with the DMM in accordance with NYSE rules, are expected to provide the DMM with our fair value per share, as determined by our most recently completed independent common stock valuation report, dated as of May 15, 2019, which was $22.14 per share of Class A common stock and Class B common stock. The common stock valuation report was prepared by an independent third party on behalf of the Company, and no financial advisor or associate financial advisor participated in the preparation of such report. The DMM, in consultation with Morgan Stanley and our other

171

financial advisors, is also expected to consider the information in the section titled "Sale Price History of our Capital Stock."

Similar to how a security being offered in an underwritten initial public offering would open on the first day of trading, before the opening public price of our Class A common stock is determined, the DMM may publish one or more pre-opening indications, which provides the market with a price range of where the DMM anticipates the opening public price will be, based on the buy and sell orders entered on the NYSE. The pre-opening indications will be available on the consolidated tape and NYSE market data feeds. As part of this opening process, the DMM will continue to update the pre-opening indication until the buy and sell orders reach equilibrium and can be priced by offsetting one another to determine the opening public price of our Class A common stock.

In connection with the process described above, a DMM in a direct listing may have less information available to it to determine the opening public price of our Class A common stock than a DMM would in an underwritten initial public offering. For example, because our financial advisors are not acting as underwriters, they will not have engaged in a book building process, and as a result, they will not be able to provide input to the DMM that is based on or informed by that process. Moreover, prior to the opening trade, there will not be a price at which underwriters initially sold shares of Class A common stock to the public as there would be in an underwritten initial public offering. This lack of an initial public offering price could impact the range of buy and sell orders collected by the NYSE from various broker-dealers. Consequently, the public price of our Class A common stock may be more volatile than in an underwritten initial public offering and could, upon listing on the NYSE, decline significantly and rapidly. See the section titled "Risk Factors—Risks Related to Ownership of Our Class A Common Stock."

In addition to sales made pursuant to this prospectus, the shares of Class A common stock covered by this prospectus may be sold by the Registered Stockholders in private transactions exempt from the registration requirements of the Securities Act.

Under the securities laws of some states, shares of Class A common stock may be sold in such states only through registered or licensed brokers or dealers.

If any of the Registered Stockholders utilize a broker-dealer in the sale of the shares of Class A common stock being offered by this prospectus, such broker-dealer may receive commissions in the form of discounts, concessions, or commissions from such Registered Stockholder or commissions from purchasers of the shares of Class A common stock for whom they may act as agent or to whom they may sell as principal (which discounts, concessions, or commissions as to particular broker-dealers may be in excess of those customary in the types of transactions involved).

<div align="center">172</div>

## LEGAL MATTERS

Our principal legal advisor is Goodwin Procter LLP, San Francisco, California. Latham & Watkins LLP is legal advisor to the financial advisors and associate financial advisors.

## EXPERTS

The consolidated financial statements of Slack Technologies, Inc. and subsidiaries as of January 31, 2018 and 2019, and for each of the years in the three-year period ended January 31, 2019, have been included herein and in the registration statement in reliance upon the report of KPMG LLP, our independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

## ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of Class A common stock covered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, some of which is contained in exhibits to the registration statement as permitted by the rules and regulations of the SEC. For further information with respect to us and our Class A common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document are not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. Each statement in this prospectus relating to a contract or document filed as an exhibit is qualified in all respects by the filed exhibit. The SEC maintains an Internet website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is www.sec.gov.

Immediately upon the effectiveness of the registration statement of which this prospectus forms a part, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, will file periodic reports, proxy statements, and other information with the SEC. These periodic reports, proxy statements, and other information will be available for inspection and copying at the website of the SEC referred to above. We also maintain a website at www.slack.com. Upon the effectiveness of the registration statement of which this prospectus forms a part, you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

173

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
| --- | --- |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Statements of Comprehensive Loss | F-5 |
| Consolidated Statements of Stockholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

F-1

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and Board of Directors
Slack Technologies, Inc.:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Slack Technologies, Inc. and subsidiaries (the Company) as of January 31, 2018 and 2019, the related consolidated statements of operations, comprehensive loss, stockholders' equity, and cash flows for each of the years in the three-year period ended January 31, 2019, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of January 31, 2018 and 2019, and the results of its operations and its cash flows for each of the years in the three-year period ended January 31, 2019, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ KPMG LLP

We have served as the Company's auditor since 2015.

San Francisco, California
April 3, 2019

F-2

**SLACK TECHNOLOGIES, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except per share amounts)**

| | As of January 31, | | As of April 30, 2019 | Pro Forma April 30, 2019 |
|---|---|---|---|---|
| | 2018 | 2019 | | |
| | | | (Unaudited) | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 120,463 | $ 180,770 | $ 256,489 | |
| Marketable securities | 428,298 | 660,301 | 536,169 | |
| Accounts receivable, net | 37,209 | 87,438 | 71,619 | |
| Prepaid expenses and other current assets | 25,954 | 54,213 | 60,043 | |
| Total current assets | 611,924 | 982,722 | 924,320 | |
| Restricted cash | 17,600 | 20,490 | 38,490 | |
| Strategic investments | 7,623 | 12,334 | 15,266 | |
| Property and equipment, net | 42,997 | 88,359 | 94,929 | |
| Intangible assets, net | — | 15,203 | 14,170 | |
| Goodwill | 8,653 | 48,598 | 48,598 | |
| Other assets | 8,983 | 31,250 | 31,257 | |
| Total assets | $ 697,780 | $ 1,198,956 | $ 1,167,030 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ 7,056 | $ 16,613 | $ 10,396 | |
| Accrued compensation and benefits | 23,647 | 46,151 | 30,853 | |
| Accrued expenses and other current liabilities | 15,510 | 29,809 | 28,225 | |
| Deferred revenue | 125,453 | 239,825 | 254,908 | |
| Total current liabilities | 171,666 | 332,398 | 324,382 | |
| Deferred revenue, noncurrent | — | 2,048 | 1,781 | |
| Other liabilities | 6,826 | 22,904 | 24,088 | |
| Total liabilities | 178,492 | 357,350 | 350,251 | |
| Commitments and contingencies (Note 8) | | | | |
| Stockholders' equity: | | | | |
| Convertible preferred stock, $0.0001 par value: 346,237, 390,589 and 390,589 shares authorized; 337,483, 373,372 and 373,372 shares issued and outstanding; liquidation preference of $962,659, $1,389,925 and $1,389,925 as of January 31, 2018 and 2019 and April 30, 2019 (unaudited), respectively; no shares outstanding as of April 30, 2019, pro forma (unaudited) | 965,221 | 1,392,101 | 1,392,101 | $ — |
| Common stock, $0.0001 par value: 1,150,785, 1,310,000 and 1,310,000 shares authorized; Class A common stock - 575,000, 660,000 and 660,000 shares authorized as of January 31, 2018 and 2019 and April 30, 2019 (unaudited), respectively, 0, 896 and 896 shares issued and outstanding as of January 31, 2018 and 2019 and April 30, 2019 (unaudited), respectively, and 896 shares outstanding as of April 30, 2019, pro forma (unaudited); Class B common stock - 575,785, 650,000 and 650,000 shares authorized as of January 31, 2018 and 2019 and April 30, 2019 (unaudited), respectively, 119,735, 126,677 and 129,876 shares issued and outstanding as of January 31, 2018 and 2019 and April 30, 2019 (unaudited), respectively, and 529,323 shares outstanding as of April 30, 2019, pro forma (unaudited) | 12 | 13 | 13 | 53 |
| Additional paid-in-capital | 71,885 | 105,633 | 112,267 | 1,705,969 |
| Accumulated other comprehensive loss | (1,089) | (498) | (78) | (78) |
| Accumulated deficit | (524,880) | (665,563) | (698,895) | (900,536) |
| Total Slack Technologies, Inc. stockholders' equity | 511,149 | 831,686 | 805,408 | 805,408 |
| Noncontrolling interest | 8,139 | 9,920 | 11,371 | 11,371 |
| Total stockholders' equity | 519,288 | 841,606 | 816,779 | $ 816,779 |
| Total liabilities and stockholders' equity | $ 697,780 | $ 1,198,956 | $ 1,167,030 | |

See accompanying notes to consolidated financial statements.

F-3

**SLACK TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share amounts)**

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| Revenue | $ 105,153 | $ 220,544 | $ 400,552 | $ 80,919 | $ 134,821 |
| Cost of revenue | 15,517 | 26,364 | 51,301 | 10,101 | 18,574 |
| Gross profit | 89,636 | 194,180 | 349,251 | 70,818 | 116,247 |
| Operating expenses: | | | | | |
|    Research and development | 96,678 | 141,350 | 157,538 | 35,410 | 51,103 |
|    Sales and marketing | 104,006 | 140,188 | 233,191 | 42,168 | 66,838 |
|    General and administrative | 37,455 | 56,493 | 112,730 | 19,568 | 36,744 |
| Total operating expenses | 238,139 | 338,031 | 503,459 | 97,146 | 154,685 |
| Loss from operations | (148,503) | (143,851) | (154,208) | (26,328) | (38,438) |
| Other income (expense), net | 1,749 | 4,581 | 16,146 | 1,802 | 7,077 |
| Loss before income taxes | (146,754) | (139,270) | (138,062) | (24,526) | (31,361) |
| Provision for income taxes | 155 | 793 | 840 | 350 | 520 |
| Net loss | (146,909) | (140,063) | (138,902) | (24,876) | (31,881) |
| Net income (loss) attributable to noncontrolling interest | (45) | 22 | 1,781 | 6 | 1,451 |
| Net loss attributable to Slack | (146,864) | (140,085) | (140,683) | (24,882) | (33,332) |
| Less: Deemed dividends to preferred stockholders | — | 40,883 | — | — | — |
| Net loss attributable to Slack common stockholders | $ (146,864) | $ (180,968) | $ (140,683) | $ (24,882) | $ (33,332) |
| Basic and diluted net loss per share: | | | | | |
| Net loss per share attributable to Slack common stockholders, basic and diluted | $ (1.28) | $ (1.47) | $ (1.16) | $ (0.21) | $ (0.26) |
| Weighted-average shares used in computing net loss per share attributable to Slack common stockholders, basic and diluted | 114,887 | 122,865 | 121,732 | 118,926 | 125,890 |
| Pro forma net loss per share attributable to Slack common stockholders, basic and diluted (unaudited) | | | $ (0.27) | | $ (0.06) |
| Weighted-average shares used in computing pro forma net loss per share attributable to Slack common stockholders, basic and diluted (unaudited) | | | 517,493 | | 525,337 |

See accompanying notes to consolidated financial statements.

F-4

**SLACK TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(In thousands)**

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| Net loss | $ (146,909) | $ (140,063) | $ (138,902) | $ (24,876) | $ (31,881) |
| Other comprehensive income (loss), net of tax: | | | | | |
| Change in unrealized income or loss on marketable securities | (153) | (677) | 591 | (516) | 420 |
| Other comprehensive income (loss), net of tax | (153) | (677) | 591 | (516) | 420 |
| Comprehensive loss | (147,062) | (140,740) | (138,311) | (25,392) | (31,461) |
| Comprehensive income (loss) attributable to noncontrolling interest | (45) | 22 | 1,781 | 6 | 1,451 |
| Comprehensive loss attributable to Slack | $ (147,017) | $ (140,762) | $ (140,092) | $ (25,398) | $ (32,912) |

See accompanying notes to consolidated financial statements.

F-5

**SLACK TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(In thousands)**

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-In-Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Noncontrolling Interest | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at January 31, 2016 | 274,537 | $ 381,812 | 120,454 | $ 12 | $ 13,760 | $ (259) | $ (153,950) | $ 2,402 | $ 243,777 |
| Exercise of stock options | — | — | 6,215 | 1 | 4,012 | — | — | — | 4,013 |
| Vesting of early exercised stock options | — | — | — | — | 572 | — | — | — | 572 |
| Issuance of restricted stock awards (RSAs) | — | — | 1,135 | — | — | — | — | — | — |
| Cancellation of restricted stock awards (RSAs) | — | — | (465) | — | — | — | — | — | — |
| Issuance of series F convertible preferred stock, net of issuance cost | 19,867 | 154,957 | — | — | — | — | — | — | 154,957 |
| Issuance of series F-1 convertible preferred stock, net of issuance cost | 6,793 | 52,940 | — | — | — | — | — | — | 52,940 |
| Capital contributions from noncontrolling interest holders | — | — | — | — | — | — | — | 5,760 | 5,760 |
| Repurchase of common stock | — | — | (1,661) | — | (6) | — | (4,297) | — | (4,303) |
| Stock-based compensation | — | — | — | — | 42,428 | — | — | — | 42,428 |
| Other comprehensive loss | — | — | — | — | — | (153) | — | — | (153) |
| Net loss | — | — | — | — | — | — | (146,864) | (45) | (146,909) |
| Balance at January 31, 2017 | 301,197 | 589,709 | 125,678 | 13 | 60,766 | (412) | (305,111) | 8,117 | 353,082 |
| Exercise of stock options | — | — | 3,662 | — | 3,634 | — | — | — | 3,634 |
| Vesting of early exercised stock options | — | — | — | — | 480 | — | — | — | 480 |
| Issuance of series G convertible preferred stock, net of issuance cost | 24,718 | 229,648 | — | — | — | — | — | — | 229,648 |
| Issuance of series G-1 convertible preferred stock, net of issuance cost | 2,149 | 20,000 | — | — | — | — | — | — | 20,000 |
| Issuance of series G-2 convertible preferred stock, net of issuance cost | 17,241 | 150,000 | — | — | — | — | — | — | 150,000 |
| Issuance of series G-3 convertible preferred stock, net of issuance cost | 1,465 | 12,714 | — | — | — | — | — | — | 12,714 |
| Repurchase of Class B common stock | — | — | (9,605) | (1) | (1,704) | — | (38,801) | — | (40,506) |
| Repurchase of series A convertible preferred stock | (458) | (44) | — | — | — | — | (3,787) | — | (3,831) |
| Repurchase of series D convertible preferred stock | (4,568) | (11,650) | — | — | — | — | (26,589) | — | (38,239) |
| Repurchase of series D-1 convertible preferred stock | (75) | (156) | — | — | — | — | (474) | — | (630) |
| Repurchase of series E convertible preferred stock | (4,186) | (25,000) | — | — | — | — | (10,033) | — | (35,033) |
| Other comprehensive loss | — | — | — | — | — | (677) | — | — | (677) |
| Stock-based compensation | — | — | — | — | 8,709 | — | — | — | 8,709 |
| Net income (loss) | — | — | — | — | — | — | (140,085) | 22 | (140,063) |
| Balance at January 31, 2018 | 337,483 | 965,221 | 119,735 | 12 | 71,885 | (1,089) | (524,880) | 8,139 | 519,288 |
| Exercise of stock options | — | — | 4,888 | 1 | 4,166 | — | — | — | 4,167 |
| Vesting of early exercised stock options | — | — | — | — | 366 | — | — | — | 366 |
| Issuance of Series H preferred stock, net of issuance cost | 33,470 | 398,082 | — | — | — | — | — | — | 398,082 |
| Issuance of Series H-1 preferred stock | 2,419 | 28,798 | — | — | — | — | — | — | 28,798 |
| Issuance of restricted stock awards (RSAs) | — | — | 2,197 | — | — | — | — | — | — |
| Issuance of Class A common stock to a third party | — | — | 900 | — | 6,084 | — | — | — | 6,084 |
| Cancellation of restricted stock awards (RSAs) | — | — | (19) | — | — | — | — | — | — |
| Repurchase of early exercised stock options | — | — | (128) | — | — | — | — | — | — |
| Other comprehensive income | — | — | — | — | — | 591 | — | — | 591 |
| Stock-based compensation | — | — | — | — | 23,132 | — | — | — | 23,132 |
| Net income (loss) | — | — | — | — | — | — | (140,683) | 1,781 | (138,902) |
| Balance at January 31, 2019 | 373,372 | 1,392,101 | 127,573 | 13 | 105,633 | (498) | (665,563) | 9,920 | 841,606 |
| Exercise of stock options (unaudited) | — | — | 2,694 | — | 2,907 | — | — | — | 2,907 |
| Vesting of early exercised stock options (unaudited) | — | — | — | — | 88 | — | — | — | 88 |
| Issuance of restricted stock awards (RSAs) (unaudited) | — | — | 505 | — | — | — | — | — | — |
| Other comprehensive income (unaudited) | — | — | — | — | — | 420 | — | — | 420 |
| Stock-based compensation (unaudited) | — | — | — | — | 3,639 | — | — | — | 3,639 |
| Net income (loss) (unaudited) | — | — | — | — | — | — | (33,332) | 1,451 | (31,881) |
| Balance at April 30, 2019 (unaudited) | 373,372 | $ 1,392,101 | 130,772 | $ 13 | $ 112,267 | $ (78) | $ (698,895) | $ 11,371 | $ 816,779 |

F-6

**SLACK TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (CONTINUED)**
**(In thousands)**

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-In-Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Noncontrolling Interest | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at January 31, 2018 | 337,483 | $ 965,221 | 119,735 | $ 12 | $ 71,885 | $ (1,089) | $ (524,880) | $ 8,139 | $ 519,288 |
| Exercise of stock options (unaudited) | — | — | 1,163 | — | 832 | — | — | — | 832 |
| Vesting of early exercised stock options (unaudited) | — | — | — | — | 101 | — | — | — | 101 |
| Cancellation of restricted stock awards (RSAs) (unaudited) | — | — | (19) | — | — | — | — | — | — |
| Repurchase of early exercised stock options (unaudited) | — | — | (103) | — | — | — | — | — | — |
| Other comprehensive income (unaudited) | — | — | — | — | — | (516) | — | — | (516) |
| Stock-based compensation (unaudited) | — | — | — | — | 6,118 | — | — | — | 6,118 |
| Net income (loss) (unaudited) | — | — | — | — | — | — | (24,882) | 6 | (24,876) |
| Balance at April 30, 2018 (unaudited) | 337,483 | $ 965,221 | 120,776 | $ 12 | $ 78,936 | $ (1,605) | $ (549,762) | $ 8,145 | $ 500,947 |

See accompanying notes to consolidated financial statements.

F-7

**SLACK TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Year Ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| **Cash flows from operating activities:** | | | | | |
| Net loss | $ (146,909) | $ (140,063) | $ (138,902) | $ (24,876) | $ (31,881) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 6,787 | 14,320 | 16,816 | 2,815 | 5,876 |
| Loss on disposal of property and equipment | 25 | — | 2,281 | 290 | — |
| Stock-based compensation | 42,058 | 8,709 | 23,132 | 6,118 | 3,639 |
| Amortization of deferred contract acquisition costs | 13 | 611 | 3,154 | 453 | 1,463 |
| Net amortization of bond premium (discount) debt securities available for sale | 2,163 | 1,352 | (3,057) | (134) | (1,081) |
| Change in fair value of strategic investments | 73 | (27) | (3,701) | — | (3,025) |
| Other non-cash charges | 145 | 366 | 546 | 153 | 37 |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | (12,030) | (21,964) | (50,305) | (88) | 15,620 |
| Prepaid expenses and other assets | (31,555) | 6,362 | (53,072) | (385) | (6,462) |
| Accounts payable | (1,363) | 4,851 | 2,846 | 1,621 | (1,039) |
| Accrued compensation and benefits | 9,617 | 12,470 | 22,504 | (7,488) | (15,298) |
| Deferred revenue | 38,237 | 68,469 | 116,420 | 21,161 | 14,816 |
| Other current and long-term liabilities | 2,933 | 8,927 | 20,279 | 3,793 | 3,209 |
| Net cash provided by (used in) operating activities | (89,806) | (35,617) | (41,059) | 3,433 | (14,126) |
| **Cash flows from investing activities:** | | | | | |
| Purchases of marketable securities | (346,407) | (510,755) | (967,055) | (229,976) | (24,907) |
| Maturities of marketable securities | 325,387 | 278,263 | 727,616 | 209,250 | 150,686 |
| Sales of marketable securities | 8,525 | 16,934 | 11,271 | — | — |
| Acquisitions of businesses, net of cash acquired | — | — | (45,313) | — | — |
| Acquisition of intangible assets | — | — | (2,382) | — | — |
| Purchases of property and equipment | (24,232) | (22,044) | (56,180) | (18,402) | (20,077) |
| Sales of property and equipment | — | — | 762 | 520 | — |
| Capitalized software development costs | (584) | (50) | (840) | — | — |
| Purchase of strategic investments | (4,460) | (2,901) | (2,276) | — | (3,100) |
| Proceeds from liquidation of strategic investments | — | 117 | 976 | — | 2,858 |
| Net cash provided by (used in) investing activities | (41,771) | (240,436) | (333,421) | (38,608) | 105,460 |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from exercise of stock options | 4,742 | 2,912 | 4,783 | 773 | 2,385 |
| Repurchase of common stock | (4,303) | (40,506) | (70) | (15) | — |
| Net proceeds from issuance of convertible preferred stock | 207,897 | 412,362 | 426,880 | — | — |
| Repurchase of convertible preferred stock | — | (77,733) | — | — | — |
| Capital contributions from noncontrolling interest holders | 5,760 | — | — | — | — |
| Issuance of common stock to third party | — | — | 6,084 | | — |
| Net cash provided by financing activities | 214,096 | 297,035 | 437,677 | 758 | 2,385 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 82,519 | 20,982 | 63,197 | (34,417) | 93,719 |
| Cash, cash equivalents and restricted cash at beginning of period | 34,562 | 117,081 | 138,063 | 138,063 | 201,260 |
| Cash, cash equivalents and restricted cash at end of period | $ 117,081 | $ 138,063 | $ 201,260 | $ 103,646 | $ 294,979 |
| | | | | | |
| **Supplemental disclosure of cash flow information:** | | | | | |
| Cash paid for income taxes | $ 48 | $ 947 | $ 876 | $ 136 | $ 346 |
| **Non-cash investing and financing activities:** | | | | | |
| Increase (decrease) in purchases of property and equipment included in liabilities | $ 6,125 | $ 763 | $ 6,334 | $ (1,407) | $ (8,664) |
| Stock-based compensation capitalized as internal-use software | $ 370 | $ — | $ — | $ — | $ — |
| Vesting of early exercised stock options | $ 572 | $ 480 | $ 366 | $ 102 | $ 88 |
| Unrealized short-term gain (loss) on marketable securities | $ (153) | $ (677) | $ 791 | $ (516) | $ 563 |

See accompanying notes to consolidated financial statements.

F-8

**SLACK TECHNOLOGIES, INC.**

**Notes to Consolidated Financial Statements**

**Note 1.   Description of Business and Summary of Significant Accounting Policies**

*Business*

Slack Technologies, Inc. (the "Company" or "Slack") operates a business technology software platform that brings together people, applications, and data and sells its offering under a software-as-a-service model. The Company was incorporated in Delaware in 2009 as Tiny Speck, Inc. In 2014, the Company changed its name to Slack Technologies, Inc. and publicly launched its current offering. The Company is headquartered in San Francisco, California.

*Fiscal Year*

The Company's fiscal year ends on January 31. References to fiscal year 2019, for example, refer to the fiscal year ended January 31, 2019.

*Basis of Presentation and Consolidation*

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The accompanying consolidated financial statements include the accounts of the Company and its wholly owned and majority-owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation. The consolidated financial statements include 100% of the accounts of wholly owned and majority-owned subsidiaries and the ownership interest of minority investors is recorded as noncontrolling interest.

*Unaudited Pro Forma Information*

*Unaudited Pro Forma Balance Sheet*

The unaudited pro forma balance sheet information as of April 30, 2019, assumes all shares of the Company's convertible preferred stock had automatically converted into an aggregate of 373,371,712 shares of the Company's Class B common stock as if such conversion had occurred on April 30, 2019.

The Company granted certain employees and non-employee directors restricted stock units ("RSUs") with both service-based and performance-based vesting conditions. The performance-based requirement is satisfied on the earlier of: (1) a change in control or (2) the effective date of a direct listing. The RSUs vest on the first date upon which both the service-based and performance-based requirements are satisfied. If the RSUs vest, the Company will deliver one share of Class B common stock for each vested RSU on the applicable settlement date. If the performance vesting condition had been met on April 30, 2019, 26.1 million RSUs that had met their service condition would have vested ("Vesting RSUs"). The Vesting RSUs have been included in the unaudited pro forma balance sheet disclosure of shares outstanding of Class B common stock, as the settlement of these shares will take place upon the satisfaction of both the service condition and performance vesting condition.

In addition, at the time the performance vesting condition becomes probable which is not until the performance vesting condition is satisfied, the Company will recognize cumulative stock-based compensation associated with outstanding RSUs based on the service-based condition using the accelerated attribution method. Accordingly, the unaudited pro forma balance sheet information as of April 30, 2019, gives effect to stock-based compensation of $201.6 million associated with the outstanding RSUs as of April 30, 2019. This pro forma adjustment is reflected as an increase to additional paid-in capital and accumulated deficit. Payroll tax expenses and other withholding obligations have not been included in the pro forma adjustments. The RSU holders will generally incur taxable income based upon the value of the shares on the date they are settled. The Company is required to withhold taxes on such value at applicable minimum statutory rates. The Company was unable to quantify these obligations as of April 30, 2019 and will remain unable to quantify them until the performance vesting condition is satisfied, as the withholding obligations will be based on the value of the shares on the settlement date.

*Unaudited Pro Forma Loss Per Share Attributable to Common Stockholders*

The unaudited pro forma basic and diluted net loss per share attributable to Slack common stockholders is computed to give effect to the automatic conversion of 373,371,712 shares of the Company's outstanding convertible preferred stock into 373,371,712 shares of Class B common stock in connection with becoming a public company. The Company used the if-converted method as though the conversion had occurred as of the beginning of the period or the original date of issuance, if later.

The pro forma share amounts include shares of common stock issued for the Vesting RSUs as of April 30, 2019. Stock-based compensation associated with the RSUs is excluded from the pro forma presentation. If the performance vesting condition had been met on April 30, 2019,  26.1 million RSUs that had met their service condition would have vested and the Company would have recorded $201.6 million of cumulative stock-based compensation related to the outstanding RSUs.

### *Unaudited Interim Financial Information*

The accompanying interim consolidated balance sheet as of April 30, 2019, the consolidated statements of operations, comprehensive loss and cash flows for the three months ended April 30, 2018 and 2019, the consolidated statement of stockholders' equity for the three months ended April 30, 2018 and 2019, and the related footnote disclosures are unaudited. These unaudited interim consolidated financial statements have been prepared in accordance with U.S. GAAP. In management's opinion, the unaudited interim consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements for fiscal years 2017, 2018, and 2019, and include all adjustments necessary to state fairly the financial position as of April 30, 2019; the results of operations and cash flows for the three months ended April 30, 2018 and 2019; and the statement of stockholders' equity for the three months ended April 30, 2018 and 2019. The financial data and the other information disclosed in these notes to the consolidated financial statements related to these three-month periods are unaudited. The results for the three months ended April 30, 2018 and 2019 are not necessarily indicative of the operating results to be expected for the full fiscal year or any future period.

### *Use of Estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. These estimates are based on information available as of the date of the consolidated financial statements. On a regular basis, management evaluates these estimates and assumptions; however, actual results could materially differ from these estimates.

The Company's most significant estimates and judgments involve revenue recognition, stock-based compensation including the estimation of fair value of common stock, valuation of strategic investments, valuation of acquired goodwill and intangibles from acquisitions, period of benefit for deferred costs, and uncertain tax positions.

### *Revenue Recognition*

On February 1, 2017, the Company adopted the requirements of Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers* ("Topic 606") as discussed further in Recently Adopted Accounting Pronouncements below. Topic 606 establishes a principle for recognizing revenue upon the transfer of promised goods or services to customers, in an amount that reflects the expected consideration received in exchange for those goods or services. Topic 606 also includes Subtopic 340-40, *Other Assets and Deferred Costs—Contracts with Customers* , which requires the deferral of incremental costs of obtaining a contract with a customer. Collectively, references to Topic 606 used herein refer to both Topic 606 and Subtopic 340-40. The Company adopted Topic 606 with retrospective application to the beginning of the earliest period presented. The impact of adopting Topic 606 on the Company's revenue is not material to any of the periods presented. The primary impact of adopting Topic 606 relates to the deferral of incremental costs of obtaining customer contracts and the amortization of those costs over the period of benefit.

The Company derives its revenue from monthly and annual subscription fees earned from customers accessing Slack. The Company's policy is to exclude sales and other indirect taxes when measuring the transaction price of its

subscription agreements. The Company accounts for revenue contracts with customers by applying the requirements of Topic 606, which includes the following steps:

- Identification of the contract, or contracts, with the customer;

- Identification of the performance obligations in the contract;

- Determination of the transaction price;

- Allocation of the transaction price to the performance obligations in the contract; and

- Recognition of the revenue when, or as, the Company satisfies a performance obligation.

Subscription revenue is recognized on a straight-line basis over the contractual term of the arrangement beginning on the date that the service is made available to the customer. The Company's subscription service contracts are generally one month to thirty-six months in duration and are generally non-cancellable. Customers are billed either annually or monthly generally in advance of services. The contracts do not provide customers with the right to take possession of the software supporting Slack. The Company's arrangements do not contain general rights of return. Amounts that have been invoiced are recorded in accounts receivable and in revenue or deferred revenue, depending on whether the performance obligation has been satisfied. For certain multi-year agreements, revenue recognition may occur in advance of invoicing, resulting in a contract asset when there is an enforceable right to receive payment for services rendered, and is included in prepaid expenses and other current assets. The Company maintains a fair billing policy, under which certain customers maintain a credit balance if they have not used the entirety of the allotment of users for which they have paid during the contractual term of their respective arrangements. These credits, accounted for as a part of deferred revenue, may be carried over to offset billings related to increases in a customer's number of active users and are not refundable for cash. A majority of the Company's contracts give a right to bill for additional usage, and this is deemed variable consideration. The variable consideration is allocated to the distinct day the services are completed, as services provided to the additional users are specific to the period that the usage occurs. To the extent that the Company believes it is probable that a significant reversal would not occur, an estimate is made for the revenue associated with incremental usage during a period. The incremental revenue recognized associated with these estimates has not been material for any period presented.

The Company recognized $18.7 million, $57.0 million, and $125.5 million of subscription revenue during the years ended January 31, 2017, 2018, and 2019 respectively, and $48.6 million (unaudited) and $88.9 million (unaudited) during the three months ended April 30, 2018 and 2019, respectively, that was included in deferred revenue balances at the beginning of the respective periods.

The Company applies the practical expedient in paragraph 606-10-50-14 and does not disclose information about remaining performance obligations that have original expected durations of one year or less, which applies primarily to its monthly and annual subscription contracts. As of January 31, 2019, future estimated revenue related to performance obligations that are unsatisfied or partially unsatisfied at the end of the reporting period was $185.1 million, of which $87.7 million, $66.0 million, $31.3 million, and $0.1 million is expected to be recognized in the years ending January 31, 2020, 2021, 2022, and 2023, respectively. As of April 30, 2019, future estimated revenue related to performance obligations that are unsatisfied or partially unsatisfied at the end of the reporting period was $192.1 million (unaudited), of which $96.8 million (unaudited), $71.3 million (unaudited), and $24.0 million (unaudited) is expected to be recognized in the twelve months ending April 30, 2020, 2021, and 2022, respectively.

The Company applies the practical expedient in paragraph 606-10-65-1(f) where the consideration allocated to the remaining performance obligations or an explanation of when it expects to recognize that amount as revenue for all reporting periods presented before the date of the initial application is not disclosed.

***Cost of Revenue***

Cost of revenue consists primarily of expenses related to hosting Slack and providing ongoing customer experience support for paid customers, including employee compensation (including stock-based compensation) and other employee-related expenses for customer experience and technical operations staff, payments to outside service

providers, third-party hosting costs, payment processing fees and amortization of internally-developed and purchased technology.

### *Stock-Based Compensation*

The Company measures compensation for all stock-based payment awards, including stock options, RSUs, and restricted stock awards ("RSAs") granted to employees, directors, and nonemployees, based on the estimated fair value of the awards on the date of grant. The fair value of each stock option granted is estimated using the Black-Scholes option pricing model. Stock-based compensation is recognized on a straight-line basis over the requisite service period.

The Company accounts for stock options issued to nonemployees based on the estimated fair value of the awards determined using the Black-Scholes option pricing model. The fair value of stock options granted to nonemployees is remeasured as the stock options vest, and the resulting change in fair value, if any, is recognized in the Company's consolidated statements of operations over the period during which the related services are rendered.

The Company grants RSUs to its employees and directors with both a service-based vesting condition and a performance-based vesting condition. The service-based vesting period for these awards is typically four years with a cliff vesting period of one year and continued vesting quarterly thereafter. The fair value of RSUs is estimated based on the fair market value of t he Company's common stock at the date of grant. The performance-based vesting condition is satisfied on the earlier of (i) an acquisition or change in control of the Company or (ii) the Company's initial public offering. No compensation expense will be recognized until the performance-based vesting condition is achieved, at which time the cumulative compensation expense using the accelerated attribution method from the service start date will be recognized.

The Company grants RSAs to its employees and directors with a service-based vesting condition. The service-based vesting period for these awards is typically four years with a cliff vesting period of one year and continued vesting monthly thereafter. The fair value of RSAs is estimated based on the fair market value of t he Company's common stock at the date of grant.

### *Research and Development Costs*

Research and development costs are expensed as incurred and consist primarily of personnel costs and allocated overhead.

### *Advertising Costs*

Advertising costs are expensed as incurred and were $39.3 million, $35.5 million, and $61.7 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $7.8 million (unaudited) and $3.2 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively. Advertising costs are included in sales and marketing expense in the accompanying consolidated statements of operations.

### *Income Taxes*

The Company recognizes deferred tax liabilities and assets for the expected future tax consequences of temporary differences between the carrying amounts and the tax bases of assets and liabilities. A valuation allowance is established, when necessary, to reduce deferred tax assets to the amount that is more likely than not to be realized.

The Company accounts for uncertain tax positions based on an evaluation as to whether it is more likely than not that a tax position will be sustained on audit, including resolution of any related appeals or litigation processes. This evaluation is based on all available evidence and assumes that the appropriate tax authorities have full knowledge of all relevant information concerning the tax position. The tax benefit recognized is based on the largest amount that is greater than 50% likely of being realized upon ultimate settlement. The Company includes interest expense and penalties related to its uncertain tax positions in interest expense and other expense, respectively.

*Financial Information about Segments and Geographical Areas*

The Company has one business activity and there are no segment managers who are held accountable for operations, results of operations, or plans for levels or components below the consolidated unit level. The Company's chief operating decision maker is its Chief Executive Officer, who reviews the financial information presented on a consolidated basis for purposes of allocating resources and evaluating the Company's financial performance. Accordingly, the Company has determined that it operates in a single operating and reporting segment. For information regarding the Company's long-lived assets and revenue by geographic area, see Note 12.

*Foreign Currency Translation*

The functional currency of the Company's foreign subsidiaries is the U.S. dollar. Accordingly, each foreign subsidiary remeasures monetary assets and liabilities at period-end exchange rates, while nonmonetary items are remeasured at historical rates. Revenue and expense accounts are remeasured at the average exchange rate in effect during the year. Remeasurement adjustments are recognized in the consolidated statements of operations as transaction gains or losses in the year of occurrence as other income (expense). Realized and unrealized foreign currency gain (loss) was ($0.1) million, $0.5 million, and $(1.0) million for the years ended January 31, 2017, 2018, and 2019, respectively, and $(0.2) million (unaudited) and $(0.7) million (unaudited) for the three months ended April 30, 2018 and 2019, respectively.

*Cash and Cash Equivalents and Restricted Cash*

The Company considers all highly liquid investments with an original maturity of three months or less when purchased to be cash equivalents. Cash equivalents consist of funds deposited into money market funds and commercial paper. Restricted cash consists of cash deposited with financial institutions as collateral for the Company's obligations under its facility leases.

A reconciliation of cash, cash equivalents and restricted cash to the consolidated statements of cash flows is as follows (in thousands):

| | As of January 31, | | As of April 30, 2019 |
|---|---|---|---|
| | 2018 | 2019 | (Unaudited) |
| Cash and cash equivalents | $ 120,463 | $ 180,770 | $ 256,489 |
| Restricted cash | 17,600 | 20,490 | 38,490 |
| Total cash, cash equivalents and restricted cash | $ 138,063 | $ 201,260 | $ 294,979 |

*Marketable Securities*

The Company determines the appropriate classification of its investments in marketable securities at the time of purchase and reevaluates such designation at each balance sheet date. The Company has classified and accounted for its marketable securities as available-for-sale. The investments are adjusted for amortization of premiums and discounts to maturity and such amortization is included in other income (expense), net. After consideration of the Company's capital preservation objectives, as well as its liquidity requirements, the Company may sell securities prior to their stated maturities. As the Company views these securities as available to support current operations, it has classified all available-for-sale securities as short-term. The Company carries its available-for-sale securities at fair value and reports the unrealized gains and losses as a component of stockholders' equity, except for unrealized losses determined to be other than temporary.

The Company evaluates its investments periodically for possible other-than-temporary impairment. A decline in fair value below the amortized costs of debt securities is considered an other-than-temporary impairment if the Company has the intent to sell the security or it is more likely than not that the Company will be required to sell the security before recovery of the entire amortized cost basis. In those instances, an impairment charge equal to the difference between the fair value and the amortized cost basis is recognized in earnings. Regardless of the Company's intent or

F-13

requirement to sell a debt security, impairment is considered other than temporary if the Company does not expect to recover the entire amortized cost basis.

### *Strategic Investments*

In December 2015, the Company agreed to commit $13.0 million to a newly formed entity, Slack Fund L.L.C. ("Slack Fund"), in exchange for a 52% voting interest. Slack Fund is in the business of purchasing, selling, investing and trading in minority equity and convertible debt securities of privately-held companies that develop applications that have potential for substantial contribution to Slack and its ecosystem. Slack Fund has a duration of ten years and its duration may be extended for three additional years. At dissolution, Slack Fund will be liquidated and the remaining assets of the Slack Fund will be distributed to the investors based on their voting interest. As of January 31, 2019 and April 30, 2019 (unaudited), the Company had contributed $8.8 million since the inception of the Slack Fund. Additionally, the minority investors in Slack Fund are also investors in the Company. The Company has elected the measurement alternative, defined as cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer. These investments are valued using significant unobservable inputs or data in inactive markets which require judgment due to the absence of market prices and inherent lack of liquidity. This could result in volatility in other income (expense), net on the consolidated statements of operations in future periods due to the valuation and timing of identical or similar investments of the same issuer.

### *Concentration of Credit Risk*

Financial instruments that potentially subject the Company to credit risk primarily consist of cash and cash equivalents, restricted cash, marketable securities, and accounts receivable. For cash, cash equivalents, restricted cash, and marketable securities, the Company is exposed to credit risk in the event of default by the financial institutions to the extent of the amounts recorded on the accompanying consolidated balance sheets that are in excess of federal insurance limits. For accounts receivable, the Company is exposed to credit risk in the event of nonpayment by customers to the extent of the amounts recorded on the accompanying consolidated balance sheets.

No customer accounted for 10% or greater of total accounts receivable as of January 31, 2018 or 2019 or April 30, 2019 (unaudited). There were no customers representing 10% or greater of revenue for the years ended January 31, 2017, 2018, or 2019 or the three months ended April 30, 2018 (unaudited) or 2019 (unaudited).

### *Fair Value of Financial Instruments*

The Company records its financial assets and liabilities at fair value. The carrying amounts of the Company's financial instruments, which include cash, cash equivalents, restricted cash, accounts receivable, and accounts payable, approximate their fair values due to their short-term nature. The accounting guidance for fair value provides a framework for measuring fair value, clarifies the definition of fair value, and expands disclosures regarding fair value measurements. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants at the reporting date. The accounting guidance establishes a three-tiered hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value as follows:

- Level 1 inputs: Unadjusted quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.

- Level 2 inputs: Other than quoted prices included in Level 1 inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.

- Level 3 inputs: Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at measurement date.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Accounts Receivable, Net*

Trade accounts receivable are recorded at invoiced amounts and do not bear interest. The Company generally does not require collateral and performs ongoing credit evaluations of its customers and provides for expected losses. The expectation of collectability is based on the Company's review of credit profiles of customers, contractual terms and conditions, current economic trends, and historical payment experience. If events or changes in circumstances indicate that specific receivable balances may be impaired, further consideration is given to the collectability of those balances and an allowance is recorded accordingly. Past-due receivable balances are written off when internal collection efforts have been unsuccessful in collecting the amount due.

The allowance for doubtful accounts reflects the Company's best estimate of probable losses inherent in the receivables portfolio determined on the basis of historical experience, specific allowances for known troubled accounts and other currently available evidence. The Company has not experienced significant credit losses from accounts receivable. The allowance for doubtful accounts and the changes in the allowance for doubtful accounts were not material, for the years ended January 31, 2018 and 2019 or the three months ended April 30, 2018 (unaudited) or 2019 (unaudited).

*Property and Equipment, Net*

Property and equipment, net is stated at cost less accumulated depreciation and amortization. Depreciation is computed using the straight-line method over the estimated useful life of the related asset, which is typically two years for computer equipment and software, five years for furniture, fixtures and office equipment, and in the case of leasehold improvements, the remaining term of the lease, unless the useful life of the asset is shorter. Maintenance and repairs are charged to expense as incurred.

*Internal-Use Software Development Costs*

The Company capitalizes qualifying internal-use software development costs that are incurred during the application development stage. Capitalization of costs begins when two criteria are met: (i) the preliminary project stage is completed and (ii) it is probable that the software will be completed and used for its intended function. Capitalization ceases when the software is substantially complete and ready for its intended use, including the completion of all significant testing. Costs related to preliminary project activities and post-implementation operating activities are expensed as incurred.

Capitalized costs are included in property and equipment. These costs are amortized over the estimated useful life of the software (generally two years) on a straight-line basis. Management evaluates the useful life of these assets on an annual basis and tests for impairment whenever events or changes in circumstances occur that could impact the recoverability of these assets. The amortization of costs related to the platform applications is included in cost of revenue.

*Business Combinations*

The Company applies the acquisition method of accounting for business combinations. Under this method of accounting, all assets acquired and liabilities assumed are recorded at their respective fair values at the date of the acquisition. Determining the fair value of assets acquired and liabilities assumed requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash inflows and outflows, discount rates, intangibles, and other asset lives, among other items. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Market participants are assumed to be buyers and sellers in the principal (most advantageous) market for the asset or liability. Additionally, fair value measurements for an asset assume the highest and best use of that asset by market participants. As a result, the Company may be required to value the acquired assets at fair value measures that do not reflect its intended use of those assets. Use of different estimates and judgments could yield different results.

Any excess of the purchase price over the fair value of the net assets acquired is recognized as goodwill. If the fair value of net assets acquired exceeds the fair value of purchase price, a gain on bargain purchase is recognized within

F-15

the consolidated statements of operations. Although the Company believes the assumptions and estimates it has made are reasonable and appropriate, they are based in part on historical experience and information that may be obtained from the management of the acquired company and are inherently uncertain. During the measurement period, which may be up to one year from the acquisition date, the Company may record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill for facts and considerations that were known at the acquisition date. Upon the conclusion of the measurement period or final determination of the values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded within the Company's consolidated statements of operations.

### Accounting for Impairment of Long-Lived Assets

The Company evaluates long-lived assets, such as property and equipment and acquired intangibles, for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets held and used is measured by comparison of the carrying amount of an asset or an asset group to estimated undiscounted future net cash flows expected to be generated by the asset or asset group. If the carrying amount of an asset exceeds these estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the assets exceeds the fair value of the asset or asset group, based on discounted cash flows. There were no impairment charges recorded for the years ended January 31, 2017, 2018, and 2019 or the three months ended April 30, 2019 (unaudited).

### Goodwill

Goodwill is not amortized, but rather is tested for impairment at least annually or more frequently if indicators of impairment are present. The Company operates as one reporting unit and performs its annual goodwill impairment analysis as of the first day of the fourth quarter of each year. The Company adopted ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment* in the year ended January 31, 2018. In assessing impairment on goodwill, the Company may bypass a qualitative assessment and proceeds directly to performing a quantitative evaluation of the fair value of its single reporting unit, in order to compare it against the carrying value of the reporting unit. A goodwill impairment charge is recognized for the amount by which the reporting unit's fair value is less than its carrying value. Any loss recognized will not exceed the total amount of goodwill allocated to that reporting unit. Based on the results of the goodwill impairment analyses, the Company determined that no impairment charge needed to be recorded for any periods presented.

### Operating Leases

The Company leases real estate facilities under operating leases. For leases that contain rent escalation, rent concession provisions, or tenant improvement allowances, the Company records the total rent expense during the lease term on a straight-line basis over the term of the lease. The Company records the difference between the rent paid and the straight-line rent expense as a deferred rent liability within accrued expenses and other current liabilities and long-term liabilities. As of January 31, 2018 and 2019 and April 30, 2019, the Company recorded a deferred rent liability of $6.7 million, $18.7 million and $19.9 million (unaudited), respectively, of which $6.4 million, $17.9 million, and $19.2 million (unaudited), respectively, were included in other liabilities in the accompanying consolidated balance sheets.

### Deferred Revenue

Deferred revenue consists of customer billings in advance of revenue being recognized from the Company's contracts, including credit balances due to the Company's fair billing policy. Deferred revenue is generally recognized during the succeeding twelve-month period.

### Deferred Costs, Net

Sales commissions earned by the Company's sales force are considered to be incremental and recoverable costs of obtaining a contract with a customer. As a result, these amounts have been capitalized as deferred costs within prepaid expenses and other current assets and other assets on the consolidated balance sheet. The Company deferred incremental costs of obtaining a contract of $0.4 million, $4.7 million, and $15.8 million during the years ended January 31, 2017,

F-16

2018, and 2019, respectively, and $2.9 million (unaudited) and $4.8 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively.

Deferred commissions, net included in prepaid expenses and other current assets were $1.3 million, $5.3 million and, $6.5 million (unaudited) as of January 31, 2018 and 2019 and April 30, 2019, respectively. Deferred commissions, net included in other assets were $3.3 million, $11.9 million, and $14.0 million (unaudited) as of January 31, 2018 and 2019 and April 30, 2019, respectively.

Deferred costs are amortized over a period of benefit of four years. The period of benefit is estimated by considering factors such as historical customer attrition rates, the useful life of the Company's technology, and the impact of competition in its industry as well as other factors. Amortized costs are included in sales and marketing expense in the accompanying consolidated statements of operations and were $13,000, $0.6 million, and $3.2 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $0.5 million (unaudited) and $1.5 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively. There was no impairment loss in relation to the deferred costs for any period presented.

### Recently Adopted Accounting Standards

In May 2014, the Financial Accounting Standards Board ("FASB") issued Topic 606. Topic 606 supersedes the revenue recognition requirements in Accounting Standards Codification ("ASC") Topic 605, Revenue Recognition, and requires the recognition of revenue when promised goods or services are transferred to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. Topic 606 also includes Subtopic 340-40, *Other Assets and Deferred Costs—Contracts with Customers* , which requires the deferral of incremental costs of obtaining a contract with a customer. Collectively, Topic 606 and Subtopic 340-40 are referred as the "new standard."

The Company early adopted the requirements of the new standard as of February 1, 2017, utilizing the full retrospective method of transition. Adoption of the new standard resulted in changes to its accounting policies for revenue recognition, deferred revenue, prepaid expenses and other current assets, and other assets.

In January 2016, the FASB issued ASU No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities* (Subtopic 825-10) and issued a subsequent amendment to the initial guidance within ASU 2018-03, which requires entities to carry all investments in equity securities at fair value and recognize any changes in fair value in net income. Under the standard, equity investments that do not have readily determinable fair values and do not qualify for the net asset value practical expedient are eligible for the measurement alternative. For our equity investments in private companies, we will elect the measurement alternative, defined as cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer. The guidance was effective for the Company's fiscal year beginning February 1, 2018 on a prospective basis for the amendments related to equity securities without readily determinable fair values existing as of the date of adoption. The Company adopted the new standard as of February 1, 2018 and it did not have a material impact on its consolidated financial statements. The impact of the new standard going forward could result in volatility in other income (expense), net on the consolidated statements of operations in future periods due to the valuation and timing of identical or similar investments of the same issuer.

In October 2016, the FASB issued ASU No. 2016-16, *Income Taxes (Topic 740) Intra-Entity Transfers of Assets other than Inventory,* which amends the guidance used in the recognition of current and deferred income taxes for an intra-entity transfer of assets other than inventory. The guidance requires an entity recognize the income tax consequences of an intra-entity transfer of an asset other than inventory at the time of transfer. The guidance is effective for annual and interim reporting periods beginning after December 15, 2017 for public entities. The Company adopted ASU No. 2016-06 as of February 1, 2018. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash* . The guidance requires restricted cash be included with cash and cash equivalents when reconciling the total beginning and ending amounts on the statement of cash flows. The guidance also requires companies who report cash and restricted cash separately on the balance sheet to reconcile those amounts to the statement of cash flows. The Company adopted

ASU 2016-18 as of February 1, 2017, utilizing the retrospective method of transition. The adoption of this standard did not have any impact on the Company's consolidated financial statements, other than a change in presentation within the accompanying consolidated statements of cash flows.

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations (Topic 805): Clarifying the Definition of a Business* , which clarifies the definition of a business to determine when a transaction is accounted for as an acquisition (or disposal) of a set of assets or a business. The Company adopted ASU No. 2017-01 as of February 1, 2018, utilizing the prospective method of transition. The adoption of the new standard did not have any impact on the consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment* which amends the guidance in ASC Topic 350 by eliminating Step 2 from the goodwill impairment test. Under the new guidance, entities will perform goodwill impairment tests by comparing the fair value of a reporting unit with its carrying amount and recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value. The standard is effective for annual and interim goodwill impairment tests in fiscal years beginning after December 15, 2019 for public entities. Early adoption is permitted and the Company adopted ASU No. 2017-04 as of February 1, 2017. The adoption of the new standard did not have any impact on the consolidated financial statements.

In May 2017, the FASB issued ASU No. 2017-09, *Compensation-Stock Compensation: Scope of Modification Accounting* , which clarifies when a change to the terms or conditions of a stock-based payment award must be accounted for as a modification. This guidance requires modification accounting if the fair value, vesting condition, or the classification of the award is not the same immediately before and after a change to the terms and conditions of the award. This standard was effective for annual periods beginning after December 15, 2017 and early adoption was permitted. The Company adopted ASU No. 2017-09 as of February 1, 2018, utilizing the prospective method of transition. The adoption of this guidance did not have a material impact on the consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, *Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* , which allows a reclassification of the income tax effects of the U.S. Tax Cuts and Jobs Act (the "Tax Act") on items within accumulated other comprehensive income to retained earnings. This standard became effective for all entities for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years. Early adoption is permitted. The new guidance may be applied retrospectively to each period in which the effect of the Tax Reform Act is recognized in the period of adoption. The Company adopted ASU No. 2018-02 as of February 1, 2019. The adoption of this standard did not have a material impact on the consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07,  *Compensation—Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting* , which simplifies the accounting for share-based payments to nonemployees by aligning it with the accounting for share-based payments to employees, with certain exceptions. This standard is effective for public business entities for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years. For all other entities, this ASU is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted, but no earlier than the adoption date of Topic 606. The Company adopted ASU No. 2018-07 as of February 1, 2019. The adoption of the new standard did not have any impact on the consolidated financial statements.

### *Recently Issued Accounting Standards Not Yet Adopted*

In February 2016, the FASB issued ASU No. 2016-02 (Topic 842), *Leases* , which supersedes the guidance in topic ASC 840, Leases. The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. This classification will determine whether lease expense is recognized based on an effective interest method or on a straight-line basis over the term of the lease. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases today. Under the standard, disclosures are required to meet the objective of enabling users of financial statements to assess the amount, timing, and uncertainty of cash flows arising from leases. The Company will be required to recognize and measure leases existing at, or entered into after, the beginning of the earliest comparative period presented using a modified retrospective approach, with certain

F-18

practical expedients available. For public companies, Topic 842 is effective for fiscal years beginning after December 15, 2018 and interim periods within those fiscal years. The Company has elected to use the extended transition period that allows the Company to delay adoption of new or revised accounting pronouncements applicable to public companies until such pronouncements are made applicable to private companies under the Jumpstart Our Business Startups Act. For as long as the Company remains an "emerging growth company," the new guidance is effective for annual reporting periods beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020, and is required to be applied using a modified retrospective approach. Early adoption is permitted. The Company is currently evaluating the impact of the adoption of this standard and currently believes the most significant impact upon adoption will be the recognition of material right-of-use assets and lease liabilities on its consolidated balance sheets associated with operating leases. The Company does not believe this standard will have a material impact on its consolidated statements of operations.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losses (Topic 326) Measurement of Credit Losses on Financial Instruments,* which requires an entity to utilize a new impairment model known as the current expected credit loss ("CECL") model to estimate its lifetime "expected credit loss" and record an allowance that, when deducted from the amortized cost basis of the financial asset, presents the net amount expected to be collected on the financial asset. The CECL model is expected to result in more timely recognition of credit losses. This guidance also requires new disclosures for financial assets measured at amortized cost, loans and available-for-sale debt securities. ASU No. 2016-13 is effective for public companies for annual periods beginning after December 15, 2019, including interim periods within those fiscal years. Entities will apply the standard's provisions as a cumulative-effect adjustment to retained earnings as of the beginning of the first reporting period in which the guidance is adopted. The Company is currently of evaluating the impact of the adoption of this standard on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement* , which modifies the disclosure requirements on fair value measurements in Topic 820, *Fair Value Measurement* . The amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial fiscal year of adoption. All other amendments should be applied retrospectively to all periods presented upon their effective date. This standard is effective for all entities for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating the potential impact of this standard on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles-Goodwill and Other-Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* , which aligns the accounting for implementation costs incurred in a hosting arrangement that is a service contract with the accounting for implementation costs incurred to develop or obtain internal-use software under ASC 350-40, in order to determine which costs to capitalize and recognize as an asset and which costs to expense. ASU No. 2018-15 is effective for annual reporting periods, and interim periods within those years, beginning after December 15, 2019, and can be applied either prospectively to implementation costs incurred after the date of adoption or retrospectively to all arrangements. The Company is currently evaluating the impact of the adoption of this standard on its consolidated financial statements.

F-19

**Note 2.   Cash, Cash Equivalents and Marketable Securities**

The carrying amounts and estimated fair value of cash, cash equivalents, and marketable securities consisted of the following (in thousands):

| | As of January 31, | | As of April 30, 2019 |
|---|---|---|---|
| | 2018 | 2019 | (Unaudited) |
| **Cash and cash equivalents:** | | | |
| Cash | $ 40,797 | $ 62,033 | $ 80,915 |
| Money market funds | 79,666 | 118,737 | 155,603 |
| Commercial paper | — | — | 19,971 |
| Cash and cash equivalents | $ 120,463 | $ 180,770 | $ 256,489 |
| **Marketable securities:** | | | |
| Commercial paper | $ 167,976 | $ 17,462 | $ — |
| U.S. agency securities | 15,155 | 44,879 | 44,978 |
| U.S. government securities | 11,185 | 370,574 | 311,729 |
| International government securities | 59,939 | 36,734 | 34,674 |
| Corporate bonds | 174,043 | 190,652 | 144,788 |
| Total marketable securities | $ 428,298 | $ 660,301 | $ 536,169 |

The following tables summarize unrealized gains and losses related to cash equivalents and marketable securities on the Company's consolidated balance sheets (in thousands):

| As of January 31, 2018 | Amortized cost | Unrealized gains | Unrealized losses | Fair value |
|---|---|---|---|---|
| Money market funds | $ 79,666 | $ — | $ — | $ 79,666 |
| Commercial paper | 168,025 | — | (49) | 167,976 |
| U.S. agency securities | 15,197 | — | (42) | 15,155 |
| U.S. government securities | 11,207 | — | (22) | 11,185 |
| International government securities | 60,151 | — | (212) | 59,939 |
| Corporate bonds | 174,807 | — | (764) | 174,043 |
| Cash equivalents and marketable securities | $ 509,053 | $ — | $ (1,089) | $ 507,964 |

| As of January 31, 2019 | Amortized cost | Unrealized gains | Unrealized losses | Fair value |
|---|---|---|---|---|
| Money market funds | $ 118,737 | $ — | $ — | $ 118,737 |
| Commercial paper | 17,461 | 1 | — | 17,462 |
| U.S. agency securities | 44,886 | 7 | (14) | 44,879 |
| U.S. government securities | 370,498 | 143 | (67) | 370,574 |
| International government securities | 36,810 | — | (76) | 36,734 |
| Corporate bonds | 190,944 | — | (292) | 190,652 |
| Cash equivalents and marketable securities | $ 779,336 | $ 151 | $ (449) | $ 779,038 |

| As of April 30, 2019 | | Amortized cost | | Unrealized gains | | Unrealized losses | | Fair value |
|---|---|---|---|---|---|---|---|---|
| | | | | (Unaudited) | | | | |
| Money market funds | $ | 155,603 | $ | — | $ | — | $ | 155,603 |
| Commercial paper | | 19,974 | | — | | (3) | | 19,971 |
| U.S. agency securities | | 44,957 | | 25 | | (4) | | 44,978 |
| U.S. government securities | | 311,459 | | 287 | | (17) | | 311,729 |
| International government securities | | 34,686 | | 9 | | (21) | | 34,674 |
| Corporate bonds | | 144,799 | | 60 | | (71) | | 144,788 |
| Cash equivalents and marketable securities | $ | 711,478 | $ | 381 | $ | (116) | $ | 711,743 |

The Company periodically evaluates its investments for other-than-temporary declines in fair value. The unrealized losses on the available-for-sale securities were primarily due to unfavorable changes in interest rates subsequent to the initial purchase of these securities. Gross unrealized losses of the Company's available-for-sale securities that have been in a continuous unrealized loss position for twelve months or longer was immaterial as of January 31, 2018 and 2019 and April 30, 2019 (unaudited). The Company expects to recover the full carrying value of its available-for-sale securities in an unrealized loss position as it does not intend or anticipate a need to sell these securities prior to recovering the associated unrealized losses. As a result, the Company does not consider any portion of the unrealized losses as of January 31, 2018 or 2019 or April 30, 2019 (unaudited) to represent an other-than temporary impairment or credit losses.

The following table classifies marketable securities by contractual maturities (in thousands):

| | | As of January 31, | | | | As of April 30, 2019 |
|---|---|---|---|---|---|---|
| | | 2018 | | 2019 | | |
| | | | | | | (Unaudited) |
| Due in one year | $ | 358,015 | $ | 506,297 | $ | 481,578 |
| Due in one to two years | | 70,283 | | 154,004 | | 54,591 |
| Total | $ | 428,298 | $ | 660,301 | $ | 536,169 |

### Note 3.   Fair Value Measurements

The Company's money market funds and sweep account are classified within Level 1 of the fair value hierarchy because they are valued using quoted prices in active markets. The Company's commercial paper, U.S. agency and government securities, international government securities, certificates of deposit, and corporate bonds are classified within Level 2 of the fair value hierarchy because they have been valued using inputs other than quoted prices in active markets that are observable directly or indirectly. The Company's strategic investments in privately held companies are classified within Level 3 of the fair value hierarchy because they have been valued using unobservable inputs for which the Company has been required to develop its own assumptions. Realized and unrealized gains and losses relating to the strategic investments are recorded in other income (expense), net in the accompanying consolidated statements of operations.

The following table provides the financial instruments measured at fair value on a recurring basis, within the fair value hierarchy (in thousands):

| As of January 31, 2018 | | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|---|
| Cash equivalents: | | | | | | | | |
| Money market funds | $ | 79,666 | $ | — | $ | — | $ | 79,666 |
| Total cash equivalents | $ | 79,666 | $ | — | $ | — | $ | 79,666 |
| Marketable securities: | | | | | | | | |

F-21

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Commercial paper | $ — | $ 167,976 | $ — | $ 167,976 |
| U.S. agency securities | — | 15,155 | — | 15,155 |
| U.S. government securities | — | 11,186 | — | 11,186 |
| International government securities | — | 59,938 | — | 59,938 |
| Corporate bonds | — | 174,043 | — | 174,043 |
| Total marketable securities | $ — | $ 428,298 | $ — | $ 428,298 |
| Noncurrent assets: | | | | |
| Strategic investments | $ — | $ — | $ 7,623 | $ 7,623 |

| As of January 31, 2019 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Cash equivalents: | | | | |
| Money market funds | $ 118,737 | $ — | $ — | $ 118,737 |
| Total cash equivalents | $ 118,737 | $ — | $ — | $ 118,737 |
| Marketable securities: | | | | |
| Commercial paper | $ — | $ 17,462 | $ — | $ 17,462 |
| U.S. agency securities | — | 44,879 | — | 44,879 |
| U.S. government securities | — | 370,574 | — | 370,574 |
| International government securities | — | 36,734 | — | 36,734 |
| Corporate bonds | — | 190,652 | — | 190,652 |
| Total marketable securities | $ — | $ 660,301 | $ — | $ 660,301 |
| Noncurrent assets: | | | | |
| Strategic investments | $ — | $ — | $ 12,334 | $ 12,334 |

| As of April 30, 2019 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (Unaudited) | | |
| Cash equivalents: | | | | |
| Money market funds | $ 155,603 | $ — | $ — | $ 155,603 |
| Commercial paper | — | 19,971 | — | 19,971 |
| Total cash equivalents | $ 155,603 | $ 19,971 | $ — | $ 175,574 |
| Marketable securities: | | | | |
| U.S. agency securities | $ — | $ 44,978 | $ — | $ 44,978 |
| U.S. government securities | — | 311,729 | — | 311,729 |
| International government securities | — | 34,674 | — | 34,674 |
| Corporate bonds | — | 144,788 | — | 144,788 |
| Total marketable securities | $ — | $ 536,169 | $ — | $ 536,169 |
| Noncurrent assets: | | | | |
| Strategic investments | $ — | $ — | $ 15,266 | $ 15,266 |

F-22

The following table presents additional information about Level 3 assets measured at fair value on a recurring basis (in thousands):

| | Year ended January 31, | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2018 | 2019 |
| | | | (Unaudited) | |
| Balance at beginning of period | $ 4,812 | $ 7,623 | $ 7,623 | $ 12,334 |
| Purchases | 2,901 | 2,276 | — | 3,100 |
| Proceeds from liquidation | (117) | (1,266) | — | (3,193) |
| Realized gains (losses) | (142) | (131) | — | 2,693 |
| Unrealized gains relating to investments still held at reporting date | 169 | 3,832 | — | 332 |
| Balance at end of period | $ 7,623 | $ 12,334 | $ 7,623 | $ 15,266 |

## Note 4.   Property and Equipment, Net

The following is a summary of the Company's property and equipment by category (in thousands):

| | As of January 31, | | As of April 30, 2019 |
| --- | --- | --- | --- |
| | 2018 | 2019 | |
| | | | (Unaudited) |
| Computer equipment and software | $ 6,093 | $ 2,222 | $ 2,807 |
| Furniture and fixtures | 10,784 | 19,693 | 21,975 |
| Capitalized internal-use software costs | 3,401 | 4,241 | 4,241 |
| Leasehold improvements | 26,164 | 86,258 | 89,019 |
| Construction in progress | 18,320 | 6,076 | 8,570 |
| Property and equipment, gross | 64,762 | 118,490 | 126,612 |
| Less: accumulated depreciation and amortization | (21,765) | (30,131) | (31,683) |
| Property and equipment, net | $ 42,997 | $ 88,359 | $ 94,929 |

Depreciation and amortization expense was $6.2 million, $13.8 million, and $15.0 million for the years ended January 31, 2017, 2018 and 2019, respectively, and $2.8 million (unaudited) and $4.8 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively.

The Company capitalized internal-use software costs of $50,000 and $0.8 million for the years ended January 31, 2018 and 2019, respectively, and $0 (unaudited) for the three months ended April 30, 2019. Amortization expense of capitalized internal-use software costs totaled $1.0 million, $1.2 million, and $0.3 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $0.1 million (unaudited) and $0.1 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively. The net carrying value of capitalized internal-use software at January 31, 2018 and 2019 and April 30, 2019 was $0.4 million , $0.9 million, and $0.8 million (unaudited), respectively.

## Note 5.   Acquisitions

### *Astro Technology*

In September 2018, the Company completed its acquisition of all issued and outstanding shares of Astro Technology Inc. ("Astro"), a pre-revenue start-up company that provides artificial-intelligence (AI) enhanced communications solutions, for a total purchase price of $43.3 million in cash.

The Company has accounted for this acquisition as a business combination and has completed the valuation of the assets acquired and liabilities assumed and the allocation of the purchase price to goodwill as of January 31, 2019. A summary of the allocation of the purchase price is presented as follows (in thousands):

| | | |
|---|---|---:|
| Identified intangible asset - developed technology | $ | 5,300 |
| Goodwill | | 37,795 |
| Net tangible assets acquired | | 234 |
| Total purchase price | $ | 43,329 |

The goodwill was primarily attributed to the value of synergies created with the Company's current and future offerings and the value of the assembled workforce. The Company anticipates both goodwill and intangible assets to be fully deductible for income tax purposes.

The Company also agreed to pay additional cash consideration of $10.7 million for unvested securities in return for future services to be provided by certain employees acquired from Astro upon continued employment by the Company. The cash consideration will be paid on each original vesting date of the unvested securities through June 2022. The Company accounted for the cash consideration outside the business combination and recorded compensation expense of $1.6 million and $0.9 million (unaudited) in research and development expense in the accompanying consolidated statement of operations for the year ended January 31, 2019 and three months ended April 30, 2019, respectively.

The Company incurred other acquisition related expenses of $0.4 million which were recorded in general and administrative expense in the accompanying consolidated statement of operations for the year ended January 31, 2019.

*Other acquisitions*

During the year ended January 31, 2019, the Company completed other acquisitions and purchases of intangible assets for total consideration of $14.5 million, of which $5.3 million and $5.0 million will be paid in the years ending January 31, 2020 and 2021, respectively. In aggregate, $11.7 million was attributed to intangible assets, $2.2 million was attributed to goodwill, and $0.6 million was attributed to a service agreement.

As part of one of the acquisitions referenced above, the Company concurrently entered into a two-year services agreement, a purchase of technology and a sale of its Class A common stock. Concurrent with this transaction, the Company sold 896,057 shares of Class A common stock to the sellers for $10.0 million. This represented a premium of $3.9 million over the then fair value of the shares which the Company recorded as a reduction to the acquisition price. These arrangements were treated as one transaction as they were executed at the same time and in contemplation of one another. The Company accounted for the transaction as an asset acquisition with $9.9 million being allocated to intangible assets and $0.6 million to the services arrangement.

These acquisitions generally enhance the breadth and depth of the Company's product offerings, expand its expertise in engineering, and are for defensive purposes to eliminate competition. The Company anticipates both goodwill and intangible assets from other acquisitions to be fully deductible for income tax purposes.

Following are the details of all intangible assets acquired as a result of acquisitions for the year ended January 31, 2019 (dollars in thousands):

| | | Amount | Weighted Average Life |
|---|---|---:|:---:|
| Customer relationships | $ | 9,100 | 7 years |
| Developed technology | | 6,700 | 3 years |
| Assembled workforce | | 1,198 | 2 years |
| Fair value of intangible assets acquired | $ | 16,998 | 5 years |

F-24

**Note 6.    Goodwill and Intangible Assets, Net**

*Goodwill*

The following table reflects the changes in the carrying amount of goodwill (in thousands):

| | Year ended January 31, | | Three Months Ended April 30, 2019 |
| | 2018 | 2019 | |
|---|---:|---:|---:|
| | | | (Unaudited) |
| Balance at beginning of year | $ 8,653 | $ 8,653 | 48,598 |
| Additions due to acquisitions | — | 39,945 | — |
| Balance at end of year | $ 8,653 | $ 48,598 | $ 48,598 |

*Intangible Assets, Net*

Intangible assets as of January 31, 2019 and April 30, 2019 consist of the following (in thousands, except years):

| As of January 31, 2019 | Weighted-average remaining amortization period | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---:|---:|---:|---:|
| Customer relationships | 6.5 years | $ 9,100 | $ 704 | $ 8,396 |
| Developed technology | 2.6 years | 8,527 | 2,743 | 5,784 |
| Assembled workforce | 1.7 years | 1,198 | 175 | 1,023 |
| Total | | $ 18,825 | $ 3,622 | $ 15,203 |

| As of April 30, 2019 | Weighted-average remaining amortization period | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---:|---:|---:|---:|
| | | (Unaudited) | | |
| Customer relationships | 6.2 years | $ 9,100 | $ 1,029 | $ 8,071 |
| Developed technology | 2.3 years | 8,527 | 3,301 | 5,226 |
| Assembled workforce | 1.5 years | 1,198 | 325 | 873 |
| Total | | $ 18,825 | $ 4,655 | $ 14,170 |

As of January 31, 2018, the net carrying amount of the Company's intangible assets acquired from its previous acquisition was zero.

The Company records amortization expense associated with customer relationships, developed technology and assembled workforce in sales and marketing expense, cost of revenue and research and development expense, respectively, in the accompanying consolidated statements of operations. Amortization expense of intangible assets was $0.6 million , $0.5 million , and $1.8 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $0 (unaudited) and $1.0 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively.

F-25

As of January 31, 2019, expected amortization expense relating to intangible assets for each of the next five years and thereafter is as follows (in thousands):

| Year ending January 31, | | |
| --- | --- | --- |
| 2020 | $ | 4,132 |
| 2021 | | 3,957 |
| 2022 | | 2,618 |
| 2023 | | 1,300 |
| 2024 | | 1,300 |
| Thereafter | | 1,896 |
| Total | $ | 15,203 |

## Note 7.   Other Income (Expense), Net

Other income (expense), net consist of the following (in thousands):

| | Year ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| Interest income, net | $ 2,025 | $ 3,838 | $ 13,400 | $ 2,076 | $ 4,690 |
| Unrealized gains (losses) on foreign exchange | 851 | 1,970 | (869) | (510) | 276 |
| Transaction losses on foreign exchange | (998) | (1,503) | (99) | 262 | (935) |
| Change in fair value of strategic investments | (73) | 27 | 3,701 | — | 3,025 |
| Other non-operating income (loss), net | (56) | 249 | 13 | (26) | 21 |
| Other income (expense), net | $ 1,749 | $ 4,581 | $ 16,146 | $ 1,802 | $ 7,077 |

## Note 8.   Commitments and Contingencies

### *Lease Commitments*

The Company has entered into various noncancelable operating leases for its facilities expiring between fiscal years 2020 and 2031. Certain operating leases contain provisions under which monthly rent escalates over time. When lease agreements contain escalating rent clauses or free rent periods, the Company recognizes rent expense on a straight-line basis over the term of the lease.

In August 2018, the Company entered into a noncancelable operating lease agreement for an office facility in Denver, Colorado. In connection with entering into the lease agreement, the Company agreed to a security deposit of $2.9 million in the form of a standby letter of credit, which is included in restricted cash as of January 31, 2019 and April 30, 2019. The lease term is from February 2019 through June 2026, with remaining future minimum lease payments of $19.3 million and $19.0 million (unaudited) as of January 31, 2019 and April 30, 2019, respectively. The Company is entitled to receive tenant incentives of $6.4 million, of which none and $0.8 million (unaudited) had been received as of January 31, 2019 and April 30, 2019, respectively.

In December 2016, the Company entered into a noncancelable operating lease for an office facility in San Francisco, California. In connection with entering into the lease agreement, the Company agreed to a security deposit of $17.6 million in the form of a standby letter of credit, which is included in restricted cash. The lease term is from November 2017 through August 2028, with future minimum lease payments of $193.5 million and $189.0 million (unaudited) as of January 31, 2019 and April 30, 2019, respectively, through the year ended January 31, 2029. The Company is entitled to receive tenant incentives of $11.8 million, of which $5.8 million and $5.8 million (unaudited)

had been received as of January 31, 2019 and April 30, 2019, respectively. Leasehold improvements associated with this lease will be amortized over the lease term.

Rent expense, net of sublease income was $9.1 million, $17.5 million, and $27.7 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $5.6 million (unaudited) and $8.3 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively.

Future minimum lease payments under noncancelable operating leases that have initial terms in excess of one year as of January 31, 2019 are as follows (in thousands):

| Year ending January 31, | | |
| --- | --- | --- |
| 2020 | $ | 27,359 |
| 2021 | | 25,832 |
| 2022 | | 25,120 |
| 2023 | | 24,802 |
| 2024 | | 23,525 |
| Thereafter | | 111,549 |
| Total | $ | 238,187 |

In March 2019, the Company entered into a noncancelable operating lease for an office facility in San Francisco, California. In connection with entering into the lease agreement, the Company agreed to a security deposit of $18.0 million in the form of a standby letter of credit, which is included in restricted cash as of April 30, 2019. The lease term is from March 2019 through June 2030, with future minimum lease payments of $171.0 million . The Company is entitled to receive tenant improvement reimbursements not to exceed $25.4 million.

### Hosting Commitments

In April 2018, the Company executed an amendment to its existing agreement with Amazon Web Services ("AWS"). The amended agreement was effective as of May 1, 2018 and continues through July 31, 2023. The Company has minimum annual commitments of $50.0 million each year of the agreement term for a total minimum commitment of $250.0 million. As of January 31, 2019, the Company had a remaining minimum payment obligation of $212.5 million to AWS through July 31, 2023.

### Legal Matters

The Company is involved from time to time in various claims and legal actions arising in the ordinary course of business. While it is not feasible to predict or determine the ultimate outcome of these matters, the Company believes that none of its current legal proceedings will have a material adverse effect on its financial position or results of operations.

### Indemnification Agreements

The Company has signed indemnification agreements with all its directors and certain of its board observers. The agreements indemnify the director or board observer from claims and expenses on actions brought against the individuals, separately or jointly with the Company, for indemnifiable events. Indemnifiable events generally mean any event or occurrence related to the fact that the director or board observer was or is acting in his or her capacity as a director or board observer for the Company or was or is acting or representing the interests of the Company. The terms of obligations under these indemnification agreements may vary.

In the ordinary course of business, the Company enters into contractual arrangements under which the Company agrees to provide indemnification of varying scope and terms to business partners and other parties with respect to certain matters, including, but not limited to, losses arising out of the breach of such agreements, intellectual property infringement claims made by third parties, and other liabilities relating to or arising from its various products, or its acts or omissions. In these circumstances, payment may be conditional on the other party making a claim pursuant to

the procedures specified in the particular contract. Further, the Company's obligations under these agreements may be limited in terms of time and/or amount, and in some instances, the Company may have recourse against third parties for certain payments.

**Note 9.   Stockholders' Equity**

*Convertible Preferred Stock*

From August to September 2018, the Company sold 33.5 million shares of Series H convertible preferred stock and 2.4 million shares of Series H-1 convertible preferred stock, each at a purchase price of $11.9053 per share, for aggregate gross proceeds of $427.3 million. The Company incurred $0.4 million in issuance costs, which are recorded as a reduction in the carrying value of the Series H convertible preferred stock.

In December 2017, the Company sold approximately 1.5 million shares of Series G-3 convertible preferred stock at $8.70 per share, for aggregate gross proceeds of $12.7 million.

In November 2017, the Company sold approximately 17.2 million shares of Series G-2 convertible preferred stock at $8.70 per share, for aggregate gross proceeds of $150.0 million.

In October 2017, the Company sold approximately 24.7 million shares of Series G convertible preferred stock and 2.1 million shares of Series G-1 convertible preferred stock at $9.305 per share, for aggregate gross proceeds of $250.0 million. The Company incurred $0.4 million in issuance costs, which are recorded as a reduction in the carrying value of the Series G convertible preferred stock.

In March 2016, the Company sold approximately 19.9 million shares of Series F convertible preferred stock and 6.8 million shares of Series F-1 convertible preferred stock at $7.80 per share, for aggregate gross proceeds of $208.0 million. The Company incurred $0.1 million in issuance costs, which are recorded as a reduction to the carrying value of the Series F convertible preferred stock.

At January 31, 2018, convertible preferred stock consisted of the following (in thousands):

| | Shares | | Net proceeds | Liquidation preference |
| | Authorized | Outstanding | | |
|---|---|---|---|---|
| Series A | 84,751 | 84,751 | $ 8,011 | $ 8,060 |
| Series B | 43,320 | 43,320 | 10,674 | 10,700 |
| Series C | 64,805 | 64,805 | 42,678 | 42,750 |
| Series D | 47,059 | 42,490 | 108,266 | 108,350 |
| Series D-1 | 1,235 | 1,235 | 2,561 | 3,149 |
| Series E | 26,787 | 22,602 | 134,832 | 135,000 |
| Series E-1 | 6,047 | 6,047 | 37,940 | 37,950 |
| Series F | 19,867 | 19,867 | 154,957 | 155,000 |
| Series F-1 | 6,793 | 6,793 | 52,940 | 53,000 |
| Series G | 24,718 | 24,718 | 229,648 | 230,000 |
| Series G-1 | 2,149 | 2,149 | 20,000 | 20,000 |
| Series G-2 | 17,241 | 17,241 | 150,000 | 150,000 |
| Series G-3 | 1,465 | 1,465 | 12,714 | 8,700 |
| Total | 346,237 | 337,483 | $ 965,221 | $ 962,659 |

F-28

At January 31, 2019 and April 30, 2019 (unaudited), convertible preferred stock consisted of the following (in thousands):

| | Shares | | Net proceeds | Liquidation preference |
|---|---|---|---|---|
| | Authorized | Outstanding | | |
| Series A | 84,751 | 84,751 | $ 8,011 | $ 8,060 |
| Series B | 43,320 | 43,320 | 10,674 | 10,700 |
| Series C | 64,805 | 64,805 | 42,678 | 42,750 |
| Series D | 47,059 | 42,490 | 108,266 | 108,350 |
| Series D-1 | 1,235 | 1,235 | 2,561 | 3,149 |
| Series E | 26,787 | 22,602 | 134,832 | 135,000 |
| Series E-1 | 6,047 | 6,047 | 37,940 | 37,950 |
| Series F | 19,867 | 19,867 | 154,957 | 155,000 |
| Series F-1 | 6,793 | 6,793 | 52,940 | 53,000 |
| Series G | 24,718 | 24,718 | 229,648 | 230,000 |
| Series G-1 | 2,149 | 2,149 | 20,000 | 20,000 |
| Series G-2 | 17,241 | 17,241 | 150,000 | 150,000 |
| Series G-3 | 1,465 | 1,465 | 12,714 | 8,700 |
| Series H | 35,150 | 33,470 | 398,082 | 398,468 |
| Series H-1 | 9,202 | 2,419 | 28,798 | 28,798 |
| Total | 390,589 | 373,372 | $ 1,392,101 | $ 1,389,925 |

Significant rights and preferences of the above convertible preferred stock are as follows:

*Conversion*

At any time following the date of issuance, each share of convertible preferred stock is convertible, at the option of its holder, into the number of shares of common stock, which results from dividing the applicable original issue price per share for each series by the applicable conversion price per share for such series. The initial conversion prices per share of all series of convertible preferred stock are equal to the original issue prices of each series, and therefore, the conversion ratio is 1:1.

Each share of convertible preferred stock shall be automatically converted into shares of Class B common stock immediately upon the earlier of (i) the closing of the Company's sale of its common stock in a firm commitment underwritten public offering pursuant to a registration statement on Form S-1 or Form SB-2 under the Securities Act of 1933, as amended, the public offering price of which was not less than $30.0 million in the aggregate or (ii) the date, or the occurrence of an event, specified by vote or written consent or agreement of the holders of at least sixty percent (60%) of the then outstanding shares of convertible preferred stock.

*Voting*

The holders of convertible preferred stock are entitled to vote on all matters and are entitled to ten votes for each share of Class B common stock into which each share is then convertible. As long as a majority of shares of Series A convertible preferred stock, Series B convertible preferred stock, and Series C convertible preferred stock, remain outstanding the holders of each series are entitled to elect one director. Class A common stock and Class B common stock (voting as one class) are entitled to elect one director. Convertible preferred stock (except for Series F-1 convertible preferred stock and Series G-1 convertible preferred stock which do not vote for directors) and common stock, voting as a single class on an as-converted basis, are entitled to elect the remaining directors.

F-29

*Dividends*

The holders of convertible preferred stock are entitled to receive, when and if declared by the Company's board of directors, out of any assets legally available therefor, any dividends as may be declared from time to time by the Company's board of directors. Any remaining dividends shall be paid to the holders of convertible preferred stock and common stock in proportion to the number of shares outstanding on an as-converted basis. The right to receive dividends on shares of convertible preferred stock is noncumulative. No dividends have been declared or paid by the Company as of January 31, 2017, 2018, or 2019 or April 30, 2019 (unaudited).

*Liquidation Preference*

Each holder of Series A convertible preferred stock, Series B convertible preferred stock, Series C convertible preferred stock, Series D convertible preferred stock, Series E convertible preferred stock, Series E-1 convertible preferred stock, Series F convertible preferred stock, Series F-1 convertible preferred stock, Series G convertible preferred stock, Series G-1 convertible preferred stock, Series G-2 convertible preferred stock, Series G-3 convertible preferred stock, Series H convertible preferred stock, and Series H-1 convertible preferred stock is entitled to receive, prior and in preference to any distribution or payment to the holders of the Series D-1 convertible preferred stock or the common stock, a liquidation preference of $0.10 for each share of Series A convertible preferred stock, $0.25 for each share of Series B convertible preferred stock, $0.66 for each share of Series C convertible preferred stock, $2.55 for each share of Series D convertible preferred stock, $5.97 for each share of Series E convertible preferred stock, $6.27 for each share of Series E-1 convertible preferred stock, $7.80 for each share of Series F convertible preferred stock, $7.80 for each share of Series F-1 convertible preferred stock, $9.305 for each share of Series G convertible preferred stock, $9.305 for each share of Series G-1 convertible preferred stock, $8.70 for each share of Series G-2 convertible preferred stock, $5.97 for each share of Series G-3 convertible preferred stock, $11.9053 for each share of Series H convertible preferred stock, and $11.9053 for each share of Series H-1 convertible preferred stock plus an amount equal to all declared but unpaid dividends on such shares. If, upon any liquidation, dissolution, or winding-up of the Company, whether voluntary or involuntary (a "Liquidation Event"), the assets of the Company are insufficient to make payment in full to the holders of Series A convertible preferred stock, Series B convertible preferred stock, Series C convertible preferred stock, Series D convertible preferred stock, Series E convertible preferred stock, Series E-1 convertible preferred stock, Series F convertible preferred stock, Series F-1 convertible preferred stock, Series G convertible preferred stock, Series G-1 convertible preferred stock, Series G-2 convertible preferred stock, Series G-3 convertible preferred stock, Series H convertible preferred stock, and Series H-1 convertible preferred stock as described in the preceding sentence, then such assets shall be distributed among such holders ratably in proportion to the full amounts to which they would otherwise be respectively entitled.

After payment has been made to the holders of Series A convertible preferred stock, Series B convertible preferred stock, Series C convertible preferred stock, Series D convertible preferred stock, Series E convertible preferred stock, Series E-1 convertible preferred stock, Series F convertible preferred stock, Series F-1 convertible preferred stock, Series G convertible preferred stock, Series G-1 convertible preferred stock, Series G-2 convertible preferred stock, Series G-3 convertible preferred stock, Series H convertible preferred stock, and Series H-1 convertible preferred stock, each holder of Series D-1 convertible preferred stock is entitled to receive, prior and in preference to any distribution or payment to the holders of the common stock, a liquidation preference of $2.55 for each share of Series D-1 convertible preferred stock, plus an amount equal to all declared but unpaid dividends on such shares. If, upon any Liquidation Event, the assets of the Company are insufficient to make payment in full to the holders of Series D-1 convertible preferred stock, as described in the preceding sentence, then such assets shall be distributed among the holders of the Series D-1 convertible preferred stock ratably in proportion to the full amounts to which they would otherwise be respectively entitled.

After payment has been made to the holders of all of the series of convertible preferred stock, the remaining assets available for distribution will be distributed ratably among the holders of common stock.

*Redemption*

The convertible preferred stock is not redeemable.

F-30

*Common Stock*

The Company's amended and restated certificate of incorporation authorizes the issuance of Class A common stock and Class B common stock. As of January 31, 2019 and April 30, 2019 (unaudited), the Company is authorized to issue 660.0 million shares of Class A common stock and 650.0 million shares of Class B common stock. Holders of Class A common stock and Class B common stock are entitled to dividends on a pro rata basis, when, as, and if declared by the Company's board of directors, subject to the rights of the holders of the Company's convertible preferred stock. Holders of Class A common stock are entitled to one vote per share, and holders of Class B common stock are entitled to ten votes per share. Upon a Liquidation Event, as defined in the amended and restated certificate of incorporation, after payments are made to holders of the Company's convertible preferred stock, any distribution of proceeds to common stockholders will be made on a pro rata basis to the holders of Class A common stock and Class B common stock. Following the completion of a direct listing of the Company's Class A Common stock, shares of Class B common stock will automatically convert into shares of Class A common stock upon a sale or transfer (other than with respect to certain estate planning and other transfers). All shares of Class B common stock outstanding on the seventh anniversary of the date of the effectiveness of the Company's registration statement will automatically convert into shares of Class A common stock. Class A common stock and Class B common stock is not redeemable at the option of the holder.

The Company had reserved shares of Class B common stock for future issuance as follows (in thousands):

| | As of January 31, 2019 | As of April 30, 2019 |
|---|---|---|
| | | (Unaudited) |
| Convertible preferred stock | 373,372 | 373,372 |
| 2009 Stock Plan: | | |
| Stock options outstanding | 18,406 | 19,318 |
| Restricted stock units and awards outstanding | 65,403 | 80,018 |
| Shares available for future grants | 19,199 | 7,825 |
| Total | 476,380 | 480,533 |

*Equity Incentive Plan*

The Company maintains a stock plan, the 2009 Stock Plan (the "Plan"), which allows the Company to grant incentive and nonstatutory stock options, RSUs, and RSAs to employees, directors, and consultants of the Company. Stock options granted under the Plan expire no later than ten years from the date of grant. Stock options and RSAs granted under the Plan usually vest over four years, with 25% vesting on the one-year anniversary and 1/48th vesting monthly thereafter and may include provisions for early exercisability. When stock options are exercised subject to a repurchase right, the Company may buy back any unvested shares at their original exercise price in the event of an employee's termination prior to full vesting. RSUs granted under the Plan have a service-based vesting period which is typically four years with a cliff vesting period of one year and continued vesting quarterly thereafter and a performance-based requirement that is satisfied on the earlier of: (1) a change in control or (2) the effective date of a direct listing.

On April 22, 2019, the Company's board of directors authorized 7.0 million shares of Class B common stock to be reserved for future issuance under the Plan.

The exercise price of incentive stock options granted under the Plan must be at least equal to 100% of the fair market value of the Company's common stock at the date of grant, as determined by the Company's board of directors. The exercise price must not be less than 110% of the fair market value of the Company's common stock at the date of grant for incentive stock options granted to an employee that owns greater than 10% of the Company stock.

F-31

*Stock Options*

A summary of stock option activity under the Plan and related information is as follows (in thousands, except years and per share data):

| | Number of stock options outstanding | Weighted-average exercise price per share | Weighted-average remaining contractual term (In years) | Aggregate intrinsic value |
|---|---|---|---|---|
| Outstanding at January 31, 2018 | 23,720 | $ 0.94 | 7.14 | $ 90,047 |
| Exercised | (4,888) | 0.88 | | |
| Cancelled | (426) | 1.76 | | |
| Outstanding at January 31, 2019 | 18,406 | $ 0.94 | 6.12 | $ 177,012 |
| Granted (unaudited) | 3,663 | 10.58 | | |
| Exercised (unaudited) | (2,694) | 1.09 | | |
| Cancelled (unaudited) | (57) | 2.11 | | |
| Outstanding at April 30, 2019 (unaudited) | 19,318 | $ 2.75 | 6.46 | $ 338,136 |
| Stock options vested and exercisable at January 31, 2019 | 16,970 | $ 0.83 | 6.05 | $ 165,149 |
| Stock options vested and expected to vest at January 31, 2019 | 18,406 | $ 0.94 | 6.12 | $ 177,012 |
| Stock options vested and exercisable at April 30, 2019 (unaudited) | 14,728 | $ 0.82 | 5.60 | $ 286,146 |
| Stock options vested and expected to vest at April 30, 2019 (unaudited) | 19,318 | $ 2.75 | 6.46 | $ 338,136 |

The total grant-date fair value of stock options granted during the years ended January 31, 2017, 2018, and 2019 was $4.1 million, $0.1 million, and $0, respectively. The total grant-date fair value of stock options granted during the three months ended April 30, 2018 and 2019 was $0 (unaudited) and $21.4 million (unaudited), respectively.

The total intrinsic value of stock options exercised in the years ended January 31, 2017, 2018, and 2019 was $18.1 million, $13.6 million, and $30.0 million, respectively. The total intrinsic value of stock options exercised in the three months ended April 30, 2018 and 2019 was $5.3 million (unaudited) and $45.3 million (unaudited), respectively.

As of January 31, 2019 and April 30, 2019, there was $1.8 million and $21.7 million (unaudited), respectively, of total unrecognized stock-based compensation related to outstanding stock options, which will be recognized on a straight-line basis over a weighted average period of 0.9 years and 4.7 years (unaudited), respectively.

*Early Exercise of Nonvested Stock Options*

At the discretion of the Company's board of directors, certain stock options may be exercisable immediately at the date of grant but are subject to a repurchase right, under which the Company may buy back any unvested shares at their original exercise price in the event of an employee's termination prior to full vesting. The consideration received for an exercise of an unvested option is considered to be a deposit of the exercise price and the related dollar amount is recorded as a liability. The liabilities are reclassified into equity as the awards vest. At January 31, 2018 and 2019 and April 30, 2019, the Company recorded a liability of $0.6 million, $0.2 million and $0.2 million (unaudited), respectively, for 0.4 million, 0.1 million and 0.1 million (unaudited) shares that were early exercised by employees as of January 31, 2018 and 2019 and April 30, 2019 that are unvested, respectively.

*RSUs and RSAs*

The fair value of RSUs and RSAs are determined using the fair value of the Company's common stock on the date of grant.

F-32

A summary of RSUs and RSAs activity under the Plan is as follows (in thousands, except per share data):

| | Restricted stock units | | Restricted stock awards | |
| --- | --- | --- | --- | --- |
| | Number of shares | Weighted-average grant date fair value (per share) | Number of shares | Weighted-average grant date fair value (per share) |
| Unvested at January 31, 2018 | 40,594 | $ 3.43 | 894 | $ 2.07 |
| Granted | 26,214 | 7.02 | 2,197 | 7.86 |
| Released | — | — | (783) | 3.22 |
| Cancelled | (3,694) | 4.35 | (19) | 2.09 |
| Unvested at January 31, 2019 | 63,114 | $ 4.87 | 2,289 | $ 7.23 |
| Granted (unaudited) | 15,773 | 15.38 | 505 | 13.60 |
| Released (unaudited) | — | — | (152) | 3.85 |
| Cancelled (unaudited) | (1,511) | 6.55 | — | — |
| Unvested at April 30, 2019 (unaudited) | 77,376 | $ 7.00 | 2,642 | $ 8.64 |

The weighted-average estimated fair value of RSUs granted in the year ended January 31, 2017 and 2018 was $3.23 and $4.15 per share, respectively. The weighted-average estimated fair value of RSAs granted in the year ended January 31, 2017 was $3.03 per share. No RSAs were granted in the year ended January 31, 2018.

As of January 31, 2019 and April 30, 2019, the Company had $15.5 million and $20.2 million (unaudited), respectively, of unrecognized stock-based compensation related to RSAs, which will be recognized over the weighted average remaining requisite service period of 3.8 years and 3.7 years (unaudited), respectively. As of January 31, 2019 and April 30, 2019, the Company had $308.9 million and $541.6 million (unaudited), respectively, of unrecognized stock-based compensation related to RSUs. As the RSUs vest upon the satisfaction of both the service condition and performance vesting condition, stock-based compensation will be deferred until the performance vesting condition is satisfied. At the time the performance vesting condition becomes probable, which is not until the performance vesting condition is satisfied, the Company will recognize cumulative stock-based compensation for the outstanding RSUs based on the service-based condition using the accelerated attribution method. As of January 31, 2019 and April 30, 2019, 63.1 million RSUs and 77.4 million RSUs (unaudited), respectively, were outstanding, of which 22.4 million and 26.1 million (unaudited), respectively, had met their service condition. If the performance vesting condition had been met on January 31, 2019 and April 30, 2019, the Company would have recorded stock-based compensation of $157.5 million and $201.6 million (unaudited), respectively, and unrecognized stock-based compensation related to the unvested RSUs as of January 31, 2019 and April 30, 2019 would have been $151.4 million and $340.0 million (unaudited), respectively, that will be recognized over a weighted-average remaining requisite service period of 2.9 years and 3.1 years (unaudited), respectively.

### Tender Offers and Repurchases

In connection with the Series G and G-1 convertible preferred stock financing, the Company facilitated a tender offer for all vested and outstanding shares of Class B common stock and all outstanding series of convertible preferred stock. In November 2017, the Company facilitated the sale of an aggregate of 17.9 million shares of vested and outstanding Class B common stock, Series A convertible preferred stock, Series D convertible preferred stock, Series D-1 convertible preferred stock and Series E convertible preferred stock from its existing or former employees and investors at a per share price of $8.37, representing a 10% discount to the Series G and G-1 issuance price, for a total gross sale of $150.0 million. Following the close of the November 2017 tender offer, the Company repurchased an additional 0.8 million shares of Class B common stock from one of the Company's co-founders at the same price per share of $8.37 for a total gross sale of $6.6 million. At the time of the tender offers, the fair value of the Company's Class B common stock was $4.24 per share. For shares of Class B common stock repurchased from both current and former employees, the Company recorded compensation expense of $38.9 million related to the excess of the selling price per share of Class B common stock over the fair value of the tendered shares. In addition, the Company recorded deemed dividends of $40.9 million as a reduction to stockholder's deficit in relation to the selling price per share of

Class B common stock and convertible preferred stock paid to existing investors in excess of the original issuance price paid by investors of the shares tendered. Upon close of the tender offer, the Company retired the repurchased shares and subsequently issued the same number of shares in Series G-2 convertible preferred stock and Series G-3 convertible preferred stock to the lead investor of the Series G convertible preferred stock financing.

In April and June 2017, the Company repurchased 0.1 million shares of common stock from former employees at a purchase price of $7.41 per share. In December 2017, the Company repurchased a combined 0.1 million shares of Class B common stock from one current and one former employee at a purchase price of $8.37 per share. For all the repurchased shares of common stock, the purchase price per share represented an excess to the fair value of the Company's fair value of common stock at the time of each transaction. In total, the Company recorded $0.5 million of compensation expense and retired all repurchased shares of common stock as of January 31, 2018.

In July 2016, the Company repurchased shares of common stock from two employees at varying share amounts and purchase prices. The first repurchase was for 42,000 shares of common stock at a per share price of $8.00 for an aggregate purchase price of $0.3 million. The second repurchase was for 1.6 million shares of common stock at a per share price of $7.41 for an aggregate purchase price of $12.0 million. The purchase price per share in each repurchase represented an excess to the fair value of the Company's outstanding common stock as determined by the Company's most recent valuation of its capital stock at the time of the transactions. At the time of the tender offers, the fair value of the Company's common stock was $2.59 per share. Upon the completion of the repurchases, the Company recorded $8.0 million as compensation expense related to the excess of the selling price per share of common stock paid to the Company's employees over the fair value of the repurchased shares. The Company retired the shares repurchased as of January 31, 2017.

A summary of the stock-based compensation related to the tender offers and repurchases, recorded in the accompanying consolidated statements of operations is as follows (in thousands):

|  | Year ended January 31, | | | Three Months Ended April 30, | |
|  | 2017 | 2018 | 2019 | 2018 | 2019 |
|  |  |  |  | (Unaudited) | |
| Cost of revenue | $ — | $ 252 | $ — | $ — | $ — |
| Research and development | 8,033 | 30,674 | — | — | — |
| Sales and marketing | — | 6,549 | — | — | — |
| General and administrative | — | 1,899 | — | — | — |
| Total | $ 8,033 | $ 39,374 | $ — | $ — | $ — |

### Stock Transfers

During the years ended January 31, 2017 and 2019 and the three months ended April 30, 2019, certain of the Company's existing investors, or investors to whom the Company waived its right of first refusal and transfer restrictions with respect to proposed transfers of outstanding common stock, acquired outstanding common stock from current or former employees of the Company for a purchase price greater than the fair value at the time of the transactions. In connection with these stock transfers, the Company waived its right of first refusal and other transfer restrictions applicable to such shares. As a result, the Company recorded stock-based compensation for the difference between the price paid and the fair value on the date of the transaction.

A summary of the stock-based compensation related to the stock transfers recorded in the accompanying consolidated statements of operations is as follows (in thousands):

| | Year ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| Cost of revenue | $ 401 | $ — | $ 533 | $ 533 | $ — |
| Research and development | 18,360 | — | 6,228 | 2,379 | — |
| Sales and marketing | 5,899 | — | 1,707 | 919 | — |
| General and administrative | 1,878 | — | 6,353 | 545 | — |
| Total | $ 26,538 | $ — | $ 14,821 | $ 4,376 | $ — |

***Stock-Based Compensation***

A summary of the stock-based compensation excluding tender offers and stock transfers recorded in the accompanying consolidated statements of operations is as follows (in thousands):

| | Year ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| Cost of revenue | $ 229 | $ 239 | $ 199 | $ 70 | $ 46 |
| Research and development | 8,153 | 4,586 | 3,720 | 1,016 | 1,635 |
| Sales and marketing | 3,845 | 1,495 | 970 | 285 | 382 |
| General and administrative | 3,293 | 2,389 | 3,422 | 371 | 1,576 |
| Total | $ 15,520 | $ 8,709 | $ 8,311 | $ 1,742 | $ 3,639 |

The Company capitalized $0.4 million, $0, and $0 during the years ended January 31, 2017, 2018, and 2019, respectively, and $0 (unaudited) for each of the three months ended April 30, 2018 and 2019 of stock-based compensation as internally-developed software.

The fair value of stock options granted to employees is estimated on the date of grant using the Black-Scholes option valuation model. This stock-based compensation expense valuation model requires the Company to make assumptions and judgments regarding the variables used in the calculation. These variables include the expected term (weighted average period of time that the stock options granted are expected to be outstanding), the expected volatility of the Company's common stock, expected risk-free interest rate and expected dividends. To the extent actual results differ from the estimates, the difference is recorded as a cumulative adjustment in the period estimates are revised. The Company accounts for forfeitures as they occur.

The Company uses the simplified calculation of expected term, as the Company does not have sufficient historical data to use any other method to estimate expected term. Expected volatility is based on an average of the historical volatilities of the common stock of several entities with characteristics similar to those of the Company. The expected risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding with the expected life of the option. The expected dividend yield is 0% as the Company has not paid, and does not expect to pay, cash dividends.

F-35

The following assumptions used in the valuation of stock options issued to employees:

| | Year ended January 31, | | Three Months Ended April 30, 2019 |
|---|---|---|---|
| | 2017 | 2018 | |
| | | | (Unaudited) |
| Expected Term | 5.69 - 6.59 years | 6.05 years | 6.08 - 6.53 years |
| Expected volatility | 48% - 56% | 41% | 43% - 44% |
| Risk-free interest rate | 1.32% - 1.45% | 1.62% | 2.37% - 2.52% |
| Dividend yield | —% | —% | —% |
| Fair value of common stock on grant date | $2.37 - $3.62 | $4.24 | $11.67 - $19.36 |

There were no stock options granted to employees during the year ended January 31, 2019. There were no stock options granted to non-employees during the years ended January 31, 2017, 2018, or 2019 or three months ended April 30, 2019.

**Note 10.    Net Loss per Share Attributable to Slack Common Stockholders**

Basic net loss per share attributable to Slack common stockholders is computed by dividing the net loss attributable to Slack common stockholders by the weighted average number of shares of common stock outstanding during the period. Diluted loss per share is the same as basic loss per share for all years presented because the effects of potentially dilutive items were antidilutive given the Company's net loss in each period presented.

The following table presents the calculation of basic and diluted net loss per share attributable to Slack common stockholders (in thousands, except per share data):

| | Year ended January 31, | | | Three Months Ended April 30, | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2018 | 2019 |
| | | | | (Unaudited) | |
| Net loss attributable to Slack | $ (146,864) | $ (140,085) | $ (140,683) | $ (24,882) | $ (33,332) |
| Less: Deemed dividends to preferred stock stockholders | — | 40,883 | — | — | — |
| Net loss attributable to Slack common stockholders | $ (146,864) | $ (180,968) | $ (140,683) | $ (24,882) | $ (33,332) |
| Weighted average common shares outstanding | 114,887 | 122,865 | 121,732 | 118,926 | 125,890 |
| Net loss per share attributable to Slack common stockholders, basic and diluted | $ (1.28) | $ (1.47) | $ (1.16) | $ (0.21) | $ (0.26) |

F-36

The following potential common shares were excluded from the calculation of diluted net loss per share attributable to Slack common stockholders because their effect would have been antidilutive for the periods presented (in thousands):

| | Year ended January 31, | | | Three Months Ended April 30, | |
| --- | --- | --- | --- | --- | --- |
| | **2017** | **2018** | **2019** | **2018** | **2019** |
| | | | | (Unaudited) | |
| Convertible preferred stock | 301,197 | 337,483 | 373,372 | 337,483 | 373,372 |
| Stock options | 28,527 | 23,720 | 18,406 | 22,389 | 19,318 |
| Unvested early exercised stock options | 705 | 419 | 115 | 254 | 84 |
| Restricted stock units | 25,721 | 40,594 | 63,114 | 43,788 | 77,376 |
| Restricted stock awards | 3,539 | 894 | 2,289 | 622 | 2,642 |
| Total antidilutive securities | 359,689 | 403,110 | 457,296 | 404,536 | 472,792 |

*Pro Forma Net Loss per Share Attributable to Common Stockholders (Unaudited)*

The following table presents the calculation of pro forma basic and diluted net loss per share attributable to Slack common stockholders (in thousands, except per share data):

| | Year Ended January 31, 2019 | Three Months Ended April 30, 2019 |
| --- | --- | --- |
| Numerator: | | |
| Net loss attributable to Slack common stockholders | $ (140,683) | $ (33,332) |
| Denominator: | | |
| Weighted-average shares used in computing net loss per share attributable to Slack common stockholders, basic and diluted | 121,732 | 125,890 |
| Pro forma adjustment to reflect assumed conversion of convertible preferred stock into common stock | 373,372 | 373,372 |
| Pro forma adjustment to reflect assumed vesting of the RSUs with service condition satisfied | 22,389 | 26,075 |
| Weighted-average number of shares used in computing pro forma net loss per share attributable to Slack common stockholders, basic and diluted | 517,493 | 525,337 |
| Pro forma net loss per share, attributable to Slack common stockholders, basic and diluted | $ (0.27) | $ (0.06) |

**Note 11.   Income Taxes**

Loss before income taxes consisted of the following (in thousands):

| | Year ended January 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2018** | **2019** |
| United States | $ (123,904) | $ (100,364) | $ (85,175) |
| Foreign | (22,850) | (38,906) | (52,887) |
| Total | $ (146,754) | $ (139,270) | $ (138,062) |

F-37

The components of the Company's provision for income tax are as follows (in thousands):

| | Year ended January 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | 3 | 20 | 355 |
| Foreign | 475 | 894 | 279 |
| Total current | 478 | 914 | 634 |
| Deferred: | | | |
| Federal | — | — | (200) |
| State | — | — | (120) |
| Foreign | (323) | (121) | 526 |
| Total deferred | (323) | (121) | 206 |
| Provision for income taxes | $ 155 | $ 793 | $ 840 |

A reconciliation of the U.S. federal statutory tax rate to the Company's provision for income tax is as follows:

| | Year ended January 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| Tax at statutory federal rate | 34.00 % | 33.80 % | 21.00 % |
| State tax, net of federal benefit | 2.75 | 2.19 | 2.12 |
| Stock-based compensation | (8.47) | (2.29) | (2.95) |
| Credits | 2.78 | 4.34 | 6.01 |
| Foreign rate differential | (5.60) | (9.92) | 9.52 |
| Unrecognized tax benefits | (9.20) | — | — |
| Other | (3.77) | (0.55) | (3.80) |
| Change in statutory tax rates | — | (17.93) | 0.13 |
| Change in valuation allowance | (12.62) | (10.21) | (32.64) |
| Effective tax rate | (0.13)% | (0.57)% | (0.61)% |

F-38

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The Company's deferred income tax assets and liabilities consisted of the following (in thousands):

|  | Year ended January 31, | | |
|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Deferred tax assets (liabilities): | | | |
| Accrued liabilities | $ 2,979 | $ 3,905 | $ 7,907 |
| Accounts receivable | 75 | 131 | 70 |
| Deferred rent | 204 | 1,438 | 4,304 |
| Net operating losses | 44,043 | 46,736 | 65,385 |
| Tax credits | 6,538 | 13,510 | 22,116 |
| Intangible assets | (772) | (108) | 15,258 |
| Property and equipment | 514 | 1,637 | 870 |
| Stock-based compensation | (851) | (275) | (2,549) |
| Other | 3 | 88 | (684) |
| Total gross deferred tax assets | 52,733 | 67,062 | 112,677 |
| Valuation allowance | (52,342) | (66,557) | (112,693) |
| Total deferred tax assets, net | $ 391 | $ 505 | $ (16) |

The Company has assessed, based on available evidence, both positive and negative, it is more likely than not that the deferred tax assets will not be utilized, such that a valuation allowance has been recorded, except for certain foreign subsidiaries which generate income. The valuation allowance increased $18.6 million, $14.2 million and $46.1 million in the years ended January 31, 2017, 2018, and 2019, respectively.

As of January 31, 2019, the Company had U.S. federal and state net operating loss carryforwards of $221.4 million and $154.5 million , respectively, available to offset future taxable income. If not utilized, these carryforward losses will expire, in various amounts, for federal and state tax purposes, both beginning in 2029.

The Company had federal and California capital loss carryforwards of $0.1 million and $0.1 million as of January 31, 2019, respectively. In addition, the Company had $17.2 million and $14.4 million of federal and state research and development tax credits, respectively, available to offset future taxes as of January 31, 2019. If not utilized, the federal credits will begin to expire in 2029. California state research and development tax credits may be carried forward indefinitely.

Utilization of the net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the "ownership change" limitations provided by Section 382 and 383 of the Internal Revenue Code of 1986, as amended, and other similar state provisions. Any annual limitation may result in the expiration of net operating loss and tax credit carryforwards before utilization.

The Company attributes net revenue, costs and expenses to domestic and foreign components based on the terms of its agreements with its subsidiaries. The Company does not provide for federal income taxes on the undistributed earnings of its foreign subsidiaries as such earnings are to be reinvested offshore indefinitely. If the Company repatriated these earnings, the resulting income tax liability would be insignificant. The Company is subject to taxation in the United States and various states and foreign jurisdictions.

On December 22, 2017, the Tax Act was signed into law, which changed many aspects of U.S. corporate income taxation. Certain key changes introduced by the Tax Act include the reduction of the corporate income tax rate to 21%, imposition of a tax on deemed repatriated earnings of foreign subsidiaries ("Transition Tax"), acceleration of expensing of certain business assets, and the implementation of a territorial tax system.

At January 31, 2018, the Company has remeasured its U.S. deferred tax assets and liabilities, offset by valuation allowances, to reflect the lower rate expected to apply when these temporary differences reverse.

As part of the transition to the new territorial tax system, the Tax Act imposes a one-time tax on a deemed repatriation of historical earnings of foreign subsidiaries. The Company does not expect any one-time Transition Tax based on the evaluation of its current operations.

Under the provisions of the Tax Act, all foreign earnings are subject to U.S. taxation. As a result of the Tax Act, the Company intends to repatriate foreign earnings that have been taxed in the United States to the extent that the foreign earnings are not restricted by local laws and accounting rules.

During the fiscal year ended January 31, 2019, the Company completed its accounting for the tax effects of the enactment of the Tax Act. The Company reaffirmed its position that it was not subject to transition tax under the Tax Act as of January 31, 2018, and therefore, the Company did not record any transition tax during the measurement period. The Company's accounting for these items is now complete.

The Company is required to inventory, evaluate and measure all uncertain tax positions taken or to be taken on tax returns, and to record liabilities for the amount of such positions that may not be sustained, or may only partially be sustained, upon examination by the relevant taxing authorities. As of January 31, 2019, the Company's total unrecognized tax benefits were $20.5 million, exclusive of interest and penalties described below. A reconciliation of the beginning and ending amount of total unrecognized tax benefits is as follows (in thousands):

| | Year ended January 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2018 | | 2019 |
| Balance at beginning of period | $ | 1,624 | $ | 17,767 | $ | 18,545 |
| Increase related to prior year tax provisions | | 515 | | 28 | | — |
| Decrease related to prior year tax provisions | | — | | (2,687) | | (2,076) |
| Increase related to current year tax provisions | | 15,660 | | 3,472 | | 4,022 |
| Lapse of statute of limitations | | (32) | | (35) | | (7) |
| Balance at end of period | $ | 17,767 | $ | 18,545 | $ | 20,484 |

Included in the balance of unrecognized tax benefits as of January 31, 2017, 2018, and 2019, are $0.1 million, $0.1 million, and $29,000, respectively, of unrecognized tax benefits that, if recognized, would affect the effective tax rate.

The Company recognizes interest accrued related to unrecognized tax benefits and penalties as income tax expense. During 2017, the Company accrued penalties of $1,000 and interest of $3,000. In total, as of January 31, 2017, the Company had recognized a liability for penalties and interest of $20,000. Related to the unrecognized tax benefits noted above, the Company accrued penalties of $0 and interest of $7,000 during 2018. In total, as of January 31, 2018, the Company recognized a liability for penalties and interest of $14,000. Related to the unrecognized tax benefits noted above, the Company accrued penalties of $0 and interest of $1,000 during 2019. In total, as of January 31, 2019, the Company recognized a liability for penalties and interest of $8,000.

The Company does not anticipate that the amount of existing unrecognized tax benefits will significantly increase or decrease within the next 12 months.

The Company files tax returns in the U.S. (federal and various states) and other foreign jurisdictions. Due to the Company's U.S. net operating loss carryforwards, its income tax returns generally remain subject to examination by federal and most state tax authorities.

During the year ended January 31, 2019, the Canada Revenue Agency ("CRA") concluded the audit for the Canadian Scientific Research and Experimental Development Tax Credit reported on tax returns for the period ended January 31, 2016 filed with the CRA. As a result, the associated FIN48 liability has been released as of January, 31, 2019.

F-40

As of January 31, 2019, the Company was subject to audits by the New York Department of Taxation and Finance ("NYTF") and the Ireland's Office of the Revenue Commissioner ("Ireland Revenue"). Accordingly, the NYTF will audit the sales and use tax reported on returns for the period from March 1, 2016 to May 31, 2018 filed with the NYTF. The Ireland Revenue will audit the income tax, payroll taxes, and value added taxes reported on returns for the three year period ended January 31, 2018 filed with the Ireland Revenue. The audit may result in an additional tax charge with related penalties and interest if the Company's position is not upheld during the audit.

**Note 12.   Geographic Information**

The following table shows the Company's revenue by geographic areas, as determined based on the billing address of its customers (in thousands):

| | Year ended January 31, | | | Three Months Ended April 30, | |
| | 2017 | 2018 | 2019 | 2018 | 2019 |
|---|---|---|---|---|---|
| | | | | (Unaudited) | |
| United States | $ 69,135 | $ 144,720 | $ 255,155 | $ 52,102 | $ 84,329 |
| International | 36,018 | 75,824 | 145,397 | 28,817 | 50,492 |
| Total | $ 105,153 | $ 220,544 | $ 400,552 | $ 80,919 | $ 134,821 |

No individual foreign country contributed in excess of 10% of revenue for the years ended January 31, 2017, 2018, and 2019 or three months ended April 30, 2018 (unaudited) or 2019 (unaudited).

The following table shows the Company's tangible long-lived assets by country (in thousands):

| | As of January 31, | | As of April 30, 2019 |
| | 2018 | 2019 | |
|---|---|---|---|
| | | | (Unaudited) |
| United States | $ 33,383 | $ 76,768 | $ 80,736 |
| Canada | 4,610 | 3,978 | 3,613 |
| Other | 5,004 | 7,613 | 10,580 |
| Total | $ 42,997 | $ 88,359 | $ 94,929 |

**Note 13.   Defined Contribution Plan**

The Company provides a tax-qualified employee savings and retirement plan, commonly known as a 401(k) plan, that allows participating employees in the United States to contribute up to 100% of their pre-tax annual compensation subject to Internal Revenue Service limits. The Company matches employee contributions at a rate of 50%, up to a maximum annual matched contribution of $4,000 per employee. Employee contributions are always fully vested while the matching contributions fully vest following one year of employee's credited service with the Company. The Company's matching contributions to its 401(k) plan totaled $1.3 million, $2.2 million, and $3.7 million for the years ended January 31, 2017, 2018, and 2019, respectively, and $1.5 million (unaudited) and $2.5 million (unaudited) for the three months ended April 30, 2018 and 2019, respectively.

**Note 14.   Subsequent Events**

The Company has evaluated subsequent events through April 3, 2019, the date that the report of independent registered public accounting firm as of and for the year ended January 31, 2019 was originally issued and the audited consolidated financial statements were available for issuance.

Subsequent to January 31, 2019, the Company granted stock options to purchase 3,651,000 shares of Class B common stock with an exercise price of $10.56 per share and issued 15,772,936 RSUs and 505,000 RSAs to employees and a non-employee director of the Company.

In March 2019, the Company entered into a noncancelable operating lease for an office facility in San Francisco, California. In connection with entering into the lease agreement, the Company agreed to a security deposit of $18.0 million in the form of a standby letter of credit. The lease term is from March 2019 through June 2030, with future minimum lease payments of $171.0 million . The Company is entitled to receive tenant improvement reimbursements not to exceed $25.4 million.

**Note 15.    Subsequent Events (Unaudited)**

In preparing the unaudited interim consolidated financial statements as of April 30, 2019 and for the three months ended April 30, 2018 and 2019, the Company has evaluated subsequent events through May 31, 2019, the date the unaudited interim consolidated financial statements were available for issuance.

On May 30, 2019, the Company entered into a $215.0 million revolving credit and guaranty agreement with a syndicate of financial institutions. The revolving credit facility has an accordion option, which, if exercised, would allow the Company to increase the aggregate commitments by up to the greater of $200.0 million and 100% of the consolidated adjusted EBITDA of the Company and its subsidiaries, plus an unlimited amount subject to satisfaction of certain leverage ratio based compliance tests after giving effect to the exercise, in each case subject to obtaining additional lender commitments and satisfying certain conditions. Pursuant to the terms of the revolving credit facility, the Company may issue letters of credit under the revolving credit facility, which reduce the total amount available for borrowing under such facility. The revolving credit facility terminates on May 30, 2024.

Interest on borrowings under the revolving credit facility accrues at a variable rate tied to the prime rate or the LIBOR rate, plus the applicable margin, at the Company's election. The margin is 0.25% in the case of prime rate loans and 1.25% in the case of LIBOR loans. Interest is payable quarterly in arrears. Pursuant to the terms of the revolving credit facility, the Company is required to pay an annual commitment fee that accrues at a rate of 0.10% per annum on the unused portion of the borrowing commitments under the revolving credit facility. In addition, the Company is required to pay a fee in connection with letters of credit issued and outstanding under the revolving credit facility that accrues at a rate of 1.25% per annum on the amount to be drawn under such letters of credit outstanding. There is an additional fronting fee of 0.125% per annum multiplied by the aggregate face amount of issued and outstanding letters of credit.

The revolving credit facility contains customary conditions to borrowing, events of default, and covenants, including covenants that restrict the Company's and its subsidiaries' ability to, among other things, incur additional indebtedness, create or incur liens, merge or consolidate with other companies, sell substantially all of our assets, liquidate or dissolve, make distributions to its equity holders or its subsidiaries' equity interests, pay dividends, make redemptions and repurchases of stock, or engage in transactions with affiliates. In addition, the revolving credit facility contains financial covenants, including a minimum liquidity balance and a minimum revenue amount .

F-42



**Through and including                , 2019 (the 25th day after the listing date of our Class A common stock), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus.**

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**ITEM 13.    OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.**

The following table sets forth all expenses to be paid by us in connection with this registration statement and the listing of our Class A common stock. All amounts shown are estimates except for the SEC registration fee and the listing fee.

| | | |
|---|---|---|
| SEC registration fee | $ | 24,115 |
| NYSE listing fee | | 320,000 |
| Printing fees and expenses | | 230,000 |
| Legal fees and expenses | | 2,500,000 |
| Accounting fees and expenses | | 1,400,000 |
| Custodian, transfer agent, and registrar fees | | 75,000 |
| Other advisers' fees | | 22,060,000 |
| Miscellaneous | | 99,186 |
| Total | $ | 26,708,301 |

**ITEM 14.    INDEMNIFICATION OF DIRECTORS AND OFFICER S.**

Section 145 of the Delaware General Corporation Law authorizes a corporation's board of directors to grant, and authorizes a court to award, indemnity to officers, directors, and other corporate agents.

Shortly following the effectiveness of this registration statement, we expect to adopt an amended and restated certificate of incorporation which will contain provisions that limit the liability of our directors for monetary damages to the fullest extent permitted by Delaware law. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for the following:

- any breach of their duty of loyalty to our company or our stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- any transaction from which they derived an improper personal benefit.

Any amendment to, or repeal of, these provisions will not eliminate or reduce the effect of these provisions in respect of any act, omission, or claim that occurred or arose prior to that amendment or repeal. If the Delaware General Corporation Law is amended to provide for further limitations on the personal liability of directors of corporations, then the personal liability of our directors will be further limited to the greatest extent permitted by the Delaware General Corporation Law.

In addition, shortly following the effectiveness of this registration statement, we expect to adopt amended and restated bylaws, which will provide that we will indemnify, to the fullest extent permitted by law, any person who is or was a party or is threatened to be made a party to any action, suit, or proceeding by reason of the fact that he or she is or was one of our directors or officers or is or was serving at our request as a director or officer of another corporation, partnership, joint venture, trust, or other enterprise. Our amended and restated bylaws are expected to provide that we may indemnify to the fullest extent permitted by law any person who is or was a party or is threatened to be made a party to any action, suit, or proceeding by reason of the fact that he or she is or was one of our employees or agents or is or was serving at our request as an employee or agent of another corporation, partnership, joint venture, trust, or

II- 1

other enterprise. Our amended and restated bylaws will also provide that we must advance expenses incurred by or on behalf of a director or officer in advance of the final disposition of any action or proceeding, subject to very limited exceptions.

Further, we have entered into indemnification agreements with each of our directors and executive officers that may be broader than the specific indemnification provisions contained in the Delaware General Corporation Law. These indemnification agreements will require us, among other things, to indemnify our directors and executive officers against liabilities that may arise by reason of their status or service. These indemnification agreements will also require us to advance all expenses incurred by the directors and executive officers in investigating or defending any such action, suit or proceeding. We believe that these agreements are necessary to attract and retain qualified individuals to serve as directors and executive officers.

The limitation of liability and indemnification provisions that are expected to be included, or are included, in our amended and restated certificate of incorporation, amended restated bylaws, and in indemnification agreements that we enter into with our directors and executive officers may discourage stockholders from bringing a lawsuit against our directors and executive officers for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against our directors and executive officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be harmed to the extent that we pay the costs of settlement and damage awards against directors and executive officers as required by these indemnification provisions. At present, we are not aware of any pending litigation or proceeding involving any person who is or was one of our directors, officers, employees, or other agents or is or was serving at our request as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification.

We expect to obtain insurance policies under which, subject to the limitations of the policies, coverage is provided to our directors and executive officers against loss arising from claims made by reason of breach of fiduciary duty or other wrongful acts as a director or executive officer, including claims relating to public securities matters, and to us with respect to payments that may be made by us to these directors and executive officers pursuant to our indemnification obligations or otherwise as a matter of law.

Certain of our non-employee directors may, through their relationships with their employers, be insured and/or indemnified against certain liabilities incurred in their capacity as members of our board of directors.

## ITEM 15.   RECENT SALES OF UNREGISTERED SECURITIES.

Since February 1, 2016, we made sales of the following unregistered securities:

### *Preferred Issuances*

In March 2016, we sold an aggregate of 26,659,824 shares of our Series F and F-1 convertible preferred stock to 12 accredited investors at a purchase price of $7.80 per share, for an aggregate purchase price of $207,999,947.

In October 2017 through December 2017, we sold an aggregate of 45,573,328 shares of our Series G, G-1, G-2 and G-3 convertible preferred stock to 12 accredited investors at a purchase price of $9.31 per share for our Series G and G-1 and $8.70 per share for our Series G-2 and G-3, for an aggregate purchase price of $412,742,651.

From August 2018 through September 2018, we sold an aggregate of 35,888,717 shares of our Series H and H-1 convertible preferred stock to 14 accredited investors at a purchase price of $11.91 per share, for an aggregate purchase price of $427,265,943.

### *Option and Class B Common Issuances*

Since February 1, 2016, we granted to our employees, consultants, and other service providers options to purchase an aggregate of 6,797,364 shares of Class B common stock under our 2009 Stock Plan, or our 2009 Plan, at exercise prices ranging from $2.28 to $16.93 per share.

Since February 1, 2016, we issued and sold to our employees, consultants, and other service providers an aggregate of 17,858,383 shares of Class B common stock upon the exercise of stock options under our 2009 Plan, at exercise prices ranging from $0.08 to $4.24 per share, for a weighted-average exercise price of $0.92.

Since February 1, 2016, we granted to our employees, consultants, and other service providers restricted stock units, or RSUs, representing an aggregate of 78,076,601 shares of Class B common stock, under our 2009 Plan.

Since February 1, 2016, we granted to our employees, consultants, and other service providers RSUs representing an aggregate of 406,017 shares of Class B common stock.

Since February 1, 2016, we granted to our employees, consultants, and other service providers restricted stock awards, or RSAs, covering an aggregate of 3,430,959 shares of Class B common stock, under our 2009 Plan.

Since February 1, 2016, we granted to our employees, consultants, and other service providers RSAs covering an aggregate of 406,017 shares of Class B common stock.

### Other Issuances

In June 2018, we issued an aggregate of 4,299 shares of our Class B common stock to an accredited investor in exchange for a release of claims.

In July 2018, we sold an aggregate of 896,057 shares of our Class A common stock to an accredited investor at a purchase price of $11.16 per share, for an aggregate purchase price of $9,999,996.

We believe these transactions were exempt from registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or Rule 701 promulgated under Section 3(b) of the Securities Act as transactions by an issuer not involving any public offering or pursuant to benefit plans and contracts relating to compensation as provided under Rule 701. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof, and appropriate legends were placed upon the stock certificates issued in these transactions. All recipients had adequate access, through their relationships with us, to information about Slack.

II- 3

**ITEM 16.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

*(a)   Exhibits.*

| Exhibit Number | Exhibit Title |
|---|---|
| 3.1** | Restated Certificate of Incorporation of the Registrant, as currently in effect. |
| 3.2** | Form of Amended and Restated Certificate of Incorporation of the Registrant to be in effect shortly following to the effectiveness of the registration statement. |
| 3.3** | Bylaws of the Registrant, as currently in effect. |
| 3.4** | Form of Amended and Restated Bylaws of the Registrant to be in effect shortly following the effectiveness of the registration statement. |
| 4.1** | Form of Class A common stock certificate of the Registrant. |
| 4.2** | Amended and Restated Investors' Rights Agreement, dated May 9, 2019, by and among the Registrant and certain of its stockholders. |
| 5.1 | Opinion of Goodwin Procter LLP. |
| 10.1** | Form of Indemnification Agreement between the Registrant and each of its directors and executive officers. |
| 10.2#** | Amended and Restated 2009 Stock Plan, as amended, and forms of agreements thereunder. |
| 10.3#** | Non-Plan Stock Grant Agreement, between the Registrant and the David Riley and Sarah Friar Revocable Trust dated August 11, 2006. |
| 10.4#** | 2019 Stock Option and Incentive Plan, and forms of agreements thereunder. |
| 10.5#** | 2019 Employee Stock Purchase Plan. |
| 10.6#** | Senior Executive Incentive Bonus Plan. |
| 10.7#** | Executive Severance Plan. |
| 10.8#** | Non-Employee Director Compensation Policy. |
| 10.9#** | Offer Letter between the Registrant and Stewart Butterfield dated March 7, 2019. |
| 10.10#** | Offer Letter between the Registrant and Allen Shim dated March 9, 2014. |
| 10.11#** | Offer Letter between the Registrant and Robert Frati dated March 23, 2016. |
| 10.12** | Lease Agreement between the Registrant and HART Foundry Square IV, LLC for Suite 100, dated January 24, 2018. |
| 10.13 | Revolving Credit and Guaranty Agreement, dated as of May 30, 2019, among the Registrant, as the borrower, the Guarantors party thereto, the Lenders and Issuing Banks party thereto, and Morgan Stanley Senior Funding, Inc., as the administrative agent and the collateral agent. |
| 21.1** | Subsidiaries of the Registrant. |
| 23.1 | Consent of KPMG LLP, independent registered public accounting firm. |
| 23.2 | Consent of Goodwin Procter LLP (included in Exhibit 5.1). |
| 24.1** | Power of Attorney (see pages II-6 to II-7 of the original filing of this Registration Statement on Form S-1) |

_____

** Previously filed.
\# Indicates management contract or compensatory plan, contract or agreement.

*(b)*   ***Financial Statement Schedules.***

All schedules are omitted because the required information is either not present, not present in material amounts, or is presented within the consolidated financial statements included in the prospectus that is part of this registration statement.

**ITEM 17.   UNDERTAKINGS.**

The undersigned Registrant hereby undertakes:

(1)   To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)    To include any prospectus required by Section 10(a)(3) of the Securities Act, as amended, or the Securities Act.

(ii)   To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement;

(iii)  To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2)   That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)   To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

Insofar as indemnification by the Registrant for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned Registrant hereby undertakes that:

(1)   For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)   For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II- 5

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in San Francisco, California, on May 31, 2019.

SLACK TECHNOLOGIES, INC.

By:  /s/ Stewart Butterfield

Stewart Butterfield
*Chief Executive Officer*

**POWER OF ATTORNEY**

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement on Form S-1 has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Stewart Butterfield<br>Stewart Butterfield | Chief Executive Officer and Director<br>(Principal Executive Officer) | May 31, 2019 |
| /s/ Allen Shim<br>Allen Shim | Chief Financial Officer<br>(Principal Financial Officer) | May 31, 2019 |
| /s/ Brandon Zell<br>Brandon Zell | Chief Accounting Officer<br>(Principal Accounting Officer) | May 31, 2019 |
| *<br>Andrew Braccia | Director | May 31, 2019 |
| *<br>Edith Cooper | Director | May 31, 2019 |
| *<br>Sarah Friar | Director | May 31, 2019 |
| *<br>John O'Farrell | Director | May 31, 2019 |
| *<br>Chamath Palihapitiya | Director | May 31, 2019 |
| *<br>Graham Smith | Director | May 31, 2019 |

*By:  /s/ Stewart Butterfield

Attorney-in-fact

II- 6

Exhibit 5.1



May 31, 2019

Slack Technologies, Inc.
500 Howard Street
San Francisco, CA 94105

Re:    Securities Registered under Registration Statement on Form S-1

Ladies and Gentlemen:

We have acted as counsel to you in connection with your filing of a Registration Statement on Form S-1 (File No. 333-231041) (as amended or supplemented, the " Registration Statement ") pursuant to the Securities Act of 1933, as amended (the " Securities Act "), relating to the registration by Slack Technologies, Inc., a Delaware corporation (the " Company ") of 118,429,640 shares (the " Registered Shares ") of the Company's Class A common stock, $0.0001 par value per share, for resale by the registered stockholders as defined and listed in the Registration Statement under "Principal and Registered Stockholders" (the " Registered Stockholders "). The Registered Shares may be sold by the Registered Stockholders, as set forth in the Registration Statement.

We have reviewed such documents and made such examination of law as we have deemed appropriate to give the opinions set forth below. We have relied, without independent verification, on certificates of public officials and, as to matters of fact material to the opinions set forth below, on certificates of officers of the Company.

The opinion set forth below is limited to the Delaware General Corporation Law.

Based on the foregoing, we are of the opinion that the Registered Shares have been duly authorized and validly issued and are fully paid and non-assessable.

We hereby consent to the inclusion of this opinion as Exhibit 5.1 to the Registration Statement and to the references to our firm under the caption "Legal Matters" in the Registration Statement. In giving our consent, we do not admit that we are in the category of persons whose consent is required under Section 7 of the Securities Act or the rules and regulations thereunder.

Very truly yours,

/s/ Goodwin Procter LLP

GOODWIN PROCTER LLP

REVOLVING CREDIT AND GUARANTY AGREEMENT

dated as of

May 30, 2019

among

SLACK TECHNOLOGIES, INC.,
as the Borrower,

the other OBLIGORS party hereto,

the LENDERS and ISSUING BANKS party hereto

and

MORGAN STANLEY SENIOR FUNDING, INC.,
as the Administrative Agent and the Collateral Agent

MORGAN STANLEY SENIOR FUNDING, INC.,

GOLDMAN SACHS LENDING PARTNERS LLC,

CREDIT SUISSE LOAN FUNDING LLC

RBC CAPITAL MARKETS

and

KEYBANC CAPITAL MARKETS INC.

as Joint Lead Arrangers and Joint Bookrunners

**TABLE OF CONTENTS**

ARTICLE 1

DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Defined Terms | 1 |
| Section 1.02. | Classification of Loans and Borrowings | 39 |
| Section 1.03. | Terms Generally | 39 |
| Section 1.04. | Accounting Terms; GAAP | 40 |
| Section 1.05. | Divisions | 40 |
| Section 1.06. | Timing of Payment or Performance | 40 |
| Section 1.07. | Basket Classification | 40 |

ARTICLE 2

LOANS AND LETTERS OF CREDIT

| | | |
|---|---|---|
| Section 2.01. | Loans | 41 |
| Section 2.02. | [Reserved] | 42 |
| Section 2.03. | Issuance of Letters of Credit and Purchase of Participations Therein | 42 |
| Section 2.04. | Pro Rata Shares; Availability of Funds | 47 |
| Section 2.05. | Evidence of Debt; Register; Lenders' Books and Records; Notes | 48 |
| Section 2.06. | Interest on Loans | 49 |
| Section 2.07. | [Reserved] | 51 |
| Section 2.08. | Default Interest | 51 |
| Section 2.09. | Fees | 51 |
| Section 2.10. | Prepayment of Loans | 52 |
| Section 2.11. | Voluntary Prepayments/Commitment Reductions | 52 |
| Section 2.12. | Mandatory Prepayments | 54 |
| Section 2.13. | Application of Prepayments/Reductions | 54 |
| Section 2.14. | General Provisions Regarding Payments | 55 |
| Section 2.15. | Interest Elections | 56 |
| Section 2.16. | Making or Maintaining Eurodollar Rate Loans | 57 |
| Section 2.17. | Increased Costs | 59 |
| Section 2.18. | Taxes | 61 |
| Section 2.19. | Pro Rata Treatment; Sharing of Set-offs | 65 |
| Section 2.20. | Mitigation Obligations; Replacement of Lenders | 65 |
| Section 2.21. | [Reserved] | 66 |
| Section 2.22. | Defaulting Lenders | 66 |
| Section 2.23. | Incremental Facilities | 68 |
| Section 2.24. | Notices | 70 |
| Section 2.25. | Extensions of Loans. | 70 |

ARTICLE 3

REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.01. | Organization; Powers | 73 |

| Section 3.02. | Authorization; Enforceability | 73 |
|---|---|---|
| Section 3.03. | Governmental Approvals; No Conflicts | 74 |
| Section 3.04. | Financial Condition; No Material Adverse Change | 74 |
| Section 3.05. | Properties | 74 |
| Section 3.06. | Litigation and Environmental Matters | 75 |
| Section 3.07. | [Reserved] | 75 |
| Section 3.08. | Compliance with Laws | 75 |
| Section 3.09. | Investment Company Status | 75 |
| Section 3.10. | Taxes | 75 |
| Section 3.11. | Disclosure | 76 |
| Section 3.12. | Subsidiaries | 76 |
| Section 3.13. | ERISA | 76 |
| Section 3.14. | Solvency | 77 |
| Section 3.15. | Anti-Terrorism Law; Sanctions. | 77 |
| Section 3.16. | FCPA; Anti-Corruption | 78 |
| Section 3.17. | Federal Reserve Regulations | 79 |
| Section 3.18. | Collateral Documents | 79 |

## ARTICLE 4
## CONDITIONS

| Section 4.01. | Effective Date | 80 |
|---|---|---|
| Section 4.02. | Each Credit Event | 82 |

## ARTICLE 5
## AFFIRMATIVE COVENANTS

| Section 5.01. | Financial Statements and Other Information | 82 |
|---|---|---|
| Section 5.02. | Notices of Material Events | 85 |
| Section 5.03. | Existence; Conduct of Business | 85 |
| Section 5.04. | Payment of Taxes and Other Claims | 85 |
| Section 5.05. | Maintenance of Properties; Insurance | 86 |
| Section 5.06. | Books and Records; Inspection Rights | 86 |
| Section 5.07. | Compliance with Laws | 86 |
| Section 5.08. | ERISA-Related Information | 87 |
| Section 5.09. | Use of Proceeds | 87 |
| Section 5.10. | Further Assurances | 88 |
| Section 5.11. | Guarantors | 89 |
| Section 5.12. | Designation of Restricted and Unrestricted Subsidiaries | 89 |
| Section 5.13. | Anti-Terrorism; Sanctions; Anti-Corruption. | 91 |

## ARTICLE 6
## NEGATIVE COVENANTS

| Section 6.01. | Indebtedness | 91 |
|---|---|---|
| Section 6.02. | Liens | 94 |
| Section 6.03. | Fundamental Changes; Asset Sales; Conduct of Business | 96 |

ii

| Section 6.04. | Restricted Payments | 98 |
|---|---|---|
| Section 6.05. | Transactions with Affiliates | 99 |
| Section 6.06. | Restrictive Agreements | 100 |

### ARTICLE 7
### FINANCIAL COVENANT

| Section 7.01. | Minimum Liquidity | 101 |
|---|---|---|
| Section 7.02. | Minimum Revenue | 101 |

### ARTICLE 8
### GUARANTY

| Section 8.01. | Guaranty of the Obligations | 102 |
|---|---|---|
| Section 8.02. | Payment by Guarantors | 103 |
| Section 8.03. | Liability of Guarantors Absolute | 103 |
| Section 8.04. | Waivers by Guarantors | 105 |
| Section 8.05. | Guarantors' Rights of Subrogation, Contribution, Etc. | 106 |
| Section 8.06. | Subordination of Other Obligations | 107 |
| Section 8.07. | Continual Guaranty | 107 |
| Section 8.08. | Authority of Guarantors or the Borrower | 107 |
| Section 8.09. | Financial Condition of the Borrower | 107 |
| Section 8.10. | Bankruptcy, Etc. | 108 |

### ARTICLE 9
### EVENTS OF DEFAULT

| Section 9.01. | Events of Default | 108 |
|---|---|---|
| Section 9.02. | Application of Funds | 111 |

### ARTICLE 10
### THE AGENTS

| Section 10.01. | Agents | 112 |
|---|---|---|
| Section 10.02. | Certain ERISA Matters | 116 |
| Section 10.03. | Additional Secured Parties | 117 |

### ARTICLE 11
### MISCELLANEOUS

| Section 11.01. | Notices | 118 |
|---|---|---|
| Section 11.02. | Waivers; Amendments | 120 |
| Section 11.03. | Expenses; Indemnity; Damage Waiver | 121 |
| Section 11.04. | Successors and Assigns | 123 |
| Section 11.05. | Survival | 129 |
| Section 11.06. | Counterparts; Integration; Effectiveness | 129 |
| Section 11.07. | Severability | 130 |
| Section 11.08. | Right of Setoff | 130 |

| | | |
|---|---|---|
| Section 11.09. | Governing Law; Jurisdiction; Consent to Service of Process | 130 |
| Section 11.10. | **WAIVER OF JURY TRIAL** | 131 |
| Section 11.11. | Headings | 131 |
| Section 11.12. | Confidentiality | 132 |
| Section 11.13. | Interest Rate Limitation | 133 |
| Section 11.14. | No Advisory or Fiduciary Responsibility | 134 |
| Section 11.15. | Electronic Execution of Assignments and Certain Other Documents | 134 |
| Section 11.16. | USA PATRIOT Act | 135 |
| Section 11.17. | Release of Guarantors | 135 |
| Section 11.18. | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 135 |
| Section 11.19. | Acknowledgement Regarding Any Supported QFCs | 136 |

**SCHEDULES**

Schedule 2.01          Revolving Commitments and Letter of Credit Issuer Sublimit

**BORROWER DISCLOSURE LETTER**

| | |
|---|---|
| Section 3.12 | Subsidiaries |
| Section 5.10 | Material Real Estate Assets |
| Section 5.11 | Guarantors |
| Section 5.12 | Unrestricted Subsidiaries |
| Section 6.01 | Existing Debt |
| Section 6.02 | Existing Liens |
| Section 6.06 | Restrictive Agreements |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption |
| Exhibit B | Form of Administrative Questionnaire |
| Exhibit C | Form of Interest Election Request |
| Exhibit D | Form of Note |
| Exhibit E | Form of Solvency Certificate |
| Exhibit F | Form of Compliance Certificate |
| Exhibit G | Form of Funding Notice |
| Exhibit H | Form of Issuance Notice |
| Exhibit I | Form of Intercompany Note |
| Exhibit J | Form of Joinder Agreement |
| Exhibit K | Form of Security Agreement |
| Exhibit L | Form of Tax Forms |

This REVOLVING CREDIT AND GUARANTY AGREEMENT, dated as of May [30], 2019, among SLACK TECHNOLOGIES, INC., a Delaware corporation, as the borrower (the " **Borrower** "), the GUARANTORS from time to time party hereto, the LENDERS and the ISSUING BANKS from time to time party hereto and MORGAN STANLEY SENIOR FUNDING, INC., as administrative agent (in such capacity, together with any permitted successor agent, the " **Administrative Agent** ") and as collateral agent (in such capacity, the " **Collateral Agent** ").

The Borrower has requested the Lenders (such term and each other capitalized term used and not otherwise defined herein having the meaning assigned to it in Article 1), to make Loans to the Borrower on a revolving credit basis on and after the date hereof and at any time and from time to time prior to the Maturity Date.

The proceeds of borrowings hereunder are to be used for the purposes described in Section 5.09. The Lenders are willing to establish the credit facility referred to in the preceding paragraph upon the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.    *Defined Terms* . As used in this Agreement, the following terms have the meanings specified below:

" **Acquisition** " means any transaction or series of related transactions resulting in the acquisition by any Obligor or any of its Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all of the Equity Interests of, or a business line or unit or a division of, any Person.

" **Adjusted LIBO Rate** " means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period *multiplied by* (b) the Statutory Reserve Rate.

" **Administrative Agent** " has the meaning set forth in the preamble hereto.

" **Administrative Questionnaire** " means an Administrative Questionnaire in substantially the form of Exhibit B or a form supplied by the Administrative Agent.

" **Affected Lender** " has the meaning set forth in Section 2.16(b).

" **Affected Loans** " has the meaning set forth in Section 2.16(b).

" **Affiliate** " means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

" **Agent Parties** " has the meaning set forth in Section 11.01(c).

" **Agents** " means the Administrative Agent and Collateral Agent or any of their respective successors or assigns.

" **Agreed L/C Cash Collateral Amount** " means 103% of the total outstanding Letter of Credit Usage.

" **Aggregate Total Exposure** " means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Loans and (ii) the Letter of Credit Usage.

" **Agreement** " means this Revolving Credit and Guaranty Agreement, as the same may hereafter be modified, supplemented, extended, amended, restated or amended and restated from time to time.

" **Alternate Base Rate** " means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day *plus* $^1/_2$ of 1% and (c) the Adjusted LIBO Rate for an Interest Period of 1 month commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) *plus* 1.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively; *provided* that, if determined pursuant to the foregoing, the Alternate Base Rate is below zero, the Alternate Base Rate will be deemed to be zero.

" **Alternative Interest Rate Election Event** " has the meaning set forth in Section 2.16(e).

" **Anti-Corruption Laws** " means all laws, rules, and regulations of any jurisdiction applicable to any Obligor or any of its Subsidiaries and Affiliates, in effect from time to time concerning or relating to bribery or corruption, including, without limitation the FCPA, the U.K. Bribery Act 2010, the Bank Secrecy Act, the USA Patriot Act, and the applicable anti-money laundering statutes of jurisdictions where any Obligor and any of its Subsidiaries conduct business, and the rules and regulations (if any) thereunder enforced by any governmental agency.

" **Anti-Terrorism Laws** " has the meaning set forth in Section 3.15(a).

" **Applicable Percentage** " means, with respect to any Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment. If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments.

" **Application** " means the Letter of Credit application in the form as may approved by the applicable Issuing Bank and executed and delivered by the Borrower to the Administrative Agent and the applicable Issuing Bank, requesting such Issuing Bank issue a Letter of Credit.

" **Approved Fund** " has the meaning set forth in Section 11.04(b)(ii)(F).

2

" **Arrangers** " means Morgan Stanley Senior Funding, Inc., Goldman Sachs Lending Partners LLC, Credit Suisse Loan Funding LLC, RBC Capital Markets and KeyBanc Capital Markets Inc. in their capacities as joint lead arrangers and joint bookrunners, and any successors thereto.

" **Asset Sale** " means a sale, lease (as lessor or sublessor), sale and leaseback, license (as licensor or sublicensor), exchange, transfer or other disposition to, any Person, in one transaction or a series of transactions, of all or any part of the businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired of any Obligor or any of its Restricted Subsidiaries, including any Equity Interests (but, for the avoidance of doubt, not including Equity Interests of the Borrower), other than (i) inventory (or other assets, including intangible assets) sold, leased or licensed out in the ordinary course of business, (ii) obsolete, surplus or worn-out property, (iii) dispositions of Cash and Cash Equivalents in the ordinary course of business (including the conversions of Cash Equivalents into Cash or other Cash Equivalents in the ordinary course of business), (iv) dispositions of property (including the sale of any Equity Interest owned by such Person) from (A) any Restricted Subsidiary that is not an Obligor to any other Restricted Subsidiary that is not an Obligor or to any Obligor or (B) any Obligor to any other Obligor; (v) dispositions of property resulting from casualty or condemnation events or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Restricted Subsidiary, including any disposition of property with respect to an insurance claim from damage to such property where the insurance company provides the Obligors or its Restricted Subsidiary the value of such property (minus any deductible and fees) in cash or with replacement property in exchange for such property; (vi) dispositions or discounts of past due accounts receivable in connection with the collection, write down or compromise thereof in the ordinary course of business, (vii) dispositions of property to the extent that (x) such property is exchanged for credit against the purchase price of similar replacement property or (y) the proceeds of such disposition are promptly applied to the purchase price of such replacement property, (viii) any abandonment, failure to maintain non-renewal or other disposition of any intellectual property (or rights relating thereto) that is no longer desirable in the conduct of any Obligor's or any of the Restricted Subsidiaries' business, as determined in good faith by such Obligor or such Restricted Subsidiary, (ix) any sale of property or series of related sales of property where the total consideration received by the Obligors and their respective Restricted Subsidiaries (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at the fair market value thereof in the case of other non-cash proceeds) does not exceed $5,000,000 for all such sales in the aggregate since the Effective Date, (x) cancellations of employee notes, (xi) real property leases in the ordinary course of business, (xii) transfers of property or assets to an Unrestricted Subsidiary by another Unrestricted Subsidiary, (xiii) expirations of contracts in accordance with their terms, (xiv) terminations of leases in the ordinary course of business, (xv) the sale or disposition of the Equity Interests in Unrestricted Subsidiaries and Immaterial Subsidiaries so long as the consideration for such Equity Interests is in an amount at least equal to the fair market value thereof, (xvi) the unwinding of any Swap Agreement and any Permitted Bond Hedge Transaction, (xvii) licenses or sublicenses of software or other Intellectual Property Rights granted in the ordinary course of business and that do not materially interfere with the ordinary course of business of the Borrower and the Restricted Subsidiaries taken as a whole, (xviii) the incurrence of Liens permitted by Section 6.02 , (xix) samples, including time-limited evaluation

3

software, provided to customers or prospective customers, (xx) de minimis amounts of equipment provided to employees and (xxi) sales, transfers or other dispositions of investments in Joint Ventures or any Subsidiary that is not a wholly owned Restricted Subsidiary to the extent required by, or made pursuant to customary buy/sell arrangements between, the parties set forth in Joint Venture arrangements and similar binding agreements.

" **Assignment and Assumption** " means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

" **Availability** " means, as of any time of determination, an amount equal to (a) the aggregate amount of Revolving Commitments in effect at such time, *minus* (b) the Aggregate Total Exposure at such time.

" **Bail-In Action** " means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

" **Bail-In Legislation** " means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

" **Bankruptcy Code** " means Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

" **Bankruptcy Event** " means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or institutes, applies for or consents to any such proceeding or appointment; *provided* that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, so long as, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

" **Base Rate Borrowing** " means a Borrowing made at the Alternate Base Rate.

" **Base Rate Loan** " means a Loan that bears interest at the Alternate Base Rate.

" **Base Rate Margin** " means 0.25%.

" **Beneficiary** " means each Agent, Lender and Issuing Bank and each other Secured Party.

4

" **Beneficial Ownership Certification** " means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

" **Beneficial Ownership Regulation** " means 31 C.F.R. § 1010.230.

" **Benefit Plan** " means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

" **Board** " means the Board of Governors of the Federal Reserve System of the United States.

" **Board of Directors** " means the board of directors of the Borrower.

" **Borrower** " has the meaning set forth in the preamble hereto.

" **Borrower Disclosure Letter** " means the disclosure letter delivered by the Borrower to the Administrative Agent and the Lenders, dated as of the Effective Date.

" **Borrowing** " means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Rate Loans, as to which a single Interest Period is in effect.

" **Business Day** " means a day (other than a Saturday or Sunday) on which banks are open for general business in New York City; *provided* that, when used in connection with a Eurodollar Rate Loan, the term " **Business Day** " shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

" **Capital Lease Obligations** " of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof accounted for as a liability on the balance sheet as determined in accordance with GAAP; *provided* that any obligations relating to a lease that was accounted for by such Person as an operating lease as of December 31, 2018 and any lease entered into after December 31, 2018 by such Person that would have been accounted for as an operating lease under GAAP as in effect as of December 31, 2018 shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations.

" **Cash** " means money, currency or a credit balance in any demand or Deposit Account.

" **Cash Equivalents** " means:

(a)   U.S. Government Obligations or certificates representing an ownership interest in U.S. Government Obligations with maturities not exceeding one year from the date of acquisition;

5

(b)    (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition and (iv) overnight bank deposits, in each case with any foreign or domestic bank or trust company having capital, surplus and undivided profits in excess of $250,000,000 whose short term debt is rated "A-2" or higher by S&P or "P-1" or higher by Moody's in the case of U.S. banks and $100,000,000 (or the dollar equivalent thereof in foreign currencies as of the date of determination) in the case of non-U.S. banks;

(c)    repurchase obligations with a term of not more than seven days for underlying securities of the type described in clauses (a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)    commercial paper rated at least P-1 by Moody's or A-1 by S&P and maturing within one year after the date of acquisition;

(e)    securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A-1 by Moody's;

(f)    securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition;

(g)    any repurchase agreement having a term of 30 days or less entered into with any Lender or any commercial banking institution satisfying, at the time of acquisition thereof, the criteria set forth in clause (b)(i) which (i) is secured by a fully perfected security interest in Cash, and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such Lender or commercial banking institution thereunder;

(h)    money market funds at least 90% of the assets of which consist of investments of the type described in clauses (a) through (g) above.

" **Cash Collateralize** " means, in respect of an Obligation, to provide and pledge (as a first priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to Administrative Agent and the applicable Issuing Bank (and " **Cash Collateralization** " and " **Cash Collateralized** " have a corresponding meaning). " **Cash Collateral** " shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

" **Change in Control** " means (a) prior to a Public Listing, the failure by the Permitted Holders to own, beneficially and of record, Equity Interests in the Borrower representing at least 50.1% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the Borrower; or (b) after a Public Listing, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act and the rules of the Securities and Exchange Commission thereunder), other than

6

the Permitted Holders, of Equity Interests in the Borrower representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the Borrower.

" **Change in Law** " means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of, or compliance by any Lender or any Issuing Bank (or, for purposes of Section 2.17(b), any lending office of such Lender or by such Lender's or such Issuing Bank's holding company, if any) with, any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a " **Change in Law** ", regardless of the date enacted, adopted or issued.

" **Class** " (a) when used with respect to any Lender, refers to whether such Lender has a Loan or Revolving Commitment with respect to a particular Class of Loans or Revolving Commitments, (b) when used with respect to Revolving Commitments, refers to whether such Revolving Commitments are Existing Revolving Commitments or Extended Revolving Commitments and (c) when used with respect to Loans, refers to whether such Loans are Existing Revolving Loans or Extended Revolving Loans.

" **Code** " means the U.S. Internal Revenue Code of 1986, as amended from time to time.

" **Collateral** " means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are granted or purported to be granted pursuant to the Collateral Documents as security for the Obligations.

" **Collateral Agent** " has the meaning set forth in the preamble hereto.

" **Collateral Documents** " means the Security Agreement and all other instruments, documents and agreements delivered by or on behalf of any Obligor pursuant to this Agreement or any of the other Loan Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of the Secured Parties, a first priority security interest and Lien on the Collateral.

" **Commitment Fee Rate** " means 0.10% per annum.

" **Commodity Exchange Act** " means the Commodity Exchange Act (7 U.S.C. §1 *et seq* .).

" **Communications** " has the meaning set forth in Section 11.01(c).

" **Compliance Certificate** " means a compliance certificate substantially in the form of <u>Exhibit F</u> .

7

" **Connection Income Taxes** " means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

" **Consolidated Adjusted EBITDA** " means, for any period, Consolidated Net Income for such period, plus without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period (other than with respect to amounts added back pursuant to clauses (h) and (l) below), the sum of (a) income tax expense (including any franchise taxes or other taxes based on income, profits or capital), (b) interest expense, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans), (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) any extraordinary, unusual or non-recurring charges, expenses or losses, (f) non-cash stock option and other equity-based compensation expenses, including in connection with any management or employee benefit plan or agreement, (g) non-cash costs or expenses resulting from purchase accounting adjustments, (h) proceeds from business interruption insurance received during such period not otherwise included in Consolidated Net Income and to the extent offsetting lost operating income, (i) all customary fees, costs and expenses incurred or paid in connection with (A) investments and Acquisitions, whether or not such investments or Acquisitions are consummated (B) Asset Sales permitted hereunder and (C) the issuance, prepayment or amendment, refinancing or extinguishment of Indebtedness permitted hereunder or the issuance of Equity Interests of the Borrower (including costs and expenses (including exploratory and preparatory costs) in connection with any Public Listing), (j) the aggregate amount of one-time, non-recurring and extraordinary settlements of legal proceedings and regulatory matters; *provided* that the aggregate amount that may be added back pursuant to this clause (j) may not exceed $15,000,000 for any period, (k) non-recurring restructuring and similar charges, reserves, signing costs, retention or completion bonuses and costs related to curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), severance, relocation costs, integration and facilities opening and consolidation of facilities costs and other business optimization expenses (including charges directly related to systems design, upgrade, establishment and implementation of cost-savings initiatives), transition costs, costs related to closure and consolidation of facilities, lease breakage, costs related to customer disputes, and project start-up costs; *provided* that the aggregate amount that may be added back pursuant to this clause (k) and the following clause (l) shall not exceed 25% of aggregate Consolidated Adjusted EBITDA for any period (determined without giving effect to any such adjustment pursuant to this clause (k) and the following clause (l)), (l) the amount of net pro forma "run rate" cost savings, operating expense reductions and synergies projected in good faith to be realized as a result of actions taken or for which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower), in each case, after the Effective Date that are otherwise permitted hereunder (including pursuant to internal procedures), in each case, no later than the date that is 18 months following the consummation of such action (calculated on a pro forma basis as though such cost savings, synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that (i) a duly completed certificate signed by a Responsible Officer of the Borrower shall be delivered to the Administrative Agent certifying that such cost savings and synergies are reasonably identifiable and factually supportable, (ii) the benefits resulting therefrom are

8

reasonably anticipated to be realized not later than 18 months of such actions having been taken, (iii) the aggregate amount that may be added back pursuant to the preceding clause (k) and this clause (l) shall not exceed 25% of aggregate Consolidated Adjusted EBITDA for any period (determined without giving effect to any such adjustment pursuant to the preceding clause (k) and this clause (l)), and (iv) no cost savings or synergies shall be added pursuant to this clause (l) to the extent duplicative of any expenses or charges otherwise added to Consolidated Adjusted EBITDA, whether through a pro forma adjustment or otherwise, for such period, (m) all costs, charges, fees and expenses related to the Transactions, and any amendments, waivers, consents, modifications, supplements, increases or extensions in connection therewith, (n) any other non-cash charges, non-cash expenses or non-cash losses of the Obligors or any of their respective Restricted Subsidiaries for such period, including, for the avoidance of doubt, non-cash foreign currency translation losses and any unrealized losses in respect of Swap Agreements (including non-cash losses related to currency remeasurement of Indebtedness) (excluding any such charge, expense or loss incurred in the ordinary course of business that constitutes an accrual of, or a reserve for, cash charges for any future period); provided, however, that cash payments made in such period or in any future period in respect of such non-cash charges, expenses or losses (excluding any such charge, expense or loss incurred in the ordinary course of business that constitutes an accrual of, or a reserve for, cash charges for any future period) shall be subtracted from Consolidated Net Income in calculating Consolidated Adjusted EBITDA in the period when such payments are made and (o) an amount equal to the positive change (if any) in deferred revenue between the balance as of the day before the first day of such period and the balance as of the last day of such period (provided, that such deferred revenue shall be calculated without giving effect to the impact of purchasing accounting and shall be calculated giving effect to any Acquisition or other investment consummated during such period), and, minus, to the extent included in the statement of such Consolidated Net Income for such period, the sum of (a) income tax benefit, (b) interest income, (c) any extraordinary income or gains determined in accordance with GAAP, (d) any other non-cash income (excluding any items that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period that are described in the parenthetical to clause (g) above) and (e) an amount equal to the negative change (if any) in deferred revenue between the balance as of the day before the first day of such period and the balance as of the last day of such period (provided, that such deferred revenue shall be calculated without giving effect to the impact of purchasing accounting and shall be calculated giving effect to any Acquisition or other investment consummated during such period), all as determined on a consolidated basis; provided that, it is agreed that, with respect to the fiscal quarters ended on April 30, 2018, July 31, 2018, October 31, 2018, and January 31, 2019, Consolidated Adjusted EBITDA shall be deemed to be $4,000,000, ($5,000,000) (which amount is a negative number), ($15,000,000) (which amount is a negative number) and $19,000,000, respectively; provided, further, that with respect to all assets and Persons acquired or disposed of, the calculation of Consolidated Adjusted EBITDA will be calculated on a Pro Forma Basis.

" **Consolidated Net Income** " means, for any period, the net income or loss of the Borrower and its Restricted Subsidiaries for such period, determined on a consolidated basis in conformity with GAAP; *provided* that there shall be excluded (a) the income of any Person (other than the Borrower) that is not a Restricted Subsidiary except to the extent of the amount of cash dividends or similar cash distributions actually paid by such Person to the Borrower or, subject to clauses (b) and (c) below, any Restricted Subsidiary during such period, (b) the

9

income of, and any amounts referred to in clause (a) above paid to any Restricted Subsidiary to the extent that, on the date of determination, the declaration or payment of cash dividends or similar cash distributions by such Restricted Subsidiary is not permitted without any prior approval of any Governmental Authority that has not been obtained or is not permitted by the operation of the terms of the organizational documents of such Restricted Subsidiary, any agreement or other instrument binding upon such Restricted Subsidiary or any law applicable to such Restricted Subsidiary, unless such restrictions with respect to the payment of cash dividends and other similar cash distributions have been legally and effectively waived, and (c) the income or loss of, and any amounts referred to in clause (a) above paid to, any Restricted Subsidiary that is not a Wholly-Owned Subsidiary of the Borrower to the extent such income or loss or such amounts are attributable to the noncontrolling interest in such Restricted Subsidiary.

" **Consolidated Total Assets** " means, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date.

" **Consolidated Total Debt** " on any date, means, with respect to the Borrower and its Restricted Subsidiaries, (i) Indebtedness for borrowed money, (ii) Capital Lease Obligations and purchase money Indebtedness, (iii) Indebtedness obligations evidenced by promissory notes, bonds or similar instruments and (iv) all Guarantees in respect of Indebtedness of the kind referred to in clauses (i) through (iii) hereof.

" **Consolidated Total Liabilities** " means, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date.

" **Consolidated Total Net Assets** " means, as of any date of determination, an amount equal to Consolidated Total Assets minus Consolidated Total Liabilities at such date.

" **Consolidated Total Revenue** " means, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total revenue" (or any like caption) on a consolidated statement of operations of the Borrower and its Restricted Subsidiaries at such date.

" **Contractual Obligations** " means, with respect to a Person, the obligations under each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument that such Person is a party to.

" **Control** " means the possession, directly or indirectly, of the power to (i) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise the outstanding voting power, by contract or otherwise or (ii) vote 10% of more of Equity Interests having ordinary voting power for the election of directors (or any similar governing body) of a Person. " **Controlling** " and " **Controlled** " have meanings correlative thereto.

" **Convertible Indebtedness** " means any unsecured Indebtedness of the Borrower or any Obligor that is or will become, upon the occurrence of certain specified events or after the

10

passage of a specified amount of time, either (a) convertible into or exchangeable for common stock of the Borrower (and cash in lieu of fractional shares) and/or cash (in an amount determined by reference to the price of such common stock) or (b) sold as units with call options, warrants or rights to purchase (or substantially equivalent derivative transactions) that are exercisable for common stock of the Borrower and/or cash (in an amount determined by reference to the price of such common stock); *provided* that:

(i) (A) such Indebtedness does not require any scheduled amortization, mandatory prepayments, redemptions, sinking fund payments or purchase offers prior to the final maturity date thereof (other than pursuant to customary asset sale and change of control (or fundamental change) offers and pursuant to settlements upon conversion) and (B) such Indebtedness shall have a stated maturity that is not earlier than the date that is 91 days after the Latest Maturity Date (it being understood, for the avoidance of doubt, that a redemption right of the Borrower or Obligor with respect to such Convertible Indebtedness will not be prohibited by this proviso, but the exercise of such redemption right will be deemed to be the declaration of a Restricted Payment);

(ii) such Indebtedness is not guaranteed by any person other than the Obligors;

(iii) the terms and conditions (other than pricing, rate floors, discounts, fees, premiums and optional prepayment or redemption provisions and any provisions customary for convertible bonds (including any customary fundamental change provisions)) of such Indebtedness are (A) reasonably satisfactory to the Administrative Agent (except for covenants or other provisions applicable only to periods after the Latest Maturity Date) or (B) in the good faith determination of the Borrower, not materially less favorable (when taken as a whole) to the Borrower than the terms and conditions of the Loan Documents (when taken as a whole) (except for covenants or other provisions applicable only to periods after the Latest Maturity Date) (it being understood that (1) to the extent that any financial maintenance covenant is added for the benefit of any such Indebtedness, the terms and conditions of such Indebtedness will be deemed not to be more restrictive than the terms and conditions of this Agreement if such financial maintenance covenant is also added for the benefit of this Agreement and (2) no consent shall be required from the Administrative Agent for terms or conditions that are more restrictive than this Agreement if such terms are added to this Agreement); *provided* that a certificate of the Borrower as to the satisfaction of the conditions described in this clause (iii) delivered at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirements of this clause (iii) , shall be conclusive unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees); and

(iv) no Event of Default shall have occurred and be continuing at the time of incurrence of such Indebtedness or would result from such incurrence.

" **Credit Date** " means the date of a Credit Extension.

11

" **Credit Event** " means each Borrowing, Credit Extension, New Revolving Loan Commitment or extension of a Letter of Credit.

" **Credit Extension** " means the making of a Loan, the issuing of a Letter of Credit or a Letter of Credit Disbursement.

" **Debtor Relief Laws** " means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

" **Default** " means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

" **Defaulting Lender** " means, subject to Section 2.19(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, (ii) fund within two Business Days any portion of its participation in Letters of Credit or (iii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless, in each case, such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to such funding or payment (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Borrower, any Lender or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent, any Issuing Bank or the Borrower, to confirm in writing to the Administrative Agent, each Issuing Bank and the Borrower that it will comply with its prospective funding obligations and participation in the outstanding Letters of Credit hereunder ( *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent, each Issuing Bank and the Borrower), (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (e) has become the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any

12

determination by the Administrative Agent that a Lender is a Defaulting Lender under any of clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.19(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

" **Deposit Account** " means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

" **Disqualified Equity Interest** " means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), (b) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (c) provides for scheduled payments or scheduled dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness (but solely such portion that is so convertible would be deemed to be a Disqualified Equity Interest) or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 120 days after the Revolving Commitment Termination Date, except, in the case of clauses (a) and (b), if as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to the prior expiration or termination of the Revolving Commitment, the payment in full of the principal of and interest on each Loan and all fees payable hereunder and the cancellation or expiration or Cash Collateralization of all Letters of Credit.

" **Disqualified Institution"** means, as of any date, (a) any Person designated by the Borrower as a "Disqualified Institution" by written notice delivered to the Administrative Agent on or prior to the Effective Date, (b) any Person that is a competitor of the Borrower or any its Subsidiaries (in each case as determined in good faith by the Borrower) that has been designated by the Borrower as a "Disqualified Institution" by written notice to the Administrative Agent (and Administrative Agent shall be authorized and instructed to post such notice to the Platform) from time to time and (c) any Affiliate of a Person described in the foregoing clause (b) that is clearly identifiable solely on the basis of the similarity of its name as an affiliate of such entity; *provided* that any person that becomes a "Disqualified Institution" after the applicable Trade Date for an assignment or participation interest shall not apply to retroactively make such person a "Disqualified Institution" with respect to such assignment or participation interest or any previously acquired assignment of or participation interest in the Loans, but such Person shall not be able to increase its Revolving Commitments under, or participation interests in, the Loans; *provided* , *however* , that, in each case, "Disqualified Institutions" shall exclude any Person that the Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to the Administrative Agent from time to time.

" **Dollars** " or " **$** " refers to lawful money of the United States.

" **Domestic Restricted Subsidiary** " means any Domestic Subsidiary that is a Restricted Subsidiary.

13

"**Domestic Subsidiary**" means any Subsidiary that is organized under the laws of any political subdivision of the United States, excluding (a) any Foreign Subsidiary Holding Company and (b) any such Subsidiary that is owned (directly or indirectly) by a Foreign Subsidiary or a Foreign Subsidiary Holding Company.

"**DQ List**" has the meaning set forth in Section 11.04(h).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country"** means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 11.02).

"**Engagement Letter**" means that certain Engagement Letter, dated as of April 26, 2019, by and between the Borrower and Morgan Stanley Senior Funding, Inc.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of remediation, fines, penalties or indemnities), of any Obligor or any of its Subsidiaries directly or indirectly resulting from or based upon (a) noncompliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

14

" **ERISA** " means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

" **ERISA Affiliate** " means any person that for purposes of Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with any Obligor or any of its respective Subsidiaries under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

" **ERISA Event** " means any one or more of the following: (a) any reportable event, as defined in Section 4043 of ERISA, with respect to a Plan, as to which the PBGC has not waived under PBGC Regulation Section 4043 the requirement of Section 4043 of ERISA that it be notified of such event; (b) the taking of any action to terminate any Plan under Sections 4041 or 4101A of ERISA; (c) the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (d) the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Sections 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; (e) the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; (f) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (g) the receipt of a written determination that any Plan is, or is expected to be, in "at-risk" status within the meaning of Section 430 of the Code or Section 303 of ERISA; (h) engaging in a non-exempt "prohibited transaction" within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to which the Borrower, any Guarantor, or any of their respective Subsidiaries is a "disqualified person" within the meaning of Section 4975 the Code or a "party in interest" within the meaning of Section 406 of ERISA or could otherwise reasonably be expected to be liable; (i) the incurrence by the Borrower, any Guarantor, any of their respective Subsidiaries or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan or a withdrawal from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" within the meaning of Section 4001(a)(2) of ERISA; (j) the receipt by the Borrower, any Guarantor, any of their respective Subsidiaries or any ERISA Affiliate from any Multiemployer Plan of any notice concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent within the meaning of Title IV of ERISA or in "endangered" or "critical" status within the meaning of Section 432 of the Code or Section 305 of ERISA.

" **EU Bail-In Legislation Schedule** " means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

" **Eurodollar** ", when used in reference to any Loan or Borrowing, refers to a Loan, or the Loans comprising a Borrowing, that bears interest at a rate determined by reference to the Adjusted LIBO Rate.

" **Eurodollar Borrowing** " means a Borrowing made at the Adjusted LIBO Rate.

15

" **Eurodollar Rate Loan** " means a Loan that bears interest at a rate determined by reference to the Adjusted LIBO Rate.

" **Event of Default** " has the meaning set forth in Section 9.01.

" **Excluded Subsidiary** " means (a) any Unrestricted Subsidiary, (b) any Immaterial Subsidiary, (c) any Subsidiary that is prohibited by applicable law, rule or regulation or by any Contractual Obligation to which such Subsidiary is a party or by which it or any of its property or assets is bound from guaranteeing the Obligations; *provided* that any such Contractual Obligation (i) is in existence on the Effective Date (or, with respect to a Subsidiary acquired or formed after the Effective Date, as of the date such acquisition or formation) and (ii) in the case of a Subsidiary acquired or formed after the Effective Date, was not entered into in connection with, or in contemplation of, such acquisition or formation, (d) any Subsidiary with respect to which guaranteeing the Obligations would require consent, approval, license or authorization from any Governmental Authority, unless such consent, approval, license or authorization has been obtained or would, contemporaneous with the Effective Date or, in the case of a Subsidiary acquired or formed after the Effective Date, the date on which such Subsidiary is acquired or formed, be obtained, (e) (i) any Foreign Subsidiary, (ii) any Foreign Subsidiary Holding Company and (iii) any direct or indirect Domestic Subsidiary of any Foreign Subsidiary or Foreign Subsidiary Holding Company, (f) any Subsidiary that is not a Wholly-Owned Subsidiary of the Borrower on the Effective Date or, if a Subsidiary ceases to be a Wholly-Owned Subsidiary of the Borrower after the Effective Date, such Subsidiary so long as the transferred Equity Interests in such Subsidiary are not held by any Affiliate of the Borrower, (g) captive insurance companies, (h) not-for-profit subsidiaries, (h) special purpose entities, and (i) any other Subsidiaries to the extent the Administrative Agent and the Borrower mutually determine that the cost and/or burden of obtaining the Guaranty therefrom (including any adverse tax consequences) outweigh the benefit to the Lenders.

" **Excluded Swap Obligation** " shall mean, with respect to any Obligor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Obligor of, or the grant by such Obligor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Obligor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Obligor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

" **Excluded Taxes** " means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on

16

amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Revolving Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Revolving Commitment (other than pursuant to an assignment request by the Borrower under Section 2.20) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.18, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.18(g) and (d) Taxes imposed under FATCA.

" **Executive Order** " has the meaning set forth in Section 3.15(a).

" **Existing Revolving Commitments** " as defined in Section 2.25(c).

" **Existing Revolving Loans** " as defined in Section 2.25(c).

" **Extended Maturity Date** " as defined in Section 2.25(a).

" **Extended Revolving Commitments** " as defined in Section 2.25(c).

" **Extended Revolving Loans** " as defined in Section 2.25(c).

" **Extension** " as defined in Section 2.25(a).

" **Extension Amendment** " as defined in Section 2.25(f).

" **Extension Offer** " as defined in Section 2.25(a).

" **FATCA** " means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation rules or official practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

" **FCPA** " means the Foreign Corrupt Practices Act of 1977, (15 U.S.C. §§ 78dd-1, et seq.).

" **Federal Funds Effective Rate** " means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

17

" **FEMA** " means the Federal Emergency Management Agency.

" **Financial Officer** " means the chief financial officer, chief accounting officer, principal accounting officer, treasurer or controller of the Borrower.

" **Fiscal Quarter** " means a fiscal quarter of any Fiscal Year.

" **Fiscal Year** " means the Fiscal Year of the Borrower and its Subsidiaries ending on January 31 of each calendar year.

" **Flood Hazard Property** " has the meaning set forth in Section 5.10(b)(iv).

" **Flood Insurance** " has the meaning set forth in Section 5.10(b)(iv).

" **Foreign Lender** " means a Lender that is not a U.S. Person.

" **Foreign Subsidiary** " means any Subsidiary other than a Domestic Subsidiary.

" **Foreign Subsidiary Holding Company** " shall mean any Subsidiary substantially all of the assets of which are Equity Interests (including any debt instrument treated as equity for U.S. federal income tax purposes) and/or debt of one or more (x) Foreign Subsidiaries and (y) other Subsidiaries that are Foreign Subsidiary Holding Companies pursuant to clause (x) of this definition.

" **Funding Notice** " means a notice substantially in the form of Exhibit G .

" **GAAP** " means generally accepted accounting principles in the United States.

" **Governmental Acts** " means any act or omission, whether rightful or wrongful, of any present or future Governmental Authority.

" **Governmental Authority** " means the government of the United States any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

" **Guarantee** " of or by any Person (the " **guarantor** ") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the " **primary obligor** ") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account

18

party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; *provided* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business, or customary indemnification obligations entered into in connection with any acquisition or disposition of assets or of other entities, in each case, that is permitted hereunder (other than to the extent that the primary obligations that are the subject of such indemnification obligation would be considered Indebtedness hereunder).

" **Guaranteed Obligations** " has the meaning set forth in Section 8.01.

" **Guarantors** " means those Subsidiaries listed on Section 5.11 of the Borrower Disclosure Letter and party hereto and any future Domestic Subsidiary of the Borrower that has delivered a joinder agreement pursuant to Section 5.11 hereof.

" **Guaranty** " means, collectively, the guaranty of the Obligations by the Guarantors pursuant to Section 8.01 of this Agreement.

" **Hazardous Materials** " means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

" **Hedge Bank** " shall mean each counterparty to a Hedging Transaction that is a Lender or an Agent (or an Affiliate of a Lender or an Agent) and each other Person if, at the date of entering into such Hedging Transaction, such Person was a Lender or an Agent (or an Affiliate of a Lender or an Agent); *provided* that if such Person is not a Lender or an Agent, prior to accepting the benefits of this Agreement, such Person shall confirm its agreement in a writing in form and substance acceptable to the Administrative Agent or the Collateral Agent to (i) the appointment of the Collateral Agent as its agent under the applicable Loan Documents and (ii) be (and agree to be) bound by the provisions of Article 10 and Sections 11.03(c) , 11.09 , 11.10 and 11.12 as if it were a Lender.

" **Hedging Transaction** " means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted) and (b) any currency exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks.

" **Immaterial Subsidiary** " means, at any date of determination, any Subsidiary of the Borrower and that has been designated by the Borrower by written notice to the Administrative Agent as an "Immaterial Subsidiary" from time to time and in relation to which the fair market value of its Consolidated Total Net Assets as of the last day of the most recently ended Test Period, as the case may be, do not exceed 7.5% of the fair market value of the Consolidated Total Net Assets of the Borrower and its Restricted Subsidiaries at such date and (b) whose revenues for the most recently ended Test Period, as the case may be, are available do not exceed

19

7.5% of the consolidated revenues of the Borrower and its Restricted Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that (i) the Consolidated Total Net Assets of all such Immaterial Subsidiaries as of the last day of the most recently ended Test Period shall not exceed 7.5% of the Consolidated Total Net Assets of the Borrower and its Restricted Subsidiaries at such date and (ii) the revenues of all such Immaterial Subsidiaries for the most recently ended Test Period shall not exceed 7.5% of the consolidated revenues of the Borrower and its Restricted Subsidiaries for such period, in each case determined in accordance with GAAP. For any determination made as of or prior to the time any Person becomes an indirect or direct Subsidiary of the Borrower, such determination and designation shall be made based on financial statements provided by or on behalf of such Person in connection with the Acquisition of such Person or such Person's assets to the extent reasonably available. If such financial statements are not reasonably available, the Borrower shall make such determination in reasonable good faith. The Borrower may change the designation of any Subsidiary as an Immaterial Subsidiary by providing notice to the Administrative Agent. If the Consolidated Total Net Assets or the revenues of all Immaterial Subsidiaries so designated by the Borrower shall at any time exceed the threshold amounts set forth above, then Immaterial Subsidiaries that are so designated at such time shall automatically be redesignated as no longer being Immaterial Subsidiaries (starting with the largest such Subsidiary and continuing with the next largest and so on) until such threshold amounts are no longer exceeded.

" **Impacted Interest Period** " has the meaning given in the definition of LIBO Rate.

" **Increased Amount Date** " has the meaning set forth in Section 2.23(a).

" **Indebtedness** " of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than (x) current trade payables incurred in the ordinary course of such Person's business and (y) earnouts and other contingent acquisition consideration to the extent not due and payable as of such date), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of bankers' acceptances, letters of credit, surety bonds or similar arrangements, (g) all Guarantees of such Person in respect of obligations of the kind referred to in clauses (a) through (f) above, (h) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned or acquired by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (i) all Disqualified Equity Interests in such Person, valued, as of the date of determination, at the greater of (i) the maximum aggregate amount that would be payable upon maturity, redemption, repayment or repurchase thereof (or of Disqualified Equity Interests or Indebtedness into which such Disqualified Equity Interests are convertible or exchangeable) and (ii) the maximum liquidation preference of such Disqualified Equity Interests; *provided* , however, that (i) contingent obligations incurred in the ordinary course of business, (ii) deferred or prepaid revenues, (iii)

20

purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller and working capital adjustments, in each case, to the extent not due and payable, (iv) premiums payable to, and advance commissions or claims payments from, insurance companies, (v) intercompany liabilities arising from their cash management and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business, (vi) accrued expenses and royalties, (vii) any non-compete or consulting obligations incurred in connection with an Acquisition or investment, (viii) reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (ix) operating lease obligations in the ordinary course and (x) reserves for retention or deductible amount under insurance programs, shall, in each case, not be considered "Indebtedness" for purposes of this definition. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. For purposes of this definition, (i) the amount of any Indebtedness described in clause (g) above shall be deemed to be an amount equal to the lesser of (A) the principal amount of the obligations guaranteed and outstanding and (B) the maximum amount for which the guaranteeing Person may be liable in respect of such obligations, (ii) the amount of any Indebtedness described in clause (h) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation and (iii) the amount of any Convertible Indebtedness will be the principal amount thereof. For the avoidance of doubt, Permitted Bond Hedge Transactions and Permitted Warrant Transactions shall not constitute Indebtedness.

" **Indemnified Taxes** " means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Obligor under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

" **Indemnitee** " has the meaning set forth in Section 11.03(b).

" **Information** " has the meaning set forth in Section 11.12.

" **Intellectual Property Rights** " has the meaning set forth in Section 3.05(b).

" **Intercompany Note** " means an intercompany note substantially in the form of Exhibit I .

" **Interest Election Request** " means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.15(b) and in substantially the form of Exhibit C attached hereto.

" **Interest Payment Date** " means (a) with respect to any Base Rate Loan, the last Business Day of each March, June, September and December and (b) with respect to any Eurodollar Rate Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more

21

than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

" **Interest Period** " means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, twelve months or less than one month) thereafter, as the Borrower may elect; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

" **Interest Rate Determination Date** " means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

" **IRS** " means the United States Internal Revenue Service.

" **ISP 98** " means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be reasonably acceptable to the applicable Issuing Bank and in effect at the time of issuance of such Letter of Credit).

" **Issuance Notice** " means an Issuance Notice substantially in the form of Exhibit H .

" **Issuing Bank** " means each Lender (or affiliate thereof) with a Letter of Credit Issuer Sublimit on Schedule 2.01 hereof, as Issuing Bank hereunder, and any other Lender (or affiliate thereof) that shall agree in writing, at the request of the Borrower and with the consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed), to become an "Issuing Bank", in each case together with its permitted successors and assigns in such capacity. Any Issuing Bank may issue Letters of Credit through any of its branch offices or through any of its affiliates or any of the branch offices of its affiliates.

" **Joinder Agreement** " has the meaning set forth in Section 5.11.

" **Joint Venture** " means a joint venture, partnership or other similar arrangement whether in corporate, partnership or other legal form; *provided* in no event shall any Subsidiary of any Person be considered to be a Joint Venture.

" **Latest Maturity Date** " shall mean, at any date of determination, the latest Maturity Date applicable to any Loan or Revolving Commitment hereunder.

22

" **Lenders** " means the Persons listed on <u>Schedule 2.01</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption or pursuant to a transaction contemplated by Section 2.23, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

" **Letter of Credit** " means a standby letter of credit issued or to be issued by an Issuing Bank pursuant to this Agreement in such form as may be approved from time to time by the applicable Issuing Bank. Letters of Credit shall be issued in Dollars.

" **Letter of Credit Disbursement** " means a payment made by an Issuing Bank pursuant to a Letter of Credit.

" **Letter of Credit Issuer Sublimit** " means (a) with respect to each Issuing Bank as of the Effective Date, as set forth on <u>Schedule 2.01</u> , and (b) with respect to any other Issuing Bank, an amount as shall be agreed to by the Administrative Agent, such Issuing Bank and the Borrower.

" **Letter of Credit Sublimit** " means the lesser of (a) $75,000,000 and (b) the aggregate unused amount of the Revolving Commitments then in effect.

" **Letter of Credit Usage** " means, as at any date of determination, the sum of (a) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding and (b) the aggregate amount of all drawings under Letters of Credit honored by any Issuing Bank and not theretofore reimbursed by or on behalf of the Borrower or with the proceeds of a Loan. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired without being drawn by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.13 or 3.14 of the ISP 98 or because a drawing was presented under such Letter of Credit on or prior to the last date permitted for presentation thereunder but has not yet been honored or dishonored, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

" **LIBO Rate** " means:

(a)    with respect to any Eurodollar Borrowings for any Interest Period, the rate appearing on Bloomberg screen LIBOR01 (or any successor to or substitute for such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; *provided* that in the event such rate is not available at such time for such Interest Period (but is available for longer and shorter periods), then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period (an " **Impacted Interest Period** ") shall be equal to the rate as determined by the Administrative Agent that results from interpolating on a linear basis between (a) the LIBO Rate for the longest period (for which the LIBO Rate is available) that is shorter than the Impacted Interest Period; and (b) the LIBO Rate for the shortest period (for which that LIBO Rate is available) that exceeds the

23

Impacted Interest Period, in each sase, at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period; and

(b)    for any rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the LIBO Rate described in paragraph (a) above, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day;

*provided* that to the extent that any such rate is below zero, the LIBO Rate described in paragraph (a) above will be deemed to be zero; *provided , further* that to the extent a comparable or successor rate is approved by the Administrative Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; *provided , further* that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

" **LIBO Rate Margin** " means 1.25%.

" **Lien** " means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

" **Limited Conditions Acquisition** " means any Acquisition or investment whose consummation is not conditioned on the availability of, or on obtaining, third party financing.

" **Liquidity** " means as of any date, the aggregate of (i) the Revolving Commitment minus the aggregate Total Exposure of the Lenders as of such date *plus* (ii) Unrestricted Cash of the Borrower and its Restricted Subsidiaries.

" **Loan Documents** " means this Agreement (including any amendment hereto or waiver hereunder), the Notes (if any), any Joinder Agreement, the Collateral Documents, and any documents or certificates executed by the Borrower in favor of an Issuing Bank relating to Letters of Credit.

" **Loans** " means the loans (including any Base Rate Loan or Eurodollar Rate Loan) made by the Lenders to the Borrower pursuant to this Agreement, including any New Revolving Loans.

" **Margin Stock** " has the meaning set forth in Regulation U of the Board of Governors as in effect from time to time.

" **Material Adverse Effect** " means a material adverse effect on (a) the business, financial condition or results of operations of the Obligors and their respective Subsidiaries, taken as a whole, (b) the ability of the Obligors and their respective Subsidiaries, taken as a whole, to perform their payment obligations hereunder, or (c) the rights of or remedies, taken as a whole,

24

available to the Agents or the Lenders under the Loan Documents, except to the extent resulting from an action or a failure to act by any Agent or any Lender.

"**Material Indebtedness**" means Indebtedness (other than any Indebtedness under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower or any Restricted Subsidiary thereof in a principal amount exceeding $20,000,000. For purposes of determining Material Indebtedness, the "**principal amount**" of the obligations of the Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"**Material Real Estate Asset**" means any domestic fee owned Real Estate Asset having a fair market value in excess of $3,000,000.

"**Maturity Date**" means May [30], 2024 (and if such date is not a Business Day, then the preceding Business Day), except to the extent extended for any Class pursuant to Section 2.25.

"**Maximum Incremental Facilities Amount**" means, as of any date of determination, an aggregate amount equal to (1) the greater of (a) $200,000,000 and (b) an amount equal to 100% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries as of the most recently ended Test Period plus (2) an unlimited amount, so long as after giving effect to such New Revolving Loan Commitments and/or Permitted Incremental Equivalent Debt and the application of proceeds thereof on a Pro Forma Basis (and, in the case of any revolving commitments, assuming full utilization of such revolving commitments (whether or not fully drawn) and, in all cases, without netting the cash proceeds of any such New Revolving Loan Commitments and Permitted Incremental Equivalent Debt incurred substantially concurrently therewith, in determining such leverage ratio), with respect to any such New Revolving Loan Commitments or Permitted Incremental Equivalent Debt that is (A) secured on a *pari passu* basis with or junior basis to the Obligations, the Secured Gross Leverage Ratio shall not exceed 2.50 to 1.00; or (B) unsecured, the Total Gross Leverage Ratio shall not exceed 4.00 to 1.00; *provided* that any amounts incurred in reliance on clause (a) above as New Revolving Loan Commitments or Permitted Incremental Equivalent Debt shall thereafter reduce the amount of Permitted Incremental Equivalent Debt or New Revolving Loan Commitments that may be incurred in reliance thereon.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means a mortgage, deed of trust or other similar instrument reasonably satisfactory to the Collateral Agent.

"**Mortgaged Property**" means any Material Real Estate Asset acquired by the Borrower or any Obligor after the Effective Date or any Real Estate Asset that becomes a Material Real Estate Asset (whether by renovation to, addition to or otherwise).

"**Multiemployer Plan**" any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is or has been contributed to by (or to which there is an obligation to contribute by) any Obligor, any of its Subsidiaries or any ERISA Affiliate.

25

" **Net Asset Sale Cash Proceeds"** means, with respect to any Asset Sale, an amount equal to: (a) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower or its Restricted Subsidiaries from such Asset Sale, *minus* (b) any bona fide direct costs, fees and expenses incurred in connection with such Asset Sale, including (i) taxes paid or reasonably estimated to be payable by the seller as a result of or in connection with such Asset Sale, (ii) payment of the outstanding principal amount of, premium or penalty on, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, and (iii) the Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities or indemnities or other contingent obligations relating to the assets sold (provided that, to the extent such cash proceeds are not so used within 180 days of such Asset Sale, such cash proceeds shall constitute Net Asset Sale Cash Proceeds), *minus* (c) the amount of any liabilities retained by the Borrower or its Restricted Subsidiaries that are associated solely with the assets that are the subject of such transaction (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Asset Sale Cash Proceeds).

" **New Revolving Loan Commitments** " has the meaning set forth in Section 2.23(a).

" **New Revolving Loan** " has the meaning set forth in Section 2.23(a).

" **New Revolving Loan Lender** " has the meaning set forth in Section 2.23(a).

" **NFIP** " has the meaning set forth in Section 5.10(b)(iv).

" **Non-Consenting Lender** " means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 11.02 and (b) has been approved by the Required Lenders.

" **Non-Defaulting Lender** " means, at any time, each Lender that is not a Defaulting Lender at such time.

" **Non-U.S. Plan** " means any plan, fund (including, without limitation, any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States by any Obligor or any of its Restricted Subsidiaries primarily for the benefit of employees, or beneficiaries thereof, of any Obligor or any of its Restricted Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

" **Non-U.S. Plan Event** " means with respect to any Non-U.S. Plan: (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority; (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments; (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Non-U.S. Plan or to appoint a trustee or

26

similar official to administer any such Non-U.S. Plan, or alleging the insolvency of any such Non-U.S. Plan; (d) the incurrence of any liability by any Obligor or any of its Restricted Subsidiaries under applicable law on account of the complete or partial termination of such Non-U.S. Plan or the complete or partial withdrawal of any participating employer therein; or (e) the occurrence of any transaction that is prohibited under any applicable law and that would reasonably be expected to result in the incurrence of any liability by any Obligor or any of its Restricted Subsidiaries, or the imposition on any Obligor or any of its Restricted Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law.

" **Note** " has the meaning set forth in Section 2.05(c).

" **Notice** " means a Funding Notice, Issuance Notice or Interest Election Request.

" **Obligations** " means all amounts owing by any Obligor to the Agents, Arrangers, any Issuing Bank, Hedge Bank or any Lender pursuant to the terms of this Agreement or any other Loan Document or any Secured Hedge Agreement, in each case whether for principal, interest (including, in each case, all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of any Obligor or any of its Subsidiaries, whether or not allowed in such case or proceeding), reimbursement of amounts drawn on Letters of Credit, fees, expenses, indemnification or otherwise. Notwithstanding the foregoing, Obligations of any Obligor shall in no event include any Excluded Swap Obligations of such Obligor.

" **Obligors** " means, collectively, the Borrower and the Guarantors.

" **Other Connection Taxes** " means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

" **Other Taxes** " means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.20).

" **Participant** " has the meaning set forth in Section 11.04(c)(i).

" **Participant Register** " has the meaning set forth in Section 11.04(c)(iii).

" **PBGC** " means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

" **Pension Plan** " means any "employee pension benefit plan" as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, that is subject to Title IV of ERISA, Section 412 of the

27

Code or Section 302 of ERISA and is maintained in whole or in part by any Obligor, any of its Subsidiaries or any ERISA Affiliate or with respect to which any of any Obligor, any of its Subsidiaries or any ERISA Affiliate has or could have an obligation to contribute.

" **Perfection Certificate** " has the meaning assigned to that term in the Security Agreement.

" **Permitted Bond Hedge Transaction** " means any call or capped call option (or substantively equivalent derivative transaction) on the Borrower's common stock purchased by the Borrower or the applicable Obligor in connection with the issuance of any Convertible Indebtedness, as may be amended from time to time; *provided* that (x) the terms, conditions and covenants of each such transaction shall be such as are customary for transactions of such type ( *provided* that a certificate of the Borrower as to the satisfaction of such requirement delivered at least five Business Days prior to the entry into such transaction, together with a reasonably detailed description of the material terms, conditions and covenant of such transaction or drafts of documentation relating thereto, stating that the Borrower has determined in good faith that such terms, conditions and covenants satisfy the foregoing requirement, shall be conclusive unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees)), and (y) the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Borrower or the applicable Obligor from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Borrower or the applicable Obligor from the sale of such Convertible Indebtedness issued in connection with the Permitted Bond Hedge Transaction.

" **Permitted Encumbrances** " means:

(a)    Liens imposed by law for taxes, assessments or governmental charges or levies that are not more than sixty (60) days overdue or are being contested in compliance with Section 5.04;

(b)    carriers', warehousemen's, mechanics', materialmen's, landlord's, supplier's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.04;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    (i) pledges and deposits to secure the performance of bids, government contracts, trade contracts, leases, statutory obligations, deductibles, co-payment, co-insurance, premiums, reimbursement obligations to providers of insurance, self-insurance or reinsurance obligations, surety, customs, stay and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business and (ii) obligations in respect of letters of credit or bank guarantees that have been posted to support payment of the items set forth in clause (i) of this clause (d);

28

(e)    Uniform Commercial Code financing statements filed (or similar filings under applicable law) solely as a precautionary measure in connection with operating leases;

(f)    judgment liens and deposits to secure obligations under appeal bonds or letters of credit in respect of judgments that do not constitute an Event of Default under clause (j) of Section 9.01;

(g)    easements, zoning restrictions, rights-of-way, building code and land use laws, minor defects or irregularities in title, encroachments and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary or are described in a mortgage policy;

(h)    Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (including Capital Lease Obligations subject to Section 6.01(c)), license or sublicense or concession agreement, in each case to the extent permitted by this Agreement; and

(i)    with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by any applicable law.

" **Permitted Incremental Equivalent Debt** " shall mean Indebtedness issued, incurred or otherwise obtained by the Borrower in respect of one or more series of senior unsecured notes, senior notes secured on a basis pari passu with or junior to the Obligations, or subordinated notes (in each case issued in a public offering or a Rule 144A or other private placement or a bridge financing in lieu of the foregoing (and any Registered Equivalent Notes issued in exchange therefor)), loans that are secured on a basis pari passu with or junior to the Obligations or loans that are unsecured, or notes or loans constituting secured or unsecured mezzanine Indebtedness; *provided* that:

(i) the aggregate principal amount of all Permitted Incremental Equivalent Debt at the time of issuance or incurrence shall not exceed the Maximum Incremental Facilities Amount available at such time;

(ii) other than any customary bridge facility with a maturity date of no longer than one year (so long as the Indebtedness into which such customary bridge facility is to be converted, or is to be exchanged for or otherwise replaces, complies with such requirement), the maturity date of such Permitted Incremental Equivalent Debt will be (1) in the case of Permitted Incremental Equivalent Debt that is secured on a *pari passu* basis with the Obligations, no earlier than the Latest Maturity Date and (2) in the case of Permitted Incremental Equivalent Debt that is unsecured or secured on a junior basis to the Obligations, no earlier than the date that is 91 days after the Latest Maturity Date;

(iii) no Permitted Incremental Equivalent Debt shall be guaranteed by any person other than a Guarantor;

29

(iv) in the case of Permitted Incremental Equivalent Debt that is secured, (A) the obligations in respect thereof shall not be secured by any Lien on any asset other than an asset constituting Collateral, (B) the security agreements relating to such Permitted Incremental Equivalent Debt shall be substantially the same as the Collateral Documents (with such differences as are appropriate to reflect the nature of such Permitted Incremental Equivalent Debt and are otherwise reasonably satisfactory to the Administrative Agent) and (C) such Permitted Incremental Equivalent Debt shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent;

(v) both immediately before and immediately after the incurrence of such Permitted Incremental Equivalent Debt, no Event of Default exists ( *provided* that, in the case of any Permitted Incremental Equivalent Debt the proceeds of which are to be used primarily to consummate a Limited Conditions Acquisition substantially concurrently with the effectiveness of such Permitted Incremental Equivalent Debt, to the extent agreed to by the Borrower and the Lenders providing such Permitted Incremental Equivalent Debt, (x) the only representations and warranties the accuracy of which shall be a condition to the effectiveness of such Permitted Incremental Equivalent Debt shall be the Specified Representations and the Specified Acquisition Agreement Representations, and (y) the existence of an Event of Default shall be tested on the date the acquisition agreement with respect to such Limited Conditions Acquisition is signed ( *provided* that, on the date such Permitted Incremental Equivalent Debt is effective, no Event of Default under Section 9.01(a), (b), (g), (h) or (i) shall exist or result therefrom));

(vi) to the extent the terms and documentation differ from the terms applicable to Loans and Revolving Commitments hereunder, the terms and conditions of such Permitted Incremental Equivalent Debt (excluding pricing, interest rate margins, rate floors, discounts, premiums, fees, and prepayment or redemption terms and provisions which shall be determined by the Borrower) either, at the option of the Borrower, (A) are reasonably satisfactory to the Administrative Agent (except for covenants or other provisions applicable only to periods after the Latest Maturity Date) or (B) are not materially more restrictive to the Borrower and its Subsidiaries (when taken as a whole) than the terms and conditions of this Agreement (when taken as a whole) (except for covenants or other provisions applicable only to periods after the Latest Maturity Date) (it being understood that (1) to the extent that any financial maintenance covenant is added for the benefit of any such Permitted Incremental Equivalent Debt, the terms and conditions of such Permitted Incremental Equivalent Debt will be deemed not to be more restrictive than the terms and conditions of this Agreement if such financial maintenance covenant is also added for the benefit of this Agreement and (2) no consent shall be required from the Administrative Agent for terms or conditions that are more restrictive than this Agreement if such terms are added to this Agreement); *provided* , *further,* that a certificate delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Permitted Incremental Equivalent Debt, together with a reasonably detailed description of the material terms and conditions of such Permitted Incremental Equivalent Debt or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirements of this definition, shall be conclusive evidence that such terms and conditions satisfy the requirements of this definition unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

30

" **Permitted Warrant Transaction** " means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Borrower's common stock sold by the Borrower or the applicable Obligor substantially concurrently with any purchase by the Borrower or the applicable Obligor of a related Permitted Bond Hedge Transaction, as may be amended from time to time; *provided* that (x) the terms, conditions and covenants of each such transaction shall be as are customary for transactions of such type ( *provided* that a certificate of the Borrower as to the satisfaction of such requirement delivered at least five Business Days prior to the entry into such transaction, together with a reasonably detailed description of the material terms, conditions and covenant of such transaction or drafts of documentation relating thereto, stating that the Borrower has determined in good faith that such terms, conditions and covenants satisfy the foregoing requirement, shall be conclusive unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees)), and (y) the terms of such transaction provide for "net share settlement" (or substantially equivalent term) as the default "settlement method" (or substantially equivalent term) thereunder.

" **Permitted Holders** " means the existing stockholders of the Borrower on the Effective Date.

" **Person** " or " **person** " means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

" **Plan** " means any "employee benefit plan" as defined in Section 3(3) of ERISA maintained by any Obligor or any of its Subsidiaries or with respect to which any Obligor or any of its Subsidiaries could have any liability.

" **Platform** " has the meaning assigned to that term in Section 11.01(c).

" **Pledged Collateral** " has the meaning assigned to that term in the Security Agreement.

" **Prime Rate** " means the rate of interest per annum from time to time published in the " **Money Rates** " or successor section of *The Wall Street Journa* l as being the " **Prime Lending Rate** " or, if more than one rate is published as the " **Prime Lending Rate** ", then the highest of such rates (each change in the Prime Rate to be effective as of the date of publication in *The Wall Street Journal* of a " **Prime Lending Rate** " that is different from that published on the preceding Business Day); *provided* that in the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the " **Prime Lending Rate** ", the Administrative Agent shall choose a reasonably comparable index or source to use as the basis for the " **Prime Lending Rate** ".

" **Principal Office** " for each of the Administrative Agent and Issuing Bank, means such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to the Borrower, the Administrative Agent and each Lender.

" **Pro Forma Basis** " means, with respect to any determination of the Secured Gross Leverage Ratio or Total Gross Leverage Ratio, (i) that such determination of Consolidated Adjusted EBITDA is made for the relevant Test Period, but that (x) any material acquisitions or material dispositions, mergers, amalgamations, consolidations or discontinuances of operations

31

during such Test Period or subsequent thereto and on or prior to the date of determination or with the proceeds of or in connection with the incurrence of Indebtedness for which the Total Gross Leverage Ratio or the Secured Gross Leverage Ratio is being determined (each, a " **Pro Forma Event** ") shall be deemed for this purpose to have occurred on the first day of such Test Period and to have given effect to the designation as a Restricted Subsidiary or an Unrestricted Subsidiary as if such designation had occurred on the first day of each such period, and (y) if since the beginning of such Test Period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have undertaken any Pro Forma Event that would have required adjustment pursuant to clause (x) above if taken by a Restricted Subsidiary, then such ratio or amount shall be calculated giving pro forma effect thereto for such Test Period as if such Pro Forma Event had occurred at the beginning of such Test Period and (ii) that such determination of Consolidated Total Gross Debt or Consolidated Secured Gross Debt is determined after giving effect to the incurrence of the Indebtedness (and all simultaneous incurrences of Indebtedness) for which such ratio is being tested, and the application of proceeds thereof. For purposes of this definition, "material" shall mean one or a series of related transactions with an aggregate value in excess of $500,000. " **Pro Forma Event** " has the meaning assigned to that term in the definition of "Pro Forma Basis".

" **Pro Rata Share** " means with respect to all payments, computations and other matters relating to the Revolving Commitment or Loans of any Lender or any Letters of Credit issued or participations purchased therein by any Lender, the percentage obtained by dividing (a) the Revolving Exposure of that Lender by (b) the aggregate Revolving Exposure of all Lenders.

" **Projections** " means the projections of the Borrower and its Subsidiaries for the period of Fiscal Year 2020 through and including Fiscal Year 2022 on an annual basis.

" **PTE** " means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time

" **Public Listing** " means a listing of the common stock of the Borrower on a nationally recognized securities exchange.

" **QFC Credit Support** " has the meaning set forth in Section 11.19.

" **Qualified ECP Guarantor** " shall mean, in respect of any Swap Obligation, each Obligor that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

" **Qualified Equity Interest** " of any person shall mean any Equity Interests of such person that are not Disqualified Equity Interests.

" **Real Estate Asset** " means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by the Borrower or any Obligor in any real property.

32

" **Recipient** " means (a) the Administrative Agent, (b) any Lender and (c) any Issuing Bank, as applicable.

" **Refinanced Indebtedness** " has the meaning given thereto in the definition of "Refinancing Indebtedness".

" **Refinancing Indebtedness** " means refinancings, renewals, or extensions of Indebtedness (and the continuation or renewal of any Liens permitted under Section 6.02 related thereto) so long as:

(a)    such refinancing, renewal, or extension does not result in an increase in the principal amount (or accreted value, if applicable) (other than any accrued or capitalized amounts) of the Indebtedness so refinanced, renewed, or extended (the " **Refinanced Indebtedness** "), other than by the amount equal to any accrued but unpaid interest, the premiums paid thereon in connection with such refinancing, renewal or extension and fees and expenses incurred in connection therewith and by the amount of existing unfunded commitments thereunder,

(b)    such refinancing, renewal, or extension has a final maturity date equal to or later than the Refinanced Indebtedness and, except in the case of revolving credit Indebtedness, does not have a shorter Weighted Average Life to Maturity,

(c)    to the extent the terms or conditions of such refinancing, renewal or extension differ from the terms and conditions of the Refinanced Indebtedness, such term and conditions, taken as a whole, are not and would reasonably be expected to be materially adverse to the interests of the Lenders,

(d)    if the Refinanced Indebtedness was subordinated in right of payment to the Obligations, such refinancing, renewal, or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders (as determined in good faith by the Board of Directors) as those that were applicable to the Refinanced Indebtedness, and

(e)    no person is an obligor with respect to such refinancing, renewal or replacement that was not an obligor with respect to such Refinanced Indebtedness.

" **Register** " has the meaning set forth in Section 2.05(b).

" **Registered Equivalent Notes** " shall mean, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same guarantee obligations) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

" **Reimbursement Date** " has the meaning set forth in Section 2.03(d).

" **Related Parties** " means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

33

" **Required Lenders** " means, at any time, Lenders having more than 50% of the aggregate amount of the Revolving Commitments or, if the Revolving Commitments shall have been terminated, holding more than 50% of the aggregate outstanding principal amount of the Loans at such time. The Revolving Commitment and Loans of any Defaulting Lender and Disqualified Institution shall be disregarded in determining Required Lenders at any time.

" **Responsible Officer** " means any of the President, Chief Executive Officer, Treasurer, director, General Counsel, Chief Accounting Officer and Chief Financial Officer of the applicable Obligor, or any person designated by any such Obligor in writing to the Administrative Agent from time to time, acting singly.

" **Restricted Payment** " means any dividend, repurchase, redemption or other distribution (whether in cash, securities or other property other than Qualified Equity Interests of such Person) with respect to any Equity Interests in the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other property other than Qualified Equity Interests of such Person), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests of such Person or any option, warrant or other right to acquire any such Equity Interests of such Person.

" **Restricted Subsidiary** " means any Subsidiary other than an Unrestricted Subsidiary; *provided* that upon the occurrence of any Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of " **Restricted Subsidiary** ".

" **Revolving Commitment** " means, with respect to each Lender, the commitment of such Lender to make Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Loans hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.11 or Section 2.12, (b) increased from time to time pursuant to Section 2.23 and (c) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 2.20 or Section 11.04. The initial amount of each Lender's Revolving Commitment as of the Effective Date is set forth on Schedule 2.01. The initial aggregate amount of the Lenders' Revolving Commitments as of the Effective Date is $215,000,000.

" **Revolving Commitment Period** " means the period from the Effective Date to but excluding the Revolving Commitment Termination Date.

" **Revolving Commitment Termination Date** " means the earliest to occur of (i) the Maturity Date, (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.11 or 2.12, and (iii) the date of the termination of the Revolving Commitments pursuant to Section 9.01.

" **Revolving Exposure** " means, with respect to any Lender as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Lender's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Loans of that Lender, (b) in the case of Issuing Banks, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by

34

that Lender (net of any participations by the Lenders in such Letters of Credit) and (c) the aggregate amount of all participations by that Lender in any outstanding Letters of Credit or any unreimbursed drawing under any Letter of Credit.

" **S&P** " means Standard and Poor's, a division of the McGraw Hill Financial, Inc.

" **Sanctioned Country** " means, at any time, a country, region or territory which is itself, or whose government is, the subject or target of any comprehensive Sanctions (including, without limitation, Cuba, Iran, North Korea, Syria and the Crimea Region of the Ukraine).

" **Sanctioned Entity** " means, at any time, (a) a Sanctioned Country or (b) a Sanctioned Person.

" **Sanctioned Person** " means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, by the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, or the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

" **Sanctions** " means comprehensive economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

" **SEC** " shall mean the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

" **Secured Gross Leverage Ratio** " means, at any date, the ratio of (i) Consolidated Total Debt that is secured by a Lien on the assets and properties of the Borrower and its Restricted Subsidiaries as of such date to (ii) Consolidated Adjusted EBITDA for the prior four Fiscal Quarter period ending on or most recently prior to such date.

" **Secured Hedge Agreement** " shall mean any Swap Agreement permitted under Article 6 that is entered into by and between the Borrower or any Obligor and any Hedge Bank and has been designated by such counterparty and the Borrower, by notice to the Administrative Agent, as a Secured Hedge Agreement. The designation of any Swap Agreement as a Secured Hedge Agreement shall not create in favor of the Hedge Bank that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor.

" **Secured Parties** " means the Agents, the Issuing Banks, any Lender, each Hedge Bank Party to a Secured Hedge Agreement or any Indemnitee (or any of their respective successors or assigns).

" **Security Agreement** " means the Pledge and Security Agreement to be executed between the Obligors and the Collateral Agent, in substantially the form attached hereto as

35

Exhibit K (as such agreement may be amended, amended and restated, supplemented or otherwise modified from time to time).

" **Security Supplement** " has the meaning assigned to that term in the Security Agreement.

" **Solvency Certificate** " means a Solvency Certificate of a Financial Officer of the Borrower substantially in the form of Exhibit E .

" **Solvent** " means, with respect to the Borrower and its Subsidiaries on a particular date, that on such date (a) the fair value (on a going concern basis) of the present assets of the Borrower and its Subsidiaries, taken as a whole, is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of the Borrower and its Subsidiaries, taken as a whole, (b) the present fair saleable value (on a going concern basis) of the assets of the Borrower and its Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liability of the Borrower and its Subsidiaries, taken as a whole, on their debts as they become absolute and matured in the ordinary course of business, (c) the Borrower and its Subsidiaries, taken as a whole, do not intend to, and do not believe that they will, incur debts or liabilities (including current obligations and contingent liabilities) beyond their ability to pay such debts and liabilities as they mature in the ordinary course of business and (d) the Borrower and its Subsidiaries, taken as a whole, are not engaged in business or a transaction, and are not about to engage in business or a transaction, in relation to which their property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

" **Specified Acquisition Agreement Representations** " means, with respect to any Limited Conditions Acquisition, the representations and warranties contained in the acquisition agreement in respect to such Limited Conditions Acquisition as are material to the interests of the Lenders providing such Permitted Incremental Equivalent Debt, but only to the extent that the Borrower or any of its Affiliates has the right (taking into account applicable cure provisions) to terminate its respective obligations under such acquisition agreement (or the right not to consummate such Limited Conditions Acquisition pursuant to such acquisition agreement) (in each case, in accordance with the terms thereof) as a result of a failure of such representation or warranty to be true and correct.

" **Specified Representations** " means, in respect of any Limited Conditions Acquisition, each representation and warranty set forth in Sections 3.01, 3.02, 3.03(c), 3.09, 3.14, 3.15, 3.16, 3.17 and 3.18.

" **Statutory Reserve Rate** " means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one, *minus* the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject for Eurodollar funding (currently referred to as " **Eurocurrency**

36

**Liabilities** " in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

" **Subsidiary** " means any subsidiary of any Obligor, as applicable.

" **subsidiary** " means, with respect to any Person (the " **parent** ") at any date, any corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent and which is required by GAAP to be consolidated in the consolidated financial statements of the parent.

" **Supported QFC** " has the meaning set forth in Section 11.19.

" **Swap Agreement** " means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower and its Subsidiaries shall be a Swap Agreement. Notwithstanding the foregoing, any Permitted Bond Hedge Transactions or Permitted Warrant Transactions shall not constitute Swap Agreements.

" **Swap Obligation** " shall mean, with respect to any Obligor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

" **Taxes** " means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

" **Test Period** " in effect at any time means, subject to the proviso in the definition of Consolidated Adjusted EBITDA, the period of four consecutive Fiscal Quarters ended on or prior to such time (taken as one accounting period) in respect of which financial statements for each such Fiscal Quarter have been or were required to be delivered pursuant to Section 5.01.

" **Title Insurance Company** " has the meaning set forth in Section 5.10(b)(iii).

" **Title Policy** " has the meaning set forth in Section 5.10(b)(iii).

37

" **Total Exposure** " means, for any Lender at any time, the sum of (i) the aggregate principal amount of all outstanding Loans of such Lender plus (ii) such Lender's Applicable Percentage of the Letter of Credit Usage.

" **Total Gross Leverage Ratio** " means, at any date, the ratio of (i) Consolidated Total Debt as of such date to (ii) Consolidated Adjusted EBITDA for the prior four Fiscal Quarter period ending on or most recently prior to such date.

" **Trade Date** " has the meaning set forth in Section 11.04(e).

" **Transactions** " means the execution, delivery and performance by the Obligors of each Loan Document to which it is a party, the borrowing of Loans, the payment of related fees and expenses and the use of the proceeds thereof.

" **Type** ", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

" **Uniform Commercial Code** " shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

" **Unreimbursed Amount** " has the meaning set forth in Section 2.03(d).

" **Unrestricted Cash** " means, as of any date of determination, Cash and Cash Equivalents that (a) does not appear (and is not required to appear) as "restricted" on the consolidated balance sheet of the Borrower (unless such appearance is related to the Liens granted to the Collateral Agent to secure the Obligations), (b) is not subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties and (c) is otherwise generally available for use by the Borrower or any other Restricted Subsidiary.

" **Unrestricted Subsidiary** " means any Subsidiary of the Borrower and that at the time of determination has previously been designated, and continues to be, an Unrestricted Subsidiary in accordance with Section 5.12. The Subsidiaries of the Borrower that are Unrestricted Subsidiaries as of the Effective Date are set forth on Section 5.12 of the Borrower Disclosure Letter.

" **USA Patriot Act** " means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

" **U.S.** " or " **United States** " means the United States of America.

" **U.S. Government Obligations** " means obligations issued or directly and fully guaranteed or insured by the U.S. or by any agent or instrumentality thereof, *provided* that the full faith and credit of the U.S. is pledged in support thereof.

" **U.S. Person** " means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

38

" **U.S. Special Resolution Regimes** " has the meaning set forth in Section 11.19.

" **Weighted Average Life to Maturity** " means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

" **Wholly-Owned Subsidiary** " means, any as to any Person, any Subsidiary of such Person of which such Person owns, directly or indirectly through one or more Wholly-Owned Subsidiaries, all of the Equity Interests of such Subsidiary other than directors qualifying shares or shares held by nominees.

" **Withdrawal Liability** " means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

" **Withholding Agent** " means any Obligor and the Administrative Agent.

" **Write-Down and Conversion Powers** " means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.    *Classification of Loans and Borrowings* . For purposes of this Agreement, Loans may be classified and referred to by Type ( *e.g.* , a " **Eurodollar Rate Loan** "). Borrowings also may be classified and referred to by Type ( *e.g.* , a " **Eurodollar Borrowing** ").

Section 1.03.    *Terms Generally* . The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, amendments and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f)

39

any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

Section 1.04.    *Accounting Terms; GAAP* . Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with a financial ratio or test, at all times prior to the first delivery of financial statements pursuant to Section 5.01(a) or (b), compliance shall be determined based on the consolidated financial statements of the Borrower with respect to the Fiscal Year ended January 31, 2019, and delivered pursuant to Section 3.04(a) hereof.

Section 1.05.    *Divisions* . For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.06.    *Timing of Payment or Performance* . When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 1.07.    *Basket Classification* . Notwithstanding anything to the contrary, (a) unless specifically stated otherwise herein, any dollar, number, percentage or other amount available under any carve-out, basket, exclusion or exception to Section 6.01 , 6.02 , 6.03(a) , 6.03(b) , 6.04 , 6.05 or 6.06 of this Agreement relied on to permit any transaction may be accumulated, added, combined, aggregated or used together by any Obligor and its Restricted Subsidiaries with any other dollar, number, percentage or other amount available under any other applicable carve-out, basket, exclusion or exception to such Section which may be used to permit such transaction, (b) any action or event permitted by this Agreement or the other Loan Documents need not be permitted solely by reference to one provision of Section 6.01 , 6.02 , 6.03(a) , 6.03(b) , 6.04 , 6.05 or 6.06 of this Agreement permitting such action or event but may be

40

permitted in part by one such provision and in part by one or more other provisions of such Section.

## ARTICLE 2
## LOANS AND LETTERS OF CREDIT

Section 2.01.    *Loans. (a) Revolving Commitments* . During the Revolving Commitment Period, subject to the terms and conditions hereof, each Lender severally agrees to make Loans to the Borrower in Dollars from time to time, in an aggregate amount such that, after giving effect thereto, the Total Exposure of such Lender does not exceed such Lender's Revolving Commitment; *provided* , that after giving effect to the making of any Loans, in no event shall the Aggregate Total Exposure exceed the Revolving Commitments then in effect. Amounts borrowed pursuant to this Section 2.01(a) may be repaid and reborrowed during the Revolving Commitment Period. Each Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date, and all Loans and all other amounts owed hereunder with respect to the Loans and the Revolving Commitments shall be paid in full no later than such date.

(b)    *Borrowing Mechanics for Loans* .

(i)    Except pursuant to Section 2.03(d), Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $500,000 and integral multiples of $500,000 in excess of that amount, and Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $500,000 and integral multiples of $500,000 in excess of that amount.

(ii)    Subject to Section 2.24, whenever the Borrower desires that Lenders make Loans, Borrower shall deliver to the Administrative Agent a fully executed and delivered Funding Notice no later than (x) in the case of a Eurodollar Rate Loan, 10:00 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date and (y) in the case of a Base Rate Loan, either (1) not later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed Credit Date or (2) not later than 10:00 a.m. (New York City time) on the proposed Credit Date; *provided* that the aggregate principal amount of Loans requested pursuant to this Section 2.01(b)(ii)(y)(2) on any one day shall not exceed $20,000,000. Except as otherwise provided herein, a Funding Notice for a Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to make a Borrowing in accordance therewith. Notwithstanding the foregoing, the Administrative Agent may agree to shorter time periods with respect to the requirements set forth above.

(iii)    Notice of receipt of each Funding Notice in respect of Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by the Administrative Agent to each applicable Lender with reasonable promptness.

(iv)    Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable

41

Credit Date by wire transfer of same day funds in Dollars, at the Principal Office of the Administrative Agent. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent shall make the proceeds of such Loans available to the Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Administrative Agent from Lenders to be credited to the account of the Borrower at the Principal Office designated by the Administrative Agent or such other account as may be designated in writing to the Administrative Agent by the Borrower.

Section 2.02.    *[Reserved]* .

Section 2.03.    *Issuance of Letters of Credit and Purchase of Participations Therein* .

(a)    *Letters of Credit* . During the Revolving Commitment Period, subject to the terms and conditions hereof, each Issuing Bank agrees to issue Letters of Credit (or amend, renew, increase or extend an outstanding Letter of Credit) at the request and for the account of the Borrower in the aggregate amount up to but not exceeding the Letter of Credit Sublimit; *provided* that (i) each Letter of Credit shall be denominated in Dollars; (ii) the stated amount of each Letter of Credit shall not be less than $100,000 or such lesser amount as is acceptable to such Issuing Bank; (iii) after giving effect to such issuance or increase, in no event shall (x) the Aggregate Total Exposure exceed the Revolving Commitments then in effect or (y) any Lender's Total Exposure exceed such Lender's Revolving Commitment; (iv) after giving effect to such issuance or increase, in no event shall the Letter of Credit Usage exceed the Letter of Credit Sublimit then in effect, (v) after giving effect to such issuance or increase, unless otherwise agreed to by the applicable Issuing Bank in writing, in no event shall the Letter of Credit Usage with respect to the Letters of Credit issued by such Issuing Bank exceed the Letter of Credit Issuer Sublimit of such Issuing Bank then in effect and (vi) in no event shall any Letter of Credit have an expiration date later than the earlier of (A) the fifth Business Day prior to the Maturity Date and (B) the date which is twelve months from the original date of issuance of such Letter of Credit. Subject to the foregoing, an Issuing Bank may agree that a standby Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each, unless such Issuing Bank elects not to extend for any such additional period and provides notice to that effect to the Borrower; *provided* that such Issuing Bank is not required to extend any such Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time such Issuing Bank must elect to allow such extension; *provided* , *further* , that if any Lender is a Defaulting Lender, no Issuing Bank shall be required to issue, amend, extend or increase any Letter of Credit unless the applicable Issuing Bank has entered into arrangements satisfactory to it and the Borrower to eliminate such Issuing Bank's risk with respect to the participation in Letters of Credit of the Defaulting Lender, including by Cash Collateralizing such Defaulting Lender's Applicable Percentage of the Letter of Credit Usage (in an amount equal to the Agreed L/C Cash Collateral Amount with respect thereto) at such time on terms reasonably satisfactory to the applicable Issuing Bank. Unless otherwise expressly agreed by the applicable Issuing Bank and the Borrower when a Letter of Credit is issued, the rules of the ISP 98 shall apply to each Letter of Credit. Notwithstanding anything to the contrary set forth herein, an Issuing Bank shall not be required to issue a Letter of Credit if the issuance of such Letter of Credit would violate any laws binding upon such Issuing Bank and/or the issuance of such Letters of Credit would violate any policies of the Issuing Bank applicable to Letters of Credit

42

generally. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; *provided* that with respect to any Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

*(b)*    *Notice of Issuance* . Subject to Section 2.24, whenever the Borrower desires the issuance of a Letter of Credit, it shall deliver to the Administrative Agent an Issuance Notice and to an Issuing Bank an Application no later than 12:00 p.m. (New York City time) at least five Business Days in advance of the proposed date of issuance or such shorter period as may be agreed to by such Issuing Bank in any particular instance. Such Application shall be accompanied by documentary and other evidence of the proposed beneficiary's identity as may reasonably be requested by such Issuing Bank to enable such Issuing Bank to verify the beneficiary's identity or to comply with any applicable laws or regulations, including, without limitation, the USA Patriot Act or as otherwise customarily requested by such Issuing Bank. Upon satisfaction or waiver of the conditions set forth in Section 4.02, such Issuing Bank shall issue the requested Letter of Credit only in accordance with such Issuing Bank's standard operating procedures. Upon the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, the applicable Issuing Bank shall promptly notify the Administrative Agent, and the Administrative Agent shall promptly notify each Lender of the pertinent details of such issuance and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.03(e).

*(c)*    *Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments* . In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, an Issuing Bank shall be responsible only to accept the documents delivered under such Letter of Credit that appear on their face to be in accordance with the terms and conditions of such Letter of Credit without responsibility for further investigation, regardless of any notice or information to the contrary. As between the Borrower and each Issuing Bank, the Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued by each Issuing Bank, by the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, the Issuing Banks shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of

43

Credit; or (viii) any consequences arising from causes beyond the control of the Issuing Banks, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of the Issuing Banks' rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by an Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of such Issuing Bank to the Borrower. Notwithstanding anything to the contrary contained in this Section 2.03(c), the Borrower shall retain any and all rights it may have against any Issuing Bank for any liability solely resulting from the gross negligence, bad faith or willful misconduct of such Issuing Bank as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(d)      *Reimbursement by the Borrower of Amounts Drawn or Paid Under Letters of Credit* . In the event an Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall promptly notify the Borrower and the Administrative Agent, and the Borrower shall reimburse such Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the " **Reimbursement Date** ") in an amount in Dollars and in same day funds equal to the amount of such honored drawing. If the Borrower fails to timely reimburse an Issuing Bank on the Reimbursement Date, the Administrative Agent shall promptly notify each Lender of the Reimbursement Date, the amount of the unreimbursed drawing (the " **Unreimbursed Amount** "), and the amount of such Lender's Applicable Percentage thereof. In such event, the Borrower shall be deemed to have requested a Borrowing of Base Rate Loans to be disbursed on the Reimbursement Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.01 for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Revolving Commitments and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice). Any notice given by an Issuing Bank or the Administrative Agent pursuant to this Section 2.03(d) may be given by telephone if promptly confirmed in writing; *provided* that the lack of such a prompt confirmation shall not affect the conclusiveness or binding effect of such notice. Anything contained herein to the contrary notwithstanding, (i) unless the Borrower shall have notified the Administrative Agent and such Issuing Bank prior to 1:00 p.m. (New York City time) on the date such drawing is honored that the Borrower intends to reimburse the applicable Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting the Lenders to make Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 4.02, the Lenders shall, on the Reimbursement Date, make Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by the Administrative Agent to reimburse the applicable Issuing Bank for the amount of such honored drawing; and *provided, further* , if for any reason proceeds of Loans are not received by such Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, the Borrower shall reimburse the applicable Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Loans, if any, which are so received. Nothing in this Section 2.03(d) shall be deemed to relieve any Lender from its obligation to make Loans on the terms and conditions set forth herein, and the Borrower shall retain any and all rights it may have against any such Lender resulting from the failure of such Lender to make such Loans under this Section 2.03(d).

44

(e)    *Lenders' Purchase of Participations in Letters of Credit* . Immediately upon the issuance of each Letter of Credit, each Lender having a Revolving Commitment shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from the applicable Issuing Bank a participation in such Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Pro Rata Share of the maximum amount which is or at any time may become available to be drawn thereunder. In the event that the Borrower shall fail for any reason to reimburse the applicable Issuing Bank as provided in Section 2.03(d), such Issuing Bank shall promptly notify the Administrative Agent (who, in turn, will promptly notify each Lender) of the unreimbursed amount of such honored drawing and of such Lender's respective participation therein based on such Lender's Pro Rata Share. Each Lender shall make available to the Administrative Agent, for the account of such Issuing Bank, an amount equal to its respective participation, in Dollars and in same day funds, no later than 12:00 p.m. (New York City time) on the first Business Day (under the laws of the jurisdiction in which the Principal Office of the Administrative Agent is located) after the date notified by such Issuing Bank. In the event that any Lender fails to make available to the Administrative Agent on such Business Day the amount of such Lender's participation in such Letter of Credit as provided in this Section 2.03(e), an Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by the applicable Issuing Bank for the correction of errors among banks and thereafter at the Alternate Base Rate. Nothing in this Section 2.03(e) shall be deemed to prejudice the right of any Lender to recover from an Issuing Bank any amounts made available by such Lender to such Issuing Bank pursuant to this Section 2.03 in the event that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted gross negligence, bad faith or willful misconduct (as determined by a final, non-appealable judgment of a court of competent jurisdiction) on the part of such Issuing Bank. In the event an Issuing Bank shall have been reimbursed by other Lenders pursuant to this Section 2.03(e) for all or any portion of any drawing honored by such Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to the Administrative Agent (who, in turn, will distribute to each Lender which has paid all amounts payable by it under this Section 2.03(e) with respect to such honored drawing such Lender's Pro Rata Share thereof) all payments subsequently received by such Issuing Bank from the Borrower in reimbursement of such honored drawing when such payments are received. Any such distribution shall be made to a Lender at its primary address set forth below its name on its Administrative Questionnaire or at such other address as such Lender may request.

(f)    *Obligations Absolute* . The obligation of the Borrower to reimburse each Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Loans made by the Lenders pursuant to Section 2.03(d) and the obligations of the Lenders under Section 2.03(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set off, defense or other right which the Borrower or any Lender may have at any time against an actual or purported beneficiary or any actual or purported transferee of any Letter of Credit (or any Persons for whom any such actual or purported transferee may be acting), any Issuing Bank, any Lender or any other Person or, in the case of a Lender, against the Borrower or any of its Subsidiaries, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between the Borrower or one of its Subsidiaries and the actual or purported beneficiary for which any Letter of Credit was

45

procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by an Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower or any Subsidiaries; (vi) any breach hereof or any other Loan Document by any party thereto; (vii) the occurrence or continuance of an Event of Default or a Default or (viii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

*(g)     Indemnification* . Without duplication of any obligation of the Borrower under Section 11.03, in addition to amounts payable as provided herein, the Borrower hereby agrees to protect, indemnify, pay and save harmless each Issuing Bank from and against any and all claims, demands, liabilities, damages and losses, and all reasonable and documented costs, charges and out-of-pocket expenses (including reasonable and documented fees, out-of-pocket expenses and disbursements of outside counsel (limited to one outside counsel per applicable jurisdiction and, in the case of a conflict of interest where the person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another outside counsel per applicable jurisdiction for such affected person)), which such Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (A) the issuance of any Letter of Credit by an Issuing Bank, other than as a result of the gross negligence, bad faith or willful misconduct of Issuing Bank as determined by a final, non-appealable judgment of a court of competent jurisdiction, (B) the wrongful dishonor by an Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (C) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

*(h)     Resignation and Removal of Issuing Bank* . An Issuing Bank may resign as an Issuing Bank upon 60 days prior written notice to the Administrative Agent, the Lenders and the Borrower. An Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank ( *provided* that no consent will be required if the replaced Issuing Bank has no Letters of Credit or reimbursement obligations with respect thereto outstanding) and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of such Issuing Bank. At the time any such replacement or resignation shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank. From and after the effective date of any such replacement or resignation, any successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter. After the replacement or resignation of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto to the extent that Letters of Credit issued by it remain outstanding and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement or resignation, but shall not be required to issue additional Letters of Credit.

*(i)     Cash Collateral* . If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders demanding the deposit of Cash Collateral pursuant to this paragraph, the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent

46

and for the benefit of the Lenders, an amount in cash equal to the Agreed L/C Cash Collateral Amount plus any accrued and unpaid interest thereon on or before the Business Day following the day of such demand (or if such demand is given to the Borrower prior to 4:00 p.m. on a Business Day, on such Business Day); *provided* that the obligation to deposit such Cash Collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in Section 9.01(g), (h) or (i) or, if the maturity of the Loans has been accelerated. Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the Obligations. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse an Issuing Bank for any disbursements under Letters of Credit made by it and for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the Letter of Credit Usage at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Issuing Banks with Letter of Credit Usage representing greater than 50% of the total Letter of Credit Usage), be applied to satisfy the other Obligations. If the Borrower is required to provide an amount of Cash Collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within seven Business Days after all Events of Default have been cured or waived, so long as no other Event of Default occurs prior to the return of such Cash Collateral to the Borrower. Notwithstanding anything to the contrary herein, if as of the expiration date of any Letter of Credit any obligation thereunder remains outstanding, the Borrower shall, at the request of the applicable Issuing Bank, deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to the Agreed L/C Cash Collateral Amount plus any accrued and unpaid interest thereon on or before the Business Day following the day of such request (or if such request is given to the Borrower prior to 4:00 p.m. on a Business Day, on such Business Day).

(j)    *Application* . To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 2.03, the provisions of this Section 2.03 shall apply.

Section 2.04.    *Pro Rata Shares; Availability of Funds* .

(a)    *Pro Rata Shares* . All Loans shall be made, and all participations purchased, by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Revolving Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

47

(b)     *Availability of Funds* . Unless the Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to the Administrative Agent the amount of such Lender's Loan requested on such Credit Date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such Credit Date and the Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the customary rate set by the Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Alternate Base Rate. In the event that (i) the Administrative Agent declines to make a requested amount available to the Borrower until such time as all applicable Lenders have made payment to the Administrative Agent, (ii) a Lender fails to fund to the Administrative Agent all or any portion of the Loans required to be funded by such Lender hereunder prior to the time specified in this Agreement and (iii) such Lender's failure results in the Administrative Agent failing to make a corresponding amount available to the Borrower on the Credit Date, at the Administrative Agent's option, such Lender shall not receive interest hereunder with respect to the requested amount of such Lender's Loans for the period commencing with the time specified in this Agreement for receipt of payment by the Borrower through and including the time of the Borrower's receipt of the requested amount. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, and the Administrative Agent has already made such corresponding amount available to the Borrower, the Administrative Agent shall promptly notify the Borrower, and the Borrower shall immediately pay such corresponding amount to the Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the rate payable hereunder for Base Rate Loans for such Type of Loans. Nothing in this Section 2.04(b) shall be deemed to relieve any Lender from its obligation to fulfill its Revolving Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.

Section 2.05.     *Evidence of Debt; Register; Lenders' Books and Records; Notes* .

(a)     *Lenders' Evidence of Debt* . Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; *provided* that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or the Borrower's Obligations in respect of any applicable Loans; *provided, further* , in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)     *Register* . The Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Revolving Commitments and Loans of, and principal amount of and interest on the Loans owing to, and drawings under Letters of Credit owing to, each Lender from time to time (the " **Register** "). The entries in the Register shall be conclusive, absent manifest error, and

48

the Borrower, the Administrative Agent, the Issuing Banks and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice; *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its Affiliates) shall be limited to the entries with respect to such Lender including the Revolving Commitment of, or principal amount of and stated interested on the Loans owing to such Lender. The Administrative Agent shall record, or shall cause to be recorded, in the Register the Revolving Commitments and the Loans in accordance with the provisions of Section 11.04, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; *provided* that failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or the Borrower's Obligations in respect of any Loan. The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.05, and the Borrower hereby agrees that, to the extent the Administrative Agent serves in such capacity, the Administrative Agent and its officers, directors, employees, agents, sub-agents and Affiliates shall constitute " **Indemnitees** " entitled to the benefits of Section 11.03.

(c)     *Notes* . If so reasonably requested by any Lender by written notice to the Borrower (with a copy to the Administrative Agent) at least two Business Days prior to the Effective Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 11.04) on the Effective Date (or, if such notice is delivered after the Effective Date, promptly after the Borrower's receipt of such notice) a note or notes in substantially the form of Exhibit D to evidence such Lender's Loan (each, a " **Note** ").

Section 2.06.     *Interest on Loans* .

(a)     Except as otherwise set forth herein, each Type of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)     if a Base Rate Loan, at the Alternate Base Rate plus the Base Rate Margin; and

(ii)     if a Eurodollar Rate Loan, at the LIBO Rate plus the LIBO Rate Margin.

(b)     The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Eurodollar Rate Loan shall be selected by the Borrower and notified to the Administrative Agent and Lenders pursuant to the applicable Funding Notice or Interest Election Request, as the case may be.

(c)     In connection with Eurodollar Rate Loans there shall be no more than seven Interest Periods outstanding at any time. In the event the Borrower fails to specify between a

49

Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Interest Election Request, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as), or (if not then outstanding) will be made as, a Base Rate Loan. In the event the Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Interest Election Request, the Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing) to the Borrower and each Lender.

(d)     Interest payable pursuant to Section 2.06(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365 day or 366 day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360 day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; *provided* , if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)     Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans.

(f)     The Borrower agrees to pay to the applicable Issuing Bank, with respect to drawings honored under any Letter of Credit, interest on the amount paid by such Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of the Borrower at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Base Rate Loans, and (ii) thereafter, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect Base Rate Loans.

(g)     Interest payable pursuant to Section 2.06(f) shall be computed on the basis of a 365/366 day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full. Promptly upon receipt by the applicable Issuing Bank of any payment of interest pursuant to Section 2.06(f), such Issuing Bank shall

50

distribute to the Administrative Agent, for the account of each Lender, out of the interest received by such Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which such Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Loans), the amount that such Lender would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Letter of Credit for such period if no drawing had been honored under such Letter of Credit. In the event an Issuing Bank shall have been reimbursed by the Lenders for all or any portion of such honored drawing, such Issuing Bank shall distribute to the Administrative Agent, for the account of each Lender which has paid all amounts payable by it under Section 2.03(e) with respect to such honored drawing such Lender's Pro Rata Share of any interest received by such Issuing Bank in respect of that portion of such honored drawing so reimbursed by the Lenders for the period from the date on which such Issuing Bank was so reimbursed by the Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by the Borrower.

Section 2.07.    *[Reserved]* .

Section 2.08.    *Default Interest* . Upon the occurrence and during the continuance of an Event of Default under Section 9.01(a), (b), (g), (h) or (i) hereunder, to the then-outstanding overdue principal amount of the Loans and, to the extent permitted by law, any interest payments or draws thereunder or any other fees overdue hereunder and such fees shall thereafter bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable on demand at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such interest and fees, at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); *provided* , in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective, such Eurodollar Rate Loans shall be automatically converted into Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.08 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

Section 2.09.    *Fees* .

(a)    The Borrower agrees to pay to Lenders (other than Defaulting Lenders):

(i)    unused commitment fees equal to (A) the average of the daily difference between (1) the Revolving Commitments and (2) the aggregate principal amount of (x) all outstanding Loans plus (y) the Letter of Credit Usage, *multiplied by* (B) the Commitment Fee Rate; and

(ii)    a Letter of Credit participation fee equal to the LIBO Rate Margin, *multiplied by* the aggregate undrawn amount of the Letters of Credit (regardless of whether any conditions for drawing could then be met and determined as of the close of business on any date of determination).

51

All fees referred to in this Section 2.09(a) shall be paid to the Administrative Agent at its Principal Office and upon receipt, the Administrative Agent shall promptly distribute to each Lender its Pro Rata Share thereof.

(b)    The Borrower agrees to pay directly to the applicable Issuing Bank, for its own account, the following fees:

(i)    a fronting fee equal to 0.125%, per annum, *multiplied by* the face amount of such Letters of Credit issued during such year without regard to whether any such Letter of Credit remains outstanding; and

(ii)    such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with the applicable Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c)    All fees referred to in Section 2.09(a) and Section 2.09(b)(i) shall be calculated on the basis of a 360 day year and the actual number of days elapsed (including the first day but excluding the last day) and shall be payable quarterly in arrears on the last Business Day of each March, June, September and December of each year during the Revolving Commitment Period, commencing on the first such date to occur after the Effective Date, and on the Revolving Commitment Termination Date.

(d)    In addition to any of the foregoing fees, the Borrower agrees to pay to Agents such other fees in the amounts and at the times separately agreed upon.

Section 2.10.    *Prepayment of Loans* . Except as otherwise provided herein, the Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (subject to the requirements of Section 2.11), subject to prior notice as provided for herein.

Section 2.11.    *Voluntary Prepayments/Commitment Reductions* .

(a)    Voluntary Prepayments.

(i)    Any time and from time to time:

(1)    with respect to Base Rate Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $500,000 and integral multiples of $500,000 in excess of that amount (or if less, the remaining outstanding principal amount of such Loans); and

(2)    with respect to Eurodollar Rate Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $500,000 and integral multiples of $500,000 in excess of that amount (or if less, the remaining outstanding principal amount of such Loans).

(ii)    All such prepayments shall be made:

52

(1)    upon written notice on the date of such prepayment in the case of Base Rate Loans; and

(2)    upon not less than three Business Days' prior written notice or such shorter period of time as agreed to by the Administrative Agent in the case of Eurodollar Rate Loans.

in each case given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required (and the Administrative Agent will promptly transmit such original notice by telefacsimile or other electronic image scan transmission (e.g., pdf via email) to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; *provided* , *however* , if a notice of prepayment is given in connection with a conditional notice of termination, such notice may be revoked by written notice to the Administrative Agent on or prior to the date of prepayment, subject to Section 2.16(c). Any such voluntary prepayment shall be applied as specified in Section 2.13(a).

(b)    Voluntary Commitment Reductions.

(i)    The Borrower may, upon not less than three Business Days' prior written notice to the Administrative Agent (which original written notice the Administrative Agent will promptly transmit by telefacsimile or other electronic image scan transmission (e.g., pdf via email) to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the Aggregate Total Exposure at the time of such proposed termination or reduction; *provided* , any partial reduction of the Revolving Commitments shall be in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.

(ii)    The Borrower's notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and if the Revolving Commitments are not being terminated, the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in the Borrower's notice and shall reduce the Revolving Commitment of each Lender proportionately to its Pro Rata Share thereof; *provided* , *however* , if a notice of commitment termination or reduction is given in connection with a conditional transaction or financing, such notice may be revoked by written notice to the Administrative Agent given on or prior to the date of such termination or reduction, subject to Section 2.16(c).

(iii)    If, after giving effect to any reduction of the Revolving Commitments, the Letter of Credit Sublimit exceeds the amount of the Revolving Commitments, such sublimit shall be automatically reduced by the amount of such excess (including a corresponding reduction to each Issuing Bank's Letter of Credit Issuer Sublimit (ratably) unless otherwise agreed by the Borrower and each applicable Issuing Bank).

53

Section 2.12.    *Mandatory Prepayments* .

(a)    If at any time, the Letter of Credit Usage exceeds the Letter of Credit Sublimit then in effect, the Borrower shall forthwith Cash Collateralize the outstanding amount of Letter of Credit Usage at the Agreed L/C Cash Collateral Amount, to the extent necessary so that such excess amounts are fully Cash Collateralized in compliance with the Agreed L/C Cash Collateral Amount.

(b)    If at any time, the Aggregate Total Exposure exceeds the aggregate Revolving Commitments then in effect, the Borrower shall forthwith prepay *first* , Loans, and *second* Cash Collateralize the outstanding amount of Letter of Credit Usage at the Agreed L/C Cash Collateral Amount, to the extent necessary so that the Aggregate Total Exposure shall not exceed the Revolving Commitments then in effect (or, in the case of Letter of Credit Usage, such amounts are fully Cash Collateralized in compliance with the Agreed L/C Cash Collateral Amount).

(c)    If, after giving effect to any termination of or reduction of the Revolving Commitments, the Letter of Credit Sublimit exceeds the amount of the Revolving Commitments, such sublimit shall be automatically reduced by the amount of such excess (including a corresponding reduction to each Issuing Bank's Letter of Credit Issuer Sublimit (ratably) unless otherwise agreed by the Borrower and each applicable Issuing Bank).

Section 2.13.    *Application of Prepayments/Reductions* .

(a)    Any prepayment of any Loan pursuant to Section 2.11 shall be applied as specified by the Borrower in the applicable notice of prepayment; *provided* , in the event the Borrower fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied as follows:

*first* , to repay outstanding Base Rate Loans to the full extent thereof; and

*second* , to repay outstanding Eurodollar Rate Loans to the full extent thereof, as the Administrative Agent may determine.

(b)    Considering each Type of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.16(c).

Section 2.14.    *General Provisions Regarding Payments* .

(a)    All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 11:00 a.m. (New York City time) on the date due at the Principal Office of the Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by the Administrative Agent after that time on such due date may, in the sole discretion of the Administrative Agent, be deemed to have been paid by the Borrower on the next succeeding Business Day.

54

(b)    All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest and any other related amounts owed, including pursuant to Section 2.16(c), on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)    The Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by the Administrative Agent.

(d)    Notwithstanding the foregoing provisions hereof, if any Interest Election Request is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)    Subject to the provisos set forth in the definition of "Interest Period" as they may apply to Loans, whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(f)    The Borrower hereby authorizes the Administrative Agent to charge the Borrower's accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(g)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the interest rate applicable to Base Rate Loans.

Section 2.15.    *Interest Elections* .

(a)    Each Borrowing initially shall be of the Type specified in the Funding Notice and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Funding Notice. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.15. The Borrower may elect different

55

options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated among the Lenders holding the Loans comprising such Borrowing in accordance with their respective Applicable Percentages, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section 2.15(b), the Borrower shall notify the Administrative Agent of such election by email or telephone by the time that a Funding Notice would be required under Section 2.01(b) if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic request shall be irrevocable and shall be confirmed promptly by hand delivery, telecopy or other electronic image scan transmission (e.g., pdf via email) of an Interest Election Request to the Administrative Agent.

(c)     Each Interest Election Request shall specify the following information in compliance with Section 2.01(b):

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be a Base Rate Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing with an Interest Period of one month's duration. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to a Base Rate Borrowing at the end of the Interest Period applicable thereto.

(f)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to convert or continue to any Borrowing of Loans if the Interest Period requested with respect thereto would end after the Revolving Commitment Termination Date.

56

Section 2.16.    *Making or Maintaining Eurodollar Rate Loans .*

*(a)     Inability to Determine Applicable Interest Rate .* In the event that the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto, absent manifest error), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted LIBO Rate, the Administrative Agent shall on such date give notice (by telefacsimile, other electronic image scan transmission (e.g., pdf via email) or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as the Administrative Agent notifies the Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Interest Election Request given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower or, at the Borrower's request, made as a Base Rate Loan.

*(b)     Illegality or Impracticability of Eurodollar Rate Loans .* In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an " **Affected Lender** " and it shall on that day give notice (by telefacsimile, other electronic image scan transmission (e.g., pdf via email) or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). If the Administrative Agent receives a notice from (x) any Lender pursuant to clause (i) of the preceding sentence or (y) a notice from Lenders constituting the Required Lenders pursuant to clause (ii) of the preceding sentence, then (w) the obligation of the Lenders (or, in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by each Affected Lender, (x) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Funding Notice or an Interest Election Request, the Lenders (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (y) the Lenders' (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender's) obligations to maintain their respective outstanding Eurodollar Rate Loans (the " **Affected Loans** ") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (z) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Funding Notice or an Interest Election

57

Request, the Borrower shall have the option, subject to the provisions of Section 2.16(c), to rescind such Funding Notice or Interest Election Request as to all Lenders by giving written or telephonic notice (promptly confirmed by delivery of written notice thereof) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above or at any time thereafter prior to the date of the applicable Borrowing, continuation or conversion, as applicable (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender).

(c)    *Compensation for Breakage or Non Commencement of Interest Periods* . The Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or payable by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in an Interest Election Request or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans (including in connection with the replacement of a Lender pursuant to Section 2.20) occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by the Borrower. The Borrower shall not be required to compensate a Lender pursuant to this Section 2.16(c) for any losses, expenses and liabilities incurred more than 180 days prior to the date that such Lender delivers written request for compensation to the Borrower.

(d)    *Booking of Eurodollar Rate Loans* . Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)    If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in subparagraph (a) of this Section 2.16 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in subparagraph (a) of this Section 2.16 have not arisen but the supervisor for the administrator of the LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Rate shall no longer be used for determining interest rates for loans (in the case of either such clause (i) or (ii), an " Alternative Interest Rate Election Event "), the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for similar syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the LIBO Rate Margin). Notwithstanding anything to the contrary in Section 11.02, such amendment shall become effective without any further action or

58

consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days after the date notice of such alternate rate of interest is provided to the Lenders, a written notice from Required Lenders stating that they object to such amendment (which amendment shall not be effective prior to the end of such five (5) Business Day notice period). To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with prevailing market convention; *provided* that, to the extent such prevailing market convention is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and the Borrower. From such time as an Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Rate Loan shall be ineffective, and (y) if any Funding Notice requests a Eurodollar Rate Loan, such Borrowing shall be made as an Base Rate Loan; provided that, to the extent such Alternative Interest Rate Election Event is as a result of clause (ii) above in this subparagraph (e), then clauses (x) and (y) of this sentence shall apply during such period only if the LIBO Rate for such Interest Period is not available or published at such time on a current basis. Notwithstanding anything contained herein to the contrary, if such alternate rate of interest as determined in this subparagraph (e) is determined to be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

Section 2.17.    *Increased Costs* .

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or any Issuing Bank;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or any Issuing Bank or the applicable interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Eurodollar Rate Loan (or, in the case of a Change in Law with respect to Taxes, any Loan) or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, such Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or

59

receivable by such Lender, such Issuing Bank or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender, such Issuing Bank or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, such Issuing Bank or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender or any Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or on the capital of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement, the Revolving Commitments hereunder or the Loans made by, or participations in Letters of Credit held by, such Lender to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's bona fide policies and the bona fide policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy or liquidity requirements), then from time to time the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

(c)     A certificate of a Lender or an Issuing Bank setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen days after receipt thereof.

(d)     Failure or delay on the part of any Lender or any Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or such Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or an Issuing Bank pursuant to this Section 2.17 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or such Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuing Bank's intention to claim compensation therefore; *provided, further,* that, if the Change in Law giving rise to such increased costs or reductions is retroactive (or has retroactive effect), then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.18.     *Taxes* .

(a)     For purposes of this Section 2.18, the term "Lender" includes any Issuing Bank and the term "applicable law" includes FATCA.

(b)     Any and all payments by or on account of any obligation of any Obligor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any

60

such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Obligor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     The Obligors shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     The Obligors shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Obligor has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Obligors to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     As soon as practicable after any payment of Taxes by any Obligor to a Governmental Authority pursuant to this Section 2.18, such Obligor shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and

61

the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.18(g)(ii)(A), (ii)(B), (ii)(D) and (iii) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)   Without limiting the generality of the foregoing,

(1)   any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(2)   any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(A)   in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, if applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, if applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)   executed copies of IRS Form W-8ECI;

(C)   in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit L- 1

62

to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, if applicable); or

(D)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, if applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-2 or Exhibit L-3 , IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-4 on behalf of each such direct and indirect partner;

(3)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(4)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

63

(iii)    Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.18 (including by the payment of additional amounts pursuant to this Section), it shall pay to the applicable indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.18(h) with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Each party's obligations under this Section 2.18 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Revolving Commitments, or the requirement to Cash Collateralize Letters of Credit and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.19.    *Pro Rata Treatment; Sharing of Set-offs* .

(a)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(b)    If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the

64

Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender or a Disqualified Institution) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(c)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.23(b) or this paragraph (c) or paragraph (b) of this Section 2.19, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.20.     *Mitigation Obligations; Replacement of Lenders.*

(a)     If any Lender requests compensation under Section 2.16 or Section 2.17, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.16, Section 2.17 or Section 2.18, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If (i) any Lender requests compensation under Section 2.17, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, (iii) any Lender is an Affected Lender (and Lenders constituting Required Lenders are not Affected Lenders) or (iv) any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 11.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) the Borrower shall have received

65

the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation pursuant to Section 2.17 or payments required to be made pursuant to Section 2.18, such assignment will result in a reduction in such compensation or payments, (iv) in the case of any assignment resulting from a Lender becoming an Affected Lender, the applicable assignee shall not be an Affected Lender, (v) such assignment does not conflict with applicable law and (v) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, (x) the applicable assignee shall have consented to, or shall consent to, the applicable amendment, waiver or consent and (y) the Borrower exercises its rights pursuant to this clause (b) with respect to all Non-Consenting Lenders relating to the applicable amendment, waiver or consent. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.21.    *[Reserved]* .

Section 2.22.    *Defaulting Lenders* . Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender, to the extent permitted by applicable law:

(a)    (i) fees shall cease to accrue on the unfunded portion of the Revolving Commitment of a Defaulting Lender, and (ii) no Defaulting Lender shall be entitled to receive any Revolving Commitment fees pursuant to Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender);

(b)    the Revolving Exposure of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 11.02); *provided* that this clause (b) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of each Lender or each Lender affected thereby;

(c)    if any Letter of Credit Usage exists at the time such Lender becomes a Defaulting Lender then:

(i)    all or any part of the Letter of Credit Usage of such Defaulting Lender shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent that (x) the sum of all Non-Defaulting Lenders' Revolving Exposures plus such Defaulting Lender's Letter of Credit Usage does not exceed the total of all Non-Defaulting Lenders' Revolving Commitments, and (y) the sum of any Non-Defaulting Lender's Revolving Exposure plus its Pro Rata

66

Share of such Defaulting Lender's Letter of Credit Usage does not exceed such Non-Defaulting Lender's Revolving Commitment; *provided* that no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation ;

(ii)    if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, within one Business Day following notice by Administrative Agent, Cash Collateralize for the benefit of each applicable Issuing Bank only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Usage (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.03(i) for so long as such Letter of Credit Usage is outstanding;

(iii)    if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Usage pursuant to clause (i) above, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.09(a)(ii) with respect to such Defaulting Lender's Letter of Credit Usage during the period such Defaulting Lender's Letter of Credit Usage is Cash Collateralized;

(iv)    if all or any portion of such Defaulting Lender's Letter of Credit Usage is reallocated pursuant to clause (i) above, then the fees payable to the Lenders pursuant to Section 2.09(a)(i) and Section 2.09(a)(ii) shall be adjusted in accordance with such Non-Defaulting Lenders' Applicable Percentages; and

(v)    if all or any portion of such Defaulting Lender's Letter of Credit Usage is neither reallocated nor Cash Collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of any Issuing Bank or any other Lender hereunder, all letter of credit fees payable under Section 2.09(a)(ii) with respect to such Defaulting Lender's Letter of Credit Usage that is not so reallocated or Cash Collateralized shall be payable to the applicable Issuing Bank until and to the extent that such Letter of Credit Usage is reallocated and/or Cash Collateralized; and

(d)    so long as such Lender is a Defaulting Lender, no Issuing Bank shall be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure and the Defaulting Lender's then outstanding Letter of Credit Usage will be 100% covered by the Revolving Commitments of the Non-Defaulting Lenders and/or Cash Collateral will be provided by the Borrower in accordance with Section 2.22(c)(ii), and participating interests in any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.22(c)(i) (and such Defaulting Lender shall not participate therein).

If (i) a Bankruptcy Event with respect to a holding company of any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) an Issuing Bank has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more

67

other agreements in which such Lender commits to extend credit, the applicable Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless such Issuing Bank shall have entered into arrangements with the Borrower or such Lender, reasonably satisfactory to such Issuing Bank to defease any risk to it in respect of such Lender hereunder.

In the event that the Administrative Agent, the Borrower and each of the Issuing Banks each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Letter of Credit Usage of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

Section 2.23.    *Incremental Facilities* .

(a)    The Borrower may by written notice to the Administrative Agent elect to request prior to the Revolving Commitment Termination Date, an increase to the existing Revolving Commitment (any such increase, the " **New Revolving Loan Commitments** ") by an amount in the aggregate not in excess the Maximum Incremental Facilities Amount and not less than $10,000,000 individually in the case of the first such New Revolving Loan Commitment and not less than $5,000,000 individually in the case of each subsequent New Revolving Loan Commitment (or, in each case, such lesser amount which shall be approved by the Administrative Agent). Each such notice shall specify (i) the date (each, an " **Increased Amount Date** ") on which the Borrower proposes that the New Revolving Loan Commitments shall be effective, which shall be a date not less than five Business Days after the date on which such notice is delivered to the Administrative Agent (or such shorter period as the Administrative Agent may agree) and (ii) the identity of each Lender or other Person that is an eligible assignee under Section 11.04(b) (which, if not a Lender, an Approved Fund or an Affiliate of a Lender), shall be reasonably satisfactory to the Administrative Agent and the Issuing Banks (in each case, not to be unreasonably withheld or delayed) (each, a " **New Revolving Loan Lender** ") to whom the Borrower proposes any portion of such New Revolving Loan Commitments be allocated and the amounts of such allocations; *provided* that any Person approached to provide all or a portion of any New Revolving Loan Commitments may elect or decline to participate in its sole discretion. Such New Revolving Loan Commitments shall become effective as of such Increased Amount Date; *provided* that (1) both before and after giving effect to such New Revolving Loan Commitments, as applicable, each of the conditions set forth in Section 4.02 (with the exception of Section 4.02(a)) shall be satisfied, including, for the avoidance of doubt, the making of the representations and warranties contained in Section 3.04(b) hereof; (2) any New Revolving Loan Commitments and New Revolving Loans made pursuant hereto shall be on the same terms as the existing Revolving Commitments and Loans made pursuant thereto (including, for the avoidance of doubt, with respect to maturity date and pricing), as set forth in and pursuant to the Loan Documents, with such additional amendments thereto as may be necessary or appropriate in the judgment of the Administrative Agent to effect such New Revolving Loan Commitments, and (3) as a condition to the effectiveness of such New Revolving Loan Commitments, the Borrower shall deliver or cause to be delivered any customary legal opinions or other certificates reasonably requested by the Administrative Agent in connection with any such transaction. Each

68

joinder agreement with a New Revolving Loan Lender not previously a Lender shall be subject to the consent (not to be unreasonably withheld or delayed) of the Issuing Banks.

(b)    On any Increased Amount Date on which New Revolving Loan Commitments are effected, subject to the satisfaction of the foregoing terms and conditions, (i) each of the Lenders with Revolving Exposure shall assign to each of the New Revolving Loan Lenders, and each of the New Revolving Loan Lenders shall purchase from each of the Lenders, at the principal amount thereof (together with accrued interest), such interests in the Loans outstanding on such Increased Amount Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Loans will be held by existing Loan Lenders and New Revolving Loan Lenders ratably in accordance with their Revolving Commitments after giving effect to the addition of such New Revolving Loan Commitments to the Revolving Commitments, (ii) each New Revolving Loan Commitment shall be deemed for all purposes a Revolving Commitment and each loan made thereunder (a " **New Revolving Loan** ") shall be deemed, for all purposes, a Loan, (iii) each New Revolving Loan Lender shall become a Lender with respect to the New Revolving Loan Commitment and all matters relating thereto, and (iv) each existing Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each New Revolving Loan Lender, and each New Revolving Loan Lender will automatically and without further act be deemed to have assumed, a portion of such Lender's participations hereunder in outstanding Letters of Credit such that, after giving effect to each deemed Assignment and Assumption of participations, all of the Lenders' (including each New Revolving Loan Lender) participations hereunder in Letters of Credit shall be held on a pro rata basis on the basis of their respective Revolving Commitment (after giving effect to any increase in the Revolving Commitment pursuant to this Section 2.23). Notwithstanding anything to the contrary herein, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to this paragraph (b) .

(c)    The Administrative Agent shall notify the Lenders promptly upon receipt of the Borrower's notice of each Increased Amount Date and in respect thereof (i) the New Revolving Loan Commitments and the New Revolving Loan Lenders and (ii) each Lender's Loans and participation interests in Letters of Credit after giving effect to the assignments contemplated by this Section 2.23.

Section 2.24.    *Notices* . Any Notice shall be executed by a Responsible Officer in a writing delivered to the Administrative Agent. In lieu of delivering a Notice, the Borrower may give the Administrative Agent telephonic or email notice by the required time of any proposed borrowing, conversion/continuation or issuance of a Letter of Credit, as the case may be; *provided* each such telephonic notice shall be promptly confirmed in writing by delivery of the applicable Notice to the Administrative Agent on or before the close of business on the date that such telephonic notice is given. In the event of a discrepancy between a telephone notice and the written Notice, the written Notice shall govern. Neither the Administrative Agent nor any Lender shall incur any liability to the Borrower in acting upon any notice (telephonic or written) referred to above that the Administrative Agent believes in good faith to have been given by a Responsible Officer or other person authorized on behalf of the Borrower or for otherwise acting in good faith.

69

Section 2.25.    *Extensions of Loans* .

(a)    Borrower may from time to time, pursuant to the provisions of this Section 2.25, agree with one or more Lenders holding Loans and/or Revolving Commitments of any Class to extend the maturity date and to provide for other terms consistent with this Section 2.25 (each such modification, an **"Extension"** ) pursuant to one or more written offers (each an **"Extension Offer"** ) made from time to time by Borrower to all Lenders under any Class that is proposed to be extended under this Section 2.25, in each case on a pro rata basis (based on the relative amounts of the Revolving Commitments of each Lender in such Class) and on the same terms to each such Lender. In connection with each Extension, Borrower will provide notification to the Administrative Agent (for distribution to the Lenders of the applicable Class), no later than five Business Days prior to the maturity of the applicable Class to be extended of the requested new maturity date for the extended Loans and/or Revolving Commitments of each such Class (each an **"Extended Maturity Date"** ) and the due date for Lender responses. In connection with any Extension, each Lender of the applicable Class wishing to participate in such Extension shall, prior to such due date, provide Administrative Agent with a written notice thereof. Any Lender that does not respond to an Extension Offer by the applicable due date shall be deemed to have rejected such Extension. In connection with any Extension, Borrower shall agree to such procedures, if any, as may be reasonably established by, or acceptable to, Administrative Agent to accomplish the purposes of this Section 2.25.

(b)    After giving effect to any Extension, the Loans and/or Revolving Commitments so extended shall cease to be a part of the Class that they were a part of immediately prior to the Extension and shall be a new Class hereunder; provided , that, in the case of any Extension Amendment, (i) all borrowings and all prepayments of Loans shall continue to be made on a ratable basis among all Lenders, based on the relative amounts of their Revolving Commitments, until the repayment of the Loans attributable to the non-extended Revolving Commitments on the relevant Maturity Date, (ii) the allocation of the participation exposure with respect to any then-existing or subsequently issued or made Letter of Credit as between the Revolving Commitments of such new "Class" and the remaining Revolving Commitments shall be made on a ratable basis in accordance with the relative amounts thereof until the Maturity Date relating to such non-extended Revolving Commitments has occurred, (iii) no termination of Extended Revolving Commitments and no repayment of Extended Revolving Loans accompanied by a corresponding permanent reduction in Extended Revolving Commitments shall be permitted unless such termination or repayment (and corresponding reduction) is accompanied by at least a pro rata termination or permanent repayment (and corresponding pro rata permanent reduction), as applicable, of the Existing Revolving Loans and Existing Revolving Commitments (or all Existing Revolving Commitments of such Class and related Existing Revolving Loans shall have otherwise been terminated and repaid in full) and (iv) with respect to Letters of Credit, the Maturity Date with respect to the Revolving Commitments may not be extended without the prior written consent of Issuing Banks. If the Total Exposure exceeds the Revolving Commitment as a result of the occurrence of the Maturity Date with respect to any Class of Revolving Commitments while an extended Class of Revolving Commitments remains outstanding, Borrower shall make such payments as are necessary in order to eliminate such excess on such Maturity Date.

70

(c)      The consummation and effectiveness of each Extension shall be subject to the following:

(i)      no Event of Default shall have occurred and be continuing at the time any Extension Offer is delivered to the Lenders or at the time of such Extension;

(ii)      the terms and conditions of the Loans and/or Revolving Commitments extended pursuant to any Extension (as applicable, **"Extended Revolving Loans"** or **"Extended Revolving Commitments"** ) shall be substantially similar to, or (taken as a whole) no more favorable to the Lenders providing such Extended Revolving Loans and/or Extended Revolving Commitments than the applicable to the Class of Loans or Revolving Commitments, as applicable, subject to the related Extension Amendment (as applicable, **"Existing Revolving Loans"** or **"Existing Revolving Commitments"** ); except (A) the final maturity date of any Extended Revolving Loans and/or Extended Revolving Commitments of a Class to be extended pursuant to an Extension shall be later than the Maturity Date of the Class of Existing Revolving Loans and/or Existing Revolving Commitments subject to the related Extension Amendment; (B) the all-in pricing (including, without limitation, margins, fees and premiums) with respect to the Extended Revolving Loans and/or Extended Revolving Commitments, may be higher or lower than the all-in pricing (including, without limitation, margins, fees and premiums) for the Existing Revolving Loans and/or Existing Revolving Commitments; (C) the revolving credit commitment fee rate with respect to the Extended Revolving Commitments may be higher or lower than the revolving credit commitment fee rate for Existing Revolving Commitments, in each case, to the extent provided in the applicable Extension Amendment; (D) no repayment of any Extended Revolving Loans shall be permitted unless such repayment is accompanied by an at least pro rata repayment of all earlier maturing Loans (including previously extended Loans) or all earlier maturing Loans (including previously extended Loans) shall otherwise be or have been repaid in full and the commitments terminated; and (E) the other terms and conditions applicable to Extended Revolving Loans and/or Extended Revolving Commitments may be on terms different than those with respect to the Existing Revolving Loans and/or Existing Revolving Commitments, as applicable, provided such terms either, at the option of the Borrower, (1) are reasonably satisfactory to the Administrative Agent (except for covenants or other provisions applicable only to periods after the Latest Maturity Date) or (2) are not materially more restrictive to the Borrower and its Subsidiaries (when taken as a whole) than the terms and conditions of this Agreement (when taken as a whole) (except for covenants or other provisions applicable only to periods after the Latest Maturity Date) (it being understood that (x) to the extent that any financial maintenance covenant is added for the benefit of any such Extended Revolving Loans and/or Extended Revolving Commitments, the terms and conditions of such Extended Revolving Loans and/or Extended Revolving Commitments will be deemed not to be more restrictive than the terms and conditions of this Agreement if such financial maintenance covenant is also added for the benefit of this Agreement and (y) no consent shall be required from the Administrative Agent for terms or conditions that are more restrictive than this Agreement if such terms are added to this Agreement); *provided further,* that a certificate delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Extended Revolving Loans and/or Extended Revolving Commitments, together

71

with a reasonably detailed description of the material terms and conditions of such Extended Revolving Loans and/or Extended Revolving Commitments or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this definition unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees); *provided further* , each Extension Amendment may, without the consent of any Lender other than the applicable extending Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent and Borrower, to give effect to the provisions of this Section 2.25 , including any amendments necessary to treat the applicable Loans and/or Revolving Commitments of the extending Lenders as a new "Class" of loans and/or commitments hereunder; provided however , no Extension Amendment may provide for any Class of Extended Revolving Loans or Extended Revolving Commitments to be secured by any Collateral or other assets of any Obligor that does not also secure the Existing Revolving Loans or Existing Revolving Commitments and no Extended Revolving Loans and/or Extended Revolving Commitments shall be guaranteed by any person other than a Guarantor;

(iii)    a minimum amount in respect of such Extension (to be determined in Borrower's discretion and specified in the relevant Extension Offer, but in no event less than $10,000,000, unless another amount is agreed to by Administrative Agent) shall be satisfied; and

(iv)    no Extension shall become effective unless, on the proposed effective date of such Extension, the conditions set forth in Section 4.02 shall be satisfied (with all references in such Section to a Credit Event being deemed to be references to the Extension on the applicable date of such Extension), and Administrative Agent shall have received a certificate to that effect dated the applicable date of such Extension and executed by an Responsible Officer of Borrower.

(d)    For the avoidance of doubt, it is understood and agreed that the provisions of Section 2.19 and Section 11.02 will not apply to Extensions of Loans and/or Revolving Commitments, as applicable, pursuant to Extension Offers made pursuant to and in accordance with the provisions of this Section 2.25, including to any payment of interest or fees in respect of any Extended Revolving Loans and/or Extended Revolving Commitments, as applicable, that have been extended pursuant to an Extension at a rate or rates different from those paid or payable in respect of Loans of any other Class, in each case as is set forth in the relevant Extension Offer.

(e)    The Lenders hereby irrevocably authorize Administrative Agent to enter into amendments (collectively, **"Extension Amendments"** ) to this Agreement and the other Loan Documents as may be necessary in order to establish new Classes of Loans and/or Revolving Commitments, as applicable, created pursuant to an Extension, in each case on terms consistent with this Section 2.25. Without limiting the foregoing, as a condition to the effectiveness of such Extension, the Borrower shall deliver or cause to be delivered any customary legal opinions or

72

other certificates reasonably requested by the Administrative Agent in connection with any such transaction.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

The Borrower and each other Obligor represents and warrants to the Lenders and the Issuing Banks that:

Section 3.01.    *Organization; Powers* . Each of the Obligors and its respective Restricted Subsidiaries (a) is duly organized, validly existing and in good standing (to the extent the concept is applicable in such jurisdiction) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, in each case (other than the Obligors in the case of clause (a)) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.    *Authorization; Enforceability* . The Transactions are within the Borrower's and each Guarantor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, equity holder action. Each of the Borrower and the Guarantors has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitute its legal, valid and binding obligations, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.    *Governmental Approvals; No Conflicts* . The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, in each case, as of the Effective Date, (ii) filings necessary to perfect Liens created under the Loan Documents and (iii) those approvals, consents, registrations, filings or other actions, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect, (b) except as would not reasonably be expected to have a Material Adverse Effect, will not violate any applicable law or regulation or any order of any Governmental Authority, (c) will not violate any charter, by-laws or other organizational document of any Obligor or any of its Restricted Subsidiaries, (d) except as would not reasonably be expected to have a Material Adverse Effect, will not violate or result in a default under any indenture, agreement or other instrument binding upon any Obligor or any of its Restricted Subsidiaries, or give rise to a right thereunder to require any payment to be made by any Obligor or any of its Restricted Subsidiaries, and (e) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Restricted Subsidiaries (other than the Liens granted to the Collateral Agent for the benefit of the Secured Parties and, after the Effective Date, the Liens permitted under Section 6.02).

73

Section 3.04.    *Financial Condition; No Material Adverse Change* .

(a)    The Borrower has heretofore furnished to the Administrative Agent its consolidated balance sheet and statements of income, stockholders equity and cash flows as of and for the Fiscal Years ended January 31, 2018 and January 31, 2019, reported on by KPMG LLP. As of the Effective Date, such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Restricted Subsidiaries as of such dates and for such periods in accordance with GAAP.

(b)    Since January 31, 2019, no event, development or circumstance exists or has occurred that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.05.    *Properties* .

(a)    Each of the Obligors and its Restricted Subsidiaries has good and marketable title to, or valid leasehold interests in or rights to use, all its real and tangible personal property material to its business, other than Liens permitted by Section 6.02 and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Such properties and assets are free and clear of Liens (other than Liens permitted by Section 6.02).

(b)    Each of the Obligors and its Restricted Subsidiaries owns or is licensed to use or otherwise has the rights to use, all trademarks, trade names, service marks, copyrights, patents, designs, software, internet domain names, trade secrets, know-how and other intellectual property rights, including any registrations and applications for registration of, and all goodwill associated with, the foregoing (" **Intellectual Property Rights** "), reasonably necessary for the conduct of their respective businesses as currently conducted, except to the extent such failure to own or be licensed or otherwise have the rights to use any such Intellectual Property Rights, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect: (i) to the knowledge of the Obligors, the use of such intellectual property as described in the first sentence of this clause (b) by the Obligors and their respective Restricted Subsidiaries and the operation of the respective businesses of the Obligors and their respective Restricted Subsidiaries as currently conducted does not infringe upon, misappropriate or otherwise violate the Intellectual Property Rights of any other Person and (ii) no such claims or litigations are pending or, to the knowledge of the Obligors, threatened in writing.

(c)    As of the Effective Date, Section 5.10 of the Borrower Disclosure Letter contains a true, accurate and complete list of all Material Real Estate Assets.

(d)    Each of the Obligors and its Restricted Subsidiaries maintains insurance with financially sound and reputable insurance companies in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 3.06.    *Litigation and Environmental Matters* .

(a)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Obligors, affecting any Obligor or any of its Restricted Subsidiaries or threatened in writing against any Obligor or any of its Restricted Subsidiaries (i) that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement, any other Loan Document or the Transactions.

(b)     Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Obligors or their respective Restricted Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) has knowledge of any fact that would subject the Borrower or any of its Restricted Subsidiaries to any Environmental Liability.

Section 3.07.     *[Reserved]*

Section 3.08.     *Compliance with Laws* . Each of the Obligors and its Restricted Subsidiaries is in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.09.     *Investment Company Status* . None of the Obligors or their respective Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 3.10.     *Taxes* . Except as would not reasonably be expected to result in a Material Adverse Effect, (i) each of the Obligors and its Restricted Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed with respect to income, properties or operations of the Obligors and their respective Restricted Subsidiaries, (ii) such returns accurately reflect in all material respects all liability for Taxes of the Obligors and their respective Restricted Subsidiaries as a whole for the periods covered thereby and (iii) each of the Obligors and its Restricted Subsidiaries has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and, to the extent required by GAAP, for which such Obligor or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.

Section 3.11.     *Disclosure* .

(a)     All written information (other than any financial projections, budgets, estimates, forecasts and other forward looking information and other than information of a general economic or industry nature) that has been or will be made available by or on behalf of the Obligors to the Administrative Agent or any Lender in connection with the negotiation of this Agreement, in connection with the Transactions or delivered hereunder or under any Loan Document is, and will be at the time it is delivered, when taken as a whole, accurate in all material respects and does not and will not at the time it is delivered, when taken as a whole,

75

contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made (giving effect to all supplements and updates thereto); *provided* that, with respect to any projected financial information or other forward looking information, each of the Obligors represents only that such information has been or will be prepared in good faith based upon assumptions believed to be reasonable at the time delivered (it being understood that such projected financial information is not to be viewed as facts, is subject to significant uncertainties and contingencies, is based on information reasonably available at the time of preparation, that no assurance can be given that any particular projections will be realized and that actual results may differ and such differences may be material).

(b)    As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 3.12.    *Subsidiaries* . Section 3.12 of the Borrower Disclosure Letter sets forth as of the Effective Date a list of all Subsidiaries and the percentage ownership (directly or indirectly) of the Borrower therein. The Equity Interests or other ownership interests of all Subsidiaries of the Borrower are fully paid and non-assessable and are owned by the Borrower, directly or indirectly, free and clear of all Liens other than Liens permitted under Section 6.02.

Section 3.13.    *ERISA* .

(a)    Each Plan is in compliance in form and operation with its terms and with ERISA and the Code and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to result in a Material Adverse Effect. Except as would not reasonably be expected to result in a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code, as applicable, or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification). No ERISA Event or Non-U.S. Plan Event has occurred other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as would not have a Material Adverse Effect, the excess of each Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA did not exceed the current value of such Pension Plan's assets, determined in accordance with the assumptions for funding by the Plan pursuant to Section 412 of the Code for the most recently computed plan year.

(c)    If each of the Obligors and its Restricted Subsidiaries and the ERISA Affiliates were to withdraw in a complete withdrawal from each Multiemployer Plan as of the date this assurance is given, the Withdrawal Liability that would be incurred to the Multiemployer Plans would not reasonably be expected to have a Material Adverse Effect.

76

(d)     There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Obligors, threatened, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to result in a Material Adverse Effect.

(e)     Each Non-U.S. Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, except as would not reasonably be expected to result in a Material Adverse Effect.

(f)     The Borrower represents and warrants as of the Closing Date that the Borrower is not and will not be using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to the Borrower's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement.

Section 3.14.     *Solvency* . As of the Effective Date, the Obligors and their respective Restricted Subsidiaries on a consolidated basis are, and after giving effect to the Transactions and the incurrence of all Indebtedness and other Obligations being incurred in connection herewith will be, Solvent.

Section 3.15.     *Anti-Terrorism Law; Sanctions*.

(a)     None of the Obligors or their respective Subsidiaries is in violation of any legal requirement relating to U.S. economic sanctions or any laws with respect to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the " **Executive Order** "), the USA Patriot Act, the laws comprising or implementing the Bank Secrecy Act to the extent applicable and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (each as from time to time in effect) (collectively, " **Anti-Terrorism Laws** ").

(b)     None of (x) the Obligors or their respective Subsidiaries, or any of their respective directors or officers or (y) to the knowledge of the Obligors, any of the employees of the Obligors or their respective Subsidiaries, is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

77

(v)    a Sanctioned Entity.

(c)    None of the Obligors or their respective Subsidiaries (i) conducts any business with, or engages in making or receiving any contribution of funds, goods or services to or for the benefit of, a Person described in Section 3.15(b)(i)-(v) above, except as permitted under U.S. law, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any applicable Anti-Terrorism Law.

(d)    No part of the proceeds of the Loans or any Letter of Credit will be used or otherwise made available, directly or indirectly, to any Person described in Section 3.15(b)(i)-(v) above, for the purpose of financing the activities of any Person described in Section 3.15(b)(i)-(v) above or in any other manner that would violate any Anti-Terrorism Laws or applicable Sanctions.

(e)    The Borrower has implemented and maintains in effect policies and procedures designed to promote compliance by the Obligors, their respective Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions, and the Obligors, their respective Subsidiaries and the officers and directors of the Obligors and their respective Subsidiaries, and, to the knowledge of the Obligors, the employees of the Obligors or their respective Subsidiaries, are in compliance in all material respects with applicable Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions.

Section 3.16.    *FCPA; Anti-Corruption* .

(a)    None of the Obligors or their respective Subsidiaries, any of the directors or officers of the Obligors or their respective Subsidiaries or, to the knowledge of the Obligors, any of the employees of the Obligors or their respective Subsidiaries, has taken or will take any action, with respect to the business of the Obligors or their respective Subsidiaries, in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any person while knowing that all or some portion of the money or value will be offered, given, or promised to anyone to improperly influence official action, to obtain or retain business or otherwise to secure any improper advantage, in each case in violation of any applicable Anti-Corruption Law.

(b)    No part of the proceeds of the Loans or any Letter of Credit will be used or otherwise made available, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any applicable Anti-Corruption Laws.

(c)    No action, suit or proceeding is pending or, to the knowledge of the Obligors, threatened, by or before any court or governmental or regulatory authorities or any arbitrator against any Obligor or any of their respective Subsidiaries for its or their violation of applicable Anti- Corruption Laws.

Section 3.17.    *Federal Reserve Regulations.* None of the Obligors or their respective Restricted Subsidiaries is engaged principally, or as one of its important activities, in the

78

business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board of Governors, including Regulation T, U or X.

Section 3.18.    *Collateral Documents* . The Collateral Documents, upon execution and delivery thereof by the parties thereto, will create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable (subject as to enforceability to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law) security interest in the Collateral and (i) when all appropriate filings, notices or recordings are made in the appropriate offices, corporate records or with the appropriate Persons as may be required under applicable laws and/or the Collateral Documents (which filings, notices or recordings shall be made to the extent required by the Collateral Documents) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by the Collateral Documents), the Liens created under the Collateral Documents will constitute fully perfected first priority (other than with respect to Liens permitted by Section 6.02 to have priority over the Liens on the Collateral securing the Obligations) Liens on, and security interests in, all right, title and interest of the Obligors in such Collateral.

ARTICLE 4
CONDITIONS

Section 4.01.    *Effective Date* . This Agreement shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 11.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto a counterpart of this Agreement and each other Loan Document to which any Obligor is a party, signed on behalf of such party.

(b)    The Administrative Agent shall have received a Note executed by the Borrower in favor of each Lender requesting a Note in advance of the Effective Date.

(c)    The Administrative Agent shall have received a customary written opinion (addressed to the Administrative Agent, the Issuing Banks and the Lenders and dated the date of the date hereof) of Goodwin Procter LLP, in form and substance reasonably satisfactory to the Administrative Agent. The Borrower hereby requests such counsel to deliver such opinion.

(d)    The Administrative Agent shall have received (i) certified copies of the resolutions of the board of directors (or comparable governing body) of each Obligor approving the transactions contemplated by the Loan Documents to which such Obligor is a party and the execution and delivery of such Loan Documents to be delivered by such Obligor on the Effective Date, and all documents evidencing other necessary corporate (or other applicable

79

organizational) action and governmental approvals, if any, with respect to the Loan Documents and (ii) all other documents reasonably requested by the Administrative Agent relating to the organization, existence and good standing of such Obligor and authorization of the transactions contemplated hereby (including, but not limited to, a copy of the current constitutional documents of each Obligor).

(e)    The Administrative Agent shall have received a certificate of a Responsible Officer of each Obligor certifying the names and true signatures of the officers of such Obligor authorized to sign the Loan Documents and the other documents to be delivered hereunder on the Effective Date to which it is a party, to be delivered by such Obligor on the Effective Date.

(f)    The Administrative Agent shall have received a certificate, dated the Effective Date and signed on behalf of the Borrower by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (b) and (c) of Section 4.02 as of the Effective Date.

(g)    In order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority security interest in the Collateral (subject to Liens permitted by Section 6.02), each Obligor shall have delivered to the Collateral Agent:

(i)    a completed Perfection Certificate dated the Effective Date and executed by a Responsible Officer of each Obligor, together with all attachments contemplated thereby;

(ii)    all Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and United States Copyright Office required to be filed in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described in the Collateral Documents in proper form for filing; and

(iii)    (x) originals of certificated securities pledged pursuant to the Collateral Documents, together with an undated stock power or other appropriate instrument of transfer (if any) for each such certificated security executed in blank by a Responsible Officer of the pledgor thereof and (y) originals of each promissory note (if any) required to be pledged to the Collateral Agent pursuant to the Collateral Documents endorsed in blank (or accompanied by an executed instrument of transfer form in blank) by a Responsible Officer of the pledger thereof.

(h)    The Lenders, the Administrative Agent and the Arrangers shall have received all fees required to be paid by the Borrower on or prior to the Effective Date, and all expenses required to be reimbursed by the Borrower for which invoices have been presented at least three Business Days prior to the Effective Date, on or before the Effective Date.

(i)    The Administrative Agent shall have received, at least five Business Days prior to the Effective Date (or such shorter period as may be agreed to by the Administrative Agent), to the extent reasonably requested by the Administrative Agent or any of the Lenders at least ten Business Days prior to the Effective Date, all documentation and other information required by bank regulatory authorities under applicable " **know-your-customer** " and anti-money laundering

80

rules and regulations, including the USA Patriot Act. At least five days prior to the Effective Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower.

(j)    The Administrative Agent shall have received an executed Solvency Certificate in form, scope and substance reasonably satisfactory to the Administrative Agent and demonstrating that the Borrower and its Subsidiaries on a consolidated basis are, and after giving effect to the Transactions and incurrence of all Indebtedness and Obligations being incurred in connection herewith will be, Solvent.

(k)    The Administrative Agent shall have received the financial statements described in Section 3.04(a) and the Projections.

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Without limiting the generality of the provisions of Article 10, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

Section 4.02.    *Each Credit Event* . The obligation of each Lender to make a Loan on the occasion of any Borrowing (other than a Borrowing consisting solely of a conversion of Loans of one Type to another Type) and of the Issuing Banks to issue Letters of Credit, and the effectiveness of any New Revolving Loan Commitment pursuant to Section 2.23, is subject to the satisfaction, or waiver in accordance with Section 11.02, of the following conditions:

(a)    except in the case of the effectiveness of any New Revolving Loan Commitment pursuant to Section 2.23, the Administrative Agent (and in the case of an issuance of a Letter of Credit, the applicable Issuing Bank) shall have received a fully executed and delivered Funding Notice or Issuance Notice, as the case may be;

(b)    the representations and warranties of the Obligors and their respective Subsidiaries, set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Credit Event; *provided* that (i) to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects on and as of such earlier date and (ii) in each case such materiality qualifier shall not be applicable to any representations and warranties that are already qualified by materiality in the text thereof;

(c)    at the time of and immediately after giving effect to such Credit Event, no Default or Event of Default shall have occurred and be continuing;

(d)    on or before the date of issuance of any Letter of Credit, the Administrative Agent and the applicable Issuing Banks shall have received all other information required by the applicable Issuance Notice and Application; and

81

(e)    at the time of and immediately after giving effect to such Credit Event and the application of the proceeds thereof, the Borrower shall be in compliance with Section 7.01.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower that the conditions specified in paragraphs (b), (c) and (e) of this Section 4.02 have been satisfied as of the date thereof.

ARTICLE 5
AFFIRMATIVE COVENANTS

Until the Revolving Commitments have expired or been terminated, the principal of and interest on each Loan and all fees and expenses and other amounts payable hereunder shall have been paid in full (other than contingent indemnification obligations for which no claim has been made) and the cancellation or expiration or Cash Collateralization of all Letters of Credit on terms reasonably satisfactory to the applicable Issuing Bank in an amount equal to the Agreed L/C Cash Collateral Amount (or other credit support satisfactory to the applicable Issuing Bank has been provided), the Borrower and each other Obligor covenants and agrees with the Lenders and the Issuing Banks that:

Section 5.01.    *Financial Statements and Other Information* . The Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent):

(a)    (i) prior to a Public Listing, within 120 days after the end of each Fiscal Year, and (ii) on and after a Public Listing, within 90 days after the end of each Fiscal Year, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by KPMG LLP, or other independent public accountants of recognized international standing (without a "going concern" or like qualification or exception (other than a qualification related to the maturity of the Revolving Commitments and the Loans at the Maturity Date) and, except in the case of any Subsidiary or business acquired by the Borrower or the Subsidiaries, in respect of events prior to the acquisition thereof, without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)    within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such Fiscal Quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

82

(c)     concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit F attached hereto (i) certifying as to whether a Default or Event of Default has occurred and is continuing as of the date thereof and, if a Default or Event of Default has occurred and is continuing as of the date thereof, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) if and to the extent that any change in GAAP that has occurred since the date of the audited financial statements referred to in Section 3.04(a) (or the most recent financial statements delivered under clause (a) or (b) above) had an impact on such financial statements, specifying the effect of such change on the financial statements accompanying such certificate, and (iii) certifying as to the current list of Unrestricted Subsidiaries appropriately designated as such pursuant to Section 5.12(a) and, with respect to such financial statements, including any adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements;

(d)     prior to a Public Listing, concurrently with any delivery of financial statements under clause (a) above, an annual plan for the Borrower and its Subsidiaries to include balance sheets, statements of income and cash flows for each Fiscal Quarter of such Fiscal Year prepared in detail and, in summary form and accompanied by a certificate of a Financial Officer of the Borrower stating that such plan is based on estimates, information and assumptions believed to be reasonable at the time prepared;

(e)     promptly after the same become publicly available, copies of all periodic and other reports, proxy statement and other materials filed by an Obligor or any of its Subsidiaries with any national securities exchange or regulator, including without limitation the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of its functions in each case that is not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)     promptly following any request in writing (including any electronic message) therefor, (i) such other information regarding the operations, business affairs and financial condition of the Obligors or any of their respective Subsidiaries, or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request, subject to the restrictions in the last section of Section 5.06 or (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws;

(g)     each year at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.01(a), the Borrower shall deliver to the Collateral Agent a certificate of its Responsible Officer either confirming that there has been no change in the information contained in the Perfection Certificate since the Effective Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes in the form of an updated Perfection Certificate; and

(h)     each quarter at the time of delivery of quarterly financial statements with respect to the preceding Fiscal Quarter pursuant to Section 5.01(a) or (b), as applicable, the Borrower

83

shall deliver to the Collateral Agent a certificate of its Responsible Officer either confirming that there has been no change in the information relating to the Intellectual Property Rights of each Obligor contained in the Perfection Certificate since the Effective Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes in the form of one or more Intellectual Property Security Agreements delivered pursuant to the Security Agreement.

Following a Public Listing, information required to be delivered pursuant to Section 5.01(a), Section 5.01(b) or Section 5.01(e) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such information, or provides a link thereto on the Borrower's website on the Internet at http://www.slack.com (or any successor page); (ii) on which such information is posted on the SEC's website on the Internet at www.sec.gov; or (iii) on which such information is posted on the Borrower's behalf on an Internet or intranet website, if any, to which the Lenders and the Administrative Agent have been granted access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that, (x) to the extent the Administrative Agent so requests, the Borrower shall deliver paper copies (which delivery may be by electronic transmission (including Adobe pdf copy)) of such documents to the Administrative Agent until a written request to cease delivering paper copies is given by the Administrative Agent and (y) the Borrower shall notify the Administrative Agent (by facsimile or email) of the posting of any such documents (other than in respect of documents required to be delivered by Section 5.01(e) or any document deemed delivered pursuant to clause (ii) above). The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to herein, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 5.02.     *Notices of Material Events* . Promptly upon obtaining knowledge thereof, the Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) prompt written notice of the following:

(a)     the occurrence of any Default or Event of Default;

(b)     the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Obligor or any other Subsidiary thereof that would reasonably be expected to result in a Material Adverse Effect; and

(c)     any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 5.02 shall be accompanied by a statement of a Responsible Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03.     *Existence; Conduct of Business* . The Borrower and each other Obligor will, and will cause each of their respective Restricted Subsidiaries to, do or cause to be done all

things necessary to preserve, renew and keep in full force and effect its legal existence (with respect to the Borrower, in a United States jurisdiction) and the rights (charter and statutory), licenses, permits, privileges, approvals, franchises and Intellectual Property Rights material to the conduct of its business; *provided* that (a) the foregoing shall not prohibit any merger, consolidation, disposition, liquidation or dissolution permitted under Section 6.03 and (b) none of the Borrower or any other Obligor or any of their respective Restricted Subsidiaries shall be required to preserve, renew or keep in full force and effect its rights (charter and statutory), licenses, permits, privileges, approvals, franchises or Intellectual Property Rights where failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 5.04.     *Payment of Taxes and Other Claims* . Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Borrower and each other Obligor will, and will cause each of their respective Restricted Subsidiaries to, pay all Tax liabilities before the same shall become delinquent or in default, and all lawful claims other than Tax liabilities which, if unpaid, have or would become a Lien upon any properties of the Borrower or any other Obligor or any of their respective Restricted Subsidiaries not otherwise permitted under Section 6.02, in each case except where (a) in the case of any Tax or claim, (i) the validity or amount thereof is being contested in good faith by appropriate proceedings and (ii) to the extent required by GAAP, the Borrower, any other Obligor or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (b) in the case of any Tax or claim which has or would become a Lien against any of the Collateral, such contest proceedings operate to stay the sale of any portion of the Collateral to satisfy such Tax or Claim.

Section 5.05.     *Maintenance of Properties; Insurance* . The Borrower and each other Obligor will, and will cause each of their respective Restricted Subsidiaries to, (a) keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear and casualty events excepted, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect and (b) maintain insurance with financially sound and reputable insurance companies in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations, including any Flood Insurance as required by Section 5.10. Except as otherwise agreed by the Collateral Agent (i) each such policy shall (a) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (b) in the case of each casualty insurance policy, contain a loss endorsement, reasonably satisfactory in form and substance to the Collateral Agent, that names the Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder and provides for at least thirty days' prior written notice to the Collateral Agent of cancellation of such policy (or ten (10) days in the case of cancellation for non-payment) and (ii) the Borrower shall promptly deliver evidence reasonably satisfactory to the Collateral Agent of the requirements set forth in clause (i), but in any event, for policies required to be in effect on the Effective Date, within 60 days of the Effective Date (or such later date as may be agreed to by the Administrative Agent).

Section 5.06.     *Books and Records; Inspection Rights* . The Borrower and each other Obligor will, and will cause each of their respective Restricted Subsidiaries to, keep proper books of record and account in which entries full, true and correct in all material respects are

85

made and are sufficient to prepare financial statements in accordance with GAAP. The Borrower and each other Obligor will, and will cause each of their respective Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender (pursuant to a request made through the Administrative Agent and whose representatives may accompany representatives of the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts of its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants ( *provided* that the Borrower, such other Obligor or such Restricted Subsidiary shall be afforded the opportunity to participate in any discussions with such independent accountants), all at such reasonable times and as often as reasonably requested (but no more than once annually if no Event of Default exists). Notwithstanding anything to the contrary in this Agreement, none of the Borrower, the other Obligors or any of their respective Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable law or any binding agreement with any third party that is not an Affiliate of the Borrower or (c) is subject to attorney, client or similar privilege or constitutes attorney work-product.

Section 5.07.    *Compliance with Laws* .

(a)    The Borrower and each Obligor will, and will cause each of their respective Restricted Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrower has, and will maintain in effect and enforce policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions.

Section 5.08.    *ERISA-Related Information* . The Borrower shall supply to the Administrative Agent (in sufficient copies for all the Lenders, if the Administrative Agent so requests): (a) promptly, and in any event within 30 days, after the Borrower, any Guarantor, any Restricted Subsidiary or any ERISA Affiliate knows or has reason to know that any ERISA Event that would reasonably be expected to result in a Material Adverse Effect has occurred, a certificate of the most senior Financial Officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by such Borrower, Guarantor, Restricted Subsidiary or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto; and (b) promptly, and in any event within 30 days, after becoming aware that there has been (i) a material increase in unfunded pension liabilities that would reasonably be expected to result in a Material Adverse Effect, (ii) the existence of potential withdrawal liability under Section 4201 of ERISA that would reasonably be expected to result in a Material Adverse Effect, if the Borrower, any Guarantor, any Restricted Subsidiary or any ERISA Affiliates withdraw from any Multiemployer Plan, or (iii)

86

the adoption of, or commencement of contributions to, or any amendment to, a Plan subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that would reasonably be expected to result in a Material Adverse Effect, a detailed written description thereof from the most senior Financial Officer of the Borrower.

Section 5.09.    *Use of Proceeds* . The proceeds of the Loans or the Letters of Credit will be used only for working capital and general corporate purposes (including, without limitation, to finance Acquisitions and investments). No part of the proceeds of any Loan or Letter of Credit will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X or any other violations of any/and rule or regulation of any Governmental Authority. The Borrower will not request any Borrowing or Letter of Credit, and the Obligors shall not use, directly or indirectly, and shall procure that their respective Subsidiaries and its and their respective directors, officers, employees and agents shall not use, directly or indirectly, the proceeds of any Borrowing or Letter of Credit, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Person, or in any country or territory that, at the time of such funding, financing or facilitating, is, or whose government is, a Sanctioned Entity, except as permitted under U.S. law, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.10.    *Further Assurances* .

(a)    At any time or from time to time upon the reasonable request of the Administrative Agent, the Borrower and each other Obligor will, at its expense, promptly execute, acknowledge and deliver such further documents and take such further actions as the Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents. In furtherance and not in limitation of the foregoing, the Borrower and each other Obligor shall take such actions as the Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are (i) guaranteed by the Guarantors and (ii) secured by the Collateral. If at any time the Collateral Agent receives a notice from a Lender or otherwise becomes aware that any Mortgaged Property has become a Flood Hazard Property, the Collateral Agent shall, within 45 days of receipt of such notice, deliver such notice to the Borrower, and the Borrower shall take, or shall cause to be taken, all actions as described in Section 5.10(b)(iv) required as a result of such change.

(b)    With respect to each Mortgaged Property, the Borrower or such other Obligor (as applicable) shall deliver or cause to be delivered to the Collateral Agent, within 90 days of the date upon which the Mortgaged Property is acquired or becomes a Mortgaged Property:

(i)    a fully executed Mortgage encumbering the Mortgaged Property in form suitable for recording or filing in all filing or recording offices that the Collateral Agent may reasonably deem necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Collateral Agent for the benefit of the Secured Parties;

87

(ii)     an opinion of counsel in the state in which the Mortgaged Property is located with respect to the enforceability of the Mortgage to be recorded and such other matters as are customary and as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent;

(iii)     (A) a lender's policy or policies or marked up unconditional binder of title insurance issued by a nationally recognized title insurance company (each, a " **Title Insurance Company** ") insuring the Lien of the Mortgage as a valid first Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Encumbrances, in an amount acceptable to the Collateral Agent (but not to exceed the fair market value), together with such customary endorsements, coinsurance and reinsurance as the Collateral Agent may request and which are available at commercially reasonable rates in the jurisdiction where such Mortgaged Property is located (each, a " **Title Policy** "), and (B) evidence satisfactory to the Collateral Agent that the Borrower or such Obligor has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgage for the Mortgaged Property;

(iv)     (A) a completed standard "life of loan" flood hazard determination form, (B) if the improvement(s) to the Mortgaged Property is located in a special flood hazard area as set forth by FEMA (any such Mortgaged Property, a " **Flood Hazard Property** ") a notification to the Borrower or such Obligor, countersigned by the Borrower or such Obligor, that such improvement(s) is located in a special flood hazard area and (if applicable) notification that flood insurance coverage under the National Flood Insurance Program (" **NFIP** ") is not available because the community where the Mortgaged Property is located does not participate in the NFIP, and (C) if the notice described in clause (B) is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following: a flood insurance policy with such coverage reasonably acceptable to the Collateral Agent (" **Flood Insurance** "), the Borrower's or such Obligor's application for Flood Insurance plus proof of premium payment, a declaration page confirming that Flood Insurance has been issued, or such other evidence of Flood Insurance reasonably satisfactory to the Collateral Agent;

(v)     a survey of the Mortgaged Property showing all improvements, easements and other customary matters for which all necessary fees (where applicable) have been paid and which is complying in all material respects with the minimum detail requirements of the American Land Title Association and American Congress of Surveying and Mapping as such requirements are in effect on the date of preparation of such survey, certified to the Collateral Agent and the Title Insurance Company and in a form sufficient for the Title Insurance Company to delete the standard survey exception; and

88

(vi)    if requested by the Collateral Agent and required to comply with the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended, an appraisal of the Mortgaged Property.

Section 5.11.    *Guarantors* . If any Person shall have become a Domestic Restricted Subsidiary of the Borrower (other than an Excluded Subsidiary), then the Borrower, as applicable, shall, within 45 days thereafter (or such longer period of time as the Administrative Agent may agree in its sole discretion), cause such Domestic Restricted Subsidiary to (i) enter into a joinder agreement (a " **Joinder Agreement** ") in substantially the form of Exhibit J hereto, (ii) become a Grantor under the Security Agreement and enter into a Joinder Agreement (as defined in the Security Agreement) and (iii) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements and certificates reasonably requested by the Administrative Agent or the Collateral Agent or required under the Loan Documents. If requested by the Administrative Agent, the Administrative Agent shall receive an opinion of counsel for the Borrower in form and substance reasonably satisfactory to the Administrative Agent in respect of matters reasonably requested by the Administrative Agent relating to any Joinder Agreement delivered pursuant to this Section 5.11, dated as of the date of such Joinder Agreement.

Section 5.12.    *Designation of Restricted and Unrestricted Subsidiaries* .

(a)    The Borrower may designate any Subsidiary, including a newly acquired or created Subsidiary, to be an Unrestricted Subsidiary if it meets the following qualifications:

(i)    such Subsidiary does not own any Equity Interest of any Obligor or any other Restricted Subsidiary;

(ii)    any guarantee or other credit support thereof by any Obligor or any other Restricted Subsidiary is permitted under Section 6.01;

(iii)    immediately before and after such designation, no Event of Default shall have occurred and be continuing or would result from such designation;

(iv)    no Subsidiary may be designated as an Unrestricted Subsidiary if it is a "restricted subsidiary" or a "guarantor" (or any similar designation) for any other Indebtedness of the Obligors or their respective Restricted Subsidiaries; and

(v)    immediately after such designation and as of each Test Period ending thereafter, the aggregate total assets of all Unrestricted Subsidiaries does not exceed an amount equal to 7.5% of the Consolidated Total Net Assets as of the most recently ended Test Period.

Once so designated, the Subsidiary will remain an Unrestricted Subsidiary, subject to subsection (b).

(b)    If the Consolidated Total Net Assets of all Unrestricted Subsidiaries so designated by the Borrower shall at any time exceed the threshold amount set forth in subsection (a)(v) of this Section 5.12, then Unrestricted Subsidiaries that are so designated at such time shall

89

automatically be redesignated as Restricted Subsidiaries (starting with the largest Unrestricted Subsidiary and continuing with the next largest and so on) until such threshold amount is no longer exceeded, subject to the consequences set forth in subsection (d).

(c)     Upon a Restricted Subsidiary becoming an Unrestricted Subsidiary,

(i)     all existing Indebtedness of any Obligor or its Restricted Subsidiaries held by it will be deemed incurred at that time, and all Liens on property of any Obligor or its Restricted Subsidiaries held by it will be deemed incurred at that time;

(ii)     all existing transactions between it and any Obligor or any Restricted Subsidiary will be deemed entered into at that time;

(iii)     it is released at that time from the Loan Documents to which it is a party and all related security interests on its property shall be released; and

(iv)     it will cease to be subject to the provisions of this Agreement as a Restricted Subsidiary.

(d)     The Borrower may designate an Unrestricted Subsidiary to be a Restricted Subsidiary if the designation would not cause an Event of Default. Upon an Unrestricted Subsidiary becoming, or being deemed to become, a Restricted Subsidiary pursuant to Section 5.12(b),

(i)     all of its Indebtedness will be deemed incurred at that time for purposes of Section 6.01;

(ii)     all Liens on its property will be deemed incurred at that time for purposes of Section 6.02;

(iii)     if it is a Domestic Subsidiary of the Borrower (unless it is an Excluded Subsidiary), it shall be required to become a Guarantor pursuant to this Agreement within the time frame set forth in Section 5.11; and

(iv)     it will thenceforward be subject to the provisions of this Agreement as a Restricted Subsidiary.

Section 5.13.     *Anti-Terrorism; Sanctions; Anti-Corruption.*

(a)     The Borrower and each of its Subsidiaries shall comply in all material respects with all applicable Anti-Terrorism Laws.

(b)     The Borrower will maintain in effect policies and procedures designed to promote compliance by the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with applicable Sanctions and with Anti-Corruption Laws.

90

ARTICLE 6
NEGATIVE COVENANTS

Until the Revolving Commitments have expired or been terminated and the principal of and interest on each Loan and all fees and expenses and other amounts payable hereunder shall have been paid in full (other than contingent indemnification obligations for which no claim has been made) and the cancellation or expiration or Cash Collateralization of all Letters of Credit on terms reasonably satisfactory to the applicable Issuing Bank in an amount equal to the Agreed L/C Cash Collateral Amount (or other credit support reasonably satisfactory to the applicable Issuing Bank has been provided), the Borrower and each other Obligor covenants and agrees with the Lenders that:

Section 6.01.    *Indebtedness* . The Borrower and each other Obligor will not, and will not permit any of its Restricted Subsidiaries to, create, incur or assume, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    Obligations of the Obligors under the Loan Documents;

(b)    Indebtedness existing on the date hereof and set forth in Section 6.01 of the Borrower Disclosure Letter and any refinancing, refundings, renewals or extensions thereof;

(c)    Capital Lease Obligations, purchase money Indebtedness and loans incurred to acquire or improve equipment or other physical plant or real property of the Borrower or any Restricted Subsidiary; *provided* that (i) such Indebtedness does not exceed the purchase price plus expenses of the asset or assets acquired (or the improvement thereon, as applicable) and (ii) any Lien that secures such Indebtedness does not apply to any other property or assets of the Borrower or its Restricted Subsidiaries; *provided, further* the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed, at any time outstanding, the greater of (x) $200,000,000 and (y) an amount equal to 100% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries as of the most recently ended Test Period.

(d)    Indebtedness of (i) any Restricted Subsidiary to any Obligor or to any other Restricted Subsidiary or (ii) any Obligor to any other Obligor or any other Restricted Subsidiary; *provided* that (i) if such Indebtedness is owed to an Obligor, it shall be subject to a Lien under the Collateral Documents to the extent required thereby, (ii) all such Indebtedness shall be unsecured and (iii), if owed by an Obligor to a Restricted Subsidiary that is not an Obligor, subordinated in right of payment to payment in full of the Obligations, as set forth in the Intercompany Note;

(e)    Indebtedness incurred by the Borrower or any Restricted Subsidiary arising from agreements providing for indemnification, adjustment of purchase price or similar obligations (including, Indebtedness consisting of the deferred purchase price of property or services acquired in an Acquisition permitted hereunder, earnouts and holdbacks), or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Restricted Subsidiary pursuant to such agreements, in connection with Acquisitions and investments or permitted dispositions of any business or assets (including stock of a Subsidiary);

91

(f)    Indebtedness in respect of any Hedging Transaction entered into for the purpose of hedging risks associated with the operations of the Obligors and their respective Subsidiaries and not for speculative purposes;

(g)    Indebtedness of the Obligors and their respective Restricted Subsidiaries which may be deemed to exist pursuant to any Guarantees, performance, statutory or similar obligations (including in connection with workers' compensation) or obligations in respect of letters of credit, surety bonds, bank guarantees or similar instruments related thereto incurred in the ordinary course of business, or pursuant to any appeal obligation, appeal bond or letter of credit in respect of judgments that do not constitute an Event of Default under clause (j) of Section 9.01;

(h)    Guarantees by the Borrower of Indebtedness of a Restricted Subsidiary or Guarantees by a Restricted Subsidiary of Indebtedness of the Borrower or any Restricted Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.01; *provided* , that if the Indebtedness that is being guaranteed is unsecured and/or subordinated to the Obligations, the Guarantee shall also be unsecured and/or subordinated to the Obligations;

(i)    Indebtedness of any Person that becomes a Subsidiary (or of any Person not previously a Subsidiary that is merged or consolidated with or into a Subsidiary in a transaction permitted hereunder) after the date hereof, and refinancing of such Indebtedness in respect thereof; *provided* that (i) such Indebtedness exists at the time such Person becomes a Subsidiary (or is so merged or consolidated) and is not created in contemplation of or in connection with such Person becoming a Subsidiary (or such merger or consolidation) and (ii) the aggregate principal amount of all such outstanding Indebtedness permitted by this clause (i) shall not exceed $50,000,000 at any time;

(j)    Permitted Incremental Equivalent Debt;

(k)    (i) Indebtedness owing to insurance companies to finance insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case under clause (i) or (ii), in the ordinary course of business;

(l)    Indebtedness under or in connection with (i) any commercial credit card program, (ii) purchasing or "p-card" program or (iii) similar programs, arising in the ordinary course of business;

(m)    Indebtedness consisting of incentive, non-compete, consulting, deferred compensation or other similar arrangements entered into in the ordinary course of business with an officer or employee of any Obligor or its Subsidiaries;

(n)    Indebtedness in respect of treasury, cash management and netting services, automatic clearinghouse arrangements, overdraft protections and otherwise in connection with securities accounts and deposit accounts;

(o)    Indebtedness in respect of letters of credit, bank guarantees or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in

92

respect of other Indebtedness) in the ordinary course of business and consistent with past practice;

(p)     other Indebtedness not permitted by the foregoing in an aggregate principal amount outstanding at any one time not exceeding the greater of (i) $200,000,000 and (ii) an amount equal to 100% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for the most recently ended Test Period;

(q)     Indebtedness in respect of letters of credit or bankers' acceptances in an aggregate principal or face amount not exceeding $50,000,000;

(r)     Refinancing Indebtedness in respect of Sections 6.01(b), 6.01(c), 6.01(h), 6.01(j), 6.01(p) and 6.01(t);

(s)     Disqualified Equity Interests in an aggregate principal amount not exceeding $5,000,000;

(t)     Convertible Indebtedness in an aggregate principal amount outstanding at any time not exceeding an amount equal to (i) $1,000,000,000 plus (ii) an amount such that, at the time of incurrence thereof and immediately after giving effect thereto on a Pro Forma Basis (and without netting the cash proceeds thereof in determining such leverage ratio), the Total Gross Leverage Ratio would not exceed 4:00:1.00; and

(u)     performance guarantees of the Borrower and its Restricted Subsidiaries in the ordinary course of business primarily guaranteeing performance of contractual obligations of the Borrower or its Restricted Subsidiaries to a third party and not for the purpose of guaranteeing payment of Indebtedness.

Section 6.02.    *Liens* . The Borrower and each other Obligor will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it except:

(a)     Permitted Encumbrances;

(b)     any Lien on any property or asset of the Borrower or any Restricted Subsidiary existing on the date hereof and set forth in Section 6.02 of the Borrower Disclosure Letter and any modifications, renewals and extensions thereof and any Lien granted as a replacement or substitute therefor; *provided* that (i) such Lien shall not apply to any other property or asset of the Borrower or any Restricted Subsidiary (other than any property or assets required to be subject to such Liens as of the Effective Date and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender) and (ii) such Lien shall secure only those obligations which it secures on the date hereof and any Refinancing Indebtedness in respect thereof;

(c)     any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Restricted Subsidiary or existing on any property or asset of any Person that becomes a Restricted Subsidiary after the date hereof prior to the time such Person becomes a Restricted Subsidiary; *provided* that (i) such Lien is not created in contemplation of or in

93

connection with such acquisition or such Person becoming a Restricted Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary (other than any property or assets required to be subject to such Lien immediately prior to the time of such acquisition and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender) and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Restricted Subsidiary, as the case may be, and any Refinancing Indebtedness in respect thereof;

(d)     Liens on fixed or capital assets acquired, developed, constructed, restored, replaced, rebuilt, maintained, upgraded or improved (including any such asset made the subject of a Capital Lease Obligation) by the Borrower or any Restricted Subsidiary; *provided* that (i) such Liens secure Indebtedness permitted under Section 6.01(c), (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, developing, constructing, restoring, replacing, rebuilding, maintaining, upgrading or improving such fixed capital assets plus expenses, and (iv) such security interests shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary (other than any replacements of such property or assets, additions and accessions thereto and the products and proceeds thereof, customary security deposits in respect thereof, and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender);

(e)     licenses or sublicenses and leases or subleases granted to others in the ordinary course of business not interfering in any material respect with the business of the Obligors or any of their respective Subsidiaries;

(f)     the interest and title of a lessor under any lease, license, sublease or sublicense entered into by the Borrower or any Restricted Subsidiary in the ordinary course of its business and other statutory and common law landlords' Liens under leases;

(g)     in connection with the sale or transfer of any assets in a transaction not prohibited hereunder, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof;

(h)     in the case of any Joint Venture, any put and call arrangements related to its Equity Interests set forth in its organizational documents or any related Joint Venture or similar agreement, in each case, in favor of the other parties to such Joint Venture;

(i)     Liens securing Indebtedness to finance insurance premiums owing in the ordinary course of business to the extent such financing is not prohibited hereunder;

(j)     Liens on earnest money deposits of Cash or Cash Equivalents made in connection with any Acquisition not prohibited hereunder;

(k)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to Cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Restricted Subsidiary, in each case granted in the ordinary course of business in favor of the

94

bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(l)    Liens in the nature of the right of setoff in favor of counterparties to contractual agreements not otherwise prohibited hereunder with the Borrower or any Restricted Subsidiaries in the ordinary course of business;

(m)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Restricted Subsidiary or existing on any property or assets of any Person that becomes a Restricted Subsidiary after the date hereof prior to the time such Person becomes a Restricted Subsidiary, as the case may be; *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary, (ii) such Lien does not apply to any other property or assets of any Obligor or any Restricted Subsidiary (other than property or assets required to be subject to such Lien immediately prior to the time of such acquisition and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender), and (iii) such Lien secures only (x) those obligations which it secures on the date of such acquisition or the date such Person becomes a Restricted Subsidiary, as the case may be and (y) any Refinancing Indebtedness with respect thereto;

(n)    Liens on cash deposits in respect of rental agreements in the ordinary course of business;

(o)    Liens securing the Obligations;

(p)    Liens securing Indebtedness incurred pursuant to Section 6.01(j); *provided* that the Obligations shall be equally and ratably secured (or secured on a senior basis) by the collateral securing such Indebtedness on terms reasonably satisfactory to the Administrative Agent;

(q)    [Reserved]

(r)    Liens on cash pledged to secure obligations in respect of letters of credit or bankers' acceptances permitted under Section 6.01(q);

(s)    Liens arising out of consignment or similar arrangements for the sale of goods in the ordinary course of business;

(t)    Liens on goods in favor of customs and revenues authorities imposed by applicable law arising in the ordinary course of business in connection with the importation of such goods;

(u)    Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(v)    Liens on securities that are the subject of repurchase agreements;

95

(w)    Liens on amounts deposited to secure obligations in connection with the making or entering into of bids, tenders, agreements or leases in the ordinary course of business and not in connection with the borrowing of money; and

(x)    Liens not otherwise permitted by the foregoing provisions of this Section 6.02 securing Indebtedness permitted by this Agreement or other obligations of the Obligors or their respective Restricted Subsidiaries in an aggregate amount not to exceed the greater of (i) $200,000,000 and (ii) an amount equal to 100% of the Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries as of the most recently ended Test Period.

Section 6.03.    *Fundamental Changes; Asset Sales; Conduct of Business* .

(a)    The Borrower and each other Obligor will not, and will not permit any of its Restricted Subsidiaries to, (x) merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, (y) sell, transfer, lease, enter into any sale-leaseback transactions with respect to, or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Obligors and their respective Restricted Subsidiaries, taken as a whole, or all or substantially all of the Equity Interests of any of its Restricted Subsidiaries (in each case, whether now owned or hereafter acquired), or (z) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), except that:

(i)    any Subsidiary or any other Person may merge into or consolidate with the Borrower in a transaction in which the Borrower is the surviving entity;

(ii)    any Person (other than the Borrower) may merge into or consolidate with any Subsidiary in a transaction in which the surviving entity is a Subsidiary; *provided* that any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity;

(iii)    any Subsidiary that is an Obligor may sell, transfer, lease or otherwise dispose of its assets to another Subsidiary that is not an Obligor; *provided* that (x) at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, and (y) any such sale, transfer, lease or other disposal must comply with Section 6.05;

(iv)    (x) any Obligor may sell, transfer, lease or otherwise dispose of its assets to any other Obligor, and (y) any Subsidiary that is not an Obligor may sell, transfer, lease or otherwise dispose of its assets to any Obligor or any other Subsidiary;

(v)    in connection with any Acquisition permitted hereunder, any Subsidiary may merge into or consolidate with any other Person, so long as the Person surviving such merger or consolidation shall be a Subsidiary; *provided* that (x) any such merger or consolidation involving an Obligor must result in an Obligor as the surviving entity, and (y) any such merger or consolidation involving the Borrower must result in the Borrower as the surviving entity; and

(vi)    any Subsidiary (other than the Borrower) may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best

96

interests of Borrower and is not materially disadvantageous to the Lenders; *provided* that if such Subsidiary is an Obligor, the entity receiving the assets of such Subsidiary upon such liquidation or dissolution shall also be an Obligor.

Notwithstanding anything to the contrary herein, including the foregoing, no sale or other disposition of all or substantially all assets of the Obligors and their respective Restricted Subsidiaries taken as a whole shall be permitted.

(b)     The Borrower and each other Obligor will not, and will not permit any of their respective Restricted Subsidiaries to, sell, lease (as lessor or sublessor), sell and leaseback, transfer or otherwise dispose to, any Person, in one transaction or a series of transactions any property of the Obligors or any of their respective Restricted Subsidiaries (including receivables and leasehold interests), whether now owned or hereafter acquired, including, in the case of any Restricted Subsidiary, issuing or selling any shares of such Restricted Subsidiary's Equity Interests to any Person, except for:

(i)     any sale, transfer, license, lease or other disposition not constituting an Asset Sale;

(ii)     Restricted Payments not prohibited by Section 6.04; and

(iii)     dispositions of non-core assets acquired pursuant to an Acquisition consummated within 12 months of the date such Acquisition is consummated; provided that the consideration for such assets shall be in an amount at least equal to the fair market value thereof; and

(iv)     any other sale, lease (as lessor or sublessor), sale and leaseback, transfer or other disposition pursuant to this clause (iv) by the Borrower or any Restricted Subsidiary, so long as (w) the Net Asset Sale Cash Proceeds of all such Asset Sales since the Effective Date do not exceed $75,000,000, (x) the consideration for such assets shall be in an amount at least equal to the fair market value thereof and (y) no less than 75% of the consideration received shall be in Cash or Cash Equivalents.

(c)     The Borrower and each other Obligor will not, and will not permit any of their respective Restricted Subsidiaries to, engage to any material extent in any business other than the type conducted by the Obligors and their respective Restricted Subsidiaries on the Effective Date or businesses reasonably related, similar, ancillary, supportive, complementary or synergistic thereto and reasonable extensions thereof (and non-core incidental businesses acquired in connection with any Acquisition or investment or other immaterial businesses).

Section 6.04.     *Restricted Payments* . The Borrower and each other Obligor will not, and will permit any of its Restricted Subsidiaries to, declare, make, order, pay any sum for, or set apart assets for a sinking or other analogous fund for, directly or indirectly, any Restricted Payment except for:

(a)     in the case of any Restricted Subsidiary, the declaration and payment of dividends or other distributions to its equity holders, so long as any such dividends or other distributions to

97

the Obligors and other Restricted Subsidiaries that are equity holders are at least pro rata to the relevant portion of equity held by such Obligor and such other Restricted Subsidiaries;

(b)    in the case of the Borrower and any of its Subsidiaries, the declaration and payment of dividends or other distributions payable solely in its Equity Interests;

(c)    (i) the making of cash payments in connection with any conversion, exchange or repurchase of Convertible Indebtedness in an aggregate amount since the date of the indenture providing for the issuance of such Convertible Indebtedness not to exceed the amount of any payments received by the Borrower or any of its Restricted Subsidiaries pursuant to the exercise, settlement, termination or unwind of any related Permitted Bond Hedge Transaction substantially concurrently with, or a commercially reasonable period of time before or after, the settlement date for the repurchase, exchange or conversion of the relevant Convertible Indebtedness, (ii) the delivery or issuance of shares of common stock (and cash in lieu of fractional shares) required by the terms of any Convertible Indebtedness, and (iii) the making of required interest payments with respect to any Convertible Indebtedness;

(d)    so long as no Event of Default shall have occurred and be continuing or be caused thereby, other Restricted Payments not otherwise permitted by this Section 6.04, so long as, immediately after giving effect thereto, Liquidity is greater than $300,000,000; and

(e)    any Restricted Subsidiary may make Restricted Payments to the Borrower, the other Restricted Subsidiaries of the Borrower and other holders of its equity securities, *provided* that the portion of any Restricted Payments paid to holders of its equity securities other than the Obligors and their respective Restricted Subsidiaries is not greater than the percentage of equity securities of such Obligor or such Restricted Subsidiary, as applicable, owned by such other Persons;

(f)    the Borrower may (i) repurchase Equity Interests upon the exercise of stock options if such Equity Interests represent a portion of the exercise price of such options, (ii) make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests in the Borrower and (iii) "net exercise" or "net share settle" warrants or options; *provided* that the aggregate principal amount of all such Restricted Payments permitted by this clause (f) shall not exceed $15,000,000 in any Fiscal Year;

(g)    the Borrower may repurchase its Equity Interests owned by employees of the Obligors or their respective Subsidiaries or make payments to employees of the Obligors or their respective Subsidiaries upon termination of employment in connection with the exercise of stock options, stock appreciation rights or similar equity incentives or equity based incentives pursuant to management incentive plans or in connection with the death or disability of such employees in an aggregate amount not to exceed $10,000,000 in any Fiscal Year and $30,000,000 in the aggregate since the Effective Date;

(h)    any required payment with respect to, or required early unwind or settlement of, any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, in each case, in accordance with the terms of the agreement governing such Permitted Bond Hedge Transaction or Permitted Warrant Transaction; provided that, to the extent cash is required to be paid under a

98

Permitted Warrant Transaction as a result of the election of "cash settlement" (or substantially equivalent term) as the "settlement method" (or substantially equivalent term) thereunder by the Borrower (or its Affiliate) (including in connection with the exercise and/or early unwind or settlement thereof), the payment of such cash shall not be permitted by this underline(h) other than to the extent such payment is offset against any payments received by the Borrower or any of its Restricted Subsidiaries pursuant to the exercise, settlement, termination or unwind of any related Permitted Bond Hedge Transaction substantially concurrently with, or a commercially reasonable period of time before or after, the unwind or settlement of the relevant Permitted Warrant Transaction, which are not applied or credited toward any payments under Convertible Indebtedness pursuant to clause (c) above.

Section 6.05. *Transactions with Affiliates* . The Borrower and each other Obligor will not, and will not permit any of its Restricted Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates except:

(a)   any such transaction on terms and conditions not less favorable to such Obligor or such Restricted Subsidiary than could be obtained on an arm's-length basis from unrelated third parties;

(b)   payment of reasonable directors' fees, customary out-of-pocket expense reimbursement, indemnities (including the provision of directors and officers insurance), compensation arrangements (including bonuses) and severance arrangements for members of the board of directors, officers or other employees of any Obligor or any of its Subsidiaries;

(c)   transactions between or among Obligors and their Restricted Subsidiaries;

(d)   transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and otherwise not prohibited hereby;

(e)   Restricted Payments permitted by Section 6.04;

(f)   (i) loans or advances to employees, officers and directors and (ii) payroll, travel and similar advances to employees, officers and directors;

(g)   any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans;

(h)   payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of investments by the Borrower and the Restricted Subsidiaries in such joint venture) in the ordinary course of business;

(i)   the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted

99

Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary;

(j)    following a Public Listing, the distribution or dividend of Equity Interests (other than Disqualified Equity Interests permitted by Section 6.01(s)) of the Borrower to the management of any Obligor or any of its Subsidiaries; and

(k)    any other transactions involving payments in an aggregate amount not to exceed $3,000,000 at any time.

Section 6.06.    *Restrictive Agreements* . The Borrower and each other Obligor will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations or (b) the ability of (i) any Restricted Subsidiary to pay dividends or other distributions with respect to any shares of its Equity Interests or to make or repay loans or advances to any Obligor or any other Restricted Subsidiary or (ii) any Obligor or any other Restricted Subsidiary to Guarantee Indebtedness of the Borrower or any other Obligor under the Loan Documents (other than Indebtedness with respect to which such Person is the primary obligor); *provided* that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement or any other Loan Document, (ii) the foregoing shall not apply to prohibitions, restrictions and conditions existing on the date hereof identified on Section 6.06 of the Borrower Disclosure Letter (and any amendments or modifications thereof that do not materially expand the scope of any such prohibition, restriction or condition), (iii) the foregoing shall not apply to customary prohibitions, restrictions and conditions contained in agreements relating to the sale of a Subsidiary (other than the Borrower) or assets of any Obligor or any of its Subsidiaries pending such sale; *provided* such restrictions and conditions apply only to the Subsidiary or assets to be sold and such sale is not prohibited hereunder, (iv) the foregoing shall not apply to any agreement, prohibition, or restriction or condition in effect at the time any Restricted Subsidiary becomes a Restricted Subsidiary, so long as such agreement was not entered into solely in contemplation of such Person becoming a Restricted Subsidiary (and any amendments or modifications thereof that do not materially expand the scope of any such prohibition restriction or condition), (v) the foregoing shall not apply to customary provisions in joint venture agreements and other similar agreements applicable to Joint Ventures, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to purchase money Indebtedness or Capital Lease Obligations permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (vii) clause (a) of the foregoing shall not apply to customary provisions in leases, licenses, sub-leases and sub-licenses and other contracts restricting the assignment thereof, (viii) the foregoing shall not apply to restrictions or conditions set forth in any agreement governing Indebtedness not prohibited by Section 6.01; *provided* that such restrictions and conditions are customary for such Indebtedness and are not materially more restrictive, taken as a whole, than the comparable restrictions and provisions in the Loan Documents; *provided* , *further* , that such restrictions and prohibitions do not prohibit the Obligations from being equally and ratably secured as required by this Agreement (or secured on a senior basis) on terms reasonably satisfactory to the Administrative Agent, (ix) the foregoing shall not apply to restrictions on cash or other deposits

100

(including escrowed funds) imposed under contracts entered into in the ordinary course of business or restrictions imposed by the terms of a Lien permitted under Section 6.02 on the property subject to such Lien and (x) the foregoing shall not apply to any consents or approvals required by the Organizational Documents (as defined in the Security Agreement) of the Borrower or any stockholder's or investor's rights or similar agreements of the Borrower.

ARTICLE 7
FINANCIAL COVENANT

Section 7.01.    *Minimum Liquidity* . As of the last day of each Fiscal Quarter and each Credit Date, Borrower and its Restricted Subsidiaries shall maintain Liquidity of at least $250,000,000.

Section 7.02.    *Minimum Revenue* . As of the last day of each Fiscal Quarter, Consolidated Total Revenue of the Borrower and its Restricted Subsidiaries for the four Fiscal Quarter period then ended shall be equal to or greater than the level corresponding to such period and set forth in the following table:

| Four Fiscal Quarter Period Ending | Consolidated Total Revenue |
| --- | --- |
| July 31, 2019 | $383,000,000 |
| October 31, 2019 | $430,000,000 |
| January 31, 2020 | $480,000,000 |
| April 30, 2020 | $531,000,000 |
| July 31, 2020 | $584,000,000 |
| October 31, 2020 | $642,000,000 |
| January 31, 2021 | $704,000,000 |
| April 30, 2021 | $769,000,000 |
| July 31, 2021 | $838,000,000 |
| October 31, 2021 | $914,000,000 |
| January 31, 2022 | $994,000,000 |
| April 30, 2022 | $994,000,000 |
| July 31, 2022 | $994,000,000 |
| October 31, 2022 | $994,000,000 |
| January 31, 2023 | $1,195,000,000 |
| April 30, 2023 | $1,195,000,000 |
| July 31, 2023 | $1,195,000,000 |
| October 31, 2023 | $1,195,000,000 |

| January 31, 2024, and each such period ending thereafter | $1,370,000,000 |
|---|---|

## ARTICLE 8
## GUARANTY

Section 8.01.    *Guaranty of the Obligations* . The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations (other than, in the case of any Guarantor, any such Obligations with respect to which such Person is the primary obligor) when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of any automatic stay or similar provision of any Debtor Relief Law) (collectively, the " **Guaranteed Obligations** "). Notwithstanding any provision hereof or in any other Loan Document to the contrary, no Obligation in respect of any Secured Hedge Agreement shall be payable by or from the assets of Obligor if such Obligor, is not, at the later of (i) the time such Secured Hedge Agreement is entered into and (ii) the date such person becomes an Obligor, an "eligible contract participant" as such term is defined in Section 1(a)(18) of the Commodity Exchange Act, as amended, and no Obligor shall be deemed to have entered into or guaranteed any Hedging Transaction at any time that such Obligor is not an eligible contract participant.

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Obligor to honor all of its obligations under this Guarantee in respect of Swap Obligations ( *provided* , *however* , that each Qualified ECP Guarantor shall only be liable under this Section 8.01 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.01 , or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 8.01 shall remain in full force and effect until the termination of this Guarantee in accordance with Section 8.07 hereof. Each Qualified ECP Guarantor intends that this Section 8.01 constitute, and this Section 8.01 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Obligor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 8.02.    *Payment by Guarantors* . The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of any automatic stay or similar provision of any Debtor Relief Law), Guarantors will upon demand pay, or cause to be paid, in Cash, to the Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations

102

(including interest which, but for the Borrower's becoming the subject of a case under any Debtor Relief Law, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

Section 8.03.    *Liability of Guarantors Absolute* . Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance that constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability and this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    the Administrative Agent may enforce this Guaranty after the occurrence and during the continuation of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor), and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Beneficiary, upon such terms as it deems appropriate under the relevant Loan Document, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other

103

guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Obligor or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than contingent indemnification obligations for which no claim has been made and the cancellation or expiration or Cash Collateralization of all Letters of Credit in the Agreed L/C Cash Collateral Amount on terms reasonably satisfactory to the applicable Issuing Bank (or other credit support satisfactory to the applicable Issuing Bank has been provided))), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or

104

thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Anything contained in this Agreement to the contrary notwithstanding, the obligations of each Guarantor under this Agreement shall be limited to an aggregate amount equal to the largest amount that would not render its obligations under this Agreement subject to avoidance as a fraudulent transfer or conveyance under applicable law.

Section 8.04.    *Waivers by Guarantors* . Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Obligor or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations (other than contingent indemnification obligations for which no claim has been made and the cancellation or expiration or Cash Collateralization of all Letters of Credit in the Agreed L/C Cash Collateral Amount on terms reasonably satisfactory to the applicable Issuing Bank (or other credit support satisfactory to the applicable Issuing Bank has been provided)); (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction by final and non-appealable judgment); (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto, and (v) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in Section 8.03 and any right to consent to any thereof; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

Section 8.05.    *Guarantors' Rights of Subrogation, Contribution, Etc.* Until the Guaranteed Obligations shall have been paid in full (other than contingent indemnification obligations for which no claim has been made) and the Revolving Commitments shall have

105

terminated and all Letters of Credit shall have expired without being drawn or been cancelled or Cash Collateralized (or other credit support satisfactory to the applicable Issuing Bank has been provided), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other guarantor (including the Guarantors) or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (i) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower or any other guarantor (including the Guarantors) with respect to the Guaranteed Obligations, (ii) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower or any other guarantor (including the Guarantors), and (iii) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been paid in full (other than contingent indemnification obligations for which no claim has been made and the cancellation or expiration or Cash Collateralization of all Letters of Credit in the Agreed L/C Cash Collateral Amount on terms reasonably satisfactory to the applicable Issuing Bank (or other credit support satisfactory to the applicable Issuing Bank has been provided)) and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired without being drawn or been cancelled or Cash Collateralized in the Agreed L/C Cash Collateral Amount on terms reasonably satisfactory to the applicable Issuing Bank (or other credit support satisfactory to the applicable Issuing Bank has been provided), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor (including the Guarantors), shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than contingent indemnification obligations for which no claim has been made) shall not have been paid in full, such amount shall be held in trust for the Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 8.06.     *Subordination of Other Obligations* . Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by such Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of such Guarantor under any other provision hereof.

106

Section 8.07.   *Continual Guaranty* . This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired without being drawn or been cancelled or Cash Collateralized in the Agreed L/C Cash Collateral Amount (or other credit support satisfactory to the applicable Issuing Bank has been provided). Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 8.08.   *Authority of Guarantors or the Borrower* . It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 8.09.   *Financial Condition of the Borrower* . Any Credit Extension may be made to the Borrower or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Beneficiary.

Section 8.10.   *Bankruptcy, Etc*.

(a)   So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Administrative Agent acting pursuant to the instructions of Required Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)   Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in Section 8.10(a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of

107

law or order which may relieve the Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

ARTICLE 9
EVENTS OF DEFAULT

Section 9.01.    *Events of Default* . If any of the following events (each, an " **Event of Default** ") shall occur:

(a)    the Borrower shall fail to pay (i) any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof, the Maturity Date, or at a date fixed for prepayment thereof or otherwise (as applicable) or (ii) when due any amount payable to any Issuing Bank in reimbursement of any drawing under any Letter of Credit;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section 9.01) payable under any of the Loan Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c)    any representation or warranty made or deemed made by the Borrower or any Subsidiary in this Agreement or any other Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document, shall prove to have been incorrect in any material respect when made or deemed made or, in the case of any such representation or warranty qualified by materiality, incorrect in any respect;

(d)    the Borrower or any other Obligor shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), Section 5.03 (solely with respect to the Borrower), Section 5.09, in Article 6 or in Article 7;

(e)    the Borrower or any other Obligor shall fail to observe or perform any covenant, condition or agreement contained in any of the Loan Documents (other than those specified in clause (a), (b) or (d) of this Section 9.01), and such failure shall continue unremedied for a period of 30 days after the earlier of (i) written notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (ii) receipt by the Administrative Agent of the notice required to be given by the Borrower pursuant to Section 5.02(a);

108

(f)    the Borrower or any Restricted Subsidiary shall (i) fail to pay any principal, interest or other amount, regardless of amount, due in respect of any Material Indebtedness (other than the Obligations), when and as the same shall become due and payable (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) beyond any applicable grace period or (ii) after giving effect to any grace period, fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Material Indebtedness, if the failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Material Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Material Indebtedness to become due prior to its stated maturity (or in the case of any such Indebtedness constituting a Guarantee in respect of Indebtedness to become payable) or become subject to a mandatory offer purchase by the obligor; *provided* , that an event or condition described in this clause (ii) shall not include any customary "conversion triggers" included in any Convertible Indebtedness incurred pursuant to Section 6.01(t) .

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Restricted Subsidiary or its debts, or of a substantial part of its assets, under any Debtor Relief Law or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    the Borrower or any Restricted Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Section 9.01, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any binding action for the purpose of effecting any of the foregoing;

(i)    the Borrower or any Restricted Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)    one or more judgments for the payment of money in excess of $20,000,000 in the aggregate shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof (to the extent not paid or covered by a reputable and solvent independent third-party insurance company which has not disputed coverage) and the same shall remain undischarged or unpaid for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Restricted Subsidiary to enforce any such judgment and such action shall not be stayed;

(k)    a Change in Control shall occur;

109

(l)    one or more ERISA Events or Non-U.S. Plan Events shall have occurred, other than as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect; or

(m)    at any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations (other than contingent indemnification obligations for which no claim has been made and the cancellation or expiration or Cash Collateralization of all Letters of Credit in the Agreed L/C Cash Collateral Amount on terms reasonably satisfactory to the applicable Issuing Bank (or other credit support reasonably satisfactory to the applicable Issuing Bank has been provided)) shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations (other than contingent indemnification obligations for which no claim has been made and the cancellation or expiration or Cash Collateralization of all Letters of Credit in the Agreed L/C Cash Collateral Amount on terms reasonably satisfactory to the applicable Issuing Bank (or other credit support reasonably satisfactory to the applicable Issuing Bank has been provided)) in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any material portion of the Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) any Obligor shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by the Lenders or Letters of Credit to be issued, under any Loan Document to which it is a party or shall contest in writing the validity or perfection of any Lien in any material portion of the Collateral purported to be covered by the Collateral Documents;

then, and in every such event (other than an event with respect to any Obligor described in clause (g), (h) or (i) of this Section 9.01), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Revolving Commitments and the obligations of the Issuing Banks to issue any Letter of Credit, and thereupon the Revolving Commitments shall terminate immediately, (ii)(A) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and (B) require that the Borrower Cash Collateralize the Letters of Credit in the Agreed L/C Cash Collateral Amount; and in case of any event with respect to the any Obligor described in clause (g), (h) or (i) of this Section 9.01, the Revolving Commitments shall automatically terminate, each Issuing Bank shall have no obligation to issue Letters of Credit hereunder and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower or such Guarantor accrued hereunder, shall automatically become due and payable,

110

without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Obligor, and (iii) Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Collateral Documents.

Section 9.02.    *Application of Funds.* After the exercise of remedies provided for in Section 9.01 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First* , to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but including fees, charges and disbursements of counsel to the Agents and amounts payable pursuant to Sections 2.17 and 2.18) payable to the Agents in their capacity as such;

*Second* , to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and fees payable to the Lenders and the Issuing Banks (including fees, charges and disbursements of counsel to the respective Lenders and the Issuing Banks and amounts payable pursuant to Sections 2.17 and 2.18)), ratably among them in proportion to the respective amounts described in this clause *Second* payable to them;

*Third* , to payment of that portion of the Obligations constituting accrued and unpaid fees and interest on the Loans, Letter of Credit Usage, Secured Hedge Agreements and other Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth* , to payment of that portion of the Obligations constituting unpaid principal, Letter of Credit Usage and Obligations then owing under Secured Hedge Agreements, ratably among the Secured Parties, in proportion to the respective amounts described in this clause *Fourth* held by them;

*Fifth* , to the Administrative Agent for the account of the applicable Issuing Banks, to Cash Collateralize that portion of Letter of Credit Usage comprised of the aggregate undrawn amount of Letters of Credit at the Agreed L/C Cash Collateral Amount; and

*Last* , the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by applicable law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clauses *Fifth* above shall be applied to satisfy drawings under such Letters of Credit or amounts due on account of such Obligations as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired without being drawn, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above, and thereafter applied as provided in clause " *Last* " above.

Notwithstanding the foregoing, Obligations arising under Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received

111

written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Hedge Bank, as the case may be.

ARTICLE 10
THE AGENTS

Section 10.01.    *Agents* . Each of the Lenders (including in any Lender's other capacity hereunder) and each of the Issuing Banks (each of the foregoing referred to as the "Lenders" for purposes of this Article 10) hereby irrevocably appoints Morgan Stanley Senior Funding, Inc., as each of the Administrative Agent and Collateral Agent and authorizes each Agent to take such actions on its behalf and to exercise such powers as are delegated to any Agent by the terms of this Agreement or any other Loan Document, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Agent is hereby expressly authorized by the Lenders to (i) execute any and all documents (including any release) with respect to the Collateral, as contemplated by and in accordance with the provisions of this Agreement and any other Loan Document, (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the discretion of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender and (iii) to approve or disapprove of any transaction described in Section 6.03. Except, in each case, as set forth in the sixth paragraph of this Article 10, the provisions of this Article 10 are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any such provisions.

The Person serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder and without any duty to account therefor to the Lenders.

Neither Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, neither Agent: (a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02 or in the other Loan Documents); *provided* that such Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law, and (c) shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to

112

the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02) or (ii) in the absence of its own gross negligence or willful misconduct. The Agents shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and such Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent and each Arranger shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent and each Arranger may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent and each Arranger may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as an Agent.

Subject to the appointment and acceptance of a successor Agent as provided in this paragraph, either Agent may resign at any time by notifying the Lenders and the Borrower; *provided* that in no event shall any such successor Administrative Agent be a Defaulting Lender or a Disqualified Institution. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States; so long as no Event of Default shall have occurred and be continuing, the Borrower shall have the

113

right to consent to such successor Administrative Agent (such consent not to be unreasonably withheld or delayed). If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above. Upon the acceptance of its appointment as either Administrative Agent or Collateral Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent (as applicable), and the retiring Administrative Agent or Collateral Agent (as applicable) shall be discharged from its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Article 10). The fees payable by the Borrower to any successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article 10 and Section 11.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as an Agent.

Each Lender acknowledges that it has, independently and without reliance upon either Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Anything herein to the contrary notwithstanding, none of the Arrangers shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, Collateral Agent, an Issuing Bank or a Lender hereunder.

Further, each Secured Party hereby irrevocably authorizes the Collateral Agent:

(a)    to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon satisfaction of any conditions to release specified in any Collateral Document, (ii) that is disposed of or to be disposed of as part of or in connection with any disposition permitted hereunder or under any other Loan Document to any Person other than an Obligor, (iii) subject to Section 11.02, if approved, authorized or ratified in writing by the Required Lenders or such other percentage of Lenders required thereby, (iv) owned by a Guarantor upon release of such Guarantor from its obligations under this Agreement, or (v) as expressly provided in the Collateral Documents;

(b)    to release any Guarantor from its obligations hereunder if such Person ceases to be a Domestic Restricted Subsidiary as a result of a transaction permitted hereunder; and

(c)    upon request of the Borrower, to take such actions as shall be required to subordinate any Lien on any property granted to the Collateral Agent to the holder of a Lien

114

permitted by Section 6.02 or to enter into any intercreditor agreement with the holder of any such Lien.

Upon request by the Collateral Agent at any time, the Required Lenders (or Lenders, as applicable) will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property, or to release any Guarantor from its obligations hereunder pursuant to this paragraph. In each case as specified in this Article 10, the Collateral Agent will, at the Borrower's expense, execute and deliver to the applicable Obligor such documents as such Obligor may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted pursuant to the Loan Documents, or to release such Guarantor from its obligations hereunder, in each case in accordance with the terms of this Article 10.

Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent, each Lender and each other Secured Party hereby agree that (i) no Secured Party (other than the Collateral Agent) shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Collateral Agent, on behalf of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

Any such release of Guaranteed Obligations or otherwise shall be deemed subject to the provision that such Guaranteed Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 10.02.    *Certain ERISA Matters* .

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arrangers and their respective Affiliates, and not, for the

115

avoidance of doubt, to or for the benefit of the Borrower or any other Obligor, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Revolving Commitments,

(ii)      the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from the prohibitions of Section 406 of ERISA and Section 4975 of the Code such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Obligor, that none of the Administrative Agent or the Arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Loans, the Letters of Credit, the Revolving Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the

116

Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

Section 10.03.    *Additional Secured Parties* . The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not an Agent, Lender or Issuing Bank as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent or the Collateral Agent, or, in any event in the case of Secured Hedge Agreement counterparties, shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent or the Collateral Agent) this Article 10 and Sections 11.03(c) , 11.09 , 11.10 and 11.12 and the decisions and actions of the Administrative Agent, the Collateral Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; *provided* , *however* , that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 11.03(c) only to the extent of liabilities, costs and expenses with respect to or otherwise relating to the Collateral, (b) each of the Administrative Agent, Collateral Agent and Lenders shall be entitled to act without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

ARTICLE 11
MISCELLANEOUS

Section 11.01.    *Notices.* Except in the case of notices and other communications expressly permitted to be given by telephone, (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy (or other electronic image scan transmission (e.g., pdf via email)), as follows:

    (i)    if to the Borrower or any other Obligor, to the Borrower at:

        Slack Technologies, Inc.
        500 Howard Street
        San Francisco, California 94105
        Attention: Gabe Stern and Brandon Zell
        Telephone No.: (855) 980-5920

        with a copy (which shall not constitute notice) to:

        Goodwin Procter LLP

117

3 Embarcadero Center
San Francisco, California 94111
Attention: Fred Lim and David Van Horne
Email Address: FLim@goodwinlaw.com and DVanhorne@goodwinlaw.com
Telephone No.: (415) 733-6000
Facsimile No.: (415) 677-9041

    (ii)    if to the Administrative Agent, to it at

Morgan Stanley Senior Funding, Inc.
1 New York Plaza, 41 st Floor
New York, New York, 10004
Attention: Agency Team
Email Address: msagency@morganstanley.com
Telephone No.: (212) 507-6680
Facsimile No.: (917) 260-5235

with a copy to

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Attention: Jason Bosworth and Josh Holt
Email Address: Jason.Bosworth@lw.com and Josh.Holt@lw.com
Telephone No.: (213) 485-1234
Facsimile No.: (213) 891-8763; and

    (iii)    if to any Lender or Issuing Bank to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in clause (b) below, shall be effective as provided in such clause (b).

(b)    Notices and other communications to the Lenders or any Issuing Bank hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender or Issuing Bank. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to

118

procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

The Borrower and each other Obligor agrees that the Administrative Agent and the Collateral Agent may make the Communications (as defined below) available to the Lenders or the Issuing Banks by posting the Communications on IntraLinks, the Internet or another similar electronic system (the " **Platform** "). THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications effected thereby (the " **Communications** "). No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent, the Collateral Agent or any of their respective Related Parties (collectively, the " **Agent Parties** ") be responsible or liable for damages arising from the unauthorized use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission, except to the extent that such damages have resulted from the willful misconduct or gross negligence of such Agent Party (as determined in a final, non-appealable judgment by a court of competent jurisdiction).

Section 11.02.    *Waivers; Amendments.* (a) No failure or delay by the Administrative Agent, the Collateral Agent, any Issuing Bank or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Obligor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 11.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which it is given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, the Collateral Agent, any Issuing Bank or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    None of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the other Obligors and the Required Lenders or by the Borrower and the other Obligors and the Administrative Agent with the consent of the Required Lenders; *provided* , *however* , that no such amendment, waiver or consent shall: (i) extend or increase the Revolving Commitment of any Lender without the written consent of such Lender,

119

(ii) reduce the principal amount of any Loan or Letter of Credit or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender or Issuing Bank directly affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, postpone the scheduled date of expiration of any Revolving Commitment, or extend the expiration date for any Letter of Credit beyond the Maturity Date, without the written consent of each Lender or Issuing Bank directly affected thereby; *provided* , *however* , that notwithstanding clause (ii) or (iii) of this Section 11.02(b), (x) only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate set forth in Section 2.08 and (y) any waiver of a Default shall not constitute a reduction of interest for this purpose, (iv) change Section 2.19(a), Section 2.19(b), or any other Section hereof providing for the ratable treatment of the Lenders or change the definition of "Pro Rata Share", in each case in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) release all or substantially all of the value of any Guaranty, or the Collateral without the written consent of each Lender and each Issuing Bank, except to the extent the release of any Guarantor or Collateral is permitted pursuant to Section 5.13(a), Article 10 or Section 11.17 (in which case such release may be made by the Collateral Agent and/or the Administrative Agent acting alone), (vi) change any of the provisions of this Section or the percentage referred to in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, (vii) waive any condition set forth in Section 4.01 (other than as it relates to the payment of fees and expenses of counsel), or, in the case of any Loans made or Letters of Credit issued on the Effective Date, Section 4.02, without the written consent of each Lender and each Issuing Bank (as applicable) and (viii) affect the rights or duties of an Issuing Bank hereunder without the prior written consent of such Issuing Bank. Notwithstanding anything to the contrary herein, (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent or any Arranger hereunder without the prior written consent of the Administrative Agent, the Collateral Agent or such Arranger, as applicable, (ii) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender and (iii) this Agreement may be amended to provide for a New Revolving Loan Commitment in the manner contemplated by Section 2.23 without the consent of the Required Lenders.

Section 11.03.     *Expenses; Indemnity; Damage Waiver* .

(a)     The Borrower shall pay (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent, the Lenders and the Arrangers in connection with the syndication of the Loans and with the preparation, negotiation, execution and delivery of the Loan Documents and any security arrangements in connection

120

therewith and, solely with respect to the Administrative Agent and the Collateral Agent, any amendment, waiver or other modification (including proposed amendments, waivers or other modifications) with respect thereto (including reasonable fees, out-of-pocket expenses and disbursements of outside counsel (limited to one outside counsel and, if reasonably necessary, one outside counsel per applicable jurisdiction and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another outside counsel per applicable jurisdiction for such affected Person)) for the Administrative Agent, the Collateral Agent, the Arrangers and the Lenders, taken as a whole; *provided* that the Borrower's obligations under this clause (i), solely with respect to the preparation, execution and delivery of the Loan Documents on the Effective Date, shall be subject to the limitations provided for in the Engagement Letter and (ii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders (including reasonable fees, out-of-pocket expenses and disbursements of outside counsel (limited to one outside counsel and, if reasonably necessary, one outside counsel per applicable jurisdiction and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another outside counsel per applicable jurisdiction for such affected Person)) in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 11.03, or in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     The Borrower shall indemnify the Administrative Agent, Arrangers, the Collateral Agent, each Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an " **Indemnitee** ") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, reasonable out-of-pocket costs or expenses, including the reasonable legal fees and expense of any outside counsel (limited to one outside counsel and, if reasonably necessary, one outside counsel per applicable local jurisdiction and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another outside counsel per applicable jurisdiction for such affected Person) for any Indemnitee, incurred by or asserted against any Indemnitee by any third party or by the Borrower or any other Obligor arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Obligors or any of their respective Subsidiaries, or any Environmental Liability related in any way to the Obligors or any of their respective Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or the Borrower or any Affiliate of the Borrower); *provided* that such indemnity shall not, as to any Indemnitee, be available (w) with respect to Taxes (and amounts

121

relating thereto) (other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim), the indemnification for which shall be governed solely and exclusively by Section 2.18, (x) with respect to such losses, claims, damages, liabilities, costs or reasonable and documented expenses that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or a material breach of this Agreement or any other Loan Document by such Indemnitee, (y) resulting from any dispute between and among Indemnitees, that does not involve an act or omission by the Obligors or their respective Subsidiaries (as determined by a court of competent jurisdiction in a final non-appealable decision) (other than any proceeding against the Agents, the Issuing Banks or the Arrangers or any other Person acting as an agent or arranger with respect to the revolving credit facility provided hereunder, in each case, acting in such capacity) and (z) to the extent resulting from a settlement agreement related thereto without the written consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided that (1) the Borrower shall be deemed to consent to such settlement if it does not respond to the indemnified party's request within 5 business days, (2) the foregoing indemnity will nevertheless apply if the Borrower shall have been offered an opportunity to assume the defense of such matter and shall have declined to do so and (3) if settled with the Borrower's consent or if there is a final judgment for the plaintiff in such proceeding, the Borrower agrees to indemnify and hold harmless each indemnified party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this paragraph.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section 11.03, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as applicable, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent, as applicable, in its capacity as such.

(d)    Without limiting in any way the indemnification obligations of the Borrower pursuant to Section 11.03(b) or of the Lenders pursuant to Section 11.03(c), to the extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

122

(e)     All amounts due under this Section 11.03 shall be payable promptly after written demand therefor.

Section 11.04.     *Successors and Assigns* .

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, each Lender and each Issuing Bank (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 11.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby), Participants (to the extent provided in paragraph (c) of this Section 11.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Banks and the Lenders, any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (c) Subject to the conditions set forth in paragraph (b) (ii) below, any Lender may assign to one or more assignees (but not to any Obligor, any Subsidiary or an Affiliate thereof or any Disqualified Institution or any natural person) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(1)     the Borrower; *provided* that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund immediately prior to such assignment or, if an Event of Default under Section 9.01(a), (b), (g), (h) or (i) has occurred and is continuing, any other assignee; *provided, further* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) days after having received notice thereof;

(2)     the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment to any Lender, an Affiliate of a Lender or an Approved Fund; and

(3)     the Issuing Banks; *provided* that no consent of the Issuing Banks shall be required for an assignment to any Lender.

(ii)     Assignments shall be subject to the following additional conditions:

(1)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment or Loans, the amount of the Revolving Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the

123

Administrative Agent) shall not be less than $1,000,000 (or a greater amount that is an integral multiple of $1,000,000) unless each of the Borrower and the Administrative Agent otherwise consent; *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(2)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(3)     unless otherwise agreed to by the Administrative Agent in its sole discretion, the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(4)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Related Parties or its securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(5)     no such assignment shall be made to (1) any Obligor nor any Subsidiary or Affiliate of a Obligor, (2) any Defaulting Lender or any of its subsidiaries, or (3) any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (5); and

(6)     in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

124

For the purposes of this Section 11.04, the term " **Approved Fund** " has the following meaning:

" **Approved Fund** " means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section 11.04, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.16, Section 2.17, Section 2.18 and Section 11.03); *provided* that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 11.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 11.04.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a Register for the recordation of the names and addresses of the Lenders, and the Revolving Commitment of, and amounts on the Loans owing to, each Lender pursuant to the terms hereof from time to time. The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 11.04(b)(iv), except to the extent that such losses, claims, damages or liabilities are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent. The Loans (including principal and interest) are registered obligations and the right, title, and interest of any Lender or its assigns in and to such Loans shall be transferable only upon notation of such transfer in the Register. In no event shall the Administrative Agent be obligated to

125

ascertain, inquire into or monitor as to whether any Lender or prospective assignee is a Disqualified Institution or enforce compliance with the provisions hereof relating to Disqualified Institutions.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b)(ii)(C) of this Section 11.04 and any written consent to such assignment required by paragraph (b)(i) of this Section 11.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.14(g), Section 2.19(c) or Section 11.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i) Any Lender may, without the consent of, or notice to, the Borrower or any other Obligor, the Administrative Agent or any Issuing Bank, sell participations to one or more banks or other entities (but not to the Borrower, any Subsidiary or an Affiliate thereof or any natural person) (a " **Participant** ") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Collateral Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 11.02(b) that affects such Participant. Subject to paragraph (c) (ii) of this Section 11.04, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.16, Section 2.17 ( *provided* that it complies with the obligations contained therein) and Section 2.18 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 11.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; *provided* such Participant agrees to be subject to Section 2.19(b) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.17 or Section 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

126

(iii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the " **Participant Register** "); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or Central Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     (i) No assignment shall be made to any Person that was a Disqualified Institution as of the date (the " **Trade Date** ") on which the assigning Lender entered into a binding agreement to sell and assign all or a portion of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment in writing in its sole and absolute discretion, in which case such Person will not be considered a Disqualified Institution for the purpose of such assignment). For the avoidance of doubt, with respect to any assignee that becomes a Disqualified Institution after the applicable Trade Date (including as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "Disqualified Institution"), (x) such assignee shall not retroactively be disqualified from becoming a Lender, and (y) the execution by the Borrower of an Assignment and Assumption with respect to such assignee will not by itself result in such assignee no longer being considered a Disqualified Institution. Any assignment in violation of this clause (e)(i) shall not be void, but the other provisions of this clause (e) shall apply.

(f)     If any assignment is made to any Disqualified Institution without the Borrower's prior written consent in violation of clause (e)(i) above, or if any Person becomes a Disqualified Institution after the applicable Trade Date, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, terminate any Revolving Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution in connection with such Revolving Commitment.

127

(g)    Notwithstanding anything to the contrary contained in this Agreement, Disqualified Institutions (i) will not (x) have the right to receive information, reports or other materials provided to Lenders by the Obligors, the Administrative Agent or any other Lender, (y) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (z) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (ii) (x) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Institution will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Institutions consented to such matter, and (y) for purposes of voting on any Plan, each Disqualified Institution party hereto hereby agrees (1) not to vote on such Plan, (2) if such Disqualified Institution does vote on such Plan notwithstanding the restriction in the foregoing clause (1), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (3) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (2).

(h)    The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent, to (i) post the list of Disqualified Institutions provided by the Borrower and any updates thereto from time to time (collectively, the " **DQ List** ") on the Platform, including that portion of the Platform that is designated for "public side" Lenders and/or (ii) provide the DQ List to each Lender requesting the same. The Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of loans, or disclosure of confidential information to, or the restrictions on any exercise of rights or remedies of, any Lender.

Section 11.05.    *Survival* . All covenants, agreements, representations and warranties made by the Obligors and their respective Subsidiaries herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Collateral Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Revolving Commitments have not expired or terminated. The provisions of Section 2.16, Section 2.17, Section 2.18 and Section 11.03 and Article 10 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Revolving Commitments or the Letters of Credit, the resignation of the Administrative Agent or the

128

Collateral Agent, the replacement of any Issuing Bank, any Lender, or the termination of this Agreement or any provision hereof.

Section 11.06.     *Counterparts; Integration; Effectiveness* . This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic image scan transmission (e.g., pdf via email) shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.07.     *Severability* . Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 11.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 11.08.     *Right of Setoff* . If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower and each other Obligor against any of and all the obligations of the Borrower and each other Obligor now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 11.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such

129

setoff and application. No amounts set off from any Obligor shall be applied to any Excluded Swap Obligations of such Obligor.

Section 11.09.    *Governing Law; Jurisdiction; Consent to Service of Process .*

(a)    THIS AGREEMENT ANY CLAIM, CONTROVERSY OR DISPUTE UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER BASED IN CONTRACT (AT LAW OR IN EQUITY), TORT OR ANY OTHER THEORY, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY ISSUING BANK OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER OBLIGOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION. THE BORROWER AND EACH OTHER OBLIGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION 11.09(B). EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.01. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

130

Section 11.10.  ***WAIVER OF JURY TRIAL* . EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10.**

Section 11.11.  *Headings* . Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 11.12.  *Confidentiality* .

(a)  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) and to not use the Information for any purpose except in connection with the Loan Documents, or other services provided to the Obligors or their Subsidiaries except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, legal counsel, independent auditors, professionals and other experts, agent or advisors, or to any credit insurance provider relating to the Borrower and its obligations, in each case whom it reasonably determines needs to know such information in connection with this Agreement and the transactions contemplated hereby (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and advised of their obligation to keep such Information confidential), (ii) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law or compulsory legal process or to the extent requested or required by governmental and/or regulatory authorities, in each case based on the reasonable advice of their legal counsel (in which case the Administrative Agent and/or the Lenders, as applicable, agree (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority or in cases where any governmental and/or regulatory authority had requested otherwise), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform the Borrower promptly thereof prior to disclosure), (iii) upon the request or demand of any regulatory authority having or purporting to have jurisdiction over the Administrative Agent or the Lenders or any of their respective affiliates (in which case the Administrative Agent and/or the Lenders agree, as applicable, to the extent practicable and not prohibited by applicable law, to inform the Borrower promptly thereof prior to disclosure (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority or in cases where any governmental and/or regulatory authority had requested otherwise)), (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or any suit, action or

131

proceeding relating to this Agreement or the enforcement of rights hereunder, (vi) to the extent that such information is received by the Administrative Agent or any Lender from a third party that is not, to the Administrative Agent's or such Lender's knowledge, as applicable, subject to contractual or fiduciary confidentiality obligations owing to the Borrower or any of its Affiliates, (vii) to the extent that such information is independently developed by the Administrative Agent or any Lender without use of the Information, (viii) to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations; *provided* that the disclosure of any such information to any assignee or prospective assignee or Participants or prospective Participants shall be made subject to the acknowledgment and acceptance by such assignee or prospective assignee or Participant or prospective Participant that the Information is being disseminated on a confidential basis (on substantially the terms set forth in this Section 11.12 or other provisions that are at least as restricted as this Section 11.12 or as is otherwise reasonably acceptable to the Borrower and the Administrative Agent or such Lender, as applicable, including, without limitation, in accordance with customary market standards for dissemination of such type of information), (ix) with the written consent of the Borrower, or (x) to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.12. For the purposes of this Section 11.12, " **Information** " means all written information received from the Borrower, relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section 11.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information, but not less than a reasonable degree of care. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement and the Revolving Commitments.

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 11.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER AND EACH ISSUING BANK REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE

132

AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 11.13.    *Interest Rate Limitation* . Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the " **Charges** "), shall exceed the maximum lawful rate (the " **Maximum Rate** ") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 11.14.    *No Advisory or Fiduciary Responsibility* .

(a)    In connection with all aspects of each Transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Obligors acknowledge and agree, and acknowledge their respective Subsidiaries' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arrangers, the Issuing Banks and the Lenders are arm's-length commercial transactions between the Obligors and their respective Affiliates, on the one hand, and the Administrative Agent, the Collateral Agent, the Arrangers, the Issuing Banks and the Lenders, on the other hand, (ii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the Transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Administrative Agent, the Collateral Agent, the Arrangers, the Issuing Banks and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Obligor or any of its Subsidiaries, or any other Person and (ii) none of the Administrative Agent, the Collateral Agent, any Arranger, the Issuing Banks nor any Lender has any obligation to any Obligor or any of its Affiliates with respect to the Transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Collateral Agent, the Arrangers, the Issuing Banks and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Obligors and their respective Affiliates, and none of the Administrative Agent, the Collateral Agent, any Arranger, the Issuing Banks nor any Lender has any obligation to disclose any of such interests to any Obligor or its Affiliates. Each of the Borrower and other Obligors agrees that it will not claim that any of the Administrative Agent, the Arrangers, the Issuing Banks, the Lenders and their respective affiliates has rendered advisory services of any nature or

133

respect or owes a fiduciary duty or similar duty to it in connection with any aspect of any transaction contemplated hereby.

(b)   The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into or monitor as to whether any Participant, Lender or prospective assignee or Participant is a Disqualified Institution or enforce compliance with the provisions hereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, inquire into or monitor as to whether any Participant, Lender or prospective assignee or Participant is a Disqualified Institution or enforce compliance with the provisions hereof relating to Disqualified Institutions or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

Section 11.15.    *Electronic Execution of Assignments and Certain Other Documents* . The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.16.    *USA PATRIOT Act* . Each Issuing Bank and each Lender that is subject to the requirements of the USA Patriot Act hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and each other Obligor, which information includes the name and address of the Borrower and each other Obligor and other information that will allow such Lender to identify the Borrower and each other Obligor in accordance with the USA Patriot Act. The Borrower shall, promptly following a request by the Administrative Agent, such Issuing Bank or such Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

Section 11.17.    *Release of Guarantors.* In the event that all the Equity Interests in any Guarantor are sold, transferred or otherwise disposed of to a Person that is not, and is not required to become, an Obligor, in a transaction permitted under this Agreement, the Administrative Agent shall, at the Borrower's expense, promptly take such action and execute such documents as the Borrower may reasonably request to terminate the guarantee of such Guarantor.

Section 11.18.    *Acknowledgement and Consent to Bail-In of EEA Financial Institutions* .

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any party hereto that is an EEA Financial Institution arising

134

under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 11.19.    *Acknowledgement Regarding Any Supported QFCs* . To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Transactions or any other agreement or instrument that is a QFC (such support, " **QFC Credit Support** " and each such QFC a " **Supported QFC** "), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the " **U.S. Special Resolution Regimes** ") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a " **Covered Party** ") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the

135

Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 11.19, the following terms have the following meanings:

" **BHC Act Affiliate** " of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

" **Covered Entity** " means any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

" **Default Right** " has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

" **QFC** " has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

136

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<div style="margin-left: 50%;">

SLACK TECHNOLOGIES, INC.,
as the Borrower


By:    /s/ Allen Smith
      Name:   Allen Smith
      Title:    Chief Financial Officer


ASTRO TECHNOLOGY, INC.,
as a Guarantor


By:    /s/ Brandon Zell
      Name:   Brandon Zell
      Title:    Chief Financial Officer, Chief
               Financial Officer and Secretary

</div>

MORGAN STANLEY SENIOR
FUNDING, INC.,
as Administrative Agent, as Collateral
Agent, as Issuing Bank and as Lender


By:    /s/ Brian Sanderson

      Name:   Brian Sanderson
      Title:    Authorized Signatory

GOLDMAN SACHS LENDING PARTNERS LLC,
as Issuing Bank and as Lender


By:     /s/ Ryan Durkin
        Name:   Ryan Durkin
        Title:    Authorized Signatory

[Signature Page to Credit Agreement]

CREDIT SUISSE AG,
CAYMAN ISLAND BRANCH,
as Issuing Bank and as Lender


By:  /s/ Judith Smith
     _____
     Name:  Judith Smith
     Title:    Authorized Signatory


By:  /s/ Emerson Almeida
     _____
     Name:  Emerson Almeida
     Title:    Authorized Signatory

[Signature Page to Credit Agreement]

KEYBANK NATIONAL ASSOCIATION,
as Issuing Bank and as Lender


By:    /s/ Geoff Smith
       Name:   Geoff Smith
       Title:    Senior Vice President

[Signature Page to Credit Agreement]

ROYAL BANK OF CANADA,
as Issuing Bank and as Lender


By:    /s/ Nicholas Heslip

       Name:   Nicholas Heslip
       Title:    Authorized Signatory

[Signature Page to Credit Agreement]

**Schedule 2.01**
Revolving Commitments and Letter of Credit Issuer Sublimit

Revolving Commitments

| Lender | Revolving Commitments |
|---|---|
| Morgan Stanley Senior Funding, Inc. | $75,000,000.00 |
| Goldman Sachs Lending Partners LLC | $75,000,000.00 |
| Credit Suisse AG Cayman Island Branch | $30,000,000.00 |
| Royal Bank of Canada | $25,000,000.00 |
| KeyBank National Association | $10,000,000.00 |
| Total | $215,000,000.00 |

Letter of Credit Issuer Sublimit

| Issuing Bank | Letter of Credit Issuer Sublimit |
|---|---|
| Morgan Stanley Senior Funding, Inc. | $26,162,790.70 |
| Goldman Sachs Lending Partners LLC | $26,162,790.70 |
| Credit Suisse AG Cayman Island Branch | $10,465,116.28 |
| Royal Bank of Canada | $8,720,930.23 |
| KeyBank National Association | $3,488,372.09 |
| Total | $75,000,000.00 |

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Slack Technologies, Inc.:

We consent to the use of our report included herein and to the reference to our firm under the heading "Experts" in the prospectus.

/s/ KPMG LLP

San Francisco, California
May 31, 2019