Melissa A. Fortunato (CA BAR #319767)
Marion C. Passmore (CA BAR #228474)
**BRAGAR EAGEL & SQUIRE, P.C.**
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
Email: fortunato@bespc.com
        passmore@bespc.com

*Counsel for Fiyyaz Pirani*

[Additional counsel on signature page.]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TYLER DENNEE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SLACK TECHNOLOGIES, INC., STEWART BUTTERFIELD, ALLEN SHIM, BRANDON ZELL, ANDREW BRACCIA, EDITH COOPER, SARAH FRIAR, JOHN O'FARRELL, CHAMATH PALIHAPITIYA, GRAHAM SMITH, ACCEL GROWTH FUND IV ASSOCIATES L.L.C., ACCEL GROWTH FUND INVESTORS 2016 L.L.C., ACCEL LEADERS FUND ASSOCIATES L.L.C., ACCEL LEADERS FUND INVESTORS 2016 L.L.C., ACCEL X ASSOCIATES L.L.C., ACCEL INVESTORS 2009 L.L.C., ACCEL XI ASSOCIATES L.L.C., ACCEL INVESTORS 2013 L.L.C., ACCEL GROWTH FUND III ASSOCIATES L.L.C., AH EQUITY PARTNERS I L.L.C., A16Z SEED-III LLC, SOCIAL+ CAPITAL PARTNERSHIP GP II, L.P., SOCIAL+CAPITAL PARTNERSHIP GP II LTD., SOCIAL+CAPITAL PARTNERSHIP GP III LP, SOCIAL+ CAPITAL PARTNERSHIP GP III, LTD., SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP L.P., and SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP LTD.,<br><br>Defendants. | Case No. 3:19-CV-05857-SI<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Hearing**<br>Date:  March 6, 2020<br>Time:  10:00 a.m.<br>Location:  Courtroom 1, 17th Floor<br>Judge:  Hon. Susan Illston |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................................. 3

  A.    The Lead Up to the Offering.................................................................................. 3

  B.    Slack Faced Material Risks Prior to its Direct Offering That Were Not Disclosed in the Offering Materials.......................................................................................... 4

  C.    Slack Goes Public Through a "Direct Listing"...................................................... 5

  D.    Company Insiders Reap Significant Financial Benefits ......................................... 6

  E.    The Undisclosed Risks Come to Fruition ............................................................. 6

III.  ARGUMENT ...................................................................................................................... 6

  A.    Relevant Legal Standards ...................................................................................... 6

  B.    Plaintiff Has Standing to Pursue Section 11 Claims.............................................. 7

  C.    Plaintiff Has Standing to Pursue Section 12 Claims............................................ 10

  D.    Plaintiff is Not Required to Establish Damages Under the Securities Act at the Pleading Stage..................................................................................................... 13

  E.    The Complaint Adequately Pleads Material Misrepresentations and Omissions in the Offering Materials.......................................................................................... 14

      1.    Misstatements Concerning Slack's Outages and Service Level Agreements ................................................................................................ 14

      2.    Misstatements Concerning Slack's Ability to Scale the Company ............. 19

      3.    Misstatements Concerning Competition from Microsoft ........................... 20

      4.    Misstatements Concerning Slack's "Key Benefits" ................................... 21

      5.    Misstatements Concerning Slack's Go-To-Market Strategy ...................... 21

  F.    The Complaint Adequately Alleges Section 15 Liability ...................................... 23

IV.   CONCLUSION.................................................................................................................. 26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:19-CV-05857-SI

# TABLE OF AUTHORITIES

## CASES

*In re Am. Apparel, Inc. S'holder Litig.*,
  No. CV 10-06352 MMM (RCx), 2013 U.S. Dist. LEXIS 189797 (C.D. Cal. Aug. 8, 2013) ..... 25

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ................................................................................................ 18

*In re Ariad Pharms., Inc. Sec. Litig.*,
  98 F. Supp. 3d 147 (D. Mass. 2015) ......................................................................................... 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................. 7

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..................................................................................... 7

*Backe v. Novatel Wireless, Inc.*,
  642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................................................... 18

*Batwin v. Occam Networks, Inc.*,
  No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365 (C.D. Ca. July 1, 2008) ......... 24, 25

*Beaver Cty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015) ................................................................................ 15, 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................................. 7

*Bielousov v. GoPro, Inc.*,
  No. 16-cv-06654-CW, 2017 U.S. Dist. LEXIS 117223 (N.D. Cal. July 26, 2017) ................. 23

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) .................................................................................................. 17

*Casella v. Webb*,
  883 F.2d 805 (9th Cir. 1989) .................................................................................................. 22

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ....................................................................................... 12, 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................................. 13

ii

*In re CytRx Corp. Sec. Litig.*,
  No. CV 14-1956-GHK (PJWx), 2015 U.S. Dist. LEXIS 91447 (C.D. Cal. July 13, 2015) ........ 24

*In re DSP Grp., Inc. Sec. Litig.*,
  No. C 95-4025-CAL, 1997 U.S. Dist. LEXIS 11942 (N.D. Cal. Mar. 5, 1997) ........................ 17

*In re Dynavax Sec. Litig.*,
  No. 4:16-cv-06690-YGR, 2018 U.S. Dist. LEXIS 93831 (N.D. Cal. June 4, 2018) .................. 17

*In re Extreme Networks, Inc.*,
  No. 15-cv-04883-BLF, 2018 U.S. Dist. LEXIS 46638 (N.D. Cal. Mar. 21, 2018) ..................... 21

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................................................... 19

*Flecker v. Hollywood Entm't Corp.*,
  Civil No. 95-1926-MA, 1997 U.S. Dist. LEXIS 5329 (D. Or. Feb. 12, 1997) ........................... 16

*In re Fortune Sys. Sec. Litig.*,
  680 F. Supp. 1360 (N.D. Cal. 1987) ...................................................................................... 13

*Fouad v. Isilon Sys., Inc.*,
  No. C07-1764 MJP,  2008 U.S. Dist. LEXIS 105870 (W.D. Wash. Dec. 29, 2008) ................. 11

*Friedman v. Rayovac Corp.*,
  295 F. Supp. 2d 957 (W.D. Wis. 2003) ............................................................................... 15, 20

*FTC v. Cyberspace.com, LLC*,
  453 F.3d 1196 (9th Cir. 2006) .............................................................................................. 15

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 U.S. Dist. LEXIS 18304 (N.D. Cal. Feb. 12, 2015) ....................................................... 17

*In re Gap Stores Sec. Litig.*,
  79 F.R.D. 283 (N.D. Cal. 1978) ............................................................................................ 11

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................................ 7, 15

*Gray v. First Winthrop Corp.*,
  82 F.3d 877 (9th Cir. 1996) .................................................................................................. 16

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994) ...................................................................................... 26

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ............................................................................................................. 11

iii

*Herman & Maclean v. Huddleston*,
　459 U.S. 375 (1983).............................................................................................................. 6

*Hertzberg v. Dignity Partners*,
　191 F.3d 1076 (9th Cir. 199) ................................................................................................ 9

*Hildes v. Arthur Andersen LLP*,
　734 F.3d 854 (9th Cir. 2013) ................................................................................................ 6

*Howard v. Everex Sys.*,
　228 F.3d 1057 (9th Cir. 2000) ............................................................................................ 24

*In re Iso Ray Sec. Litig.*,
　189 F. Supp. 3d 1057 (E.D. Wash. 2016) ........................................................................... 16

*In re JDS Uniphase Corp. Sec. Litig.*,
　No. C 02-1486 CW, 2003 U.S. Dist. LEXIS 28726 (N.D. Cal. Nov. 3, 2003) ............................ 7

*J&R Mktg. v. GMC*,
　549 F.3d 384 (6th Cir. 2008) .............................................................................................. 18

*Khoja v. Orexigen Therapeutics, Inc.*,
　899 F.3d 988 (9th Cir. 2018) ................................................................................................ 1

*Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*,
　416 F.3d 940 (9th Cir. 2005) .............................................................................................. 16

*Maldonado v. Dominguez*,
　137 F.3d 1 (1st Cir. 1998).................................................................................................... 11

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)......................................................................................................... 7, 18

*Miller v. Thane Int'l, Inc.*,
　519 F.3d 879 (9th Cir. 2008) .............................................................................................. 18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
　592 F.3d 347 (2d Cir. 2010) ........................................................................................... 6, 21

*Mulligan v. Impax Labs., Inc.*,
　36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................... 22

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000) ............................................................................................... 17

*O'Sullivan v. Trident Microsystems, Inc.*,
　No. 93 Civ. 20621, 1994 U.S. Dist. LEXIS 17065 (N.D. Cal. Jan. 31 1994) ........................... 25

iv

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996) ............................................................................................................ 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)................................................................................................................ 7

*Pinter v. Dahl*,
    486 U.S. 622 (1988)............................................................................................................. 11, 12

*Plotkin v. IP Axess Inc., Etc.*,
    407 F.3d 690 (5th Cir. 2005) .................................................................................................... 17

*In re Puda Coal Sec. Inc. Litig.*,
    No. 11 Civ. 2598 (KEF), 2013 U.S. Dist. LEXIS 142081 (S.D.N.Y. Oct. 1, 2013) .................. 12

*Primo v. Pac. Biosciences of Cal., Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) .................................................................................... 11

*In re Quality Sys.*,
    865 F.3d 1130 (9th Cir. 2017) .................................................................................................. 22

*In re Questcor Sec. Litig.*,
    SA CV 12-01623 Civ. 1623, 2013 U.S. Dist. LEXIS 142865 (C.D. Cal. Oct. 1, 2013) ............. 15

*Rabkin v. Lion Biotechnologies, Inc.*,
    No. 17-cv-02086-SI, 2018 U.S. Dist. LEXIS 25326 (N.D. Cal. Feb. 15, 2018) ........................ 23

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) .................................................................................... 14

*Robinson v. Audience, Inc.*,
    No. 1:12-cv-232227, 2013 Cal. Super. LEXIS 1358
    (Cal. Super. Ct., Cty. of Santa Clara Sept. 3, 2013) ................................................................ 17

*Rubke v. Capital Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .................................................................................................. 20

*Shaw v. Dig. Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)..................................................................................................... 12

*Sloman v. Presstek, Inc.*,
    No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475 (D.N.H. Sept. 18, 2007).............................. 20

*In re Snap Inc. Sec. Litig.*,
    No. 17-cv-03679-SVW-AGR, 2018 U.S. Dist. LEXIS 97704 (C.D. Cal. June 7, 2008)............ 13

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    C 99-00109 SBA, 2000 U.S. Dist. LEXIS 15370 (N.D. Cal. Sept. 29, 2000) ............................ 25

v

*In re STEC Inc. Sec. Litig.*,
    SACV 09-Civ. 1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75083 (C.D. Cal. June 17, 2011) .. 15

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ................................................................................................ 16

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
    690 F. Supp. 2d 959 (D. Az. 2010) ........................................................................................ 25

*Tellabs, Inv. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................................. 7

*Thomas v. Magnachip SemiConductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................................. 25

*In re Thoratec Corp. Sec. Litig.*,
    No. C-04-03168 RMW, 2006 U.S. Dist. LEXIS 30602 (N.D. Cal. May 10, 2006) .................... 18

*In re Tut Sys. Inc. Sec. Litig.*,
    No. C01-02659 CW, 2002 U.S. Dist. LEXIS 27092 (N.D. Cal. Aug. 15, 2002) ....................... 14

*In re Valence Tech. Sec. Litig.*,
    No. C 95-20459 JW, 1996 U.S. Dist. LEXIS 22135 (N.D. Cal. Jan. 23, 1996) ......................... 11

*In Re Violin Memory Sec. Litig.*,
    No. 13-CV-5486 YGR, 2014 U.S. Dist. LEXIS 155428 (N.D. Cal. Oct. 31, 2014) ................... 16

*Warman v. Overland Data*,
    No. 97cv833 JM (JFS), 1998 U.S. Dist. LEXIS 2009 (S.D. Cal. Feb. 20, 1998) .................. 23, 25

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ..................................................................................................... 12

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ................................................................................................. 13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................................. 23

**STATUTES**

15 U.S.C. § 77k(e) .................................................................................................................... 13

15 U.S.C. § 77l(a)(2) ................................................................................................................. 11

17 C.F.R. § 229.105 .................................................................................................................. 19

17 C.F.R. § 229.303 .................................................................................................................. 18

vi

**RULES**

Fed. R. Civ. P. Rule 8 ................................................................................................. 7, 12, 18

Lead Plaintiff Fiyyaz Pirani ("Plaintiff") respectfully submits the following opposition to Defendants' Motion to Dismiss Amended Class Action Complaint for Violations of Federal Securities Laws (ECF No. 52).[1]

## I.    INTRODUCTION[2]

This case, which involves alleged violations of Sections 11, 12, and 15 of the Securities Act, presents a matter of first impression that, if decided in Defendants' favor, will provide a blueprint for companies to evade liability under Section 11 for filing a misleading registration statement.

The Complaint alleges that Defendants violated Sections 11, 12, and 15 of the Securities Act by filing a false and misleading registration statement and prospectus (collectively, the "Offering Materials"). Specifically, the Offering Materials contained misleading statements concerning the effect that competition was having on Slack's revenues and failed to include material information concerning Slack's user contracts and refunds that Slack would have to make to users in the event of even minor interruptions in Slack's service.

Before Slack went public, the Company stated, "No public market for our Class A common stock currently exists." Kahn Decl. Ex. E at i (ECF No. 54-5). In or around early 2019, however, Slack's early investors wanted to create a market for their shares and implemented a plan to evade Section 11 liability: the Company would register only a portion of the stock held by existing stockholders, but *all* of Slack's shares would become publicly tradeable at the same time. Slack did not issue new shares—rather it facilitated its pre-public stockholders' divestitures. In structuring the

---

[1] Unless otherwise defined, capitalized terms herein have the same meaning as in the Amended Class Action Complaint (ECF No. 42, the "Complaint") and all citations herein to "¶_" refer to the Complaint. All citations to "MTD" refer to Defendants' brief in support of their motion to dismiss (ECF No. 52). Unless otherwise noted, all internal citations are omitted and emphasis is added.

[2] Defendants have requested judicial notice of five documents. ECF No. 53. Plaintiff does not object to Defendants' references to SEC filings, *except to the extent that Defendants rely on them for the truth of the matters asserted therein. See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 998, 1003 (9th Cir. 2018) (on a motion to dismiss securities fraud claims "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well pleaded complaint") (collecting cases). Likewise, Plaintiff does not challenge Defendants' reliance on other documents incorporated into the Complaint. However, Defendants' heavy reliance on extrinsic documents underscores the inappropriateness of Defendants' attempt to circumvent applicable pleading standards by introducing an alternative factual narrative prior to *any* discovery. *Id.* at 999 (criticizing "a concerning pattern in securities cases like this one: exploiting these [judicial notice] procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage").

Offering this way, Defendants attempt to take unfair advantage of the judge-made "traceability" requirement that arose out of cases involving successive offerings in which plaintiffs must show they bought their shares in the specific offering at issue. Here, there was only one offering, and owners of all shares—registered or unregistered—could piggyback off the Offering Materials.

Defendants rely upon inapposite case law to argue that because both registered and unregistered shares were available to be traded when the Offering became effective, Plaintiff and members of the Class who purchased shares in the direct offering do not have standing to bring a Section 11 claim because they cannot "trace" their shares to the Registration Statement – *i.e.*, prove that the shares they purchased were the registered shares rather than other shares that were publicly available pursuant to SEC Rule 144. *See* 17 C.F.R. § 230.144. Defendants concede, however, that the concept of "tracing" a share of stock – *i.e.*, establishing a chain of title for a particular share back to the share's original owner – is a concept that no longer exists in today's market and is not possible.

The result Defendants advocate would eviscerate the rights afforded by Section 11 and allow companies to eliminate Section 11 liability by releasing non-registered shares into the market at the same time as registered shares. "The purpose of [the Securities Act] is to protect the investing public and honest business. The basic policy is that of informing the investor of the facts concerning securities to be offered for sale in interstate and foreign commerce and providing protection against fraud and misrepresentation."[3] Instead, Defendants' reading would have the limited exceptions to requiring that publicly traded shares be registered swallow Congress' express intent to prohibit the sale of registered shares through false and misleading registration statements. Congress never intended this result, nor would it make sense. Clever lawyering cannot turn prior distinguishable case law into the exclusion of Section 11's applicability to direct offerings.

There is only one interpretation of Section 11 that makes sense in the context of a direct offering, and Plaintiff urges the Court to adopt that rule of law. Where a company offers its shares

---

[3] *See* Declaration of Melissa A. Fortunato in Support of Plaintiff's Request for Judicial Notice filed concurrently herewith ("Fortunato Decl.") with exhibits ("Ex") attached thereto at Ex. 1. *See also* Fortunato Decl. Ex. 2 ("There is, however, an obligation upon us to insist that every issue of *new securities* to be sold in interstate commerce shall be accompanied by full publicly and information, and that no essentially important element attending the issue shall be concealed form the buying public.").

2

for public trading through a direct offering or otherwise by filing a registration statement as required by the federal securities laws, and non-registered shares also become publicly traded in the same offering, any person who acquires shares (*i.e.*, the shares that could be sold on a public exchange only when and because the registration statement was filed) may, either in law or in equity, sue those responsible under Section 11 of the Securities Act where, as here, that registration statement contains material misstatements and omissions.

## II.   STATEMENT OF FACTS

### A.   The Lead Up to the Offering

Slack is an international software company co-founded by defendant Stewart Butterfield in 2009.  ¶ 44.  Because Butterfield was already known for another successful tech startup, the Company drew interest from various venture capital firms, including defendants Accel Partners and Andreessen Horowitz.  ¶ 45.  In 2013, Slack launched its real-time collaboration app and platform (the "App"), which is an instant messaging system designed for organizations.  ¶ 47.

Slack enjoyed limited competition during its first few years.  ¶51. In 2017, Microsoft launched a collaboration application called Microsoft Teams, which competed directly with Slack. ¶¶ 51-52.  Slack immediately realized the significant threat it faced from Microsoft Teams, and industry experts began to note the advantages Microsoft Teams had over Slack. *See* ¶¶ 53-59.  As a result, Slack sought to grow the Company in a variety of ways, but in particular, leading up to the Offering, the Company aggressively pursued direct sales and go-to-market efforts for its higher revenue generating customers. ¶¶ 60-61.  Specifically, Slack began including an "uptime guarantee" in its service level agreements ("SLA") that guaranteed Slack's service will be available 99.99% of the time for each fiscal quarter.  ¶¶ 3, 62.  Slack later conceded that this guarantee was "outrageously customer-centric," "exceptionally generous," and far out of line with industry standards.  ¶¶ 6, 109, 112, 120.

On January 11, 2019, it was reported that Slack was planning to forgo a traditional IPO and instead go public through a direct offering.  ¶ 66.  In an IPO, the company raises funds by issuing new shares to the public, through an underwriter.  ¶¶ 67-68.  In a direct offering, the company does not issue new shares or sell shares directly to the public.  ¶ 69.  Instead, the company files a

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:19-cv-05857-SI

registration statement to register shares already held by insiders and early investors and arranges to have its stock listed on a public exchange.  ¶¶ 69-70.  Once the stock is listed, any registered shares or shares that are exempt from registration pursuant to Rule 144 can be sold in the public market. The company does not raise any funds in the offering.  ¶ 69.

On February 1, 2019, Defendants filed a confidential Form DRS registration statement with the SEC, and after SEC feedback, multiple amendments, and a request to accelerate the effective date of the Registration Statement, the Company's Form S-1 Registration Statement was declared effective on June 7, 2019.  ¶¶ 71, 73-74.  On May 13, 2019, Slack hosted an "investor day" to generate investor interest in the Offering.  ¶ 72.

**B.    Slack Faced Material Risks Prior to its Direct Offering
That Were Not Disclosed in the Offering Materials**

The Offering Materials touted Slack's "[d]ifferentiated go-to-market strategy" as a combination of a highly effective customer engagement model through customers' word-of-mouth engagement and a direct sales force driving successful adoption and expansion within larger organizations that had the potential to increase the number of users.  ¶ 77.  However, the Offering Materials failed to disclose that the Company's:  (i) revenue growth was declining while marketing expenses were increasing due to competition from Microsoft Teams; (ii) App's reliability was compromised due to scaling its technology to meet enterprise-level customer needs; (iii) financials were uniquely vulnerable due to its unique SLA which included an "exceptionally generous credit payout multiplier" of 100 times the price paid by the customer during the downtime, which the Company provided whether or not the customer was actually affected; and (iv) growth was slowing, including its key metric, "daily average users" ("DAU").  ¶ 82.

Regarding competition, the Offering Materials only vaguely described existing competition and downplayed the impact of competitors on Slack's business, however, at the time of the Offering, the Company was already experiencing fierce competition from Microsoft.  ¶¶ 83-85.

The Offering Materials also asserted that the App was a market leader with unique advantages over its competitors and that the Company possessed the ability to scale up its services to reach more lucrative customers.  ¶¶ 91-93.  In reality, Microsoft Teams had already overtaken Slack as the

4

market leader at the time of the Offering, the App's reliability was regularly below the promised 99.99% uptime, and Slack was facing difficulty in scaling globally and attaining Enterprise customers due to problems in maintaining and expanding its infrastructure as evidenced by the App's widespread downtime.  ¶ 94.

Finally, the Offering Materials contained numerous generic, boilerplate, conditional, and purportedly hypothetical statements regarding its service commitment and potential service interruptions.  ¶ 95.  The Offering Materials failed to include the following, which were known risks at the time of the Offering:

- The App was already suffering vulnerabilities that caused severe service disruptions and the Company could not support its promised uptime guarantee of 99.99%;

- Slack's reliability problem was not merely hypothetical but a known issue since in 2018 alone the Company failed to meet its 99.99% uptime guarantee in seven out of twelve months;

- Due to service disruptions from its inability to sufficiently scale its platform that triggered the punitive 100x provision, Slack's financial and operational results, including revenues and reputation, were significantly impacted;

- Slack was automatically paying significant service credits to customers who did not experience service disruptions below the uptime guarantee threshold and whether or not customers complained about the service outages or requested a refund or service credit;

- Slack was rapidly losing market share and Microsoft had already overtaken Slack as the market leader in the work collaboration space by the time of the Offering; and

- Slack had difficulty scaling globally and expanding its paying enterprise customer base due to problems in maintaining and expanding its infrastructure.  ¶ 96.

## C.    Slack Goes Public Through a "Direct Listing"

On June 20, 2019, Defendants filed the Prospectus, and Slack shares were listed on the NYSE for $38.50 per share.  ¶¶ 1, 4, 75.  The Company became only the second to go public through a direct offering.   Over 137 million Slack shares were traded that day.  Fortunato Decl. Ex. 3.

5

### D.    Company Insiders Reap Significant Financial Benefits

Collectively, Defendants sold approximately 14.5 million shares of Class A common stock for proceeds of over $559 million in the Offering, with the venture capital ("VC") Defendants alone reaping over $484 million.  ¶¶ 19-22, 25-26; *see also* Fortunato Decl. Ex. 4.

### E.    The Undisclosed Risks Come to Fruition

On June 28, 2019, about one week after the Offering, Slack's platform suffered outages that affected users across the United States and Europe.  ¶ 99.  The outage caused the stock to decline by 2.5% on July 1, 2019 and close at $35.00 per share on July 8, 2019.  ¶ 103.  On July 29, 2019, the App suffered another large-scale outage affecting over 2,000 users worldwide, and the stock fell another 1.3%.  ¶ 106.  Butterfield later admitted that the service disruptions were partly caused by the Company's attempt to scale its services.  ¶ 111.

At the same time, Microsoft Teams surpassed Slack's DAU figures (¶ 107) and analysts expressed concern over Slack's "anemic" growth after the Company reported disappointing second quarter fiscal 2020 results on September 4, 2019 (¶¶ 108, 117-19).  Analysts also highlighted that Slack had changed its SLA after the service outages in June and July.  ¶ 120.  On September 6, 2019, Slack's stock plummeted and traded as low as $19.53 per share.  ¶¶ 122-25.  At the time the Complaint was filed, Slack stock was trading at approximately 42% below the Offering price.  ¶ 125.

## II.    ARGUMENT

### A.    Relevant Legal Standards

Plaintiff alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act.  The Securities Act "places a relatively minimal burden on a plaintiff."  *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983)).  Under Section 11, a plaintiff need only demonstrate a material misstatement or omission, and "'[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements.'"  *Id.*[4]  Additionally, Sections 11 and 12(a)(2) do not require allegations of intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.  *Omnicare, Inc. v.*

---

[4]  Defendants admit that Sections 11 and 12(a)(2) have "roughly parallel elements."  *See* MTD 15 n.6 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (9th Cir. 2010)).

*Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) ( a "buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud"). *See also In re JDS Uniphase Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 28726, at *36-37 (N.D. Cal. Nov. 3, 2003) ("[U]nder § 11; defendants will be liable for innocent or negligent material misstatements or omissions. . . . Section 12(a)(2) has been called 'a strict liability provision, in that the purchaser need not prove scienter, fraud, or negligence on the part of the seller.'").

Allegations pursuant to Sections 11 and 12(a)(2) need only satisfy Rule 8's notice pleading standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."[5]  Fed. R. Civ. Proc. Rule 8; *JDS*, 2003 U.S. Dist. LEXIS 28726, at *39.  Further, a court ruling on a motion to dismiss pursuant to 12(b)(6) must "accept all factual allegations in the complaint as true" and construe them in the light most favorable to plaintiff.  *Tellabs, Inv. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1153 (S.D. Cal. 2008).  To survive a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (same).  A "district court ruling on a motion to dismiss is not sitting as a trier of fact . . . .  '[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007)).  Because the Complaint more than adequately satisfies these standards, Defendants' motion should be denied in its entirety.

### B.    Plaintiff Has Standing To Pursue Section 11 Claims

Plaintiff purchased 30,000 Slack shares on June 20, 2019, 40,000 shares on June 21, 2019, 20,000 shares on June 24, 2019, and another 160,000 (approximate) shares between July 9, 2019 and September 9, 2019.  *See* ECF No. 26-1.

Defendants argue that Plaintiff lacks standing under Section 11 because he cannot know

---

[5] Defendants do not argue that any other pleading standard applies.

whether he acquired registered shares in the direct offering or unregistered shares sold on the exchange pursuant to an exemption under Rule 144.  MTD 7-9.  Indeed, in today's market, as Defendants concede, shares can no longer be "traced" to their source.  Once shares are sold into a public market, they cease to be "registered" or "non-registered" shares – they are simply book entries on ledgers at brokerage houses or depository companies.  But certain facts remain indisputable: Slack's shares would not have traded publicly had Slack not filed the Offering Materials.  MTD 8 (noting that the Registration Statement provided holders of Rule 144 shares with access to the public market).  Plaintiff, in purchasing Slack shares, could not have relied upon any registration statement but the Offering Materials because none were in existence.  Most importantly, if Plaintiff does not have standing to bring Section 11 claims due to the sale of non-registered shares after the direct public offering, then Section 11 is effectively eliminated as to any sales of Slack common shares.

Further, prior to the enactment of the Securities Act, the House of Representatives Committee on Interstate and Foreign Commerce set forth a general summary of Section 11, stating:

> Inasmuch as the value of a security may be affected by the information given in the registration statement, irrespective of whether a particular sale takes place in interstate or intrastate commerce, the civil remedies accorded by this subsection against those responsible for a false or ***misleading statement filed with the Federal Trade Commission are given to all purchasers regardless of whether they bought their security at the time of the original offer or at some later date*** . . . .  In this connection, it must be borne in mind that no one is obliged to register a security under this act unless he desires to make use of the mails or of the channels of interstate or foreign commerce in the distribution of the security.  But if a person does avail himself of the privilege of registration accorded by this act, it is obviously within the constitutional powers of Congress to ***accord a remedy to all purchasers who may reasonably be affected by any statements in the registration statement.***

Fortunato Decl. Ex. 5.  The sweeping language the Committee used, describing Section 11 as applying to "all purchasers" "affected" by "any statement" in the registration statement, shows that Congress intended Section 11 to apply to any security purchased pursuant to a registration statement and whose value was affected by the material misstatement.

The Ninth Circuit's rulings on traceability generally involve suits brought after a company issues more than one registration statement in connection with successive stock offerings.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).  Thus, the Ninth Circuit held

that "when a company has issued shares under more than one registration statement, the plaintiff must prove that her shares were issued under the allegedly false or misleading registration statement rather than some other registration statement." *Id.*[6]  In other words, "a person holding shares issued in a different, undisputed offering does not have standing to join a Section 11 action, as he cannot be said to have relied on the purportedly fraudulent registration materials." *In re Ariad Pharms., Inc. Sec. Litig.*, 98 F. Supp. 3d 147, (D. Mass. 2015), *aff'd in relevant part*, 842 F.3d 744 (1st Cir. 2016).[7]

Defendants rely upon certain lower court decisions holding that plaintiffs lack Section 11 standing where the market contains a mixture of registered and non-registered stock.  MTD 9.  However, none of those cases, which are not binding authority, involved a direct public offering like Slack's Offering.  Respectfully, the Court should decline to follow those decisions.

Unlike cases involving successive registration statements, here, there is no question that purchasers in the public markets relied on the only Offering Materials on file.  When purchasing shares, they did not ask for "registered shares" or "non-registered" shares.  Notably, the Offering Materials do not warn investors that Section 11 would be unavailable to them in the event the Offering Materials were false and misleading.

Unlike the cases on which Defendants rely, here, there were no other Slack shares on the market before Plaintiff's initial purchase.  *See* Kahn Decl. Ex. E, at i. ("No public market for our Class A common stock currently exists.").  Defendants were able to sell Slack shares to the public only because the Registration Statement was filed with the SEC.  Plaintiff purchased his shares pursuant to the Offering Materials on the date of the Offering – there were no other registration statements in effect.  Accordingly, regardless of whether Plaintiff can trace his shares to specific

---

[6]  Notably, the Ninth Circuit's musing that traceability may be "difficult to meet in some circumstances," is ill-informed. *Id.* at 1107.  In today's modern market, tracing is all but impossible in all transactions on a public exchange.

[7]  In *Hertzberg v. Dignity Partners*, 191 F.3d 1076 (9th Cir. 1999), the Ninth Circuit held that a Section 11 plaintiff need not purchase shares in the offering itself if he could trace his shares to the misleading registration statement. *Id.* at 1080.  "If there is a mixture of pre-registration stock and stock sold under the misleading registration statement, a plaintiff must either show that he purchased his stock in the initial offering or trace his later purchased stock back to the initial offering." *Id.* n.4.  Here, Plaintiff can show that he purchased shares in the initial offering on June 20, 2019.

shares registered in the Registration Statement, Plaintiff purchased his shares in a *public market pursuant* to the Offering Materials because they were the only materials on file at that time.

Requiring traceability in direct offerings, despite no previous offerings, would create a loophole that would undermine Section 11.  Indeed, attorneys at Latham & Watkins, LLP, the firm that advised Slack to pursue a direct offering (*see* Fortunato Decl. Ex. 6), published an article encouraging companies to use direct offerings to skirt Section 11 liability.  *See* Fortunato Decl. Ex  7.  The *Law.com* article states:

> In this article, we discuss **another important advantage of the direct listing: the potential to deter private plaintiffs from bringing claims under Section 11 of the Securities Act of 1933**, which imposes strict liability for material misstatements or omissions in registration statements.
>
> The primary reason a direct listing could deter litigation is by restricting the class of persons who have standing to sue under Section 11.  To establish standing under Section 11, a plaintiff must "trace" the shares it purchased to the challenged registration statement.  *See* 15 U.S.C. § 77k(a).  In the case of a traditional IPO, tracing is easily established by anyone who purchased stock before non-IPO shares enter the market.  **But tracing is difficult (if not impossible) to establish in "mixed market" situations**—such as after the expiration of an IPO lockup period or secondary offerings—**where registered and unregistered shares are commingled in the market.** This is because paper stock is rarely traded in today's markets; instead, market participants trade interests in a pool of stock of the same type (for example, common stock) that is held by a depositary institution called The Depository Trust Company or "DTC."  In this system, stockholders do not have a direct interest in any specific security certificate of a particular issuer.  Instead, they have a pro-rata interest in the "fungible bulk" of all the securities held by DTC that share the same CUSIP.  This practice is necessary to assure the prompt and accurate settlement of trades because all shares that trade in the market must be fungible.  But the practice also means that where a security is held by DTC and there are multiple registration statements or a mix of registered and unregistered shares, it is currently impossible to determine whether a particular stock holding is tied to a particular registration statement once trading commences.

*Id.*[8]

## C.  Plaintiff Has Standing To Pursue Section 12 Claims

Section 12(a)(2) of the Securities Act imposes civil liability on "any person who . . . offers or

---

[8]  The SEC has also taken notice of the issues surrounding direct offerings.  On December 20, 2019, *The Wall Street Journal* reported that the SEC is investigating Slack's direct offering in a probe looking at how the first day of trading was handled.  Fortunato Decl. Ex 8.  On January 3, 2020, *The Wall Street Journal* also reported that the American Securities Association wrote a letter to SEC Chairman Jay Clayton stating, "[Direct offerings] would be a complete end run around the traditional underwriting process, and it would create a massive loophole in the regulatory regime that governs the offerings of securities to the public."  Fortunato Decl. Ex 9.

10

sells a security . . . by the use of any means or instruments . . . in interstate commerce . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . ."  15 U.S.C. § 77l(a)(2).  "[Section 12(a)(2)] applies to the sale of all securities, ***registered and unregistered***, and finds its constitutional nexus in the utilization of a facility of interstate commerce.  The statute provides that any person who offers or sells a security "by the use of any means or instruments of transportation or communication or of the mails, by means of a prospectus or oral communication," which includes a material misrepresentation shall be liable to the person purchasing the security from him."  *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 306 (N.D. Cal. 1978).[9]

Further, "[l]iability under §12 is not limited only to those who pass title to a purchaser.  It also encompasses a 'person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"  *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1125 (N.D. Cal. 2013) (quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).  "Thus, under the statute, a 'seller is someone: (1) who passes title to the securities; or (2) who solicits the sale of securities to serve his own financial interest or the financial interest of the securities' owner.'"  *Id*. (citing *Fouad v. Isilon Sys., Inc.*, 2008 U.S. Dist. LEXIS 105870, at \*7 (W.D. Wash. Dec. 29, 2008)); *Pinter*, 486 U.S. at 647-50.

"Although the 'purchasing from' language in the statute literally appears to contemplate a relationship between defendant and plaintiff 'not unlike traditional contractual privity,' the *Pinter* Court held that Section 12 liability is not limited to those who actually pass title to the suing

---

[9] Defendants' argument that Section 12(a)(2) does not apply to Slack's direct listing because it is not a public offering is based on semantics and is a red herring, as Defendants' cases make clear.  *See* MTD 11, n.3; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 571 (1995) ("determining that a contract for a private sale of securities was not a "prospectus" and noting that "the liability imposed by § 12(2) cannot attach unless there is an obligation to distribute the prospectus in the first place" *i.e.*, if, as here, there is a public offering); *Maldonado v. Dominguez*, 137 F.3d 1, 8 (1st Cir. 1998) (noting the difference between a private and public offer:  "A placement of stock is private if it is offered only to a few sophisticated purchasers who each have a relationship with the issuer, enabling them to command access to information that would otherwise be contained in a registration statement."); *In re Valence Tech. Sec. Litig.*, 1996 U.S. Dist. LEXIS 22135, at \*14 (N.D. Cal. Jan. 23, 1996) ("§ 12(2) applies only to a transaction which requires a prospectus to be delivered").

purchaser.  This is so because even 'in common parlance,' a person may 'offer or sell' property without actually passing title."  *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1214-15 (1st Cir. 1996) (quoting *Pinter*, 486 U.S. at 642, 645); *In re Puda Coal Sec. Inc. Litig.*, 2013 U.S. Dist. LEXIS 142081, at *29 (S.D.N.Y. Oct. 1, 2013) (explaining that to satisfy the privity requirement, the plaintiff must have either purchased securities from the defendant or have purchased them as the result of a defendant's solicitation).

A plaintiff adequately pleads solicitation if she "allege[s] more than mere participation.  As many courts have found, the registration statement is itself a solicitation document.  Although the act of signing a registration statement, alone, may not always suffice, it is at least suggestive of solicitation activity."  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009) (citing *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996)).  "Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs' need only satisfy Rule 8(a)'s lenient pleading standards."  *Id*. at 717.

In *Charles Schwab Corp. Securities Litigation*, the court found allegations that the defendants "signed offering documents such as  registration statements," "participated in the written or oral communications used to market the fund," and "participated in the marketing of the fund" were sufficient to satisfy the seller requirement of Section 12(a)(2).  257 F.R.D. 534, 549-50 (N.D. Cal. 2009).

Here, Plaintiff alleges much more.  Plaintiff details that the Individual Defendants signed the Offering Materials (*see, e.g.*, ¶ 20), actively solicited buyers through the Investor Day (*see, e.g.*, ¶ 72), sold significant amounts of shares (*see, e.g.*, ¶ 20), and were financially motivated by a desire to serve their own financial interests (*see, e.g.*, ¶¶ 23, 69-75).  Further, Plaintiff also adequately alleges privity with his sellers.  As opposed to traditional underwritten IPOs, this was a direct offering in which Defendants sold Slack shares directly to Plaintiff and other purchasers.  ¶¶ 69-70. Defendants' decision to circumvent underwriters makes privity more plausible in the Complaint under Rule 8(a)(2) than traditional underwritten IPOs.

12

**D.      Plaintiff is Not Required to Establish Damages Under the Securities Act at the Pleading Stage**

"Damages are not an element" of a Section 11 claim.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168 n.40 (C.D. Cal. 2008) (citing *Huddleston*, 459 U.S. at 382).  "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."  *Huddleston*,. at 382. Defendants' argument that Plaintiff cannot establish damages is an affirmative defense that places a "heavy burden" of proof on the defense.  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994) ("The defendant has the burden of proof on this defense.").

Even though Plaintiff need not allege damages at the pleading stage, Plaintiff adequately alleged damages in the Complaint.  For purposes of calculating Section 11 damages, the "amount paid for the security" can never exceed "the price at which the security was offered to the public."  15 U.S.C. § 77k(e).  The Complaint alleges that Slack stock opened at $38.50 per share.  ¶¶ 4, 75.  No insider sold any shares on the opening day below $38.50, indicating that is the floor of the "offering price" of Slack shares.  Fortunato Decl. Ex. 4.  Defendants' Forms 4 indicate that several insiders sold shares at more than $40 per share on the opening day, pushing the cap on damages higher than the $38.50 opening price.  *Id.* (Form 4, Steward Butterfield; Form 4, Cal Henderson; Form 4, Andrew Braccia).

Further, Plaintiff and other Class members "also could have suffered a decline in the value— the true price—of their securities."  Order Granting Plaintiff's Motion for Class Certification, *In re Snap Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 97704 (C.D. Cal. June 7, 2008.  Value-based Section 11 damages can be proven if Plaintiff can show, at a later stage, that the stock's price at the time of the Offering should have been lower if not for the omissions and misrepresentations.  Pursuant to the value-based Section 11 damages theory, purchasers can recover the difference between the price that securities were offered and the true value of the securities.  *See id.* at 22 n.24 ("Courts recognize, and Defendants even acknowledge, that there are times where a stock price at IPO does not reflect the true value of the security.") (citing *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987)).

13

### E.　The Complaint Adequately Pleads Material Misrepresentations and Omissions in the Offering Materials

The Complaint alleges extensive facts indicating that the Offering Materials contained false and/or misleading statements and failed to disclose information regarding: (1) Slack's growth strategy and growth rate; (2) competition from Microsoft Teams and its impact on Slack's growth; (3) the App's vulnerabilities resulting from the Company's attempt to grow revenue from enterprise customers; and (4) Slack's ability to meet its 99.99% uptime guarantee and credit policy for service outages. ¶ 76.

### 1.　Misstatements Concerning Slack's Outages and SLAs

The Offering Materials misled investors regarding known vulnerabilities with the App and omitted to inform investors of the highly unusual and punitive SLAs the Company had entered into with many of its customers. *See, e.g.*, ¶¶ 91-98. The Company maintained a 99.99% uptime guarantee, a significantly higher guarantee than the 99.9% promised by its competitors. ¶¶ 63, 109. The Offering Materials did not disclose that in 2018, Slack failed to meet its 99.99% uptime guarantee *for seven of the twelve months*. ¶ 121. That level of failure was a material fact to an investor and significantly different from Defendants' vague statement that "[w]e have in the past . . . experience[d] disruptions." ¶ 95. Thus, at the time of the Offering, Defendants knew that Slack had consistently been suffering from repeated service outages and would continue to in the future. Yet in the Offering Materials, Slack presented the potential for future service outages as unexpected and a mere possibility, not a certainty based on then-known information of past performance, stating, among other things, that the Company "*may not* be able to maintain the level of service uptime." *Id.*. Additionally, Slack admitted that any disruption in service *could* be harmful to business (*Id.*), which would indicate to any reasonable investor that the Company was not currently experiencing, and did not anticipate experiencing, these harmful effects. These risks should have been accurately disclosed by Defendants. *See In re Tut Sys. Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 27092, at *29 (N.D. Cal. Aug. 15, 2002) (risk disclosure misleading because only warned "design defects in [] products *could* harm [the company's] reputation" not of the already existing "product problems and recalls"); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1034-35 (N.D. Cal. 2016) (risk

14

disclosures regarding product issues "in the past" and that "if" product failed "in the future" the company "could be harmed" insufficient).

In addition to the paltry risk disclosures which omitted material then-known facts, the Offering Materials also failed to disclose the outrageous and punitive terms of Slack's SLAs which would cost the Company profoundly when the 99.99% uptime was not met.  More specifically, Defendants failed to disclose the terms of the Company's SLAs with Plus and Enterprise clients. These SLAs promised a credit multiplier *of 100 times what each customer paid* for the service during the time that Slack was inaccessible *regardless of whether the customer complained or was even affected by the outage*.  *See, e.g.*, ¶¶ 96, 112, 120.  In sharp contrast to these SLA terms, the Offering Materials only revealed that Slack provided SLAs and "*if*" the Company "fail[ed] to meet these contractual commitments, [it] could be obligated to provide credits for future services, or face contract termination with refunds of prepaid amounts."  ¶ 95.  Tellingly, Slack has since admitted that the terms of its SLAs were "outrageously customer-centric," "exceptionally generous," and far out of line with industry standards.  ¶¶ 6, 96, 112.

Courts routinely find technically accurate statements of historical fact actionable if such statements fail to disclose material information that would have made the statements not misleading when made.  *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) ("[I]t is well-established that a statement that is technically true can still be misleading.").[10]  Although the Company disclosed that it had experienced some service outages in the past, it failed to disclose the frequency of the outages, that these outages were ongoing and consistent and, importantly, failed to disclose the terms of the SLAs.  *See Gilead Scis.*, 536 F.3d at 1052 (omitting facts regarding demand while "highlighting the drug's success made a true statement (that demand was strong) also a misleading one"); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A

---

[10]  *See In re STEC Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 75083, at \*7-9 (C.D. Cal. June 17, 2011) (statement announcing a contract is actionable where defendant failed to disclose that it was a one-off event); *Beaver Cty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1051 (D. Minn. 2015) (statement attributing success to supplier relationships triggered duty to disclose that most sales were to related party entities and noting that "[a]lthough the statements may have been literally true, the literal truth fails to appraise reasonable investors of the full story"); *In re Questcor Sec. Litig.*, 2013 U.S. Dist. LEXIS 142865, at \*41 (C.D. Cal. Oct. 1, 2013) (statements "conceal[ing] the true causes of the increased sales and financial success" were materially misleading).

15

solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

Defendants contend that the Offering Materials disclosed the risks of service interruptions, but these purported disclosures were anything but "robust." *See* MTD 16-17.  As stated above, literally true statements can be misleading.  To offset a false and misleading statement or omission, the true information "must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by insiders' one-sided representations." *In re Iso Ray Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016); *see also Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (on a motion to dismiss, dismissal "requires a stringent showing . . . [that the] 'risk disclosure [was such] that reasonable minds could not disagree that the challenged statements were not misleading'"); *Flecker v. Hollywood Entm't Corp.*, 1997 U.S. Dist. LEXIS 5329, at \*17-18 (D. Or. Feb. 12, 1997) (similar); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (finding prospectus disclosures not sufficient as they were "so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading" and that certain disclosures "coupled with" alleged false statements "would have softened the impact of [the company's] disclosures").  Disclosing that some "intermittent connectivity issues" (¶ 95) had occurred and that they may occur again is a far cry from the failure to meet its 99.99% uptime guarantee *for seven of twelve months* (¶ 121), and coupled with the fact that Defendants failed to disclose the onerous nature of the SLA terms, the purported risk disclosures were clearly insufficient.[11]

Defendants' attempt to downplay the significance of the fact that the Company failed to meet its uptime guarantee seven out of twelve months in 2018 fails.  MTD 17-18.  Defendants cite *In re*

---

[11]  Defendants' cited cases for the proposition that no claim exists when the allegedly omitted information was sufficiently disclosed are distinguishable. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 197-98 (9th Cir. 1998) (the alleged known risks and adverse trends were in line with prior business results, *e.g.*, slow growth in the fourth quarter); *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) ("allegations that the [investment] portfolios failed to perform as predicted" was fraud by hindsight and losses were not the result of undisclosed risks); *In Re Violin Memory Sec. Litig.*, 2014 U.S. Dist. LEXIS 155428, at \*51 (N.D. Cal. Oct. 31, 2014) (declining to dismiss where there was "a narrow question as to whether in the months leading up to the IPO, federal sales had declined such that there was a 'trend' as required for disclosure under Item 303").

*Fusion-io, Inc. Securities Litigation*, 2015 U.S. Dist. LEXIS 18304 (N.D. Cal. Feb. 12, 2015) in arguing that Company performance in 2018 is not indicative of performance in 2019. MTD 18. However, in *Fusion-io*, a case subject to the heightened pleading standards of Rule 9(b), the Company stated that it expected to continue the current revenue and growth trend and had no indication at the time that it would be unable to meet that goal three months later. 2015 U.S. Dist. LEXIS 18304, at \*63. Here, Slack knew that it had an established trend of service outages from the previous year and failed to disclose that material information to investors.[12] ¶ 121. Defendants' claim that Plaintiff does not allege the effect that the downtime had on the Company is absurd. MTD 18. The effects of that downtime, as alleged in the Complaint, were the significant credit payments to customers as well as a decline in growth rates and customer retention.[13] ¶¶ 63, 96, 108-24.

Defendants argue that there was no duty to disclose the terms of the SLA simply because the SLA was mentioned (MTD 17), however, it is undeniable that those terms would have been considered material by an investor and their omission made the Offering Materials false and misleading. *In re Dynavax Sec. Litig.*, 2018 U.S. Dist. LEXIS 93831, \*14-15 (N.D. Cal. June 4, 2018) (material information must be disclosed if its omission would "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists").[14] The uptime guarantee of 99.99% was significantly higher than the typical 99.9% promise of most competitors. When coupled with the exceptionally high credit multiplier and overly broad customer

---

[12] Contrary to Defendants' claim (MTD 18 n.8), the post-Offering outages can and do support falsity. *See, e.g.*, *Robinson v. Audience, Inc.*, 2013 Cal. Super. LEXIS 12582, at 10 (Cal. Super. Ct., Cty. of Santa Clara Sept. 3, 2013) ("allegations of later emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation"); *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 698 (5th Cir. 2005); *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000).

[13] Defendants also argue that Slack's growth after the issuance of the Registration Statement is proof that the Company's unreliable platform did not "prevent[] the Company from growing." MTD 18-19. This is a red herring. Plaintiff does not allege that the outages and unreliable platform resulted in an instantaneous and complete bar on growth, rather that they had a significant effect by drastically decreasing the growth rate. ¶¶ 76-82, 119-24.

[14] Plaintiff's allegations regarding the SLA are not based on a "tell me more" theory as Defendants contend (MTD 17), and as their cited cases make clear, although there is no duty to make disclosures complete, the omitted information cannot make the statement misleading. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (securities laws "prohibit *only* misleading and untrue statements, not statements that are incomplete") (emphasis original); *In re DSP Grp., Inc. Sec. Litig.*, 1997 U.S. Dist. LEXIS 11942, at \*14 (N.D. Cal. Mar. 5, 1997) ("no duty to disclose the detailed terms of every new license agreement they announced" because without "revenue projections or other predictions" the statements were accurate statements of historical facts).

---

17

application, the SLA's terms would have unquestionably altered the total mix of information available to investors. *Matrixx*, 563 U.S. at 28. The stock price reaction to news of the outages and the SLA policy (¶¶ 99-125) is further compelling direct evidence that this information was material to investors and that the disclosures in the Offering Materials were materially misleading. *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1183 (S.D. Cal. 2009) ("[t]he significance of this information is illustrated by . . . the market reaction to the alleged disclosures").

Defendants argue that Slack's disclosure of the terms of the SLA through its website absolves them. MTD 17 n.7. This veiled truth on-the-market defense is without merit. First, the Offering Materials expressly stated that investors were ***to only rely*** on the Offering Materials and that "[i]nformation contained on our website is not part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only." Kahn Decl. Ex. E. at 8, 170; *see also* Kahn Decl. Ex. A at 8, 173 (same). Second, the Ninth Circuit have made clear that "[a]vailablility elsewhere of truthful information cannot excuse untruths or misleading omissions" in Offering Materials. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008) ("investors are not generally required to look beyond a given document to discover what is true and what is not"); *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("omissions. . . are not rendered immaterial by the fact that the omitted facts are otherwise available to the public").[15]

Finally, pursuant to Item 303 of the SEC Regulation S-K, 17 C.F.R. § 229.303, issuers must disclose trends that are (1) presently known to management and (2) reasonably likely to have material effects on registrants' financial condition or results of operation. As established in the Complaint and outlined above, Slack's management knew of the persistent service disruptions throughout 2018 as well as the difficulty they were facing with scaling and that Slack had been surpassed by Microsoft as the market leader. ¶¶ 8, 52-59, 77-90, 121.[16] Although defendant Shim stated that service level

---

[15] Additionally, a truth-on-the-market defense is inappropriate at this stage. *In re Thoratec Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 30602, *13 (N.D. Cal. May 10, 2006) ("a truth-on-the-market defense is available in principle . . . but not at the pleading stage").

[16] Defendants' contention that knowledge must be pleaded for an Item 303 violation (MTD 19) ignores the Rule 8 pleading standard applicable here, a distinction readily acknowledged in a case Defendants cite. *See J&R Mktg. v. GMC*, 549 F.3d 384, 392 (6th Cir. 2008) (Section 11 "does not impose a further requirement of knowledge, as a fraud action would. If it did, the plaintiff would have to prove that (1) defendant knew of an event that was reasonably likely to impact its liquidity

[Footnote continued on next page]

18

disruptions of the magnitude experienced in June and July were unusual for the Company (MTD 18, 19), outages in general were not, as shown by the seven out of twelve months in 2018 where Slack failed to meet its uptime guarantee, and the outrageous credit payout terms were not unusual. Defendants do not dispute that if shown, these trends would be reasonably likely to have a material effect on the financial conditions or operations of the Company. Item 105 requires disclosure of "the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.105. As established in the Complaint and above, Defendants failed to adequately discuss these factors in the "Risk Factors" section of the Offering Materials. ¶ 96.

### 2. Misstatements Concerning Slack's Ability to Scale the Company

Slack experienced mass outages throughout 2018, on June 28, 2019, and again on July 29, 2019. ¶¶ 99-103, 106, 121. The service disruptions in 2018 were abundant; Slack failed to meet its 99.99% service uptime guarantee for seven of the twelve months of 2018. ¶ 121. These are not merely conclusory allegations as Defendants contend (MTD 19-20), but particularized facts proving a known and ongoing issue of service outage at the Company. Nevertheless, the Offering Materials touted that the Company "ha[s] built [its] technology infrastructure using a distributed and scalable architecture on a global scale." ¶ 92. As discussed above, boilerplate cautionary language that Slack "may or may not be able to scale [their] technology to accommodate the increased capacity requirements, which may result in interruptions or delays in service" was insufficient to make the statement and others like it not misleading. *In re Facebook, Inc.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) ("To be meaningful, a cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil.").

In the September 2019 earnings call, Butterfield explained that the June and July disruptions were caused in part by scaling. ¶¶ 108-11. Butterfield's statement that the Company was "successful in scaling . . . between 99.9% and 99.99% in every quarter, and in most quarters, 99.99%" with "occasional hiccups" that "affect everyone in the industry" does not make the statements made in the

[Footnote continued from previous page]
(thereby having a duty to disclose under Item 303); and that (2) defendant knowingly failed to disclose this information when preparing its registration statement" constituting fraud.").

19

Offering Materials not misleading.  MTD 20.  Slack had a 99.99% uptime guarantee which acted as a huge draw for customers since most competitors only guaranteed an uptime percentage of 99.9%.  ¶¶ 62-65.  Even if the Company did meet the same service uptime as its competitors, by promising a higher percentage and then knowingly failing to deliver, the Company's statements were materially misleading at the time they were made.

### 3.    Misstatements Concerning Competition from Microsoft

Defendants erroneously claim that Plaintiff fails to mention Slack's admission in the Offering Materials that its primary competitor was Microsoft.  MTD 20, *cf.* ¶ 83 ("[t]he Offering Materials identified Microsoft as the Company's primary competitor").  As the Complaint states, this admission, while true, was materially misleading since it "only vaguely described the existing competition[,] downplayed the impact," (¶ 83) and failed to disclose that despite previous and concurrent representations that Slack was the market leader, Microsoft ***had already surpassed*** Slack as the market leader at the time of the Offering (¶¶ 8, 52-59, 85-89).  *Friedman*, 295 F. Supp. 2d at 991 (finding that a statement that is technically true can still be misleading).  In response to Microsoft's July 11, 2019 announcement that it had surpassed Slacks' DAUs, Butterfield quickly backtracked on the market leadership statements in his subsequent public statements.  ¶ 89.

Defendants mistakenly equate the timing of Microsoft's announcement with Defendants' ability to have knowledge of market share and thus whether their statements were misleading.[17] MTD 20.  While Microsoft did not make a public announcement regarding its higher growth rates and DAUs until July 11, 2019, Slack made an affirmative statement claiming to be the market leader at the time of the Offering, just weeks earlier.  ¶ 80.  In fact, the temporal proximity between the false and misleading statements and Butterfield's July 15, 2019 public backtrack on the Company's "market leadership" (¶ 89) bolsters a presumption of falsity.  *See Sloman v. Presstek, Inc.*, 2007 U.S. Dist. LEXIS 69475, at *28 (D.N.H. Sept. 18, 2007) ("The temporal proximity of the [false statement] . . . to the [] press release revealing 'disappointing' news, is itself 'a circumstance potentially

---

[17]  In *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009), the Court found that Defendants could not have known that board members would engage in deceptive phone calls in the future, (MTD 20), whereas here, Slack made an affirmative claim that it was the market leader and a few weeks later a competitor revealed that this was untrue.

bolstering the complaint's claims'"). *See also In re Extreme Networks, Inc.*, 2018 U.S. Dist. LEXIS 46638, at \*105 (N.D. Cal. Mar. 21, 2018) (similar). Defendants already knew their respective market share and the change over time, and thus Microsoft's announcement would not have been news to Slack's management. *See also* ¶ 87 (chart published by *Vox* on July 9, 2019 showing Slack's stagnating growth compared to Microsoft), ¶ 88 (chart comparing DAUs for Slack and Microsoft from August 2013 through June 2019). Thus, Slack failed to fully disclose material information regarding the effect of competition on its business.

### 4.    Misstatements Concerning Slack's "Key Benefits"

As Defendants state, "when analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety." *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010). When looked at holistically, the statements made in the Offering Materials implied that the App was a market leader with unique advantages over its competitors and that the Company possessed the ability to scale up its services to reach more lucrative enterprise customers. ¶¶ 91-93. The "Key Benefits" section of the Offering Materials touts greater accessibility to data in real time and a greater ability for developers to "reach and deliver value to their customers." ¶ 91. These statements, coupled with the claim of market leadership and the omissions regarding outages and the SLAs, have a clear connection to the misleading implication that Slack was the market leader at the time and that the Company would be able to effectively scale its operations without compromising these promises of user benefits. Therefore, there is a direct nexus between the omitted information and the statements regarding Slack's features. As discussed in the Complaint and above, the Offering Materials failed to give sufficient disclosures regarding any of the misleading statements in the "Summary of Key Benefits."

### 5.    Misstatements Concerning Slack's Go-To-Market Strategy

In its Offering Materials, Slack implied that its go-to-market strategy was responsible for Slack's: (1) "rapid[]" growth; (2) high customer engagement; and (3) revenue growth and decreasing net losses from 2017 through 2019. ¶ 78. The Offering Materials also stated, among other things, that "[f]rom the outset, our go-to-market strategy has centered around offering an exceptional product and level of service to organizations on Slack" and touted the Company's increasing revenues,

21

scalability, market leadership, and ability to attract new users. ¶¶ 79-81. These statements were materially false and misleading as revenue growth was decreasing while marketing expenses were increasing and growth was slowing. *See, e.g.*, ¶¶ 60, 79-85, 108-19. Further, as previously explained these statements omitted the material facts relating to the App's reliability and outages and unique SLA terms. *See* Sections II. E. 1 and 2.

Defendants incorrectly assert that these statements were "optimistic puffery" (MTD 21-22), failing to recognize that in determining whether a statement is puffery, "the court must analyze the context in which the statements were made," *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014), and that "[w]hat might be innocuous puffery . . . standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation," *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989). That is exactly the case here. These statements relate to the plans Defendants had to induce growth of the Company, growth that, as discussed above in Sections II. E. 1, 2, and 3, was already stymied due to increased competition and the App's vulnerabilities. *See, e.g.*, *In re Quality Sys.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (general statements of optimization, when taken in context, may form a basis for a . . . claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly").

Defendants argue that the omitted information is unrelated to the discussion of strategy. MTD 22. However, by painting an unrealistic picture of the Company's business position at the time of the Offering and touting a continuation of their supposedly successful "go-to-market" strategy to achieve growth which they knew would be decreasing, and continue their market leadership which they knew they no longer had, Defendants materially misled investors. A failure to disclose the trend of service outages and thus the unreliability of the platform, the terms of the SLAs, and that user and revenue growth was slowing, is directly related to these strategy discussions in the Offering Materials.

Defendants also argue that the omitted information was in fact disclosed. MTD 22-23. The Company touted its growth, high customer engagement, and improving financials. ¶¶ 77-81. While specific year to year numbers were disclosed illustrating a decrease in revenue and user growth along with an increase in marketing expenses, these numbers failed to give a fulsome disclosure regarding

22

the Company's current and future business prospects because the negative effects of the outages, competition, and punitive SLA terms were not disclosed. *See Beaver Cty. Emps.*, 94 F. Supp. 3d at 1047-48 (finding a duty to disclose when the statement may have been literally true, but the literal truth failed to appraise reasonable investors of the full story).

Last, Defendants argue that the statements were forward-looking and are protected by the bespeaks caution doctrine. MTD 22. As explained above, many of the statements made in the Offering Materials either stated outright or implied that Slack's then-existing growth, customer engagement, revenue growth, and decreasing net losses from 2017 through 2019 were a result of the Company's go-to-market strategy. Furthermore, the Complaint states that the Offering Materials risk disclosures were inadequate, and thus, the bespeaks caution doctrine does not apply. *Livid Holdings*, 416 F.3d at 947 ("Dismissal on the pleadings under the bespeaks caution doctrine, however, requires a stringent showing: There must be sufficient cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading"). Here, reasonable minds could view the challenged statements as misleading and therefore the bespeaks caution doctrine does not apply.

### F.    The Complaint Adequately Alleges Section 15 Liability[18]

As Plaintiff has adequately stated a claim for the primary violations under Sections 11 and 12(a)(2), the Section 15 control liability claims should also be sustained. *See Bielousov v. GoPro, Inc.*, 2017 U.S. Dist. LEXIS 117223, at \*21 (N.D. Cal. July 26, 2017) (control person liability is adequately pled "as long as the plaintiff demonstrates a 'primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator'") (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)).

Whether the VC Defendants were controlling persons "is an intensely factual question" and control person claims "can generally only be dismissed at the pleading stage if a plaintiff fails to adequately plead a primary violation" which has not occurred here. *Rabkin v. Lion Biotechnologies,*

---

[18]  Further, as no defendant other than the VC Defendants present "an argument as to their status as control persons" the Court must deny their "motion to dismiss this claim." *Warman v. Overland Data*, 1998 U.S. Dist. LEXIS 2009, \*18 (S.D. Cal. Feb. 20, 1998).

*Inc.*, 2018 U.S. Dist. LEXIS 25326, at *54-57 (N.D. Cal. Feb. 15, 2018) (Illston, J.) (determining as to one defendant that the control question "is a factual determination better suited for resolution at a later stage"). Further, a "plaintiff need not show the controlling person's scienter or that the [defendant] "culpably participated" in the alleged wrongdoing." *Id.* at 54.

Control is shown through "the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (stating that day-to-day oversight and control "and ***involvement in the financial statements at issue were sufficient*** to presume control") *Id..* "The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board." *Batwin v. Occam Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at *77 (C.D. Ca. July 1, 2008). Further, "[a]lthough not all courts agree, numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state . . . control status." *Schwab*, 257 F.R.D. at 550-51 (finding that on motion to dismiss plaintiffs had adequately pled control claims as to parent companies and "entity that over[saw] the asset management and administration of the [fund]"); *see also In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *62-63 (C.D. Cal. July 13, 2015) (finding control where defendants signed registration statement showing that they "exercise[ed] actual authority and control, at least over the contents of and/or release of th[e] statements [they signed].").

Here, Plaintiff alleges that the VC Defendants owned 23.8%, 13.2%, and 10.1% of the Company's supervoting shares at the time of the Offering. ¶¶ 30-32. The VC Defendants each had a director on Slack's Board who reviewed and signed the Offering Materials and had access to material non-public information. ¶¶ 22, 25, 26, 35-37. Each of the VC Defendants sold shares under the Offering, garnering $329 million, $116 million, and $39.6 million, respectively. ¶¶ 22, 25, 26. Together, the VC Defendants held more than 47% of the Company's voting power and caused the Company to indemnify them from any liabilities arising from the Securities Act and the Securities Exchange Act of 1934. ¶ 34. In addition, they caused the Company to obtain and maintain a directors and officers insurance policy for them as long as they or their designees served on the Board. *Id.* The Complaint details several of the VC Defendants pre-Offering capital infusions

(¶¶ 45, 48) and alleges decisions made, in part, by the VC Defendants (*see* ¶ 73 ("[t]he Individual Defendants and the Venture Capital Defendants wished to cash in . . . so . . . the Company and defendant Butterfield asked the SEC to accelerate the effective date")). The "traditional indicia of control," a prior lending relationship, stock ownership, and a seat on the board are alleged here, and this is all that is required to show the VC Defendants' control at the motion to dismiss stage.

*American Apparel* is instructive. There, as here, a lender defendant disputed control. *In re Am. Apparel, Inc. S'holder Litig.*, 2013 U.S. Dist. LEXIS 189797 (C.D. Cal. Aug. 8, 2013). The lender in *American Apparel* had the right to appoint two board seats, a minor ownership stake, and allegedly "had access to significant non-public material information about" [the company].'" *Id.* at \*126. The court found that the plaintiffs had adequately alleged control by the lender because, among other things, the lender designated directors signed the report with the misleading statements, and owned approximately 18% of the outstanding shares. *Id.* at \*134-43. *See also Batwin*, 2008 U.S. Dist. LEXIS 52365, at \*80-81; *Thomas v. Magnachip SemiConductor Corp.*, 167 F. Supp. 3d 1029, 1048-49 (N.D. Cal. 2016) (finding a venture capital firm's control alleged because, among other things, the firm "used its control . . . to cash out its investments in the Company at enormous profits" and had appointees on the board);[19] *Warman*, 1998 U.S. Dist. LEXIS 2009, at \*18 (finding control liability plead where "plaintiffs allege the venture capitalist substantially controlled Overland through their representatives who were members of the board"). Thus, the Complaint adequately pleads control liability by each of the VC Defendants.[20]

---

[19] *See also* 167 F. Supp. 3d at 1049 (stating that "Defendants' cases stand merely for the proposition, which no one here disputes, that a party that has always held only a minority share of the company does not, ***by virtue of that fact alone***, possess 'control' over that company") (distinguishing, among others, cases relied upon by Defendants here (MTD 24); *In re Splash Tech. Holdings Sec. Litig.*, No. 2000 U.S. Dist. LEXIS 15370 (N.D. Cal. Sept. 29, 2000); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994); *O'Sullivan v., Trident Microsystems, Inc.*, 1994 U.S. Dist. LEXIS 17065 (N.D. Cal. Jan. 31 1994)). Furthermore, Plaintiff is "not required to demonstrate actual participation by Defendants or the exercise of power." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 977 (D. Az. 2010).
[20] The fact that the VC Defendants together owned 47% of Slack's voting power is relevant to the analysis of control, but, as discussed above, not the only or most significant fact showing control.

25

III.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.    Plaintiff respectfully requests that he be granted leave to amend if the Court grants Defendants' motion.

DATED:  February 6, 2020                              Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Melissa A. Fortunato*
Melissa A. Fortunato (#319767)
Marion C. Passmore (#228474)
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
Email: fortunato@bespc.com
              passmore@bespc.com

- and -

Lawrence P. Eagel (*admitted pro hac vice*)
W. Scott Holleman (#310266)
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5888
Facsimile: (212) 504-3260
Email: eagel@bespc.com
              holleman@bespc.com

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:19-cv-05857-SI