1
2
3
4         UNITED STATES DISTRICT COURT
5         NORTHERN DISTRICT OF CALIFORNIA
6

7    FIYYAZ PIRANI,                          Case No. 19-cv-05857-SI

8                    Plaintiff,

9         v.                                 **ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANTS'
10   SLACK TECHNOLOGIES, INC., *et al*.,     MOTION TO DISMISS AND
                                             GRANTING LEAVE TO AMEND**
11                   Defendants.
                                             Re: Dkt. No. 52
12

13         Before the Court is defendants' motion to dismiss the Amended Class Action Complaint

14   ("ACAC") filed by lead plaintiff Fiyyaz Pirani. Pursuant to Civil Local Rule 7-1(b) and General

15   Order 72, the Court finds this matter appropriate for resolution without oral argument. Having

16   considered the papers submitted and for good cause shown, the motion is GRANTED in part and

17   DENIED in part, and plaintiff is GRANTED leave to amend. If plaintiff wishes to amend the

18   complaint, he shall do so by **May 6, 2020.**

19

20                              **BACKGROUND**

21   **I.        The Parties and the Direct Listing**

22         This securities class action is brought by lead plaintiff Fiyyaz Pirani ("plaintiff") against

23   Slack Technologies, Inc. ("Slack") and other named defendants. Plaintiff purchased 30,000 shares

24   of Slack's Class A common stock at $40/share on June 20, 2019, the first day of Slack's public

25   listing, and approximately another 220,000 shares at various prices from June 21 to September 9,

26   2019. Holleman Decl. in Supp. of Mot. to Appoint Lead Pl., Ex. A (Dkt. No. 26-1). Plaintiff brings

27   this case "on behalf of a class consisting of all persons and entities that purchased or otherwise

28   acquired Slack common stock pursuant to and/or traceable to the Offering Materials." ACAC ¶ 38

*United States District Court*
*Northern District of California*

(Dkt. No. 42).

Slack is a San Francisco-based software company "that offers a cloud-based collaboration and productivity platform" for workspace computing. *Id.* ¶ 2. Other named defendants include CEO Stewart Butterfield, CFO Allen Shim, and CAO Brandon Zell; and Board of Directors ("Board") members Andrew Braccia, Edith Cooper, Sarah Friar, John O'Farrell, Chamath Palihapitiya, and Graham Smith (collectively "Individual Defendants"). *Id.* ¶¶ 19-29.

The complaint also names as defendants three venture capital firms: Accel, which appointed defendant Braccia to the Board; Andreessen Horowitz, which appointed defendant O'Farrell to the Board; and Social+Capital, which appointed defendant Palihapitiya to the board (collectively "VC Defendants"). *Id.* ¶¶ 22, 25, 26, 30-33. The VC Defendants "collectively held more than 47% of the Company's voting power and included 3 members of the Board at the time of the Offering." *Id.* ¶ 34. They "caused Slack to effectuate the Offering." *Id.* They also "caused [Slack] to indemnify them from any liabilities arising from the Securities Act [of 1933] and the Securities Exchange Act of 1934" and "to obtain and maintain a directors and officers insurance policy for them." *Id.* Upon Slack's listing, the VC Defendants "sold more than 12.5 million shares for gross proceeds of more than $484 million." *Id.*

Slack's Class A common stock shares began trading on the New York Stock Exchange ("NYSE") on June 20, 2019 under the ticker symbol "WORK." *Id.* ¶ 4. Slack did not take the traditional route of an Initial Public Offering ("IPO"), in which "a company will offer a certain amount of new and/or existing shares to the public . . . [to] help raise additional capital for company operations and expansion." *Id.* ¶¶ 66-67. Instead, Slack opted for a direct listing: no new shares were issued, but insiders and early investors of the company were able to sell their preexisting shares to the public. *Id.* ¶¶ 66, 69.[1] Because these shares were not subject to a lockup period as in an IPO, they were available for sale immediately upon Slack's listing. *Id.* ¶ 70.

In preparation for the direct listing, Slack filed a Form S-1 resale shelf registration statement (the "Registration Statement") and a Form 424B4 prospectus (the "Prospectus") (collectively the

---

[1] The regulatory changes that enabled Slack's direct listing are discussed in greater detail *infra*.

United States District Court
Northern District of California

"Offering Materials") with the Securities Exchange Commission ("SEC").  *Id.* ¶¶ 71-75.  Slack, with defendants Butterfield and Shim, also "hosted an 'investor day' in New York City to generate investor interest" on May 13, 2019.  *Id.* ¶ 72.  The contents of the Offering Materials applied to "up to 118,429,640" shares offered for resale to the public.  *Id.* ¶ 4; *see* Kahn Decl. in Supp. of Mot. to Dismiss, Ex. A (Dkt. No. 54-1).[2]  The Offering Materials noted that additional shares were available for resale and exempt from registration pursuant to SEC Rule 144[3]: "approximately 164,932,646 shares of common stock immediately after [Slack's] registration."  Kahn Decl. Ex. A at 164; *see* ACAC ¶ 4.

## II.    The Offering Materials

Plaintiff alleges that he and other class members suffered losses to the value of their purchased shares as a result of misstatements or omissions of material facts in the Offering Materials.  *Id.* ¶¶ 11-12.  These include statements regarding service outages and Slack's Service Level Agreements ("SLAs") in the case of such outages; competition from Microsoft Teams; scalability and purported key benefits; and growth and growth strategy.  *Id.* ¶ 76.

Regarding outages, Slack disclosed that it had "service level commitments to [its] paid customers" in the event of service disruptions and noted that if Slack failed to meet those commitments, it "could be obligated to provide credits for future service . . . which could harm [its] business, results of operations, and financial condition."  *Id.* ¶ 95 (emphasis removed).  However, Slack did not disclose alleged vulnerabilities it was already suffering that "caused severe service disruptions," including a failure to meet its uptime guarantee for "7 out of 12 months" in 2018 alone.

---

    [2]  Defendants request judicial notice of several documents, including Exhibit A, which is the Registration Statement filed with the SEC and incorporated by reference into the ACAC.  Dkt. No. 53.  Plaintiff does not object except to the extent that defendants rely on the documents for the truth of the matters asserted.  Pl's Opp'n at 1 n.2.  The Court GRANTS defendants' request for judicial notice without "assum[ing] the truth of [the] incorporated document if such assumptions only serve to dispute facts stated in a well pleaded complaint."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 998, 1003 (9th Cir. 2018).

    [3]  SEC Rule 144 is an administrative rule adopted "to establish specific criteria for determining whether a person is not engaged in a distribution."  17 C.F.R. § 230.144.  This in turn determines whether a securities transaction is exempt, pursuant to Section 4(a)(1) of the Securities Act of 1933, from certain registration requirements.  15 U.S.C. § 77*d*(a)(1).

*Id*. ¶ 96.  Slack also failed to disclose that its service level commitment was "highly unusual and punitive."  *Id*.  "[W]hile most competitors guaranteed uptime of three-nines (99.9%), Slack guaranteed four-nines (99.99%)."  *Id*. ¶ 63.  Failure to meet that guarantee would require a refund or credit payout of "100 times what the customer would have paid during the downtime as opposed to the actual cost of service lost during the downtime," automatically and regardless of whether or not specific customers actually experienced the downtime or requested the credit.  *Id*.

Regarding competition, the Offering Materials identified Microsoft as its primary competitor but stated that "we are uniquely positioned to more rapidly innovate and respond to new technologies and customer requirements than our competitors."  *Id*. ¶¶ 83-84.  Defendants allegedly "downplayed the impact" of these competitors, including "the impact . . . Microsoft in particular[] was already having on [Slack's] expansion into enterprise customers prior to the Offering."  *Id*.  The competitor product Microsoft Teams launched in March 2017; in December 2017, defendant Butterfield acknowledged in a *Business Insider* interview that "Microsoft is the main competitor. They're the third largest company in the world and if they start channeling all their resources against you, that's a lot to compete with."  *Id*. ¶¶ 52-53.  In 2018, when Microsoft Teams introduced a free tier and a feature for adding people outside of an organization, it began "to compete head-to-head with Slack's freemium model."  *Id*. ¶ 52.  That same year, Slack acquired intellectual property from another software company, Atlassian, and announced a close partnership between them.  *Id*. ¶¶ 54-55.  *PCMag.com* reported: "What went unsaid in both [Slack's and Atlassian's] statements is that they're partnering up to take on an even bigger competitor in Microsoft Teams."  *Id*. ¶ 57.

Plaintiff alleges that the Offering Materials touted various "key benefits to users, teams, and organizations" and that Slack built its "technology infrastructure using a distributed and scalable architecture on a global scale," and that these statements  "implied that the Slack App was a market leader with unique advantages over its competitors and that the Company possessed the ability to scale up its services to reach more lucrative enterprise customers."  *Id*. ¶¶  91-93 (emphasis removed).  Slack also stated that it had a "[d]ifferentiated go-to-market strategy," comprised of a customer engagement model and expansion within larger organizations, and implied this was responsible for "'rapid[]' growth . . . high customer engagement . . . [and] revenue growth and

4

decreasing net losses from 2017 through 2019." *Id.* ¶¶ 77-78.  But Slack's "growth was slowing down in several aspects, including its key metric, [daily active users]." *Id.* ¶ 82.

### III.      Performance After the Direct Listing

On the first day of trading, June 20, 2019, shares began selling at $38.50.  *Id.* ¶ 4.  On June 28, 2019, Slack experienced a service outage of approximately fifteen hours affecting customers in the United States and Europe; the outage received attention from the media, with reporting by such news outlets as *Newsweek*.  *Id.* ¶¶ 99-102.  Another large-scale service outage occurred on July 29, affecting customers in the United States, Japan, and Europe.  *Id.* ¶ 106.  In a conference call on September 4, defendant Butterfield admitted that the outages were caused by "scaling . . . we continue to hit limits that we didn't realize were built into the system."  *Id.* ¶ 111 (emphasis removed).  He also admitted that the uptime guarantee reflected policies that "are outrageously customer-centric," "exceptionally generous," and "unusual."  *Id.* ¶¶ 109-112.

By July 11, 2019, Microsoft Teams had reached 13 million daily active users, surpassing Slack in this metric.  *Id.* ¶ 107.  On November 20, 2019, *MarketWatch* reported that "Microsoft Teams, which grew 54% since July to more than 20 million daily active users, is on a trajectory to double Slack's customer base by early next year as more corporations adopt group chat."  *Id.* ¶ 90.

On September 4, 2019, Slack reported second-quarter fiscal 2020 results, including that "[r]evenue was negatively impacted by $8.2 million of credits related to service level disruption in the quarter"; that "GAAP operating loss was $363.7 million, or 251% of total revenue, compared to a $33.7 million . . . or 37% of total revenue" loss in the second quarter of the previous year; and "[n]et cash provided by operations was $0.3 million, or 0% of total revenue, compared to cash provided by operations of $1.5 million, or 2% of total revenue, for the second quarter of fiscal year 2019."  *Id.* ¶ 108.

After the September 4, 2019 earnings announcement, share prices dropped to below $25, going as low as $19.53.  *Id.* ¶¶ 9-10.  At the time this action commenced, the price was $25.72 per share; at the time the ACAC was filed, the price was $22.  *Id.* ¶¶ 10 & 10 n.2.

Plaintiff brings this action under the Securities Act of 1933, asserting claims under Sections

11, 12(a)(2), and 15.  Defendants move to dismiss all claims under Fed. R. Civ. P. 12(b)(6).

## LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and a complaint that fails to do so is subject to dismissal pursuant to Rule 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, a district court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

As a general rule, courts may not consider materials beyond the pleadings when ruling on a Rule 12(b)(6) motion.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  However, the incorporation-by-reference doctrine "permit[s] district courts to consider material outside a complaint" in order to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998, 1002 (9th Cir. 2018).  There are

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    also instances, albeit rare, where the court may review a document when assessing the sufficiency

2    of a claim at the pleading stage.  *Id*. at 1002 (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.

3    2005) (affirming the incorporation of materials that the complaint did not reference at all because

4    the claim "necessarily depended on them")).

5         If the Court dismisses the complaint, it must then decide whether to grant leave to amend.

6    The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

7    request to amend the pleading was made, unless it determines that the pleading could not possibly

8    be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)

9    (citations and internal quotation marks omitted).

10

11                                    **DISCUSSION**

12        Defendants argue that plaintiff cannot plead standing under Section 11 because of the case

13   law interpreting that statute holding that a plaintiff's purchased shares must be traced to the defective

14   registration statement, which is impossible to do here.  Defendants further argue that Section 11

15   damages cannot be established in the case of a direct listing, that plaintiff lacks standing under the

16   stricter privity requirement of Section 12, and that failure to state a claim under either Sections 11

17   or 12 necessarily obviates standing under Section 15.  Lastly, defendants argue that plaintiff has

18   failed to allege material misstatements or omissions.

19        Plaintiff argues that, because of the unique regulatory framework of Slack's direct listing,

20   this case "presents a matter of first impression that, if decided in Defendants' favor, will provide a

21   blueprint for companies to evade liability under Section 11 for filing a misleading registration

22   statement." Pl.'s Opp'n at 1 (Dkt. No. 63).  Plaintiff contends that by structuring the Offering such

23   that registered and unregistered shares became publicly tradeable at the same time, "Defendants

24   attempt to take unfair advantage of the judge-made 'traceability' requirement that arose out of cases

25   involving successive offerings in which plaintiffs must show that they bought their shares in the

26   specific offering at issue." *Id*. at 2.  Plaintiff contends that there is only one interpretation of Section

27   11 that makes sense in the context of a direct offering:  where a company offers its shares for public

28   trading through a direct listing or otherwise by filing a registration statement as required by the

federal securities laws, and non-registered shares also become publicly traded in the same offering, any person who acquires shares – which could be sold on a public exchange only when and because the registration statement was filed – may sue those responsible under Section 11 where the registration statement contains material misstatements and omissions.

## I.      Section 11 Standing

### A.      "Such security"

Section 11 of the Securities Act of 1933 (the "Securities Act") provides a strict liability cause of action for violations of certain registration requirements.  The statute reads in relevant part: "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue . . . ."  15 U.S.C. § 77*k*.

The Second Circuit was the first to interpret the phrase "such security."  *See Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967).  In *Barnes*, shares were issued pursuant to registration statements issued in 1961 and 1963, and purchasers filed shareholder class actions alleging claims under Section 11 that the 1963 registration statement and prospectus contained material misstatements and omissions.  The district court approved a settlement limited to purchasers who could establish that they had purchased securities issued under the 1963 registration statement.  Objectors to the settlement, who could not trace their purchases to the 1963 registration statement, appealed.  Writing for the court, Judge Friendly[4] found "the difficulty, presented when as here the registration is of shares in addition to those already being traded, is that 'such' has no referent."  *Id.* at 271.  Judge Friendly weighed two possible readings of the phrase: a narrower reading, "acquiring a security issued pursuant to the registration statement"; and a broader reading, "acquiring a security of the same nature as that issued pursuant to the registration statement."  *Id.*  Of the broader reading,

---

[4] "Judge Friendly, without a doubt, did more to shape the law of securities regulation than any judge in the country."  Louis Loss, *In Memoriam: Henry J. Friendly*, 99 Harv. L. Rev. 1722, 1723 (1986).

United States District Court
Northern District of California

United States District Court
Northern District of California

Judge Friendly noted that it "would not be such a violent departure from the words that a court could not properly adopt it if there would good reason for doing so." *Id.* Judge Friendly adopted the narrower reading after a review of the overall statutory scheme[5]; language from the legislative history[6]; dicta from within the Second Circuit[7]; and a treatise and amicus brief from the SEC. *Id.* at 272-73. The Ninth Circuit has followed suit in its interpretation: "Clearly, this limitation [on 'any person'] only means that the person must have purchased a security issued under that, rather than some other, registration statement." *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999) (citing *Barnes*, 373 F.2d 269).

This narrower reading became the basis for case law requiring plaintiffs to "trace their shares back to the relevant offering" in order to plead standing under Section 11. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). In the Ninth Circuit, this means plaintiffs must either have "purchased shares in the offering made under the misleading registration statement," or purchased shares in the aftermarket "provided they can trace their shares back to the relevant offering." *Id.* The difficulty arises when there are multiple registration statements, in which case the plaintiff must prove that the purchased shares were issued under the allegedly false or misleading one, "rather than some other registration statement." *Id.*; *Hertzberg*, 191 F.3d at 1080. "Courts have long noted that tracing shares in this fashion is 'often impossible,' because 'most trading is

---

[5] Reasoning that Section 11's "stringent penalties are to insure full and accurate disclosure through registration," Judge Friendly observed that "under §§ 2(1) and 6, only individual shares are registered." *Id.* at 272. By contrast, the antifraud sections 12(2) and 17 "are not limited to the newly registered shares." *Id.* Furthermore, the damages and liability limitations in sections 11(g) and 11(e) suggested that standing should be limited "to purchasers of the registered shares, since otherwise their recovery would be greatly diluted when the new issue was small in relation to the trading in previously outstanding shares." *Id.*

[6] The identical House and Senate versions of the statute contained the language, "every person acquiring any securities specified in such statements," and "any persons acquiring any securities to which such statement relates." *Id.* (citing S. 875, 73d Cong. § 9 (1st Sess. 1933); H.R. 4314, 73d Cong. §9 (1st Sess. 1933)).

[7] In *Barnes*, Judge Friendly gave particular weight to Judge Frank's dictum in *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 786 (2d Cir. 1951) (noting, in the context of holding that proof of fraud or deceit is not required for Section 11 claim, that a Section 11 claim "may be maintained only by one who comes within a narrow class of persons i.e. those who purchase securities that are the direct subject of the prospectus and the registration statement") because of Judge Frank's role as "a leading member of the SEC in its early days." *Barnes*, 373 F.2d at 273.

done through brokers who neither know nor care whether they are getting newly registered or old shares,' and 'many brokerage houses do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position.'" *Century Aluminum*, 729 F.3d at 1107 (quoting *Barnes*, 373 F.2d at 271-72). Nevertheless, courts have deferred to Congress to amend the statute. *See Century Aluminum*, 729 F.3d at 1107 ("this tracing requirement is the condition Congress has imposed for granting access to the 'relaxed liability requirements' § 11 affords"); *Barnes*, 373 F.2d at 273 ("the time may have come for Congress to reexamine these two remarkable pioneering statutes in the light of thirty years' experience").[8] Lower courts in this and other jurisdictions have imposed the same requirement where unregistered shares entered the market following the issue of registered shares; these courts have resolved the tracing requirement by limiting claims to certain factual circumstances or time periods. *See, e.g.*, *Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996) (granting leave to amend for plaintiffs to "identify the purchasers of the unregistered shares" that entered market prior to registered shares or other "specific dates and facts that establish . . . standing"); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118-119 (S.D.N.Y. 2004) (cutting off plaintiff class period "at the time when unregistered shares became tradeable"), *vacated on other grounds by* 471 F.3d 24 (2d Cir. 2006).

The precise issue before this Court appears to be one of first impression. This is because Slack's direct listing on the NYSE is the result of a new regulatory development approved by the SEC in 2018. *See* Order Granting Accelerated Approval of NYSE Proposed Rule Change Relating to Listing of Companies, Exchange Act Release No. 34-82627, 83 Fed. Reg. 5650 (Feb. 2, 2018). The SEC approved changes to the NYSE Listed Company Manual in order to "provide a means for a category of companies with securities that have not previously been traded on a public market and

---

[8] The American Law Institute's model code for comprehensive reform included eliminating the tracing requirement by giving "a right of action to a person who proves— (1) that, in the case of an offering statement, he bought a security of a class covered by the offering statement after its effectiveness; or (2) that, in the case of a registration statement or report, he bought or sold a security of the registrant after the effectiveness of the registration statement or the filing of the report." Fed. Sec. Code § 1704(c)(2) (Am. Law Inst. 1980). In the only amendment to the Securities Act since the 1930s, a provision for joint liability was added at § 11(f), but the relevant language discussed here remained unchanged. Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 201(b), 109 Stat. 737.

that are listing only upon effectiveness of a selling shareholder registration statement, without a related underwritten offering, and without recent trading in a Private Placement Market, to list on the Exchange." *Id*. at 5654.  Most significantly for this case, the rule change allows a company to (1) enter the public market for the first time on a major public listing (2) without issuing *new* shares as in an IPO; but the company is still (3) subject to the registration requirements of the Securities Act and thus (4) subject to Section 11 liability.[9]  Because no new shares are issued, insiders holding preexisting shares are not subject to the typical "'lock-up period' of 90 to 180 days where they cannot sell their shares."  ACAC ¶ 70.  In other words, shares of Slack common stock became available for purchase on the NYSE immediately on June 20, 2019, from two simultaneous entry points: under the Securities Act registration statement and under the SEC Rule 144 exemption from registration.  *See* 17 C.F.R. § 230.144.  In a traditional IPO, the registered shares would be sold first, and the unregistered shares would become available for sale after the lockup period; a plaintiff pleading Section 11 standing for purchases made *after* the availability of unregistered shares would likely be unsuccessful because the market would be so diluted as to make tracing "virtually impossible."  *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 118.  In a direct listing, the impossibility of tracing begins on the very first day of listing due to the simultaneous offering of unregistered and registered shares.

Plaintiff argues that to follow the standard tracing analysis here "would eviscerate the rights afforded by Section 11 and allow companies to eliminate Section 11 liability by releasing non-registered shares into the market at the same time as registered shares."  Pl.'s Opp'n at 2 (Dkt. No. 63).  Defendants acknowledge that "Slack's direct listing was only the second significant direct listing ever to take place" and that cases analyzing the tracing requirement have involved successive rather than simultaneous stock offerings; nevertheless, defendants assert the same principles of tracing apply.  Defs.' Reply at 4 (Dkt. No. 66).

Because this case presents a question of apparent first impression – whether an investor who

---

[9] The proposal's previously withdrawn Amendment No. 2 envisioned no Section 11 liability whatsoever; the proposed rule "would have allowed a company to list immediately upon effectiveness of an Exchange Act [of 1934] registration statement only, without any concurrent IPO or Securities Act of 1933 ('Securities Act') registration."  *Id*. at 5651 fn.11.

purchases a security in a direct listing in which registered and unregistered shares are made publicly tradeable at the same time may bring a Section 11 claim – the Court finds it instructive to return to the statutory text. If the text is ambiguous, the Court "may [also] use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019) (citation omitted). The Court is "guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018). "The 1933 and 1934 Acts are remedial legislation, among the central purposes of which is full and fair disclosure relative to the issuance of securities." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 480 (9th Cir. 1973) (citing *Tcherepnin*, 389 U.S. at 336); *see also  SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) ("These exemptions [from Section 5's registration requirements] must be narrowly viewed because, as remedial legislation, the Securities Act is entitled to a broad construction."). The Supreme Court "itself has construed securities law provisions 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'" *Pinter v. Dahl*, 486 U.S. 622, 653 (1988) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)). The canon, however, "should not be 'treated . . . as a substitute for a conclusion grounded in the statute's text and structure.'" *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019) (citation omitted).

As discussed above, the phrase "any purchaser acquiring such security" is susceptible of at least two meanings. 15 U.S.C. § 77*k*. The second, broader meaning—"acquiring a security of the same nature as that issued pursuant to the registration statement"—has yet to be examined. *Barnes*, 373 F.2d at 271. Judge Friendly remarked only that it "would not be such a violent departure from the words that a court could not properly adopt it if there were good reason for doing so." *Id*. Here, the Court finds good reason for doing so.

The statutory scheme of the Securities Act provides for remedial penalties (Sections 11, 12, 15) where its registration requirements have been violated (Sections 5 through 7). 15 U.S.C. §§ 77*k*-77*l*, 77*o*, 77*e*-77*g*. Pursuant to Section 4 and Rule 144, certain transactions are exempted from the

United States District Court
Northern District of California

registration requirement, and those exempt transactions are not subject to the remedial penalties.[10] Ordinarily, as discussed in the tracing cases above, transactions subject to the registration requirements and those that are exempt from such requirements occur at different time periods. *See, e.g.*, *Lilley*, 936 F. Supp at 715-16 (80,000 unregistered shares entered market prior to IPO and preferred stock offering). In Slack's direct listing, however, both types of transactions originated and occurred simultaneously. Applying the narrower reading of "such security" in the context of Slack's direct listing would cause the exemption provision of Section 4 to completely obviate the remedial penalties of Sections 11, 12 and 15.

Moreover, "[c]ourts must interpret a congressional act, if possible, in a manner that gives each section its due effect without inconsistency or repugnancy." *In re Sheehan*, 253 F.3d 507, 514 (9th Cir. 2001) (citation omitted). Whereas the narrow reading would cause exemption from registration to obviate liability for a defective registration, the broader reading makes it "possible to interpret [Section 11] and [Section 4] without conflict, while giving meaning to both rules, [making this] the correct interpretation." *Id*. The Court also finds persuasive that an interpretation need not be adopted if it would lead to "absurd or futile results . . . plainly at variance with the policy of the legislation as a whole." *EEOC v. Commercial Office Prod. Co*., 486 U.S. 107, 120 (1988) (Marshall, J.) (plurality opinion) (rejecting an interpretation that would result in "the preclusion of any federal relief for an entire class of discrimination claims"); *see also Wenger v. Lumisys, Inc*., 2 F. Supp. 2d 1231, 1242 (N.D. Cal. 1998) (rejecting interpretation of safe harbor provision in Private Litigation Reform Act where interpretation would lead to absurd results). The elimination of civil liability under the Securities Act, "among the central purposes of which is full and fair disclosure relative to the issuance of securities," would certainly lead to a futile result at variance with the policy of this remedial legislation. *Glenn W. Turner Enters., Inc.*, 474 F.2d at 480.

Therefore, this Court finds that in this unique circumstance—a direct listing in which shares

---

[10] Section 4(a)(1) exempts from registration certain classes of transactions, including those "by a person other than an . . . underwriter." 15 U.S.C. § 77*d*(a)(1). Section 2(a)(11) defines an underwriter as "any person who has purchased from the issuer with a view to . . . distribution." *Id*. § 77*b*(a)(11). And Rule 144, an SEC administrative rule, was adopted "to establish specific criteria for determining whether a person is not engaged in a distribution." 17 C.F.R. § 230.144.

United States District Court
Northern District of California

United States District Court
Northern District of California

registered under the Securities Act become available on the first day simultaneously with shares exempted from registration—the phrase "such security" in Section 11 warrants the broader reading: "acquiring a security of the same nature as that issued pursuant to the registration statement." *Barnes*, 373 F.2d at 271.  Accordingly, the Court DENIES defendants' motion to dismiss for lack of Section 11 standing.

### B.     "Offered to the public"/Damages

Defendants also contend that plaintiff's Section 11 claim fails as a matter of law because plaintiff has not and cannot allege an offering price from the direct listing, and therefore cannot establish damages.  Defendants argue that a necessary predicate for establishing damages under Section 11 is the existence of a price at which a "security was offered to the public."  15 U.S.C. § 77*k*(g); *see also id.* § 77*k*(e) (damages "shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public)" and various determinations of the security's value before, at, or after the time of suit).  Defendants argue that unlike an IPO in which the initial offering price is established by the company and the underwriters, here the NYSE established a reference price for Slack's shares one day prior to the commencement of trading and a designated market maker set the opening trading price without coordination from Slack.[11]  Defendants argue that because Slack's direct listing did not involve a public offering price, plaintiff cannot recover damages under Section 11.

Plaintiff argues that he is not required to establish damages at the pleadings stage, and that

---

[11] Because Slack went public with a direct listing and not an IPO, there was a "lack of an initial public offering price."  Kahn Decl. Ex. A at 172.  The SEC-approved changes to the NYSE Listed Company Manual included changes to Rule 15(c)(1), which specifies a security's Reference Price and thus informs pre-opening indications; and Rule 104(a)(2), which provides for the facilitation of openings and reopenings for securities.  Order Granting Accelerated Approval of NYSE Proposed Rule Change Relating to Listing of Companies, Exchange Act Release No. 34-82627, 83 Fed. Reg. 5650, 5652 (Feb. 2, 2018).  The rule changes provided an alternative means for determining the Reference Price in a direct listing without an IPO: "a price determined by the Exchange in consultation with a financial advisor to the issuer of such security."  *Id*.  The rule changes also required the Designated Market Maker who facilitates openings to consult with the issuer's financial advisor, a requirement "based in part on Nasdaq Rule 4120(c)(9), which requires that a new listing on Nasdaq that is not an IPO have a financial advisor willing to perform the functions performed by an underwriting in connection with pricing an IPO on Nasdaq."  *Id*. & fn.33.

a purported lack of damages is an affirmative defense upon which defendants have a heavy burden. Plaintiff also asserts that he has adequately alleged an opening public price of $38.50 on the first day of trading, and also that under a "value-based Section 11 damages theory" plaintiff "can show, at a later stage, that the stock's price at the time of the Offering should have been lower if not for the omissions and misrepresentations."  Pl.'s Opp'n at 13 (citing *In re Snap Inc. Sec. Litig.*, Case No. 2:17-cv-03679-SVW-AGR, 2018 WL 2972528, at *8-9 (denying motion to dismiss Section 11 claim and holding that the plaintiff's argument that "Snap's actual stock price at IPO overestimated the true value of the stock at that time because of the alleged material omissions and misrepresentations . . . is a valid theory of damages"), and *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987) (granting summary judgment in favor of defendants where after "full and fair discovery" the "plaintiffs have failed to present any evidence indicating that the price of Fortune stock on June 15 differed at all from its 'value.'").

       "Damages are not an element" of a Section 11 claim.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168 n.40 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).  Courts have treated Section 11's damages measure as an affirmative defense.  *See id.* at 1169; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1258, 1261 (N.D. Cal. 2000). "For a complaint to be dismissed because the allegations give rise to an affirmative defense 'the defense clearly must appear on the face of the pleading.'"  *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990) (citation omitted), *superseded by rule on other grounds as recognized in Konarski v. Rankin*, 603 F. App'x 544, 546 (9th Cir. 2015); *see, e.g.*, *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-04 (9th Cir. 2002) (affirming Rule 12(b)(6) dismissal of Section 11 claim where it was indisputable that all class members profited from the sale of the relevant securities).

       The Court concludes that defendants have not met their burden at the pleading stage to show that plaintiff cannot recover damages as a matter of law.  Courts have held that "[a] plaintiff is required (1) to allege that he purchased the relevant securities; and (2) to allege facts creating the reasonable inference that the value of the securities on the presumptive damages date – that is, either the value at the time the plaintiff sold the securities; or the value at the time of suit, if the plaintiff

still holds the securities—is *less* than the purchase price."  *In re Countrywide*, 588 F. Supp. 2d at 1169-70 (emphasis in original).  Plaintiff has done that.

Defendants make much of the "Not applicable" answer on the Registration Statement's cover page, in the table for "Proposed Maximum Offering Price Per Share."  Kahn Decl. Ex. A. They also emphasize the Registration Statement's explanation that the "opening public price of [Slack shares] on the NYSE will be determined by buy and sell orders collected by the NYSE from various broker-dealers and will be set based on the [Designated Market Maker's] determination" in consultation with "Morgan Stanley and [Slack's] other financial advisors" but, "in each case, without coordination with [Slack]."  *Id.* at 171.  But the same explanation in the Registration Statement describes how a pre-opening indication may be published in anticipation of the opening public price, based on buy-and-sell orders on the NYSE, "[s]imilar to how a security being offered in an underwritten initial public offering would open on the first day of trading."  *Id.* at 172.  In the NYSE rule changes as well as in the Slack Registration Statement, the unique direct listing process is accommodated by analogy to the traditional IPO pricing process.  Defendants' reliance on an overly narrow reading of Section 11's "price at which the security was offered to the public" is thus unavailing.  Further, as plaintiff asserts in his opposition, plaintiff may pursue a value-based theory of damages, which is a fact-intensive inquiry that is not appropriate for resolution at the pleadings stage.

Accordingly, the Court DENIES defendants' motion to dismiss for lack of damages under Section 11.

## II.     Section 12(a)(2)

Next, defendants argue that plaintiff cannot plead standing under Section 12(a)(2) because defendants are not statutory sellers within the scope of Section 12.  Section 12(a)(2) provides that any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . shall be liable . . . to the person purchasing such security from him."  15 U.S.C.

§ 77*l*(a)(2).  In the case of registered shares and exempted shares becoming available simultaneously on the first day of a direct listing, this Court reads "such security" in accordance with the construction of Section 11 discussed above.  Therefore, the Court rejects defendants' argument that Section 12 liability in this case extends only to shares directly traceable to those registered under the prospectus.  That does not end the analysis, however.  As both parties indicate, "purchasing . . . from him" introduces a privity requirement not present in Section 11.

The Supreme Court has provided two ways to establish that someone is a statutory "seller" under Section 12: (1) by directly passing title or (2) by actively soliciting the sale.  *See Pinter v. Dahl*, 486 U.S. 622, 642-44 (1988).  "Soliciting" does not include "urg[ing] another to make a securities purchase . . . merely to assist the buyer" or "the giving of gratuitous advice, even strongly or enthusiastically." *Id.* at 647.  "[L]iability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.*  In rejecting a "substantial factor" test, the Supreme Court emphasized that liability under Section 12 requires more than "mere participation" because the language of the statute "focuses on the defendants' relationship with the plaintiff-purchaser." *Id.* at 651.  The Ninth Circuit has not yet elaborated on what facts constitute more than "mere participation," and district courts have adopted different approaches.  *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009) (citing divided lower court cases, and finding sufficient allegations of signing a registration statement and actively participating in marketing events), *with In re Harmonic, Inc., Sec. Litig.*, No. C 00-2287 PJH, 2006 WL 3591148 at *13 (N.D. Cal. Dec. 11, 2006) (citing divided lower court cases, and finding insufficient allegations of signing a registration statement or prospectus).

Plaintiff contends that defendants are statutory sellers because:

> [T]he Individual Defendants signed the Offering Materials (*see, e.g.*, [ACAC] ¶ 20), actively solicited buyers through the Investor Day (*see, e.g.*, ¶ 72), sold significant amounts of shares (*see, e.g.*, ¶ 20), and were financially motivated by a desire to serve their own financial interests (*see, e.g.*, ¶¶ 23, 69-75). Further, Plaintiff also adequately alleges privity with his sellers. As opposed to traditional underwritten IPOs, this was a direct offering in which Defendants sold Slack shares directly to Plaintiff and other purchasers. ¶¶ 69-70.

Pl.'s Opp'n at 12.

United States District Court
Northern District of California

Defendants rely on district courts cases holding that signing a registration statement is insufficient to establish solicitation.  *See In re Infonet Servs. Corp. Sec. Litig*., 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003); *Harmonic*, 2006 WL 3591148, at *10; *Welgus v. TriNet Grp., Inc*., Case No. 15-cv-03625 BLF, 2017 WL 167708, at *19 (N.D. Cal. Jan. 17, 2017).   As to participation in marketing activities such as a roadshow presentation, the IPO equivalent of the Investor Day here, some courts have held this is also insufficient.  *See Infonet*, 310 F. Supp. 2d at 1101 (even if oral misrepresentations at roadshow presentations were not protected by bespeaks caution doctrine, "Plaintiffs do not allege that Defendants . . . personally or directly solicited any of the named Plaintiffs"); *In re CytRx Corp. Sec. Litig*., Case No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *15 (C.D. Cal. July 13, 2015) ("participation of some directors in a road show . . . is insufficient"); *Maine State Ret. Sys. v. Countrywide Fin. Corp*., No. 2:10-CV-0302 MRP (MANx), 2011 WL 4389689, at *9 (C.D. Cal. May 5, 2011) (same).

Plaintiff relies primarily on *Charles Schwab*, which also notes the absence of Ninth Circuit guidance and the split in district court opinions.  257 F.R.D. at 549.  Finding support in district court cases from within the Ninth, Second, and Seventh Circuits, the court in *Charles Schwab* found that "[a]lthough the act of signing a registration statement, alone, may not always suffice, it is at least suggestive of solicitation activity." *Id*. & fn.3 (citing, *e.g*., *In re Nat'l Golf Props., Inc*., No. CV 02-1383 GHK (RZX), 2003 WL 23018761 (C.D. Cal. 2003); and *In re Portal Software, Inc. Sec. Litig*., No. C-03-5138 VRW, 2006 WL 2385250, at *4 (N.D. Cal. 2006)); *see also In re Keegan Mgmt. Co. Sec. Litig.*, Civ. No. 91-20084 SW, 1991 WL 253003, at *8 (N.D. Cal. Sept. 10, 1991) ("To one who studies corporate filings and news releases before purchasing via a dealer on an impersonal and anonymous market, the corporation, its officers and directors, and other promoters of the stock appear to be the true 'sellers.'").  Moreover, the plaintiffs in *Charles Schwab* also alleged that "certain defendants were involved in marketing the fund.  Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy Rule 8(a)'s lenient pleading standards." *Id*. at 550.

The Court concludes that plaintiff has alleged enough facts to support an active solicitation

theory against the Individual Defendants.[12]  Plaintiff alleges that all of the Individual Defendants signed the Offering Materials, that certain defendants solicited sales at the Investor Day, and that all of the Individual Defendants were financially motivated to solicit sales.  The Court finds *Charles Schwab* involved similar allegations and that Court agrees that the solicitation question is "a factual question which should generally be left to the jury." *Id*.

Accordingly, the Court DENIES defendants' motion to dismiss for failing to state a claim under Section 12.

### III.    Material Misstatement or Omission

To survive a motion to dismiss the Section 11 and Section 12(a)(2) claims, the complaint must plead that the Offering Materials contained (1) a materially untrue statement or omitted a material fact (2) required to be stated or (3) necessary to make the statements not misleading.  15 U.S.C. §§ 77*k*(a), 77*l*(a)(2).  Items 105 and 303 of SEC Regulation S-K require to be stated, respectively, "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky," and a description of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §§ 229.105, 229.303(3)(a)(ii).  Allegations which state a claim under Item 303 also state a claim under Sections 11 and 12(a)(2). *See Steckman v. Hart Brewing, Inc*., 143 F.3d 1293, 1296 (9th Cir. 1998).  For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted).  A misrepresentation or omission is material if "it would have misled a reasonable investor about the nature of his or her investment." *In re Daou*, 411 F.3d at 1027 (citation omitted).  "Generally, whether a public statement is misleading, or whether adverse

---

[12] The parties' briefing focuses largely on whether the Individual Defendants can be held liable as statutory sellers under Section 12.  It is not clear to the Court how plaintiff contends that Slack is a statutory seller.  However, to the extent plaintiff contends that Slack sold shares directly to plaintiff and the class members, the Court is not persuaded because, *inter alia*, the company did not issue new shares in the direct listing.  If plaintiff wishes to pursue a Section 12 claim against Slack, the amended complaint shall articulate the basis of that claim.

United States District Court
Northern District of California

facts were adequately disclosed is a mixed question to be decided by the trier of fact." *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011) (citations and internal quotation marks omitted). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds [could] not differ.'" *Id.* at 1220-21 (citations omitted).

Plaintiff alleges material misrepresentations or omissions in several sets of statements concerning Slack's: (A) outages and SLAs, (B) scalable architecture, (C) competition with Microsoft, (D) key benefits, and (E) growth and growth strategy.[13]

### A.    Outages and SLAs

Plaintiff alleges that the Offering Materials misled investors regarding known vulnerabilities related to outages and omitted to inform investors of the highly unusual and punitive SLAs the company had entered into with many of its customers. Slack disclosed in the Offering Materials that its

> continued growth depends, in part, on the ability of existing and potential organizations on Slack to access Slack 24 hours a day, seven days a week, without interruption or degradation of performance. We have in the past and may in the future experience disruptions, data loss, outages, and other performance problems. We may not be able to maintain the level of service uptime and performance required by organizations on Slack, especially during peak usage times and as our user traffic and number of integrations increase. For example, we have experienced intermittent connectivity issues and product issues in the past, including those that have prevented many organizations on Slack and their users from accessing Slack for a period of time.

ACAC ¶ 95 (emphasis removed). Slack also disclosed, "We provide service level commitments under certain of our paid customer contracts. If we fail to meet these contractual commitments, we could be obligated to provide credits for future service, or face contract termination with refunds of prepaid amounts related to unused subscriptions, which could harm our business, results of operations, and financial condition." *Id*.

Plaintiff contends that these statements were misleading and that they omit information

---

[13] The parties' briefing organizes the alleged misstatements and omissions into five categories, which largely but not entirely align with the organization of the ACAC, which organizes the misstatements and omissions into four categories. The Court's order follows the parties' organization of the alleged misstatements and omissions into five separate categories.

United States District Court
Northern District of California

required by Items 105 and 303 because, *inter alia*, Slack's reliability problem was not simply hypothetical but a known issue to defendants and the company was automatically paying out significant amounts of service credits regardless of whether customers were affected or requested a refund.  Plaintiff alleges that the Offering Materials did not disclose that the SLAs guaranteed an uptime of 99.99%, which is significantly stricter than the 99.9% promised by competitors; moreover, Slack did not disclose that the SLAs provided that failing to meet the guarantee would cost Slack a credit payout multiplier of 100 times what each customer paid, regardless of whether the customer complained or was even affected by the outage.  *Id*. ¶¶ 63, 96, 109, 112, 120.  Nor did the Offering Materials disclose that during seven out of the twelve months of 2018, Slack had already failed to meet its uptime guarantee.  *Id*. ¶ 121.  Plaintiff alleges that this information is material because of the significant stock price drop following the September 4, 2019 conference call revealing the policies that Slack admitted were "outrageously customer-centric," "exceptionally generous," and not "in line with industry standards."  *Id.* ¶¶ 6, 96, 109, 112; 99-125.

The Court finds that plaintiff has plausibly pled that Slack's disclosures omitted material information as well as violations of Items 105 and 303.  Although the disclosures do discuss the existence of Slack's SLAs, the unusual nature of the SLAs' terms is an omitted and "significant factor[] that make[s] an investment . . . risky."  *See* 17 C.F.R. § 229.105.  And although the question of whether the seven months of outages in 2018 constitute a "trend" is a factual inquiry for a later stage of these proceedings, it is plausibly pled that Slack was aware of those outages at the time of its disclosures, and that future outages would have an "unfavorable impact . . . on revenues" due to the SLA terms.  *See* 17 C.F.R. § 229.303(3)(a)(ii).

At minimum, the adequacy of Slack's disclosures is not "so obvious that reasonable minds [could] not differ."  *See SEC v. Todd*, 642 F.3d at 1220-21.  The characterization of past outages as "intermittent" is technically true, and Slack "could be obligated to provide credits" per the SLAs; but omitting the considerable frequency of outages as well as their "exceptional[]" consequences out of line with industry standards could plausibly "mis[lead] a reasonable investor about the nature of his or her investment."  *In re Daou*, 411 F.3d at 1027.  The nearly 12% drop in stock price to $27.38 immediately following the September 4 announcement about financial highlights, outages

in the quarter, and the unusual uptime commitment—followed by another 8.98% drop to $24.92 the next trading day—indicate the materiality of this information to investors.  *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1183 (S.D. Cal. 2009) ("significance of this information is illustrated by," *inter alia*, "the market reaction to the alleged disclosures").  That the SLA terms were already publicly available on Slack's website does not make its omission from the Offering Materials less material.  *See Miller v. Thane Int'l, Inc*., 519 F.3d 879, 887 (9th Cir. 2008) ("Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public.").

Since the ultimate question of "whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact" and there is room for reasonable disagreement here, s*ee SEC v. Todd*, 642 F.3d at 1220-21, the Court finds that plaintiff's challenge to statements regarding outages and the SLAs is adequate for the pleading stage.

### B.    Scalable Architecture

In a section of the Offering Materials describing Slack's business, Slack stated that it "built [its] technology infrastructure using a distributed and scalable architecture on a global scale." ACAC ¶ 92; *see also* Kahn Decl. Ex. A at 124.  Plaintiff alleges that this statement was misleading because "Slack was facing difficulty in scaling globally and attaining enterprise customers . . . as evidenced by the Slack App's widespread downtime."  *Id*. ¶ 94.  Plaintiff also alleges that this statement was misleading because in the September 4, 2019 earnings call, defendant Butterfield stated that the June and July 2019 outages were caused by "scaling . . . we continue to hit limits that we didn't realize were built into the system."  *Id.* ¶ 111.

Defendants contend that there is nothing misleading about the statement that Slack "built [its] technology infrastructure using a distributed and scalable architecture," and they note that the Registration Statement discloses, in the section on risks, that "as we continue to expand . . . we may not be able to scale our technology to accommodate the increased capacity requirements, which may result in interruptions or delays in service."  Kahn Decl. Ex. A at 29.  Defendants also note that in the September 4, 2019 call, Butterfield also noted: "We have been successful in scaling . . . between

99.9% and 99.99% . . . every quarter and most quarters 99.99%." Kahn Decl. Ex. D at 14 (Dkt. No. 54-4).

The Court agrees with defendants that the challenged statement is not misleading.  Although plaintiff contends that the 2018 and 2019 outages show that Slack was facing difficulty in scaling globally, that does not make the general statement that Slack "built [its] technology infrastructure using a distributed and scalable architecture," misleading, particularly when Slack disclosed that as the company grew "we may not be able to scale our technology to accommodate" increased requirements, leading to possible outages.  Asserting the existence of a "scalable architecture" is not a representation that there have not been any problems with the infrastructure nor is it a promise that there will not be any future problems with scaling.  *Compare In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (finding actionable statements about a pipeline because "Plochocki and the others did not just describe the pipeline in subjective or emotive terms.  Rather, they provided a concrete description of the past and present state of the pipeline.  They repeatedly reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters."), *with In re Intel Corp. Sec. Litig.*, Case No. 18-cv-00507-YGR, 2019 WL 1427660, at *9-12 (N.D. Cal. Mar. 29, 2019) (holding various statements regarding chip security and performance to be too vague to be actionable).  Moreover, the disclosures noted that Slack may be unable to maintain service uptime for exactly the reason stated in the September 4, 2019 call: "especially during peak usage times and as our user traffic and number of integrations increase."  ACAC ¶ 95.  The Court therefore GRANTS defendants' motion to dismiss on this ground.


### C.      Competition with Microsoft

Next, plaintiff challenges statements about the "strength of [Slack's] market leadership," and statements that "only vaguely described the existing competition and downplayed the impact the potential competitors may have on [Slack]."  *Id.* ¶¶ 80, 83.  Plaintiff alleges that Microsoft Teams had already eclipsed Slack as the market leader before the direct listing, and continued to do so after the listing; the pre-listing evidence of this is based on a *PCMag.com* analysis comparing the two

companies, and the post-listing evidence is based on a *Vox* article graphing a comparison of the companies' daily active users. *Id.* ¶¶ 57-58, 86-88.

The Court finds these allegedly misleading statements immaterial because the competitive advantages of Microsoft were adequately disclosed.  The Offering Materials expressly state, "Our primary competitor is currently Microsoft Corporation," and that "we expect competition to intensify in the future."  Kahn Decl. Ex. A at 16.  The Offering Materials also state that "[m]any of our existing competitors have . . . substantial competitive advantages," and list these advantages in detail, including: "greater brand name recognition and longer operating histories, larger sales and marketing budgets and resources, broader distribution, and established relationships with independent software vendors, partners, and customers, greater customer experience resources, greater resources to make acquisitions, lower labor, and development costs . . ." *Id.* at 17.

Moreover, Slack was under no duty to report the data and relative capacity of its competitors. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406 (9th Cir. 1996) (rejecting proposition that defendant company "was obliged not only to report on its own product line and marketing plans, but to report on and make predictions regarding *Microsoft's* intentions," even if Microsoft had disclosed those intentions to the company).  Although the pleadings plausibly demonstrate that Slack was in fierce competition with Microsoft before the direct listing, and that Slack had data on its own metrics, Slack did not omit material information by failing to include data or comparisons on Microsoft's metrics.

The Court therefore GRANTS defendants' motion on this ground.

### D.     Key Benefits

Plaintiff also challenges Slack's "Summary of Key Benefits," which contained such statements as: "People love using Slack and that leads to high levels of engagement"; "Slack increases an organization's 'return on communication'"; "Slack increases the value of existing software investment"; "An organization's archive of data increases in value over time"; "Slack helps achieve organizational agility"; and  "Developers are better able to reach and deliver value to their

customers."  ACAC ¶ 91.[14]  Plaintiff alleges that these statements "in combination with other statements in the Offering Materials . . . implied that the Slack App was a market leader with unique advantages over its competitors and that the Company possessed the ability to scale up its services to reach more lucrative enterprise customers."  *Id.* ¶ 92.  "However, the statements in [¶ 91] were materially false and/or misleading because: (1) Microsoft Teams had already overtaken Slack as the market leader at the time of the Offering; (2) the Slack App's reliability was regularly below the promised 99.99% uptime; and (3) Slack was facing difficulty in scaling globally and attaining enterprise customers due to problems in maintaining and expanding its infrastructure as evidenced by the Slack App's widespread downtime."  *Id.* ¶ 94.

Defendants contend that plaintiff fails to plead that these statements are misleading because the statements about Slack's "key benefits" have nothing to do with the allegedly omitted information about Microsoft Teams, outages, or scalability problems.  Defendants also argue that the Registration Statement contained disclosures about these matters in other parts of the document.

The Court finds that the statements in the "Key Benefits" section are not actionable.  Plaintiff does not allege that any particular statement is false or misleading.  For example, one of the seven "key benefits" is:

> **An organization's archive of data increases in value over time.**  As teams continue to use Slack, they build a valuable resource of widely accessible information.  Important messages are surrounded by useful context and users can see how fellow team members created and worked with the information and arrived a decision.  New employees can have instant access to the information they need to be effective whenever they join a new team or company.  Finally, the content on Slack is available through powerful search and discovery tools, powered by machine learning, which improve through usage.

*Id.* ¶ 92.  Plaintiff does not allege that there is anything false or misleading about this statement or any of the other statements found in the other six "key benefits."  Instead, plaintiff claims that by touting its "key benefits" Slack "implied that the Slack App was a market leader with unique advantages over its competitors and that the Company possessed the ability to scale up its services to reach more lucrative enterprise customers," when in fact the company was experiencing problems

---

[14]  These statements are the bolded statements within each bullet point paragraph quoted in Paragraph 91; the Court has not replicated the entirety of Paragraph 91, but the bolded statements are illustrative of the statements in the "Summary of Key Benefits."

due to competition, reliability and infrastructure. *Id.* ¶¶ 92, 94. However, a review of the "Summary of Key Benefits" section does not reveal any explicit or implicit statements about Slack's market position, competition, the reliability of its technology, or its infrastructure. While the Court has concluded that plaintiff has sufficiently alleged that the risk disclosures omitted material information about the outages and the SLAs, the Court is not persuaded by plaintiff's contention that Summary of Key Benefits is false or misleading simply because it described, in very general terms, the company's strengths.

Further, the Court notes that most, if not all, of the statements quoted in Paragraph 91 would appear to be inactionable puffery. *See, e.g.*, *id.* ¶ 91 ("People love using Slack and that leads to high levels of engagement. Slack is enterprise software created with an eye for user experience usually associated with consumer products. We believe that the more simple, enjoyable, and intuitive the product is, the more people will want to use it. As a result, teams benefit from the aggregated attention that happens when all members of a team are engaged in a single collaboration tool."); *see Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (finding various challenged statements to be inactionable puffery).

The Court GRANTS defendants' motion to dismiss on this ground.

### E.    Growth and Growth Strategy

Lastly, plaintiff alleges that the Offering Materials contained materially false or misleading statements about Slack's "[d]ifferentiated go-to-market strategy" in three subsections of the "Summary" part of the Registration Statement: "Our Business Model," "What Sets Us Apart," and "Growth Strategy." ACAC ¶¶ 77-81. Plaintiff alleges,

> The statements in ¶¶ 77-81 were materially false and/or misleading and omitted material facts at the time of the Offering because: (1) the Company's revenue growth was trending downward while marketing expenses were increasing due to increasing competition from Microsoft Teams; (2) the Slack App's reliability was compromised due to scaling its technology to meet enterprise-level customer needs; (3) the Company's financials were uniquely vulnerable due to its unique SLA which included an "exceptionally generous credit payout multiplier" of 100 times the price paid by the customer during the downtime, which the Company provided whether or not the customers were actually affected; and, (4) the Company's growth was slowing down in several aspects, including its key metric, DAUs.

1    *Id.* ¶ 82.

2        Defendants contend that these statements are not actionable because (1) they consist of

3    optimistic puffery (for example, statements about Slack "offering an exceptional product," "[t]he

4    strength of our market leadership" and "[c]ustomer love leading to stickiness and organic

5    expansion", *id.* ¶¶ 79-80); (2) they are forward-looking statements that are not actionable under the

6    "bespeaks caution" doctrine (for example, the statements in "Growth Strategy" such as "we will

7    continue to expand our marketing and sales efforts to reach more users" and "We plan to continue

8    to grow use and users within organizations on Slack by increasing our investments in our direct

9    sales force . . .", *id.* ¶ 81)[15]; (3) the allegedly omitted information is unrelated to Slack's discussion

10   of its strategy; and (4) the disclosures are not misleading because the information was actually

11   disclosed either in the challenged subsection (e.g., the slowing revenue growth numbers) or

12   elsewhere in the Registration Statement (such as information about increasing sales and marketing

13   expenses and numbers of users).

14       The Court agrees with defendants.  As with the "Key Benefits" section, plaintiff does not

15   allege that any particular statements are false or misleading.  Instead, plaintiff claims that certain

16   information was omitted, but as defendants note, information about revenue growth, sales and

17   marketing expenses, and numbers of users was disclosed either in the Business Model section or

18   elsewhere in the Registration Statement.  To the extent plaintiff challenges statements in the

19   "Growth Strategy" section, plaintiff has not explained how these forward-looking statements are

20   actionable.  Finally, although the Court has concluded that plaintiff has stated a claim that the risk

21   disclosures were misleading by omitting information about the outages and unique vulnerabilities

22   posed by the SLAs, the Court is not persuaded that a general summary of "What Sets Us Apart"[16]

24       [15]  This section also states, *inter alia*, "We will continue a relentless focus on product design
     . . . We believe our market remains underpenetrated and we will continue to expand our marketing
25   and sales efforts . . . We plan to continue to grow use and users . . . we believe adoption of [guest
     accounts and shared channels features] will grow significantly in the coming years . . . We intend to
26   increase investments in marketing  .  .  .  We plan to open offices and hire sales and customer
     experience people . . ." *Id.*

27       [16]  The "What Sets Us Apart" section contains numerous statements that the Court views as
28   inactionable puffery, such as "Our development, design, partnerships, customer engagement, and
     investments are targeted at realizing the enormity and simplicity of Slack's mission:  to make

or even a more specific and factual description of "Our Business Model" is rendered misleading by omitting unrelated information about risks.

Accordingly, the Court GRANTS this aspect of defendants' motion.

## IV.    Section 15 Standing

Section 15 imposes secondary liability upon "[e]very person who . . . controls any person liable under sections 77k [Section 11] or 77l [Section 12]."  15 U.S.C. § 77o.  Plaintiff brings this claim against the Individual Defendants and the VC Defendants.  Defendants move to dismiss this claim because of a failure to plead both an underlying violation and to adequately plead that the VC Defendants controlled Slack.  Since the Court has found that plaintiff states an adequate claim for the underlying violations, only the second issue remains to be resolved.[17]

Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405; *see Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 n.9 (9th Cir. 2000).[18]  "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Howard*, 228 F.3d at 1065 (citation omitted).  "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power."  *No. 84 Employer-Teamster Joint Council*

---

people's working lives simpler, more pleasant, and more productive"; "People love using Slack and many become advocates for wider use inside of their organizations"; and "As Slack usage increases inside an organization, more value is created for each additional user who might join, as well as for all existing users."  Kahn Decl. Ex. A at 5; ACAC ¶ 80; *see Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606 ("Feel good monikers" such as "good" and "well-regarded" are inactionable puffery).

[17]  The Individual Defendants do not contend that they are not controlling persons.

[18]  "[T]he controlling person analysis is the same" for Section 15 claims under the Securities Act, as for Section 20(a) claims under the Securities Exchange Act.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990).  Although Securities Exchange Act claims are typically analyzed under the heightened fraud pleading standard of 9(b), "district courts in the Ninth Circuit have concluded that because fraud is not a necessary element of a control person claim, the pleading of such a claim need only meet the requirements of Rule 8(a)."  *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *33 n.249 (C.D. Cal. Aug. 8, 2013) (citation omitted).

*Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (quoting *Howard*, 228 F.3d at 1065). "[A]t least some indicia of . . . control is a necessary element of 'controlling person' liability." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996). "[T]raditional indicia" include a prior lending relationship with the accused company, ownership of its stock, and a seat on its Board. *Id.* at 1162.

Plaintiff alleges that the three VC Defendants are controlling persons because they: infused capital into Slack before its direct listing; owned respectively 23.8%, 13.2%, and 10.1% of Slack's supervoting shares at the time of the direct listing; each had a director on the Board, who reviewed and signed the Offering Materials; "caused [Slack] to indemnify them from any liabilities arising from the Securities Act" and "to obtain and maintain a directors and officers insurance policy for them"; "caused Slack to effectuate the Offering" because they "wished to cash in their early investment and stake in [Slack] as soon as possible"; and sold their shares in the direct listing, respectively earning $329 million, $116 million, and $39.6 million. ACAC ¶¶ 22, 25, 26, 30-34, 45, 48, 73.

As an initial matter, the Court is not persuaded that being a beneficiary of the indemnity and insurance policies is relevant to allegations of control in relation to the violation at issue here, namely misrepresentations or omissions in the Offering Materials. *See Paracor*, 96 F.3d at 1158, 1161 (finding "evidence that [defendant lender] had a strong hand in Casablanca's debenture offering," on which bridge loan had been conditioned, unrelated to "indicia of control of Casablanca in a broader sense"). Thus, the Court turns to the other control allegations.

Defendants identify a line of cases within this district demonstrating that ownership of a minority of shares, a position on the Board, or a combination of both are insufficient to establish control. *See In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1243 (N.D. Cal. 1994) (no presumption of control from status as outside director, nor for minority shareholder with agent on Board); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-00109 SBA, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29. 2000) (no control for one defendant serving on Board, nor for another defendant owning a 20% amount of shares that declined through class period); *O'Sullivan v. Trident Microsys., Inc.*, No. C 93-20621 RMW (EAI), 1994 WL 124453, at *19 (N.D. Cal. Jan. 31, 1994)

United States District Court
Northern District of California

(no facts demonstrating exertion of control through 9.5% stock ownership or through agent placed on Board).[19]

Plaintiff responds with two lower court cases within this Circuit finding sufficient control allegations comparable to the facts here. *See Thomas v. Magnachip Semiconductor Corp*., 167 F. Supp. 3d 1029, 1048-49 (N.D. Cal. 2016) (defendant lost majority shareholder status shortly after beginning of class period; placed designees on the Board, who signed the relevant documents; and "used its control of [company] to cash out its investments . . . at enormous profits"); *In re Am. Apparel, Inc. S'holder Litig*., Case No. CV 10-06352 MMM (RCx), 2013 WL 10914316, at *34 (C.D. Cal. Aug. 8, 2013) (defendant held 20% ownership stake and designated two Board members who signed relevant report).

The Court concludes that plaintiff's pleading is sufficient under the lenient standard of 8(a). *See In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (under 8(a) standard, "even if the specific facts alleged by plaintiffs, taken alone, would not be enough to establish actual control . . . dismissal is improper as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster") (discussed by *Am. Apparel*, 2013 WL 10914316, at *37 n.262). Here, in addition to the plaintiff's allegations of the traditional indicia of control, plaintiff also alleges that a direct listing primarily enables the resale of existing shares by insiders and early investors such as the VC Defendants. Plaintiff has alleged that the VC Defendants "caused Slack to effectuate" this unusual listing in order to cash out their shares. The Court concludes that it is plausible that a factual record of control can be developed through discovery here.

Accordingly, the Court DENIES defendants' motion to dismiss for lack of Section 15 standing.

## CONCLUSION

For the foregoing reasons and for good cause shown, defendants' motion is GRANTED IN

---

[19] In *Golub v. Gigamon Inc*., defendants had only a 15.3% ownership stake, and the alleged contractual agreements granted defendants no control over the company. 372 F. Supp. 3d 1033, 1053 (N.D. Cal. 2019). However, the court dismissed the Section 15 claim because there was no primary violation, and the control analysis is dicta.

PART and DENIED IN PART.  If plaintiff wishes to amend the complaint, he must do so by **May 6, 2020**.

      **IT IS SO ORDERED**.

Dated: April 21, 2020

                                        SUSAN ILLSTON
                                        United States District Judge

United States District Court
Northern District of California