# Exhibit A



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com



# Slack's Direct Listing Tests Limits Of Securities Act

By **Francis McConville, Alec Coquin and Charles Wood** (December 10, 2019, 2:50 PM EST)

The initial public offering market has evolved. With recent regulatory changes and tidal waves of cash flowing through private markets, private equity has replaced the conventional liquidity IPO by sustaining companies until a later stage in their life cycle.

Now, IPOs, and direct listings specifically, are rapidly becoming a means of cashing out early investments by private equity and insiders.

This evolution — encouraged by federal regulation, rulemaking and the relaxation of listing requirements by the exchanges — is testing the boundaries of the Securities Act of 1933, and potentially eroding age-old investor protections designed for more conventional liquidity-driven IPOs.



Francis McConville

Slack Technologies Inc.'s recent direct listing on the New York Stock Exchange and the resulting shareholder litigation highlight the tension between current listing requirements and the potentially dated investor protections of the Securities Act.

**The Securities Act of 1933 and the Registration of Securities**

In the aftermath of the stock market crash of 1929, the Securities Act was enacted by President Franklin D. Roosevelt in 1933 as part of the New Deal amid the Great Depression.[1]

The purpose of the Securities Act was to foster transparency by providing investors with robust and uniform disclosures and to forbid the dissemination of misinformation or fraudulent conduct in connection with public offerings of securities.



Alec Coquin

To accomplish this goal, the Securities Act mandates the registration of securities offered to the public, with several notable exemptions, including private placements by the issuer under U.S. Securities and Exchange Commission Regulation D.[2]

Any such registration statement, which must be filed with and approved by the SEC, is required to disclose information necessary for investors to assess the financial health and prospects of the issuer. Thus, in a traditional underwritten IPO, a company issues new shares which are registered under the Securities Act, providing investors with a prospectus and registration statement.



Charles Wood

Importantly, the Securities Act armed investors with several private causes of action. Among them, Section 11 provides for the recovery of damages in connection with the purchase of securities on, or traceable to, a public offering in the event the registration statement contains material misstatements and/or omissions at the time the SEC declared it effective.

The statute, which sounds in negligence, generally limits damages to the difference between the offering price of the security at issue, and the price of the security upon the filing of a civil complaint.

[3]

## Rule 144 and the Unregistered Resale of Securities

SEC Rule 144[4] provides an exemption from the Securities Act's registration requirements to those seeking to publicly resell securities received through private placements or other exempt offerings. To comply with Rule 144, the restricted or control securities must have been held by the acquirer for a certain length of time depending on the circumstances.

For new public companies, i.e., companies that have not been subject to SEC reporting requirements for at least 90 days, securities sold under Rule 144 must have been held for at least one year from receipt prior to resale to the public. If the company in question has been public for 90 days or more, this holding period is reduced to six months.

## The Slack Direct Listing and Amendment to the NYSE Listing Requirements

Forgoing a conventional IPO through traditional Securities Act registration, Slack went public on June 20 through a direct listing on the New York Stock Exchange.

In a direct listing, a company registers some, but not all, outstanding shares held by third parties, and does not issue any new shares. This alternate route, which unlike traditional IPOs is not used to raise capital, can save a company underwriting fees and allow its existing shareholders, namely company insiders and early private equity investors, the ability to immediately sell their stock after the listing without the lock-up restrictions that accompany conventional IPOs.

Notably, only approximately 42% of Slack's outstanding shares were registered in its direct listing, with the remaining 58% exempt from registration under Rule 144. Therefore, the market for Slack shares is now a mixed market containing both registered shares and shares exempt from registration under Rule 144.

Slack's listing was permitted by a recent change to Section 102.01B of the NYSE Listed Company Manual, known as the Spotify Rule, which now allows the NYSE, in its discretion, to approve a company for listing that does not have any history of trading in a private placement market if the company provides an independent third-party valuation evidencing a market value of its shares held by nonaffiliates of at least $250 million.[5]

In a bid to attract further so-called unicorn listings to its platform, the NYSE has also recently filed a proposal with the SEC to allow companies that go public through a direct listing to also sell new shares.[6]

## Shareholder Litigation Follows Slack's Direct Listing

Slack is currently the subject of a securities class action brought pursuant to the Securities Act in connection with the company's IPO, alleging material misstatements and omissions in the company's registration statement.

Slack filed a motion to dismiss well before the conclusion of the Private Securities Litigation Reform Act, or PSLRA, lead plaintiff appointment process, arguing that all putative plaintiffs lack statutory standing because they cannot trace their shares to the registration statement where unregistered shares were also available for sale under Rule 144 at the time of the direct listing.[7]

Defendants also argued that because Slack's direct listing never set an offering price, that plaintiffs will be unable to prove statutory damages.[8]

## Are Direct Listing Shares Traceable to a Registration Statement?

Defendants contend that the action must be dismissed for lack of standing on traceability grounds. Namely, that because at the time of the direct listing, only about 42% of Slack's shares were registered, with the other 48% exempt from registration under Rule 144, it would be impossible to determine whether the shares purchased after the direct listing were registered.

Defendants bolster this argument by highlighting that, in the context of Slack's direct listing, the sale of registered shares is purely up to the discretion of the existing stockholders. And, indeed, reported transactions following Slack's IPO suggest that material amounts of both registered and unregistered shares were sold during the direct listing.[9]

To plead a violation of Section 11, a plaintiff must adequately allege that the securities it purchased were issued under the registration statement — i.e., that its securities can be traced to that registration statement. The level of factual specificity needed for a plaintiff to adequately allege that shares are traceable to an offering varies depending on the context.

When all of a company's shares were issued in a single offering under a single registration statement, it is sufficient merely to allege that the plaintiff's shares are directly traceable to the offering in question. According to the U.S. Court of Appeals for the Ninth Circuit's 2013 decision in Century Aluminum Co. Securities Litigation, no "further factual enhancement is needed because by definition all of the company's shares will be directly traceable to the offering in question."

However, when a company has issued shares in multiple offerings under more than one registration statement or when a sufficient amount unregistered shares have entered the market, the Ninth Circuit said in Century Aluminum that "a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering."

Even where 97% of shares were issued pursuant to a registration statement, courts have balked at finding traceability.

While the cases addressing traceability in the Ninth Circuit have never specifically addressed traceability in the context of a direct listing, the defendants in the securities class action against Slack have nevertheless raised a compelling argument that, given the nature of a direct listing and the mix of registered and unregistered shares available for sale, any putative plaintiff will be unable to establish traceability at the pleading stage.

While technically accurate, the defendants' arguments will undoubtedly embolden the plaintiffs' counsel to seek jurisdictional discovery from the NYSE and other third parties in order to establish traceability.

As the PSLRA discovery stay is not a bar to jurisdictional discovery, the defendants' attempted end-run around Securities Act liability may do nothing more than increase litigation costs early in the securities class action litigation.[10]

At the very least, the defendants' traceability arguments will push the plaintiffs' counsel toward careful scrutiny of the alleged anonymity in securities transactions and the timing and other requirements of Rule 144.

Failing success on these challenges, the deterrent effect of Section 11 in preventing material omissions and misrepresentations in connection with public offerings of securities may be greatly diminished.

**Measure of Damages Under the Securities Act in a Direct Listing**

The defendants also argue that the complaint must be dismissed for lack of damages. Specifically, that because a direct listing has no set offering price, recovery of Section 11 damages are per se unrecoverable. Therefore, according to the defendants, neither the $38.50 initial opening price of Slack shares nor the $26 reference price constitute an offering price, thus eliminating Section 11 liability in the direct listing context.

However, damages in a direct listing could be predicated on a value-based analysis. Under a value-based model, instead of relying on the traditional offering price — or in the case of Slack, the purported lack thereof — plaintiffs may seek to plead that the actual value of the securities was less than the purchase price to establish the damages element of Section 11.

By way of example, if an investor buys shares of Example Co. in a public offering for $20 per share,

yet it is later determined that the true value of Example Co. shares at the time of the offering was $10 but for the misstatements and omissions, the investor may argue that she has cognizable damages of $10 per share.

A value-based damages model may play an important role if the trend of major direct listings continues to expand, as may be inferred from recent proposals by the exchanges. Where a company's valuation is determined predominantly through private equity participants — many of whom immediately cash out following the direct listing — there is arguably a strong incentive to inflate a company's valuation prior to taking it public.

Indeed, Softbank Group Corp. has recently been accused of inflating the value of its private investments by participation in multiple consecutive funding rounds at inflated values.[11] This, coupled with the fact that direct listings lack a traditional offering price, may require aggrieved investors to alternatively argue for valuation-based damages.

A value-based theory of damages has recently been upheld at class certification in the pending federal securities class action against Snap Inc.[12]

In Snap, the market price of the securities at issue was trading above the offering price at the time the suit was brought, thereby precluding damages under a traditional price-based analysis. The court, however, in looking to case law from the U.S. Court of Appeals for the Second Circuit,[13] determined that a value-based damages theory was valid. Therefore, this theory may become key to Section 11 cases arising from direct listings.

**Conclusion**

It is clear the evolution of the IPO is stressing the boundaries of Section 11 of the Securities Act with potentially grave implications for the quality and substance of disclosures afforded investors in public companies.

With regulatory proposals seeking to further expand the versatility of direct listings to allow companies to issue securities, the outcome of the defendants' motion to dismiss in the securities class action against Slack will bare careful scrutiny.

Should the defendants successfully immunize direct listings from a private cause of action, a rational modification of the Securities Act will be needed to ensure that investors in the next direct listing are given a fair shake.

---

*Francis P. McConville is of counsel, and Alec T. Coquin and Charles Wood are associates at Labaton Sucharow LLP.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74.

[2] See 17 C.F.R. §230.500–508.

[3] For example, if Example Co. held a stock offering for $10 per share, and upon the filing of a complaint the shares were trading at $5, damages would be limited to $5 per share.  As discussed, infra, however, what constitutes an "offering price" is subject to interpretation.

[4] 17 C.F.R. §230.144.

[5] The prior rule required companies to demonstrate that their share held by non-affiliates would have a market value of at least $100 million based on the trading of the shares in a trading system for unregistered securities operated by a national exchange or registered broker-dealer.

[6] See Tom Zanki, NYSE Want to Let Cos. Raise Capital Via Direct Listings, Law360 (Nov. 26, 2019),

https://www.law360.com/securities/articles/1223653/nyse-wants-to-let-cos-raise-capital-via-direct-listings.

[7] See Motion to Dismiss, Dennee v. Slack Techs., Inc., No. 19-cv-05857 (N.D. Cal. Nov. 8, 2019), ECF No. 14.

[8] See id. at 16.

[9] See, e.g., Ari Levi, Here's Who Is Getting Rich from Slack's Stock Market Debut, CNBC (June 19, 2019), https://www.cnbc.com/2019/06/19/slack-debut-means-big-returns-for-accel-and-andreessen.html.

[10] See In re Baan Co. Sec. Litig., 81 F. Supp. 2d 75, 83 (D.D.C. 2000) ("Limited discovery must be permitted to prevent the unfairness of a party's being denied access to information which his opponent possesses and which, if produced, would establish the legitimacy of his being before the court. There is no reason to read the [PSLRA] or its legislative history to abolish the case law permitting limited jurisdictional discovery and to create the very unfairness that case law prevents.").

[11] See Peter Elstrom & Pavel Alpeyev, After WeWork, SoftBank's Startup Bookkeeping Draws Scrutiny, Bloomberg (Nov. 25, 2019), https://www.bloomberg.com/news/features/2019-11-26/after-wework-softbank-s-startup-bookkeeping-draws-scrutiny.

[12] Order Granting Plaintiff's Motion for Class Certification, In Re Snap Inc. Sec. Litig., No. 17-cv-03679 (C.D. Cal. Nov. 20, 2019), ECF No. 341 at 11–12; see also In Chambers Order Denying Motion to Dismiss, In Re Snap Inc. Sec. Litig., No. 17-cv-03679, ECF No. 92 at 15 (also determining that a value-based damages model is a "valid theory").

[13] See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co. ⬤ , 693 F.3d 145, 165 (2d Cir. 2012); McMahan & Co. v. Wherehouse Entm't, Inc. ⬤ , 65 F.3d 1044, 1048–49 (2d Cir. 1995).

---

All Content © 2003-2020, Portfolio Media, Inc.