# Exhibit B

# CORPORATE COUNSEL

The Business Magazine for In-House Counsel

corpcounsel.com | December 20, 2019

# Complex and Novel Section 11 Liability Issues of Direct Listings

*By Andrew Clubok, Gavin Masuda, Gregory Mortenson, Morgan Whitworth, Greg Rodgers and Brittany Ruiz*

Latham & Watkins has been at the forefront of the development of the direct listing, an innovative "going public" alternative to the traditional IPO, having represented music streaming giant Spotify Technology S.A. in its 2018 direct listing, the first ever, and the financial advisors to messaging platform Slack Technologies in its 2019 direct listing. From a business perspective, the benefits of a direct listing are clear: a company's outstanding shares are listed on a stock exchange without either a primary or secondary underwritten offering, enabling (but not requiring) existing shareholders, such as employees and early-stage investors, to sell their shares on a stock exchange. Since there is no underwritten offering, a direct listing does not require the participation of underwriters, which eliminates certain features that are typical of a traditional IPO, such as lock-up agreements and price stabilization activities by the underwriters. In the direct listings completed thus far, both registered and unregistered shares (sold in reliance on SEC Rule 144, which permits, in part, non-affiliates to sell unregistered shares) were immediately sold as trading opened, and both

companies' stock had significant investor interest. The success of these direct listings proves that a direct listing is a viable way for companies to "go public" while providing immediate liquidity to employees and other investors.

In this article, we discuss another important advantage of the direct listing: the potential to deter private plaintiffs from bringing claims under Section 11 of the Securities Act of 1933, which imposes strict liability for material misstatements or omissions in registration statements.

The primary reason a direct listing could deter litigation is by restricting the class of persons who have standing to sue under Section 11. To establish standing under Section 11, a plaintiff must "trace" the shares it purchased to the challenged registration statement. See 15 U.S.C. §77k(a). In the case of a traditional IPO, tracing is easily established by anyone who purchased stock before non-IPO shares enter the market. But tracing is difficult (if not impossible) to establish in "mixed market" situations—such as after the expiration of an IPO lockup period or secondary offerings—where registered and unregistered shares are



commingled in the market. This is because paper stock is rarely traded in today's markets; instead, market participants trade interests in a pool of stock of the same type (for example, common stock) that is held by a depositary institution called The Depository Trust Company or "DTC." In this system, stockholders do not have a direct interest in any specific security certificate of a particular issuer. Instead, they have a pro-rata interest in the "fungible bulk" of all the securities held by DTC that share the same CUSIP. This practice is necessary to assure the prompt and accurate settlement of trades because all shares that trade in the market must be fungible. But the practice also means that where a security is held by DTC and there are multiple registration statements or a mix of registered and

**CORPORATECOUNSEL**

unregistered shares, it is currently impossible to determine whether a particular stock holding is tied to a particular registration statement once trading commences.

The federal courts and plaintiffs' bar have recently begun to recognize the difficulty of tracing in mixed market situations. The Ninth and First Circuits, in particular, have held that where there are multiple offerings of a security, a plaintiff cannot generally allege the shares it purchased are "traceable" to the registration statement at issue in order to establish Section 11 standing. See *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1107-08 (9th Cir. 2013); *In re Ariad Pharm. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) (citing Century Aluminum). Instead, "greater factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." *Century Aluminum*, 729 F.3d at 1107-08. Although neither the Ninth nor First Circuits has prescribed the situations where "greater specificity" is required, it is clear that motions to dismiss for lack of Section 11 standing could be granted in appropriate circumstances. No other federal court of appeals has specifically addressed the question of tracing's impact on Section 11 standing at the pleadings stage, but federal district courts have reached contrary conclusions. See, e.g., *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015).

In the Ninth Circuit, district courts have begun to apply *Century Aluminum* to find that a plaintiff cannot establish standing once *any* unregistered shares enter the market. In *In re Pivotal Technologies Sec. Litig.*, No. 3:19-cv-02589-CRB, 2019 WL 5864581, at *8-11 (N.D. Cal. Nov. 8, 2019), for example, Judge Breyer of the Northern District of California disqualified two investors from serving as lead plaintiffs on grounds that both purchased their securities after the expiration of a 180-day lockup period and *un*registered shares were sold into the market. The disqualified investors argued they adequately pled standing because only 25% of the shares outstanding at the time of their purchases were unregistered—rendering it "plausible" (i.e., more likely than not) that the shares they purchased were registered. The eventual lead plaintiff countered that percentages are insufficient to establish standing in this mixed-market scenario because it was "simply impossible to do that here because you can't trace the chain of title between registered and unregistered shares." Judge Breyer agreed, finding that the disqualified investors failed to plead "additional facts that tend to exclude the possibility" that the shares purchased came from "non-IPO shares." Id.; but see *In re Snap Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2019 WL 6270291, at *11 (C.D. Cal. Nov. 20, 2019) (acknowledging at class certification that the tracing requirement "fits uncomfortably

in the modern securities trading world," but declining to hold statistical tracing invalid where approximately 99.95% of the shares in the market during the relevant period were traceable to the registration statement because it could "effectively inoculate a corporation against nearly all potential Section 11 liability").

No court has yet considered Section 11's tracing requirement vis-à-vis a direct listing. But applying the tracing requirement as interpreted by courts in the Ninth Circuit to the facts of a direct listing suggests that few (if any) purchasers will be able to trace their stock to the challenged registration statement. As discussed above, both registered and unregistered stock are immediately sold into the market in a direct listing. In order to assure fair and equitable access of all stockholders to the public market and facilitate orderly settlement of those trades, stockholders who elect to sell *must* transfer their stock from being held directly as a stockholder of record to being held in "street name" at DTC. This means that from the very first moment of trading, registered and unregistered stock are held in a comingled "fungible bulk" at DTC, and cannot be distinguished from one another. At least in the Ninth Circuit, a direct listing should be regarded as a "mixed-market" situation requiring plaintiffs to plead additional facts (if any such facts can be pled) to "exclude the possi-

**CORPORATECOUNSEL**

bility" that the shares it purchased came from unregistered sales.

Second, the direct listing could limit the damages a plaintiff may claim. Section 11 provides for damages calculated (in most cases) as the difference between "the amount paid for the security (not exceeding the price at which the security was offered to the public)," and the value of the security at the time suit was brought. See 15 U.S.C. §77k(e). In a traditional IPO, courts have construed this language to refer to the "offering price"—i.e., the price at which the underwriters sell registered shares to initial purchasers (typically institutional investors).

There is no "offering price" in a direct listing. Instead, in both the Spotify and Slack listings, the NYSE, in consultation with financial advisors, established the "reference price" (essentially a guideline price that, in the case of Spotify and Slack, was close to the last material private sale prices, but which could be established by other criteria) for each company's stock. But, like in an IPO, the price at which the company's stock opens public trading—the "opening price"—is set by forces of supply and demand, with the designated market maker ("DMM" serving to match buy- and sell-side orders at what it believes will be a relatively stable opening price.

The absence of an "offering price" could impact Section 11 damages in several ways. For example, plaintiffs could argue that there is no cap on damages—which we think would be clearly inconsistent with Congress's intent in capping Section 11 damages "at the price at which the security was offered to the public." 15 U.S.C. §77k(g). On the other hand, defendants could potentially argue that the absence of an "offering price" means no damages are claimable from the company. Alternatively, the parties might argue that the "reference price" (i.e., the guideline price, explained above) or "opening price" (i.e., the first price at which the public is able to buy the security) should be the cap, or that the "value" of the security should control the analysis. Because courts rarely have had occasion to examine Section 11's damages cap in depth, the first decisions in the direct listing context will likely have to be made without the benefit of informative precedent.

Of course, multiple liability regimes of the Federal securities laws potentially attach to an offering of securities. While Section 11 claims may be difficult to plead due to the tracing requirement imposed by the statute, plaintiffs may be able to bring claims under other provisions, such as Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.

\* \* \*

The direct listing has proven to be a viable, alternate path to "going public" that most notably provides immediate liquidity to essentially all the listing company's stockholders. As more companies directly list their stock, litigants will increasingly spar over how Section 11—a statute born of the Great Depression and the paper trading of its time—applies to direct listings and today's electronic trading markets.

*Andrew Clubok is global chair of Latham & Watkins' securities litigation and professional liability practice. Based in the firm's Washington, D.C. and New York offices. Gavin Masuda is a partner in the firm's San Francisco office and a member of the firm's securities litigation and professional liability practice, white-collar defense and investigations, and complex commercial litigation practices. Gregory Mortenson is an associate in the firm's New York office and a member of the firm's litigation and trial department. Morgan E. Whitworth is a litigation associate in the San Francisco office with significant experience defending large technology companies in complex securities class actions and shareholder derivative suits. Greg Rodgers is a corporate partner in the New York office and a member of the capital markets, derivatives, and public company representation practices. Brittany D. Ruiz is an associate in the New York office. She is a member of the corporate department and her practice focuses on capital markets, general securities, and corporate matters.*

Reprinted with permission from the December 20, 2019 edition of CORPORATE COUNSEL © 2020 ALM Media Properties, LLC. This article appears online only. All rights reserved. Further duplication without permission is prohibited. For information, contact 877-257-3382 or reprints@alm.com. # CC-01022020-XXXXX