# Exhibit 5

**FILED**

**SAN MATEO COUNTY**

AUG 1 2 2020

Clerk of the Superior Court

By _____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

| | |
|---|---|
| IN RE SLACK TECHNOLOGIES INC. SHAREHOLDER LITIGATION, _____ / <br><br> This Document Relates To: <br><br> ALL ACTIONS _____ / | Master File No. 19CIV005370 (Consolidated with 19CIV05411; 19CIV05674; 19CIV05784; 19CIV05840; 19CIV06181; and 20CIV02589) CLASS ACTION <br><br> Assigned for All Purposes to Hon. Marie S. Weiner, Dept. 2 <br><br> **CASE MANAGEMENT ORDER #5** |

On June 3, 2020, hearing was held on Defendants' Demurrers to the Plaintiffs' Consolidated Class Action Complaint in Department 2 of this Court before the Honorable Marie S. Weiner in Department 2 of this Court. James Jaconette of Robbins Geller Rudman & Dowd LLP, Brian Danitz and Noorjahan Rahman of Cotchett Pitre & McCarthy LLP, John Jasnoch and Hal Cunningham of Scott + Scott Attorneys At Law LLP, Joshua Silverman and Jared Schneider of Pomerantz LLP, Yury Kolesnikov of Bottini & Bottini Inc., and Stephen Oddo of Robbins LLP appeared on behalf of the various Plaintiffs; and Michael Celio and Matthew Kahn of Gibson Dunn & Crutcher

1

LLP appeared on behalf of all Defendants. Also attending was Gabe Stern, Vice President of Legal Affairs for Defendant Slack Technologies Inc.

Upon due consideration of the briefs and evidence presented, and the oral argument of counsel for the parties, and having taken the matter under submission,

IT IS HEREBY ORDERED as follows:

1. Defendants' Demurrer to the Consolidated Class Action Complaint, first cause of action for violation of Section 11 of the Securities Act of 1933 is OVERRULED.

2. Defendants' Demurrer to the CCAC second cause of action for violation of Section 12 of the Securities Act of 1933 is SUSTAINED WITH LEAVE TO AMEND as to Defendants Slack Technologies Inc., Zell, and Smith; and is otherwise OVERRULED.

3. Defendants' Demurrer to the CCAC third cause of action for violation of Section 15 of the Securities Act of 1933 is OVERRULED.

4. Defendants' Requests for Judicial Notice are GRANTED as to Exhibits A (Registration Statement), D (Slack's Second Quarter Results Conference Call), and E (Prospectus), which are specifically referenced and quoted in the CCAC; and is DENIED as to Requests B and C. Indeed, although the Plaintiffs refer to Service Level Agreements, Exhibit B is not an SLA, but simply a portion of Slack's website discussing SLAs. Further the Court rejects Defendants' citations to websites and other factual arguments based upon information which is not in the CCAC and not subject to judicial notice.

5. Plaintiffs' Request for Judicial Notice of the Pirani/Denee decision by the USDC Northern District of California is GRANTED. Defendants' objection that

2

Plaintiffs are not entitled to engage in legal argument and analysis in a request for judicial notice, instead of a memorandum of points and authorities (potentially subject to page limitations) is SUSTAINED. Defendants' Supplemental Requests for Judicial Notice of subsequent orders in Pirani/Denee is GRANTED.

6.    Defendants other than Slack, Smith, and Zell, shall file and serve their Answer(s) to the Consolidated Class Action Complaint on or before **September 3, 2020.**

7.    Plaintiffs shall file and serve their First Amended Consolidated Class Action Complaint, if any, on or before **October 2, 2020.**

THE COURT FINDS as follows:

### *Section 11 Claims*

Plaintiffs have alleged a first cause of action for violation of Section 11 of the Securities Act of 1933 against the corporation Slack Technologies and against the Individual Defendants who are current or former officers and/or directors of Slack who signed the Registration Statement.

### *Tracing*

First, Defendants assert that Plaintiffs have no standing to sue under Section 11 in that Defendants argue Plaintiffs cannot "trace" their purchases of Slack Class A Common Stock to those shares sold pursuant to the Registration Statement and Prospectus because registered shares and unregistered shares were subject to sale at the same time pursuant to the public offering of registered shares.

In general, Plaintiffs have adequately pleaded standing. Each of Plaintiffs Farina , Norell, and Ren allege in the Consolidated Class Action Complaint that they "purchased shares of the Company's common stock that were issued in the Offering and pursuant and

traceable to the Offering Documents and was damaged thereby." The other Plaintiffs alleged that they "purchased shares of the Company's common stock in the offering and pursuant and traceable to the Offering Documents and was damaged thereby." See, Rieckborn v. Jefferies LLC (ND Cal. 2015) 81 F.Supp.3d 902, 925-926 (alleging purchase "pursuant to" or alleging "pursuant **and** traceable to" is sufficient, but alleging "pursuant **or** traceable to" is insufficient).[1] "These allegations are sufficient to show that plaintiffs purchased their [] securities in a public offering as opposed to on the aftermarket." Id., at p. 926.

> While it is not necessary to prove that the securities are traceable at the pleading stage, traceability must be alleged in the complaint. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3d Cir.1992). It is sufficient, however, if a plaintiff generally alleges that he or she purchased securities pursuant to the registration statement or statements at issue. *Id.*; *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1171 (C.D.Cal.2003); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 208 (S.D.N.Y.2003). Traceability is also sufficiently alleged where the complaint seeks relief on behalf of a proposed class comprised of investors who purchased securities pursuant to the allegedly false registration statement. *In re Immune Response,* 375 F.Supp.2d at 1039.

In re Metropolitan Securities Litigation (ED Wash 2007) 532 F.Supp.2d 1260, 1280; see also In re SeeBeyond Technologies Corporation Securities Litigation (CD Cal. 2003) 266 F.Supp.2d 1150, 1172 ("The Court finds that, in this case, whether the plaintiff is able to trace its stock is not a question that can be resolved on this motion. The Court acknowledges the defendants' argument that it may be difficult or impossible to trace the stock purchased by the plaintiff, but the plaintiff should be provided the opportunity to prove its allegation in this respect."); see also Rieckhorn, 81 F.Supp.3d at p. 926.

---

[1]     "Courts have thus distinguished between allegations that a plaintiff purchased a security 'pursuant or traceable to' a registration statement or similar document, and allegations that a plaintiff purchased a security 'pursuant to' the document. While the latter allegation is sufficient to establish standing under Section 12(a)(2), the former is not. [Citations.]" Rieckborn, at pp. 925-926.

4

In our case there was only *one* Registration Statement and Prospectus before the public sale of any Slack Class A Common Stock; there was only one "public" "offering" of that stock. In addition, such persons who purchased registered Slack common shares have standing under Section 11, "regardless of whether he bought in the initial offering, a week later, or a month after that." Hertzberg v. Dignity Partners Inc. (9th Cir. 1999) 191 F.3d 1076, 1080-1082.

For the sake of argument, even if there is a mixture of registered and unregistered stock, a shareholder is entitled to show that he/she purchased on the initial public offering or trace the purchase back to the registered shares. Hertzberg, at fn. 4, and authorities cited therein.

Although Defendants reference and quote snippets from Jensen v. iShares Trust (2020) 44 Cal.App.5th 618 regarding Section 11, the holding and discussion in Jensen regarding Section 11 liability is not controlling and is distinguishable. The situation in Jensen involved ETFs (exchange traded funds) that are *not* shares of stock, and the purchasesr never actually own shares of any company. In Jensen, the plaintiffs *conceded* that they could *not* trace their securities to a particular registration statement or prospectus, and it was undisputed (and the trial court found after *holding a court trial*) that all ETFs are *only* sold to the public in the secondary market. The Court of Appeal found this similar to a "firm commitment underwriting" where all initial issuance of stock is sold by the issuing corporation to only underwriter broker-dealers, who then resell to the public. This is not is our situation. Further, Jensen was not a decision about adequacy of pleading a Section 11 claims – it was addressing a judgment after court trial on Section 11.

### *Disputed Factual Issue Not Appropriate for Determination by Demurrer*

This is a factual dispute that need not be resolved at the pleading stage. It is certainly not apparent from the face of the pleading that Plaintiffs cannot and will not ever be able to prove that they purchased registered shares. Defendants have not established *as a matter of law and undisputed fact* that Plaintiffs could never prove that they purchased registered shares or shares traceable to the registered stock offering.

The one and only allegation in the Consolidated Class Action Complaint regarding the potential sale of unregistered shares is in Paragraph 3, as follows: "On June 20, 2019, the Company completed a direct listing of its Class A stock on the New York Stock Exchange ("NYSE"), offering for sale to the public up to 118,429,640 registered shares and 164,932,646 unregistered shares purportedly exempt from registration." That's all. No explanation or details are provided in the CCAC regarding these unregistered shares -- or if they were actually offered, or how they were offered, or whether they were sold to the public, or how they were sold to the public, or by whom they were sold to the public, or when.

Another factual complication, according to the Prospectus, is apparently unregistered exempt Class A Common Stock could not legally be sold to the public but for the issuance of the Registration Statement and Prospectus, which were necessary to establishment of the NYSE listing of Slack common stock.

Defendants assert in their moving papers that detailed explanation regarding the unregistered exempt stock and its sale contemporaneous with the sale of registered shares is set forth in pages 46, 58, 152, 164 and 171 of the Prospectus. First, this is argument because the CCAC does not allege this. Defendants make a lot of factual assertions in their opening brief, but there is actually no evidence of such at this point, because we are

6

only addressing the adequacy of the allegations of the complaint. Second, there is no mention of "unregistered" or "exempt" stock on pages 46, 58, or 171 of the Prospectus. Despite Defendants' arguments, the CCAC contains nothing about Rule 144 or sales or timing of sales thereunder – again Defendants make factual merits arguments, not appropriate for determination of the pleadings.

Third, apparently the discussion that Defendant references is regarding anticipated sales of stock by Slack employees and insiders after exercise of their "RSUs" (restricted stock units) (p. 11 of the Prospectus). Page 46 discusses the differences between an initial public offering and a direct listing, and that stock volatility is more likely and more risky. There is a statement that that "RSUs" will "vest and settle" upon the direct listing and Slack anticipates that people will sell some of their resulting Class A common stock in order to cover taxes. Page 58 is entitled "RSU Sales" and explains that a type of stock compensation is given by Slack to its employees and directors, that will vest upon listing and public trading of Slack Class A common stock. Slack states that it anticipates its former and current employees and "other service providers" will sell some of their stock to cover taxes. Page 152 explains who are the "Registered Stockholders" whose Class A stock will be the subject of registration and sales pursuant to the Registration Statement and Prospectus. It again references the vesting of RSUs. Although it *does* mention that these persons "may have" sold or transferred their stock pre-registration in "transactions exempt from the registration requirements of the Securities Act", it certainly does not say that (i) they actually occurred, or (ii) that they were sales to the "public", or (ii) that they cannot be traced. It is simply a generic statement. Page 171 is entitled "Plan of Distribution" and discusses (i) Slack's efforts to put together the direct listing and Prospectus, (ii) that Registered Stockholders may sell shares through the registration, but

7

are not required to sell anything, and (iii) how the stock will be initially priced. It says nothing about sales of unregistered stock.

Page 164 discusses "Shares Eligible for Future Sale" and "Rule 144". It seems to indicate that the Registered Stockholders (which would basically include the Individual Defendants) can *only* sell their Class A stock through registration, and other owners of restricted Class A stock would have to wait at least 90 days from the initial public sale in order to sell any of their stock.[2] This is not evidence that they actually sold their stock, or when. So again, this does not seem to foreclose tracing or that Plaintiffs bought registered stock from the Registered Stockholders, including Defendants. Again, these are complicated facts involved a new form of securities transactions, that do not need to be resolved on the pleadings – they should be resolved on the factual evidence and merits – especially evidence of who *actually sold* and when.

If anything, the information in the Prospectus indicates that persons and entities issued restricted stock were directors, officers, employees, and corporate affiliates known to Slack – which may facilitate tracing. There are no facts as yet as to what happened during the initial sale of the common stock to the public, and there is nothing of those details in the pleadings.

What we do know is that the CCAC alleges that Individual Defendants actually made the decision to offer *their own stock* as registered shares to be sold to the public *as*

---

[2]      "Following the listing of our Class A common stock on the NUSE, shares of our Class A common stock may be sold either by the Registered Stockholders pursuant to this prospectus or by our other existing stockholders in accordance with rule 144 of the Securities Act.
        As further described below, until we have been a reporting company for at least 90 days, only non-affiliates who have beneficially owned their shares of common stock for a period of at least one year will be able to sell their shares of Class A common stock under rule 144, which is expected to include approximately 164,932,646 shares of common stock immediately after our registration."

*the stock offered pursuant to the Registration Statement and Prospectus,* and that they *did* sell shares to which they had title to the public as registered common stock.  (CCAC at Paragraphs 30-38.)  CEO and Chair Butterfield registered over 11 shares of his Slack Class A common stock for sale to the public under the Registration Statement and Prospectus, and immediately sold 1.36 million shares when the public offering opened. CFO Shim registered over 1.3 million of his Class A shares for sale under the Offering, and immediately solve over 502,000 shares for $19.4 million. Director Cooper registered over 102,000 shares for sale to the public.  Director Friar registered over 50,000 shares for sale to the public.  Director O'Farrell and an investment firm of which he was general partner registered over 16.6 million shares, and immediately sold 3 million shares for proceeds of $116 million.  Director Palihapitiya and the investment entities of which he was general partner registered over 12.7 million shares, and immediately sold 1 million shares for $39.7 million.  Director Braccia and the Accel entities for which he served as Managing Member registered over 29 million shares for sale to the public, and immediately sold approximately 8.5 million shares, reaping over $329 million.  (¶42.)

But we simply don't know at the pleading stage – despite efforts of Defendants to try and present evidence outside of the pleadings and make factual arguments more appropriate for a motion for summary judgment or other motion on the merits.

When it comes to the interplay of exempt unregistered stock, there is no factual allegation in the CCAC or facts established by judicial notice regarding the actual *sale* of unregistered Class A Common Stock of Slack *to the public* on the NYSE, occurring prior to the filing of the initial complaint (or thereafter).

9

***Damages***

Second, Defendants assert that Plaintiffs have failed to adequately allege a claim under Section 11 because Plaintiffs allegedly will be unable to prove monetary damages. Defendants rely upon the fact that no market price was set *by Slack in its Prospectus* for public sale of the Class A stock. The Prospectus as part of the Registration Statement states: "No public market for our Class A common stock currently exists. . . . Based on information provided by the NYSE, the opening public price of our Class A common stock on the NYSE will be determined by buy and sell orders collected by the NYSE from broker-dealers. Based on such orders, the designated market maker will determine an opening price for our Class A common stock in consultation with a financial advisor pursuant to applicable NYSE rules."

Section 11 provides the following measure of damages:

> The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

15 U.S.C. §77k(e). Section 11 also provides an alternative remedy of rescission and restitution. 15 U.S. C. §77l. Section 11 also sets a cap on damages: "In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public." 15 U.S.C. §77k(g).

On its face, the lack of a pre-set public market price does not protect Defendants from being sued under Section 11 for issuance of a Registration Statement and Prospectus containing material misrepresentations or material omissions. Plaintiffs have

10

pleaded that they sustained damages. Indeed, there is no reason to expect that Plaintiffs will not be able to present evidence of how much they paid for the stock, the market price of the stock at the time the lawsuit was filed, or the price they sold their stock (if applicable). Plaintiffs have alleged that there was an opening stock price for the NYSE public trading of Slack stock of $38.50 per share. (CCAC at ¶4.) Indeed, as reflected in In re Broderbund/Learning Co. Securities Litigation (9th Cir. 2002) 294 F.3d 1201, these Section 11 damages terms and measures are considered practically and liberally.

Alternatively, if it is Defendants' contention that there is no "price at which the security is offered to the public", that would not legally bar Plaintiffs from any recovery. Rather, it may indicate that there is no "cap" on damages – because of how the Defendants intentionally structured their stock offering.

But we are at the pleading stage. Regardless of Defendants' arguments disputing recoverable damages, the law is established that Plaintiffs need not plead damages in order to allege a Section 11 claim in the complaint. "Damages are not an element" of pleading a Section 11 claim. In re Countrywide Financial Corp. Securities Litigation (CDE Cal. 2008) 588 F.Supp.2d 1132, 1168 fn. 40; see also, Bily v. Arthur Young & Co. (1992) 3 Cal.4th 370, 395 and fn. 10; Jensen v. iShares Trust (2020) 44 Cal.App.5th 618, 630 (only two elements). Courts treat Section 11 damages measurement as an affirmative defense. Countrywide, at p. 1169; In re McKesson HBOC Inc. Securities Litigation (ND Cal. 2000) 126 F.Supp.2d 1248, 1258, 1261.

### Misrepresentations

To state a claim under Section 11, the plaintiff must allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable

11

investor about the nature of his or her investment." 15 U.S.C.A. § 77k(a). A statement is material when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. In re Ubiquiti Networks, Inc. Sec. Litig. (N.D. Cal. 2014) 33 F.Supp.3d 1107, 1127. Materiality is a fact-specific determination and is rarely appropriate to decide at the demurrer stage. Id. at p. 1126, fn. 6; In re Stac Electronics Sec. Litig. (9th Cir. 1996) 89 F.3d 1399, 1405.

Plaintiffs alleged that representations made, regarding potential business risks in the Registration Statement at Prospectus pages 19-20 regarding outage risks and at page 32 regarding potential penalties and refunds under service level agreements with certain customers, were false and misleading. Plaintiffs allege that using words like "may" and "could" did not accurately communicate the already known and existing problems with outages and payment of penalties under SLAs.

Plaintiffs' specific allegations regarding material misrepresentations and omissions regarding service outages and the terms and outage penalties in Slack's Service Level Agreements are set forth in Consolidated Class Action Complaint, Paragraphs 7-12, 52-53, 76-82, and 84-85.

For example, the Prospectus states:

"We have in the past and may in the future experience disruptions, data loss, outages, and other performance problems with our infrastructure due to a variety of factors, including infrastructure changes, introductions of new functionality, human or software errors, capacity constraints, denial-of-service attacks, ransomware attacks, or other security-related incidents."
* * *

"Certain of our paid customer agreements contain service level agreements, under which we guarantee specified minimum availability of Slack. From time to time, we have granted credits to paid customers pursuant to the terms of these agreements. We do not currently have any

12

material liabilities accrued on our balance sheet for these commitments. Any failure of or disruption to our infrastructure could make Slack unavailable to organizations on Slack. If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Slack, we may be contractually obligated to provide affected paid customers with service credits for future subscriptions, or paid customers could elect to terminate and receive refunds for prepaid amounts related to unused subscriptions. Our revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreement switch our paid customer, and any extended service outages could adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales."

Plaintiff specifically allege that these are material misrepresentations and omissions by

Defendants:

Reliability of the service also had a material impact on Slack's bottom line. For its Plus and Enterprise Grid customers, Slack entered into service level agreements ("SLAs") containing reliability guarantees that Defendant Butterfield would later describe as "outrageously customer centric." At the time of the Offering, Slack's SLAS differed from industry-standard SLAS in four material respects:
(1) Slack guaranteed four nines (99.99%) of reliability, whereas most guaranteed only three nines (99.9%);
(2) Instead of reimbursing customers for the actual value of service lost during an outage, Slack's SLAS guaranteed that it would pay customers 100 times the value of interrupted service;
(3) Slack would pay customers — with the 100x multiplier — whenever Slack experienced interruptions, regardless of whether the customer actually experienced an outage in service; and
(4) Slack credited all eligible customers automatically, whether or not they requested an outage credit.
As a result of these provisions, Slack was uniquely exposed to significant economic loss from even a small interruption in service at the time 0f the Offering. (Paragraph 53.)
* * *

The statements . . . were materially false and misleading and omitted the following material facts: (a) Slack's SLAs were highly unusual for the industry in that they required near-perfect ("four nines") reliability and included an "exceptionally generous credit payout multiplier" requiring Slack, in the event of an interruption in service, to compensate both affected and unaffected customers up to 100 times the value of the lost service; (b) as a result of its "exceptionally generous" contractual provisions, even small interruptions were then materially impacting Slack's financial health; (c) repeated service interruptions and

13

outages in the months leading up to the Offering were already significantly negatively impacting the Company's revenues because of these "exceptionally generous" contractual provisions; and (d) Slack was paying out significant amounts of service credits to customers that were not even experiencing service disruptions below the service commitment threshold. (Paragraph 77.)

\* \* \*

The statements . . . were materially false and misleading and omitted the following material facts: (a) Slack's infrastructure could not support its promised uptime guarantee of 99.99%; (b) Slack's unreliability was not hypothetical but actual — Slack had failed to meet its contractual 99.99% standard of uptime in 7 out of 12 months in 2018 and repeatedly in the months leading up to the Offering in 2019; (c) Slack had included a highly unusual and "exceptionally generous credit payout multiplier in [its] contracts," requiring Slack, in the event of an interruption in service, to compensate both affected *and unaffected customers* up to 100 times the value of the lost service; and (d) as a result of its "exceptionally generous" contractual provisions and service disruptions caused by the Company's inability to adequately scale its platform, Slack's revenues and ability to garner large enterprise customers were being significantly negatively, among other material facts. (Paragraph 80)

Plaintiffs have alleged that, soon after the public listing and sale of Slack Class A Common Stock effective June 20, 2019, Slack Technologies experienced major and repeated outages of service, specifically June 29, 2019 for approximately 15 hours, and July 11, 2019   (CCAC ¶¶ 92-94, 99.)

Plaintiffs alleged that, on September 4, 2019 and thereafter, Slack provided quarterly financial results, and admitted that millions of dollars of losses were sustained, due to the service outages and payments made to customers as a result of the unusual terms of their Service Level Agreements providing penalties.  (¶¶101-110.)  At the time of filing the complaint, it is alleged that the stock price had dropped to $21.00 per share.

Plaintiffs have adequately pleaded that the Registration Statement and Prospectus contained material misrepresentation and omissions.

In pleading a claim based upon misrepresentation of material fact, "a single actionable false representation properly pleaded may be sufficient ground for an action

14

for damages or restitution after rescission". Witkin, 5 California Procedure (5th ed. 2008) Pleading §718(a). "[I]t is immaterial that **other** allegations set forth nonactionable representations or actionable representations defectively averred." Id., bold added. "[O]ne false representation, properly pleaded, would make the pleading sufficient as against the attack of a general demurrer. [Citations.]" Ramey v. General Petroleum Corp. (1959) 173 Cal.App.2d 386, 399.

Accordingly, the Court is not required to address the sufficiency of any other alleged misrepresentations asserted in the CCAC for purposes of ruling on demurrer.

### Section 12

Plaintiffs have alleged a second cause of action for violation of Section 12 of the Securities Act of 1934 against Slack Technologies and against the Individual Defendants who are/were officers and directors of Slack.

Defendants' Demurrer to the Section 12 claim, on the basis that Plaintiffs have failed to adequately plead material misrepresentations and omissions, is OVERRULED for the reasons set forth in the above discussion regarding Section 11.

Defendants also assert by Demurrer that Plaintiffs have no standing to sue because Plaintiffs must have purchased shares sold to them "by means of a prospectus". For the reasons set forth above, the Demurrer is OVERRULED on this alleged ground. Indeed, Plaintiffs *have* so alleged in the CCAC.

For the sake of argument, it would seem that Plaintiffs have a *stronger* case in asserting that they purchased shares *publicly* sold "by means of a prospectus", given that any holders of unregistered securities were dependent upon the issuance of the Registration Statement and Prospectus in order to sell stock to the public and through the

15

NYSE. As discussed above, this is a factual dispute not appropriate for adjudication on the pleadings.

Defendants' also demur to the CCAC on the basis that Plaintiffs fails to adequately plead that they are statutory "sellers" under Section 12.

Defendants cite to the Pinter decision, and lower court decisions that rely upon Pinter. In Pinter v. Dahl (1988) 486 U.S. 622, the Supreme Court resolved the inconsistent rulings by the various Circuits as to whom may be liable for violation of Section 12 of the Securities Act of 1933. Although the Supreme Court only addressed the question of who is a statutory "seller" under Section 12(1) – regarding the sale of unregistered securities – and explicitly declined to adjudicate that issue as to Section 12(2)[3] – for false representations and material omissions in a prospectus or other offering documents – subsequent Circuits have held that Pinter applies to all Section 12 claims.

In Pinter, investors in unregistered fractional undivided interests in oil and gas leases sued Pinter for violation of Section 12(1) of the Securities Act of 1933 for the unlawful sale of unregistered securities. [Accordingly the Pinter case did *not* involve any issue of whether or not a Registration Statement contained misrepresentations or omissions, did not involve the sale of common stock, and did not involve multiple corporate officers and directors or any underwriters.]

Pinter, an oil and gas producer and registered securities dealer, sold fractional undivided interests in oil and gas leases to Dahl, who was a real estate broker and experienced investor in (unsuccessful) oil and gas ventures. Id., at p. 627. Initially, Dahl advanced $20,000 to Pinter to acquire oil and gas leases, with the understanding that Dahl

---

[3]    "Nevertheless, this case does not present, nor do we take a position on, the scope of a statutory seller for purposes of §12(2). Pinter, at fn. 20.

would be given a right of first refusal to drill certain wells on the leasehold properties. Id. Dahl himself "toured the properties, often without Pinter, in order to talk to others and 'get a feel for the properties.'" Id. "Upon examining the geology, drilling logs, and production history assembled by Pinter," Dahl invested $310,000 in the leasehold properties. Id. Dahl then touted the venture to his friends and relatives, got them to invest $7500 each, and helped them fill out subscription agreement forms drafted by Pinter. Id., at p. 626. The investment checks were made payable to Pinter's company, Black Gold Oil Company. Id. None (but one) of the investors every met Pinter or spoke to Pinter or toured the properties. Id. They all invested "[b]ecause of Dahl's involvement in the venture." Id. Dahl was not paid any commission by Pinter for these investments by others. Id. The venture failed, and all of the investors (including Dahl) sued Pinter. Id., at pp. 627-628.

*After a court trial*, the federal district court held Pinter liable to all investors for unlawful sales of unregistered securities in violation of Section 12(1), which entitled the investors to rescission, i.e. return of their investment. Id., at p. 628. On appeal, the issue was whether Dahl could be held responsible as well. A divided Fifth Circuit held that Pinter had no "in pari delicto" affirmative defense against Dahl, as a matter of law, and that Pinter was not entitled to any contribution from Dahl as a co-seller of the unregistered securities to the other investors, because Dahl received no commission on those sales. The Supreme Court reversed, holding that an in pari delicto defense is available in a Section 12(1) private rescission action, and **that a 'seller" under Section 12(1) is *not* limited to one who passes title/ownership, but also may include solicitors who are motivated, at least in part, by a desire to serve their own financial interests**

17

**or those of the securities owner.** The Supreme Court rejected other methods used by Circuit Courts such as the "substantial factor" test or "participation" test.

In determining whether Dahl was a "seller" subject to liability to the other investors under Section 12(1), the Supreme Court held that there was a spectrum for being a statutory seller under Section 12(1), with a direct seller who passes ownership title on one end, and one who solicits an offer or sale with a motivation of personal financial interest on the other end.

> [T]he Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue. The courts, on their part, have not defined the term uniformly.
>
> At the very least, however, the language of §12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity. Thus, it is settled that §12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value. [Citation.] Dahl, of course, was not a seller in this conventional sense, and therefore may be held liable only if §12(1) liability extends to persons other than the person who passes title.
>
> . . . [T]he Securities Act defines the operative terms of §12(1) [in] Section 2(3) . . . Under these definitions, the range of persons potentially liable under §12(1) is not limited to persons who pass title. The inclusive of the phrase "solicitation of an offer to buy" within the definition of "offer" brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of §12. [Citations.] . . .
>
>                       * * *
>
> . . . A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title. [Citation.]

Pinter, at pp. 642-644.

> . . . [W]e share the Court of Appeals' conclusion that Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer. . . .

18

> The language and purpose of §12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interest or those of the securities owner. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him and to align him with the owner in a rescission action.

Id., at p. 647.

The Supreme Court then remanded the case to the district court for further evidence and/or findings as to Dahl's motivation, in order to determine whether he may be liable as a statutory seller under Section 12. Pinter, at pp. 654-655. "Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as where he "anticipates a share of the profits," [citation], or receives a brokerage commission, [citation]. But, a person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under §12(1) without showing that he expects to participate in the benefits the owner enjoys." Id.

Under Pinter, Section 12 liability is *not* limited to those in strict privity with the investment purchasers, but rather, persons who did not directly pass title to the securities may still be subject to liability under Section 12(2) "if they solicited the purchases and were motivated, at least in part, by financial gain." Moore v. Kayport Package Express Inc. (9th Cir. 1989) 885 F.2d 531, 537. In regard to solicitors as statutory "sellers" under Section 12, Plaintiffs "must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain." In re Daou Systems Inc. (9th Cir. 2005) 411 F.3d 1006, 1029; In re Charles Schwab Corp. Securities Litigation (ND Cal. 2009) 257 F.R.D. 534, 548.

"The language in *Pinter v. Dahl*, coupled with prevailing federal case law in other circuits, seems to undermine the continuing viability of the strict privity concept under

19

section 12(2). [Citations.]" Schlifke v. Seafirst Corp. (7th Cir. 1989) 866 F.2d 935, 940. Indeed, the Supreme Court stated that the common law elements of a claim for rescission (such as privity) are not required for Section 12. Pinter, at fn. 23.

Defendants cite to Jensen v. iShares Trust, 44 Cal.App.5th 618, regarding Section 12, but that case is quite different from ours and is not controlling. A major focus in Jensen was that it involved ETFs which are *not* common stock, are sold to the public *only* on the secondary market, and was a firm commitment underwriting situation. Our case is none of these.

Indeed, on the contrary, the Registered Stockholders of Slack expressly had absolutely *no* obligation to commit to register or sell any of their Class A common stock pursuant to the Registration Statement: "The registered Stockholders may, or may not, elect to sell their shares of Class A common stock covered by this prospectus, as and to the extent they may determine." (Prospectus at page one.) Also uniquely the corporation itself was not issuing any new shares or selling registered stock to the public: "If the Registered Stockholders choose to sell their shares of Class A common stock, we will not receive any proceeds from the sale of shares of Class A common stock by the Registered Stockholders." (Prospectus at page one.)

The Jensen case involved ETFs, which are investment companies registered under the Investment Company Act of 1940 as open-end funds or unit investment trusts. Jensen, at p. 625. Evidence was presented that ETFs are not sold directly to investors, but rather are only sold to investors through the after-market.[4] Jensen, at p. 626. On the

---

[4]    "Creation units are sold to 'authorized participants,' such as broker-dealers or large institutional investors, which may then sell some or all of the shares to investors in the secondary market; creation units are not sold directly to retail investors." Jensen, at p. 626.

20

other hand, evidence was presented that "iShares continuously issues and redeems ETF shares, issuing and selling new shares of each series in primary market transactions pursuant to registration statement or amended registration statement filed with the SEC. Accordingly, iShares registration statement are amended at least annually." Jensen, at p. 627. This created a situation of ever-changing and ever-issuing registration statements.

*After a court trial,* the trial court found that plaintiffs were unable to prove that their ETF purchases were directly traceable to any particular registration statement or prospectus that they claimed was false. Jensen, at p. 628. This was undisputed by plaintiffs, given that there was a continuous cycle of amended registration statements on the ETFs and the nature of ETFs themselves. Indeed, the plaintiffs conceded that it was "impossible to trace" ETFs because they are not like individual common stock shares issued and owned by investors. Rather they are "creation units" held in "fungible bulks" by depository trust company, and sold in fractional interest ownership. Jensen, at p. 638. On top of that, the registration statements are constantly being amended or new ones issued.

Instead, the Jensen plaintiffs argued that they should not be required to meet the standing requirements of the Securities Act of 1933 on their claims for violation of Sections 11 and 12 – that they should not be required to trace their purchase to a particular primary market registration statement or prospectus. Plaintiffs argued that if they could demonstrate standing under the Investment Company Act of 1940, that should be sufficient.

Not surprisingly, the Court of Appeal in Jensen held that investors suing for claims under the Securities Act of 1933, including Section 11 and 12, must meet the standing requirements of the Securities Act of 1933. Jensen, at pp. 629-646. Relying

21

upon Hertzberg v. Dignity Partners Inc. (9th Cir. 1999) 191 F.3d 1076, the Jensen court acknowledged that investors who purchased securities on the after-market may have standing to sue under Section 11, if they can trace their investments back to the false registration statement regarding the initial public offering of that security.  Hertzberg, at pp. 1081-1082.  As the plaintiffs could not "trace" their ETF purchases to a particular allegedly false registration statement, and the evidence was undisputed that they purchased their ETFs on the *secondary market,* they had no claim under the Securities Act of 1933.

Defendants in Jensen were the Investment Company which managed the ETF funds, and its subsidiaries and affiliates that served as investment advisor or as distributor, as well as a few unidentified individuals (whom this Court assumes were some type of officers or managers of the ETF entities).  Jensen, at p. 625.  As an alternate ground for upholding the trial court's decision, the Court of Appeal also discussed that the defendants could not be deemed "sellers" of securities under Section 12, because the evidence at trial showed that *none* of the ETF investors had purchased their investment through an initial public offering, i.e., all purchases were on the secondary market. Jensen, at pp. 642-644.  Although after-market purchases might be actionable under Section 11 (if traceable), only primary market purchasers can sue under Section 12(2).

Despite its holding that evidence was presented at trial that plaintiffs only purchased on the secondary market, and thus could have no claim under the Securities Act of 1933 at all, and despite the fact that the trial court had granted on the motion for judgment on the pleadings as to Section 12 only on the basis that plaintiffs had no standing to sue as they could only buy on the secondary market, the Jensen court gratuitously goes further and discusses whether or not the defendants were actually

22

"sellers" under Section 12. Defendants here quote from the portions of Jensen regarding the Court of Appeal's discussion of whether or not an issuing company can be a "seller" in a "firm commitment underwriting" – which is irrelevant to our case. Indeed, the Court of Appeal acknowledged that the question of whether or not an issuer in a primary offering of securities, i.e., an IPO, is a "seller" under the Securities Act of 1933 in the circumstances of a firm commitment underwriting, under SEC Rule 159A, was irrelevant to that Court's decision, as "[t]he present case involves only secondary market purchasers of securities." Jensen, at p. 650, fn. 21.

Importantly, the Jensen court acknowledged that the primary authority on this issue is the U.S. Supreme Court's decision in Pinter, as discussed above, and thus Pinter is controlling here.

For the sake of argument, even if there was some analogy between our direct listing situation and a firm commitment underwriting situation, case law reflects that issuing companies and officers and directors *can* be subject to Section 12 liability as statutory "sellers" (including solicitors) and that plaintiff shareholders may be able to sufficiently plead a Section 12 claim. Thus, overruling a demurrer is appropriate.

Indeed, in reported decisions, federal district courts in the Ninth Circuit have acknowledged that under Pinter, Section 12 liability for a firm commitment underwriting is not simply limited to those underwriters, but rather the issuing company and its officers and directors might also have Section 12 liability as "sellers" or "solicitors." E.g., In re Stratosphere Corp. Securities Litigation (D.Nevada 1998) 1 F.Supp.2d 1096, 1121; In re Bare Escentuals Inc. Securities Litigation (ND Cal. 2010) 745 F.Supp.2d 1052, 1073.

In Shaw v. Digital Equipment Corp. (1st Cir. 1996) 82 F.3d 1194, cited by the Court of Appeal in Jensen, an investor class action was filed, by those who purchased

23

preferred stock in an IPO, for violations of the Securities Act of 1933 against the corporation, its CEO, its CFO, and its underwriters and investment bankers. After finding that the complaint adequately alleged that the IPO prospectus contained misrepresentations and omissions, for purposes of Section 11 and Section 12(2), the First Circuit then addressed the alternative argument that defendants were not "sellers" under Section 12, because it was a firm commitment underwriting. Importantly, the First Circuit in Shaw specifically acknowledged that an issuing company and its officers and directors *could possibly be held liable under Section 12*, even if it was a firm commitment underwriting – or be sufficiently alleged for purposes of the pleading stage. Shaw, at p. 1216.

In Lone Star Ladies Investment Club v. Schlotzsky's Inc. (5th Cir. 2001) 238 F.3d 363 -- relied upon by the Jensen court for the proposition that the issuing company is not "ordinarily" liable under Section 12 as a "seller" in the circumstance of a "firm commitment underwriting" -- the *actual holding* of the Fifth Circuit in Lone Star was that the plaintiffs in that "firm commitment underwriting" case *had* sufficiently pleaded that the issuing company and its officers and directors were "statutory sellers" under Section 12 of the Securities Act of 1933.

> As we see it, the pivot point here is not whether defendants were "sellers", because "Congress expressly intended to define broadly" the concept of seller to "encompass the entire selling process, including the seller/agent transaction." Rather, our issue is controlled by section 12's provision that a seller is only liable "to the person purchasing such security from him." The argument is that in a firm commitment underwriting, the public purchases from the underwriter, not from the issuer.
>
> *Pinter* held that the purchase clause of section 12 does not "exclude solicitation from the category of activities that may render a person liable when a sale has taken place." For example, "a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer

24

'purchased,' even though the agent himself did not pass title," for example a broker acting for an issuer. *Shaw* found that under some circumstances, "an issuer involved in a firmly underwritten public offering could be a 'seller' for purposes of Section 12(2)" where the issuer solicited the sale of the stock. This much is clear under *Pinter*.

It is also true under *Pinter* that under some circumstances, the issuer is immune from section 12 liability in a firm commitment underwriting. . . .

Lone Star, at p. 370, footnote citations omitted. Further, the Fifth Circuit held that the issue should be addressed on the merits, not on the pleadings:

On remand, plaintiffs will bear the burden of demonstrating that these issuers did solicit in a manner sufficient to satisfy *Pinter*, if they wish to preserve their section 12 claims. We say only that this claim cannot be decided in this case and on these facts upon a Rule 12(b)(6) motion, although the parties may bring the question again upon a properly developed record under Rule 56 of the Federal Rules of Civil Procedure[5]. We decline to step further onto this terrain by applying these principles to possible facts that plaintiffs might adduce. The able district court is better equipped to first address these issues, with facts in hand.

Lone Star, at pp. 370-371, footnote citations omitted, footnote added.

The Jensen court also cited to reported appellate decisions from the Third Circuit of In re Westinghouse Securities Litigation (3rd 1996) 90 F.3d 696 and In re Craftmatic Securities Litigation (3rd Cir. 1989) 890 F.2d 628, which involved a firm commitment underwriting. Once again, those Court of Appeals' decisions held that the plaintiffs *had* adequately pleaded a claim for violation of Section 12:

Plaintiffs argue that because the facts alleged in their complaint are so similar to the factual allegations of the complaint sustained in *Craftmatic,* they stated a section 12(2) claim. [Citation.] We are constrained to agree.

It is certainly true that plaintiffs' section 12(2) allegations are not clearly drafted. Plaintiffs do not, for example, make clear which defendants are alleged to be direct sellers as opposed to solicitor sellers. [Citation.] Nor do plaintiffs allege how the Westinghouse defendants, assuming they are alleged to be solicitor sellers, directly and actively

---

[5] This is the federal court equivalent of a motion for summary judgment or summary adjudication under Code of Civil Procedure Section 437c.

25

participated in the solicitation of the immediate sales. Further, plaintiffs' allegation that defendants "promoted the sale of" securities would not, standing alone, give rise to any section 12(2) liability. The district court could certainly require that plaintiffs clear up these ambiguities on remand.

Taken in the light most favorable to plaintiffs, however, the complaint does allege that the Westinghouse defendants "solicited plaintiffs" to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests. Contrary to the district court's statement, these are factual allegations – allegations plaintiffs will have to prove – and not bare legal conclusions. Under *Craftmatic,* plaintiffs' allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6). "It cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." [Citations.] For these reasons, we reverse the district court's order dismissing the Section 12(2) claims against the Westinghouse defendants.

Westinghouse, at p. 717.

Applying the holdings of Pinter (which did not involve determination of pleading sufficiently) and of multiple Court of Appeals' decisions regarding the sufficiently of Section 12 pleadings, and finding that the factual allegations of the Plaintiffs in our case are more specific and expansive than those found adequate in the above-stated reported federal decisions, this Court finds that generally Plaintiffs have adequately pleaded a Section 12 claim – except as to particular defendants, discussed below. The factual *evidence* required to actually prove that each Defendant is a statutory seller under Section 12 and Pinter is properly left to a motion on the merits.

Although the Ninth Circuit has yet to opine on the subject, California district courts have held that whether or not the factual allegations of the activities of corporate directors and officers regarding a public offering reach the level of being a seller or solicitor under Section 12 and under Pinter should not be decided on the pleadings, but rather on the merits. For example:

The Ninth Circuit has not addressed whether simply alleging that a defendant signed a registration statement – possibly combined with other

26

generalized allegations of solicitation activity – will suffice to state a Section 12 claim. Other courts faced with such claims have reached varying results. . . . In *Pinter*, the Supreme Court left little doubt that mere *participation* in a solicitation or sale will not suffice.

* * *

This order finds that plaintiffs adequately pled solicitation. Plaintiffs alleged more than mere participation. As many court have found, the registration statement is itself a solicitation document. Although the act of signing a registration statement, alone, may not always suffice, it is at least suggestive of solicitation activity. As stated, the complaint also alleges that defendants "actively solicited the sale of the fund's shares" and that certain defendants were involved in marketing the fund. Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy rule 8(a)'s lenient pleading standards. [Citation.] For these reasons, the complaint adequately pleads that defendants were statutory "sellers" under section 12(a)(2).

In re Charles Schwab Corp. Securities Litigation, 257 F.R.D. at p. 549.

Plaintiffs have adequately pleaded that the Individual Defendants, other than Zell and Smith, were statutory "sellers" under Section 12, in that they actually registered and sold their own Slack stock, and/or solicited the sale of Slack Class A Common Stock, to Plaintiffs and the Class. The CCAC specifically alleges that each of them *actually decided and did sell their Class A stock as **registered** shares as part of the public offering* pursuant to the Registration Statement and Prospectus. Further, each of them (including Zell and Smith) signed the Registration Statement, which included the Prospectus. The CCAC makes specific factual allegations supporting the allegation that these Individual Defendants acted to advance their own economic interests and those of Slack. Some of them are also alleged to have personally participated in public activities designed to solicit purchases of Slack shares by the public.

The same is not true of the allegations as to Defendant Zell, the corporate Chief Accounting Officer, who is not alleged to have owned Slack stock or sold Slack stock, or

27

to be a Registered Shareholder. Although he signed the Registration Statement, there are no allegations that he owned any Class A stock, that he owned and converted Class B stock, that he sold any Class A stock to the public, that he solicited sales of Slack stock other than by signing the Registration Statement, nor allegation that he acted to advance his own economic interests or those of Slack in doing so.

So too as to Defendant Smith, who is not alleged to have registered or sold any stock, or engage in any other sale or solicitation other than signing the Registration Statement.

The Court also finds that Plaintiffs have not adequately alleged that Defendant Slack Technologies itself is a statutory "seller" – whether seller or solicitor – under Section 12. This is not a traditional "initial public offering" – Slack had already issued restricted stock not subject to public sale, and Slack was *not* issuing any new shares as part of the public offering identified in the Registration Statement and Prospectus. In this "direct listing" transaction, and as explicitly stated in the Registration Statement and Prospectus, Slack itself did not offer any Class A Common Stock to the *public* pursuant thereto – and there are no allegations in the CCAC that they did issue or sell any of their own shares to the public. According to the Offering Documents, all registered shares were owned and to be offered by "Registered Stockholders" – who are officers, directors, and affiliates of Slack who already owned Class A or Class B stock (convertible to Class A at 1:10). Although it may be possible for Plaintiffs to adequately allege that Slack is a "seller," i.e., solicitor, under Section 12, they have yet to do so.

28

### *Section 15*

Plaintiffs have alleged a third cause of action under Section 15 of the Securities Act of 1933 for "control person" secondary liability against various Accel entities (which the CCAC calls collectively the Venture Capital Defendants), and against the Individual Defendants.

> Sections 15 and 20(a) impose liability on control persons for a primary violation of the securities laws. . . . Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996). "[W]hether a person is a 'controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* at 1162. Traditional indicia of control include "having a prior lending relationship, owning stock in the target company, or having a seat on the board." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 945 (9th Cir.2003).

Takiguchi v. MRI International Inc. (D. Nevada 2014) 47 F.Supp.3d 1100, 1117-1118.

"'[A]lthough a person's being an officer or director does not create any *presumption* of control, it is a sort of red light.' *Arthur Children's Trust,* 994 F.2d at 1396 (quoting 4 Loss & Seligman, *Securities Regulation* 1724 (1990)) (emphasis in Loss & Seligman)." Paracor Finance Inc. v. General Electric Capital Corp. (9th Cir. 1996) 96 F.3d 1151, 1163.

In pleading a Section 15 claim, "it is a plausible inference' that individuals who are officers of the issuing company and who signed the Registration Statements "were in a position to exercise power and control" over the primary violators at the issuing company. In re Charles Schwab Corp. Securities Litigation, 257 F.R.D. at pp. 550-551.

Section 15(a) imposes joint and several liability upon every person who controls any person liable under §§ 11 or 12. *In re Daou,* 411 F.3d at 1029. The SEC has defined "control" to mean: "[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. As alleged by plaintiffs, defendants are either executive officers and directors of Levi or directors of Levi during the relevant period. In addition, all defendants signed at least one of the registration statements at issue. CAC ¶¶ 19–34. Thus, the court concludes that these individuals are properly alleged to be control persons within the meaning of § 15 by virtue of their positions and role in the registration statements. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568 n. 4, 1575 (9th Cir.1990) ("The standards for liability as a controlling person under § 15 are not materially different from the standards for determining controlling person liability under § 20(a).... [W]e make clear that in an action based on § 20(a), the defendant who is a controlling person, and not the plaintiff, bears the burden of proof as to defendant's good faith. Thus, a plaintiff need not make a showing as to defendant's culpable participation; rather, a defendant has the burden of pleading and proving his good faith.").

In re Levi Strauss & Co. Securities Litigation (ND Cal. 2007) 527 F.Supp.2d 965, 984.

The SEC defines control as, "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." 17 C.F.R. § 230.405. A person exercises control over an issuing corporation when he or she oversees day-to-day company operations. *Howard,* 228 F.3d at 1065. While an individual's status as an officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control, *Id.,* an officer or director who has signed an SEC filing does exercise control. *In re Alstom,* 406 F.Supp.2d at 487–88; *Sprint,* 314 F.Supp.2d at 1144–45.

Whether an individual may be considered a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *In re Metawave Communs. Corp. Secs. Litig.,* 298 F.Supp.2d 1056, 1087 (W.D.Wash.2003)(quoting *Howard,* 228 F.3d at 1065.) It is sufficient, at the pleading stage, to identify the defendants' positions and allege that they " 'had the power to control and influence [the defendant], which they exercised.' " *In re Cylink Secs. Litig.,* 178 F.Supp.2d 1077, 1089 (N.D.Cal.2001). In addition, persuasive authority indicates that audit committee members, including outside directors, who sign SEC filings qualify as control persons. *See In re Enron Corp. Sec. Litig.,* 258 F.Supp.2d 576, 598 (S.D.Tex.2003)(citing cases); *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 437 (S.D.N.Y.2001)(holding that an outside director can be presumed to exercise control over

30

management and policies related to "company reports and SEC registrations that they actually sign").

In re Metropolitan Securities Litigation (ED Wash. 2007) 532 F.Supp.2d 1260, 1296-1297.

Accordingly, Plaintiffs have sufficiently alleged a Section 15 "control person" cause of action against the Individual Defendants.

In regard to the Accel Venture Capital Defendants, the Court finds that Plaintiffs have adequately alleged a Section 15 claim.

> "Section 15 extends liability created under §§ 11 and 12(a)(2) to "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under sections [11 or 12.]" 15 U.S.C. § 77o. The section creates joint and several liability for control persons after a primary securities violation is found. *In re Daou,* 411 F.3d at 1029–30. Whether a defendant is a control person is a fact question rarely appropriate for motion practice. *In re Worlds of Wonder Sec. Litig.,* 694 F.Supp. 1427, 1435 (N.D.Cal.1988)."

In re Countrywide Financial Corp. Securities Litigation (CD Cal. 2008) 588 F.Supp.2d 1132, 1183.

> To establish "controlling person" liability, the plaintiff must show that a primary violation was committed and that the defendant "directly or indirectly" controlled the violator. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). "In general, the determination of who is a controlling person ... is an intensely factual question." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir.1993). The plaintiff need not show the controlling person's scienter or that they "culpably participated" in the alleged wrongdoing.[12] *Id.* at 1398.

* * *

> [I]n *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.1994), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995), we [the Ninth Circuit] stated that whether a person is a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* at 1382 (internal quotation marks omitted). We did not inquire into the defendant's involvement in an isolated corporate action. *See id.; see also Arthur Children's Trust,* 994 F.2d at 1397.

31

> Similarly, in *Hollinger,* 914 F.2d at 1572 n. 16, we cited the SEC's definition of "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Paracor, at pp.1161-1162; see also Howard v. Everex Systems Inc. (9th Cir. 2000) 228

F.3d 1057, 1065-1066.

Plaintiffs have alleged multiple facts supporting their "control person" allegations

as to the Accel entities. For example, the CCAC alleges:

> At the time of the Offering, Defendant Andrew Braccia ("Braccia") was serving as a director 0n the Slack Board. As a director and board designate of Slack's largest shareholders, Braccia participated in the preparation 0f, and reviewed and approved, the statements in the Offering Documents, which he signed. He also reviewed and approved the Offering's investor day and investor education meetings presentation. Braccia was motivated by the financial implications of the Offering given his financial stake in the Company and the financial stake of the Accel venture capital firm that designated him to Slack's board and at which he was a partner. That financial stake included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Braccia beneficially owned over 119 million shares 0f Slack Class B supervoting common stock, providing him and the Venture Capital Defendants (defined below in 141) with approximately 24% voting control as of the Offering. Braccia, a primary violator as alleged herein, was controlled by the Venture Capital Defendants, and in fact the Venture Capital Defendants did have the ability to influence or control him. Braccia is a managing member of defendants Accel Growth Fund III Associates L.L.C., Accel X Associates L.L.C., and Accel XI Associates L.L.C., the Limited Liability Companies possessing sole voting and dispositive power over the Accel funds holding a combined total of approximately 24% voting control as of the Offering. He was also compensated and evaluated at Accel in part based on his ability to execute the Offering. (CCAC, Paragraph 33)

> Defendants Accel Growth Fund III Associates L.L.C., Accel X Associates L.L.C., and Accel XI Associates L.L.C., along with Defendant Braccia, are part of the largest venture capital stake in Slack and they beneficially owned, through partnerships they controlled (including Defendants Accel Growth Fund III L.P., Accel X L.P., and Accel XI L.P., respectively), approximately 24% of the Company's Class B common stock supervoting shares at the time of the Offering. Defendants Accel Growth Fund III L.P., Accel X L.P., and Accel XI L.P., held over 14.8 million, 68.5 million,

and 14.5 million shares of Slack's Class B common stock, respectively. Defendants Accel Growth Fund III Associates L.L.:C., Accel X Associates L.L.C., and Accel XI Associates L.L.C., possessed sole voting and dispositive power with regard to the shares held by Defendants Accel Growth Fund III L.P., Accel X L.P., and Accel XI L.P., respectively. The L.L.C. and L.P. entities identified in this paragraph (the "Venture Capital Entities"), as well as Defendant Braccia, are collectively referred t0 herein as the "Venture Capital Defendants." (Paragraph 41)

As a result of their holdings, having a director on Slack's Board, and having access to and input in Slack's confidential affairs, the Venture Capital Defendants effectively controlled Slack and caused it to conduct the Offering. The Venture Capital Defendants also obtained the Company's indemnification of them in the event they were held liable as control persons under §15 of the 1933 Act, and required applicable directors and officers ("D&O") Insurance. The Venture Capital Defendants also wielded great influence over Slack in general and had very significant influence over Slack in particular when it came to major matters of corporate governance and Slack's capitalization and ability to sell stock or obtain financing. A 27-page investor rights agreement that included rights (and Company obligations) allowing the Venture Capital Defendants to demand registration of their stock, obtain indemnification, require D&O insurance, control stock vesting, reserve common stock in the capital structure, exercise right of first offer, require sustained SEC reporting, and more. The Venture Capital Defendants exercised their rights in requiring the Company to register over 29 million Class A common shares for sale. And the Venture Capital Defendants participated in the immediate sale of approximately 8.5 million of those shares for proceeds of over $329 million. (Paragraph 42.)

The Venture Capital Defendants each had the ability to influence the policies and management of Slack at all relevant times by their voting and dispositive control over Slack's Class B supervoting common stock, pre-Offering agreements, and by having their designated director, Braccia, serving on the board of Slack.. . . The Venture Capital Defendants were not only control persons of Slack by virtue of their ownership of Slack related securities, Board membership, relationships with management, and involvement in establishing Slack's management, they also had extensive contractual rights regarding Slack's governance, capitalization, and ability to finance, including, but not limited to, rights to cause the registration of their shares. (Paragraph 141.)

"Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the

corporation and the defendant's power to control corporate actions." Howard at p. 1065;

In re Charles Schwab Corp. Securities Litigation, 257 F.R.D. at p. 550.

DATED:      August 12, 2020

_____
HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

34

SERVICE LIST
*Slack Technologies,* Master File 19CIV05370
As of November 2019

Plaintiffs' Co-Lead Counsel:

JAMES JACONETTE
BRIAN COCHRAN
ROBBINS GELLER RUDMAN
        & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
(619) 231-1048

BRIAN DANITZ
GINA STASSI
TYSON REDENBARGER
ANYA THEPOT
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000

JOHN JASNOCH
HAL CUNNINGHAM
SCOTT + SCOTT
600 West Broadway, Suite 3300
San Diego, CA  92101
(619) 233-0508

JORDAN LURIE
ARI BASSER
POMERANTZ LLP
1100 Glendon Avenue, 15th Floor
Los Angeles, CA  90024
(310) 432-8492

Attorneys for Defendants:

MICHAEL CELIO
GIBSON DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5326

MATTHEW KAHN
MICHAEL KAHN
GIBSON DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105
(415) 393-8212
(415) 393-8212