GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
LINDSEY YOUNG, SBN 300080
WESLEY SZE, SBN 306715
1881 Page Mill Road
Palo Alto, CA  94304
Telephone: 650.849.5300

MATTHEW S. KAHN, SBN 261679
MICHAEL J. KAHN, SBN 303289
555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone: 415.393.8200

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER DENNEE, | Case No. 3:19-cv-05857-SI |
| Plaintiff, | CLASS ACTION |
| v. | **DECLARATION OF MICHAEL D. CELIO IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION TO LIFT STAY** |
| SLACK TECHNOLOGIES, INC., STEWART BUTTERFIELD, ALLEN SHIM, BRANDON ZELL, ANDREW BRACCIA, EDITH COOPER, SARAH FRIAR, JOHN O'FARRELL, CHAMATH PALIHAPITIYA, GRAHAM SMITH, ACCEL GROWTH FUND IV ASSOCIATES L.L.C., ACCEL GROWTH FUND INVESTORS 2016 L.L.C., ACCEL LEADERS FUND ASSOCIATES L.L.C., ACCEL LEADERS FUND INVESTORS 2016 L.L.C., ACCEL X ASSOCIATES L.L.C., ACCEL INVESTORS 2009 L.L.C., ACCEL XI ASSOCIATES L.L.C., ACCEL INVESTORS 2013 L.L.C., ACCEL GROWTH FUND III ASSOCIATES L.L.C., AH EQUITY PARTNERS I L.L.C., Al6Z SEED-III LLC, SOCIAL+ CAPITAL PARTNERSHIP GP II, L.P., SOCIAL+CAPITAL PARTNERSHIP GP II LTD., SOCIAL+CAPITAL PARTNERSHIP GP III LP, SOCIAL+ CAPITAL PARTNERSHIP GP III, LTD., SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP L.P., and SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP LTD., | Date:        January 7, 2022<br>Time:        10:00 a.m.<br>Place:       Courtroom 1, 17th Floor<br>Judge:      Honorable Susan Illston |
| Defendants. | |

Gibson, Dunn &
Crutcher LLP

DECLARATION OF MICHAEL D. CELIO IN SUPPORT OF
DEFENDANTS' OPPOSITION TO MOTION TO LIFT STAY
CASE NO. 3:19-cv-05857-SI

I, Michael D. Celio, declare and state as follows:

1.      I am an attorney duly licensed by the State Bar of California and admitted to practice before this Court.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, and I represent Defendants Slack Technologies, Inc. ("Slack" or the "Company"), Stewart Butterfield, Allen Shim, Brandon Zell, Andrew Braccia, Edith Cooper, Sarah Friar, John O'Farrell, Chamath Palihapitiya, Graham Smith, Accel Growth Fund IV Associates L.L.C., Accel Growth Fund investors 2016 L.L.C., Accel Leaders Fund Associates L.L.C., Accel Leaders Fund Investors 2016 L.L.C., Accel X Associates L.L.C., Accel Investors 2009 L.L.C., Accel XI Associates L.L.C., Accel Investors 2013 L.L.C., Accel Growth Fund III Associates L.L.C., AH Equity Partners I L.L.C., Al6z Seed-III LLC, Social+Capital Partnership GP II, L.P., Social+Capital Partnership GP II Ltd., Social+Capital Partnership GP III LP, Social+Capital Partnership GP III, Ltd., Social+Capital Partnership Opportunities Fund GP L.P., and Social+Capital Partnership Opportunities Fund GP Ltd. (together, with the Company, the "Defendants") in the above-captioned case.  I make this Declaration in support of Defendants' Opposition to Motion to Lift Stay, filed concurrently herewith.  I have personal knowledge of the facts stated in this Declaration and, if called upon, could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the First Amended Consolidated Class Action Complaint filed October 5, 2020 in *In re Slack Technologies, Inc. Shareholder Litigation*, No. 19-5370 (Cal. Super. Ct.) (the "State Action").

3.      Attached hereto as **Exhibit B** is a true and correct copy of Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel that was publicly filed in the State Action, dated October 21, 2021.

4.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the certified transcript of case management conference held on August 13, 2021, in the State Action.

5.      On November 29, 2021, Defendants produced to Plaintiff all documents (nearly 170,000 pages) that Defendants have produced to State Action plaintiffs.

DECLARATION OF MICHAEL D. CELIO IN SUPPORT OF
DEFENDANTS' OPPOSITION TO MOTION TO LIFT STAY
CASE NO. 3:19-CV-05857-SI

Gibson, Dunn &
Crutcher LLP

6.    During discussions with Plaintiff's counsel, Defendants have extended offers to Plaintiff's counsel to participate in depositions of Slack witnesses in the State Action.

I declare under penalty of perjury that the foregoing is true and correct.  This Declaration is executed on this 1st day of December, 2021, at Palo Alto, California.


/s/ Michael D. Celio
Michael D. Celio

3

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES I. JACONETTE (179565)
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

COTCHETT, PITRE & McCARTHY, LLP
BRIAN DANITZ (247403)
TYSON REDENBARGER (294424)
NOORJAHAN RAHMAN (330572)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  650/697-6000
650/697-0577 (fax)

POMERANTZ LLP
JORDAN L. LURIE (130013)
ARI Y. BASSER (272618)
1100 Glendon Avenue, Suite 1558
Los Angeles, CA  90024
Telephone:  310/432-8492

SCOTT+SCOTT ATTORNEYS AT LAW LLP
JOHN T. JASNOCH (281605)
HAL D. CUNNINGHAM (243048)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON        10/5/2020
By_____/s/ Una Finau_____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| In re SLACK TECHNOLOGIES, INC. SHAREHOLDER LITIGATION | Lead Case No. 19CIV05370 (Consolidated with Nos. 19CIV05411; 19CIV05674; 19CIV05784, 19CIV05840, 19CIV05681 and 20-CIV-02589) |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 |
| | DEMAND FOR JURY TRIAL |

Plaintiffs Nicole Farina, Brian Knapp, Andrew R. Norell, Laurent Chardonnet, Martin Ren, Imran Naushahi, Vinodkumar Kazhipurath, and Mason Chu (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, analyst and media reports, other commentary analysis concerning Slack Technologies, Inc. ("Slack" or the "Company") and consultations with persons knowledgeable about Slack's business. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all those who purchased or otherwise acquired Slack common stock pursuant or traceable to the Company's Registration Statement and the incorporated Prospectus (collectively, the "Offering Documents") that offered over 283 million shares of Class A common stock issued in connection with Slack's June 2019 direct public offering (the "Offering"). Plaintiffs bring this action pursuant to §§11, 12 and 15 of the Securities Act of 1933 (the "1933 Act"). The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make statements therein not misleading.

2. Slack is a San Francisco-based technology company that offers a cloud-based collaboration and productivity platform that brings people, applications, and data together into a single, centralized hub where work can be executed — "often . . . replac[ing] the use of email inside the organization." Slack utilizes "team-based" channels to maintain a record of conversations, data, documents, and application workflows relevant to a project or a specific topic, while also integrating with thousands of third-party applications to ensure critical business information flows, is acted upon

- 2 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

and transformed, and is then quickly routed to its desired destination.  Slack works on a subscription freemium basis, providing users a basic, free version of its service (for an unlimited period of time) or the option to pay for other plans (*e.g.*, Standard, Plus or Enterprise Grid).

3.    On June 20, 2019, the Company completed a direct listing of its Class A stock on the New York Stock Exchange ("NYSE"), offering for sale to the public up to 118,429,640 registered shares and 164,932,646 unregistered shares purportedly exempt from registration.

4.    The public began purchasing Slack stock on the NYSE under the ticker symbol "WORK" on June 20, 2019, at an opening price per share of $38.50 (the "Offering Price").

5.    On September 4, 2019, Slack issued a press release announcing its second quarter fiscal 2020 ("2Q2020") results and admitted that "[r]evenue was negatively impacted by $8.2 million of credits related to service level disruption in the quarter."

6.    The value of Slack shares dropped precipitously.  News outlets such as *Forbes* reacted with headlines such as: "Slack Stock Has Plunged 33%.  Here's What Happened."[1]  The Offering opening price of $38.50 fell 33% to $26.  As of this filing, Slack shares are trading in the range of $21 per share.

7.    Unbeknownst to shareholders, Slack had omitted in its Offering Documents material facts concerning the Company's excessively punitive contracts with existing customers that were forcing the Company to suffer much higher revenue losses than anticipated.  The Company had agreed to award customers credits in the event of even a *de minimis* disruption in its service – that is, service availability that fell below a 99.99% "uptime" threshold.   Slack's internally-known service interruptions as of the Offering  were requiring the Company to credit its customers millions of dollars as a result of Slacks "up-time" commitments.  Indeed, Slack's infrastructure could not support the 99.99% service level requirement in light of expanding customer needs (including large enterprise customers) in advance of the Offering, and multiple significant outages occurred in the months

---

[1]    Sergei Kiebnikov, "Slack Stock Has Plunged 33%.  Here's What Happened.," *Forbes*, Sept. 11, 2019,  https://www.forbes.com/sites/sergeiklebnikov/2019/09/11/slack-stock-has-plunged-33-heres-what-happened/#6b3e0b18550e (last visited Dec. 19, 2019).

- 3 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

leading up to the Offering.  Moreover, Slack was even awarding credits in significant amounts to customers unaffected by service interruptions.

8.    Days after the Offering, Slack's platform had three notable service disruptions, resulting in uptime performance of only 99.9%.  This triggered the penalties in customers' contracts for falling below the 99.99% service level requirement.  The Company was forced to award millions of dollars' worth of credits, which deeply offset revenue for that quarter.

9.    Only after the abysmally high losses were revealed on September 4, 2019, did Chief Executive Officer ("CEO") Defendant Stewart Butterfield admit that the contract provisions were "*outrageously customer-centric*."  He also admitted that the 99.99% "uptime" requirement is an extraordinary and unusual standard in the industry.  He stated that Slack competitors such as Salesforce.com, Inc. ("Salesforce") or Microsoft Corporation ("Microsoft") would not have had to pay credits because they have committed to the lower 99.9% ("three nines") industry standard.  He also admitted that the Company's policy is to *proactively award credits to customers, even those unaffected by service outages*.  Thus, many customers who experienced no service outage were still awarded credits.

10.    Chief Financial Officer ("CFO") Defendant Allen Shim further admitted that the Company had committed to an "exceptionally *generous credit payout multiplier*" in customer contracts, which compounded the financial impact of the service disruptions occurring in June and July 2019.

11.    These "outrageously consumer-centric" policies and contract provisions resulted in a deduction of over $8 million from revenue in one period alone.

12.    The Company's historic inability to maintain the promised 99.99% service-level availability demonstrates that a consumer credit payout was inevitable and that the consumer centric contracts and policies have a material impact on the Company's financial success.  Slack has historically failed to consistently perform at 99.99%.  In 2018, the Company performed below the 99.99% standard in 7 months out of 12.

- 4 -

13.    Furthermore, the Offering Documents omitted the significant and intensifying competition Slack was experiencing from Microsoft Teams (or "Teams") and the inability of the Company to penetrate the lucrative "enterprise" market in light of Slack's problem scaling its platform to serve enterprise clients without service disruptions.

14.    Slack has not been able to maintain the 99.99% threshold due to its attempt to reach enterprise customers.   As discovered in plaintiffs' extensive investigation, Slack lacked the infrastructure to support a 99.99% uptime guarantee and was particularly vulnerable because of frequent changes to its codebase, indicating that there could be dozens of new code updates daily.  As a result, service outages, including outages on a global scale, occurred with far greater frequency than the near-perfect ("four nines") reliability guaranteed by Slack.

15.    In sum, the Offering Documents were false and misleading and omitted to state material facts both required by governing regulations and necessary to make the statements made therein not misleading.  More specifically, contrary to the Offering Documents' hyping of the Company's "go-to-market" enterprise business growth strategy and product scalability:

(a)    the Company was experiencing significant and intensifying competition from Microsoft Teams due in part to Microsoft's bundled business productivity suite;

(b)    Slack's attempt to attract and serve enterprise clients was creating vulnerabilities in its platform, including service disruptions, and Slack was having significant technical difficulties preventing adequate scaling of its platform;

(c)    Slack could not support its non-industry standard **uptime guarantee of 99.99%** and had failed to satisfy this threshold in 7 months out of 12 in 2018;

(d)    Slack's failure to satisfy its uptime guarantee results in the award of credits to customers;

(e)    the credit award is subject to an "'exceptionally generous credit payout multiplier in [its] contracts,'" requiring Slack, in the event of an interruption in service, to compensate customers **up to 100 times the value of the lost service**;

(f)    even customers unaffected by service disruptions are granted credits; and

- 5 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

(g)    as a result of Slack's "'exceptionally generous'" contractual provisions, even a *de minimis* service interruption materially impacts Slack's financial performance.

16.    Based on the Offering Documents' material misrepresentations and omissions, the Offering was a stunning success for Defendants. Since going public, however, the price of Slack's common stock has largely been on a one-way trip down. By the time this action was first filed, Slack's stock had fallen below $26.00 and has continued to decline – a far cry from its $38.50 opening Offering Price.



17.    As a result of Defendants' wrongful acts and omissions, and the significant share price decline in Slack's common stock, Plaintiffs and other Class (defined below) members have suffered and continue to suffer significant losses and damages. The claims asserted herein are purely strict liability and negligence claims. Plaintiffs expressly eschew any allegation sounding in fraud.

- 6 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

**JURISDICTION AND VENUE**

18.     This Court has subject-matter jurisdiction over this action pursuant to the California Constitution, Article VI, §10 and §22 of the 1933 Act, 15 U.S.C. §77v.  This action is not removable. *See* 15 U.S.C. §77v; *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, ___ U.S. ___, 138 S. Ct. 1061, 1078 (2018).

19.     This Court has personal jurisdiction over each Defendant named herein because each conducted business in, resided in, and/or was a citizen of California at the time of the Offering. Additionally, three of the Individual Defendants (defined below), Andrew Braccia, John O'Farrell, and Chamath Palihapitiya, are residents of this County and the statements complained of herein were disseminated into this State.

20.     Venue is proper in this Court because Defendants' wrongful acts arose in and emanated from, in part, this County.  The violations of law complained of herein occurred in this County, including the dissemination of materially misleading statements into this County and acquisition of the Company's common stock by members of the Class who reside in this County.  In addition, certain of the Defendants reside in this County.

**PARTIES**

**A.     Plaintiffs**

21.     Plaintiff Nicole Farina purchased shares of the Company's common stock that were issued in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

22.     Plaintiff Brian Knapp purchased shares of the Company's common stock in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

23.     Plaintiff Andrew R. Norell purchased shares of the Company's common stock that were issued in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

24.     Plaintiff Laurent Chardonnet purchased shares of the Company's common stock in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

- 7 -

25. Plaintiff Martin Ren purchased shares of the Company's common stock that were issued in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

26. Plaintiff Imran Naushahi purchased shares of the Company's common stock in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

27. Vinodkumar Kazhipurath purchased shares of the Company's common stock in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

28. Plaintiff Mason Chu purchased shares of the Company's common stock in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

29. Plaintiff Mohammed Kassem purchased shares of the Company's common stock in the Offering and pursuant and traceable to the Offering Documents and was damaged thereby.

**B.    Defendants**

30. Defendant Slack is a workplace collaboration software company based in San Francisco, California. Slack's shares are listed and traded on the NYSE under the ticker "WORK." Slack is subject to liability as an issuer, solicitor, and control person, and all the statements and solicitation herein made by Slack's officers was on behalf, and at the behest, of the Company. Slack organized and invited investors to meet with its top executives at "early investor" education meetings. In so doing, Slack directly targeted over 50 institutional investors including "Hedge Funds" and "Long Only" investors, a portion of whom were already investors in Slack. It sent Defendant CEO Stewart Butterfield to meet virtually and in person with key contacts of these investors in San Francisco and other locations on the West Coast and internationally, as well as in New York and Boston, where, at Slack's direction, Defendant Butterfield and other Slack top executives pitched the investors on Slack's anticipated Offering with an electronic presentation that Slack prepared.

31. Slack designated numerous personnel in a working group for the Offering, including its CEO and CFO, each of whom not only reviewed and approved the Offering Documents, but also pitched investors at Slack's behest in Slack's "investor day" in New York City on May 13, 2019, and "investor education meetings," according to a PowerPoint and talking points/script that was reviewed

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

and approved by Slack, in particular Slack's CEO and CFO and other Slack personnel. At substantial expense, Slack also arranged and prepared "investor day" and the "investor education meetings." Slack not only specifically targeted potential and existing investors for "investor day" and "investor education meetings," it also conducted corporate outreach for "investor day" by employing financial news outlets to announce the date of Slack's "investor day," inviting investors. And Slack solicited and participated in originating customer testimonials to promote the Offering. The investor day presentation and PowerPoint slides were recorded and broadcast on Slack's website through a web-link promoted to investors by Slack that was available starting in May 2019. Through that link and information on Slack's website, investors were provided information to facilitate investing in Slack's shares.

32. In fact, Slack designated a significant group of executives in addition to Defendants CEO Butterfield and CFO Shim, to assist in pitching investors at "investor day" and in the "investor education meetings," including Chief Product Officer Tamar Yehoshua, General Manager Bryan Elliott, Vice President of Investor Relations Jesse Hulsing, Senior Vice President of Sales and Customer Success Robert Frati, Director of Product, Lifecycle Fareed Mosavat, and Vice President and Global Head of Customer Success and Services Christina Kosmowski. Each of these persons, including Defendants Butterfield and Shim, were incentivized by the Company to execute Slack's Offering with compensation and/or bonuses that were triggered upon the closing of Slack's Offering as a performance-based condition. A portion of those incentives Slack granted to CEO Butterfield, CFO Shim, Tamar Yehoshua and Robert Frati, included Restricted Stock Units ("RSUs") for over 1.7 million, 1.1 million, 1 million and 720,000 shares of Class B common stock, respectively.

33. Slack invited investors to "investor day" and "investor education meetings" and pitched investors through its top officers because it was motivated by its financial interests and the financial interests of others served by the Offering. The Offering was in fact necessary to provide Slack and early investors in Slack's capital structure with liquidity and the ability to exit investments in Slack's securities that were made by those investors, which included private equity/venture capital funds holding nearly half of Slack's Class B supervoting stock (ten votes to every one vote of Class

- 9 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

A common stock) as of the Offering and that employed directors serving on Slack's Board of Directors. *See infra*, ¶¶37, 40-41 (identifying defendants Braccia, O'Farrell, and Palihapitiya as board designates for venture capital firms Accel, Andreessen Horowitz and Social Capital, respectively, and alleging voting control percentages). Slack needed the liquidity of the public market (here the NYSE) for its own future securities issuances and to compensate its employees. It also needed to provide Slack's early investors liquidity not only as a result of obligations under certain shareholder agreements, but also to demonstrate success to help it garner future financings. Those early investors included entities affiliated with Accel, Andreessen Horowitz, Social Capital, and SoftBank Group Corp. ("Softbank"), for which Slack registered for sale over 29.9 million, 16.6 million, 12.7 million, and 2.2 million shares, respectively, of Slack's Class A common stock. Slack was also financially motivated to serve the interests of its executive officers and directors whose compensation was in part tied to Slack securities that required a liquid market to cash out, and Slack registered a total of over 18 million shares of Slack's Class A common stock that included shares held by those persons, including Defendants, as alleged below at ¶¶34-35, 38-39. These stakeholders, including the venture capital/private equity funds and Slack's officers and directors, also held unregistered shares that benefited from the liquidity of the public markets created by the Offering, and Slack was financially motivated to execute the Offering to provide liquidity for those purported unregistered shares as well. Indeed, immediately before the Offering, Accel, Andreessen Horowitz, Social Capital, and Defendant Butterfield, each, beneficially owned *four times* as many "unregistered" shares as shares registered in the Offering, and SoftBank held nearly *20 times* as many "unregistered" shares as it did registered shares. Defendants Shim, Braccia, Friar, Palihapitiya and Smith, collectively beneficially owned over 190 million unregistered shares. As Slack recognized in inviting "partners" such as these to Slack's private "NYSE CELEBRATION" that Slack hosted at the NYSE in advance of and during the ringing of the bell on the day Slack listed its shares: "We literally wouldn't be here without you – your partnership with Slack has made all of this possible."

34. At the time of the Offering, Defendant Stewart Butterfield ("Butterfield"), who co-founded the Company, was serving as CEO and Chairman of the Board of Directors (the "Board").

- 10 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

As one of Slack's executives in the Offering working group and at the behest of Slack, Butterfield reviewed and approved, and participated in making, the statements in the Offering Documents, which he signed. At the behest of Slack, he also reviewed, edited and approved the Offering's investor day and investor education meetings presentation, talking points and script, in addition to participating in making false and misleading statements at the investor day presentation as Slack's CEO. Butterfield was motivated by the financial implications of the Offering given his financial stake in the Company, which included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Immediately prior to the Offering, Defendant Butterfield beneficially owned 41.6 million Class B supervoting shares and held voting control over an additional 46.9 million shares, and he registered over 11 million Class A common shares for sale. In the Offering, Defendant Butterfield immediately sold 1.36 million shares and has continued to sell shares daily since. Butterfield was also motivated by the financial implications of the Offering for Slack and Slack's selling investors, which included a number of venture capital firms and individuals.

35.     At the time of the Offering, Defendant Allen Shim ("Shim") was serving as CFO. Defendant Shim first joined Slack in March 2014 and served as Senior Vice President of Finance and Operations. As one of Slack's executives in the Offering working group and at the behest of Slack, Shim reviewed and approved, and participated in making, the statements in the Offering Documents, which he signed. At the behest of Slack, he also reviewed, edited and approved the Offering's investor day and investor education meetings presentation, talking points and script, in addition to participating in making false and misleading statements at the investor day presentation as Slack's CFO. Shim was motivated by the financial implications of the Offering given his financial stake in the Company, which included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Immediately prior to the Offering, Defendant Shim beneficially owned over 1.9 million Class B supervoting shares, and he registered over 1.3 million Class A common shares for sale. In the Offering, Defendant Shim immediately sold over 502,000 shares for proceeds of $19.4 million, and has continued to sell tens of thousands of shares between June and

- 11 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

December 2019. Shim was also motivated by the financial implications of the Offering for Slack and Slack's selling investors, which included a number of venture capital firms and individuals.

36. At the time of the Offering, Defendant Brandon Zell ("Zell") was serving as Chief Accounting Officer. Defendant Zell participated in the preparation of and signed the Offering Documents.

37. At the time of the Offering, Defendant Andrew Braccia ("Braccia") was serving as a director on the Slack Board. As a director and board designate of Slack's largest shareholders, the Accel venture capital firm, Braccia participated in the preparation of, and reviewed and approved, the statements in the Offering Documents, which he signed. He also reviewed and approved the Offering's investor day and investor education meetings presentation. Braccia was motivated by the financial implications of the Offering given his financial stake in the Company and the financial stake of the Accel venture capital firm that designated him to Slack's board and at which he was a partner. That financial stake included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Braccia beneficially owned over 119 million shares of Slack Class B supervoting common stock, providing him and the Venture Capital Defendants (defined below in ¶45) with approximately 24% voting control as of the Offering. Braccia, a primary violator as alleged herein, was controlled by the Venture Capital Defendants, and in fact the Venture Capital Defendants did have the ability to influence or control him. Braccia is a managing member of Defendants Accel Growth Fund III Associates L.L.C., Accel X Associates L.L.C., and Accel XI Associates L.L.C., the Limited Liability Companies possessing sole voting and dispositive power over the Accel funds holding a combined total of approximately 24% voting control as of the Offering. He was also compensated and evaluated at Accel in part based on his ability to execute the Offering.

38. At the time of the Offering, Defendant Edith Cooper ("Cooper") was serving as a director on the Slack Board. Defendant Cooper participated in the preparation of and signed the Offering Documents. Cooper was motivated by the financial implications of the Offering given her financial stake in the Company, which included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Immediately prior to the Offering, Defendant

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

Cooper beneficially owned over 273 thousand Class B supervoting shares, and she registered over 102 thousand Class A common shares for sale. Cooper was also motivated by the financial implications of the Offering for Slack and Slack's selling investors, which included a number of venture capital firms and individuals.

39. At the time of the Offering, Defendant Sarah Friar ("Friar") was serving as a director on the Slack Board. Defendant Friar participated in the preparation of and signed the Offering Documents. Friar was motivated by the financial implications of the Offering given her financial stake in the Company, which included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Immediately prior to the Offering, Defendant Friar beneficially owned over 406 thousand Class B supervoting shares, and she registered over 50 thousand Class A common shares for sale. Friar was also motivated by the financial implications of the Offering for Slack and Slack's selling investors, which included a number of venture capital firms and individuals.

40. At the time of the Offering, Defendant John O'Farrell ("O'Farrell") was serving as a director on the Slack Board. As a director and board designate of Slack's second largest shareholders, venture capital firm Andreessen Horowitz, O'Farrell participated in the preparation of, and reviewed and approved, the statements in the Offering Documents, which he signed. He also reviewed and approved the Offering's investor day and investor education meetings presentation. O'Farrell was motivated by the financial implications of the Offering given his financial stake in the Company and the financial stake of the Andreessen Horowitz venture capital firm that designated him to Slack's board and at which he was a general partner. That financial stake included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. O'Farrell beneficially owned over 66 million shares of Slack Class B supervoting common stock, providing him and the Andreessen Horowitz venture capital firm with approximately 13.2% voting control as of the Offering, and Andreessen Horowitz registered over 16.6 million shares of Class A common stock for sale. In the Offering, O'Farrell's venture capital firm immediately sold 3 million shares for proceeds

- 13 -

of $116 million. He was also compensated and evaluated at Andreessen Horowitz in part based on his ability to execute the Offering.

41. At the time of the Offering, Defendant Chamath Palihapitiya ("Palihapitiya") was serving as a director on the Slack Board. As a director and board designate of Slack's third largest shareholders, venture capital firm Social Capital, Palihapitiya participated in the preparation of, and reviewed and approved, the statements in the Offering Documents, which he signed. He also reviewed and approved the Offering's investor day and investor education meetings presentation. Palihapitiya was motivated by the financial implications of the Offering given his financial stake in the Company and the financial stake of the Social Capital venture capital firm that designated him to Slack's board, which financial stake included multiple forms of securities that could be sold (or converted and sold) to investors in or after the Offering. Palihapitiya beneficially owned over 50 million shares of Slack Class B supervoting common stock, providing him and the Social Capital venture capital firm with approximately 10.1% voting control as of the Offering, and Social Capital registered over 12.7 million shares of Class A common stock for sale. In the Offering, limited partnerships holding Slack Class A common shares over which Palihapitiya had voting and dispositive power as the CEO of the General Partner of the General Partner of the limited partnerships, immediately sold 1 million shares for proceeds of $39.7 million. He was also compensated and evaluated at Social Capital in part based on his ability to execute the Offering.

42. At the time of the Offering, Defendant Graham Smith ("Smith") was serving as a director of the Slack Board. Defendant Smith participated in the preparation of and signed the Offering Documents. Smith was motivated by the financial implications of the Offering given his financial stake in the Company, which included 210 thousand shares of Class B supervoting common stock. Smith was also motivated by the financial implications of the Offering for Slack and Slack's selling investors, which included a number of venture capital firms and individuals.

43. Defendants Butterfield, Shim, Zell, Braccia, Cooper, Friar, O'Farrell, Palihapitiya, and Smith are collectively referred to herein as the "Individual Defendants."

- 14 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

44.    Slack and the Individual Defendants are collectively referred to herein as the "Defendants."  Defendants Butterfield and Shim are collectively referred to herein as the "Executive Defendants."

45.    Defendants Accel Growth Fund III Associates L.L.C., Accel X Associates L.L.C., and Accel XI Associates L.L.C., along with Defendant Braccia, are part of the largest venture capital stake in Slack and they beneficially owned, through partnerships they controlled (including Defendants Accel Growth Fund III L.P., Accel X L.P., and Accel XI L.P., respectively), approximately 24% of the Company's Class B common stock supervoting shares at the time of the Offering.  Defendants Accel Growth Fund III L.P., Accel X L.P., and Accel XI L.P., held over 14.8 million, 68.5 million, and 14.5 million shares of Slack's Class B common stock, respectively.  Defendants Accel Growth Fund III Associates L.L.C., Accel X Associates L.L.C., and Accel XI Associates L.L.C., possessed sole voting and dispositive power with regard to the shares held by Defendants Accel Growth Fund III L.P., Accel X L.P., and Accel XI L.P., respectively.  The L.L.C. and L.P. entities identified in this paragraph (the "Venture Capital Entities"), as well as Defendant Braccia, are collectively referred to herein as the "Venture Capital Defendants."

46.    As a result of their holdings, having a director on Slack's Board, and having access to and input in Slack's confidential affairs, the Venture Capital Defendants effectively controlled Slack and caused it to conduct the Offering.  The Venture Capital Defendants also obtained the Company's indemnification of them in the event they were held liable as control persons under §15 of the 1933 Act, and required applicable directors and officers ("D&O") Insurance.  The Venture Capital Defendants also wielded great influence over Slack in general and had very significant influence over Slack in particular when it came to major matters of corporate governance and Slack's capitalization and ability to sell stock or obtain financing.  A 27-page investor rights agreement that included rights (and Company obligations) allowing the Venture Capital Defendants to demand registration of their stock, obtain indemnification, require D&O insurance, control stock vesting, reserve common stock in the capital structure, exercise right of first offer, require sustained SEC reporting, and more.  The Venture Capital Defendants exercised their rights in requiring the Company to register over 29 million

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

Class A common shares for sale.  And the Venture Capital Defendants participated in the immediate sale of approximately 8.5 million of those shares for proceeds of over $329 million.

47.    Pursuant to the 1933 Act, Defendants are liable for the false and misleading statements in the Offering Documents.  Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

48.    Defendants also orchestrated the Offering.  They purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

49.    Defendants planned the Offering and determined: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.

50.    Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and relevant Offering Documents, including to Plaintiffs and the Class. Furthermore, the Individual Defendants signed the Offering Documents.

## SUBSTANTIVE ALLEGATIONS

**A.    Slack's Business and Focus on Expanding Enterprise Adoption**

51.    Slack offers a single application for users to work in to manage all the other applications they use on a daily basis.  Through its global collaboration and productivity solution, which brings people, applications, and data into a single place, Slack's cloud platform leverages team-focused channels to create a unified communication environment to share and aggregate information from multiple sources.  Slack's cloud platform directs information flow between users and aggregates data from internal and external sources into a centralized information hub that is intended to enhance productivity and streamline communication.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

52.    The pillars of Slack's growth strategy include: (1) Expanding its user base: Slack plans to invest in product design and new user experience to reach more users and increase adoption; (2) Growing the number of organizations: Slack plans to invest in sales and marketing efforts to increase adoption across organizations; (3) Increasing the number of paid customers: Slack is planning to increase investments in its direct salesforce, customer success and customer experience teams, along with new user education initiatives; and (4) Increasing usage within organizations: Slack is planning to increase the number of active users within organizations by increasing investments in the Company's Enable Slack usage across existing and new business networks.

53.    To achieve these ends, Slack offers a multi-tiered subscription model comprising two primary offerings: Slack for Teams and Slack Enterprise Grid.  Slack for Teams provides a single workspace and is designed with small to medium-sized businesses in mind.  Users can easily self-onboard onto any of Slack for Teams subscription tiers, which include: (1) Free (for small teams sampling Slack; offers limited searchable messages and integrations, and storage with no external access options); (2) Standard ($8.00/active user/month or $6.67 on an annual basis; for teams/businesses looking for Slack's full product capabilities); and (3) Plus ($15.00/active user/month or $12.50 on an annual basis; for businesses requiring guaranteed uptime and compliance features).  To encourage adoption of paid subscriptions, Slack offers customers more functionality, larger file storage, enhanced access to content, unlimited integrations, shared channels, and product support.

54.    For larger organizations, Slack offers Slack Enterprise Grid, which incorporates enterprise features (security, compliance and administrative upgrades) and provides unlimited customized workspaces and organization-wide search capabilities.  To join, large businesses need to establish a direct sales relationship with Slack. At the time of the Offering, Slack aggressively invested in direct sales and go-to-market efforts for the Enterprise Grid subscription, looking to turn non-paying users into large enterprise-wide deployments.

55.    Slack's direct sales and customer success efforts are focused on larger organizations who have a greater number of users and teams and have the potential to increase spending over time.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

Key to Slack's efforts to drive deeper penetration into these large enterprises is its ability to add more enterprise-grade data security and governance requirements while managing actual and perceived cloud vulnerabilities, building out its enterprise sales force, and maintaining its competitive advantage over Microsoft Teams. Microsoft Teams is bundled with Microsoft's enterprise-installed Office365 solution, which, as of April 2019, exposed it to 180 million-plus active Microsoft Office users.

56.    Reliable service is crucial to Slack's expansion efforts. Because Slack positioned itself as the primary communication tool for enterprise clients, Slack needed to avoid service outages. Additionally, because Slack structured itself as a software-as-a-service company, its customers could not take their own steps to ensure reliability, such as employing a redundant architecture. Instead, Slack's customers had to rely entirely upon the Company to provide uninterrupted service.

57.    Reliability of the service also had a material impact on Slack's bottom line. For its Plus and Enterprise Grid customers, Slack entered into service level agreements ("SLAs") containing *reliability guarantees* that Defendant Butterfield would later describe as "*outrageously customer-centric*." At the time of the Offering, Slack's SLAs differed from industry-standard SLAs in four material respects:

(1) Slack guaranteed four nines (**99.99%**) of reliability, whereas most guaranteed only three nines (99.9%);

(2) Instead of reimbursing customers for the actual value of service lost during an outage, Slack's SLAs guaranteed that it would pay customers *100 times the value of interrupted service*;

(3) Slack would pay customers – with the 100x multiplier – whenever Slack experienced interruptions, regardless of whether the customer actually experienced an outage in service; and

(4) Slack credited all eligible customers automatically, whether or not they requested an outage credit.

As a result of these provisions, Slack was uniquely exposed to significant economic loss from even a small interruption in service at the time of the Offering.

- 18 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

58.    Interruptions in service also posed a competitive threat to Slack, which faced increasing competition from Microsoft Teams.  Any interruption in Slack service would (and did) provide additional fodder for Microsoft's campaign against the Company.

59.    At the time of the Offering, Slack's customer base consisted of over 10 million daily active users ("DAUs"), more than 500,000 organizations on its Free subscription plan, and more than 95,000 Paid Customers, including more than 65 companies in the Fortune 100.  At the time of the Offering, Slack measured the number of Paid Customers with more than $100,000 of annual recurring revenue ("ARR"), as a gauge of adoption within and expansion into large enterprises.  As of April 30, 2019, Slack had 645 Paid Customers with more than $100,000 of ARR, which accounted for approximately 43% of its revenue in the three months ended April 30, 2019.

**B.    Slack's Direct Integrated Offering**

60.    On February 1, 2019, Defendants filed a confidential draft Registration Statement on Form DRS with the SEC.  After receiving confidential comments from the SEC, Defendants filed a Registration Statement on Form S-1 with the SEC on April 26, 2019.

61.    Following amendments of the Form S-1 Registration Statement on May 13, 2019, May 20, 2019, and May 31, 2019, on June 5, 2019, Defendants Slack and Butterfield sent a letter to the SEC requesting that the effective date of the Registration Statement be accelerated.  The June 5, 2019 letter explained that "[i]n making this acceleration request, the Company acknowledges that it is aware of its responsibilities under the [Securities] Act," including its obligation under §11 of the 1933 Act to ensure that the Registration Statement does not "contain[] an untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *See* 15 U.S.C. §77k(a).

62.    On June 7, 2019, the SEC declared the Registration Statement effective.

63.    On June 20, 2019, Defendants filed a Prospectus on Form 424B4 that amended the Offering Documents and allowed the sale of securities to the public to proceed.  Slack's Offering began selling shares on June 20, 2019 at $38.50 per share.

- 19 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

**C.    The Offering Documents' False and Misleading Statements**

64.    The Offering Documents were negligently prepared and contained false statements of material fact or omitted to state other facts necessary to make the statements made not false or misleading.  The following false and misleading statements in the Offering Documents were also repeated in substance or verbatim, including by reference to the Offering Documents, by the Executive Defendants at the "investor day" in New York City on May 13, 2019, and "investor education meetings," as well as in the replay of these presentations broadcast on Slack's website in advance of, and during, the Offering (the "Investor Pitch Statements").

***Statements Concerning/Related to Slack's "Go-To-Market" Enterprise***
***Business Growth Strategy and the Company's Overall Revenue Growth Rate***

65.    According to the Offering Documents, the Company's "***[d]ifferentiated go-to-market strategy***" set it apart from others in the space.  Specifically, Slack repeatedly touted the benefits, current and future, of its "go-to-market" approach, which consisted of a combination of a highly effective self-service customer engagement model that had previously concentrated on word-of-mouth adoption, and a direct sales force with customer success professionals focused on driving successful adoption and expansion within larger organizations with a greater number of users and teams that had the potential to increase spend over time.

66.    Slack's augmented "go-to-market" strategy was a key selling point to Offering investors and was among the few features of the Company profiled at the time of the Offering.  For example, in an article published on *Forbes*, entitled "The Secret Behind Slack's Runaway Success," the adoption of Slack's "robust sales force" was credited as being "essential" to break into the major leagues of enterprise software.

67.    In a section entitled "Our Business Model," the Offering Documents make the following representations concerning Slack's "go-to-market" strategy, and importantly, its impact on key performance indicators, such as "Paid Customers >$100,000" who "accounted for approximately 40% of" Slack's business in 2019:

> From the outset, our go-to-market strategy has centered around offering an exceptional product and level of service to organizations on Slack.  We offer a self-service approach, for both free and paid subscriptions to Slack, which capitalizes on

- 20 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

strong word-of-mouth adoption and customer love for our brand. Since 2016, we have augmented our approach with a direct sales force and customer success professionals who are focused on driving successful adoption and expansion within organizations, whether on a free or paid subscription plan.

\*    \*    \*

Our direct sales and customer success efforts are focused on larger organizations who have a greater number of users and teams and have the potential to increase spend over time. We measure the number of Paid Customers > $100,000 of annual recurring revenue, or ARR, as a gauge of adoption within and expansion into large enterprises. **As of January 31, 2019, we had 575 Paid Customers >$100,000 of ARR, which accounted for approximately 40% of our revenue in fiscal year 2019.**

68.     The Offering Documents juxtapose these comments with revenue figures from 2017 through 2019, suggesting to investors that the Company's "go-to-market" strategy is **the** driving force behind the Company's continued (and expected) growth:

Our reven ue [sic] was $105.2 million, $220.5 million, and $400.6 million in fiscal years 2017, 2018, and 2019, respectively, **representing annual growth of 110% and 82%, respectively**. . . . Our growth is global with international revenue representing 34%, 34%, and 36% of total revenue in fiscal years 2017, 2018, and 2019, respectively . . . .

69.     Reaffirming these inferences, the Offering Documents then claim that the Company is committed to "continu**ing to invest in growing our business to capitalize on our market opportunity**," before then touting how "**[o]ur net losses have been decreasing as a percentage of revenue over time as revenue growth has outpaced the growth in operating expenses.**"

70.     The Offering Documents also underscore the importance of the Company's expansion within organizations already using its products, noting, in particular, how the rate of expansion within Slack's paid customer base was closely tracked:

Expansion within organizations on Slack is a significant contributor to our growth. We measure the rate of expansion within our Paid Customer base, both sales-driven and through organic growth, by Net Dollar Retention Rate. **Our Net Dollar Retention Rate was 138% as of April 30, 2019.** We believe that our Net Dollar Retention Rate is a reflection of the rapid pace of adoption that often occurs as usage spreads within and across teams. **We believe that all of these factors will contribute to a high lifetime value of an organization on Slack**.

71.     Defendants continue to emphasize these assertions in the section of the Offering Documents entitled "**What Sets Us Apart**," stating, in relevant part:

**Scale and market leadership**

- 21 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

*The strength of our market leadership is demonstrated by the scale and growth of our users, the high level of engagement within our user base, our growth within organizations, the breadth of applications that integrate with Slack, and the size of our developer ecosystem.*

\*     \*     \*

*Customer love leading to stickiness and organic expansion*

People love using Slack and many become advocates for wider use inside of their organizations. They also tend to recommend Slack when they switch jobs or join organizations that are not yet using Slack. *This customer love is a source of growth that is exceptional in enterprise software.*

*Differentiated go-to-market strategy*

*Organic growth is generated as users realize the benefits of Slack. This growth enables us to attract new and prospective organizations through a highly effective self-service customer engagement model for free and paid subscription plans. We complement our self-service strategy with a focused direct sales effort and our customer success teams work to broaden adoption of Slack into wider-scale developments.*

72. Finally, the Offering Documents lay out the Company's "Growth Strategy," which include committing to "[g]row the number of organizations on Slack and increase our paid customers," "[i]ncrease usage within organizations on Slack," and "[f]urther invest in enterprise capabilities," stating, in relevant part:

We intend to continue to grow by the following means:

\*     \*     \*

*Grow the number of organizations on Slack and increase our paid customers*

We believe our market remains underpenetrated and *we will continue to expand our marketing and sales efforts* to reach more users and organizations and *to increase the number of paid customers*.

*Increase usage within organizations on Slack*

We plan to *continue to grow use and users within organizations on Slack by increasing our investments in our direct sales force, customer success, and customer experience teams*, along with new user education initiatives.

\*     \*     \*

*Further invest in enterprise capabilities*

We intend to *increase investments in marketing, expand our field sales team,* and continue to build product functionality *in order to drive greater adoption of Slack by large organizations.*

- 22 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

73.     The foregoing statements in paragraphs 61, 63-68 were materially false and misleading and omitted material facts, for as of the Offering Slack was in fact (1) experiencing significant and intensifying competition from Microsoft Teams, which, as a result, caused the Company's revenue growth to trend downward, stall and/or decline while losses from heavy investments in sales and marketing swelled; (2) already and increasingly vulnerable to service outages caused by scaling its technology to meet enterprise-level customer needs; and (3) uniquely susceptible to suffer financially because of an "exceptionally generous credit payout multiplier" Slack was required to provide **both affected and unaffected customers** following service outages.

74.     Relatedly, the Offering Documents misrepresent and omit material facts demonstrating that Slack's overall growth rate was slowing, stating instead that "Our user base has grown rapidly since our launch in 2014. During the three months ended January 31, 2019, our daily active users exceeded 10 million." The aforementioned statement was materially false and omitted the material fact that Slack's key growth metric, DAUs, was actually decelerating.

75.     Additionally, with respect to competition, the Offering Documents identify Microsoft as Slack's "primary competitor," but fail to mention the existence, and increasing adoption, of Teams, and the present (and knowable future) impact that Teams was having (and would continue to have) on the Company's ability to penetrate enterprise users. Instead, the Offering Documents generally state:

> The market for services like Slack is emerging, rapidly evolving, and fragmented, and we believe that Slack represents a new category of business technology. As a result, ***we principally compete against incumbent collaboration and communication tools and products from established vendors, such as Microsoft***, productivity tool and email providers, such as Google, unified communications providers, such as Cisco, and consumer application companies that have entered the business software market, such as Facebook. We also compete with smaller companies that offer niche or point products that attempt to address certain problems that Slack addresses. These smaller companies include companies that specialize in voice or video communication, instant messaging, email filtering and email inbox organization, business workflows, team-based collaboration, intranet creation, and maintenance and other functionality. Some of these companies offer free or discounted services. We believe that we compete favorably with these smaller companies because they do not offer the unique mix of features and functionality combined with our proven ability to scale to handle large amounts of users, usage, and data. In addition, our market is subject to changing technology, shifting customer needs, new market entrants, and frequent introductions of new products and services.

- 23 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

We believe that the principal competitive factors in our markets include the following:

- *ease of adoption*, use, and deployment;
- product functionality;
- platform capabilities;
- breadth and depth of platform integrations;
- *scalability*;
- security and privacy;
- ability to support intercompany collaboration;
- brand awareness and reputation;
- customer support; and
- *total cost of ownership*.

*We believe that our product experience and product strategy, technological innovation, and company culture enable us to compete favorably on each of these factors.*

*We expect competition to increase as* established and emerging companies continue to enter the markets we serve or attempt to address the problems Slack addresses, as customer requirements evolve and as new products, technologies, and regulations are introduced.  Further, *some of our competitors have longer operating histories, the ability to bundle a broader range of products and services, larger marketing budgets, access to larger existing user bases, and greater financial, technical, and other resources than we do.  We believe, however, that we are uniquely positioned to more rapidly innovate and respond to new technologies and customer requirements than our competitors.*

76.    Each of the statements referenced above in ¶75 were materially false and misleading and omitted material facts, that existed at the time of the Offering, including that Slack was experiencing significant and intensifying competition from Microsoft, that Microsoft had included its Teams solution in its business productivity suite that was already prolifically used by the enterprise-level customers Slack desperately coveted, and as a result, Slack's revenue growth was stalling and/or declining at the same time that heavy investments in sales and marketing were swelling.

***Statements Concerning Slack's Platform's Scalability, Reliability and Susceptibility to Service Disruptions as Well as Related Risks***

77.    According to the Offering Documents, Slack "built [its] technology infrastructure using a distributed and *scalable architecture on a global scale*."

78.    The Offering Documents also include a section entitled "Summary of Key Benefits," that focuses on Slack's ability to generate improved communication, accessibility and "organizational agility,"  listing the following "Key Benefits," among others:

- 24 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

- **Slack increases an organization's "return on communication."** Moving to channel-based communication increases accessibility of communication, which in turn increases transparency and breaks down silos. The organization benefits from increased coordination and alignment from a given amount of communication, with no additional effort in the form of status reports, update meetings, and so on.

  \*       \*       \*

- **An organization's archive of data increases in value over time.** As teams continue to use Slack, they build a valuable resource of widely accessible information. Important messages are surrounded by useful context and users can see how fellow team members created and worked with the information and arrived at a decision. New employees can have instant access to the information they need to be effective whenever they join a new team or company. Finally, the content on Slack is available through powerful search and discovery tools, powered by machine learning, which improve through usage.

  \*       \*       \*

- **Slack helps achieve organizational agility.** Slack's channels immerse workers directly into the dynamic and evolving communication, decision making, and data flow that defines modern work. Because workers have both more access to data updated in real time and more context for that data, they are better able to quickly react and adjust work streams in response to new business priorities or changing conditions while staying in alignment with one another.

- **Developers are better able to reach and deliver value to their customers.** Slack has aggregated hundreds of thousands of organizations on one platform and made it easier for developers to distribute their software to any Slack-using organization. By making information from their applications available and allowing users to perform key actions through a whole new interface, developers can make their customers happier and more engaged.

79. The statements identified in ¶¶77-78 above were materially false and misleading and omitted the following material facts: (a) Microsoft Teams, not Slack, was the market leader at the time of the Offering; (b) Slack's services were unstable and service disruptions were significantly inhibiting customers' needs for Slack's promised 99.9% uptime; and (c) Slack was experiencing inability to scale globally and serve large businesses adequately because of problems in maintaining and expanding its infrastructure, which was manifesting in widespread service disruptions and outages.

- 25 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

80.     Relatedly, the Offering Documents spoke about the service level commitments Slack agreed to with certain of its paid customers, including its obligation to provide credits for future services, stating in relevant part:

> ***We provide service level commitments under certain of our paid customer contracts. If we fail to meet these contractual commitments, we could be obligated to provide credits for future service, or face contract termination with refunds of prepaid amounts related to unused subscriptions, which could harm our business, results of operations, and financial condition.***

> Certain of our paid customer agreements contain service level agreements, under which we guarantee specified minimum availability of Slack. From time to time, we have granted credits to paid customers pursuant to the terms of these agreements. We do not currently have any material liabilities accrued on our balance sheet for these commitments. Any failure of or disruption to our infrastructure could make Slack unavailable to organizations on Slack. ***If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Slack, we <u>may</u> be contractually obligated to provide affected paid customers with service credits for future subscriptions***, or paid customers could elect to terminate and receive refunds for prepaid amounts related to unused subscriptions. Our revenue, other results of operations, and financial condition ***could*** be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages ***could*** adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales.

81.     The statements identified in ¶80 above were materially false and misleading and omitted the following material facts: (a) Slack's SLAs were highly unusual for the industry in that they required near-perfect ("four nines") reliability and included an "exceptionally generous credit payout multiplier" requiring Slack, in the event of an interruption in service, to compensate both affected and unaffected customers up to 100 times the value of the lost service; (b) as a result of its "exceptionally generous" contractual provisions, even small interruptions were then materially impacting Slack's financial health; (c) repeated service interruptions and outages in the months leading up to the Offering were already significantly negatively impacting the Company's revenues because of these "exceptionally generous" contractual provisions; and (d) Slack was paying out significant amounts of service credits to customers that were not even experiencing service disruptions below the service commitment threshold.

82.     The descriptions of potential interruptions in the Offering Documents are likewise conditional, generic and boilerplate, and misrepresent and omit that Slack had a history of

- 26 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

unreliability, that it was particularly vulnerable at the time of the Offering, or material facts about Slack's unique contractual provisions:

> If there are interruptions or performance problems associated with the technology or infrastructure used to provide Slack, organizations on Slack may experience service outages, other organizations may be reluctant to adopt Slack, and our reputation could be harmed.

> Our continued growth depends, in part, on the ability of existing and potential organizations on Slack to access Slack 24 hours a day, seven days a week, without interruption or degradation of performance. We have in the past and may in the future experience disruptions, data loss, outages, and other performance problems with our infrastructure due to a variety of factors, including infrastructure changes, introductions of new functionality, human or software errors, capacity constraints, denial-of-service attacks, ransomware attacks, or other security-related incidents. In some instances, we may not be able to identify the cause or causes of these performance problems immediately or in short order. We may not be able to maintain the level of service uptime and performance required by organizations on Slack, especially during peak usage times and as our user traffic and number of integrations increase. For example, we have experienced intermittent connectivity issues and product issues in the past, including those that have prevented many organizations on Slack and their users from accessing Slack for a period of time. If Slack is unavailable or if organizations are unable to access Slack within a reasonable amount of time, or at all, our business would be harmed. Since organizations on Slack rely on Slack to communicate, collaborate, and access and complete their work, which in many cases includes entire organizations that complete substantially all of their work functions on Slack, any outage on Slack would impair the ability of organizations on Slack and their users to perform their work, which would negatively impact our brand, reputation, and customer satisfaction, and could give rise to legal liability under our service level agreements with paid customers.

> Moreover, we depend on services from various third parties to maintain our infrastructure, including Amazon Web Services, or AWS. If a service provider fails to provide sufficient capacity to support Slack or otherwise experiences service outages, such failure could interrupt access to Slack by users and organizations, which could adversely affect their perception of Slack's reliability and our revenue and harm the businesses of organizations on Slack. Any disruptions in these services, including as a result of actions outside of our control, would significantly impact the continued performance of Slack. In the future, these services may not be available to us on commercially reasonable terms, or at all. Any loss of the right to use any of these services could result in decreased functionality of Slack until equivalent technology is either developed by us or, if available from another provider, is identified, obtained, and integrated into our infrastructure. If we do not accurately predict our infrastructure capacity requirements, organizations on Slack could experience service shortfalls. We may also be unable to effectively address capacity constraints, upgrade our systems as needed, and continually develop our technology and network architecture to accommodate actual and anticipated changes in technology.

> Any of the above circumstances or events may harm our reputation, cause organizations on Slack to terminate their agreements with us, impair our ability to obtain subscription renewals from organizations on Slack, impair our ability to grow the base of users and organizations on Slack, subject us to financial penalties and

- 27 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

liabilities under our service level agreements with our paid customers, and otherwise harm our business, results of operations, and financial condition.

83.    Other statements regarding reliability were even more boilerplate.  For example, in its highly generic list of potential risks, the Offering Documents state that "If we fail to manage our growth effectively, we may be unable to execute our business plan or maintain high levels of service and customer satisfaction," and "[i]f there are interruptions or performance problems associated with the technology or infrastructure used to provide Slack, organizations on Slack may experience service outages, other organizations may be reluctant to adopt Slack, and our reputation could be harmed."

84.    The statements identified in ¶¶82-83 above were materially false and misleading and omitted the following material facts: (a) Slack's infrastructure could not support its promised uptime guarantee of 99.99%; (b) Slack's unreliability was not hypothetical but actual – Slack had failed to meet its contractual 99.99% standard of uptime in 7 out of 12 months in 2018 and repeatedly in the months leading up to the Offering in 2019; (c) Slack had included a highly unusual and "'exceptionally generous credit payout multiplier in [its] contracts,'" requiring Slack, in the event of an interruption in service, to compensate both affected *and unaffected customers* up to 100 times the value of the lost service; and (d) as a result of its "'exceptionally generous'" contractual provisions and service disruptions caused by the Company's inability to adequately scale its platform, Slack's revenues and ability to garner large enterprise customers were being significantly negatively, among other material facts.

85.    The Offering Documents also represented as a mere future risk that "[*i*]*f* [SLACK] [we]re not able to continue to provide high levels of customer service, [its] reputation, as well as [its] business, results of operations, and financial condition, *could* be harmed."  That statement was false and misleading and omitted material facts.  In truth, Slack was already, at the time of the Offering, failing to sustain the level of customer service promised in its service level agreement (having fallen short of its contractual thresholds 7 out of 12 months in 2018 and repeatedly in 2019), its platform was already suffering vulnerabilities subjecting its platform and customers to severe service disruptions, and as a consequence was both paying out exorbitant credits to its customers and losing market share to rivals such as Microsoft.

- 28 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

86.     The Offering Documents further represented as mere future risk that "security breaches, technical difficulties, or interruptions to Slack resulting in service level agreement credits" "*may* result in significant fluctuations in our quarterly results of operations."  That statement was false and misleading and omitted material facts.  In truth, Slack *already had* experienced significant interruptions that were causing significant declines in its revenues and growth rate.  Slack was already, at the time of the Offering, vulnerable to and suffering from rampant service disruptions that were already, at the time of the Offering, subjecting Slack to exorbitant credit payouts to its customers and already resulting in negative impacts on Slack's reported financial and operational results.

87.     The Offering Documents further represented that while Slack "will need to ensure that [it] can scale to meet the evolving needs of users and organizations on Slack, particularly as [it] continue[s] to focus on larger organizations with Enterprise Grid," "[r]eal or perceived errors, failures, vulnerabilities, or bugs in Slack *could* result in negative publicity, loss or leaking of personal data and data of organizations on Slack, loss of or delay in market acceptance of Slack, loss of competitive position, regulatory fines or claims by organizations on Slack for losses sustained by them, all of which could harm our business, results of operations, and financial condition."  Those statements were false and misleading and omitted material facts.  In truth, Slack was *then already* failing to sustain the level of customer service promised in its service contracts (having fallen short 7 out of 12 months in 2018 and repeatedly in 2019), its platform was already suffering rampant errors, bugs, and other technical vulnerabilities subjecting its platform and customers to service disruptions, and as a consequence Slack was paying out exorbitant credits to its customers and losing market share to rivals such as Microsoft.

88.     The Offering Documents further represented that certain Slack "paid customer agreements contain service level agreements, under which [Slack] guarantee[s] specified minimum availability of Slack," that "[f]rom time to time, [Slack] have granted credits to paid customers pursuant to the terms of these agreements," that "[a]ny failure of or disruption to [Slack] infrastructure *could* make Slack unavailable to organizations on Slack." The Offering Documents then represented as mere future risk that "*[i]f* [Slack] are unable to meet the stated service level commitments to [its]

- 29 -

paid customers or suffer extended periods of unavailability of Slack, [Slack] *may* be contractually obligated to provide affected paid customers with service credits for future subscriptions, or paid customers *could* elect to terminate and receive refunds for prepaid amounts related to unused subscriptions," and that Slack's "revenue, other results of operations, and financial condition *could* be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages *could* adversely affect our business and reputation as paid customers may elect not to renew and we *could* lose future sales." Those statements were false and misleading and omitted material facts. In truth, Slack was *then already* failing to sustain the level of customer service promised in its service contracts (having fallen short 7 out of 12 months in 2018), its platform was already suffering rampant errors, bugs, and other technical vulnerabilities subjecting its platform and customers to service disruptions, and as a consequence Slack was already being forced to pay out exorbitant credits to its customers, which in turn was already adversely affecting Slack's reputation, revenue, results operations, and financial condition. Moreover, Slack was paying customers significant amounts of service credits even when it was *not* contractually obligated to do so.

89. The Offering Documents further represented that certain Slack "paid customer agreements contain service level agreements, under which [Slack] guarantee[s] specified minimum availability of Slack," that "[f]rom time to time, [Slack] have granted credits to paid customers pursuant to the terms of these agreements," that "[a]ny failure of or disruption to [Slack] infrastructure *could* make Slack unavailable to organizations on Slack." The Offering Documents then represented as mere future risk that "*[i]f* [Slack] are unable to meet the stated service level commitments to [its] paid customers or suffer extended periods of unavailability of Slack, [Slack] *may* be contractually obligated to provide affected paid customers with service credits for future subscriptions, or paid customers *could* elect to terminate and receive refunds for prepaid amounts related to unused subscriptions," and that Slack's "revenue, other results of operations, and financial condition *could* be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages *could* adversely affect our

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

business and reputation as paid customers may elect not to renew and we *could* lose future sales." Those statements were false and misleading and omitted material facts. In truth, Slack was *then already* failing to sustain the level of customer service promised in its service contracts (having fallen short 7 out of 12 months in 2018), its platform was already suffering rampant errors, bugs, and other technical vulnerabilities subjecting its platform and customers to service disruptions, and as a consequence Slack was already being forced to pay out exorbitant credits to its customers, which in turn was already adversely affecting Slack's reputation, revenue, results operations, and financial condition. Moreover, Slack was paying customers significant amounts of service credits even when it was *not* obligated to do so "pursuant to the terms of [the customer] agreements."

***Statements Regarding Slack's Offering Price, Distribution and Market Volatility***

90. At the front of the Offering Documents investors were told to reference recent "low and high sales price per share of Class B common stock" and that "the designated market maker will determine an opening price for our Class A common stock in consultation with a financial advisor pursuant to applicable NYSE rules." These statements were misleading for they omitted material information concerning the manner in which the Offering was being priced. As investors later learned, questionable practices concerning communications with the designated market maker, led to an SEC investigation of the Offering.

91. In addition to being false and misleading, Defendants' failure to disclose the material information described herein in the Offering Documents violated at least four independent duties to disclose.

92. First, pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 and the SEC's related Interpretative Releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. As set forth above, at the time of the Offering, unbeknownst to investors, Slack was experiencing significant and intensifying competition from Microsoft Teams and uniquely susceptible to suffer financially because of an "exceptionally generous credit payout multiplier" it was on the hook to provide ***both affected and unaffected***

- 31 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

*customers* following service outages, which the Company was already vulnerable, but increasingly exposed, to because of its need to scale. The adverse events and uncertainties associated with these negative trends were reasonably likely to have a material impact on Slack's financial performance, and, therefore, were required to be disclosed in the Offering Document, but were not.

93. Second, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, required, in the "Risk Factors" section of the Offering Documents, a discussion of the most significant factors that make the Offering risky or speculative and that each risk factor adequately describe the risk. The Offering Documents' discussion of risk factors did not even mention, much less adequately describe, the risk posed by Microsoft Teams and the scalability issues related to Slack's efforts to penetrate further into the enterprise market, the impact of these efforts on the platform's 99.99% uptime guarantee and credit payouts, and their materially adverse effects on the Company's future results, share price, and prospects.

94. Third, by affirmatively raising these topics, Defendants took on a duty to be complete and truthful about such topics. Defendants' violated that duty by failing to disclose the material information described herein.

95. Fourth, Defendants' failure to disclose the then-increasing competition, the technical limitations, susceptibility and vulnerability of Slack's solution, competitive disadvantages hampering its enterprise-customer growth, ballooning losses, and consequently, diminished growth, and other financial metrics, and the likely material effects these omissions would have on Slack's share price, rendered false and misleading the Offering Documents' many references to known "*risks*" which "*if*" occurring "*may*" or "*could*" materially affect the Company, as these "risks" had already materialized at the time of the Offering.

A.     **Additional Facts Demonstrating Materiality**

96. On June 28, 2019, Slack experienced a performance degradation issue impacting users on a global scale, with multiple services down. According to Down Detector, which considers itself the "weatherman for the digital world," detecting service interruptions and outages in real time for all

- 32 -

4827-9756-3341.v3

kinds of services, issues with Slack most strongly affected services in Europe, Japan, and both coasts of the United States:

Users on Twitter were quick to report messages being repeated and showing up multiple times after being sent. "Anyone else's @SlackHQ gone all echoey? People are sending things once but it's coming up 2-3 times," one user wrote.

97.     The service interruption lasted for nearly 15 hours, from 4:30 a.m. PDT to 7:20 p.m. PDT, during which the Company provided the following incident summary report:

> On June 28, 2019 at 4:30 a.m. PDT some of our servers became unavailable, causing degraded performance in our job processing system.  This resulted in delays or errors with features such [as] notifications, unfurls, and message posting.
>
> At 1:05 p.m. PDT, a separate issue increased server load and dropped a large number of user connections.  Reconnection attempts further increased the server load, slowing down customer reconnection.  Server capacity was freed up eventually, enabling all customers to reconnect by 1:36 p.m. PDT.
>
> Full service restoration was completed by 7:20 p.m. PDT.  During this period, customers faced delays or failure with a number of features including file uploads, notifications, search indexing, link unfurls, and reminders.
>
> Now that service has been restored, the response team is continuing their investigation and working to calculate service interruption time as soon as possible.  ***We're also working on preventive measures to ensure that this doesn't happen again in the future***.  If you're still running into any issues, please reach out to us at feedback@slack.com.

- 33 -
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

98. The media was quick to point out the impact Slack's degraded functionality had on the many businesses that use it as the central means to communication, recalling that the Company suffered "a major outage last year as messages could no longer be sent between users, *sparking panic online*." *See* Jason Murdock, "Slack Down: Work Chat App Suffers Global Outage and 'Degraded Service' as Messages Stop Working," *Newsweek*, July 29, 2019, https://www.newsweek.com/slack-down-global-outage-messages-down-detector-united-states-europe-1446484        (last        visited December 19, 2019).

99. On news of the global service disruption, the Company's stock dropped 2.5%, closing on July 1, 2019 at $36.55 per share. The stock continued to decline over the next few days, even as analysts initiated positive coverage of the Company, crediting, for example, Slack's "land-and-expand. . . model" and functionality as key factors driving new user growth, paid customer and use-case expansion.

100. Slack's diminished competitive position *vis a vis* Microsoft Teams, which was "designed for large enterprises," and expected to strongly compete with Slack by leveraging its size, broad enterprise installed base, and strong channel support, began to be revealed.

101. On July 11, 2019 – only 21 days after Slack's Offering began – Microsoft announced that Microsoft Teams had grown to 13 million daily active users. *See* Jared Spataro, "Microsoft teams reaches 13 million daily active users, introduces 4 new ways for teams to work better together," *Microsoft*    (July    11,    2019),    https://www.microsoft.com/en-us/microsoft-365/blog/2019/07/11/microsoft-teams-reaches-13-million-daily-active-users-introduces-4-new-ways-for-teams-to-work-better-together. The post also included a graph indicating that Teams' DAUs had surpassed Slack's 10-million-user figure sometime in April 2019, and had a much stronger growth trajectory: On this news, Slack's stock slid another 3.63%, falling from $35 per share on July 11, 2019 to close at $33.73 per share on July 12, 2019.

102. Days later, on July 18, 2019, Slack announced that the Company suffered a security issue in 2015 when its user profile database was accessed without authorization, and that Slack was

- 34 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

resetting the passwords of tens of thousands of its customers.  On this news, the Company's shares declined 4.36% from $33.46 per share on July 17, 2019 to $32.00 per share on July 18, 2019.

103.    To make matters worse, and despite having "work[ed] on preventive measures," Slack then experienced yet another major outage on July 29, 2019, leaving "'[s]ome workspaces. . . experiencing issues with messages sending and loading.'"    On this news, the Company's stock dropped another 1.30%.

104.    By August 7, 2019, reporters and analysts were linking Slack's 11% July 2019 total stock decline to Microsoft Teams' announcement that it surpassed Slack in number of users and the two service outages, which "cast[] doubts about [Slack's] reliability."  *See, e.g.*, Jeremy Bowman, "Why Slack Technologies Stock Lost 11% in July," *The Motley Fool*, Aug. 7, 2019, htts://www.fool.com/investing/2019/08107/why-slack-technologies-stock-1054-11-in-july.aspx.

105.    On September 4, 2019, after the market closed, Slack released its first earnings report as a public company, for 2Q2020.  In its related press release, Defendants attempted to assuage concerns by boosting Slack's full-year guidance and touting increases in annual recurring revenue.

- 35 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

Defendants also conceded that "Revenue was negatively impacted by $8.2 million of credits related to service level disruption in the quarter," *more than 27 times the $0.3 million in net cash provided by Slack's operations during the quarter.* Slack's press release stated, in relevant part:

> Slack Technologies, Inc. (NYSE: WORK), the leading global collaboration hub that makes people's working lives simpler, more pleasant and more productive, today reported financial results for its fiscal quarter ended July 31, 2019.

> **Management Commentary:**

> "This is an entirely new category of software enabling a once-in-a-generation shift in the way people work together. We believe channel-based collaboration is so superior to email-based communication for work, that this shift is inevitable," said Stewart Butterfield, Chief Executive Officer and Co-Founder at Slack. "*Customers are choosing Slack because we offer a great user experience, a rich application platform and ecosystem, and a growing network for inter-company collaboration via shared channels*."

> "Revenue growth was 58% year-over-year, despite a one-time revenue headwind from credits issued in the quarter related to service level disruption," said Allen Shim, Chief Financial Officer at Slack. "*We remain focused on expansion within existing customers and growing our large enterprise customer base, and ended the quarter with 720 Paid Customers greater than $100,000 in annual recurring revenue, which is up 75% year-over-year.*"

> **Second Quarter Fiscal 2020 Financial Highlights:**

> - *Total revenue was $145.0 million, an increase of 58% year-over-year. Revenue was negatively impacted by $8.2 million of credits related to service level disruption in the quarter.*

> - *Calculated Billings was $174.8 million an increase of 52% year-over-year.*

> - *GAAP gross profit was $113.9 million, or 78.5% gross margin, compared to $80.7 million, or 87.7% gross margin, in the second quarter of fiscal year 2019.* Non-GAAP gross profit was $126.3 million, or 87.1% gross margin, compared to $80.7 million, or 87.7% gross margin, in the second quarter of fiscal year 2019.

> - *GAAP operating loss was $363.7 million, or 251% of total revenue, compared to a $33.7 million loss in the second quarter of fiscal year 2019, or 37% of total revenue.* GAAP operating loss includes $307.0 million of stock-based compensation and related employer payroll taxes, primarily related to the satisfaction of the performance vesting condition on outstanding RSUs in connection with Slack's direct listing on June 20, 2019. Non-GAAP operating loss was $55.6 million, or 38% of total revenue, compared to a $32.0 million loss in the second quarter of fiscal year 2019, or 35% of total revenue.

> \*      \*      \*

- 36 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

**Financial Outlook:**

For the third quarter of fiscal year 2020, Slack currently expects:

- Total revenue of $154 million to $156 million, representing year-over-year growth of 46% to 48%.

- Non-GAAP operating loss of $49 million to $47 million.

- Non-GAAP net loss per share of $0.09 to $0.08, assuming weighted average shares outstanding of 544 million.

106. During the Company's corresponding conference call with investors during which it discussed 2Q2020 results, a Citigroup Inc. analyst specifically questioned the Company's billing growth patterns, stating, in relevant part:

> This is Jacek Rycko in for Walter Pritchard. I have a question probably best directed at [Shim], and that's I've been assessing the billing growth patterns. And I just wanted to – I just needed a little bit of help in contextualizing them. *Q1 to Q3 of last year, you grew billings pretty consistently around 70%, and then you had a very fabulous Q4, close to 100% year-over-year billings growth. And then that growth has since dropped to around 47% in Q1. And it hasn't really improved that much because this quarter, it was around 52%. And when I'm looking at the top end of your billings guidance for the full year, it implies on H2, you'll be growing around 45%.* And so given that you had a very good Q4 last year, what is the danger that you may be perceived as, say, a 30% billings grower by the end of the year, as we're ending the year. And at the same time, what are you trying to signal to us regarding growth in billings beyond this fiscal year given there's a tapering of growth?

107. On the same call, Defendant Shim elaborated about the service-level disruption Slack suffered, and explained Slack's credit policy further, acknowledging that the financial hit was caused largely by the "exceptionally generous" but undisclosed "credit payout multiplier" in Slack's contracts:

> Revenue growth was above the high end of guidance despite an $8 million onetime revenue headwind from credits issued in the quarter related to service-level disruption in the quarter. *Our uptime was 99.9% or three nines in the quarter. But this was below our commitment of 99.99% or 4 nines. Service-level disruption of this magnitude is unusual for us. Compounding the financial impact of the down time was an exceptionally generous credit payout multiplier, and our contracts* dating from when we were a very young company. We've adjusted those terms to be more in line with industry standards while still remaining very customer friendly.

108. Although Defendant Shim did not disclose the amount of the payout multiplier, an article appearing the following day on industry website TechTarget.com indicated that Slack had previously provided customers on its Enterprise Grid and Plus plans "credits worth 100 times what

- 37 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

each customer paid for the service during the time Slack was inaccessible," but would only provide credits for "10 times that cost" going forward. *See* Jonathan Dame, "Slack waters down cloud SLA after $8.2 million payout," *TechTarget* (Sept. 5, 2019), https://searchunifiedcommunications.techtarget.com/ news/252470248/Slack-waters-down-cloud-SLA-after-82-million-payout.

109. Further, despite Defendant Shim's claim, service level disruptions of this magnitude, were *not* unusual for Slack. According to reports published after the Offering, *for 7 out of 12 months in 2018*, Slack failed to deliver the 99.99% uptime level. *See, e.g.*, Matthew Katz, "Slack is Back Up After Being Down Worldwide. Here's the Latest on the Outage" (July 29, 2019), https://www.digitaltrends.com/news/slack-down-outage-monday; https://www.cnbc.com/2019/09/05/slack-says-in-q2-earnings-that-outage-costs-were-one-time-issue.html .

110. In fact, Slack lacked the infrastructure to support a 99.99% uptime guarantee and was particularly vulnerable because of frequent changes to its codebase, indicating that there could be dozens of new code updates daily, which eroded uptime. And internally it was known at Slack that the Company was suffering significant outages, including multiple global outages in the months leading up to the Offering.

111. Additionally, on the investor call, following Defendant Butterfield's attempt to "emphasize the critical nature of *true scalability* for [Slack's] enterprise customers," by claiming that "*[o]nly* Slack's Enterprise Grid product can support the scale and structure of the largest organizations in the world," and in response to Goldman Sachs Group Inc. analyst Heather Bellini's request for specifics about "what caused the downtime," Defendant Butterfield admitted that the disruptions were attributable at least in part to *issues with scaling Slack's services for its growing user load*.

112. Defendant Butterfield also characterized the Company's reimbursement obligation as "unusual" and "outrageously customer-centric." Specifically, Defendant Butterfield revealed that Slack gave out credits for service disruptions "just proactively," whether or not a customer requested a credit, and whether or not the customer was even affected by a disruption. As a result, Defendant

- 38 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

Butterfield acknowledged, Slack gave its exceptionally generous enhanced payouts to all customers with service level agreements, even though outages generally affected only a tiny minority such as "1% or 0.5% or 3%":

> Yes.  What caused it the answer depends how literal and specific we want to get. The actual answer might even be over my head in true technical terms. ***But if we want to move a little bit further afield from that the more distant answer is scaling.*** So ***we continue to hit limits that we didn't realize were built into the system***.  And at one point when were 8 people first getting started we thought Slack will be a great tool for 8-person software development team, and then got our first team with 100 users and we had to reimagine a whole bunch of stuff, not just technically but from the user experience. Then we got teams with 1,000 people and then 10,000 and now we were well over 100,000 with several customers.  And we're still figuring some of those things out. Having said that, this is a big area of investment, we've made some great hires on the infrastructure side, we've put a lot more tooling in place, a lot more automated testing.  And we definitely have a commitment because we feel it that we understand we are among the heaviest Slack users ourselves, and so any disturbance in availability, it causes a big problem. ***The last thing I want to note though, for the big service credits, there is a bunch of things we do with that are unusual besides what Allen mentioned, which is the payout ratio.  One is, customers don't have to request it, we just proactively give it.  And almost no outages.  I don't know every details affect like for this quarter but almost no outages affect all customers, in fact most of them affect like 1% or 0.5% or 3% of customers at any given time.  And we give those service credits to every customer even if they were not specifically affected. So those policies are outrageously customer centric, which is part of our background and our orientation.  And that is one of the reasons we see that effect.***

113.    Defendant Butterfield also acknowledged that Slack would never have incurred the $8.2 million outage cost but for Slack's unusual contractual provisions:

> [The payout is] not necessarily proportionate to the outage, because if we had the same SLA as Salesforce or Microsoft or any of our peers in the industry, we wouldn't have paid out anything because we would have hit the [three nines] they're committed to, it's our [four nines] and the rest of the policies that make a difference.

114.    Slack's service disruption credits, deeper-than-expected operating losses and intensifying competition with Microsoft Teams, were among the main focal points of numerous media reports covering the Company's quarterly results.  *BusinessInsider.com*, for example, published an article on September 5, 2019 entitled, "Slack plummets on inaugural earnings report after saying growth will slow (WORK)," which quoted an analyst from Bernstein Research who called the Company's growth "'anemic,'" and stated further:

> Slack is feeling slack in its stock price after its first earnings release as a public company reported after the market close on Wednesday.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

Shares of the company fell as much as 15% in the early hours Thursday, putting the stock on pace to open just above its indicated direct-listing price of $26. Slack went public in June.

***The slide followed the report that showed a larger-than-expected operating profit loss in the second quarter and a slightly trimmed outlook for the company's performance in the second half of fiscal 2020***.

\*        \*        \*

The company also noted that revenue was negative impacted by $8.2 million of credit "related to serve level disruption." Slack was down for two hours in the last quarter, which led to the credit cost.

\*        \*        \*

In addition, the release showed that the company's paid customer base is seeing slowed growth. The company added 5,000 paying customers in the quarter to 100,000 total, the growth represents a 37% increase from last year, down from 55%.

115. Similarly, *MarketWatch.com* published an article on September 5, 2019 entitled, "Slack shares plunge 13% on weak earnings guidance," which stated:

***Growth remains a principle worry. Slack's revenue rose 110% in fiscal years 2017-2018, but slowed to 82% in 2018-2019 and the company is now forecasting 51% in the current fiscal year, with revenue between $603 million and $610 million.***

\*        \*        \*

***A major obstacle to Slack's growth is Microsoft Corp. . . . which includes the Teams work chat app in Office 365 business subscriptions. In July, Microsoft released statistics suggesting Teams is more widely used than Slack, largely because of adoption among companies that use Microsoft productivity software.***

Less than 1% of Slack's customer base is comprised of customers that spend more than $100,000 a year, according to Bloomberg Intelligence analyst Andrew Eisenson.

116. Analysts were also focused on Slack's shaky infrastructure, its decelerating growth and its issuance of service outage credits – all of which were credited with causing the Company's stock to decline. William Blair & Co., for example, noted in its September 5, 2019 analyst report:

While revenue growth decelerated on an as-reported basis from 66.7% law quarter, this was largely due to an $8 million adverse revenue impact this quarter that stemmed from a product outage in late June. ***As a result of the outage, Slack did not meet its 99.99% uptime SLA in the quarter and issued $8 million in credits to customers*** that were accounted for as contra-revenue items. . . .

***. . . At a high level, the cause of the outage in late June was due to scaling as the company hit limits in its system***. ***Scalability is a big area of investment for Slack, especially as it gains a more prominent presence in large enterprise customers***.

- 40 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

117.    Likewise, *SeekingAlpha.com* contributor Stone Fox Capital provided its take in a September 5, 2019 article entitled, "Slack: Wheels Just Fell Off," tracking the Company's decelerating growth and recognizing that Microsoft Teams is cutting into Slack's growth rates, stating in relevant part:

**Decelerating Metrics**

No other metric kills a highly priced IPO than metrics pointing towards decelerating growth. So, despite beating FQ2 revenue estimates by $3.7 million, ***the company only reported 57.5% growth for the quarter. The company had growth rates in the mid-60% range in FQ1.***

***The bigger issue is all of the trends that drive future growth are all decelerating.*** The customer base hit 100,000 for only 37% growth YoY. Last FQ2, the customers were at 73,000 for 55% growth. The growth rate has dipped at least 500 bps per quarter for three quarters now.



***The net retention rate is another metric facing constant deceleration***. Slack saw FQ2'20 net dollar retention at 136%, down from 146% in the same period last year. The number is still impressive, but a lower retention rate will naturally reduce growth rates.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3



Considering the reasonable expectations that the decelerating revenue growth holds according to projections, the company just can't guide to an operating loss of up to $180 million for the year and retain lofty valuation multiples. *Large losses are best supported by accelerating or at least stable revenue growth*.

At the least, *the numbers are enough to concern investors that the competitive Microsoft (MSFT) Teams collaboration app is cutting into growth rates*. The tech giant recently reported 13 million DAUs to top the amount claimed by Slack.

118.    On this news, Slack's stock price cratered, plummeting approximately 11.88% from its September 4, 2019 closing price of $31.07 per share, to close at $27.38 per share on September 6, 2019, thereby demonstrating the materiality of the previously omitted and misrepresented facts.

119.    By September 9, 2019, the next trading day, Slack's stock lost an additional 8.98%, or more than $5 billion in market value since it went public, a point not lost on *SeekingAlpha.com*, which ran an article entitled "Slack: Overfull Valuation Taking Its Toll," stating in relevant part:

Slack's (WORK) public debut was all the rage earlier this year, but barely one quarter into its existence as a public company, the once-proud unicorn is tanking. Slack has shed more than $5 billion in market value since it went public in a direct listing in late June, falling in a consistent down-trend and following the trajectory of other highly-anticipated IPOs like Uber (UBER) and Lyft (LYFT). *Losses were aggravated after the company released a dismal Q2 earnings report, and now Slack is back near the $26 "reference price" that it set immediately prior to its public debut.*

*                *                *

The question for investors now: is Slack a "buy the dip" situation, or does the stock have further to fall?  In my view, it's the latter. Slack benefited from a lot of hype going into its IPO, selling a compelling story that Slack was disrupting the future of work-based communication. *In reality, Slack is up against a slew of competitors from the likes of Microsoft Teams (MSFT)* and Microsoft Skype, various

- 42 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

workflow/collaboration tools like Atlassian (TEAM), new entrant Workplace by Facebook (FB), as well as old-fashioned email and text chains.

*Slack's furious growth rates in its S-1 filing were something of a "teaser rate."* In FY19, Slack's revenues grew at a compelling 88% y/y rate. In Q1, that fell to 67% y/y, and now in Q2, Slack's growth rate has crumbled to 57% y/y.

\*      \*      \*

*Slack's huge losses are another significant problem* – on a pro forma basis, even after stripping out the impacts of Slack's substantial stock compensation to executives, Slack's operating losses nearly doubled this quarter, growing at a faster pace than revenue growth.

\*      \*      \*

*Key takeaways*

*Slack's disappointing growth is a reflection of the hyper-competitive nature of its product niche. A plethora of companies are competing in the work communication space, and though Slack enjoys plenty of support from Silicon Valley startups, offerings like Microsoft Teams – with its native connection to Microsoft Office applications and workflows – may make more sense for customers that are already deeply embedded into the Microsoft ecosystem. Slack's significant service downtime in Q2 – and the potential ripple effects that may have had on customer retention – is another red flag.*

120. By the time this action was first filed, Slack's stock had fallen below $26.00 – a far cry from its $38.50 opening Offering Price. At present, the Company's stock trades in the range of $21 per share.



Slack Class A Common Stock Trading Price and Volume, June 20, 2019 to December 20, 2019

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

121.    Plaintiffs bring this action as a class action on behalf of a class consisting of all those who purchased the Company's common stock pursuant or traceable to the Company's Offering and Offering Documents and who were damaged thereby (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

122.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

123.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

124.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

125.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

(b)    whether the Prospectus and Offering Documents  contained materially false and misleading statements and omissions; and

(c)    to what extent Plaintiffs and the other members of the Class have sustained damages and the proper measure of such damages.

- 44 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

126. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### Violations of §11 of the 1933 Act
### Against All Defendants Except the Venture Capital Entities

127. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

128. This claim is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants. This claim does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter of fraudulent intent. This claim is based on strict liability. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

129. The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

130. The Company is the issuer of the securities purchased by Plaintiffs and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

131. The Individual Defendants each signed the Offering Documents. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the

- 45 -

failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the Offering Documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiffs and the Class.

132. By reasons of the conduct herein alleged, each Defendant violated §11 of the 1933 Act.

133. Plaintiffs acquired the Company's common stock pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Offering Documents.

134. This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

135. By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## SECOND CAUSE OF ACTION

**Violations of §12(a)(2) of the 1933 Act**
**Against All Defendants Except the Venture Capital Entities**

136. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

137. This claim is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against each of the Defendants identified above (referenced in this Cause of

- 46 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933

4827-9756-3341.v3

Action as "Defendants"). By means of the defective Prospectus, Defendants promoted and sold Slack Class A common stock to Plaintiffs and other members of the Class in the integrated offering of over 283 million shares. This cause of action does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based on strict liability. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims expect that any challenged statements of opinion or belief in connection with the Offering are alleged to have been materially misstated statements of opinion or believe when made.

138. Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Offering. The Offering was a primary offering, the first public issuance of Slack securities. Slack was the issuer of all of Slack Class A common stock sold by means of the Offering. Defendants issued, caused to be issued, and signed the Offering Documents in connection with the Offering and also solicited investors, including Plaintiffs, motivated by their own financial interests and the financial interests of others. Slack made, and the Executive Defendants additionally participated in making, the Investor Pitch Statements at the behest of Slack, in connection with the Offering. The Offering Documents and Investor Pitch Statements were used to induce investors, such as Plaintiffs and the other members of the Class, to purchase the Company's shares.

139. The Offering Documents and Investor Pitch Statements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted material facts required to be stated therein. Defendants' acts of solicitation included participating in the preparation of the false and misleading Offering Documents. Slack and the Executive Defendants additionally solicited by participating in making the Investor Pitch Statements, and by targeting and inviting existing and potential investors to presentations by Slack and the Executive Defendants to pitch the Offering.

140. Plaintiffs and the other members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Offering Documents and Investor Pitch Statements.

- 47 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

141.    The Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there were no omissions of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

142.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Slack common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases.  Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the Defendants sued herein.  Class members who have sold their common stock seek damages to the extent permitted by law.

143.    This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Documents and Investor Pitch Statements and within three years after the Company's shares were sold to the Class in connection with the Offering.

### THIRD CAUSE OF ACTION

**For Violation of §15 of the 1933 Act**
**Against the Individual Defendants and Venture Capital Defendants**

144.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145.    This claim is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.  This cause of action does not sound in fraud.  Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability.  Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims

- 48 -

expect that any challenged statements of opinion or belief in connection with the Offering are alleged to have been materially misstated statements of opinion or believe when made.

146.    The Individual Defendants each were control persons of Slack by virtue of their positions at Slack as directors and/or senior officers as of the Offering.  The Venture Capital Defendants each had the ability to influence the policies and management of Slack at all relevant times by their voting and dispositive control over Slack's Class B supervoting common stock, pre-Offering agreements, and by having their designated director, Braccia, serving on the board of Slack. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Slack.  The Venture Capital Defendants were not only control persons of Slack by virtue of their ownership of Slack-related securities, Board membership, relationships with management, and involvement in establishing Slack's management, they also had extensive contractual rights regarding Slack's governance, capitalization, and ability to finance, including, but not limited to, rights to cause the registration of their shares.

147.    The Venture Capital Defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability of their investment.  The Individual Defendants and Venture Capital Defendants were each critical to effecting the Offering, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the Offering, and by having otherwise directed through their authority the processes leading to execution of the Offering, including registration, qualification, authorization, pricing, offering to the public, and issuance and sale of the shares in the Offering.

148.    By reason of such conduct, the Individual Defendants and the Venture Capital Defendants are liable pursuant to §15 of the 1933 Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

- 49 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiffs as the Class Representatives;

B.     Awarding Plaintiffs and the other members of the Class compensatory damages;

C.     Awarding Plaintiffs and the other members of the Class rescission, disgorgement, and all other remedies in equity or at law pursuant to the 1933 Act;

D.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.     Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  October 2, 2020

ROBBINS GELLER RUDMAN
   & DOWD LLP
JAMES I. JACONETTE
BRIAN E. COCHRAN


JAMES I. JACONETTE

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jamesj@rgrdlaw.com
bcochran@rgrdlaw.com

DATED:  October 2, 2020

COTCHETT, PITRE & McCARTHY, LLP
BRIAN DANITZ
TYSON REDENBARGER
NOORJAHAN RAHMAN


BRIAN DANITZ

- 50 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650/697-6000
650/697-0577 (fax)
bdanitz@cpmlegal.com
tredenbarger@cpmlegal.com
nrahman@cpmlegal.com

DATED: October 2, 2020          POMERANTZ LLP
                                JOSHUA B. SILVERMAN
                                JARED SCHNEIDER

                                _____
                                        JARED SCHNEIDER

                                10 South LaSalle Street, Suite 3505
                                Chicago, IL 60603
                                Telephone: 312/377-1181
                                312/377-1184 (fax)
                                jbsilverman@pomlaw.com
                                jschneider@pomlaw.com

                                POMERANTZ LLP
                                JORDAN L. LURIE
                                ARI Y. BASSER
                                1100 Glendon Avenue, Suite 1558
                                Los Angeles, CA 90024
                                Telephone: 310/432-8492
                                jllurie@pomlaw.com
                                abasser@pomlaw.com

DATED: October 2, 2020          SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                JOHN T. JASNOCH
                                HAL D. CUNNINGHAM

                                _____
                                        JOHN T. JASNOCH

                                600 West Broadway, Suite 3300
                                San Diego, CA 92101
                                Telephone: 619/233-4565
                                619/233-0508 (fax)
                                jjasnoch@scott-scott.com
                                hcunningham@scott-scott.com

- 51 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  650/697-6000
650/697-0577 (fax)
bdanitz@cpmlegal.com
tredenbarger@cpmlegal.com
nrahman@cpmlegal.com

DATED:  October 2, 2020                POMERANTZ LLP
                                       JOSHUA B. SILVERMAN
                                       JARED SCHNEIDER


_____

                                       JARED SCHNEIDER

10 South LaSalle Street, Suite 3505
Chicago, IL  60603
Telephone:  312/377-1181
312/377-1184 (fax)
jbsilverman@pomlaw.com
jschneider@pomlaw.com

POMERANTZ LLP
JORDAN L. LURIE
ARI Y. BASSER
1100 Glendon Avenue, Suite 1558
Los Angeles, CA  90024
Telephone:  310/432-8492
jllurie@pomlaw.com
abasser@pomlaw.com

DATED:  October 2, 2020                SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                       JOHN T. JASNOCH
                                       HAL D. CUNNINGHAM


_____

                                       JOHN T. JASNOCH

600 West Broadway, Suite 3300
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

- 51 -

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933

4827-9756-3341.v3

SCOTT+SCOTT ATTORNEYS AT LAW LLP
THOMAS L. LAUGHLIN, IV
JONATHAN M. ZIMMERMAN
RANDY MOONAN
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
Telephone:  212/223-6444
212/223-6334 (fax)
tlaughlin@scott-scott.com
jzimmerman@scott-scott.com
rmoonan@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
AMANDA F. LAWRENCE
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860/537-5537
860/537-4432 (fax)
alawrence@scott-scott.com

Co-Lead Counsel for Plaintiffs

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
CHASE M. STERN
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonfistel.com
chase@johnsonfistel.com

BOTTINI & BOTTINI, INC.
FRANCIS A. BOTTINI, JR.
ALBERT Y. CHANG
YURY A. KOLESNIKOV
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA  92037
Telephone:  858/914-2001
858/914-2002 (fax)
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

- 52 -
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

THE SCHALL LAW FIRM
BRIAN J. SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  310/301-3335
310-388-0192 (fax)
brian@schallfirm.com

BRONSTEIN GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212-697-6484
212/697-7296 (fax)
peretz@bgandg.com

HEDIN HALL LLP
DAVID W. HALL
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone:  415/766-3534
415/402-0058 (fax)
dhall@hedinhall.com

ROBBINS LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
JONATHAN D. BOBAK
5040 Shoreham Place
San Diego, CA 92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsllp.com
soddo@robbinsllp.com
jbobak@robbinsllp.com

Executive Committee Members

- 53 -
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933

4827-9756-3341.v3

## DECLARATION OF ELECTRONIC SERVICE
## AND SERVICE BY REGULAR U.S. MAIL

I, Sumner Caesar, is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action, and have a business address of 655 West Broadway, Suite 1900, San Diego, California 92101.

I hereby declare that on October 2, 2020, I served the following documents on the parties in the within action by e-filing using Odyssey, an electronic filing service provider of the Superior Court of San Mateo County to provide e-service. The document was also served by Regular U.S. Mail to the parties on the attached Service List.

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 2nd day of October, 2019, at San Diego, California.

_____
SUMNER CAESAR

- 54 -
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4827-9756-3341.v3

# EXHIBIT B

2

**COTCHETT, PITRE & McCARTHY, LLP**
JOSEPH W. COTCHETT (SBN 36324)
BRIAN DANITZ (SBN 247403)
KARIN SWOPE (*PRO HAC VICE PENDING)*
NOORJAHAN RAHMAN (SBN 330572)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577 (fax)

**ROBBINS GELLER RUDMAN
& DOWD LLP**
JAMES I. JACONETTE (SBN 179565)
BRIAN E. COCHRAN (SBN 286202)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: (619) 231-1058
Fax: (619) 231-7423

**POMERANTZ LLP**
JORDAN L. LURIE (SBN 130013)
ARI Y. BASSER (SBN 272618)
1100 Glendon Avenue, Suite 1558
Los Angeles, CA 90024
Telephone: (310) 432-8492

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN JASNOCH (SBN 281605)
HAL D. CUNNINGHAM (SBN 243048)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Fax: (619) 233-0508

*Co-Lead Counsel for Plaintiffs*
[Additional counsel appear on signature page.]

Electronically
**FILED**
By Superior Court of California, County of San Mateo
ON    10/22/2021
By    /s/ **Tovar, Priscilla**
_____
**Deputy Clerk**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| **In re SLACK TECHNOLOGIES, INC. SHAREHOLDER LITIGATION** | **Lead Case No. 19-CIV-05370** (Consolidated with Nos. 19-CIV-05411; 19-CIV-05674; 19-CIV-05784; 19-CIV-05840, 19-CIV-06181 and 20-CIV-02589) |
| **This Document Relates To:** | **CLASS ACTION** |
| **ALL ACTIONS.** | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** |
| REDACTED PUBLIC VERSION PORTIONS LODGED CONDITIONALLY UNDER SEAL PURSUANT TO PROTECTIVE ORDER | DATE: February 28, 2022 TIME: 3:00 P.M. DEPT: 23 JUDGE: Hon. V. Raymond Swope |

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................. 5

II.   BACKGROUND .................................................................................................. 6

III.  ARGUMENT........................................................................................................ 8

      A.    Legal Standard ........................................................................................ 8

      B.    The Court Should Certify Both Requested Classes ................................. 9

            1.    The Classes Are Ascertainable and Sufficiently Numerous .......................... 10

            2.    The Classes Share a Well-Defined Community of Interest ........................... 11

                  a.    Common Questions Predominate ........................................................ 11

                  b.    The Class Representatives' Claims Are Typical ................................ 14

                  c.    The Class Representatives and Counsel Adequately Represent
                        the Classes.......................................................................................... 15

                        Cotchett, Pitre & Mccarthy, LLP..................................................... 16

                        Robbins Geller Rudman & Dowd LLP........................................... 18

            3.    A Class Action Is Superior to Any Alternative ........................................... 19

IV.   CONCLUSION ................................................................................................... 19

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Sec. Litig.*
  (N.D. Cal. 1991) 139 F.R.D. 150 ........................................................................................... 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
  (2013) 568 U.S. 455 ................................................................................................................ 15

*Amtower v. Photon Dynamics, Inc.*
  (2008) 158 Cal.App.4th 1582 ................................................................................................. 15

*In re Apple Inc. Device Performance Litigation*
  (N.D. Cal.) No. 5:18-md-02827-EJD ..................................................................................... 21

*In re Automotive Parts Antitrust Litigation*
  (E.D. Mich.) Case No. 2:12-md-02311-SFC ......................................................................... 20

*Ayala v. Antelope Valley Newspapers, Inc.*
  (2014) 59 Cal.4th 522 ............................................................................................................ 14

*Bily v. Arthur Young & Co.*
  (1992) 3 Cal.4th 370 .............................................................................................................. 14

*Brinker Rest. Corp. v. Superior Court*
  (2012) 53 Cal.4th 1004 ....................................................................................... 12, 14, 16, 17

*Califano v. Yamasaki*
  (1979) 442 U.S. 682 ................................................................................................................ 22

*Carter v. City of Los Angeles*
  (2014) 224 Cal.App.4th 808 ................................................................................................... 14

*In re Charles Schwab Corp. Sec. Litig.*
  (N.D. Cal. 2009) 264 F.R.D. 531 ........................................................................................... 15

*Classen v. Weller*
  (1983) 145 Cal.App.3d 27 ...................................................................................................... 17

*Cohen v. DIRECTV, Inc.*
  (2009) 178 Cal.App.4th 966 ................................................................................................... 13

*In re Constar Int'l Inc. Sec. Litig.*
  (3d Cir. 2009) 585 F.3d 774 .............................................................................................. 16, 17

*Daniels v. Centennial Grp., Inc.*
  (1993) 16 Cal.App.4th 467 ..................................................................................................... 17

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

*In re DJ Orthopedics, Inc. Sec. Litig.*
  (S.D. Cal. 2003) 2003 WL 27363735 ................................................................................. 15

*In re Elec. Data Sys. Corp. Sec. Litig.*
  (E.D. Tex. 2005) 226 F.R.D. 559 ...................................................................................... 13

*In re Facebook, Inc.*
  (S.D.N.Y. 2015) 312 F.R.D. 332 ....................................................................................... 19

*In re IndyMac Mortg.-Backed Sec. Litig.*
  (S.D.N.Y. 2012) 286 F.R.D. 226 ....................................................................................... 18

*Johnson v. GlaxoSmithKline, Inc.*
  (2008) 166 Cal.App.4th 1497 ............................................................................................. 22

*Katz v. China Century Dragon Media, Inc.*
  (C.D. Cal. 2012) 287 F.R.D. 575 ...................................................................................... 17

*Korn v. Franchard Corp.*
  (2d Cir. 1972) 456 F.2d 1206 .............................................................................................. 17

*Lazar v. Hertz Corp.*
  (1983) 143 Cal. App. 3d 128 .............................................................................................. 13

*Lockheed Martin Corp. v. Superior Court*
  (2003) 29 Cal.4th 1096 ....................................................................................................... 14

*Martinez v. Joe's Crab Shack Holdings*
  (2014) 231 Cal.App.4th 362 ............................................................................................... 17

*McGhee v. Bank of Am.*
  (1976) 60 Cal. App. 3d 442 ................................................................................................ 18

*In re Medical Capital Securities Litigation*
  (C.D. Cal.) No. SA CV 09-1048-DOC-RNB .................................................................... 20

*Medrazo v. Honda of N. Hollywood*
  (2008) 166 Cal.App.4th 89 ...................................................................................... 12, 13, 18

*Noel v. Thrifty Payless, Inc.*
  (2019) 7 Cal.5th 955, 980 ................................................................................................... 12

*Pirani v. Slack Techs., Inc.*
  (9th Cir. Sept. 20, 2021) _ F.4th _, 2021 WL 4258835 ..................................... 8, 13, 18

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*
  (S.D.N.Y. 2011) 277 F.R.D. 97 .................................................................................. 8, 22

*Ret. Sys. v. ANZ Sec., Inc.*
  (2017) _U.S._, 137 S. Ct. 2042 ........................................................................................ 22

- 3 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

*Reyes v. Bd. of Supervisors*
(1987) 196 Cal.App. 3d 1263 ................................................................................ 13

*Rose v. City of Hayward*
(1981) 126 Cal. App. 3d 926 ................................................................................ 13

*Sav-On Drug Stores, Inc. v. Superior Court*
(2004) 34 Cal. 4th 319 .................................................................................. 12, 22

*Schleicher v. Wendt*
(7th Cir. 2010) 618 F.3d 679 .............................................................................. 15

*Tyson Foods, Inc. v. Bouaphakeo*
(2016) 577 U.S. 442............................................................................................ 14

*United Food & Com. Workers Union v. Chesapeake Energy Corp.*
(W.D. Okla. 2012) 281 F.R.D. 641...................................................................... 21

*Vasquez v. Superior Court*
(1971) 4 Cal.3d 800 ........................................................................... 7, 8, 13, 22

*Wershba v. Apple Comput., Inc.*
(2001) 91 Cal.App.4th 224 ................................................................................. 18

*Williams v. Superior Court*
(2013) 221 Cal.App.4th 1353 ............................................................................. 16

**Statutes**

California Code of Civil Procedure:
Section 382........................................................................................... 7, 8, 12

Privacy Securities Act of 1933:
Sections 11, 12(a)(2), and 15 ................................................... 8, 9, 15, 16, 20

**Other Authorities**

Code of Federal Regulations:
17 C.F.R. §229.105 ............................................................................................ 15
17 C.F.R. §229.303 ............................................................................................ 15

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

## I.    INTRODUCTION

Pursuant to Section 382 of the California Code of Civil Procedure ("C.C.P. § 382"), plaintiffs Laurent Chardonnet, Nicole Farina, Mohammed Kassem, Brian Knapp, Imran Naushahi, Andrew R. Norell, and Martin Ren ("Plaintiffs") respectfully submit this memorandum in support of Plaintiffs' motion for class certification ("Motion"). Plaintiffs also move the Court to appoint Plaintiffs Laurent Chardonnet, Mohammed Kassem, Brian Knapp, and Andrew R. Norell as Class Representatives and appoint Cotchett, Pitre & McCarthy, LLP and Robbins Geller Rudman & Dowd LLP as Class Counsel on behalf of the Classes.

California courts have long endorsed "the utility of the class suit to vindicate the rights of stockholders." *Vasquez v. Sup. Ct.* (1971) 4 Cal.3d 800, 807.  Courts nationwide recognize that:

> [S]uits alleging violations of the securities laws, particularly those brought pursuant to Sections 11 and 12(a)(2), are especially amenable to class action resolution.  [They] depend[], more than anything else, on establishing that certain statements and omissions common to all the offerings were material misrepresentations: a classic basis for a class action.

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.* (S.D.N.Y. 2011) 277 F.R.D. 97, 101 (collecting cases); *accord Vasquez*, 4 Cal.3d at 820 n.17 (citing with approval "the numerous federal cases permitting class actions in securities . . . cases").

This is just such a classic case ideally suited for class certification. Every member of the nationwide putative Classes asserts the same claims against the same defendants arising out of the same misrepresentations in a uniform Registration Statement and Prospectus issued in connection with a single integrated offering of uniform common stock: Slack's June 2019 Direct Public Offering. Furthermore, in a published ruling the Ninth Circuit already acknowledged that: "All of Slack's shares sold in this direct offering, whether labeled as registered or unregistered, can be traced to that one registration." *Pirani v. Slack Techs., Inc*. (9th Cir. Sept. 20, 2021) _F.4th_, 2021 WL 4258835, at *5.

The overriding principal issues in this case—whether the uniform Registration Statement and Prospectus (the "Offering Documents") contained material misrepresentations and omissions—will necessarily turn on the same documentary and testimonial evidence for Plaintiffs and each member of the proposed Classes.  Nearly every other legal and factual issue presented is also readily amenable

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

to class-wide resolution. Given Plaintiffs' already ample record of diligence, as well as Plaintiffs' counsel's extensive experience, a case more well-suited for class certification is difficult to imagine.

## II.    BACKGROUND

This is the first securities action commenced in the wake of Slack Technologies, Inc.'s ("Slack") Direct Public Offering ("Offering"). Plaintiffs assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act"), alleging the Offering Documents issued for the Offering contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make statements therein not misleading.

On June 20, 2019, Slack went public via an integrated Direct Public Offering, thereby listing its Class A common stock on the New York Stock Exchange ("NYSE") under the ticker symbol "WORK," and offering for sale to the public approximately 283 million shares at an opening price per share of $38.50 (the "Offering Price") *See* ¶¶3-4; Ex. 1 (N.Y. Times); Ex. 2 (Reuters).[1]

Unbeknownst to Plaintiffs and other ordinary public shareholders, Slack had omitted in its Offering Documents and Investor Pitch Statements (*see* ¶64) material facts concerning the Company's excessively punitive provisions in Service Level Agreements ("SLA") with existing customers that were forcing Slack to suffer high revenue losses. *See* Ex. 3 (CNBC article); Ex. 4 (Press Conference Transcript). The Company had agreed to award customers credits in the event of even a *de minimis* disruption in its service – that is, service availability that fell below a 99.99% "uptime" threshold. ¶¶7, 57. This near-perfect "four nines" threshold was far higher than industry standards, and, critically (yet undisclosed to investors) Slack's infrastructure could not support this requirement. *Id.* In 2018 alone, the Company performed below the 99.99% standard in seven out of twelve months due, in part, to its attempt to reach enterprise customers. ¶¶14, 109-110.

As discovered in Plaintiffs' extensive investigation, Slack lacked the infrastructure to support a 99.99% uptime guarantee and was particularly vulnerable because of frequent changes to its

---

[1]    "¶_" refers to paragraphs of the operative First Amended Consolidated Class Action Complaint for Violations of the Securities Act of 1933, filed October 5, 2021 ("FAC"). "Ex._" refers to exhibits attached to the Joint Declaration of Brian Danitz and James I. Jaconette In Support Of Plaintiffs' Motion For Class Certification ("Joint Decl."), filed concurrently herewith.

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

codebase.  As a result, service outages, including outages on a global scale, occurred with far greater frequency than the "four nines" reliability guaranteed by Slack. These critical deficiencies, undisclosed to investors, ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

Ex. 5. ████████████████████████

████████████████████ Ex. 6. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ *See, e.g.,* ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

Indeed, the negative financial impact of these outages and credit issuances was so severe that,

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

- 7 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

With these and other alleged materially false and misleading misrepresentations and omissions, Defendants were able to complete the Offering, resulting in the sale of over 283 million shares of Slack Class A common stock to Plaintiffs and other members of the unsuspecting investing public. But then, just days after the Offering, Slack's platform had three notable service disruptions, resulting in uptime performance of only 99.9%. *See* ¶¶8, 96-103. This triggered the penalties in customers' contracts, and Slack was forced to award millions of dollars in credits, which deeply undercut revenue for the quarter. *See* ¶8; Ex. 4. Only after the losses were revealed on September 4, 2019, did Chief Executive Officer Stewart Butterfield publicly admit that Slack's SLA provisions were "***outrageously customer-centric***," that Slack's 99.99% "uptime" requirement was an extraordinary and unusual standard in the industry, that Slack competitors would not have had to pay similar credits because they maintain the lower 99.9% ("three nines") industry standard, and further that Slack's policy was to ***proactively award credits to customers, even those unaffected by service outage***s, resulting in many customers who experienced no service outage still being awarded credits. *See* ¶¶9, 112; Ex. 4 at 7 (Press Conf. Tr.). Chief Financial Officer Allen Shim further admitted that the Company had committed to an "exceptionally ***generous credit payout multiplier***" in customer contracts, which compounded the financial impact of the service disruptions occurring in June and July 2019. *See* ¶¶10, 107-108; Ex. 4 at 5. These "outrageously customer-centric" policies and contract provisions resulted in over $8 million deducted from revenue. *Id.*

As the undisclosed truth emerged across a series of revelations, the price of Slack's common stock declined precipitously. *See* ¶¶6, 16; Ex. 3 (CNBC article). By the time this action was first filed, Slack's stock had fallen below $26.00, a far cry from its $38.50 opening Offering Price. *See* ¶16. As a result of Defendants' misconduct, Plaintiffs and other investors suffered billions of dollars in losses. *See* ¶16; Ex. 17 (Declaration of Bjorn I. Steinholt, CFA ["Steinholt Decl."]) ¶¶8-16.

## III.   ARGUMENT

### A.   Legal Standard

Under C.C.P. §382, the "party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives."

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

*Brinker Rest. Corp. v. Sup. Ct.* (2012) 53 Cal.4th 1004, 1021. This demonstration "'is essentially a procedural one." *Id.* at 1023. "[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of [class certification] are met." *Id.* "A class certification motion is not a license for a free-floating inquiry into the validity of the complaint's allegations . . . ." *Id.* Courts must "assum[e] . . . that any claims have merit," "examine the allegations of the complaint and supporting declarations and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." *Id.* at 1021-23. If "the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." *Id.* at 1022. Always, the "focus" is "what type of questions – common or individual – are likely to arise," and "whether the theory of recovery advanced by the proponents of certification is . . . likely to prove amenable to class treatment." *Sav-On Drug Stores, Inc. v. Sup. Ct.* (2004) 34 Cal.4th 319, 327.

**B.     The Court Should Certify Both Requested Classes**

Plaintiffs move the Court to certify the following proposed classes (the "Classes"):

**Section 11 Class:**

**All persons who purchased or otherwise acquired Slack Class A common stock traceable to the Registration Statement issued in connection with Slack's June 2019 Direct Public Offering during the period of June 20, 2019 to September 5, 2019.**

**Section 12 Class:**

**All persons who purchased or otherwise acquired Slack Class A common stock pursuant to the Prospectus issued in connection with Slack's June 2019 Direct Public Offering during the period of June 20, 2019 to September 5, 2019.**[2]

Class certification requires "an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class

---

[2]     Excluded from both Classes are Defendants, their families, officers and directors and affiliates of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

- 9 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

superior to the alternatives." *Brinker*, 53 Cal.4th at 1021. Here, both proposed Classes readily satisfy these requirements.

### 1.     The Classes Are Ascertainable and Sufficiently Numerous

"A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description." *Medrazo v. Honda of N. Hollywood* (2008) 166 Cal. App.4th 89, 101; *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 980. "As long as the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation, the ascertainability requirement is met." *Medrazo*, 166 Cal.App.4th at 101. Here, both classes are defined by objective, transaction-based facts – the acquisition of Slack common stock issued pursuant to the Offering Materials, all by means of a single, uniform direct public offering. These facts are readily identifiable by class members' and Defendants' records. *See Vasquez*, 4 Cal. 3d at 810-11 ("no serious obstacle" where "class members may be ascertained from defendants' books"); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 976 (2009) ("[n]o more is needed" where the class is defined "with objective characteristics and transactional parameters"). Moreover, as the Ninth Circuit recently held, all the purchases of Slack shares during the period the Registration Statement was effective are traceable to the Registration Statement. "All of Slack's shares sold in this direct listing, whether labeled as registered or unregistered, can be traced to that one registration. The legislative history of Section 11 supports this interpretation." *Pirani*, 2021 WL 4258835, at *5. Accordingly, the class members are readily ascertainable.

The Classes are also sufficiently numerous. This requirement is "indefinite and has been construed liberally." *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934. Nor is plaintiff "required at this stage of the proceedings to establish the existence and identity of class members." *Reyes v. Bd. of Supervisors* (1987) 196 Cal.App.3d 1263, 1274. The Classes here consist of purchasers of the over 283 million new shares of Slack common stock issued pursuant to Slack's June 2019 Direct Public Offering. ¶1. Although the exact number cannot be determined before discovery is complete, based on the hundreds of millions of shares issued and traded on the NYSE, class

- 10 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

members likely number in the thousands and reside across many states, such that joinder would be burdensome and impracticable. *See Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 137; *In re Elec. Data Sys. Corp. Sec. Litig.* (E.D. Tex. 2005) 226 F.R.D. 559, 564 ("'Any class composed of the sellers of a nationally traded security during a period in which hundreds of shares of the security were traded' is 'necessarily . . . so numerous that joinder of all members is impracticable.'").

### 2. The Classes Share a Well-Defined Community of Interest

The well-defined community of interest "requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." *Brinker*, 53 Cal.4th at 1021. Here, all three are satisfied as to both Classes.

### a. Common Questions Predominate

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" *Id.*; *Lockheed Martin Corp. v. Sup. Ct.* (2003) 29 Cal.4th 1096, 1104-05. A "trial court must examine the plaintiff's theory of recovery" and "assess the nature of the legal and factual disputes likely to be presented." *Brinker*, 53 Cal.4th at 1025. An issue is common if it "can be determined by facts common to all members of the class." *Id.* at 1022. "Common issues predominate when they would be 'the principal issues in any individual action, both in terms of time to be expended in their proof and of their importance.'" *Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 818. In this comparison, all issues "are not of uniform significance." *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 539. predominance "hinges" on "the theory of recovery advanced by the proponents of certification." *Brinker*, 53 Cal.4th at 1021. Even where individualized defenses or other ancillary questions remain, if "the defendant's liability can be determined by facts common to all members of the class, a class will be certified." *Id.*; *Tyson Foods, Inc. v. Bouaphakeo* (2016) 577 U.S. 442, 453 ("[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate," the action should be certified "even though other important matters will have to be tried separately, such as damages or some affirmative defenses").

- 11 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

Here, Plaintiffs' principal theory of liability depends on common questions of law and fact: "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish a prima facie case." *Bily v. Arthur Young & Co*. (1992) 3 Cal.4th 370, 395 n.10; *Amtower v. Photon Dynamics, Inc*. (2008) 158 Cal.App.4th 1582, 1601 ("Section 11 is a strict liability statute. The mere existence of the omission or misrepresentation is sufficient to support a claim"). This *prima facie* case reduces to two overarching common issues – falsity and materiality – which both measure against objective standards and thus will always "prevail or fail in unison" class-wide. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds* (2013) 568 U.S. 455, 459-60 ("Because materiality is judged according to an objective standard, the materiality of [an issuer's] alleged misrepresentations and omissions is a question common to all members of the class"); *id.* at 475 ("the falsity or misleading nature of the defendant's alleged statements or omissions are common questions"); *Schleicher v. Wendt* (7th Cir. 2010) 618 F.3d 679, 685 ("Falsehood and materiality affect investors alike "). As is typically true in cases like this, these principal issues of liability are of such overriding importance that they predominate.[3] *Merrill Lynch*, 277 F.R.D. at 101, 106 ("[S]uits alleging violations of the securities laws, particularly those brought pursuant to Sections 11 and 12(a)(2), are especially amenable to class action resolution").

Plaintiffs' principal theory also embeds additional common questions.  For example: 1) the ***existence of trends*** under Item 303 (17 C.F.R. §229.303 ("Management's discussion and analysis of financial condition and results of operations")); 2) whether those trends ***were known*** to Defendants; 3) whether those trends ***were reasonably likely*** to impact Slack's future results; 4) whether those trends ***were disclosed*** in the Offering Documents; 5) the ***existence of risks*** under Item 105 (17 C.F.R. §229.105 ("Risk factors")); 6) whether those risks were the "***most significant***" under Item 105; 7)

---

[3]    Section 12(a)(2) imposes similar liability on sellers and solicitors for material misstatements or omissions in a prospectus or related oral communication, and §15 imposes derivative liability on those who control primary violators of §§11 or 12(a)(2). These claims pose additional common questions – *e.g.*, statutory seller status, the integrated nature of the Direct Public Offering, control over primary violators – but no disparate individualized issues. *In re Charles Schwab Corp. Sec. Litig*., 264 F.R.D. 531, 537 (N.D. Cal. 2009) (under §12(a)(2), whether defendant is "a statutory 'seller' is an issue common to the class"); *In re DJ Orthopedics, Inc. Sec. Litig*., (S.D. Cal. 2003) 2003 WL 27363735, at *4 ("whether defendants are control persons[] is also a common question").

- 12 -

whether those most significant risks were ***accurately and candidly disclosed*** in the Offering Materials; 8) whether Defendants ***solicited*** sales under §12(a)(2) of the 1933 Act; 9) whether Defendants were ***financially motivated*** under §12(a)(2); and 10) whether Defendants had the ***power to control*** primary violators under §15 of the 1933 Act.  Each of these issues "is by its nature a common question," turning on the very same evidence – same documents, same witnesses, same expert testimony – for all class members uniformly.  *See Brinker*, 53 Cal. 4th at 1033.

Moreover, damages are set by statutory formula, which will apply mechanically for each class member. Steinholt Decl. ¶¶8-16. For the §11 claims, statutory damages are presumed as the difference between "the amount paid for the security" and either the "value" of the security at the time the suit was brought or the "price" at which the security was sold. 15 U.S.C. §77k(e); Steinholt Decl. ¶¶ 9-14. The value at the time of suit is the same for all class members, and any sale prices before or after suit are readily determinable from public trading data and class members' own records. *Id.* The calculation is even simpler for the §12 claims. Steinholt Decl. ¶¶15-16. That class-wide damages are calculable using a statutory formula supports predominance. *In re Constar Int'l Inc. Sec. Litig.* (3d Cir. 2009) 585 F.3d 774, 785; *Williams v. Sup. Ct.* (2013) 221 Cal. App.4th 1353, 1365 ("differences in . . . individual damages" do not "defeat class certification."); *see also* Steinholt Decl. ¶16.

On top of the numerous common questions central to Plaintiffs' *prima facie* theory and remedies, Defendants have asserted affirmative defenses, nearly all of which pose additional common questions. For example: 1) whether Defendants acted with ***due diligence*** with respect to the Offering Materials; 2) whether Defendants acted in ***conformity with SEC regulations***; 3) whether Defendants ***acted in good faith***; 4) whether Defendants ***knew or had reason to know*** of the alleged misstatements; 5) whether the alleged misstatements are protected by the ***safe harbor*** for forward-looking statements; 6) whether the alleged misstatements are protected by the common law ***bespeaks caution*** doctrine; and 7) ***negative causation***, *i.e.*, whether Defendants can prove that declines in Slack's stock price were caused by something other than the alleged misstatements. Ex. 10. Each of these defenses concerns the conduct or circumstances of Defendants, the market, or a hypothetical reasonable investor, not any unique details specific to particular class members; thus, their ultimate merit will turn on common questions of law and fact.  *Constar*, 585 F.3d at 785 ("although [negative] causation

- 13 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

is an affirmative defense in a §11 case, this defense would not defeat predominance"); *Merrill Lynch*, 277 F.R.D. at 119 (similar); *Katz v. China Century Dragon Media, Inc*. (C.D. Cal. 2012) 287 F.R.D. 575, 584  ("due diligence" presents "common questions"). That Defendants' asserted defenses turn on common evidence further underscores the predominance of common questions in this action.

As each issue central to Plaintiffs' theory of liability, as well as most if not all of Defendants' affirmative defenses, is capable of class-wide resolution, common issues predominate.  *See, e.g*., *Brinker*, 53 Cal. 4th at 1022; *Daniels v. Centennial Grp., Inc*. (1993) 16 Cal.App.4th 467, 473 (where claims arise from "single prospectus," "'prepared by the same defendants, and containing the same alleged omissions and misrepresentations,'" defendants' "misconduct is the single, pivotal, and common issue"); *Korn v. Franchard Corp.* (2d Cir. 1972) 456 F.2d 1206, 1210 ("plainly satisfied [where] the alleged misrepresentations in the prospectus relate to all the investors"; "the existence and materiality of such misrepresentations obviously present important common issues").

### b.    The Class Representatives' Claims Are Typical

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375. But "it has never been the law in California that the class representative must have ***identical*** interests with the class members." *Classen v. Weller* (1983) 145 Cal.App.3d 27, 46. "It is only when a defense unique to the class representative will be a major focus of the litigation, or when the class representative's 'interests are antagonistic to or in conflict with the objectives of those [s]he purports to represent' that denial of class certification is appropriate." *Medrazo*, 166 Cal.App.4th at 99.

Here, Plaintiffs' claims are typical of, if not identical to, the claims of all other class members. All acquired Slack common stock in connection with Slack's Direct Public Offering. *See Pirani*, 2021 WL 4258835, at *7 ("Slack's shares offered in its direct listing, whether registered or unregistered, were sold to the public when 'the registration statement . . . became effective,' thereby making any purchaser of Slack's shares in this direct listing a 'person acquiring such security'"). All assert that the Offering Documents and Investor Pitch Statements misrepresented and omitted the same material

- 14 -

facts. All assert the same claims against the same Defendants. All those claims turn upon the same facts and legal theories and will be proven by the same evidence at trial. And no defenses unique to Plaintiffs risk any distraction or conflict of interest detrimental to any absent class members. Even damages can be measured uniformly by statutory formula. *In re IndyMac Mortg.-Backed Sec. Litig.* (S.D.N.Y. 2012) 286 F.R.D. 226, 235 n.69; Steinholt Decl. ¶¶ 8-16.  Thus, typicality is satisfied.

### c.    The Class Representatives and Counsel Adequately Represent the Classes

The adequacy requirement "depends on whether **the plaintiff's attorney** is qualified to conduct the proposed litigation and the **plaintiff's interests** are not antagonistic to the interests of the class."  *McGhee v. Bank of Am.* (1976) 60 Cal. App. 3d 442, 450. "Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  *Wershba v. Apple Comput., Inc.* (2001) 91 Cal.App.4th 224, 226.

Here, Plaintiffs' interests are aligned with those of the Class. Plaintiffs assert the very same claims as all absent class members.  Furthermore, Plaintiffs have demonstrated their willingness and ability to take an active role in, and control of, this litigation to protect the interests of the absent class. As set forth in their Declarations, Plaintiffs (i) understand the requirements and responsibilities of serving as a class representative in this securities class action; (ii) have reviewed the key pleadings in this action; (iii) will continue to supervise and monitor the progress of this litigation; (iv) intend to work with counsel to maximize the recovery to the class; and (v) will continue to work alongside counsel through discovery, trial preparation, and trial.  *See* Exs. 11-14 (Plaintiff declarations);  *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 156 (N.D. Cal. 1991) (class representatives adequate where they "appear familiar with the basic outline of th[e] action . . . It is not necessary that they be intimately familiar with every factual and legal issue in the case.").  Plaintiffs' complete alignment with and demonstration of commitment to represent the absent Classes, coupled with their selection of experienced counsel, more than satisfies the adequacy requirement. *See, e.g., United Food & Com. Workers Union v. Chesapeake Energy Corp.* (W.D. Okla. 2012) 281 F.R.D. 641, 654.

Proposed Class Counsel are well-qualified to conduct this class action. On November 22, 2019, the Court appointed four firms as co-lead counsel: Cotchett, Pitre & McCarthy, LLP, Robbins

- 15 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

Geller, Scott + Scott Attorneys at Law LLP, and Pomerantz LLP. *See* Joint Stipulation and Order Relating and Consolidating Complex Cases And Appointing Lead Counsel; Case Management Order No. 2.  Co-Lead Counsel have agreed and respectfully request that the Court appoint Cotchett, Pitre and McCarthy, LLP and Robbins Geller as Class Counsel. Proposed Class Counsel also enjoy the full support of the executive committee of additional experienced counsel, including, *inter alia*, the firms Hedin Hall LLP, Bottini & Bottini, Inc., Robbins LLP, and Johnson Fistel LLP.

Cotchett, Pitre & McCarthy, LLP and Robbins Geller have served as counsel in many large and significant securities class actions in state and federal courts nationwide.  Both firms have achieved success representing aggrieved shareholders in complex securities class actions.  *See* Joint Decl. ¶¶17-26*;* Exs. 15-16 (firm résumés).  Indeed, proposed Class Counsel have already demonstrated their commitment and expertise in the case over the course of the last two years, by, *inter alia*, successfully opposing Defendants' motion to stay and demurrer, engaging in discovery, and working with experts to prepare this case for dispositive motions and trial.  Joint Decl. ¶16; *In re Facebook, Inc.* (S.D.N.Y. 2015) 312 F.R.D. 332, 345.  Proposed Class Counsel have the experience and resources necessary to vigorously prosecute this action and protect the interests of the Class, have already committed significant resources to this case, and will continue to do so if appointed. *Id.*

### <u>COTCHETT, PITRE & McCARTHY, LLP</u>

Based in San Mateo County with offices in Los Angeles and New York, for over 50 years Cotchett, Pitre & McCarthy, LLP ("CPM") has dedicated its services to prosecuting or defending socially just actions. *See* Joint Decl. ¶¶ 17-19. Repeatedly recognized by the National Law Journal, CPM has earned a national reputation for the breadth of its practices and the diversity of its clients. *Id.* CPM has secured billions of dollars for its clients and classes, and its attorneys have been honored with such prestigious accolades as induction to the American College of Trial Lawyers, named as Top 100 attorneys by "Super Lawyers" and the Daily Journal, and service on government commissions and the boards of numerous non-profit organizations. *Id.*

CPM has served as Lead Counsel in numerous class action and complex cases in federal and state courts. The firm possesses extensive experience in cases based on violations of the Securities Act of 1933, as well as consumer protection and unfair competition statutes, among other practice

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

areas. CPM also has the resources necessary to vigorously prosecute complex actions and protect the interests of the class and, importantly, proven trial experience. CPM has been acknowledged by courts and counsel for trying complex cases efficiently and effectively to courts and juries. *Id*.

CPM has obtained billions of dollars in recoveries for the classes it has represented. For instance, as co-lead counsel, CPM secured a $75 million settlement for a class of investors in Alibaba's initial public offering in *Chicago Laborers Pension Fund, et al. v. Alibaba Group Holding Ltd., et al.*, No. CIV535692 (San Mateo Super. Ct.), and CPM secured a combined $219 million in *In re Medical Capital Securities Litigation* (C.D. Cal.) No. SA CV 09-1048, one of the largest recoveries against indenture trustees in U.S. history and the largest Ponzi recovery in California history. Joint Decl. ¶ 20. In *In re Automotive Parts Antitrust Litigation* (E.D. Mich.) No. 2:12-md-02311, CPM helped recover over $1.2 billion., and in *In re LendingClub Sec. Litig.*, No. CIV537300 (San Mateo Super. Ct.), CPM was co-lead counsel for a certified class of shareholders based on LendingClub's initial public offering, which actions (including the federal case brought by Robbins Geller) settled for a total of $125 million. And recently, CPM secured a non-reversionary minimum class settlement amount of $310 million, with a maximum amount of $500 million, in *In re Apple Inc. Device Performance Litigation* (N.D. Cal.) No. 5:18-md-02827-EJD. *See* Joint Decl. ¶ 20; Ex. 15.

CPM's efforts in this case are being led by Joseph Cotchett, Brian Danitz, Karin Swope, Tyson Redenbarger, and Noorjahan Rahman, as well as the firm's extensive support staff. Joint Decl. ¶ 21. Joseph Cotchett, CPM's founding partner, is considered one of the foremost trial lawyers in the country and has been named one of the most 100 influential lawyers in the nation for the past 15 years. *Id.* Over his 50-plus-year career, Cotchett has tried more than 100 cases to verdict and settled hundreds more. *Id.* In the 1980s, Cotchett won mammoth judgments for investors in white-collar fraud cases and was lead trial lawyer for 23,000 plaintiffs in the *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation* in 1990 involving Charles Keating, attorneys, banks, and accountants. *Id.* The trial resulted in one of the largest jury verdicts in history, $3.3 billion. In recent years, Cotchett has taken on major corporations such as Enron, Worldcom, Global Crossing, Qwest, Lehman Brothers, and Apple, including being lead co-trial counsel in the now landmark $1.1

- 17 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

billion toxic lead paint verdict. *Id.* The accompanying Joint Declaration provides additional attorney information (Joint Decl. ¶¶ 21-23) and a firm biography (Ex. 15).

### ROBBINS GELLER RUDMAN & DOWD LLP

Robbins Geller also possesses the experience and resources necessary to successfully prosecute this large and complex action for the benefit of the class.  Courts throughout the nation have noted Robbins Geller's reputation for excellence, resulting in the appointment of Robbins Geller to lead roles in hundreds of securities class actions and other complex litigations.[4] *See* Joint Decl. ¶ 25. Robbins Geller attorneys have obtained the largest securities fraud class action recovery in the Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits, as well as a 2019 PSLRA class action trial victory in *HsingChing Hsu v. Puma Biotechnology, Inc*. (C.D. Cal.) No. 8:15-cv-00865-AG, and the largest securities class action settlement in the Northern District of California in *In re Twitter Inc. Sec. Litig.*, No. 4:16-cv-05314, for $810 million, on the eve of trial.[5]  Lead counsel for Robbins Geller in this action, James Jaconette, was one of three partners charged with responsibility for the day-to-day litigation in *In re Enron Corp. Sec. Litig*., No. 4:01-cv-03624, from start to finish, in which Robbins Geller achieved the largest securities class action recovery to date.  *See* Joint Decl. ¶ 26. Ex. 16.

---

[4]   *See, e.g., In re Facebook Biometric Info. Privacy Litig*, 2021 WL 757025, at *1 (N.D. Cal. Feb. 26, 2021) ("[b]y any measure, the $650 million settlement in this biometric privacy class action is a landmark result"); *United Food & Commercial Workers Union v. Chesapeake Energy Corp*., 281 F.R.D. 641, 654 (W.D. Okla. 2012) (recognizing Robbins Geller as "highly qualified counsel with extensive experience in securities litigation"); *In re Enron Corp. Sec. Litig*., 586 F. Supp. 2d 732, 789 (S.D. Tex. 2008) (Robbins Geller "are to be commended for their zealousness, their diligence, their perseverance, their creativity, the enormous breadth and depth of their investigations and analysis, and their expertise in all areas of securities law on behalf of the proposed class."); *In re Cardinal Health Inc. Sec. Litig*., 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) ("The quality of representation in this case was superb.  Lead Counsel [Robbins Geller] are nationally recognized leaders in complex securities litigation class actions.")

[5]   *See In re Enron Corp. Sec. Litig*., No. 4:01-cv-03624 (S.D. Tex.) ($7.3 billion recovery is largest securities class action recovery in U.S. history and in the Fifth Circuit); *In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio) ($600 million recovery, largest securities class action recovery in the 6th Circuit); *Lawrence E. Jaffe Pension Fund v. Household Int'l Inc*., No. 1:02-cv-05893 (N.D. Ill.) ($1.575 billion recovery, largest securities class action recovery ever following a trial as well as the largest securities class action recovery in the 7th Circuit); *In re UnitedHealth Group Inc. Sec. Litig*., No. 0:06-cv-01691-JMR-FLN (D. Minn.) ($925 million recovery, largest securities class action recovery in the Eighth Circuit); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig*., No. 1:01-cv-01451-REB-KLM (D. Colo.) ($445 million recovery, largest securities class action recovery in the Tenth Circuit); *In re HealthSouth Corp. Sec. Litig*., No. 2:03-cv-01500-KOB-TMP (N.D. Ala.) ($671 million recovery, largest securities class action recovery in the 11th Circuit).

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

Proposed Class Counsel have decades of experience and have served as lead counsel in scores of class and complex litigation actions, both in California as well as throughout the country. Their experience as class counsel will ensure that this action will be prosecuted efficiently and effectively. The Court should be confident that Proposed Class Counsel law firms will effectively represent and guide the plaintiff class toward a resolution that is in their best interests.

### 3. A Class Action Is Superior to Any Alternative

"Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.'" *Johnson v. GlaxoSmithKline, Inc*. (2008) 166 Cal.App.4th 1497, 1509. "[R]elevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing." *Id*.

A class action here is not only superior to individual actions, but also the only sensible course. The Classes likely consist of thousands of geographically dispersed investors who cannot be practicably joined. *Vasquez*, 4 Cal. 3d at 808. Even were a multiplicity of individual suits possible, it would risk conflicting decisions and inefficient administration – precisely the "evil that [class actions were] designed to prevent." *Califano v. Yamasaki* (1979) 442 U.S. 682, 690; *Sav-On*, 34 Cal.4th at 340. As the statute of repose is not tolled (*see Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.* (2017) _U.S._, 137 S. Ct. 2042, 2051), denial of class certification could ultimately leave thousands of aggrieved investors entirely without recourse. Given the predominance of common issues of fact and law, the size and geographic diversity of the Classes, and the lack of adequate alternatives, class certification is the most just and efficient means to manage and resolve this litigation.

### IV. CONCLUSION

For these reasons, the Court should: (1) certify the Classes; (2) appoint Plaintiffs Laurent Chardonnet, Mohammed Kassem, Brian Knapp, and Andrew R. Norell as Class Representatives; and (3) appoint Cotchett, Pitre & McCarthy, LLP and Robbins Geller and as Class Counsel.

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

Respectfully submitted,

DATED:  October 21, 2021

**COTCHETT, PITRE & McCARTHY, LLP**
JOSEPH W. COTCHETT
BRIAN DANITZ
KARIN B. SWOPE
TYSON REDENBARGER
NOORJAHAN RAHMAN


*/s/ Brian Danitz*
BRIAN DANITZ

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  650/697-6000
650/697-0577 (fax)
jcotchett@cpmlegal.com
bdanitz@cpmlegal.com
kswope@cpmlegal.com
tredenbarger@cpmlegal.com
nrahman@cpmlegal.com

*Co-Lead Counsel for Plaintiffs*

DATED:  October 21, 2021

**ROBBINS GELLER RUDMAN & DOWD LLP**
STEVEN W. PEPICH
JAMES I. JACONETTE
BRIAN E. COCHRAN


*/s/ James I. Jaconette*
JAMES I. JACONETTE

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
stevep@rgrdlaw.com
jamesj@rgrdlaw.com
bcochran@rgrdlaw.com

*Co-Lead Counsel for Plaintiffs*

- 20 -

**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

**POMERANTZ LLP**
JORDAN L. LURIE
ARI Y. BASSER
1100 Glendon Avenue, Suite 1558
Los Angeles, CA  90024
Telephone:  310/432-8492
jllurie@pomlaw.com
abasser@pomlaw.com

JOSHUA B. SILVERMAN
10 South LaSalle Street, Suite 3505
Chicago, IL  60005
Telephone:  312/377-1181
312/377-1184 (fax)
jbsilverman@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN T. JASNOCH
HAL D. CUNNINGHAM
600 West Broadway, Suite 3300
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

THOMAS L. LAUGHLIN, IV
JONATHAN M. ZIMMERMAN
RANDY MOONAN
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
Telephone:  212/223-6444
212/223-6334 (fax)
tlaughlin@scott-scott.com
rmoonan@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
CHASE M. STERN
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonfistel.com
chases@johnsonfistel.com

- 21 -
**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

**BOTTINI & BOTTINI, INC**.
FRANCIS A. BOTTINI, JR.
ALBERT Y. CHANG
YURY A. KOLESNIKOV
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA  92037
Telephone:  858/914-2001
858/914-2002 (fax)
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

**THE SCHALL LAW FIRM**
BRIAN J. SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  310/301-3335
310-388-0192 (fax)
brian@schallfirm.com

**BRONSTEIN GEWIRTZ & GROSSMAN, LLC**
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212-697-6484
212/697-7296 (fax)
peretz@bgandg.com

**HEDIN HALL LLP**
DAVID W. HALL
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone:  415/766-3534
415/402-0058 (fax)
dhall@hedinhall.com

**ROBBINS LLP**
BRIAN J. ROBBINS
STEPHEN J. ODDO
JONATHAN D. BOBAK
5040 Shoreham Place
San Diego, CA 92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsllp.com
soddo@robbinsllp.com
jbobak@robbinsllp.com

*Executive Committee Members*

- 22 -
**MP&A ISO MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

# EXHIBIT C

4

1

IN THE SUPERIOR COURTS OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

---oOo---


NICOLE FARINA,                          C E R T I F I E D   T R A N S C R I P T

            PLAINTIFF,

      VS.                               CASE NO. 19-CIV-05370


SLACK TECHNOLOGIES, INC.,

            DEFENDANTS.

_____/


REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE:  HONORABLE V. RAYMOND SWOPE, JUDGE

DEPARTMENT 23

AUGUST 13, 2021




A P P E A R A N C E S   V I A   Z O O M

FOR THE PLAINTIFF:   BRIAN DANITZ, ESQ.   JAMES JACONETTE, ESQ.
                     KARIN SWOPE, ESQ.    NORA RAHMAN, ESQ.

FOR THE DEFENDANTS:  MICHAEL CELIO, ESQ.  MATTHEW KAHN, ESQ.






REPORTED BY:  GERALDINE VANDEVELD, C.S.R. 8634

**GOVERNMENT CODE SECTION 69954(D) RESTRICTS COPYING THIS TRANSCRIPT**

COULD SAY THAT IT'S NOT REQUIRED AND WE JUST GO FORWARD.

MORE LIKELY THE RULING WOULD BE SOMEWHERE IN BETWEEN.  THE NINTH CIRCUIT WILL EXPLAIN WHAT NEEDS TO BE SHOWN.  AND WHAT DEFENDANTS WILL PROPOSE AND WE PUT THIS IN OUR CASE MANAGEMENT STATEMENT IS THAT WE WOULD LIKE TO JUST AS THE JENSEN CASE DID BIFURCATE THAT ISSUE AND TRY THAT CASE FIRST BECAUSE STANDING, STATUTORY STANDING IS A PREREQUISITE TO EVERY ONE OF THESE CLAIMS IN THE CASE.

WE HEARD FROM MR. JACONETTE AND MR. DANITZ FOR YEARS NOW THAT THEY BELIEVE THEIR CASES PLEADED DIFFERENTLY THAN THE FEDERAL CASE, SO WE WILL HAVE THAT OUT MOST LIKELY AND THAT'S A PROCEEDING WE SHOULD HAVE OUT.  YOU KNOW, FRANKLY ONE OF THE REASONS WE MOVED TO STAY AND WE THOUGHT DISCOVERY SHOULDN'T GO FORWARD EXCEPT ON THIS ISSUE IS IT HAS BEEN VERY EXPENSIVE. AND FRANKLY THERE'S A GOOD CHANCE THAT WE WON'T GET TO ANY OF THESE ISSUES.  WE LIKE OUR CHANCE.  WE LIKE OUR ARGUMENT A GREAT DEAL.

SO THAT'S OUR VIEW OF IT.  WE THINK IT'S INCREDIBLY IMPORTANT WHAT THE NINTH CIRCUIT SAYS AND GOING TO MASSIVELY IMPACT WHAT HAPPENS HERE.  LITERALLY THE SAME SET OF FACTS. BOTH CLASS ACTIONS.  AND BECAUSE THE CALIFORNIA COURT OF APPEAL HAS SAID THAT NINTH CIRCUIT LAW IS CALIFORNIA LAW ON THESE ISSUES.

MR. DANITZ:  YOUR HONOR, IF I MAY RESPOND?

THE COURT:  YES.

MR. DANITZ:  FIRST OF ALL, TO CORRECT MR. CELIO,

166,000 PAGES IS NOT 166,000 DOCUMENTS.  IN FACT, ONLY 35,000 DOCUMENTS HAVE BEEN PRODUCED IN THIS CASE.  AN ISSUE THAT WILL COME UP BEFORE YOUR HONOR IN A MOTION TO COMPEL.  THAT'S A VERY POULTRY NUMBER IN A CASE THIS COMPLEXITY AND SCOPE.  IT INVOLVES TENS AND TENS OF THOUSANDS OF INVESTORS WHO LOST MONEY DUE TO MATERIALLY FALSE AND MISLEADING PERSPECTIVES.

35,000 DOCUMENTS IS QUITE POULTRY.  AND, FRANKLY, WE'VE NOT HEARD ANY REASON FOR THAT SMALL NUMBER OF DOCUMENTS.  AND THERE ARE SIGNIFICANT CATEGORIES THAT HAVE NOT BEEN RESPONDED TO AND IN FACT HAVE BEEN EVADED, BUT WE WILL GET TO THAT ON A MOTION TO COMPEL.  SO JUST PUTTING ASIDE THE 166,000 NUMBER WHICH IS JUST INCORRECT.  AND THE DISCOVERY IN THIS CASE HAS BEEN GOING FORWARD ON THE ISSUE OF TRACING, YOUR HONOR.  AND WE ARE GETTING TRACTION.  WE ARE SEEING THAT OUR ARGUMENTS IN FAVOR OF TRACING ARE SUPPORTED.

NOW, THAT SAID, WE HAVE HAD TO ISSUE MANY DOZENS AND DOZENS OF SUBPOENAS BECAUSE SLACK HAS REFUSED TO PRODUCE THE INFORMATION AND DOCUMENTS THAT THEY HAVE IN THEIR CONTROL.  TO GIVE THAT, SIMPLY GIVE US THAT INFORMATION, WE HAVE HAD TO GO AROUND THE BEND AS FAR AS CANADA.  BROKERS ALL OVER THE UNITED STATES TO DO THIS TRACING EXERCISE.

AND WE HAVE PUT SLACK AND GIBSON DUNN, YOUR HONOR, ON NOTICE THAT IF IN DEPOSITIONS IF WE FIND OUT THAT THEY HAD THIS INFORMATION ALL ALONG, WE WILL ASK YOUR HONOR FOR SANCTIONS AGAINST THEM BECAUSE THIS HAS BEEN EXTRAORDINARILY EXPENSIVE AND IN OUR VIEW UNNECESSARY EXERCISE.

16

STATE OF CALIFORNIA   )

                      )  SS.

COUNTY OF SAN MATEO   )

          I, GERALDINE VANDEVELD, OFFICIAL COURT REPORTER,

COUNTY OF SAN MATEO, STATE OF CALIFORNIA, DO HEREBY CERTIFY:

     THAT THE FOREGOING CONTAINS A TRUE, FULL AND CORRECT

TRANSCRIPT OF THE PROCEEDINGS GIVEN AND HAD IN THE

WITHIN-ENTITLED MATTER THAT WERE REPORTED BY ME AT THE TIME

AND PLACE MENTIONED AND THEREAFTER TRANSCRIBED BY ME OR AT MY

DIRECTION INTO LONGHAND TYPEWRITING AND THAT THE SAME IS A

CORRECT TRANSCRIPT OF THE PROCEEDINGS.

                    DATED:  AUGUST 25, 2021

                    _____
                    GERALDINE VANDEVELD, C.S.R. #8634
                    OFFICIAL COURT REPORTER